AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Southern                    District of                    New York

RACHEL ROTHSTEIN, et al.
con't on Rider attached hereto

V.

UBS AG

### SUMMONS IN A CIVIL ACTION

CASE NUMBER:    08 CV    4414

JUDGE RAKOFF

TO: (Name and address of Defendant)

UBS AG
1285 Avenue of the Americas
19th Floor
New York, New York  10019

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

JAROSLAWICZ & JAROS, LLC
225 Broadway, 24th Floor
New York, New York  10007

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint.  Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON                        MAY 0 9 2008

CLERK                                                DATE

(By) DEPUTY CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------------------- X

RACHEL ROTHSTEIN, FRED ROTHSTEIN,
NORA ROTHSTEIN, JENNY RUBIN, DEBORAH RUBIN,
DANIEL MILLER, ABRAHAM MENDELSON, STUART
ELLIOT HERSH, RENAY E. FRYM, NOAM ROZENMAN,
ELENA ROZENMAN, TZVI ROZENMAN, SHAUL STERN,
individually and as personal representative of the Estate of
Leah Stern, JOSEPH STERN, SHIMSON STERN, YOCHEVED
KUSHNER, JULIA KATZ, ALICE FEINSTEIN, CHARLES
FEINSTEIN, EMILE FEINSTEIN, ALEXANDER FEINSTEIN,
CHAIM KAPLAN, individually and as natural guardian of
plaintiffs Mushka Kaplan, Arye Leib Kaplan, Menachem
Kaplan, Chana Kaplan, Efraim Kaplan, RIVKA KAPLAN,
individually and as natural guardian of plaintiffs Mushka
Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan,
Efraim Kaplan, MUSHKA KAPLAN, minor, ARYE LEIB KAPLAN,
minor, MENACHEM KAPLAN, minor, CHANA KAPLAN,
minor, EFRAIM KAPLAN, minor, AVISHAI REUVANE,
ELISHEVA ARON, CHAYIM KUMER, NECHAMA KUMER,
NETANEL HERSKOVITZ, MARTIN HERSKOVITZ and PEARL
HERSKOVITZ, BENNET AND PAULA FINER, individually
and legal guardians for plaintiff Chana Nachenberg, CHANA
NACHENBERG, DAVID NACHENBERG, SARA NACHEBERG,
minor, BENNETT FINER, PAULA FINER, ZEVE FINER,
SHOSHANA FINER OHANA, MINA DORA GREEN,
HOWARD M. GREEN,

                                       Plaintiffs,

       -against-

UBS AG

                                     Defendant.

----------------------------------------------------------------------------------- X

**RIDER TO
SUMMONS IN
A CIVIL
ACTION**

**CASE NO.** *08 CV4414*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------X

RACHEL ROTHSTEIN, FRED ROTHSTEIN,
NORA ROTHSTEIN, JENNY RUBIN, DEBORAH RUBIN,
DANIEL MILLER, ABRAHAM MENDELSON, STUART
ELLIOT HERSH, RENAY E. FRYM, NOAM ROZENMAN,
ELENA ROZENMAN, TZVI ROZENMAN, SHAUL
STERN, individually and as personal representative of the
Estate of Leah Stern, JOSEPH STERN, SHIMSON STERN,
YOCHEVED KUSHNER, JULIA KATZ, ALICE
FEINSTEIN, CHARLES FEINSTEIN, EMILE FEINSTEIN,
ALEXANDER FEINSTEIN, CHAIM KAPLAN,
individually and as natural guardian of plaintiffs Mushka
Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana
Kaplan, Efraim Kaplan, RIVKA KAPLAN, individually
and as natural guardian of plaintiffs Mushka Kaplan, Arye
Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim
Kaplan, MUSHKA KAPLAN, minor, ARYE LEIB
KAPLAN, minor, MENACHEM KAPLAN, minor,
CHANA KAPLAN, minor, EFRAIM KAPLAN, minor,
AVISHAI REUVANE, ELISHEVA ARON, CHAYIM
KUMER, NECHAMA KUMER, NETANEL HERSKOVITZ,
MARTIN HERSKOVITZ and PEARL HERSKOVITZ,
BENNETT AND PAULA FINER, individually and as legal
guardians for plaintiff Chana Nachenberg, CHANA
NACHENBERG, DAVID NACHENBERG, SARA
NACHENBERG, minor, ZEV FINER, SHOSHANA FINER
OHANA, HOWARD M. GREEN, and MINA DORA
GREEN,

                     Plaintiffs,

       -against-

UBS AG,

                     Defendant.

-----------------------------------------------------------------------------X

Civil Action No. *08 CV 4414*

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiffs, by their attorneys, JAROSLAWICZ & JAROS, LLC complain of the Defendant, UBS AG, and allege for their Complaint as follows:

## INTRODUCTION

1.    This is a civil action for international terrorism, wrongful death, personal injury and related torts pursuant to the Antiterrorism Act, 18 U.S.C. §2333, brought by United States citizens, and by the family members and personal representatives of the estates of United States citizens, who were killed and injured by a series of terrorist attacks caused and facilitated by defendant UBS AG ("UBS").

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this matter and over defendant UBS pursuant to 18 U.S.C. §§ 2333-2334, and 28 U.S.C. §§ 1332 and 1367.

3.    Venue is proper in this Court pursuant to 18 U.S.C. §2334(a).

## THE PARTIES

4.    Plaintiff Rachel Rothstein, an American citizen and a domiciliary of California, suffered severe physical and psychological injuries as the result of a suicide bombing carried out by the Hamas terrorist organization on September 4, 1997 at a pedestrian mall in Jerusalem, Israel ("September 4, 1997 bombing").

5.    Plaintiff Fred Rothstein, an American citizen and a domiciliary of Oregon, is the father of Rachel Rothstein and was harmed by the September 4, 1997 bombing.

6.    Plaintiff Nora Rothstein, an American citizen and a domiciliary of Oregon, is the mother of Rachel Rothstein and was harmed by the September 4, 1997 bombing.

7.     Plaintiff Jenny Rubin, an American citizen, suffered severe psychological injuries as the result and was severely injured by the September 4, 1997 bombing.

8.     Plaintiff Deborah Rubin, an American citizen, is the mother of Jenny Rubin and was harmed by the September 4, 1997 bombing.

9.     Plaintiff Daniel Miller, an American citizen and domiciliary of Florida, suffered severe physical and psychological injuries as the result of the September 4, 1997 bombing.

10.     Plaintiff Abraham Mendelson, an American citizen and domiciliary of California, suffered severe physical and psychological injuries as the result of the September 4, 1997 bombing.

11.     Plaintiff Stuart Elliot Hersh, an American citizen, suffered severe physical and psychological injuries as the result of the September 4, 1997 bombing.

12.     Plaintiff Renay E. Frym, an American citizen, is the wife of Stuart Elliot Hersh and was harmed by the September 4, 1997 bombing.

13.     Plaintiff Noam Rozenman, an American citizen, suffered severe physical and psychological injuries as the result of the September 4, 1997 bombing.

14.     Plaintiff Elena Rozenman, an American citizen, is the mother of Noam Rozenman and was harmed by the September 4, 1997 bombing.

15.     Plaintiff Tzvi Rozenman, an American citizen, is the father of Noam Rozenman and was harmed by the September 4, 1997 bombing.

16.     Plaintiff Shaul Stern, an American citizen and domiciliary of New York, is the son and the personal representative of the Estate of Leah Stern, who was murdered

in a terrorist bombing carried out by the Hamas terrorist organization on July 30, 1997, in a market in Jerusalem, Israel ("July 30, 1997 bombing"). Plaintiff Shaul Stern was harmed by the July 30, 1997 bombing, and brings this action individually and as personal representative of the Estate of Leah Stern.

17.     Plaintiff Joseph Stern, an American citizen and domiciliary of New York, is the son of decedent Leah Stern and was harmed by the July 30, 1997 bombing.

18.     Plaintiff Shimson Stern, an American citizen, is the son of decedent Leah Stern and was harmed by the July 30, 1997 bombing.

19.     Plaintiff Yocheved Kushner, an American citizen and domiciliary of New York, is the daughter of decedent Leah Stern and was harmed by the July 30, 1997 bombing.

20.     Plaintiff Julia Katz an American citizen, suffered severe physical and psychological injuries as the result of a terrorist bombing carried out by the Hamas terrorist organization on December 1, 2001 at a pedestrian mall in Jerusalem, Israel ("December 1, 2001 bombing").

21.     Plaintiff Alice Feinstein, an American citizen and a domiciliary of California, is the mother of Julia Katz and was harmed by the December 1, 2001 bombing.

22.     Plaintiff Charles Feinstein, an American citizen and a domiciliary of California, is the father of Julia Katz and was harmed by the December 1, 2001 bombing.

23.     Plaintiff Emile Feinstein, an American citizen and a domiciliary of California, is the sister of Julia Katz and was harmed by the December 1, 2001 bombing.

4

24.     Plaintiff Alexander Feinstein, an American citizen and a domiciliary of California, is the brother of Julia Katz and was harmed by the December 1, 2001 bombing.

25.     Plaintiff Chaim Kaplan, an American citizen, suffered severe physical and psychological injuries as the result of two terrorist rocket attacks carried out by the Hizbollah terrorist organization on July 13, 2006, in Safed, Israel. Plaintiff Chaim Kaplan brings this action individually and as natural guardian of his minor children plaintiffs Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan.

26.     Plaintiff Rivka Kaplan, an American citizen and the wife of plaintiff Chaim Kaplan, suffered severe physical and psychological injuries as the result of a terrorist rocket attack carried out by the Hizballah terrorist organization on July 13, 2006, in Safed, Israel. Plaintiff Rikva Kaplan brings this action individually and as natural guardian of her minor children plaintiffs Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan.

27.     Plaintiffs Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan, minors, are American citizens and suffered severe physical and psychological injuries as the result of a terrorist rocket attack carried out by the Hizbollah terrorist organization on July 13, 2006, in Safed, Israel.

28.     Plaintiff Avishai Reuvane, an American citizen, suffered severe physical and psychological injuries as the result of a terrorist rocket attack carried out by the Hizbollah terrorist organization on July 13, 2006, in Safed, Israel.

29.    Plaintiff Elisheva Aron, an American citizen and the wife of plaintiff Avishai Reuvane, suffered severe physical and psychological injuries as the result of a terrorist rocket attack carried out by the Hizballah terrorist organization on July 13, 2006, in Safed, Israel.

30.    Plaintiff Chayim Kumer, an American citizen, suffered severe psychological injury as the result of a barrage of terrorist rocket attacks carried out by the Hizbollah terrorist organization between July 13 and July 22, 2006, in Safed, Israel.

31.    Plaintiff Nechama Kumer, an American citizen and the wife of plaintiff Chayim Kumer, was harmed as the result of a barrage of terrorist rocket attacks carried out by the Hizbollah terrorist organization between July 13 and July 22, 2006, in Safed, Israel.

32.    Plaintiff Netanel Herskovitz, an American citizen, suffered severe physical and psychological injuries as the result of a terrorist bombing carried out by the Hamas terrorist organization on March 28, 2001, next to a group of school children waiting at a bus stop near Neve Yamin, Israel ("March 28, 2001 bombing").

33.    Plaintiffs Martin Herskovitz and Pearl Herskovitz, both American citizens, are the parents of plaintiff Netanel Herskovitz and were harmed by the March 28, 2001 bombing.

34.    Plaintiff Chana Nachenberg is an American citizen and presently resides in a coma in Tel Aviv, Israel, at a full care facility.

35.    Plaintiff Chana Nachenberg was severely injured on August 9, 2001 when a Hamas bomber detonated himself in the Sbarro's Pizzeria in Jerusalem while Chana

Nachenberg was seated with her minor daughter, plaintiff Sara Nachenberg, who is also an American citizen and who suffered severe psychological injuries as a result of the attack.

36.    At the time of the attack Chana Nachenberg was seated with her uncle and aunt, plaintiffs Howard M. Green and Mina Dora Green, who are American citizens.

37.    Plaintiffs Howard M. Green suffered severe physical and psychological injuries and Mina Dora Green suffered severe psychological injuries as a result of the Hamas terrorist bombing.

38.    Plaintiffs Bennett and Paula Finer are both American citizens and citizens of the State of Israel. They are the parents and guardians of plaintiff Chana Nachenberg. They presently reside in Israel, and as a result of the attack they have suffered severe psychological injuries.

39.    Plaintiff David Nachenberg is an American citizen and the husband of plaintiff Chana Nachenberg and the father of plaintiff Sara Nachenberg. Plaintiff David Nachenberg was informed that his wife and daughter were at the scene of the terrorist attack shortly after it occurred by Chana Nachenberg's brother.    Plaintiff David Nachenberg has suffered severe psychological injuries as a result of the attack.

40.    Plaintiff Zev Finer is a citizen of the United States and citizen and resident of the State of Israel.  He is the brother of plaintiff Chana Nachenberg.

41.    As a result of the attack, plaintiff Zev Finer has suffered severe psychological injuries.

7

42.     Plaintiff Shoshana Finer Ohana is a citizen of the United States and a citizen and resident of the State of Israel.   She is the sister of plaintiff Chana Nachenberg.

43.     As a result of the attack, plaintiff Shoshana Finer Ohana has suffered severe psychological injuries.

44.     Defendant UBS is a financial institution incorporated and headquartered in Switzerland. UBS' principal place of business is in Switzerland.

45.     UBS maintains numerous offices in the United States, including an office in New York City, and does extensive business in New York and throughout the United States. UBS has approximately $600 billion of its assets and 22,000 employees in the United States.

46.     UBS is regulated by both the United States Federal Reserve and Swiss banking regulators.

## STATEMENT OF FACTS

### Iran's Provision of Cash Dollars to Terrorist Organizations

47.     Since 1984 and until the present time, the Islamic Republic of Iran ("Iran") has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. §2405(j)).

48.     Among the terrorist groups supported and sponsored by Iran between 1996 and the present day are Hamas, Hizbollah and the Palestinian Islamic Jihad

("PIJ"). The Patterns of Global Terrorism Report published by the Department of State in April 1996 found that "Iran remains the premier state sponsor of international terrorism and is deeply involved in the planning and execution of terrorist acts both by its own agents and by surrogate groups ... Iran provides arms, training, and money to Lebanese Hizballah and several Palestinian extremists groups that use terrorism to oppose the Middle East peace process. Tehran, which is against any compromise with or recognition of Israel, continued in 1995 to encourage Hizballah, HAMAS, the PIJ ... and other Palestinian rejectionist groups to form a coordinated front to resist Israel and the peace process through violence and terrorism ... Iran continued to view the United States as its principal foreign adversary, supporting groups such as Hizballah that pose a threat to US citizens. Because of Tehran's and Hizballah's deep antipathy toward the United States, US missions and personal abroad continue to be at risk."

49. Iran provides support to Hamas, Hizbollah and the PIJ for terrorism because it shares the strategic goals that these groups seek to achieve using terrorism, which include intimidating the civilian populations of Israel and the United States, and influencing the policy and conduct of the Israeli and U.S. governments.

50. Between 1996 and the present day, Iran provided Hamas, Hizbollah and the PIJ with hundreds of millions of dollars in support annually, for the specific purpose of facilitating and causing terrorist attacks against innocent civilians.

51. The financial support provided by Iran to Hamas, Hizbollah and the PIJ between 1996 and the present day included tens of millions of dollars in cash annually.

9

Iran provided Hamas, Hizbollah and the PIJ with these cash dollar payments for the specific purpose of facilitating and causing terrorist attacks against innocent civilians.

52.    Hamas, Hizbollah and the PIJ needed the cash dollars which they received from Iran: (a) in order to build and maintain their respective operational infrastructures for the planning and execution of terrorist attacks; (b) in order to purchase and store weapons, explosives and other materiel used by them to carry out terrorist attacks; (c) in order to pay, train, transport and shelter their terrorist operatives; and (d) in order to carry out specific terrorist attacks.

53.    Hamas, Hizbollah and the PIJ specifically needed cash dollars in order to perform the illegal activities described in the previous paragraph because (a) Hamas, Hizbollah and the PIJ were unable to freely use banking services (e.g. wire transfers, checks) to pay for those activities due to counterterrorism sanctions and restrictions imposed by the U.S. government and (b) cash dollars are a universally accepted currency and means of payment.

54.    If Hamas, Hizbollah and the PIJ had not received cash dollars from Iran, their ability to carry out terrorist attacks and to perform the other activities described in ¶ 37 would have been severely crippled and limited.

55.    The cash dollars provided by Iran to Hamas, Hizbollah and the PIJ substantially increased their ability to plan and carry out terrorist attacks, and facilitated the execution of terrorist attacks by them.

**Defendant UBS' Illegal Provision of Cash Dollars to Iran**

56.     Like Hamas, Hizbollah and the PIJ, Iran itself is subject to strict U.S. government sanctions which make it extremely difficult for Iran to obtain the large sums of cash dollars which it gives to Hamas, Hizbollah and the PIJ. Defendant UBS solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash between 1996 and 2004, as detailed below.

57.     In 1996 the Federal Reserve introduced the Extended Custodial Inventory Program ("ECI") to facilitate the international distribution of U.S. banknotes and to protect against sudden spikes in the international demand for U.S. currency. Under this program, private sector commercial banks are designated as ECI facilities and function as overseas cash depots that hold currency on behalf of the Federal Reserve on a custodial basis to distribute and maintain the supply of U.S. currency abroad. When U.S. banknotes are withdrawn from the ECI vault to fill banknote orders for the ECI operator's customers, the ECI operator's account at the United States Federal Reserve is debited accordingly. Similarly, when banknotes are deposited into the ECI vault to augment the Federal Reserve inventory, the operator's account in the United States is credited.

58.     Several international banks were given the privilege of operating an ECI facility on behalf of the Federal Reserve, and ECI facilities were established in Frankfurt, London, Hong Kong, Singapore, and Zurich, Switzerland.

59.     The responsibility of operating the Zurich ECI facility was given to UBS, and UBS was required to sign an ECI Agreement with the Federal Reserve. Under the

11

ECI Agreement UBS was obligated to provide monthly reports of its transactions and to comply with all regulations issued by the Office of Foreign Asset Control ("OFAC") of the U.S. Treasury.

60.    Thereafter, in 1996 UBS began participating in the ECI program on behalf of the U.S. Federal Reserve.

61.    On April 20, 2003 the New York Times reported that as much as $650 million in United States currency had been found by American soldiers behind a false wall in a small building on the grounds of one of Saddam Hussein's palaces. The report indicated that the discovered U.S. currency was brand new, in sequential order, and bore the wrappings of the Federal Reserve, even though Iraq had been subject to U.S. sanctions for more than a decade and was prohibited from obtaining new U.S. currency.

62.    The head of the legal unit of the Federal Reserve Bank of New York, Thomas C. Baxter, read accounts of this news story and helped launch an immediate investigation that included assistance from the New York Fed, the Treasury Department, and the Customs Service.

63.    The investigation indicated that the currency found in Iraq was linked to the ECI program and had most likely come from ECI vaults at the Bank of America, the HSBC Group, the Royal Bank of Scotland (RBS), or UBS.

64.    By the end of May 2003 nearly all ECI banks contacted by federal investigators had identified the countries or parties with whom they had financial transactions. There was, however, one exception—UBS.

12

65.    UBS informed the federal investigators that it did not track the serial numbers of currency it traded and that Swiss bank secrecy laws prevented it from identifying specific trading partners.

66.    Eventually, on June 25, 2003, UBS reluctantly provided federal investigators with a list of countries to which it had shipped dollars. When federal investigators finally obtained this confidential list they discovered that UBS had transferred U.S. currency to Iran.

67.    Federal investigators asked UBS how these Iranian transactions could have occurred despite the provision in Article 9 of the ECI Agreement that required UBS to comply with all OFAC regulations, and why these transactions had not been reported on the monthly dollar transaction reports that were required by Article 8 of the ECI Agreement.

68.    UBS falsely responded that the Iranian transactions were simply an innocent mistake and not an intentional deception.

69.    In July 2003 the Federal Reserve decided to submit questions to UBS and its outside auditor regarding UBS's compliance with OFAC regulations.

70.    While answering these questions UBS's auditor discovered that in addition to the transactions with Iran, UBS had also had transactions with Cuba and that in preparing its monthly dollar transaction reports for the Federal Reserve, UBS had concealed these transactions and failed to report them.

71.    UBS's auditor advised UBS to disclose these newly discovered transactions and any other violations it discovered.

72.    On October 24, 2003 representatives of UBS met with Mr. Baxter and admitted that UBS had engaged in transactions with Iran, Cuba, and Libya.

73.    On October 28, 2003, the New York Federal Reserve terminated UBS's ECI Agreement.

74.    Within one week of the termination UBS also admitted that it had engaged in transactions with Yugoslavia during the time that Yugoslavia was subject to OFAC sanctions.

75.    Following the termination of the ECI Agreement, UBS's senior management began to cooperate with U.S. investigators, and UBS appointed an investigation committee and two outside law firms to conduct an internal investigation that was assisted by UBS's auditors.

76.    On December 3, 2003 UBS provided a report concerning the investigation to the New York Federal Reserve, and on April 16, 2004 UBS provided a final report.

77.    On May 10, 2004 the Federal Reserve in Washington D.C. issued an Order of Assessment of a Civil Money Penalty Issued Upon Consent which found that, in violation of its ECI Agreement:

> UBS engaged in U.S. dollar banknote transactions through the Zurich ECI with counterparties in jurisdictions subject to sanctions by the Office of Foreign Assets Control of the U.S. Department of the Treasury, specifically, Cuba, Libya, Iran, and Yugoslavia…and in violation of law, certain former officers and employees of UBS engaged in intentional acts aimed at concealing those banknote transactions from the Reserve Bank, including, but not limited to,

the falsification of monthly reports submitted by UBS to
the Reserve Bank.

78.    As a consequence of these findings, the Federal Reserve imposed a one
hundred million dollar fine on UBS.

79.    On May 10, 2004 UBS also released a press statement that stated:

> After NY FED enquiries, UBS found that banknotes had
> been traded with Cuba, Iran, Libya and Yugoslavia, in
> breach of the agreement.... [The] investigation further
> revealed that ... former employees involved had
> submitted false reports to the NY FED concealing the
> transactions in question.... 'UBS recognizes that very
> serious mistakes were made.'

80.    On May 20, 2004 the Senate Committee on Banking, Housing, and Urban
Affairs held a hearing on the "Oversight of the Extended Custodial Inventory Program"
and specifically on the disclosure of UBS's transactional relationships with state
sponsors of terrorism.

81.    During the hearing Chairman Richard C. Shelby summarized UBS'
activities:

> [F]rom the time UBS began working with the Fed in
> 1996 until sometime last year, UBS employees were
> conducting business through the ECI program with
> entities from nations restricted by [OFAC] ... UBS used
> the Federal Reserve to conduct billions of dollars worth
> of transactions with entities in Cuba, Iran, Libya, and
> Yugoslavia. Billions to Cuba, Iran, Libya, and
> Yugoslavia. While we will never know the full extent of
> the damage, we do know that our national security and
> economic interests were significantly compromised by
> these despicable acts.

15

82.    In a statement before the Committee General Counsel of the New York Federal Reserve Thomas C. Baxter, Jr. stated:

> The investigation confirmed that UBS engaged in USD banknote transactions, through the ECI, with four OFAC sanctioned countries: Cuba, Libya, Iran, and the former Yugoslavia. UBS consistently engaged in these transactions from the inception of the ECI Program, notwithstanding the fact that the UBS personnel involved clearly understood that the ECI Agreement prohibited such transactions. Moreover, UBS personal took affirmative steps to conceal these transactions from the New York Fed, including, but not limited to, falsifying the monthly U.S. dollar transaction reports that it was contractually obligated to submit. UBS personnel continued their efforts to conceal these transactions even after the investigation was underway. The banknote personnel of UBS also affirmatively misled the EBK [Swiss bank regulators].

83.    In addition, Mr. Baxter stated that UBS had provided "between $4 and $5 billion aggregate" to sanctioned jurisdictions and he concluded that UBS had engaged in "egregious conduct."

84.    On June 2, 2004, the U.S. House of Representatives held a hearing on UBS before the Subcommittee on Oversight and Investigations of the Committee on Financial Services.

85.    At the hearing, Chairwoman Sue W. Kelly from New York described the conduct of UBS as "inexcusable behavior" and she noted:

> While this fine of a $100 million seems very large, it is merely, I believe, a drop in a bucket of a $1 trillion institution … Our safety depends on banks and bank regulators to be on the front lines to prevent terrorists

from using our financial systems to fund their activities.

86.    In a prepared statement attached as an appendix to the hearing report, Chairman Michael G. Oxley explicitly questioned "whether the magnitude of the UBS fine is sufficient in light of the gravity of the risk management failures and deliberate efforts to conceal prohibited activity. The fine seems roughly equivalent to the value of the ECI business. But it barely dents the quarterly earnings at UBS."

87.    In testimony before the Committee, Mr. Baxter also noted the seriousness of giving American currency to state sponsors of terrorism:

> The U.S. dollar is the most desired form of money in the world. In many ways our dollar represents the strength of the American economy. The dollar is so desired around the world because it is a stable, always reliable medium of exchange and store of value.

## UBS' Conduct Was Criminal

88.    On April 24, 1996 the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") (Pub. L. 104-132, 110 Stat. 1214) was signed into law.

89.    Section 321 of the AEDPA (18 U.S.C. § 2332d) amended Chapter 113B of Title 18 to prohibit any United States person from knowingly engaging in financial transactions with the government of a country designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979.

90.    Iran has been designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act since 1984. Defendant UBS, which at all relevant times

maintained numerous offices in the United States, is a "United States person" within the meaning of § 2332d, which includes "any person in the United States." § 2332d(b)(D).

91.    Thus, once §2332d was enacted on April 24, 1996, it became a criminal violation for UBS to knowingly engage in any financial transaction with Iran.

92.    The term "financial transaction" in § 321 of the AEDPA was defined pursuant to 18 U.S.C. § 1956(c)(4) to include "a transaction which in any way or degree affects interstate or foreign commerce," "involving the movement of funds by wire or other means or … involving one or more monetary instruments" or a "transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."

93.    Therefore, each and every one of UBS' numerous and systematic currency transactions with Iran between 1996 - 2004 constituted a criminal violation of § 2332d.

94.    Defendant UBS' massive transfers of cash dollars to Iran also violated the provisions of 18 U.S.C. §§ 2339A and 2339C.

95.    Section 2339A provides in relevant part that "Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out" an act of violence or terrorism, commits a criminal offense. § 2339A

96.    Section 2339C provides in relevant part that "Whoever … by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be

used, in full or in part, in order to carry out" an act of terrorism or other act of violence, has committed a criminal offense. § 2339C.

97.     UBS knew full well that the cash dollars it was providing to a state-sponsor of terrorism such as Iran would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas, Hizbollah and PIJ. Iran was designated as a state sponsor of terrorism precisely because it "is a country which has repeatedly provided support for acts of international terrorism." 49 Fed. Reg. 2836-02 (January 23, 1984).

98.     Additionally, on August 5, 1996, President Clinton signed the Iran and Libya Sanctions Act of 1996 ("ILSA") (Pub.L. 104-172, 110 Stat. 1541) to impede Iran's access to foreign capital. The ILSA placed businesses around the world on notice of the threat posed by state sponsors of terrorism, and imposed sanctions on foreign companies which engaged in transactions with Iran even if those foreign companies had no jurisdictional contacts with the United States.

99.     Upon signing the ILSA, President Clinton declared that "Iran and Libya are two of the most dangerous supporters of terrorism in the world. The Iran and Libya sanctions bill I sign today will help to deny those countries the money they need to finance international terrorism … It shows we are fully prepared to act to restrict the funds to Iran and Libya that fuel terrorist attack … every advanced country is going to have to make up its mind whether it can do business with people by day who turn around and fuel attacks on … innocent civilians by night." *See*

19

http://clinton6.nara.gov/1996/08/1996-08-05-remarks-by-president-at-sanctions-act-signing.html.

100.    Defendant UBS made up its mind (to borrow the President's phrase): it elected to illegally provide Iran with the "fuel" it needed to enable its terrorist allies in Hizbollah, Hamas and the PIJ to carry out further attacks on innocent civilians. Indeed, at a hearing of the House Subcommittee on Oversight and Investigations of the Committee on International Relations, held on March 29, 2006, Congressman Rohrabacher stated:

> What concerns us greatly is the role UBS has played in not only supplying United States dollar bank notes to Iran several years ago as part of the Extended Custody Inventory program, or the ECI program, but also their reasons for doing this …

> According to UBS, over $440 million in United States bank notes was supplied to Iran during the 1990s and beyond that through the ECI program. This was in total contravention to the United States sanctions on Iran …

> **If the United States was trying to restrict Iran's flow of income but UBS was working to supplement it through loans and credit, then it seems to me that the bank, which has a substantial presence here in the United States, was working directly against the interests of our country and, yes, the interests of a safer and more stable world.**

(Emphasis added).

**Plaintiffs Were Harmed in Iranian-Sponsored Terrorist Attacks**

101.    On July 30, 1997, two suicide bombers belonging to and acting on behalf of the Hamas terrorist organization entered the Mahane Yehuda outdoor market in downtown Jerusalem carrying briefcases packed with explosives. The bombers set off their explosives, killing 15 shoppers and wounding another 168. Among the dead was Mrs. Leah Stern, a 69 year-old widow, who was the mother of plaintiffs Shaul Stern, Joseph Stern, Shimson Stern, and Yocheved Kushner.

102.    The bombing which murdered Mrs. Stern was carried out by Hamas with the financial support of Iran. Defendant UBS' provision of cash dollars to Iran enabled Hamas to carry out, and caused and facilitated, that bombing. If not for UBS' provision of cash dollars to Iran, Hamas would have been unable to carry out that bombing.

103.    On September 4, 1997, Hamas carried out a triple suicide bombing on the Ben Yehuda pedestrian mall in downtown Jerusalem. Plaintiffs Rachel Rothstein, Fred Rothstein, Nora Rothstein, Jenny Rubin, Deborah Rubin, Daniel Miller, Abraham Mendelson, Stuart Elliot Hersh, Renay E. Frym, Noam Rozenman, Elena Rozenman and Tzvi Rozenman were harmed by that bombing.

104.    The September 4, 1997 bombing was carried out by Hamas with the financial support of Iran. Defendant UBS' provision of cash dollars to Iran enabled Hamas to carry out, and caused and facilitated, that bombing. If not for UBS' provision of cash dollars to Iran, Hamas would have been unable to carry out that bombing.

105.    On March 28, 2001, Hamas carried out a suicide bombing at a bus stop near Neve Yamin, Israel, where a group of school children were waiting for a bus.

Plaintiffs Netanel Herskovitz, Martin Herskovitz and Pearl Herskovitz were harmed by that bombing.

106.    The March 28, 2001 bombing was carried out by Hamas with the financial support of Iran. Defendant UBS' provision of cash dollars to Iran enabled Hamas to carry out, and caused and facilitated, that bombing. If not for UBS' provision of cash dollars to Iran, Hamas would have been unable to carry out that bombing.

107.    On the evening of December 1, 2001, Hamas carried out another suicide bombing on the Ben Yehuda pedestrian mall in Jerusalem. Plaintiffs Julia Katz, Alice Feinstein, Charles Feinstein, Emile Feinstein and Alexander Feinstein were harmed by that bombing.

108.    The December 1, 2001 bombing was carried out by Hamas with the financial support of Iran. Defendant UBS' provision of cash dollars to Iran enabled Hamas to carry out, and caused and facilitated, that bombing. If not for UBS' provision of cash dollars to Iran, Hamas would have been unable to carry out that bombing.

109.    During July 2006, Hizbollah launched thousands of rockets at civilian targets in northern Israel.

110.    On July 13, 2006, plaintiff Chaim Kaplan was severely injured by two Hizbollah rocket which landed in Safed, Israel. The second rocket struck the Kaplan family's home, and also injured Chaim's wife, plaintiff Rivka Kaplan, as well as the couple's minor children plaintiffs Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan.

111.    Plaintiffs Avishai Reuvane and Elisheva Aron were also injured on July 13, 2006, by a rocket fired by Hizbollah which landed in Safed.

112.    Between July 13 and July 22, 2006 Hizbollah fired scores of rockets at Safed and its environs. As a result of this barrage, which was specifically intended to terrorize Safed's civilian population, plaintiff Chayim Kumer, a resident of Safed, suffered a nervous breakdown and was hospitalized, which in turn caused severe harm to his wife, plaintiff Nechama Kumer.

113.    All of Hizbollah's July 2006 terrorist rocket attacks on Safed were carried out by Hizbollah with the financial support of Iran. Defendant UBS' provision of cash dollars to Iran enabled Hizbollah to carry out, and caused and facilitated, those rocket attacks. If not for UBS' provision of cash dollars to Iran, Hizbollah would have been unable to carry out those rocket attacks.

114.    The August 9, 2001 terrorist bombing at the Sbarro's Pizzeria in Jerusalem was carried out by Hamas with the financial support of Iran. Defendant UBS' provision of cash dollars to Iran enabled Hamas to carry out, and caused and facilitated, that bombing. If not for UBS' provision of cash dollars to Iran, Hamas would have been unable to carry out that bombing.

115.    As a result of this attack, plaintiffs Chana Nachanberg, David Nachenberg, Sara Nachanberg, Bennett Finer, Paula Finer, Zev Finer, Shoshana Finer Ohana, Howard M. Green, and Mina Dora Green were harmed.

FIRST COUNT
ON BEHALF OF ALL PLAINTIFFS
INTERNATIONAL TERRORISM
PURSUANT TO 18 U.S.C. § 2333(a)

116.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

117.    At all relevant times, defendant UBS was aware of the grave danger posed to the United States and its citizens by Iran's sponsorship of international terrorism, including its sponsorship of Hamas, Hezbollah, and PIJ.

118.    At all relevant times, defendant UBS knew that Iran provided extensive material support or resources (as defined in section 2339A of Title 18) to terrorist organizations including, but not limited to, Hamas, Hezbollah and PIJ.

119.    At all relevant times and from at least 1996, UBS knowingly and willingly transferred hundreds of millions of dollars in cash to Iran using currency that had been entrusted to it as part of the ECI Program, in violation of U.S. law and of its contract with the Federal Reserve.

120.    By its course of conduct described herein, defendant UBS aided and abetted acts of international terrorism within the meaning of 18 U.S.C. § 2331 and the murder or attempted murder of United States citizens in violation of 18 U.S.C. § 2332.

121.    By its course of conduct described herein, defendant UBS violated the criminal provisions of 18 U.S.C. §§ 2332d, 2339A and 2339C.

122.    As a direct and proximate result of UBS' conduct, which enabled, facilitated and caused the terrorist attacks described above, plaintiffs suffered severe harm and injuries, including: death; pain and suffering; pecuniary loss and loss of

24

income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

123.    Defendant UBS is therefore liable to the plaintiffs for all their injuries pursuant to 18 U.S.C. § 2333.

124.    Defendant UBS' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

**SECOND COUNT**
**ON BEHALF OF PLAINTIFFS SHAUL STERN, JOSEPH STERN, SHIMSON STERN**
**YOCHEVED KUSHNER AND THE ESTATE OF LEAH STERN**
**WRONGFUL DEATH**

125.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

126.    Defendant's conduct constituted a breach of legal duties under United States and Swiss law.

127.    Defendant's actions were willful, malicious, intentional, wrongful, unlawful, negligent and/or reckless and were the proximate cause of the bombing in which decedent Leah Stern was murdered.

128.    At the time of her death, decedent Leah Stern was 69 years of age, enjoying good health, was industrious and in possession of all her faculties.

129.    The murder of Leah Stern caused decedent, her estate and plaintiffs Shaul Stern, Joseph Stern, Shimson Stern and Yocheved Kushner severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship

and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

130.    Defendant UBS is therefore liable for the full amount of plaintiffs' damages.

131.    Defendant UBS' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

### THIRD COUNT
### ON BEHALF OF THE ESTATE OF LEAH STERN
### SURVIVAL DAMAGES

132.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

133.    The bombing murder of Leah Stern caused by defendant's actions described herein caused Leah Stern severe conscious pain and suffering.

134.    Defendant UBS is therefore liable to the Estate Leah Stern for the full amount of decedent's damages.

135.    Defendant UBS' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

FOURTH COUNT
ON BEHALF OF PLAINTIFFS
RACHEL ROTHSTEIN, DANIEL MILLER, ABRAHAM MENDELSON, STUART
ELLIOT HERSH, NOAM ROZENMAN, JULIA  KATZ, CHAIM KAPLAN, RIVKA
KAPLAN, MUSHKA KAPLAN, ARYE LEIB KAPLAN, MENACHEM KAPLAN,
CHANA KAPLAN, EFRAIM KAPLAN, AVISHAI REUVANE, ELISHEVA ARON,
NETANEL HERSKOVITZ, CHANA NACHENBERG,  AND HOWARD M. GREEN
BATTERY

136.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

137.    The terrorist attacks described above caused plaintiffs Rachel Rothstein, Daniel Miller, Abraham Mendelson, Stuart Elliot Hersh, Noam Rozenman, Julia  Katz, Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, Avishai Reuvane, Elisheva Aron, Netanel Herskovitz, Chana Nachanberg, and Howard M. Green severe physical and psychological injuries, extreme pain and suffering, and severe financial loss, including deprivation of present and future income.

138.    The terrorist attacks described above constituted a battery on the persons of plaintiffs Rachel Rothstein, Daniel Miller, Abraham Mendelson, Stuart Elliot Hersh, Noam Rozenman, Julia  Katz, Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, Avishai Reuvane, Elisheva Aron, Netanel Herskovitz, Chana Nachanberg, and Howard M. Green.

139.    As a result of the severe injuries inflicted on them by the terrorist attacks described above, these plaintiffs required hospitalization and medical treatment, and continue to suffer from permanent injuries.

140.    Defendant UBS' actions were the proximate cause of the terrorist attacks described above and the battery on the persons of the aforementioned plaintiffs and the injuries plaintiffs suffered thereby.

141.    Defendant UBS is therefore liable for the full amount of plaintiffs' damages.

142.    Defendant UBS' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

### FIFTH COUNT
### ON BEHALF OF PLAINTIFFS
RACHEL ROTHSTEIN, JENNY RUBIN DANIEL MILLER, ABRAHAM MENDELSON, STUART ELLIOT HERSH, NOAM ROZENMAN, JULIA KATZ, CHAIM KAPLAN, RIVKA KAPLAN, MUSHKA KAPLAN, ARYE LEIB KAPLAN, MENACHEM KAPLAN, CHANA KAPLAN, EFRAIM KAPLAN, AVISHAI REUVANE, ELISHEVA ARON, CHAYIM KUMER AND NETANEL HERSKOVITZ, CHANA NACHANBERG, SARA NACHANBERG, HOWARD M. GREEN, AND MINA DORA GREEN.
### ASSAULT

143.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

144.    The terrorist attacks described above and the ensuing carnage caused plaintiffs Rachel Rothstein, Jenny Rubin, Daniel Miller, Abraham Mendelson, Stuart Elliot Hersh, Noam Rozenman, Julia Katz, Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, Avishai Reuvane, Elisheva Aron, Chayim Kumer, Netanel Herskovitz, Chana Nachanberg, Sara

Nachanberg, Howard M. Green, and Mina Dora Green fear and apprehension of harm and death, and actual physical harm, and constituted an assault on their persons.

145.    The terrorist attacks described above and assault on their persons, which were direct and proximate results of defendant UBS' actions, caused these plaintiffs extreme mental anguish and actual physical injury and pain and suffering.

146.    Defendant UBS is therefore liable for the full amount of plaintiffs' damages.

147.    Defendant UBS' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## SIXTH COUNT
## ON BEHALF OF ALL PLAINTIFFS
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

148.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

149.    Defendant UBS' conduct was willful, outrageous and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

150.    Defendant's conduct caused the plaintiffs to be terrorized and to suffer egregious emotional distress.

151.    Defendant UBS is therefore liable for the full amount of plaintiffs' damages.

152.   Defendant UBS' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## SEVENTH COUNT
## ON BEHALF OF ALL PLAINTIFFS
## LOSS OF CONSORTIUM/SOLATIUM

153.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

154.   As a result and by reason of the death of Leah Stern, which was caused by the actions of defendant described herein, plaintiffs Shaul Stern, Joseph Stern, Shimson Stern and Yocheved Kushner were deprived of the services, society, consortium and solatium of their mother, and have suffered and will continue to suffer terror, severe mental anguish, bereavement and grief, and injury to their feelings.

155.   As a result and by reason of the physical and psychological injuries caused to plaintiffs Rachel Rothstein, Jenny Rubin, Daniel Miller, Abraham Mendelson, Stuart Elliot Hersh, Noam Rozenman, Julia Katz, Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, Avishai Reuvane, Elisheva Aron, Chayim Kumer, Netanel Herskovitz, Chana Nachanberg, David Nachenberg, Sara Nachanberg, Bennett Finer, Paula Finer, Zev Finer, Shoshana Finer Ohana, Howard M. Green, and Mina Dora Green by the actions of defendant described herein, those plaintiffs were deprived of the services, society, consortium and solatium of their family members.

156.   As a result and by reason of the physical and psychological injuries caused to plaintiffs Rachel Rothstein, Jenny Rubin, Daniel Miller, Abraham Mendelson, Stuart Elliot Hersh, Noam Rozenman, Julia Katz, Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, Avishai Reuvane, Elisheva Aron, Chayim Kumer , Netanel Herskovitz, and Chana Nachanberg, David Nachenberg, Sara Nachanberg, Bennett Finer, Paula Finer, Zev Finer, Shoshana Finer Ohana, Howard M. Green, and Mina Dora Green by the actions of defendant described herein, their family members, who are also plaintiffs herein, were deprived of the services, society, consortium and solatium of the foregoing plaintiffs.

157.   Defendant UBS is therefore liable for the full amount of plaintiffs' damages.

158.   Defendant UBS' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

**EIGHTH COUNT**
**ON BEHALF OF ALL PLAINTIFFS**
**NEGLIGENCE**
**(Under the Law of the State of Israel)**

159.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

160.   Causes of action in tort in Israeli law are codified in the *Civil Wrongs Ordinance (New Version) - 1968*, (hereinafter "CWO"). The CWO provides that any

person injured or harmed by the torts enumerated in the CWO is entitled to relief from the person liable or responsible for the tort.

161.    Section 35 of the Israeli CWO creates a tort of Negligence.

162.    CWO §35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

163.    CWO §36 provides that the obligation stated in CWO §35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

164.    The Israeli courts have construed the tort of Negligence as including intentional and/or reckless conduct.

165.    Defendant UBS committed acts which a reasonable and prudent person would not have committed under the same circumstances, and refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO.

32

166.    Defendant UBS did not, in the performance of its occupations, use the skill or exercise the degree of caution which a reasonable person qualified to act in those occupations would have used or exercised under the same circumstances, within the meaning of the CWO.

167.    Defendant UBS acted negligently in connection with the plaintiffs toward whom, in the circumstances described herein, defendant had an obligation not to act as they did. Defendant was  obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, the plaintiffs were liable to be injured by defendant's acts and omissions described herein.

168.    Defendant UBS' behavior therefore constitutes Negligence under the CWO, and a result of the defendants' negligent behavior plaintiffs suffered the harm and injuries enumerated herein.

169.    Defendant UBS is therefore liable for the full amount of plaintiffs' damages.

170.    Defendant UBS' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## NINTH COUNT
## ON BEHALF OF ALL PLAINTIFFS
## <u>AIDING AND ABETTING</u>
### (Under the Law of the State of Israel)

171.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

172.    Defendant UBS provided Iran with cash dollars which aided, abetted, facilitated and caused the acts of terrorism which harmed the plaintiffs.

173.    Aiding and abetting principles are recognized in Israeli law in §12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

174.    Defendant UBS is therefore liable for the full amount of plaintiffs' damages.

175.    Defendant UBS' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.


## <u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs pray that this Court:

(a)    Enter judgment against the defendant and for the plaintiffs for compensatory damages in an amount to be determined at trial but no less than $500 million, and for punitive damages in an amount to be determined at trial;

34

(b)    Enter judgment against the defendant and for the plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(c)    Enter judgment against the defendant and for the plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(d)    Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated:   New York, New York
         May 9, 2008

Yours,

JAROSLAWICZ & JAROS, LLC
*Attorneys for the Plaintiffs*

By: _____
         Robert J. Tolchin

225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780

NITSANA DARSHAN-LEITNER & CO.
Nitsana Darshan-Leitner, Adv.
*Israeli Counsel for Plaintiffs*
10 Hata'as Street
Ramat Gan, 52512
Israel

35