UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RACHEL ROTHSTEIN, *et al.*,

          Plaintiffs,

        -against-

UBS AG,

          Defendant.

No. 08-cv-4414 (JSR)

Electronically Filed

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Attorneys for Defendant UBS AG

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ................................................................................................ 1

THE COMPLAINT'S ALLEGATIONS ................................................................................... 5

    The Parties ......................................................................................................................... 5

    The Terrorist Attacks and Plaintiffs' Alleged Injuries ..................................................... 6

    The ECI and the UBS Banknote Transactions................................................................... 7

    UBS's Conduct Was Not Criminal .................................................................................... 9

    Iran's Alleged Role in Middle East Terrorism ................................................................. 9

    The Implausible "Connection" Between the U.S. Banknote Transactions and
    Plaintiffs' Injuries ........................................................................................................... 10

    The Complaint's Causes of Action ................................................................................. 13

ARGUMENT ........................................................................................................................... 14

    I.      PLAINTIFFS LACK STANDING BECAUSE THEIR INJURIES
           ARE NOT "FAIRLY TRACEABLE" TO UBS'S CONDUCT .......................... 15

    II.    PLAINTIFFS FAIL TO STATE AN ATA CLAIM ........................................... 16

          A.    Plaintiffs Fail to State a Claim for Section 2333(a) Primary
               Liability....................................................................................................... 17

               1.    Plaintiffs Fail To Allege That UBS Committed An "Act Of
                     International Terrorism" .............................................................. 17

               2.    Plaintiffs Have Not Adequately Pleaded the "By Reason
                     of" Element ................................................................................. 20

                         a.    Cause-in-Fact ...................................................... 21

                         b.    Proximate Cause ................................................. 22

               3.    Plaintiffs Have Not Adequately Pleaded Knowledge And
                     Intent ........................................................................................... 24

          B.    Plaintiffs Fail to State a Claim Based on UBS's Alleged Violations
               of Section 2232d, 2339A and 2339C ....................................................... 24

               1.    UBS Is Not a "United States Person" Under Section 2332d ....... 25

               2.    Plaintiffs Have Not Alleged That UBS Provided Material
                     Support to "Primary Perpetrators of Violent Acts" Under
                       Section 2339A .............................................................................. 26

                3.    There Is No Section 2339C Jurisdiction Over UBS's
                     Alleged Conduct .......................................................................... 26

                4.    UBS Did Not Act "Knowingly" or "Intentionally" Under
                     Sections 2339A and 2339C.......................................................... 28

|     | C.  | Plaintiffs Fail To State An Aiding-and-Abetting Claim | 29 |
| III. |    | THE COURT HAS NO JURISDICTION OVER THE NON-ATA CLAIMS | 30 |
|     | A.  | There Is No Diversity Jurisdiction | 30 |
|     | B.  | The Court Should Decline To Exercise Supplemental Jurisdiction Over The Non-ATA Claims | 31 |
| IV. |    | PLAINTIFFS' NON-ATA CLAIMS ARE EITHER TIME-BARRED OR DEFICIENT UNDER GOVERNING ISRAELI LAW | 31 |
|     | A.  | Most of Plaintiffs' Non-ATA Claims Are Time-Barred | 32 |
|     | B.  | Israeli Law Governs Plaintiffs' Remaining Non-ATA Claims | 32 |
|     | C.  | Plaintiffs' Non-ATA Claims Fail Under Israeli Law | 33 |
| CONCLUSION |    |    | 35 |

# TABLE OF AUTHORITIES

PAGE

## CASES

*Allen v. Wright*, 468 U.S. 737 (1984) ................................................................ 15

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ........................... 27

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..................... 14

*Bell Atlantic Corp v. Twombly*, 127 S. Ct. 1955 (2007) .......................... 14, 20, 21, 24

*Boim v. Holy Land Foundation for Relief and Development*, 511 F.3d 707 (7th Cir. 2007) ("*Boim II*"), *reh'g en banc granted, opinion vacated*, 2008 U.S. App. LEXIS 12925 (7th Cir. June 16, 2008) .................................... 20, 21, 22, 24

*Boim v. Quaranic Literacy Inst.*, 127 F. Supp. 2d 1002 (N.D. Ill. 2001) ................... 20

*Boim v. Quaranic Literacy Inst.*, 291 F.3d 1000 (7th Cir. 2002) ("*Boim I*") ........... passim

*Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704 (2d Cir. 2002) ............................. 32

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ............................ 31

*Caruolo v. John Crane, Inc.*, 226 F.3d 46 (2d Cir. 2000) .................................... 33

*Cresswell v. Sullivan & Cromwell*, 922 F.2d 60 (2d Cir. 1990) ............................. 31

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................................................................................................. 15

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ........................................ 15

*Greenberg v. Bush*, 150 F. Supp. 2d 447 (E.D.N.Y. 2001) ................................... 16

*Humanitarian Law Project v. Gonzales*, 380 F. Supp. 2d 1134 (C.D. Cal. 2005) ......... 29

*In re Terrorist Attack on Sept. 11, 2001*, 2007 WL 2907278 (S.D.N.Y. Oct. 5, 2007) ................................................................................................. 14

*In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ........ 30

*Johnson & Johnson v. Am. Nat'l Red Cross*, 528 F. Supp. 2d 462 (S.D.N.Y. 2008) ........ 8

*Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118 (2d Cir. 2006) ...................... 31

*Kush v. City of Buffalo*, 462 N.Y.S.2d 831 (N.Y. 1983) ...................................... 34

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ........................................................... 28

*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) ........................ 19, 20

*Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826 (1989) .............................. 30

*Padula v. Lilarn Prop. Corp.*, 620 N.Y.S.2d 310 (N.Y. 1994) .............................. 33

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 2007 WL 528703 (S.D.N.Y. Feb. 20, 2007) ......................................... 21

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ............................................. 32

*Schaaf v. Residential Funding Corp.*, 517 F.3d 544 (8th Cir. 2008) ........................ 20

*Sheldon v. PHH Corp.*, 135 F.3d 848 (2d Cir. 1998) ......................................... 33

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) .................................... 15

*Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ............... 19, 20, 30

*Stutts v. The De Dietrich Group*, 2006 WL 1867060 (E.D.N.Y. June 30, 2006) ................ passim

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ........................................... 31

*United States v. Bodmer*, 342 F. Supp. 2d 176 (S.D.N.Y. 2004) ................................... 28

*United States v. Chalmers,* 474 F. Supp. 2d 555 (S.D.N.Y. 2007) ................................. 25

*United States v. Plaza Health Labs., Inc.*, 3 F.3d 643 (2d Cir. 1993) ........................... 27

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) ............................................................................. 15

*Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006) ............. passim

## STATUTES

18 U.S.C. § 2331 ........................................................................................... 3, 18, 19

18 U.S.C. § 2332 ............................................................................................... 4, 30

18 U.S.C. § 2332d ........................................................................................... passim

18 U.S.C. § 2333 ............................................................................................. passim

18 U.S.C. § 2339A ........................................................................................... passim

18 U.S.C. § 2339C ........................................................................................... passim

18 U.S.C. § 2339d ................................................................................................ 25

28 U.S.C. § 1332 ................................................................................................. 30

28 U.S.C. § 1367(a) ............................................................................................. 31

50 U.S.C. Appx. § 2405(j) ...................................................................................... 9

N.Y. CPLR ......................................................................................................... 32

N.Y. ESTATE POWERS & TRUSTS LAW § 5-4.1 ........................................................ 32

U.S. Const. Art. III ............................................................................................... 15

## OTHER AUTHORITIES

148 Cong. Rec. S5569, S5572 (2002) ..................................................................... 27

*Civil Wrongs Ordinance [New Version], 1968* ................................................... 33, 34

FED. R. CIV. P. 44.1 ............................................................................................. 33

FED. R. CIV. P. 8 ................................................................................................. 14

H.R. DOC. NO. 107-139 ........................................................................................ 27

H.R. REP. NO. 107-307 (2001) ............................................................................... 27

International Convention for the Suppression of the Financing of Terrorism, Apr. 10, 2002, S. TREATY DOC. NO. 106-49, 39 I.L.M. 270 ............................................. 27

Israel Gilead, *Israel* (Kluwer Law International 2003) *reprinted in* 2 International Encyclopaedia of Laws, Tort Law (R. Blanpain & S. Stijins eds., Kluwer Law International 2007) ("*Gilead*") ..................................................................... 34

## PRELIMINARY STATEMENT[1]

The Complaint in this action is simply a lawyer's theoretical construct in search of a factual basis. Plaintiffs' counsel has collected forty-five victims and victim families from six Hamas and Hizbollah terrorist attacks in Israel, and seeks to hold UBS liable for the atrocities against them. The Complaint contains no allegation that UBS has ever had any dealings with anyone from Hamas or Hizbollah. Nor does it allege that UBS was aware that these attacks were contemplated or that UBS intended in any way to facilitate terrorism anywhere. Nevertheless, Plaintiffs' counsel claims that UBS is somehow liable under ATA Section 2333(a), which provides a civil remedy—including treble damages and attorneys' fees—for "[a]ny national of the United States injured in his or her person, property or business by reason of an act of international terrorism."

What is Plaintiffs' counsel's theory? They rely on a May 10, 2004 consent order in which UBS admitted that a few UBS employees had breached a 1996 contract between UBS and the Federal Reserve Bank of New York. Under that contract, UBS operated a U.S. banknote depot on the Fed's behalf in Zurich, Switzerland. As UBS admitted in the 2004 consent order, UBS employees breached that contract by engaging in, and failing to report, U.S. banknote transactions with counterparties in Iran from 1996 through 2003 (transactions that UBS discovered through an internal investigation). The result was that the Fed cancelled the UBS contract and levied a $100 million civil penalty based on UBS's reporting failures. But as senior

---

[1] For convenience, this memorandum refers to UBS AG as "UBS" and all plaintiffs collectively as "Plaintiffs." All references to "Section ___" (e.g., Section 2333(a)) are to the corresponding sections of the Antiterrorism Act ("ATA"), 18 U.S.C. §§ 2331, et seq. The Complaint is cited as "Compl." Citations to the "Cantor Decl." are to the accompanying declaration of Daniel L. Cantor, Esq., dated July 2, 2008. Unless otherwise noted, this memorandum omits internal quotation marks in citations and adds any emphasis reflected in quoted passages.

Fed and U.S. Treasury Department Office of Foreign Asset Control ("OFAC") officials testified before Congress, UBS's banknote transactions were not illegal, they were a breach of contract.

Plaintiffs are trying to transform that contract breach into an "act of international terrorism" that injured them. Their hypothesis goes as follows. First, the Iranian government is a recognized terrorism sponsor, and has funded Hamas and Hizbollah. Second, Hamas and Hizbollah needed U.S. cash dollars to carry out terrorism. Third, without cash dollars from Iran, Hamas and Hizbollah would have been unable to carry out terrorism. Fourth, UBS's banknote transactions with Iranian counterparties supplied the Iranian government with the cash dollars it needed to fund terrorism. Fifth, Hamas and Hizbollah used Iran's cash dollars to commit the six terrorist attacks at issue, and they would not have been able to carry out those attacks but for the cash dollars that UBS provided to Iran. Sixth, UBS's banknote transactions therefore constituted an "act of international terrorism," by reason of which Plaintiffs were injured.

Plaintiffs' tortured theory is riddled with logical and factual flaws. The most glaring examples are as follows:

- o   The consent order on which the Complaint is based provides that UBS engaged in banknote transactions with "counterparties" in Iran, *not the Iranian government*. The Complaint pleads no facts supporting Plaintiffs' leap that UBS engaged in U.S. currency transactions with the Iranian government.

- o   The Iranian government had *billions* in dollar-denominated reserves during the relevant period from exporting oil to countries throughout the world. The sums involved in the UBS banknote transactions were only a tiny fraction of the dollars that Iran independently possessed. And given that there were numerous non-U.S. banks with access to U.S. currency whose foreign operations were not bound by OFAC regulations, the Iranian government hardly needed the UBS banknote transactions to fund terrorism or anything else.

- o   Eleven of the plaintiffs here allege in another ATA case that (i) Hamas was funded, *not by Iran*, but by a global network of charities known as the Union of Good; and (ii) Hamas and the Palestinian Islamic Jihad use Arab Bank PLC, a Jordanian bank, to convert Saudi currency into U.S. dollars, which are then routed to Arab Bank's West Bank branches. Thus, numerous plaintiffs have admitted

2

that the terrorist groups who committed these attacks had ample funding without Iran's cash.

In the end, Plaintiffs' counsel completely ignore their obligation to plead facts that raise a right to relief beyond the speculative level. Their claims are based on conjecture, innuendo, and distorting public record facts. This case therefore boils down to a cynical attempt to capitalize on the ATA's treble damages and attorneys' fees provisions to extract a settlement from a deep pocket whose contract breaches are wholly disconnected from the unspeakable terrorist acts that victimized Plaintiffs. This Court has numerous bases to dismiss these claims.

*First*, Plaintiffs do not have Article III standing because their alleged injuries are not "fairly traceable" to the UBS banknote transactions. UBS had no connection to the numerous non-parties who independently planned and carried out the attacks. Because the Complaint does not plausibly allege that the attacks would not have occurred without the U.S. banknote transactions, Plaintiffs do not have standing.

*Second*, Plaintiffs cannot state a claim for Section 2333(a) primary liability because the Complaint fails to allege facts showing that UBS (as opposed to Hamas or Hizbollah) committed an "act of international terrorism." The second prong of the ATA's three-prong "act of international terrorism" definition, Section 2331(1)(B), provides that a defendant's actions must "appear to be intended" to intimidate civilians, influence a government's policy or affect its conduct. The Complaint does not allege facts even suggesting that UBS intended to intimidate or coerce civilians and governments through the banknote transactions. Nor can Plaintiffs establish an "act of international terrorism" based solely on the Complaint's allegations that UBS violated ATA Sections 2332d, 2339A or 2339C because any such violations (which are not adequately pleaded either) would not, in and of themselves, establish the intent required under Section 2331(1)(B).

3

*Third*, Plaintiffs do not allege facts sufficient to show that they were injured "by reason of" UBS's actions, *i.e.*, that UBS's actions were the cause-in-fact and proximate cause of Plaintiffs' injuries. The Complaint's causation allegations are boilerplate, devoid of any plausible facts linking the currency transactions to the attacks that injured Plaintiffs. Because Plaintiffs cannot credibly allege that UBS was Iran's sole source for U.S. banknotes, that Iran actually used the banknotes from the UBS transactions to support Hamas and Hizbollah, and that Iran was Hamas's and Hizbollah's primary source for terrorism financing, they cannot establish either but-for causation or the "substantial factor" element of proximate cause. Plaintiffs also cannot establish that the attacks were "reasonably foreseeable" consequences of the banknote transactions because (a) there is no allegation connecting UBS's Iranian counterparties to the Iranian government's policy of funding anti-Israeli terrorism, and (b) Iran's general designation as an international terrorism sponsor does not render Hamas or Hizbollah attacks in Israel the foreseeable consequence of banknote transactions in Switzerland.

*Fourth*, the Complaint does not adequately allege that UBS knew and intended that its actions would further international terrorism—essential elements of a Section 2333(a) claim. Plaintiffs do not even attempt to allege that UBS intended to further international terrorism in any way. And there is no factual allegation to support the Complaint's conclusory assertion that "UBS knew full well" that Iran would use U.S. banknotes to fund international terrorism, rather than for some other purpose.

*Fifth,* even if a Section 2332d, 2339A or 2339C violation were enough to establish liability under Section 2333(a), the Complaint still would fail to state a claim against UBS under any of these provisions:

> o   UBS is not subject to Section 2332d because, as a Swiss entity, it is not a "United States person";

4

   o  the Complaint's Section 2339A allegations are deficient because there is no allegation that UBS provided material support or resources directly to the "primary perpetrators of violent acts," *i.e.*, Hamas and Hizbollah;

   o  there is no Section 2339C jurisdiction over UBS's alleged conduct here, which occurred entirely outside the United States; and

   o  the Complaint's Section 2339A and 2339C claims also fail because the Complaint does not allege facts showing that UBS intentionally or knowingly helped finance terrorist activities.

*Sixth,* Plaintiffs have not adequately alleged that UBS violated the ATA by aiding and abetting the murder or attempted murder of U.S. citizens, or any other (unspecified) terrorist acts. There is no allegation that UBS intended the banknote transactions to aid a murder, and it is well established that financial dealings like the banknote transactions do not constitute knowing and substantial assistance for violent attacks.

*Seventh,* once the ATA claims are dismissed, this Court has no original jurisdiction over the remaining claims because many of the plaintiffs are U.S. citizens domiciled abroad, who cannot invoke the Court's diversity jurisdiction. And there is no compelling reason for this Court to exercise supplemental jurisdiction over the non-ATA claims.

*Eighth,* even if the Court were to exercise supplemental jurisdiction, the non-ATA claims would still fail because (i) most of Plaintiffs' non-ATA claims are time-barred; and (ii) under Israeli law—which is controlling under New York choice of law principles—the individual Hamas and Hizbollah terrorists, not UBS, were the "decisive cause" of Plaintiffs' injuries.

### THE COMPLAINT'S ALLEGATIONS[2]

**The Parties**

Plaintiffs are forty-five American citizens who were allegedly injured by terrorist attacks in Israel. (Compl. ¶¶ 4-43.) Only twelve plaintiffs are U.S. domiciliaries; another five are Israeli

---

[2]    The Complaint's allegations are assumed to be true solely for purposes of this motion.

domiciliaries. (*Id.* ¶¶ 4-6, 9-10, 16-17, 19, 21-24, 34, 38, 40, 42.) The Complaint does not identify the other plaintiffs' domiciles, but based on the Complaint's allegations, they appear to be Israeli residents. (*See, e.g., id.* ¶¶ 110, 112.)

UBS is an international financial institution headquartered in Basel and Zurich, Switzerland. (*Id.* ¶ 44.) It has more than 80,000 employees worldwide, and offices in more than 50 countries.[3] The Complaint does not allege that any transaction at issue occurred in the United States—rather, the only activity at issue involves banknote transactions originating in Switzerland, the laws of which the Complaint never references.

## The Terrorist Attacks and Plaintiffs' Alleged Injuries

The Complaint identifies six terrorist attacks in Israel that allegedly injured Plaintiffs: (1) a July 30, 1997 Hamas suicide bombing at a Jerusalem market; (2) a September 4, 1997 Hamas suicide bombing at a Jerusalem pedestrian mall; (3) a March 28, 2001 Hamas suicide bombing at a bus stop near the town of Neve Yamin; (4) an August 9, 2001 Hamas suicide bombing at a Jerusalem pizzeria; (5) a December 1, 2001 Hamas suicide bombing at a Jerusalem pedestrian mall; and (6) multiple Hizbollah rocket attacks on the town of Safed between July 13 and July 22, 2006. (*Id.* ¶¶ 101, 103, 105, 107, 112, 114.)

Each plaintiff is an alleged victim of one attack. Plaintiffs Rachel Rothstein, Jenny Rubin, Daniel Miller, Abraham Mendelson, Stuart Elliot Hersh, Noam Rozenman, Netanel Herskovitz, Chana Nachenberg, Julia Katz, Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, Avishai Reuvane, Elisheva Afon, Chayim Kumen and Leah Stern (deceased) claim physical and psychological injuries from the

---

[3]  *See* UBS, *About Us,* http://www.ubs.com/1/e/about.html (last visited July 2, 2008) (Cantor Decl. Exh. 1).

6

attacks. Their relatives are the remaining plaintiffs, who claim psychological injuries resulting from the attacks on their family members. (*See generally id.* ¶¶ 4-43.)

### The ECI and the UBS Banknote Transactions

In 1996, the Fed introduced the Extended Custodial Inventory program ("ECI"). The ECI's primary purpose was to facilitate U.S. banknotes' international distribution and repatriation by setting up overseas cash depots. (Compl. ¶ 57.) Private-sector banks operated these depots and held U.S. banknotes on a custodial basis for the Fed. (*Id.*) One such depot was in Zurich, Switzerland, and in 1996, the Fed contracted with UBS to operate that facility. (*Id.* ¶¶ 59-60.) According to the Complaint, UBS's contract with the Fed (the "ECI Agreement") required it to provide the Fed with monthly reports of all ECI transactions and to comply with all OFAC regulations—which would not otherwise apply to a foreign bank's non-U.S. operations. (*Id.* ¶ 59.)

In June 2003, in response to Fed inquiries, UBS disclosed that several of its ECI-facility employees had engaged in U.S. banknote transactions (*i.e.*, selling and delivering actual banknotes) with counterparties in Iran. (*Id.* ¶ 66.) Although the Complaint repeatedly refers to transactions "with Iran" (*see, e.g., id.* ¶ 70)—which it defines as the "Islamic Republic of Iran" (*id.* ¶ 47)—the Fed actually claimed that UBS had traded with "*counterparties in jurisdictions subject to [OFAC] sanctions ...*." (*Id.* ¶ 77.)

The ECI Agreement's OFAC-compliance provisions prohibited the U.S. banknote transactions with Iranian counterparties, which UBS had failed to disclose on its monthly ECI reports. (*Id.* ¶ 67.) Consequently, on October 28, 2003, the Fed terminated the ECI Agreement. (*Id.* ¶ 73.) Immediately thereafter, UBS launched an internal investigation into its ECI-facility operations, and provided the Fed with confidential investigative reports on December 3, 2003,

7

and April 16, 2004. (*Id.* ¶¶ 75-76.) The reports concluded that UBS's ECI-facility employees

had deliberately concealed the improper currency transactions from the Fed. (*Id.* ¶ 77.) On

May 10, 2004, UBS consented to a $100 million civil money penalty. (*Id.* ¶ 78.) As a senior

Fed official made clear in his Senate testimony, that penalty served as punishment for UBS's

ECI-facility employees' deception; the remedy for the improper currency transactions was

terminating the ECI Agreement.[4]

On the day the civil penalty was announced, UBS issued a press release taking "full

responsibility" and expressing regret for its employees' "very serious mistakes." (*See* Compl.

¶ 79.)[5] UBS also stated that it had fired the responsible employees and disciplined others. (*Id.*)

UBS further announced that it would exit the international banknote trading business. (*Id.*) Less

than two years later, UBS became the first major non-U.S. bank to announce that it would sever

---

[4]  *See Oversight of the Extended Custodial Inventory Program: Hearing on the Recent Events
    Involving the Union Bank of Switzerland-Zurich which Violated its ECI Agreement with the
    Federal Reserve Bank of New York by Engaging in U.S. Dollar Banknote Transactions with
    Countries Subject to Sanctions by the U.S. Department o the Treasury's Office of Foreign
    Assets Control, which Administers and Enforces Economic Sanctions Against Targeted
    Foreign Countries Before the S. Committee on Banking, Housing and Urban Affairs*, 108th
    Cong. at 5-6 (2004) ("May 20, 2004 Senate Hearing") (statement of Thomas C. Baxter, Jr.,
    Executive Vice President and General Counsel, Federal Reserve Bank of New York) (Cantor
    Decl. Exh. 2).  The "hearing testimony is … incorporated into the Complaint by reference
    [(Compl. ¶¶ 80-83)] and constitutes a public record of which the Court can take judicial
    notice.  The Court can therefore consider the entire hearing testimony on this motion."
    *Johnson & Johnson v. Am. Nat'l Red Cross*, 528 F. Supp. 2d 462, 464 n.1 (S.D.N.Y. 2008)
    (Rakoff, J.).

[5]  UBS statement on regulatory actions by the U.S. Federal Reserve and the Swiss Federal
    Banking Commission, May 10, 2004,
    http://www.ubs.com/1/e/media_overview/media_global/search1/search10?newsId=59058
    (last visited July 2, 2008) (Cantor Decl. Exh. 3).

global business ties with the Iranian government, its officials and related entities, Iranian banks, and all other persons or entities located in Iran.[6]

## UBS's Conduct Was Not Criminal

Contrary to the Complaint's naked assertions, UBS's conduct was *not* criminal. The currency transactions did not violate any U.S. law involving OFAC sanctions because, as then-OFAC Director R. Richard Newcombe testified, non-U.S. entities like UBS are not subject to OFAC regulations outside the United States: "we do not have jurisdiction over UBS Zurich— there's no enforcement action that we can take against that bank ... we are not involved in the ECI program. It goes to banks over which we do not have jurisdiction."[7] That is why, as the Fed's Thomas Baxter testified, "the [ECI] contract exported the [OFAC] restrictions . . . from the United States to our ECI facilities . . . ."[8] Nor did the UBS banknote transactions violate Swiss law because, as Mr. Baxter also testified, "in Switzerland there are no prohibitions on transactions by Swiss banks . . . with Iran."[9]

## Iran's Alleged Role in Middle East Terrorism

Since 1984, the United States government has designated Iran a state-sponsor of terrorism under 50 U.S.C. Appx. § 2405(j). (Compl. ¶ 47.) According to the Complaint, Iran supports, among others, the Palestinian terrorist groups Hamas, Hizbollah, and the Palestinian

---

[6]   *See* Hugo Miller and Marc Wolfensberger, *UBS breaks ties with Iran*, INT'L HERALD TRIB., Jan. 23, 2006, *available at* http://www.iht.com/articles/2006/01/22/business/bxubs.php (Cantor Decl. Exh. 4).

[7]   May 20, 2004 Senate Hearing at 10-11 (statement of R. Richard Newcomb, Director, Office of Foreign Assets Control, U.S. Department of the Treasury) (Cantor Decl. Exh. 2).

[8]   May 20, 2004 Senate Hearing at 7 (statement of Thomas C. Baxter, Jr., Executive Vice President and General Counsel, Federal Reserve Bank of New York) (Cantor Decl. Exh. 2).

[9]   *Risk Management and Regulatory Failures at Riggs Bank and UBS: Lessons Learned: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. of Fin. Servs.*, 108th Cong. at 16 (2004) (statement of Thomas Baxter, Jr., General Counsel and Executive Vice President of the Federal Reserve Bank of New York) (Cantor Decl. Exh. 5).

9

Islamic Jihad ("PIJ"), allegedly providing the three groups "with hundreds of millions of dollars in support annually … includ[ing] tens of millions of dollars in cash annually." (*Id.* ¶¶ 48-51.) The Complaint asserts that Hamas, Hizbollah and PIJ used the hard dollars they got from Iran to fund their terrorist operations and that they "specifically needed cash dollars" because they were cut off from ordinary banking tools such as wire transfers and checks. (*Id.* ¶¶ 52-53.) Thus, the Complaint concludes, without Iran's cash dollars, Hamas, Hizbollah and PIJ's terrorist activities "would have been severely crippled and limited." (*Id.* ¶ 54.)

**The Implausible "Connection" Between the**
**U.S. Banknote Transactions and Plaintiffs' Injuries**

Plaintiffs claim that Iran financed each of the attacks identified in the Complaint, and that Hamas and Hizbollah "would have been *unable* to carry out" any of these attacks without the U.S. banknote transactions. (*See id.* ¶¶ 102, 104, 106, 108, 113-14.) But the Complaint offers no facts to support these speculative assertions and, as demonstrated below, they are simply not plausible given certain plaintiffs' terrorism-financing allegations in other cases and the publicly-available information concerning Iran.

As an initial matter, the Complaint's allegations that Iranian-supplied U.S. banknotes are the financial lynchpin of Middle East terrorism (*id.* ¶¶ 51-54) are contradicted by recent allegations in a different lawsuit by David and Sara Nachenberg, Bennett, Paula and Zev Finer and Shoshana Finer Ohana, Howard and Mina Green, and Netanel, Martin and Pearl Herskovitz—all plaintiffs here. In *Strauss, et al. v. Credit Lyonnais, S.A.*, No. CV-06-0702 (CPS) (E.D.N.Y.), those plaintiffs, and others, allege that "[f]unds raised by or on behalf of HAMAS for 'charitable purposes' are used to finance its terrorist attacks," and that "HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, operated by the

Muslim Brotherhood."[10]  And in *Coulter, et al. v. Arab Bank, PLC*, No. CV-05-0365 (NG)
(E.D.N.Y.), those same plaintiffs allege that "[b]oth HAMAS and PIJ raise funds to support their
terrorist acts through charitable front organizations which they control."[11]  They also allege that a
Jordanian bank, Arab Bank PLC, facilitates the transfer of these funds to the West Bank:
"[donations in] Saudi currency, which cannot be conveniently converted into Israeli currency
(most commonly used in Palestinian controlled areas) ... are converted into U.S. dollars through
the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the
West Bank."[12]  These allegations belie the Complaint's conclusory assertion that Palestinian
terrorist activity "would have been severely crippled and limited" without U.S. banknotes from
Iran.  (Compl. ¶ 54.)

     But even accepting the Complaint's "lynchpin" assertion as true, Plaintiffs fail to offer
*any* factual allegations, much less plausible allegations, establishing that the UBS ECI
transactions were Iran's only, or even primary, source of U.S. banknotes from 1996-2003.  As
discussed above, (i) non-U.S. banks are not subject to OFAC's Iran-sanctions regulations outside
the United States, and (ii) Switzerland and other financial centers did not prohibit banks from
doing business with Iran during the relevant period.[13]  Indeed, it was not until 2006 that
international banks and financial institutions—led by UBS—began voluntarily to cease doing

---

[10]  Third Amended Complaint ¶¶ 596-97, *Strauss, et al. v. Credit Lyonnais, S.A.*, No. CV-06-
0702 (CPS) (E.D.N.Y. Jan. 28, 2008) (Cantor Decl. Exh. 6).

[11]  Complaint ¶ 550, *Coulter, et al. v. Arab Bank, PLC*, No. CV-05-0365 (NG) (E.D.N.Y. Jan.
21, 2005) (Cantor Decl. Exh. 7).

[12]  *Id.* ¶ 546.

[13]  *See* May 20, 2004 Senate Hearing at 5-6, 10-11 (Cantor Decl. Exh. 2).

business with the Iranian government, its officials and related entities, Iranian banks, and all other person or entities located in Iran.[14]

And industrial countries around the world have had good reason to do U.S. dollar business with Iran. As is common knowledge, Iran has long been a leading oil exporter and is a founding OPEC member.[15] As is also common knowledge, most of Iran's oil sales (like those of other oil exporters) were until recently paid for with U.S. dollars.[16] From 1996-2003, Iran averaged more than $23.5 billion in annual oil exports.[17] This enabled Iran to amass huge dollar -denominated reserves. For example, in 2007, Iran itself estimated that even after reducing dollar-denominated reserves to just 20% of its total foreign currency reserves, it still had $10-20 billion in U.S. currency.[18] Thus, with the assistance of non-U.S. banks free to do business with Iran, oil money provided Iran with more than ample cash to fund the "tens of millions of dollars in cash annually" that Iran is alleged to have given Hamas, Hizbollah and PIJ. (Compl. ¶ 51.)

Iran also had numerous potential uses for its cash dollars other than supporting terrorism in Israel. For example, (a) during 1996-2002, there were multiple railway construction projects

---

[14]   *See* Robin Wright, *Iran Feels Pinch As Major Banks Curtail Business*, WASH. POST., March 26, 2007, at A10, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/03/25/AR2007032501084.html (Cantor Decl. Exh. 8).

[15]   *See* OPEC FAQs, http://www.opec.org/library/FAQs/aboutOPEC/q2.htm (last visited July 2, 2008) (Cantor Decl. Exh. 9) (identifying Iran as a founding OPEC member).

[16]   *See* Carl Mortished, *Iran turns from dollar to euro in oil sales*, TIMES (London), Dec. 22, 2006, *available at* http://business.timesonline.co.uk/tol/business/economics/article 1263954.ece (Cantor Decl. Exh. 10) (noting that "Iran is selling more of its oil for payment in euros than dollars as it seeks to shift its foreign currency reserves away from the" dollar).

[17]   OPEC Annual Statistical Bulletin 2004 at 12, *available at* http://www.opec.org/library/ Annual%20Statistical%20Bulletin/asb2004.htm (relevant pages annexed as Cantor Decl. Exh. 11).

[18]   *See* Stephanie Phang and Soraya Permatasari, *Iran is Cutting Dollar Reserves, Central Bank Says*, Bloomberg, March 27, 2007, http://www.bloomberg.com/apps/ news?pid=20601083&sid=aPHQQ_BayCRg&refer=currency (Cantor Decl. Exh. 12) (quoting Iran Central Bank Governor Ebrahim Sheibany)

12

started or completed in Iran, including the Tehran subway; (b) since 1997, Iran has been funding a project to build additional dams on the Karun River that generate hydroelectric power; and (c) since the 1990s, Iran has spent billions of dollars developing the massive South Pars oil and natural gas field in the Persian Gulf.[19]  As Plaintiffs acknowledge, "cash dollars are a universally accepted currency and means of payment."  (*Id.* ¶ 53.)

The Complaint does not allege that UBS intended the banknote transactions to aid international terrorism.  To the contrary, UBS's 2004 internal investigation found that UBS's ECI employees were motivated by the belief that they were creating "operational efficiencies"— *i.e.*, saving UBS money—by not creating the duplicate structures necessary to run the ECI business separately from UBS's *other* banknote operations, which were not contractually bound by OFAC regulations.[20]

**The Complaint's Causes of Action**

The Complaint contains nine counts, all of which are based on the supposed causal connection between UBS's U.S. banknote transactions in Switzerland and the attacks that injured Plaintiffs.  The First Count invokes the ATA's civil remedies provision, Section 2333(a). Plaintiffs contend that by "knowingly and willfully" engaging in the U.S. banknote transactions, UBS (a) allegedly violated ATA Sections 2332d, 2339A and 2339C, and (b) aided and abetted

---

[19]  *See* http://www.msedv.at/rai/archive.html#22 (collecting articles on Iran railway construction 1996-2002) (last visited July 2, 2008) (Cantor Decl. Exh. 13); http://www.hatchenergy.com/company/expertise/PDs/p09300.pdf (last visited July 2, 2008) (discussing Karun Dam project) (Cantor Decl. Exh. 14); *See* http://www.offshore-technology.com/projects/southpars/ (discussing construction projects involving South Pars field) (last visited July 2, 2008) (Cantor Decl. Exh. 15).

[20]  *Offshore Banking, Corruption, and the War on Terrorism: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on International Relations*, 109th Cong. at 46, 51 (2006) (statement of Michael Herde, Managing Director, Region Americas Head of Compliance, UBS Investment Bank) (Cantor Decl. Exh. 16).

murder, attempted murder and other "terrorist acts." In the Second and Third Counts, decedent

Leah Stern's estate and children assert wrongful death and survival damages claims based on the

July 30, 1997 attack that killed Ms. Stern. The Fourth and Fifth Counts assert claims for assault

and battery on behalf of some, but not all, plaintiffs. In the Sixth and Seventh Counts, Plaintiffs

assert claims for negligent infliction of emotional distress and loss of consortium. The Eighth

and Ninth Counts invoke Israeli law, asserting negligence and aiding-and-abetting claims.

## ARGUMENT

The Supreme Court recently clarified the federal pleading standard under FED. R. CIV. P.

8. *Bell Atlantic Corp v. Twombly*, 127 S. Ct. 1955 (2007). The *Twombly* pleading standard

applies regardless of the subject matter of the claims at issue. *See ATSI Commc'ns, Inc. v. Shaar

Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007). Under that standard, a complaint's "[f]actual

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 127

S. Ct. at 1965 (internal citation omitted). The complaint must contain "more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

Plaintiffs must plead sufficient facts to "nudge[] their claims across the line from conceivable to

plausible." *Id.* at 1974. *See also In re Terrorist Attack on Sept. 11, 2001*, 2007 WL 2907278

(S.D.N.Y. Oct. 5, 2007) (dismissing ATA claim against defendant bank where plaintiff failed to

allege facts sufficient to "make [her] claim plausible").

The Complaint here falls short of satisfying this standard. Plaintiffs' allegations rarely

advance beyond "a formulaic recitation of the elements of a cause of action." *Twombly*, 127 S.

Ct. at 1965. Even then, they offer nothing more than speculative conclusions, particularly as to

the critical elements of causation, intent, and knowledge.

14

## I.    PLAINTIFFS LACK STANDING BECAUSE THEIR INJURIES ARE NOT "FAIRLY TRACEABLE" TO UBS'S CONDUCT

Plaintiffs do not have standing to sue UBS based on its U.S. banknote transactions with counterparties in Iran. The Constitution limits a federal court's power to resolving "cases" and "controversies." U.S. Const. Art. III, § 2; *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). The doctrine of "standing" is one of the "most important" components of the "case or controversy" requirement. *Allen v. Wright*, 468 U.S. 737, 750 (1984). Standing is a jurisdictional prerequisite; the Complaint must allege facts establishing Plaintiffs' standing. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

To establish standing, Plaintiffs must allege that "(1) [they] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) *the injury is fairly traceable to the challenged action of the defendant*; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Allen*, 468 U.S. at 751 ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). The "fairly traceable" requirement tests whether "the line of causation between [defendant's allegedly] illegal conduct and [plaintiff's] injury [is] too attenuated." *Allen*, 468 U.S. at 752. There is no standing where it is "purely speculative" that the injury can be fairly traced to "the challenged action of the defendant," as opposed to "the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

Plaintiffs cannot establish standing here because their alleged injuries are unconstitutionally attenuated from the UBS banknote transactions. There are an untold number

15

of non-parties without whose "independent action" Plaintiffs would not have been injured—
starting with the individual Hamas and Hizbollah members who allegedly planned and carried
out the attacks. *See Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001) (dismissing
for lack of standing a claim that American foreign policy resulted in terrorist attacks in Israel
because "[i]t would be difficult to imagine a clearer example of a third party's actions breaking
the causal chain. The gunshots and other violence complained of are fairly traceable to neither
Defendants' foreign policy decisions nor actions taken in accordance with those decisions."). As
discussed above (*see supra* pp. 10-13), there can be no legitimate dispute that Iran and the
terrorist groups had the means to finance and carry out the attacks without any UBS
involvement. The Complaint's implausible conclusory assertions that Hamas and Hizbollah
"would have been unable to carry out" the attacks without the UBS banknote transactions (*e.g.*,
Compl. ¶ 102) are insufficient. Rather, "Plaintiffs must satisfy the burden of alleging *facts* from
which it could be reasonably inferred that absent Defendants' unlawful acts, there is a substantial
probability that Plaintiffs would not have been [attacked] by a third party." *Greenberg*, 150 F.
Supp. 2d at 455. Because their injuries cannot be "fairly traced" to UBS's actions, Plaintiffs'
lack Article III standing and their claims must be dismissed.

## II.    PLAINTIFFS FAIL TO STATE AN ATA CLAIM

The Complaint's First Count claims that UBS is liable under ATA Section 2333(a) for
having violated Sections 2332d, 2339A and 2339C. (Compl. ¶ 121.) Plaintiffs further claim that
UBS is liable under Section 2333(a) for having "aided and abetted acts of international terrorism
within the meaning of 18 U.S.C. § 2331 and the murder or attempted murder of United States
citizens in violation of 18 U.S.C. § 2332." (*Id.* ¶ 121.) Plaintiffs' ATA claim has numerous fatal
flaws and should be dismissed.

16

## A.    Plaintiffs Fail to State a Claim for Section 2333(a) Primary Liability

Plaintiffs cannot state a claim for Section 2333(a) primary liability because they have not adequately alleged (1) that UBS committed an "act of international terrorism," (2) that their injuries occurred "by reason of" UBS's conduct, and (3) that UBS acted with the requisite knowledge and intent.  Any one of these pleading deficiencies requires the Complaint's dismissal.

### 1.    Plaintiffs Fail To Allege That UBS Committed An "Act Of International Terrorism"

Plaintiffs' claims should be dismissed because they fail to allege that UBS committed "an act of international terrorism."  Although Section 2333(a) "defines the class of plaintiffs who may sue, it does not limit the class of defendants, and [the court] must therefore look to tort law and the legislative history to determine who may be held liable for injuries covered by the statute."  *Boim v. Quaranic Literacy Inst.*, 291 F.3d 1000, 1010 (7th Cir. 2002) ("*Boim I*").  The Seventh Circuit in *Boim I* concluded that Section 2333(a)'s legislative history, "in combination with the language of the statute itself, evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law."  *Id.*  Consistent with "general common law tort principles," Section 2333(a) primary liability requires proof that the defendant breached a duty, which the statute defines as committing an "act of international terrorism."  *See id.* ("the statute itself contains all of the elements of a traditional tort:  breach of a duty (*i.e.*, committing an act of international terrorism). . . .").  To the extent that Plaintiffs' First Count seeks to establish Section 2333(a) primary liability (Compl. ¶ 121), the Complaint must adequately allege that UBS committed an "act of international terrorism."

17

The ATA defines "international terrorism" in Section 2331(1) as having three

components:

> "activities that--
>
> (A) involve violent acts or acts dangerous to human life that are a
>     violation of the criminal laws of the United States or of any
>     State, or that would be a criminal violation if committed
>     within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended--
>
>> (i) to intimidate or coerce a civilian population;
>> (ii) to influence the policy of a government by intimidation
>> or coercion; or
>> (iii) to affect the conduct of a government by mass
>> destruction, assassination, or kidnapping; *and*
>
> (C) occur primarily outside the territorial jurisdiction of the
>     United States, or transcend national boundaries in terms of
>     the means by which they are accomplished, the persons they
>     appear intended to intimidate or coerce, or the locale in
>     which their perpetrators operate or seek asylum."

*See* 18 U.S.C. § 2331(1). The Complaint does not satisfy Section 2331(1)'s second prong,

Section 2331(1)(B), because it does not allege facts even suggesting that UBS's transactions with

Iran "appear to be intended" to intimidate civilians, influence a government's policy or affect its

conduct. Thus, the Complaint fails to state a claim against UBS under Section 2333(a). *See*

*Stutts v. The De Dietrich Group*, 2006 WL 1867060, at *2 (E.D.N.Y. June 30, 2006) (dismissing

Section 2333(a) claim against foreign banks where no allegations "their actions [were] designed

to coerce civilians or government entities as *required* under § 2331").

Plaintiffs attempt to meet the "act of international terrorism" requirement by alleging

simply that UBS violated ATA Sections 2332d, 2339A and 2339C. But even if true, that would

arguably only satisfy prong (A) of Section 2331(1)'s three-part "international terrorism"

definition.[21]  No court has ever held that such a violation, in and of itself, would satisfy prong (B).

And it clearly would not.  Section 2331(1)(B) plays a vital role in determining the scope of civil liability under Section 2333(a).  It requires the essence of terrorist intent:  proof that a defendant's activities "appear to be intended" to intimidate civilians or influence governments.  It thus stands in sharp contrast to Sections 2332d, 2339A and 2339C, which, by their terms, do *not* require terrorist intent where the defendant knows that (i) it has engaged in financial transactions with a state-sponsor of terrorism's government (Section 2332d), (ii) its "material support" will be used in preparation for, or carrying out, a violent terrorist act (Section 2339A), or (iii) the funds it has provided or collected will be used to carry out a terrorist act (Section 2339C).  *See, e.g., Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 630 (E.D.N.Y. 2006) (noting that a Section 2339C violation requires *either* knowledge or intent, not both).  Permitting a plaintiff to establish an "act of international terrorism" based solely on a Section 2332d, 2339A or 2339C violation would effectively delete Section 2331(1)(B)'s intimidation or influence requirement from the ATA.

For the same reason, decisions holding that violations of Sections 2339A or 2339C constitute "acts of international terrorism" under Section 2331 do not apply.  *See Boim I*, 291 F.3d at 1015 (Section 2339A); *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *1-2 (E.D.N.Y. Oct. 5, 2006) (Section 2339C); *Weiss*, 453 F. Supp. 2d at 613 (Section 2339C); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 581 (E.D.N.Y. 2005) (Sections 2339A and 2339C).  Those cases never considered whether a Section 2339A or 2339C violation would satisfy prong (B) of Section 2331's "international terrorism" definition.  In *Boim I*, the Seventh Circuit had no

---

[21]  Although this motion addresses only Section 2331(1)(B), UBS does not concede that a violation of Sections 2332d, 2339A or 2339C would necessarily satisfy Section 2331(1)(A).

19

occasion to address whether a Section 2339A violation would also satisfy Section 2331(B)

because defendants had *conceded* in the district court that "the activities alleged in the complaint

meet prongs (B) and (C) of the definition of 'international terrorism' under § 2331." *See Boim v.*

*Quaranic Literacy Inst.*, 127 F. Supp. 2d 1002, 1012 n.7 (N.D. Ill. 2001). Likewise, in *Linde*,

defendant did not "challenge the sufficiency of plaintiffs' allegations with respect to the apparent

purpose and location of these acts, as required by Section 2331(1)(B) and (C)." 384 F. Supp. 2d

at 581. And in *Strauss* and *Weiss*, which the same judge decided just days apart, the court

simply cited *Boim I* without discussion. *Strauss*, 2006 WL 2862704, at \*1; *Weiss*, 453 F. Supp.

2d at 613.

Therefore, because the Complaint does not allege facts showing that UBS's actions

"appear to be intended" to intimidate civilians, influence a government's policy or affect its

conduct, it fails to state a claim against UBS under Section 2333(a).

### 2.    Plaintiffs Have Not Adequately Pleaded the "By Reason of" Element

Section 2333(a)'s "by reason of" language requires Plaintiffs to show that UBS's actions

were both the cause-in-fact and the proximate cause of Plaintiffs' injuries. *See Strauss*, 2006

WL 2862704, at \*17-18; *Weiss*, 453 F. Supp. 2d at 631; *see also Boim v. Holy Land Foundation*

*for Relief and Development*, 511 F.3d 707, 739-40 (7th Cir. 2007) ("*Boim II*") (holding that

"Congress when it enacted section 2333 intended to embrace traditional tort principles," and

discussing cause-in-fact and proximate cause elements), *reh'g en banc granted, opinion vacated,*

2008 U.S. App. LEXIS 12925 (7th Cir. June 16, 2008). In a post-*Twombly* pleading, Plaintiffs

cannot rely on conclusory causation assertions. *See Schaaf v. Residential Funding Corp.*, 517

F.3d 544, 549-53 (8th Cir. 2008) (citing *Twombly* and dismissing common law and state

securities fraud claims because plaintiff failed to allege facts establishing "a causal connection

between [defendant's] material misrepresentations and [plaintiff's] loss."); *Pension Comm. of the*

*Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 2007 WL 528703, at *7

(S.D.N.Y. Feb. 20, 2007) (dismissing common law tort claims because "conclusory [proximate

cause] assertions" failed to establish that defendant's actions were "substantial factor in the

sequence of responsible causation"). Here, Plaintiffs do not plead facts sufficient to establish

either cause-in-fact or proximate cause.

**a.    Cause-in-Fact**

As discussed above, Section 2333(a) codifies "general common law tort principles" and

"contains all the elements of a traditional tort [including] causation ...." *Boim I*, 291 F.3d at

1010. Under general common law tort principles, cause-in-fact requires proof that Plaintiffs'

injuries would not have occurred absent UBS's alleged conduct. *Boim II*, 511 F.3d at 739-40

(citing RESTATEMENT (THIRD) OF TORTS § 26). Even though Plaintiffs need not establish a direct

link between UBS's actions and the specific attacks that injured them, *id.* at 741, they still must

allege facts establishing that the UBS banknote transactions caused terrorist activity that included

the attacks here. *Id.*

The Complaint is devoid of non-conclusory allegations establishing cause-in-fact. The

Complaint is based on two disconnected series of alleged events—(i) UBS engaging in U.S.

banknote transactions "with Iran" and (ii) groups like Hamas and Hizbollah using U.S.

banknotes from Iran to carry out terrorist attacks—without any factual allegations linking those

events. Instead, Plaintiffs offer only the conclusory assertion (repeated for each attack) that "[i]f

not for UBS' provision of cash dollars to Iran, [Hamas/Hizbollah] would have been unable to

carry out that [attack]." (Compl. ¶¶ 102, 104, 106, 108, 113-14.) But this "formulaic recitation"

of but-for causation is insufficient to state a claim against UBS. *Twombly*, 127 S. Ct. at 1965.

And as discussed above, Plaintiffs cannot credibly allege that: (i) the UBS banknote transactions

were Iran's sole or even primary source for U.S. banknotes, (ii) Iran actually used the banknotes

21

that UBS provided to fund Hamas and Hizbollah, and (iii) Iran was Hamas and Hizbollah's primary source for terrorism financing. Accordingly, Plaintiffs' causation allegations do not rise "above the speculative level." *Id.*

### b.    Proximate Cause

Under the ATA, a "showing of proximate cause requires plaintiffs to show that defendant's actions were '*a substantial factor* in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Weiss*, 453 F. Supp. 2d at 631 (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)). Plaintiffs' claims fail because they have not adequately pleaded either proximate cause element.

The Complaint's repeated assertions that "UBS' provision of cash dollars to Iran enabled [Hamas/Hizbollah] to carry out, and caused and facilitated that [attack]" (Compl. ¶¶ 102, 104, 106, 108, 113-14) are simply boilerplate, totally lacking factual content. They therefore do not adequately plead that the UBS banknote transactions were a substantial factor in causing the attacks. And as discussed above, several plaintiffs have contradicted that conclusory allegation: they allege elsewhere that Hamas got most of its terrorism financing through donations to Islamic charities—not from Iran. Moreover, Iran indisputably had access to billions in U.S. banknotes independent of the UBS transactions: (i) Iran's oil sales generated billions of dollars in revenue every year, and (ii) there were numerous non-U.S. banks who could convert that revenue into U.S. banknotes. Therefore, it is speculative at best—and implausible—to claim that the UBS banknote transactions were a substantial factor in bringing about the attacks.

The Complaint also fails to plead facts sufficient to establish proximate cause's foreseeability element, which "serves to limit rather than expand the set of tortfeasors who may be liable for the plaintiff's injury." *Boim II*, 511 F.3d at 740. Plaintiffs' speculation that UBS "knew full well" that U.S. banknotes "would be used to cause and facilitate terrorist attacks by

Iranian-sponsored terrorist organizations such as Hamas, Hizbollah and PIJ" is based solely on the U.S. government's designation of Iran as a state sponsor of terrorism. (Compl. ¶ 97.) But as discussed above, that allegation unjustifiably assumes that UBS was providing U.S. banknotes directly to the Iranian government, as opposed to "counterparties" in Iran. (*Id.* ¶ 77.) The Complaint does not allege whether, and if so how, U.S. currency was transferred from UBS's counterparties to the Iranian government, much less why UBS should have foreseen any such transfers.

But even if UBS knew that it was trading U.S. banknotes with a "state-sponsor of terrorism," that U.S. government designation alone does not establish a causal connection between UBS's conduct and Plaintiffs' injuries. *See Stutts*, 2006 WL 1867060, at *3-4. *Stutts* involved ATA claims by individuals exposed to toxic agents when Iraq's chemical weapons stockpile was destroyed following the 1991 Gulf War. Among the defendants were banks that had issued letters of credit facilitating Iraq's purchase of materials allegedly needed to manufacture such weapons. *Id.* at *1. The plaintiffs claimed that "widespread publicity" about Iraq's use of chemical weapons against its Kurdish citizens put the banks on notice that their services "were likely to be used in an unlawful and dangerous manner." *Id.* at *4. The court dismissed the ATA claim, holding that "general publicity [about Iraq's chemical weapons use] does not provide a causal link between the Bank Defendants' conduct and plaintiffs' injuries" and that plaintiffs had failed "to demonstrate that it was reasonably foreseeable" that issuing letters of credit would result in Iraq manufacturing chemical weapons. *Id.*

Iran's state-sponsor of terrorism designation is an even more attenuated link between the UBS's conduct and the Hamas and Hizbollah attacks. Unlike the banks in *Stutts*, there is no claim that UBS financed Iran, *i.e.*, provided a rogue nation with funds it did not otherwise have.

Rather, Plaintiffs simply allege that UBS converted the Iranian counterparties' existing funds into U.S. banknotes.

### 3.    Plaintiffs Have Not Adequately Pleaded Knowledge And Intent

A Section 2333(a) claim also requires a plaintiff to plead and prove that the defendant knew and intended that its actions would further international terrorism. *See Boim I*, 291 F.3d at 1015 ("such acts would give rise to civil liability under section 2333 *so long as knowledge and intent are also shown*"); *Stutts*, 2006 WL 1867060, at *2 (dismissing claims against foreign banks where "plaintiffs fail to sufficiently allege facts showing *the Banking Defendant's knowledge and intent*"); *see also Boim II*, 511 F.3d at 738 (defendant's conduct "would constitute an act of international terrorism for purposes of civil liability under section 2333, *so long as the defendant's knowledge and intent were also shown*").[22]  Plaintiffs' claims should be dismissed because, as discussed above (*see supra* pp. 18, 22-23), (a) the Complaint does not allege *any* facts even suggesting that UBS intended to further international terrorism in any way, and (b) there is no factual support for the Complaint's conclusion that "UBS knew full well" that trading currency with Iranian counterparties would promote terrorism in Israel.  Under *Twombly*, that will not do.  127 S. Ct. at 1965.

### B.    Plaintiffs Fail to State a Claim Based on UBS's Alleged Violations of Section 2232d, 2339A and 2339C

Even if a violation of Section 2332d, 2339A or 2339C were sufficient to state a Section 2333(a) claim, Plaintiffs' ATA claim would still fail because the Complaint does not adequately

---

[22]    On June 16, 2008, the Seventh Circuit granted appellees' motion for rehearing *en banc* and vacated *Boim II*.  The court asked the parties to address the following issue on rehearing: "Whether a donor to an organization that, the donor knows, practices terrorism, can be liable under 18 U.S.C. § 2333(a) in the absence of proof that the donor intended to advance the violent component of the recipient's activities."  2008 U.S. App. LEXIS 12925, at *2 (7th Cir. June 16, 2008).

allege that UBS violated any of these sections. First, UBS could not have violated Section 2332d because it is not a "United States person." Second, the Complaint does not adequately allege a Section 2339A violation because there is no allegation that UBS provided material support or resources directly to the "primary perpetrators of violent acts." Third, there is no Section 2339C jurisdiction over UBS's alleged conduct here, which occurred entirely outside the United States. Fourth, the Complaint lacks facts showing that UBS knew it was helping, or intended to help, finance terrorist activities, a requirement under Section 2339A and 2339C.

### 1.    UBS Is Not a "United States Person" Under Section 2332d

Section 2332d prohibits a "United States person" from engaging in a financial transaction with the government of a country that supports international terrorism. 18 U.S.C. § 2339d(a). Section 2332d(b)(2) defines "United States person" as any "(A) United States citizen or national; (B) permanent resident alien; (C) juridical person organized under the laws of the United States; or (D) any person found in the United States." The only decision interpreting Section 2332d(b)(2), *United States v. Chalmers,* 474 F. Supp. 2d 555 (S.D.N.Y. 2007), held that a foreign corporation is not a "United States person" under Section 2332d, even when it is controlled by a U.S. citizen and the alleged wrongdoing occurs in the U.S. *Id.* at 565-66. Because UBS is a Swiss corporation (Compl. ¶ 44), it is not a "United States person" and cannot violate Section 2332d. Moreover, the *Chalmers* court noted that Section 2332d(b)(2) is essentially identical to the OFAC regulations' "United States person" definition (31 C.F.R. § 575.321). *Id.* at 565. But as discussed above, OFAC's then-Director testified in 2004 that OFAC regulations do not apply to non-U.S. entities like UBS outside the United States. (*See supra* p. 9.) Accordingly, Plaintiffs' attempt to use Section 2332d fails.

25

### 2. Plaintiffs Have Not Alleged That UBS Provided Material Support to "Primary Perpetrators of Violent Acts" Under Section 2339A

Section 2339A prohibits providing "material support or resources" with the knowledge or intent that they will be used to plan or carry out certain specified violent acts. 18 U.S.C. § 2339A(a). As the Seventh Circuit has recognized, Section 2339A only "appl[ies] to those persons who provide material support to the *primary perpetrators* of violent acts of terrorism." *Boim I*, 291 F.3d at 1014. The Complaint alleges that Hamas or Hizbollah agents carried out all the attacks that injured Plaintiffs. (Compl. ¶¶ 101-114.) Although the Complaint alleges that Iran provided "financial support" for those attacks (*see, e.g., id.* ¶ 102), there are absolutely no allegations that Iran itself planned or executed any attack. Nor are there any allegations that UBS provided "material support or resources" directly to Hamas or Hizbollah, the primary perpetrators. Accordingly, the Complaint fails to allege that UBS violated Section 2339A.

### 3. There Is No Section 2339C Jurisdiction Over UBS's Alleged Conduct

Section 2339C prohibits collecting or providing funds with the intent or knowledge that the funds will be used to carry out a terrorist act. 18 U.S.C. § 2339C(a)(1). Congress expressly limited the extraterritorial application of Section 2339C to specific, narrowly defined factual circumstances. *See* Section 2339C(b). The only one of those circumstances that even *possibly* applies here is where "the offense takes place outside the United States and ... a perpetrator is found in the United States." 18 U.S.C. § 2339C(b)(2)(B).[23] But Plaintiffs cannot rely on that

---

[23] The other jurisdictional bases that the statute lists do not apply because the offense did not take place in the United States, 18 U.S.C. § 2339C(b)(1); UBS is not a U.S. national or a stateless person residing in the United States, 18 U.S.C. § 2339C(b)(2)(A); the offense was not directed toward U.S. government property, person or property in the United States, or U.S. nationals or their property, 18 U.S.C. § 2339C(b)(2)(C); nor was the offense committed aboard a U.S. flagged vessel or a U.S. aircraft, 18 U.S.C. § 2339C(b)(2)(3), (4); nor was the offense intended to influence U.S. policy, 18 U.S.C. § 2339C(b)(5).

provision because both context and legislative history establish that only natural persons, not corporations like UBS, may be "found" in the United States.

Subsection (b)(2)(B) was enacted to fulfill the United States' obligation—under Section 10 of the International Convention for the Suppression of the Financing of Terrorism, Apr. 10, 2002, S. TREATY DOC. NO. 106-49, 39 I.L.M. 270 (the "Convention")—to prosecute those individuals whom the U.S. government decides not extradite. It covers perpetrators of offenses abroad who are later found within the United States, and implements a crucial Convention element that requires all State Parties either to extradite or prosecute perpetrators of enumerated offenses (Article 10) who are found within a State Party's territory. H.R. DOC. NO. 107-139, at 22. *See also* H.R. REP. NO. 107-307, at 12 (2001); *see also* 148 Cong. Rec. S5569, S5572 (2002). This shows that Subsection (b)(2)(B) was meant to address the treatment of those persons potentially subject to extradition, *i.e.*, natural persons.

The statute's structure supports this construction. Section 2339C(f) adds a civil penalty that expressly applies only to entities "*located within* the United States or *organized under the laws* of the United States." Such descriptive language would be unnecessary if subsection (b)(2)(B)'s "found in the United States" applied to corporations—Congress could have simply provided civil penalties for corporate violations. Any interpretation of one part of a statute that renders other parts redundant or surplusage is disfavored. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) ("[W]e construe statutes, where possible, so as to avoid rendering superfluous any parts thereof.").

The "rule of lenity" cements this construction. That rule requires that the Court resolve any ambiguity in a criminal statute like Section 2339C in the defendant's favor. *See United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 649 (2d Cir. 1993). It applies even where, as here,

the criminal statute is used in a civil context. *See Leocal v. Ashcroft*, 543 U.S. 1, 12 n.8 (2004) ("Because we must interpret the statue consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies."). And courts also apply the rule of lenity in construing ambiguous jurisdictional provisions. *See, e.g., United States v. Bodmer*, 342 F. Supp. 2d 176, 180-81, 189 (S.D.N.Y. 2004) (applying rule of lenity to jurisdictional provision in Foreign Corrupt Practices Act). Because the phrase "found in the United States" is, at best, ambiguous as to whether it applies to entities, the rule of lenity requires that it be interpreted not to apply to UBS.

### 4.    UBS Did Not Act "Knowingly" or "Intentionally" Under Sections 2339A and 2339C

Both Sections 2339A and 2339C require that the defendant must act with the knowledge or intent that the funds or other material support it provides will be used to carry out a violent terrorist act. Plaintiffs have failed to plead either of these elements.

As described above, there is no allegation that UBS intended to aid terrorist acts. As for knowledge, the Complaint only alleges facts showing that UBS was generally aware that Iran supports international terrorism. That is insufficient under Sections 2339A and 2339C because both provisions require knowledge that the funds or other material support provided are to be used to carry out specific terrorist acts. *See* Section 2339A(a) (defendant must know or intend that its "material support" will be used to commit one of over 30 different offenses); Section 2339C(a)(1) (defendant must know or intend that the funds it provides or collects will be used to violate one of nine international treaties). The specific knowledge required by those sections stands in contrast to Section 2339B, which requires only that a defendant know that the entity to which it provides material support is a designated terrorist organization or engages in terrorism or terrorist activity. *See* Section 2339B(a)(1); *see also Humanitarian Law Project v. Gonzales*,

380 F. Supp. 2d 1134, 1146 (C.D. Cal. 2005) ("As § 2339A was limited to donors intending to further the commission of specific federal offenses, Congress passed § 2339B to encompass donors who acted without the intent to further federal crimes."). The Complaint does not allege facts showing that UBS knew that the banknote transactions would fund any terrorist attack (as opposed to peaceful construction projects) much less any of the specific attacks here.

## C.    Plaintiffs Fail To State An Aiding-and-Abetting Claim

To assert a Section 2333(a) aiding-and-abetting claim, Plaintiffs must allege that UBS "knew of [a terrorist's] illegal activities, that [it] desired to help those activities succeed, and [it] engaged in some act of helping the illegal activities." *Boim I*, 291 F.3d at 1023; *Weiss*, 453 F. Supp. 2d at 621-22 (plaintiffs must allege defendant provided "substantial assistance" to terrorist group "with knowledge and with the intent to have the venture go forward and succeed"); *Stutts*, 2006 WL 1867060, at *6 (plaintiffs "failed to sufficiently allege that the Bank Defendants knew about Iraq's illegal use of chemical weapons or intended to facilitate that activity."). Plaintiffs posit two types of illegal activities that UBS allegedly aided and abetted: (a) "murder or attempted murder of United States citizens" and (b) "acts of international terrorism." (Compl. ¶ 120.) But the Complaint alleges no facts supporting these conclusory allegations, and thus, the aiding-and-abetting claims should be dismissed.

The Complaint does not even suggest that UBS intended the U.S. banknote transactions to aid the murder of U.S. citizens or terrorist acts generally. The inability to allege that UBS "desired to help those activities succeed" is fatal to Plaintiffs' aiding-and-abetting claims. *Stutts*, 2006 WL 1867060, at *6 (dismissing aiding-and-abetting claim where plaintiffs "allege no facts to suggest that the Bank Defendants intended to further Saddam Hussein's activities.").

Plaintiffs' aiding-and-abetting murder or attempted murder claim also fails because the Complaint does not allege sufficient facts to establish that UBS provided knowing and

substantial assistance for any of the attacks. Mere financial dealings, such as the banknote

transactions here, are insufficient to establish substantial assistance for murder. *See Weiss*, 453

F. Supp. 2d at 621-22 (bank's "mere maintenance of accounts and processing of transfers" is not

substantial assistance); *Strauss*, 2006 WL 2862704, at \*9 (same); *Stutts*, 2006 WL 1867060, at

\*6 (banks' letters of credit for Iraq not knowing and substantial assistance for chemical weapons

program); *see also In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 833 (S.D.N.Y.

2005) (no aiding-and-abetting liability for bank based on "injuries funded by money passing

through it on routine banking business").

The Complaint does not specify what additional "acts of international terrorism" beyond

the identified attacks—which would all be violations of Section 2332—UBS supposedly aided

and abetted. That alone is grounds for dismissal. To the extent Plaintiffs intend to claim that

UBS aided and abetted Iran's own purported violation of Section 2339A (*see* Compl. ¶ 118), as

discussed above (*see supra* at pp. 22-24, 28-29), Plaintiffs have failed to allege that UBS knew

that the banknote transactions would assist Iran's pro-terrorist activities or that such assistance

was substantial. Thus, the aiding-and-abetting claim fails.

## III.    THE COURT HAS NO JURISDICTION OVER THE NON-ATA CLAIMS

### A.    There Is No Diversity Jurisdiction

Once the Court dismisses the ATA claims, the only potential basis for invoking the

Court's original jurisdiction would be diversity of citizenship, 28 U.S.C. § 1332. But it is clear

from the Complaint that there is no basis for diversity jurisdiction. Many Plaintiffs are United

States citizens domiciled abroad (*see supra* pp. 5-6), who cannot invoke this Court's diversity

jurisdiction. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989) ("In order to

be a citizen of a State within the meaning of the diversity statute, a natural person must both be a

citizen of the United States *and* be domiciled within the State."). Consequently, diversity

jurisdiction is defeated as to all plaintiffs. *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 69

(2d Cir. 1990) ("three plaintiffs are United States citizens who permanently reside abroad....

[S]ince not all of the plaintiffs are entitled to sue in federal court based on the diversity statute,

plaintiffs may not maintain this suit on the basis of diversity.").

## B.     The Court Should Decline To Exercise Supplemental Jurisdiction Over The Non-ATA Claims

Federal district courts have supplemental jurisdiction over state-law claims "that are so

related to claims in the action within such original jurisdiction that they form part of the same

case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

But as the Supreme Court stated in discussing Section 1367's predecessor judicial doctrine,

pendent jurisdiction, this is traditionally "a doctrine of discretion, not of plaintiff's right." *United

Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Thus, a district court "may decline to

exercise supplemental jurisdiction" under Section 1367(c) if it "has dismissed all claims over

which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). And the Supreme Court has declared

"that in the usual case in which all federal-law claims are eliminated before trial, the balance of

factors to be considered under the [supplemental] jurisdiction doctrine -- judicial economy,

convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the

remaining [non-federal] claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7

(1988); *accord Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).

Because there is no reason to conclude that this is anything other than the "usual case," the Court

should decline to exercise supplemental jurisdiction over the non-ATA claims.

## IV.     PLAINTIFFS' NON-ATA CLAIMS ARE EITHER TIME-BARRED OR DEFICIENT UNDER GOVERNING ISRAELI LAW

Even if the Court were to exercise supplemental jurisdiction over Plaintiffs' non-ATA

claims, those claims should still be dismissed because (a) all the adult plaintiffs' 1997- and 2001-

attack-based claims, as well as the 2006-attack-based assault and battery claims, are time-barred, and (b) the remaining claims fail to state a claim under governing Israeli law.

### A.   Most of Plaintiffs' Non-ATA Claims Are Time-Barred

In determining what law applies to non-federal claims, a federal court exercising supplemental jurisdiction under 28 U.S.C. § 1367 must apply the forum state's choice of law rules. *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989). That includes any "borrowing statute" for determining statutes of limitations. *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002). Under New York's borrowing statute, N.Y. CPLR § 202, a cause of action accruing out of state must be commenced within the limitations periods of both New York and the place where the cause of action accrued. *Id*. Plaintiffs' non-ATA claims would be subject to New York's one-, two- or three-year statutes of limitations. *See* N.Y. CPLR § 214(5) (three-year statute of limitations for personal injury claims); *Id*. § 215(3) (one-year statute of limitations for assault, battery claims); N.Y. ESTATE POWERS & TRUSTS LAW § 5-4.1 (two-year statute of limitations for wrongful death). Accordingly, the adult plaintiffs' 1997- and 2001-attack-based claims, as well as the 2006-attack-based assault and battery claims are time-barred.[24] The only timely non-ATA claims are the minor plaintiffs' Fourth and Fifth Count claims and any Sixth through Ninth Count claims arising out of the 2006 attacks.

### B.   Israeli Law Governs Plaintiffs' Remaining Non-ATA Claims

Under New York's choice of law principles, Israeli law would apply to the remaining claims that are not time-barred. *Rogers*, 875 F.2d at 1002 (a federal court exercising supplemental jurisdiction must apply the forum state's choice of law rules). Those rules require a court first to determine whether the rule of law in question regulates conduct or allocates loss.

---

[24]   The statutes of limitations for the minors' claims were tolled. *See* N.Y. CPLR § 208.

32

*Sheldon v. PHH Corp.*, 135 F.3d 848, 853 (2d Cir. 1998). Conduct-regulating rules "involve the appropriate standards of conduct," *i.e.*, whether one's actions are tortious. *Padula v. Lilarn Prop. Corp.*, 620 N.Y.S.2d 310, 311 (N.Y. 1994). For conduct-regulating rules, "the law of the place of the tort governs." *Sheldon*, 135 F.3d at 853. The torts asserted in Plaintiffs' Fourth, Fifth, Sixth, Eighth and Ninth Counts all involve conduct-regulating rules and, thus, are governed by the law of Israel, where the attacks occurred.

Loss-allocating rules "are those which prohibit, assign or limit liability after the tort occurs." *Padula*, 620 N.Y.S.2d at 312. Plaintiffs' Seventh Count, loss of consortium, involves a loss-allocating rule. *See Sheldon*, 135 F.3d at 853. The choice of law analysis for loss-allocating rules requires applying one of New York's three *Neumeier* rules, which "take into account the domicile of the parties, the conduct at issue, and the purposes of the substantive law." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 57 (2d Cir. 2000) (citing *Neumeier v. Kuehner*, 335 N.Y.S.2d 64, 70 (1972)). The second *Neumeier* rule provides that where, as here, the parties reside in different states and the incident occurs in one of those states (*i.e.*, Israel), that state's law applies. *Id.* Israeli law, therefore, applies to the Seventh Count.

## C. Plaintiffs' Non-ATA Claims Fail Under Israeli Law

As Plaintiffs acknowledge, tort causes of action under Israeli law are codified in the *Civil Wrongs Ordinance [New Version], 1968* ("CWO"). (*See* Compl. ¶ 160.)[25] Leaving aside whether the Complaint adequately pleads any UBS "civil wrong," Plaintiffs cannot recover from UBS unless it were "deemed to have caused damage by [its] fault." CWO § 64. But Section

---

[25] A published English translation of the CWO and other Israeli statutes is annexed as Cantor Decl., Exh. 17. "In determining foreign law, the court may consider any relevant material or source, ... whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P. 44.1.

64(2) provides that UBS "shall not be so deemed" to have caused Plaintiffs' damage if "another person's fault was the *decisive cause* of the damage." *Id.*

Section 64(2) embodies the superseding cause doctrine familiar to legal systems like those of the United States and England. *See, e.g., Kush v. City of Buffalo,* 462 N.Y.S.2d 831, 835 (N.Y. 1983) ("An intervening act will be deemed a superseding cause and will serve to relieve defendant of liability when the act is of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant.").[26]  Under Israeli law, the intervening act "becomes 'decisive' when it is not reasonably foreseeable."[27]  As demonstrated above (*see supra* pp. 22-24), Plaintiffs do not plausibly allege that it was reasonably foreseeable to UBS that its banknote transactions with counterparties in Iran would result in the attacks in Israel that injured Plaintiffs. Therefore, the Fourth through Eighth Counts fail to state a claim under Israeli law.

The same holds true for Plaintiffs' aiding-and-abetting claim (Ninth Count).  Israeli law permits recovery against one who "participates, assists, advises or entices in an act or omission committed or to be committed by another person . . . ." CWO § 12. But to be liable, the defendant has to know that he is helping the eventual tortfeasor—even if he does not know that a tort will be committed. *See Gilead* at 171. The tortfeasors here were Hamas and Hizbollah members, but there is no plausible allegation that UBS knew that the banknote transactions would aid Hamas or Hizbollah attacks in any way. Thus, the Complaint fails to plead an aiding and abetting claim under Israeli law.

---

[26]  Thus, even if New York law applied, UBS would not be liable to Plaintiffs for Hamas and Hizbollah's independent unforseeable acts. *Id.*

[27]  Israel Gilead, *Israel* at 247 (Kluwer Law International 2003) *reprinted in* 2 International Encyclopaedia of Laws, Tort Law (R. Blanpain & S. Stijins eds., Kluwer Law International 2007) ("*Gilead*").  Cited portions of *Gilead* are annexed as Cantor Decl., Exh. 18.

## CONCLUSION

The Complaint here is more theory than pleading. Plaintiffs' counsel fails to connect UBS's banknote transactions with six horrific Hamas and Hizbollah terrorist attacks. Indeed, the nexus between UBS's conduct and Plaintiffs' injuries is so illusory that Plaintiffs lack Article III standing to sue UBS for those injuries. But even if Plaintiffs had standing, their claims would still fail for numerous pleading deficiencies. Plaintiffs' ATA claim not only fails to allege the requisite causal connection between the banknote transactions and their injuries, it lacks plausible allegations that UBS intended to support Hamas and Hizbollah's atrocities, or that UBS had any idea what its banknote transaction counterparties would do with the U.S. currency. Absent a viable ATA claim, and with no basis for diversity jurisdiction, the Court should decline to exercise supplemental jurisdiction over the non-ATA claims. But even if the Court decides to exercise supplemental jurisdiction, it should still dismiss those non-ATA claims as (i) time-barred; and (ii) deficient under governing Israeli law because Hamas and Hizbollah—not UBS— are the decisive causes of Plaintiffs' injuries.

UBS respectfully requests that the Court dismiss the Complaint with prejudice.

Dated: New York, New York
July 2, 2008

O'MELVENY & MYERS LLP

By _____
Jonathan Rosenberg
Daniel L. Cantor

Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000
jrosenberg@omm.com
dcantor@omm.com

Attorneys for Defendant UBS AG