UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RACHEL ROTHSTEIN, *et al.*, | No. 08-civ-4414 (JSR) |
| Plaintiffs, | Electronically Filed |
| -against- | **DECLARATION OF DANIEL L. CANTOR, ESQ.** |
| UBS AG, | |
| Defendant. | |

**DANIEL L. CANTOR, ESQ.**, under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.     I am an attorney admitted to practice before the courts of the State of New York and the Southern District of New York, and a member of the firm of O'Melveny & Myers LLP, counsel for defendant UBS AG ("UBS") in the above-captioned action. I submit this declaration in support of UBS's Motion to Dismiss the Complaint.

2.     Attached to this Declaration as **Exhibit 1** is a true and correct copy of UBS, *About Us*, http://www.ubs.com/1/e/about.html (last visited July 2, 2008).

3.     Attached to this Declaration as **Exhibit 2** is a true and correct copy of *Oversight of the Extended Custodial Inventory Program: Hearing on the Recent Events Involving the Union Bank of Switzerland-Zurich which Violated its ECI Agreement with the Federal Reserve Bank of New York by Engaging in U.S. Dollar Banknote Transactions with Countries Subject to Sanctions by the U.S. Department o the Treasury's Office of Foreign Assets Control, which Administers and Enforces Economic Sanctions Against Targeted Foreign Countries Before the S. Committee on Banking, Housing and Urban Affairs*, 108th Cong. (2004).

4.      Attached to this Declaration as **Exhibit 3** is a true and correct copy of UBS statement on regulatory actions by the U.S. Federal Reserve and the Swiss Federal Banking Commission, May 10, 2004, http://www.ubs.com/1/e/media_overview/media_global/search1/search10?newsId=59058 (last visited July 2, 2008).

5.      Attached to this Declaration as **Exhibit 4** is a true and correct copy of Hugo Miller and Marc Wolfensberger, *UBS breaks ties with Iran*, INT'L HERALD TRIB., Jan. 23, 2006, *available at* http://www.iht.com/articles/2006/01/22/business/bxubs.php.

6.      Attached to this Declaration as **Exhibit 5** is a true and correct copy of the testimony of Thomas Baxter, Jr., General Counsel and Executive Vice President of the Federal Reserve Bank of New York in *Risk Management and Regulatory Failures at Riggs Bank and UBS: Lessons Learned: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. of Fin. Servs.*, 108th Cong. at 6-30 (2004).

7.      Attached to this Declaration as **Exhibit 6** is a true and correct copy of the Third Amended Complaint in *Strauss, et al. v. Credit Lyonnais, S.A.*, No. CV-06-0702, (E.D.N.Y.).

8.      Attached as **Exhibit 7** is a true and correct copy of the Complaint in *Coulter et al. v. Arab Bank, PLC*, No. CV-05-0365 (E.D.N.Y.).

9.      Attached to this Declaration as **Exhibit 8** is a true and correct copy of Robin Wright, *Iran Feels Pinch As Major Banks Curtail Business*, WASH. POST., March 26, 2007, at A10, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/03/25/AR2007032501084.html.

10.     Attached as **Exhibit 9** is a true and correct copy of OPEC FAQs, http://www.opec.org/library/FAQs/aboutOPEC/q2.htm (last visited July 2, 2008).

11.     Attached to this Declaration as **Exhibit 10** is a true and correct copy of Carl Mortished, *Iran turns from dollar to euro in oil sales*, TIMES (London), Dec. 22, 2006, *available at* http://business.timesonline.co.uk/tol/business/economics/article1263954.ece.

12.     Attached to this Declaration as **Exhibit 11** is a true and correct copy of page 12 of the OPEC Annual Statistical Bulletin 2004, *available at* http://www.opec.org/library/Annual%20Statistical%20Bulletin/asb2003.htm.

13.     Attached to this Declaration as **Exhibit 12** is a true and correct copy of Stephanie Phang and Soraya Permatasari, *Iran is Cutting Dollar Reserves, Central Bank Says*, Bloomberg, March 27, 2007, http://www.bloomberg.com/apps/news?pid=20601083&sid=aPHQQ_BayCRg&refer=currency.

14.     Attached to this Declaration as **Exhibit 13** is a true and correct copy of http://www.msedv.at/rai/archive.html#22 (last visited July 2, 2008).

15.     Attached to this Declaration as **Exhibit 14** is a true and correct copy of http://www.hatchenergy.com/company/expertise/PDs/p09300.pdf (last visited July 2, 2008).

16.     Attached to this Declaration as **Exhibit 15** is a true and correct copy of http://www.offshore-technology.com/projects/southpars/ (last visited July 2, 2008).

17.     Attached to this Declaration as **Exhibit 16** is a true and correct copy of the testimony of Michael Herde, Managing Director, Region Americas Head of Compliance, UBS Investment Bank in *Offshore Banking, Corruption, and the War on Terrorism: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on International Relations*, 109th Cong. at 39-60 (2006).

18.     Attached to this Declaration as **Exhibit 17** is a true and correct copy of *Civil Wrongs Ordinance [New Version], 1968.*

19.     Attached to this Declaration as **Exhibit 18** is a true and correct copy of pages 153-172 and 244-247 from Israel Gilead, Israel (Kluwer Law International 2003) *reprinted in* 2 International Encyclopaedia of Laws, Tort Law (R. Blanpain & S. Stijins eds., Kluwer Law International 2007).

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: July 2, 2008

Daniel L. Cantor

EXHIBIT 1

 **UBS**

Home | Accessibility |    Zoom version |    Local Sitemap |    Service Finder | Contact | eng deu fra it

→ About Us    → Analysts & Investors    → Media    →

 **About us**

---

News
RSS
UBS News Alert

**Who we are**

...in a few words
...in a few figures
...in a few video clips
Our Boards
Organizational Structure
Corporate Governance
Our employees
Diversity
History of UBS

**What we do**

Our Businesses
Research
Annual Review

**Our Commitments**

Corporate Responsibility
Sponsorship

**Where to find more**

Locations
Contact
Search
Glossaries

---

UBS Homepage > **About us**

# About us

## News

**Zurich / Basel, July 1, 2008 : UBS establishes new Corporate Governance and calls an Extraordinary General Meeting to elect four new members to the Board of Directors**

**Zurich/Basel/Amsterdam, June 24, 2008, 07:00 AM : UBS to enter Dutch wealth management market together with VermogensGroep**

**Zurich/Basel, June 13, 2008, 08:30 PM : Settlement between Parmalat and UBS**

**Zurich / Basel, June 13, 2008, 07:00 AM : UBS AG successfully completes its rights offering**

More

## Key facts

UBS is the leading global wealth manager, a top tier investment banking and securities firm, and one of the largest global asset managers.

In Switzerland, UBS is the market leader in retail and commercial banking.

With headquarters in Zurich and Basel, Switzerland, UBS operates in over 50 countries and from all major international centers.

UBS employs more than 80,000 people.

**More facts**

## Video clips

 **Videos**

▼ Profile | Responsibilities | People

Who we are and what we do in a short video clip.

Video: | Introduction to UBS ▼ | Go

## Key figures

| CHF million | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|
| Operating income | 31,032 | 47,171 | 39,896 | 35,971 |
| Net profit[1] | (5235) | 11,249 | 9442 | 7357 |
| Invested assets (billion) | 3189 | 2989 | 2652 | 2217 |

[1] attributable to UBS shareholders from continuing operations

**More figures**

Page last updated: May 29, 2008, 1:25 PM

---

Print this page     Rate this page     Send this page

Important legal information - please read the disclaimer before proceeding.
Products and services in these webpages may not be available for residents of certain nations. Please
consult the sales restrictions relating to the service in question for further information.
© UBS 1998-2008. All rights reserved.
Privacy Policy

EXHIBIT 2

S. Hrg. 108–752

# OVERSIGHT OF THE EXTENDED CUSTODIAL INVENTORY PROGRAM

# HEARING

BEFORE THE

## COMMITTEE ON
## BANKING, HOUSING, AND URBAN AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED EIGHTH CONGRESS

SECOND SESSION

ON

THE RECENT EVENTS INVOLVING THE UNION BANK OF SWITZERLAND-ZURICH WHICH VIOLATED ITS ECI AGREEMENT WITH THE FEDERAL RESERVE BANK OF NEW YORK BY ENGAGING IN U.S. DOLLAR BANKNOTE TRANSACTIONS WITH COUNTRIES SUBJECT TO SANCTIONS BY THE U.S. DEPARTMENT OF THE TREASURY'S OFFICE OF FOREIGN ASSETS CONTROL, WHICH ADMINISTERS AND ENFORCES ECONOMIC SANCTIONS AGAINST TARGETED FOREIGN COUNTRIES

MAY 20, 2004

Printed for the use of the Committee on Banking, Housing, and Urban Affairs



U.S. GOVERNMENT PRINTING OFFICE

98–014 PDF                    WASHINGTON : 2005

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

## COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

RICHARD C. SHELBY, Alabama, *Chairman*

ROBERT F. BENNETT, Utah
WAYNE ALLARD, Colorado
MICHAEL B. ENZI, Wyoming
CHUCK HAGEL, Nebraska
RICK SANTORUM, Pennsylvania
JIM BUNNING, Kentucky
MIKE CRAPO, Idaho
JOHN E. SUNUNU, New Hampshire
ELIZABETH DOLE, North Carolina
LINCOLN D. CHAFEE, Rhode Island

PAUL S. SARBANES, Maryland
CHRISTOPHER J. DODD, Connecticut
TIM JOHNSON, South Dakota
JACK REED, Rhode Island
CHARLES E. SCHUMER, New York
EVAN BAYH, Indiana
ZELL MILLER, Georgia
THOMAS R. CARPER, Delaware
DEBBIE STABENOW, Michigan
JON S. CORZINE, New Jersey

KATHLEEN L. CASEY, *Staff Director and Counsel*
STEVEN B. HARRIS, *Democratic Staff Director and Chief Counsel*
DOUGLAS R. NAPPI, *Chief Counsel*
MARK F. OESTERLE, *Counsel*
SKIP FISCHER, *Professional Staff*
STEPHEN R. KROLL, *Democratic Special Counsel*
JOSEPH R. KOLINSKI, *Chief Clerk and Computer Systems Administrator*
GEORGE E. WHITTLE, *Editor*

(II)

# CONTENTS

### THURSDAY, MAY 20, 2004

| | Page |
|---|---|
| Opening statement of Chairman Shelby | 1 |

#### WITNESSES

| | |
|---|---|
| R. Richard Newcomb, Director, Office of Foreign Assets Control, U.S. Department of the Treasury | 2 |
| Thomas C. Baxter, Jr., Executive Vice President and General Counsel, Federal Reserve Bank of New York | 3 |
| Prepared statement | 18 |

(III)

# OVERSIGHT OF THE EXTENDED CUSTODIAL INVENTORY PROGRAM

---

## THURSDAY, MAY 20, 2004

U.S. SENATE,
COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS,
*Washington, DC.*

The Committee met at 10:08 a.m., in room SD–538, Dirksen Senate Office Building, Senator Richard C. Shelby (Chairman of the Committee) presiding.

### OPENING STATEMENT OF CHAIRMAN RICHARD C. SHELBY

Chairman SHELBY. The hearing will come to order.

The purpose of today's hearing is to conduct oversight of the Federal Reserve's operation of its Extended Custodial Inventory, or ECI, program.

This program, which is administered by the Federal Reserve Bank of New York, was established to address the significant issues associated with the fact that a huge amount of U.S. currency circulates outside of the United States.

By partnering with United States and foreign banks at various locations throughout the world, the program is intended to enhance the ability of the Federal Reserve to deal with counterfeiting, to promote repatriation of old U.S. banknotes, to recirculate fit new U.S. banknotes, and to facilitate the international distribution of U.S. currency.

Unfortunately, recent events make it abundantly clear that the oversight of this program deserves a good portion of this Committee's time and attention.

Last week, the Federal Reserve announced that it was imposing a $100 million fine against the Union Bank of Switzerland, or UBS, as punishment for serious transgressions the Swiss Bank committed in its capacity as an ECI program participant.

Apparently, from the time UBS began working with the Fed in 1996 until sometime last year, UBS employees were conducting business through the ECI program with entities from nations restricted by the Office of Foreign Asset Control or OFAC.

While these activities were strictly prohibited under the terms of the ECI contract, UBS employees were able to engage in this deceptive conduct for a prolonged period by falsifying documents they were required to provide to the Federal Reserve.

Ultimately, UBS used the Federal Reserve to conduct billions of dollars worth of transactions with entities in Cuba, Iran, Libya, and Yugoslavia. Billions to Cuba, Iran, Libya, and Yugoslavia.

2

While we will never know the full extent of the damage, we do know that our national security and economic interests were significantly compromised by these despicable acts.

This morning, we will look at the circumstances that made it possible for the Federal Reserve to be repeatedly and systematically deceived by UBS, as well as the operation and oversight of the overall program.

In consideration of the amounts of money involved, we must be sure that the Federal Reserve employs the appropriate procedural safeguards, and perhaps more importantly, we must be sure that the staff of the Federal Reserve have the requisite frame of mind to aggressively and consistently apply those safeguards.

In the end, I believe we must look to the matter of ECI contract compliance as something requiring far more consideration than it seems to have been given in the past.

This morning we have as our witnesses, Richard Newcomb, Director, Office of Foreign Assets Control, U.S. Department of the Treasury, and Thomas C. Baxter, General Counsel and Executive Vice President of the Federal Reserve Bank of New York, and we have a number of people accompanying them, but Mr. Newcomb and Mr. Baxter, I believe will testify.

We will start with you, Mr. Newcomb.

### STATEMENT OF R. RICHARD NEWCOMB
### DIRECTOR, OFFICE OF FOREIGN ASSETS CONTROL
### U.S. DEPARTMENT OF THE TREASURY

Mr. NEWCOMB. Thank you, Mr. Chairman. I want to thank you for inviting me to testify today about the Extended Custodial Inventory program. It is a pleasure to be here again to work with you and with your staff as we have over the years, and to discuss the Office of Foreign Assets Control and its relationship with the Federal Reserve Bank.

As you know, the primary mission of the Office of Foreign Assets Control is to administer and enforce economic sanctions against targeted foreign countries and groups and individuals, including terrorists, terrorist organizations, and narcotics traffickers which pose a threat to the national security, foreign policy, and economy of the United States. We act under general Presidential wartime and national emergency powers, as well as specific legislation to prohibit transactions and freeze assets subject to U.S. jurisdiction. Economic sanctions are intended to deprive the target of the use of its assets and deny the target access to the U.S. financial system, and the benefits of trade, transactions, and services involving U.S. markets. These same authorities have also been used to protect assets within U.S. jurisdiction of countries subject to foreign occupation and to further important U.S. nonproliferation goals.

We currently administer and enforce some 28 economic sanctions programs pursuant to Presidential and Congressional mandates. These programs are a crucial element in preserving and advancing the foreign policy and national security objectives of the United States, and are usually taken in conjunction with diplomatic, law enforcement, and occasionally military action.

Enforcement of these programs is defined by our jurisdiction, which extends to all U.S. citizens and permanent resident aliens,

3

regardless of where they are located, all persons and entities within the United States and all U.S. incorporated entities and their foreign branches. In the case of Cuba, we also have jurisdiction with regard to foreign subsidiaries owned or controlled by U.S. companies. For the purposes of our discussion, let us call these "U.S. persons."

OFAC has always had an outstanding relationship with the Federal Reserve, especially with the Federal Reserve Bank of New York. Because of this outstanding relationship, in early July 2003, the Federal Reserve Bank of New York contacted us to indicate that it had learned that U.S. dollar banknotes held in the Union Bank of Switzerland-Zurich, or UBS, may have been illegally bought or sold to sanctioned countries by UBS in violation of their Extended Custodial Inventory agreements with the Federal Reserve Bank of New York. I understand that the Federal Reserve Bank of New York has not previously been aware of the situation because officers and employees of UBS in Zurich had submitted deliberately falsified statistical reporting data.

We kept in touch with the Federal Reserve Bank of New York while UBS, at the Fed's insistence, and under the oversight of the Swiss banking authorities, initiated an internal investigation into this matter. UBS issued an initial report of findings on December 1, 2003, and a supplemental report dated January 26 of this year. The initial report was provided to the Federal Reserve Bank with a request that it be shared with OFAC. OFAC received it electronically on January 20 of this year with the supplemental report received on the January 29. We immediately reviewed the material and initiated an enforcement investigation into any possible activities on the part of "U.S. persons" over whom we would have jurisdiction.

The UBS/Zurich ECI contract was terminated for breach on October 28, 2003, and UBS, as you know, has paid a significant fine to the Federal Reserve Bank of New York for deception. We have met with all of the key players of the Federal Reserve Bank of New York and understand that the Bank, through new contracts made effective in February of this year, has taken very substantial steps to enhance controls over all remaining ECI's with respect to sanctions compliance. We applaud the Fed for these efforts.

I would like to thank you once again, and the Committee, for the opportunity to speak here this morning, and when we conclude we will be happy to answer any questions you may have.

Chairman SHELBY. Thank you, Mr. Newcomb.

Mr. BAXTER.

### STATEMENT OF THOMAS C. BAXTER, JR.
### EXECUTIVE VICE PRESIDENT AND GENERAL COUNSEL
### FEDERAL RESERVE BANK OF NEW YORK

#### ACCOMPANIED BY:
#### RICHARD ASHTON, ASSOCIATE GENERAL COUNSEL AND
#### MICHAEL LAMBERT, FINANCIAL SERVICES MANAGER, CASH SECTION,
#### DIVISION OF RESERVE BANK OPERATIONS AND PAYMENT SYSTEMS
#### BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

Mr. BAXTER. Thank you, Mr. Chairman.

4

Chairman Shelby, distinguished Members of the Committee, my name is Thomas Baxter and I am the General Counsel and Executive Vice President of the Federal Reserve Bank of New York.

At the New York Fed, I have responsibility for the law function, security, and the Corporate Secretary's Office. I appreciate your invitation, and I am honored to appear before you to discuss the Federal Reserve's operation of our Extended Custodial Inventory program, and our response to UBS's misconduct in operating one of our ECI facilities.

The U.S. dollar is the most desired form of money in the world. In many ways our dollar represents the strength of the American economy. The dollar is so desired around the world because it is a stable, always reliable medium of exchange and store of value.

Today, I will be speaking about the Federal Reserve's operation of our ECI program. I should start by describing it. In operation since 1996, when the Treasury, Secret Service, and Federal Reserve collectively decided to launch it, the ECI program has been a great success. The program sustains the quality of the U.S. dollar banknote, helps to deter counterfeiting, and provides an efficient and effective mechanism for the distribution of those notes in what is our largest market, the market outside of the United States.

We estimate that up to two-thirds of our currency circulates outside of the United States. The ECI program involves the use of financial institutions, mainly commercial banks, that are highly active in the international currency distribution business as Federal Reserve contractors. They agree to extend the Federal Reserve's reach into major financial centers of other countries, and hold inventory of our most popular product, the Federal Reserve note. They do this by holding in custody for us in their vaults U.S. dollar notes that we expect to distribute abroad, or old and unfit notes that we wish to repatriate.

The Extended Custodial Inventory facility helps to assure the quality of our product and its efficient distribution. With respect to quality, the ECI facility performs two important functions. First, it positions us to better monitor and better control the quality of our product by identifying counterfeit notes. The ECI's are well situated to detect such notes, to remove them from circulation, to provide intelligence to law enforcement authorities here and abroad, and to distribute new authentic notes. They perform similar functions with respect to what we call "unfit" notes, which is a cash processing code word for worn and dirty.

As for the efficiency of our distribution network, through our ECI contract partners we are positioned in the high volume wholesale banknote markets. Currently these markets are located in London, Frankfurt, Zurich, Hong Kong, and Singapore. Our ECI contractors are the market makers in those markets. At the present time we have ECI contracts with American Express, Bank of America, HSBC, Royal Bank of Scotland, and United Overseas Bank. Our ECI contractors bring into the markets they serve new fit notes quickly, and with similar expedition they repatriate unfit or old design notes to the United States for destruction.

With respect to repatriation, let me highlight one technical but very important point. Before the ECI program, wholesale dealers in U.S. dollars had a financial incentive to recirculate the unfit and

5

old design notes that came into their possession, because the time to transport those notes to the United States carried a corresponding delay in credit. The ECI program changed that, and as a consequence, the unfit and old design notes move into our custody much sooner. A credit for those notes passes from the Federal Reserve to the ECI contractor earlier, providing a financial incentive for quality control. Finally, our ECI contractors have ready a substantial inventory of banknotes to satisfy the periodic spikes in supply and demand encountered in a world full of uncertainties. Because these notes are Federal Reserve property, the ECI contractors do not have to finance the inventory when it is not needed.

This leads me to my first point. The experience that we have had with UBS does not change the fact that the ECI program is a success. I hasten to add that I am in no way trying to minimize what UBS did. The breach by UBS of our contract was wrongful, and the concerted acts of deception by UBS, carried out over a long period of time, violated our laws. The Federal Reserve terminated the contract with UBS in October 2003, and we assessed a $100 million civil money penalty against UBS on May 10 of this year, thereby remedying the breach and punishing the deception.

This leads me to my second point, which looks at how we respond when someone doing our business performs badly. The prompt corrective action taken to terminate the Federal Reserve's contractual relationship with UBS and to punish deception by UBS with a large monetary penalty, demonstrates a resolve that Federal Reserve operations will be conducted to the highest standards and in full compliance with U.S. legal requirements. In this regard it is noteworthy that our ECI contracts, in essence, export U.S. legal requirements including OFAC restrictions to offshore facilities.

When the Federal Reserve learned that UBS had breached its contractual obligations to abide by the restrictions of the U.S. sanctions program and engaged in U.S. dollar transactions with impermissible jurisdictions, we acted swiftly and surely. We terminated our contract with UBS and debited UBS's account with us for the entire inventory maintained in the Zurich vault. In a day, UBS lost an entire business line that had been profitable throughout the 8 years that UBS served as an ECI contractor.

The forfeiture of a profitable business is a financial consequence. UBS also suffered a reputational injury. Through the related action of our colleagues at the Swiss Federal Banking Commission, UBS is forbidden from reentering the wholesale external banknote business without the permission of that Commission.

This leads to my third point. The Federal Reserve will not tolerate deception. We will not tolerate deception from those banking organizations that we supervise, and we will not tolerate deception from those with whom we contract to execute important Federal programs. The ECI program is one such program. To transact business out of the Zurich facility with Iran, Cuba, Libya, and Yugoslavia, UBS personnel needed to act covertly and to hide their activity from the Federal Reserve. For a time they succeeded in their deceptive scheme, but we put a stop to it just about a year ago.

The people who engaged in such conduct in Switzerland have lost their jobs. The business franchise is no more. In the civil money

6

penalty that we announced on May 10, UBS paid a heavy price for the deceit of the banknote personnel which it formerly employed.

Turning for just a moment back to the ECI program, the imposed penalty gave our remaining ECI contractors 100 million reasons to remain truthful.

And on top of all of that, the Swiss Federal Banking Commission issued a formal public reprimand to the largest bank in Switzerland. The banknote personnel of UBS deceived people at the Banking Commission just as they deceived us. Our colleagues at the Banking Commission joined with us in finding such deception inexcusable and warranting reprimand.

This brings me to my fourth and final point. At the Federal Reserve we are dedicated to continuous improvement, and we know that all internal controls can be bolstered through the lessons of experience, including our own unfortunate experience with the UBS case.

That experience has shown that our primary control for compliance with country restrictions, truthful monthly reporting of currency transactions by country, was just not sufficient. Since February of this year, our ECI contracts have a number of new features that enhance the control environment. One is the requirement that management of our ECI contractors attest yearly on contract compliance and on accurate reporting, and that an independent public accounting firm certifies to the Federal Reserve that the management attestation is fairly stated. This Sarbanes-Oxley inspired change shows our commitment to continuous improvement.

Let me also acknowledge a lesson learned. With the country reports we receive from UBS, we did not follow the old audit admonition, "trust but verify." Going forward, verification of the accuracy in reporting by our ECI contractors will come from the certifications of those attestations from public accounting firms.

In summing up, let me restate my four points. The ECI program is important and successful because it fosters the excellent quality of U.S. currency and its efficient distribution outside the United States. When someone performs poorly in the ECI program you can be assured that the Federal Reserve will respond with prompt corrective action. If there is deception in addition to poor performance, as was the case with UBS, the consequences will be severe. Finally, we will strive to continuously improve our internal controls by borrowing the best ideas and by learning lessons from our experiences.

Thank you for your attention and I look forward to answering any questions you may have.

Chairman SHELBY. Thank you. I would like to acknowledge the presence of Richard Ashton, Associate General Counsel, and Michael Lambert, Financial Services Manager, Cash Section, Division of Reserve Bank Operations and Payment Systems, Board of Governors of the Federal Reserve. Welcome to both of you gentlemen.

Mr. Baxter, if you could, walk us through how the ECI program should have ideally worked from the Fed's perspective by walking us through a buy and sell order. Explain, if you could, how it was used and operated by UBS in contravention of your agreement and how they deceived you. Can you do that, just slowly?

7

Mr. BAXTER. The first way they deceived us, Chairman, was by not telling the truth. We will start out with the breach of the contract, and the contract exported the restrictions that Director Newcomb spoke about in his testimony this morning. We export those restrictions from the United States to our ECI facilities, and one was in Zurich.

One of the restrictions was that the UBS facility could not send cash from our ECI vault to Iran. That provision in the contract was breached, so that is the first provision that would have prevented this that was violated by UBS. The control on that particular contract provision is the monthly reports that the contract also requires be rendered by an ECI operator.

Chairman SHELBY. Were those reports false?

Mr. BAXTER. You will not be surprised to hear, Chairman, that the reports rendered by UBS's facility never showed Iran, and so, yes, sir, they were false. We had the breach and the doing of the business of Iran and then we have the deception with respect to the falsification of the monthly reports. Had the reports been truthful, then the activity would have been revealed to us and we would have addressed it immediately.

Chairman SHELBY. How much money was involved here, billions, was it not?

Mr. BAXTER. Between $4 and $5 billion aggregate for the jurisdictions that it should not have done business with.

Chairman SHELBY. Was the deception facilitated to some degree by failure to audit primary documentation that would have evidenced OFAC violations? In other words, from your standpoint, you cannot just trust somebody in a blanket way, can you?

Mr. BAXTER. In some of your contractual dealings, Chairman, with respect to some contractual provisions, it is customary to rely on reps and warranties from your counterparty, and there is a basic business principle that your counterparty will tell you the truth.

Here we did not entirely trust our counterparty because we did audit the cash in the vaults to be sure. We went over with our auditors to make sure that the money in the vaults belonging to the Federal Reserve was accurate in count.

With respect to the representation concerning OFAC restrictions, which was breached, there we did not audit for compliance. Instead we relied in the past on the monthly reporting information from the ECI operator. Of course, that has changed. That has changed because going forward we are going to receive the management attestation and then the independent check of the public accounting firm that will have to assure us in a certification that there is a fair basis for that attestation.

Chairman SHELBY. Under the terms of the ECI agreement, in addition to receiving statistical data, reports for money laundering, and OFAC compliance, the Federal Reserve Bank retained the right to enter, "the ECI operation on an announced or unannounced basis to conduct audits of the Bank's assets as well as request," in this case UBS, "to account for and reconcile in the Bank's presence," in your presence, "all other United States currency on the books at UBS." This is from the document.

8

What was the purpose of this provision? Why were these rights necessary?

Mr. BAXTER. We wanted to have the ability of our audit personnel to go in and assure themselves and us——

Chairman SHELBY. Unannounced too.

Mr. BAXTER. Unannounced or announced, that the cash that was expected to be in the vault was there, and that we did. What we did not do is——

Chairman SHELBY. Did you ever go unannounced? Did the Fed ever conduct unannounced audits of the ECI?

Mr. BAXTER. I do not believe so, Chairman.

Chairman SHELBY. Will you check for the record? You think not?

Mr. BAXTER. I think they always knew we were coming.

Chairman SHELBY. Did the Federal Reserve ever request or conduct a review of U.S. currency transactions on UBS's books over the course of the contract? You acknowledged a minute ago you went in and counted the money, but did you ever conduct a review of U.S. currency transactions on the UBS books over that contract?

Mr. BAXTER. Let me answer it in this way, Chairman, because there are really two steps. There is the transaction between UBS and our vault, and of course, that is closely monitored, and then there is the next layer of transaction between UBS and its counterparties, and it was the next layer we never actually looked at that segment, but we certainly were looking——

Chairman SHELBY. You wish you had though, do you not?

Mr. BAXTER. Now I do.

Chairman SHELBY. Mr. Baxter, what about an oversight regime seemingly dependent upon the voluntary compliance of the banks which you contracted to hold U.S. currency? In other words, you are basically voluntary.

It is my understanding that the Federal Reserve Bank did not suspect that there could be a problem with at least one of its contractors because of the false reports filed with the Fed by those contractors. In other words, you relied on them.

Are you comfortable with a compliance system that relies so heavily on voluntary compliance with the integrity of a major U.S. international economic program; that is, our ability to combat counterfeiting, our ability to enforce sanctions against rogue regimes and a heck of a lot of cash here at stake? What measures has the Fed taken or do you plan to take so that it is less reliant on an apparently flawed compliance system? In other words, you just told us that you did not go the second layer. You did not go to examine what they were doing, what UBS was doing. You counted the money, so to speak.

Mr. BAXTER. Yes, Chairman.

Chairman SHELBY. What is the Fed doing now?

Mr. BAXTER. First, let me part company with the word "voluntary" because there was a contract. The contract required the rendering of monthly reports, then and now. So it was not that it was voluntary. It was required, and the failure to provide those reports would be a breach. I would not characterize the reporting as voluntary. It was mandatory, then and now.

The problem with the reporting is we trusted the truthfulness of our reporter, and our reporter here was being deceptive, and that

9

we have addressed through the public accounting firm certification. What we have not done, and it would be very, very difficult to do, would be to go to the next layer and say, "Okay," with an institution, for example, the size of HSBC, "we want to see every currency transaction between HSBC anywhere it is in the world and all of its counterparties" because it has branches in many, many different jurisdictions, there are currency transactions between HSBC and many, many other banks. So, to take it to that level would be very, very difficult.

And that gets into one of the fundamental problems here, trying to trace banknotes, once they are outside of the United States, from hand-to-hand. And in an organization the size of an HSBC or a Bank of America, that becomes extremely difficult.

Chairman SHELBY. Were the monthly reports basically just computer spreadsheets that you were getting?

Mr. BAXTER. What the monthly reports would show is a listing of all of the countries that you either received cash into our ECI facility from or you sent cash from our ECI facility to. You have all of those countries, and then you would have amounts for shipments out and receipts. That is what those reports show.

That is exactly why the reports rendered by UBS were false because they were missing countries, first, and, second, the amounts that were shown for those countries were being placed in a different place on the reports.

Chairman SHELBY. Totally fraud, in a sense.

Mr. BAXTER. Deception, no question.

Chairman SHELBY. Mr. Baxter, I understand that the banknote trading business was supposed to be kept operationally separate from the extended custodial inventory program. There does seem to be some confusion regarding the extent to which these two activities may have been blurred together.

Were the same people who traded the banknotes for the ECI program also involved in, for example, UBS's proprietary banknote trading operation?

Mr. BAXTER. The ECI facility——

Chairman SHELBY. Do you understand my question?

Mr. BAXTER. I do understand, Chairman.

The ECI facility in Zurich was run out of the airport there. In the airport, there were operational personnel who prepared the monthly reports that were deceptive, that contain false entries, and then there were trading personnel. And there was a form of Great Wall of China between those two operations.

Chairman SHELBY. Could you see through it?

Mr. BAXTER. Not only could you see through it, Chairman, not only was there deception, but there was also a conspiracy among the deceivers who were preparing the reports and also who were doing the trading. So you had the worst of all worlds. You had deceptive activity, and you had conspiracy between people on the operational side and people on the trading side.

Chairman SHELBY. What has happened to these people who were involved in this conspiracy at UBS? In other words, I know you fined them $100 million, but have they violated Swiss law here? Have they violated our laws or what have they done? Are you looking at it closely?

10

Mr. BAXTER. Let me answer this in two ways. First, the people have been fired. Second, there are continuing investigations with respect to potential actions against those people not only here in the United States, but also in Switzerland. And as I said in my opening statement, there was deception not only to the Federal Reserve, but also to the Swiss Federal Banking Commission.

Chairman SHELBY. Mr. Newcomb, I believe it is your responsibility at the Treasury to enforce the U.S. economic sanctions against countries like Cuba, Iran, Libya, and under its old regime of Yugoslavia, what used to be Yugoslavia. These have been some of the key countries I think have been a concern for the United States in other words, for Treasury for many years.

Notwithstanding changes with respect to U.S. relations with Yugoslavia and Libya, has the integrity of the sanction regimes that have been an essential and important tool of U.S. foreign policy been harmed by UBS's conduct and Los Angeles oversight on the part of the Federal Reserve?

Mr. NEWCOMB. Mr. Chairman, let me answer that question in this way. Whenever we find hemorrhaging like this, it is significant to——

Chairman SHELBY. It is a lot of money, is it not?

Mr. NEWCOMB. It is a lot of money.

Chairman SHELBY. It evens it out.

Mr. NEWCOMB. It affects the ability of us to administer sanctions programs.

We have unilateral sanctions programs.

Chairman SHELBY. I know.

Mr. NEWCOMB. It is unilateral on Iran, it is unilateral on Cuba, and it was, for a time, on Yugoslavia unilateral. So you cannot, other than jawboning foreign governments to go along with your programs, it is very difficult in all instances to get cooperation. Some governments, in fact, have blocking statutes prohibiting their nationals from cooperating in administering sanctions programs.

I think what we have here is a very significant event and, as Mr. Baxter has pointed out, lessons learned. Though we do not have jurisdiction over UBS Zurich—there is no enforcement action that we can take against that bank—we do have other matters open that I cannot comment about to determine if there is U.S. jurisdiction and if U.S. laws have been violated. But we do look forward to cooperating with the Fed. We have met with them twice in the last month and anticipate next week to continue to see, though we do not have jurisdiction, to see what further steps we can take to ensure that these and other agreements for distribution of dollars are consistent with our goal in implementing the sanctions programs.

Chairman SHELBY. Mr. Newcomb, when entities are sanctioned for OFAC violations, how much money is usually involved in the underlying transaction? Does it vary?

Mr. NEWCOMB. It depends on what the country is and the timing of the sanctions program. If it is an oil-rich country, where there is an element of surprise, there can be billions and sometimes tens of billions of dollars involved. In other situations where relationships have deteriorated, there usually is a very small amount blocked, but the size of transactions can be anywhere in the hundreds of dollars up to the billions of dollars, depending on the par-

11

ticular facts and circumstances of the country program and point
in time.

Chairman SHELBY. Did you rely on the same reporting require-
ments to check compliance in your areas that they did?

Mr. NEWCOMB. Well, we are not involved in the ECI program. It
goes to banks over which we do not have jurisdiction. Any reliance
we would have would be on the contractual relationship that the
Fed would have with its ECI counterparties to control what is tak-
ing place within those institutions. But we have no jurisdiction, for
example, to go and look in a foreign bank, so there would be no
way we could oversee the activities.

Chairman SHELBY. But to help coordinate your job, do you rely,
in this case, on some of their information?

Mr. NEWCOMB. Yes, we do.

Chairman SHELBY. And obviously a lot of it was false, was it not?

Mr. NEWCOMB. The information that UBS had given to the Fed
was false. I will say, as soon as the Fed was aware of it last July,
they notified us immediately, and as developments occurred in
July, I think again in October, and then in January, gave us a re-
porting. As I mentioned since, in recent weeks, we have met twice
and are looking forward to the cooperation of the Fed to see what
steps we might be able to bootstrap, recognizing that we do not
have jurisdiction over foreign banks, but we are very concerned
about the sanctions program implementation.

Chairman SHELBY. Sure.

Mr. Baxter, if one of the purposes behind the distribution of new
dollars in the ECI program was to curtail counterfeiting, why was
a Swiss location used? In other words, the contracts require co-
operation with the New York Federal Reserve and the Secret Serv-
ice in investigating counterfeits. Was there a concern that Swiss
Bank secrecy law would inhibit the Secret Service access to useful
information for combatting counterfeiting on a real-time basis? And
was there any explicit or implicit agreement with the Swiss au-
thorities regarding access to information that would be necessary
to investigate counterfeiting in Switzerland, for example?

Mr. BAXTER. Originally, in 1996, UBS was selected in Zurich as
one of our ECI counterparties and for a very specific reason, Chair-
man. At the time, the United States was introducing a new $100
note, and one of the places that note was going to be most highly
prized was the former Soviet Union.

The key point for shipment of dollars into the former Soviet
Union was Zurich. UBS was an institution that was very interested
in the Russian business. So it was for those reasons that we origi-
nally started our ECI operation in Zurich with UBS.

With respect to counterfeiting, we get excellent cooperation from
the Swiss government. There is an international convention that
deals with the counterfeiting of another state's currency within
your territory, and that is one of the things that is highly useful
in these matters.

In addition, what we have with respect to the ECI program is a
capability, when a counterfeit note is detected in a place like Zu-
rich, to alert the Secret Service in the United States as to the coun-
try of origin for that counterfeit note, and that was also another
key factor because, with respect to terrorism, there was a concern,

12

with respect to the $100 note, that certain countries were active in supporting counterfeiting of our currency really to call into question the strength of the dollar.

Another aspect of this, in quartering a facility in a place like Zurich, was to get into the market that would lead to the early detection of the counterfeiting and the possible use of money as a hostile attack on the U.S. dollar. So those were all considerations.

Swiss secrecy law, which was also in your question, was certainly acknowledged as an issue, but an issue that we did not think would interfere with our getting the country information, and the country information was seen to be most important, then and now.

Chairman SHELBY. Mr. Baxter, the opinion letter of UBS's counsel makes it clear that the New York Fed would have absolutely no recourse, under Swiss law, if it became necessary to obtain customer-specific information. As a matter of fact, under paragraph 10(2) of the original 1996 contract, the New York Fed stipulated that it was not acting "as a foreign government body," arguably giving up what limited recourse might be available to foreign governments, like us, for law enforcement information through the Swiss judicial system.

Don't these limitations in some way diminish the value of the Zurich ECI with respect to law enforcement efforts. I know you wanted to launch your new $100 bill there, but you did have to give up some other things, did you not?

Mr. BAXTER. You are correct, Chairman, that to conduct Governmental activity on the soil of Switzerland would be a violation of the Swiss penal law. However, with respect to secrecy, I have yet to meet, in my 24-year career as a lawyer, a secrecy law that did not have some weaknesses in it, and one of them—and you can see it here, Chairman—is you can find a gateway usually through a supervisor. That is why, on July 22, I went to Bern, Switzerland, and I met with people who I have known for years at the Swiss Federal Banking Commission, and I asked for their assistance in getting information through them, not directly, because there are legal prohibitions to get it directly, but if you get it through the supervisory authority, you can find a gateway through secrecy, and that is exactly what I was looking for on January 22. That is exactly what the Federal Reserve got because we received the information that we needed to take the action, and the action was taken in October and May.

So secrecy laws did not stand in the way because the Federal Reserve knew how to find the gateway.

Chairman SHELBY. But that was after 7 years of violations, was it not?

Mr. BAXTER. And the violations resulted from the deception, no question, Chairman.

Chairman SHELBY. Seven years. Were you or the Secret Service ever alerted by UBS of counterfeit evidence over the course of the contract?

Mr. BAXTER. I do not know, Chairman.

Chairman SHELBY. Can you check that out for the record?

Mr. BAXTER. Yes.

Chairman SHELBY. Mr. Baxter, why would you use a foreign bank as an ECI contractor? Would the Fed not have useful leverage

13

over the U.S. bank with foreign operations? In other words, we have huge banks headquartered here. I could name, you could name them all, that do business all over the world. We have Citicorp, we have Bank of America, you can go on and on, and you would have some jurisdiction over these U.S. banks, as opposed to a foreign bank to deal with U.S. dollars, distribution, repatriating, and so forth. The merits of it. Could you discuss the relative merits of using UBS, as opposed, say, to Citicorp or Bank of America or, gosh, you name it, JP Morgan Chase. I better name them all.

[Laughter.]

Mr. BAXTER. Chairman, two points. First, with respect to the selection of an ECI contractor, we look at the place, and we look at who can make markets or make markets in those places. So you have to be active in the banknote business, and there are only about 30 banks worldwide that are active in that business. Not all of them are American banks.

Chairman SHELBY. Are some of the American banks active in the banknote business?

Mr. BAXTER. Yes. In fact, three of our ECI operators are American. We have American Express, we have Bank of America, and HSBC, our contract is with HSBC USA.

Chairman SHELBY. A British bank, right?

Mr. BAXTER. Well, our contract is with the American subsidiary. So three of our five are American.

Chairman SHELBY. Have you had trouble with HSBC? Are you auditing HSBC?

Mr. BAXTER. Well, remember, we audit all of our facilities with respect to the cash in the vault.

Chairman SHELBY. Is your auditing going to the second-tier audit now? You did not with UBS, but are you looking at the others more thoroughly now? And if not, why not?

Mr. BAXTER. What our first line of defense is, is the public accounting certification of both contract compliance and accuracy in reporting. So we are not doing it using our own personnel, Chairman. We are using the personnel of public accounting firms for that purpose.

Chairman SHELBY. I hope they are accurate.

Mr. BAXTER. The other point about UBS, Chairman, that I was going to offer, I know it is commonplace to think of UBS as a Swiss institution, and it does have a Swiss license, but it is a trillion-dollar bank with $600 billion of its assets in the United States and 22,000 employees in the United States.

Chairman SHELBY. We understand that. We know they are a good bank, but we also know that they have done some awful things for the Fed to fine them $100 million. That is not just a slap on the wrist, monetarily speaking, right?

Mr. BAXTER. Correct, Chairman.

Chairman SHELBY. Now, you are not trying to defend their conduct, are you?

Mr. BAXTER. Absolutely not, Chairman.

Chairman SHELBY. In light of the fact that we now know that UBS falsified records relating to OFAC issues, has there ever been a question as to their records with respect to counterfeiting and money laundering? In other words, if they would falsify the records

14

dealing with rogue nations, what about counterfeiting and money laundering? What about terrorist financing, you know, or anything? I think these questions should be followed anyway. In other words, if you do those kinds of things what else would you do? Do you see my question?

Mr. BAXTER. I do, Chairman.

Chairman SHELBY. Is anybody looking at that?

Mr. BAXTER. I know that the Swiss Federal Banking Commission has looked at those issues with respect to Swiss banks, generally, and with respect to UBS, specifically, and that is one of its charges, as the home country supervisor of UBS, and I know the people there carry that out quite seriously. I also know, Chairman, from the testimony of others, like David Aufhauser, Juan Zarate, that there is an opinion in the Government today that the Swiss are doing more than ever before not only in the antimoney laundering area, but also in the terrorist finance area.

Chairman SHELBY. Are they doing enough?

Mr. BAXTER. I do not know if any of us are doing enough, Chairman.

Chairman SHELBY. It begs the question here, I think, if they would falsify dealing with rogue nations, what else would they do? Maybe nothing. Maybe this is all they did, but it makes you wonder—it does me, and I am sure it does others that deal with money laundering, terrorist financing, everything else—because if you are dealing with some of these rogue nations in that regard, would you be dealing with them in other respects? I do not know that question, I do not know the answer to it.

Mr. Baxter, the operations manual for UBS, Union Bank of Switzerland, makes continued reference to the Avix computer system. What is the AVIX system?

Mr. BAXTER. My belief is the AVIX system that we use with respect to counterfeit identification, and that is one of the purposes of an ECI is the early detection of the counterfeit market.

Chairman SHELBY. Does it provide a real-time relay of information to the New York Fed? Is that part of it?

Mr. BAXTER. I do not know that, Chairman, as I sit here.

Chairman SHELBY. Can counsel answer that? Does the AVIX computer system provide a real-time relay of information to the New York Fed?

Mr. Lambert, do you want to answer that?

Mr. LAMBERT. Yes, Mr. Chairman. That system is a real-time system that will convey information from the ECI facilities back to New York on payment and receipt activity. So it is a real-time system.

Chairman SHELBY. So this system would provide a field for designating the source of a deposit or a request for cash?

Mr. LAMBERT. It is basically the payment to and receipt from information.

Chairman SHELBY. Do all ECI contractors use the same program and manual for controls and operations here, do you know?

Mr. LAMBERT. Yes, they do.

Chairman SHELBY. Who insures the integrity of the data that the New York Fed receives from the ECI operators? Is Mr. Lambert the proper one to answer that?

15

Mr. LAMBERT. I think perhaps Mr. Baxter may be able to.

Chairman SHELBY. Mr. Baxter.

Mr. BAXTER. With respect to cash into or out of an ECI vault, there would be records that would be maintained on both the credit and the debt side, and there would be records on the custody side, which is out at the ECI facility itself. And when our audit personnel go out to an ECI to do an audit, that is exactly what they are looking at, Chairman.

Chairman SHELBY. Mr. Baxter, we are talking about trust, but you know you can trust too much sometimes. You have to verify, you have to check, especially when significant amounts of money are involved, and there were $4 or $5 billion—I believe that was your number—involved here. Is there a cultural issue at the New York Federal Reserve that made it difficult for you to adopt a rigorous verification program. In other words, why did you not have a rigorous verification program?

Mr. BAXTER. Mr. Chairman, with respect to the culture at the Federal Reserve Bank of New York, our culture has always been rigorous with respect to compliance and with respect to the enforcement of U.S. sanctions regime.

I can tell you, Chairman, as a very young lawyer, I started my career in the summer of 1980 at the New York Fed working on the Iranian hostage crisis. I am one of the very few people probably left who has actually been involved with sanctions longer than Director Newcomb, who I think started in 1981. I learned from my seniors then, and I have carried with through today, a very healthy respect for that regime of sanctions. It is part of our culture. It is part of my being, I believe in it, and part of the culture of compliance.

Chairman SHELBY. But this undermines the sanctions.

Mr. BAXTER. Absolutely, and that is why we responded swiftly and surely, sir.

Chairman SHELBY. You responded that—I understand that—and I commend you for that. But an overarching concern that a lot of us have is that it took the discovery of a $600-million cash hoard in Iraq, as reported by *The New York Times*, to make you aware of what could be characterized as a fairly significant and material fraudulent conduct here and this, after at least two major revisions of the contract and numerous other amendments of the contract terms, over the course of the life of the contract from 1996 through 2003.

You significantly altered the terms of your contracts after this discovery. Are you confident, Mr. Baxter, that such conduct could be detected in the future from other banks that you have contracted with? And if so, how? In other words, how has your compliance changed in your examination? In other words, if you have not changed, how are you, other than somebody discovering it for you or alerting you to it, how are you going to find out what is really going on with your contract banks in this regard?

Mr. BAXTER. I think the first thing that you need, and this gets to the culture question, Chairman, is you need to be attentive and responsive, and if you look at how this started, it started on Sunday, April 20, 2003, when I saw in *The New York Times* this reference to our money being found in Baghdad. And, of course, the

16

first question was how could that happen not only with U.S. sanctions, but also with UN sanctions? How could that happen?

The beginning of the tracing exercise was symptomatic of a culture that we cannot sit still when we see problems. That is exactly what you see in the chronology of the Federal Reserve's response.

Chairman SHELBY. But a thorough audit might have prevented those problems early on, could it? Maybe, maybe not.

Mr. BAXTER. Truthfulness by our ECI contractor would have prevented it, and that is why I think it is so important, when we see deception, that we respond not only swiftly and surely, but we also respond aggressively, and that is what happened here. That is what we did.

Chairman SHELBY. How many foreign banks—even if they are based somewhere, if they are based in London, they are based in Zurich, they are based in Frankfurt, or wherever or Tokyo or you name it in the world—are your contractors in this regard?

Mr. BAXTER. Two—Royal Bank of Scotland and United Overseas Bank.

Chairman SHELBY. I thought HSBC was one you——

Mr. BAXTER. Our contract is with the American subsidiary.

Chairman SHELBY. Now, what has changed in your audit, in other words your compliance, since last year to now is what I am getting at or is it the same procedure you had?

Mr. BAXTER. We first added, in both the contract and the manual of procedures, many more provisions dealing with antimoney laundering and OFAC compliance, including having a compliance program for OFAC compliance, appointing a compliance officer. So there is a much more robust control environment imposed by contract. That is the first point.

Chairman SHELBY. But that is a contract.

Mr. BAXTER. That is correct.

Chairman SHELBY. But what are you doing yourself to make sure that contract is complied with?

Mr. BAXTER. And then the second thing——

Chairman SHELBY. In other words, a thorough audit.

Mr. BAXTER. —is the management attestation of two things, Chairman. First is contract compliance. So all of those new provisions now are going to get a management official who is going to attest to compliance with all of those new provisions, and that management official is also going to attest to truthful, accurate reporting.

And, the third level, we have a public accounting firm that is going to come in, and here they are essentially doing the inspection in place of us, and they are looking at those management attestations with respect to compliance and with respect to accurate reporting, and they are saying directly to the Fed, "You can rest comfortably, you can take assurance——"

Chairman SHELBY. Were they doing this before? Were they doing this a year ago, these accounting firms? Were they doing the——

Mr. BAXTER. They were not, Chairman. This was put into place in February of this year.

Chairman SHELBY. They were not. So this is a change you have brought about.

Mr. BAXTER. Yes, Chairman.

17

Chairman SHELBY. And what level of management is involved in the oversight of this at the Fed?

Mr. BAXTER. Well, I am at the executive vice president level. I am essentially second level down from the first vice president and the president. So you have it at my attention, and I am on the Management Committee. I am a very senior person at the New York Fed.

Chairman SHELBY. Do you feel like this is not going to happen again? You cannot predict that, can you?

Mr. BAXTER. Well, I have learned in my career never to say never, Chairman. I certainly will use my best efforts to assure that it does not happen again.

Chairman SHELBY. We appreciate your appearance here today. Senator Sarbanes has a number of questions for the record. We will leave that open if others do. There are a lot of meetings going on, but we think this is important to hold this oversight.

Thank you a lot.

The hearing is adjourned.

[Whereupon, at 11:07 a.m., the hearing was adjourned.]

[Prepared statements supplied for the record follow:]

18

## PREPARED STATEMENT OF THOMAS C. BAXTER, JR.

EXECUTIVE VICE PRESIDENT AND GENERAL COUNSEL
FEDERAL RESERVE BANK OF NEW YORK

MAY 20, 2004

### Introduction

Chairman Shelby, Senator Sarbanes, and Members of the Committee, I am pleased to be here this morning to discuss certain recent events relating to the Federal Reserve's Extended Custodial Inventory (ECI) program. More specifically, I will focus on conduct by one of the former operators of an ECI facility, namely UBS, a Swiss banking organization. UBS operated a site in Zurich, Switzerland until late October 2003 when the Federal Reserve Bank of New York (New York Fed) terminated its contract with UBS for serious breaches. More recently, the Federal Reserve assessed a $100 million civil money penalty against UBS for deceptive conduct both in connection with its performance under the ECI contract, and with respect to the investigation into that performance.

My remarks today will cover four topics. First, I will provide some background regarding the ECI program. Second, I will review the chronology surrounding our discovery that UBS had violated its ECI Agreement with the Federal Reserve Bank of New York by engaging in U.S. dollar (USD) banknote transactions with countries subject to sanctions by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC), and, moreover, that certain former officers and employees of UBS had intentionally deceived the Federal Reserve Bank of New York in order to conceal those transactions. Third, I will explain the rationale behind our decision to assess a civil money penalty in the amount of $100 million and will distinguish this punitive action from the earlier action for breach of contract and the remedial action of the Swiss supervisor, the Swiss Federal Banking Commission (referred to as the "EBK"). Fourth, I will discuss the steps the New York Fed has taken with respect to its remaining ECI operators so as to improve the controls relating to OFAC compliance.

### Background on the ECI program

Let me now begin with some background on the ECI program.

The ECI program serves as a means to facilitate the international distribution of U.S. banknotes, permit the repatriation of old design banknotes, promote the recirculation of fit new-design currency, and strengthen the U.S. information gathering capabilities on the international use of U.S. currency and sources of U.S. banknote counterfeiting abroad. ECI facilities function as overseas cash depots operated by private sector commercial banks. These banks hold currency for the New York Fed on a custodial basis.

It is estimated that as much as two-thirds of the value of all Federal Reserve notes in circulation, or over $400 billion of the $680 billion now in circulation, is held abroad. The billions of dollars held overseas represent a financial benefit to U.S. taxpayers. While many financial institutions trade U.S. dollars in the foreign exchange markets, no more than thirty institutions worldwide participate in the wholesale buying and selling of physical USD banknotes. At the present time, the principal hubs for the distribution of U.S. banknotes are: Frankfurt, London, Zurich, Hong Kong, and Singapore. Wholesale banknote dealers purchase approximately 90 percent of the U.S. banknotes that are exported to international markets from the New York Fed.

Working with the U.S. Department of the Treasury, the Federal Reserve introduced the ECI program as a pilot in 1996 to aid in the introduction of the $100 new currency design note, and in recognition that an assured supply of U.S. currency abroad would help to alleviate any uncertainty that might have been associated with a new design. The pilot program succeeded in ensuring the orderly introduction of the new design banknotes by providing ready supplies of such notes, particularly in the European and former Soviet Union markets.

After the successful introduction of the new design $100 banknote, the primary purpose of the ECI program shifted to enhancing the international banknote distribution system. The ECI program was placed into full operation in January 1998 with ECI facilities in London, Frankfurt, and Zurich, and soon thereafter, Hong Kong. In 2000, an ECI facility was established in Buenos Aires, but the site was closed in February 2002 because of unpredictable economic and political conditions. The Singapore ECI started operation in 2002. Currently, a total of eight ECI facilities are operated in five cities by five banks: American Express Bank (London), Bank of America (Hong Kong, Zurich), HSBC (London, Frankfurt, Hong Kong), Royal Bank of Scotland (London), and United Overseas Bank (Singapore).

19

The New York Fed manages the ECI program and provides management oversight and monitoring of it. We coordinate the shipment and receipt of currency between our offices and the ECI's. All banknotes contained within an ECI vault and while being transported between the New York Fed and an ECI vault, remain on the books of the New York Fed. When banknotes are withdrawn from the ECI vault to fill a banknote order to third parties, or for an ECI operator's use, the ECI operator's account at the New York Fed is debited accordingly. When banknotes are deposited into the ECI vault to augment the New York Fed inventory, the operator's account at the New York Fed is credited.

The relationship between ECI operators and the New York Fed is governed by an ECI Agreement and a Manual of Procedures for the ECI program (Manual of Procedures). From the start of the ECI program, the ECI Agreement has specifically prohibited ECI operators from engaging in transactions affecting ECI inventory with OFAC sanctioned entities. In addition, since the beginning of the program, the ECI Agreement and the Manual of Procedures have required ECI operators to provide the New York Fed with monthly reports showing all countries that engaged in U.S. dollar transactions with the operator during the preceding month and the volume of those transactions.

The ECI program facilitates the international distribution of U.S. currency by maintaining sufficient inventory of Federal Reserve Notes in strategically located international distribution centers. The ECI's also are a key part of the Federal Reserve's and Treasury's efforts to distribute currency to the major global financial markets during times of crises. In the wake of the September 11 attacks, when air transportation was seriously disrupted, having U.S. currency already positioned at the ECI facilities helped enable the Federal Reserve to continue satisfying international demand for U.S. currency in the major financial markets without any interruption of service.

In addition to its role in international currency distribution, the ECI program is critical to ensuring the quality of U.S. currency abroad. ECI's are required to sort currency purchased from market participants both by currency design (old and new) and into fit and unfit notes. These requirements ensure that old design and unfit notes are removed from circulation in a timely fashion. ECI's are also responsible for authenticating banknotes purchased in the market. Therefore, the ECI's detect counterfeit notes as they circulate in significant offshore money markets, and quickly report information on the geographic sources of these counterfeit notes to the Secret Service.

Finally, the information provided by the ECI's to the New York Fed regarding country level flows of payments, and receipts of U.S. dollars, has given the U.S. Government a valuable tool for estimating stocks and flows of U.S. currency abroad, particularly for countries about which little information was available previously.

### The Chronology

I will now turn to the chronology of events surrounding the discovery that UBS had engaged in ECI transactions with OFAC sanctioned countries and had concealed those transactions from the New York Fed.

On April 20, 2003, the Sunday New York Times reported that U.S. armed forces had discovered, in Baghdad, approximately $650 million in United States currency. According to the article, the wrapping on the currency indicated that it originated, in part, from the New York Fed. Upon reading this article, I sent an e-mail directing staff at the New York Fed to attempt to determine how currency bearing the mark of the Federal Reserve Bank of New York might have traveled from our offices to Baghdad. Around the same date, staff from the Board of Governors of the Federal Reserve System (Board of Governors) in Washington were contacted by the Treasury Department and asked to assist in tracing the same currency. Also at this time, staff at the New York Fed and other Reserve Banks received telephone calls from agents of the United States Customs Service seeking information regarding the discovered banknotes.

Within days, the New York Fed received serial numbers for a small sample of the banknotes found in Iraq. By April 24, 2003, our cash staff in East Rutherford, New Jersey had determined, using serial number records, that the sampled notes were part of twenty-four shipments that had been sent from our offices to three of our ECI facilities: HSBC in London, Bank of America in Zurich, and UBS in Zurich. Over the next few weeks, we received additional serial numbers from other samples of the discovered currency as well as serial numbers from samples of an additional $112 million that was discovered shortly after the initial hoard. We successfully traced those serial numbers to the same three ECI facilities, as well as to HSBC's ECI facilities in Frankfurt and London; to the Royal Bank of Scotland's ECI facility

20

in London; to a number of commercial banks in the United States and abroad; and to several foreign central banks.

In an effort to follow the currency trail further, in early May 2003 we contacted each of the ECI operators, and one of the commercial banks that had done a large volume of relevant currency purchases, and asked them to provide us with information regarding the counterparties to whom they sold the identified banknotes. By the end of May, we had received responses from HSBC and Bank of America that included, for HSBC, specific counterparty information, and for Bank of America, more general country information, for the relevant shipments. No transactions with Iraq or any other OFAC sanctioned countries were contained in these responses. Our investigative efforts to follow the trail of the currency discovered in Iraq are continuing.

UBS responded to our inquiry by advising that it did not track serial numbers for its banknote sales. In the alternative, UBS agreed to provide information regarding shipments of currency from the ECI that corresponded closely to the dates on which the notes found in Iraq had been shipped from the New York Fed's New Jersey office to the UBS ECI. UBS also informed the New York Fed that Swiss law considerations precluded the sharing of specific counterparty names. Accordingly, only country destinations could be provided. On June 25, 2003, UBS provided a report to one of our cash officers, who was in Zurich for a periodic site inspection. The report purported to list the relevant shipments by date and included the countries to which the banknotes were sold and the amounts in each shipment. While no transactions with Iraq were identified, included in this report were entries representing eight shipments of banknotes to Iran. Of course, we had not expected such a disclosure as currency transactions with Iran were expressly prohibited by the ECI Agreement.

Upon learning that UBS had sold banknotes to Iran, we asked UBS to explain how these Iranian transactions could have occurred in view of the clear contractual prohibition in the ECI Agreement against shipping currency to countries that are the subject of regulations issued by OFAC. We also inquired as to why these transactions had not appeared on the monthly dollar transaction reports that UBS was required to provide to the New York Fed pursuant to the ECI Agreement. UBS responded that the transactions with Iran were done by mistake. Further, with respect to our specific questions directed at the false monthly reports, UBS banknote personnel provided a facially plausible, but false, explanation. The explanation was that the reports were the result of an innocent mistake and not an intentional deception.

In early July 2003, New York Fed management concluded that the transactions by our ECI operator, UBS, with Iran constituted a material event that needed to be reported. Consequently, on July 11, 2003, I sent a memorandum reciting the facts known then to the New York Fed's Board of Directors, which, under Section 4 of the Federal Reserve Act, exercises "supervision and control" of the Bank management. In addition, the New York Fed disclosed what we knew to senior staff at OFAC, the Board of Governors, and the Department of the Treasury. On July 17, 2003, the UBS situation was discussed with the New York Fed's Board of Directors at its July meeting. The directors concurred in the management recommendation to more fully understand the facts by involving UBS' home country supervisor, the EBK, and when the facts were fully understood, to make a decision with respect to contract termination.

On July 22, 2003, I met with representatives of the EBK in Switzerland to discuss how to move forward with an inquiry. I explained to the representatives that, to avoid termination of its ECI contract, UBS would have to provide the New York Fed with reassurance as to its compliance. I emphasized that the New York Fed would not tolerate a repeat violation. I also told the EBK that I was not satisfied with the explanation proffered by UBS concerning the monthly reports. It was agreed that the New York Fed would draft questions regarding UBS' compliance with OFAC regulations in the operation of the ECI and that Ernst and Young (E&Y), UBS' outside auditor, would review the operation and prepare responses to our questions.

In late July 2003, E&Y began its review of UBS' ECI operation. During the course of this review, E&Y learned that in addition to the transactions with Iran, UBS had also engaged in banknote purchase transactions with Cuba, another country on the OFAC list, and that the banknotes had been deposited into the ECI. E&Y also learned that, in preparing the monthly dollar transaction reports, personnel in UBS' banknotes operation had concealed the Cuban transactions from the New York Fed. E&Y informed senior UBS personnel of its findings and encouraged UBS to disclose the information to the EBK and to the New York Fed.

In mid-October, UBS disclosed to the EBK that, in addition to the transactions with Iran, it had engaged in USD banknote transactions with Cuba that involved

21

the ECI. The EBK advised UBS to disclose the transactions to the New York Fed. Late on Friday, October 24, 2003, representatives of UBS met with me at the New York Fed. They told me that UBS had engaged in transactions not only with Iran, but also with Cuba, and Libya, yet another country on the OFAC list. On Tuesday, October 28, 2003, the New York Fed terminated its ECI Agreement with UBS for breach of Articles 8 and 9 of the Agreement which dealt with, respectively, UBS' monthly reporting obligations and its OFAC compliance obligations. Within a week of the termination, UBS disclosed that it had also engaged in transactions with Yugoslavia (the Republics of Serbia and Montenegro) during the time that Yugoslavia was subject to OFAC sanctions. On November 10, 2003, I provided a written report on the termination decision to New York Fed Board of Directors, and reviewed it with the Board at their meeting on November 20.

After terminating the contract for breach, the New York Fed needed UBS' continuing cooperation in the investigation of the facts regarding the breach and the false reports. Senior management of UBS did cooperate with us in these specific matters. Further, we received extraordinary assistance from our supervisory colleagues at the EBK.

Following the termination of the ECI Agreement, UBS appointed an investigative steering committee and retained two respected law firms to conduct a full investigation into the operation of the Zurich ECI. The internal and external auditors of UBS were asked to assist. The EBK agreed to allow UBS to share the results of this investigation with the New York Fed on a confidential basis.

Over the next 6 months, the investigative team interviewed forty-eight UBS employees, many on multiple occasions, and reviewed several thousand documents, including e-mails. On December 3, 2003, the first report from the investigation was provided to the New York Fed. Between delivery of the first report and April 2004, I, along with other New York Fed officers, met with representatives of UBS on three occasions and had numerous telephone conversations. We reviewed the status of the investigation, and requested that more work be done on specific issues. During this same time period, the UBS investigative team also provided us with numerous supplemental responses, documents, and updated chronologies. True to its commitment during the summer of 2003, the EBK enabled UBS to make full disclosure of the investigative results, and also enabled the New York Fed to interview members of the E&Y team that had reviewed UBS' ECI operations. On April 16, 2004, UBS provided the New York Fed with its final supplement to the December report.

The investigation confirmed that UBS engaged in USD banknote transactions, through the ECI, with four OFAC sanctioned countries: Cuba, Libya, Iran, and the former Yugoslavia. UBS consistently engaged in these transactions from the inception of the ECI program, notwithstanding the fact that the UBS personnel involved clearly understood that the ECI Agreement prohibited such transactions. Moreover, UBS personnel took affirmative steps to conceal these transactions from the New York Fed, including, but not limited to, falsifying the monthly U.S. dollar transaction reports that it was contractually obligated to submit. UBS personnel continued their efforts to conceal these transactions even after the investigation was underway. The banknote personnel of UBS also affirmatively misled the EBK.

In early May 2004, the New York Fed engaged the EBK in discussions regarding the appropriate supervisory response to UBS' conduct. Our goal was for the EBK to take remedial action in its capacity as UBS' home country supervisor, and for the Federal Reserve to take punitive action against UBS for its deceptive conduct with respect to an important U.S. program - our sanction regime. On May 10, 2004, the EBK publicly reprimanded UBS for the failures in internal control that permitted both the breach of contract and the deception. The EBK's decision acknowledged that UBS planned to discontinue its banknotes trading business, and forbade UBS from restarting this business without the EBK's consent. Simultaneous with the EBK's announcement of its supervisory decision, the Federal Reserve announced the assessment of a $100 million civil money penalty against UBS.

**The Civil Money Penalty Assessment**

I now turn to my third topic and focus on the amount of the civil money penalty assessed by the Federal Reserve Board against UBS. At the outset let me emphasize that the civil money penalty is directed at deception and the violation of U.S. laws relating to deception. The remedy for breach of contract was contract termination, and that occurred more than 6 months ago.

The Federal Reserve's statutory authority to assess a civil money penalty is expressly set out in Section 8(i) of the Federal Deposit Insurance Act (FDI Act). When the Federal Reserve determines that a financial institution has violated the law, as UBS did here, and that such a violation justifies the assessment of a civil money penalty, we look first to Section 8(i) to determine the range of the penalty that

22

might be imposed. The statute carefully lays out a three-tiered approach to assessment. The tiers focus on both the likelihood that the violation will cause financial harm to the institution and on the degree of willfulness demonstrated by the institution in committing the violation. The greater the likelihood of harm and the more deliberate the act, the higher the maximum penalty.

UBS' conduct here constituted a tier two violation. Section 8(i)(2)(B) of the FDI Act provides that any depository institution that violates any law, which violation is part of a pattern of misconduct, shall pay a civil money penalty of not more than $25,000 for each day during which such violation continues. This formula, applied to UBS' multiple violations of law, permitted the Federal Reserve to assess a civil money penalty of $100 million.

While UBS is a $1 trillion institution, and has abundant financial resources, banknote trading was a very small piece of UBS' overall business. For the years 1999–2003, UBS' banknote trading business for all currencies with all countries had aggregate net profit of approximately $87 million. From 1996 through 2003, UBS earned net profit of slightly less than $5 million from its banknote transactions with countries subject to OFAC sanctions. Thus, the $100 million civil money penalty represents a penalty that is approximately twenty times the amount of the net profit that UBS derived from its wrongful conduct.

Clearly, however, we recognized the severity of UBS' actions. UBS had deceived us over an 8-year period in several different ways. In assessing the civil money penalty, however, we were mindful that the assessment should not be made in a vacuum. Other than the $200 million penalty the Board of Governors assessed against BCCI, the $100 million civil money penalty assessed against UBS is equal to the highest penalty the Federal Reserve has ever assessed against an institutional respondent. Last year, in conjunction with a criminal disposition by the U.S. Department of Justice, the Federal Reserve assessed Credit Lyonnais a $100 million civil money penalty. While no two cases are alike, Credit Lyonnais engaged in a similar pattern of deliberate and repeated false statements to the Federal Reserve in connection with its secret acquisition of the Executive Life Insurance Company.

In considering whether the amount of the civil money penalty was sufficiently large, it is not enough to look only at the size of UBS' balance sheet and net profit. It is important to keep in mind that UBS is a Swiss institution with its own banking supervisor, the EBK, which has no authority to impose money penalties. A Swiss governmental reprimand to the largest bank in Switzerland, as occurred in this case is, to our knowledge, unprecedented in Swiss history. The EBK took that action, in no small measure, to demonstrate that it would not tolerate deception any more than we would. We gave special consideration to the EBK's views also because, as senior Treasury officials have noted in testimony before Congress, the EBK has demonstrated exceptional cooperation in matters relating to the global fight against terrorist financing. As a bank supervisor active in that fight, the Federal Reserve appreciates the value of global cooperation.

In short, the $100 million civil money penalty that we assessed against UBS was appropriate. It was within the range permitted by statute. It was in proportion to the revenues UBS derived from its unlawful actions. It was in line with the Federal Reserve's history of civil money penalties. And, it was appropriate because we were able to act together with the EBK to craft supervisory action that is both punitive and remedial.

## Remedial Measures With Other ECI Operators

I will now turn to my final topic and address the steps the New York Fed has taken with respect to its remaining ECI operators so as to improve the controls relating to OFAC compliance.

Immediately following the discovery that UBS had engaged in transactions with Iran, in July 2003, we directed inquiries toward each of the five banks with which we continue to maintain an ECI relationship. The banks responded by detailing for us the procedures each had in place to ensure their contractual compliance with the OFAC regulations and various antimoney laundering (AML) statutes and regulations. These responses gave us sufficient confidence to carry us through for the period necessary until we could amend our contracts to strengthen the OFAC and AML compliance provisions.

In the fall of 2003, the New York Fed began a process of amending its contracts with the remaining ECI banks to incorporate new controls into the ECI Agreements and add new compliance sections to the ECI Manual of Procedures. Prior to these amendments, the Federal Reserve relied on several means of oversight for the ECI program. All ECI operations were subject to regular audits by (1) the New York Fed's audit function, (2) the banks' own internal auditors, and (3) the banks' external auditors. Our primary means of oversight for OFAC compliance, however, was

23

the monthly dollar transaction reports required by Article 8 of the ECI Agreement and by the Manual of Procedures. These reports were reviewed by New York Fed staff to ensure that the reported numbers corresponded to the amounts shipped from, and received by, each ECI in the given month. UBS' manipulation of these reports effectively concealed its transactions with OFAC sanctioned countries from the New York Fed, and thwarted this oversight mechanism.

In revising the ECI Agreements, two major changes were made to the OFAC Compliance Section. First, language was added to expressly provide that the ECI bank "agrees that ECI Banknote Activity is subject to the jurisdiction of the U.S. Department of Treasury's Office of Foreign Assets Control." Second, the Agreement was amended to include an acknowledgement from the operating bank that, with respect to banknote transactions, it must comply with the provisions of the United States Trading with the Enemy Act, the International Emergency Economic Powers Act, the Antiterrorism and Effective Death Penalty Act, and "any other similar asset control laws, to the extent that they are implemented by OFAC regulations."

Perhaps the most significant changes, however, relate to new audit requirements for the ECI's. A new section was added to the ECI Agreement requiring an annual audit of the operating bank's AML and OFAC Compliance programs. The ECI Agreement provides that a management representative must attest that the ECI operator is complying with the contract. Then, the contract requires that a public accounting firm, hired at the ECI operator's expense, must attest to the management assertion, and specifically, whether the assertion is fairly stated. The public accounting firm must also render an opinion on whether the monthly reports that the ECI bank has provided to the New York Fed are accurate.

As part of these remedial measures, major changes were also made to the Manual of Procedures. The Manual of Procedures now contains sections setting forth specific requirements for AML Compliance and OFAC Compliance programs. With respect to OFAC Compliance, the ECI operator must (1) establish a system of internal controls to ensure compliance with all OFAC regulations; (2) perform and document a comprehensive OFAC risk assessment of all aspects of ECI Banknote Activity; (3) designate a Compliance Officer responsible for monitoring compliance with all OFAC laws and regulations, and an officer responsible for overseeing any funds blocked as a result of any OFAC law or regulation; (4) implement an audit program that will provide for independent testing of all aspects of the OFAC Compliance program, and for an annual comprehensive audit of each line of business relating to the ECI Banknote Activity; (5) provide appropriate OFAC Compliance training for the appropriate employees; (6) maintain the most current OFAC List of prohibited countries, entities, and individuals; (7) retain all OFAC related records for a period of not less than 5 years; and (8) require the OFAC Compliance Officer to develop a program to screen customers and transactions for OFAC compliance.

Finally, in order to ensure that the New York Fed can react quickly to any compliance problems that may arise, there is a new procedural section requiring the ECI operator to notify the New York Fed immediately of any activity that violates the compliance requirements of the ECI Agreement.

The new contracts were all executed and became fully effective in February 2004. I should note that, following the announcement of the assessment of the $100 million civil money penalty against UBS, we again directed inquiries to our ECI operators to learn their reactions to the Federal Reserve's action. All of the ECI operators viewed the penalty as significant and understood that it reflected the importance the New York Fed places on both strict compliance with the OFAC requirements of the ECI Agreement and the Manual of Procedures, and on the integrity of its ECI operators.

### Conclusion

The ECI program serves an important function by ensuring that we supply USD banknotes to the global market in an efficient manner, and that the quality of, and confidence in, our currency is maintained at a high level. UBS' egregious conduct should not overshadow the ECI program's benefits. In terminating the UBS ECI contract, in assessing a $100 million civil money penalty against UBS for its deceptive conduct as a former ECI operator, and in working with the EBK to craft a coordinated regulatory response, the Federal Reserve acted decisively and properly to send a message about the importance it places on OFAC compliance. The remedial measures that have been put into place underscore that message and, we believe, will promote such compliance in the future.

I thank you for the opportunity to appear before you today and look forward to answering any questions you may have.

EXHIBIT 3





Home | Accessibility | Zoom version | Local Sitemap | Service Finder | Contact | eng deu fra ita |

→ Analysts & Investors   → Careers   → About us   → 

**Media**

Media Americas   Media Asia Pacific   Media EMEA   Media Global   Media Switzer

**Media Releases**

Latest Media Releases

Virtual Press Kits

Archive / Search

**Financial Information**

Quarterly Reporting

Quarterly Themes

Annual Reporting

Share Information

Ratings

**Who we are**

...in a few words

...in a few figures

...in a few video clips

Our Businesses

Boards

Organizational Structure

Factsheet

General Meetings of Shareholders

**Services**

Corporate Calendar

Presentations

UBS News Alert

RSS

Download Images

Order UBS Logos

Mailing List Media

**Contact**

Contact Information

Contact Form

UBS Homepage > Media > Media Global > Archive / Search > **Archive / Search**

# Archive/ Search

May 10, 2004

**UBS statement on regulatory actions by the U.S. Federal Reserve and the Swiss Federal Banking Commission**

The Federal Reserve Board (FED) and the Swiss Federal Banking Commission (SFBC) have sanctioned UBS in connection with violations of an agreement governing its involvement in the "Extended Custodial Inventory Program" for US dollar banknotes. The FED has announced that it will levy a civil penalty of USD 100 million. UBS recognizes that very serious mistakes were made, accepts the sanctions and expresses its regret. It has already instituted corrective and disciplinary measures and has decided to exit the international banknote trading business.

In 1996, UBS, through its Investment Bank, entered an agreement with the Federal Reserve Bank of New York (NY FED) as part of the "Extended Custodial Inventory Program"(ECI). The ECI agreement allowed UBS to maintain in Zurich a depot for US dollar banknotes for the NY FED. Such depots are established with private sector banks in order to ease the introduction and circulation of new US dollar banknotes while retiring old ones.

As part of the agreement, UBS undertook not to deliver, accept or deposit US dollar banknotes into or out of the NY FED depot to or from clients in countries facing US trade restrictions.

After NY FED enquiries, UBS found that banknotes had been traded with Cuba, Iran, Libya and Yugoslavia, in breach of the agreement.

UBS subsequently launched, in close co-operation with the authorities, a comprehensive internal investigation, with a taskforce including outside counsel.

That investigation further revealed that the former employees involved had submitted false reports to the NY FED concealing the transactions in question.

As a consequence of these findings, and having taken into

**Language Selection**

**Please choose you language**

→ English

→ Deutsch

→ Français

→ Italiano

account UBS's co-operation, the FED has announced that it
will levy a civil penalty of USD 100 million. The SFBC has
reprimanded UBS, and will make inspections to assess the
effectiveness of UBS's corrective measures.

Peter Wuffli, Chief Executive Officer, said: "UBS recognizes
that very serious mistakes were made. We accept the
sanctions, take full responsibility, and would like to express
our regret. We have already instituted a number of corrective
and disciplinary measures. The behavior highlighted by the
investigation cannot and will not be tolerated in UBS. We will
do everything we can to prevent similar incidents and put this
matter behind us."

Several employees have been dismissed. Disciplinary
measures were taken against other employees.

In addition, UBS has decided to end its banknotes trading
business with counterparties in countries outside Switzerland.
UBS will in future limit its banknotes business to physical
delivery to financial institutions in Switzerland and
Liechtenstein. The banknotes trading to be discontinued is an
immaterial part of UBS's foreign exchange business. UBS has
no intention to re-enter this business.

Zurich / Basel, 10 May 2004
**UBS**

Page last updated: October 18, 2005, 4:20 PM

---

Print this page        Rate this page        Send this page

---

Important legal information - please read the disclaimer before proceeding.
Products and services in these webpages may not be available for residents of certain nations. Please con
sales restrictions relating to the service in question for further information.
© UBS 1998-2008. All rights reserved.
Privacy Policy

EXHIBIT 4



INTERNATIONAL
# Herald Tribune | Marketplace by Bloomb
THE GLOBAL EDITION OF THE NEW YORK TIMES

iht.com   **Business**   **Culture**   **Sports**   **Opinion**

AMERICAS   EUROPE   ASIA/PACIFIC   AFRICA/MIDDLE EAST   TECH/MEDIA   STYLE   HEALTH

TRAVEL   PROPERTIES   BLOGS   DISCUSSIONS   SPECIAL REPORTS   AUDIONEWS

# UBS breaks ties with Iran

*It's about business, not politics, firm says*

**By Hugo Miller and Marc Wolfensberger**          Published: MONDAY, JANUARY 23, 2006

**GENEVA:** UBS, the biggest European bank in terms of assets, said on Sunday that it would cut all its business ties with Iran, a process it began last year after a review of business opportunities there.

UBS is closing accounts held by individuals and companies residing in Iran and is shutting down its trade financing business there, Serge Steiner, a UBS spokesman, said. He did not say specifically when UBS would wind down the business.

"It's not a political expression but a review of business opportunities," Steiner said. "I wouldn't make the link between them." Steiner said he could not say how big the bank's business in Iran was, citing company policy.

In May 2004, UBS was fined $100 million by U.S. regulators for transferring dollars to Iran, Cuba and other nations subject to U.S. trade sanctions and then trying to hide the transactions.

UBS closed its Tehran representative office five years ago.

## Today in Marketplace by Bloomberg

Bank of America moves quickly to cut jobs after earnings disappoint

Sony profit helped by camera sales, but game console still trailing rivals

Microsoft profit soars 23 percent, beating expectations

Iran said on Jan. 3 that it would resume research on the nuclear fuel cycle after two years of suspending the research to underline its contention that its nuclear program was peaceful. As a result, Germany, France and Britain have called for a vote at the International Atomic Energy Agency on referring Iran to the UN Security Council.

About 40 foreign banks operate in Iran. They mainly focus on trade finance in Iran's oil and gas industry as well as arranging loans for Iranian companies like Iran Khodro, the country's largest carmaker.

Mo

24 Ho

1. [

2. 1

3. \

4. L

5. /

6. \

7. ʻ

8. S

9. L
     c

10. L
      c



Case 1:08-cv-04414-JSR     Document 9     Filed 07/02/2008     Page 40 of 168

BNP Paribas, HSBC, Deutsche Bank and Calyon, the investment banking arm of Crédit Agricole, are among the biggest foreign financial institutions in Iran.

Credit Suisse is monitoring the situation in Iran "with growing concern," the newspaper SonntagsZeitung reported Sunday, citing a spokesman for the bank, Georg Soentgerath.

Iran expelled banks like HSBC in 1979 after the Islamic revolution that brought Ayatollah Ruhollah Khomeini to power.

BNP Paribas of France, like Credit Suisse, has been active in Iran for 30 years. HSBC returned there in 1999.

Foreign banks can operate only through representative offices in Iran.

**Home** > Marketplace by Bloomberg            Back to top



**News:** Americas | Europe | Asia - Pacific | Africa & Middle East | Techn...
**Features:** Culture | Fashion & Style | Travel | At Home Abroad | Blogs | He...
**Business:** Business with Reuters | World Markets | Currencies | Commoditie...
**Opinion:** Opinion Home | Send a letter to the editor | Newspaper Masthead
**Classifieds:** Classifieds Home | Properties | Education Center

**Company Info:** About the IHT | Advertise in the IHT | IHT Events | Press Office
**Newspaper:** Today's Page One in Europe | Today's Page One in Asia | Publish
**Other Formats:** IHT Mobile | RSS | AudioNews | PDA & Smartphones | Newsba...
**More:** Daily Article Index | Hyper Sudoku | IHT Developer Blog | In Our P...

Search

Subscriptions
Sign Up | Manage

Contact Us | Site Index | Archives | Terms of Use | Contribute to...

Copyright © 2008 the International Herald Tribune All rights reserved

EXHIBIT 5

# RISK MANAGEMENT AND REGULATORY FAILURES AT RIGGS BANK AND UBS: LESSONS LEARNED

# HEARING

BEFORE THE

## SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

OF THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED EIGHTH CONGRESS

SECOND SESSION

JUNE 2, 2004

Printed for the use of the Committee on Financial Services

**Serial No. 108–91**



U.S. GOVERNMENT PRINTING OFFICE

95–062 PDF          WASHINGTON : 2004

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

## HOUSE COMMITTEE ON FINANCIAL SERVICES

MICHAEL G. OXLEY, Ohio, *Chairman*

JAMES A. LEACH, Iowa
DOUG BEREUTER, Nebraska
RICHARD H. BAKER, Louisiana
SPENCER BACHUS, Alabama
MICHAEL N. CASTLE, Delaware
PETER T. KING, New York
EDWARD R. ROYCE, California
FRANK D. LUCAS, Oklahoma
ROBERT W. NEY, Ohio
SUE W. KELLY, New York, *Vice Chair*
RON PAUL, Texas
PAUL E. GILLMOR, Ohio
JIM RYUN, Kansas
STEVEN C. LaTOURETTE, Ohio
DONALD A. MANZULLO, Illinois
WALTER B. JONES, Jr., North Carolina
DOUG OSE, California
JUDY BIGGERT, Illinois
MARK GREEN, Wisconsin
PATRICK J. TOOMEY, Pennsylvania
CHRISTOPHER SHAYS, Connecticut
JOHN B. SHADEGG, Arizona
VITO FOSSELLA, New York
GARY G. MILLER, California
MELISSA A. HART, Pennsylvania
SHELLEY MOORE CAPITO, West Virginia
PATRICK J. TIBERI, Ohio
MARK R. KENNEDY, Minnesota
TOM FEENEY, Florida
JEB HENSARLING, Texas
SCOTT GARRETT, New Jersey
TIM MURPHY, Pennsylvania
GINNY BROWN-WAITE, Florida
J GRESHAM BARRETT, South Carolina
KATHERINE HARRIS, Florida
RICK RENZI, Arizona

BARNEY FRANK, Massachusetts
PAUL E. KANJORSKI, Pennsylvania
MAXINE WATERS, California
CAROLYN B. MALONEY, New York
LUIS V. GUTIERREZ, Illinois
NYDIA M. VELAZQUEZ, New York
MELVIN L. WATT, North Carolina
GARY L. ACKERMAN, New York
DARLENE HOOLEY, Oregon
JULIA CARSON, Indiana
BRAD SHERMAN, California
GREGORY W. MEEKS, New York
BARBARA LEE, California
JAY INSLEE, Washington
DENNIS MOORE, Kansas
MICHAEL E. CAPUANO, Massachusetts
HAROLD E. FORD, Jr., Tennessee
RUBÉN HINOJOSA, Texas
KEN LUCAS, Kentucky
JOSEPH CROWLEY, New York
WM. LACY CLAY, Missouri
STEVE ISRAEL, New York
MIKE ROSS, Arkansas
CAROLYN McCARTHY, New York
JOE BACA, California
JIM MATHESON, Utah
STEPHEN F. LYNCH, Massachusetts
BRAD MILLER, North Carolina
RAHM EMANUEL, Illinois
DAVID SCOTT, Georgia
ARTUR DAVIS, Alabama
CHRIS BELL, Texas

BERNARD SANDERS, Vermont

Robert U. Foster, III, *Staff Director*

(II)

SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

SUE W. KELLY, New York, *Chair*

RON PAUL, Texas, *Vice Chairman*
STEVEN C. LaTOURETTE, Ohio
MARK GREEN, Wisconsin
JOHN B. SHADEGG, Arizona
VITO FOSSELLA, New York
JEB HENSARLING, Texas
SCOTT GARRETT, New Jersey
TIM MURPHY, Pennsylvania
GINNY BROWN-WAITE, Florida
J. GRESHAM BARRETT, South Carolina

LUIS V. GUTIERREZ, Illinois
JAY INSLEE, Washington
DENNIS MOORE, Kansas
JOSEPH CROWLEY, New York
CAROLYN B. MALONEY, New York
JIM MATHESON, Utah
STEPHEN F. LYNCH, Massachusetts
ARTUR DAVIS, Alabama
CHRIS BELL, Texas

(III)

.

# CONTENTS

|                    | Page |
|--------------------|------|
| Hearing held on:   |      |
| June 2, 2004 ............................................................................ | 1 |
| Appendix:          |      |
| June 2, 2004 ............................................................................ | 31 |

## WITNESSES

### WEDNESDAY, JUNE 2, 2004

Baxter, Thomas Jr., General Counsel and Executive Vice President of the Federal Reserve Bank of New York, accompanied by Katherine Wheatley, Assistant General Counsel, Federal Reserve Board and Michael Lambert, Financial Services Cash Manager, Federal Reserve Board ............................ 6

Stipano, Daniel, Deputy Chief Counsel, Office of the Comptroller of the Currency ................................................................................................................ 6

## APPENDIX

Prepared statements:

Kelly, Hon. Sue W. .......................................................................................... 32

Oxley, Hon. Michael G. .................................................................................. 34

Baxter, Thomas Jr. .......................................................................................... 36

Stipano, Daniel ................................................................................................ 54

### ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

Kelly, Hon. Sue W.:

Bank Secrecy Act: OCC Examination Coverage of Trust and Private Banking Services, U.S. Department of the Treasury .................................. 74

6

findings. Throughout this process, we provided the FBI with exper-
tise on both general banking matters and on some of the complex
financial transactions that were identified.

The OCC began its next examination of the bank's BSA compli-
ance in October 2003. The purpose of this examination was to as-
sess compliance with the Order and the USA PATRIOT Act and to
review accounts related to the Embassy of Equatorial Guinea. The
examiners found that, as with the Saudi Embassy accounts, the
bank lacked sufficient policies, procedures, systems and controls to
identify suspicious transactions concerning the bank's relationship
with Equatorial Guinea. The findings from this examination as
well as from previous examinations formed the basis for the OCC's
recent civil money penalty and cease and desist actions.

In retrospect, as we review our BSA-compliance supervision of
Riggs during this period, we should have been more aggressive in
our insistence on remedial steps at an earlier time. We also should
have done more extensive probing and transaction testing of the
Embassy accounts. As described more fully in my written testi-
mony, we have reevaluated our BSA supervision processes in light
of this experience, and we will be implementing changes to improve
how we conduct supervision in this area.

While not to be minimized, the Riggs situation must be put in
broader context. Unlike other financial institutions which have
only recently become subject to compliance program and suspicious
activity reporting requirements, banks have been under such re-
quirements for years. Not surprisingly, banks are widely recognized
as the leaders among the financial services industry in the anti-
money laundering area. The role of the OCC and the other Federal
banking agencies is not that of criminal investigators, but rather
to ensure that the institutions we supervise have strong anti-
money laundering programs in place. As a consequence of our su-
pervision, most banks today have strong anti-money laundering
programs, and many of the largest national banks have programs
that are among the best in the world.

In conclusion, the OCC is committed to preventing national
banks from being used wittingly or unwittingly to engage in money
laundering, terrorist financing or other illicit activities. We are
ready to work with Congress, the other financial institutions regu-
latory agencies, law enforcement and the banking industry to con-
tinue to develop and implement a coordinated and comprehensive
response to the threat posed to the Nation's financial system by
money laundering and terrorist financing.

[The prepared statement of Daniel P. Stipano can be found on
page 54 in the appendix.]

Chairwoman KELLY. Thank you very much.

Mr. Baxter.

## STATEMENT OF THOMAS BAXTER, JR., GENERAL COUNSEL AND EXECUTIVE VICE PRESIDENT, FEDERAL RESERVE BANK OF NEW YORK, ACCOMPANIED BY KATHERINE WHEATLEY, ASSISTANT GENERAL COUNSEL, AND MICHAEL LAMBERT, FINANCIAL SERVICES CASH MANAGER

Mr. BAXTER. Chairwoman Kelly, Representative Gutierrez and
Members of the subcommittee, my name is Thomas Baxter, and I

7

am the general counsel and executive vice president of the Federal Reserve Bank of New York.

At the New York Fed, I have responsibility for the Legal Department, Security and the Court Secretary's Office. With me today are two representatives of the Federal Reserve Board, Katherine Wheatley, assistant general counsel, and Michael Lambert, financial services cash manager.

Chairwoman KELLY. We welcome their presence. Thank you very much, Mr. Baxter.

Mr. BAXTER. We appreciate your invitation and are privileged to appear before you to discuss the Federal Reserve's operation of the extended custodial inventory, or ECI program, and our responses to UBS's misconduct in operating one of our ECI facilities.

The U.S. dollar is the most desired form of money in the world. In many ways, our dollar represents the strength of the American economy. The dollar is so desired around the world because it is a stable, always-reliable medium of exchange and store of value. Today, I will be speaking about the Federal Reserve's operation of the ECI program, and I should start by describing that program.

In operation since 1996, when the Treasury, Secret Service and Federal Reserve collectively decided to launch it, the ECI program has been a great success. The program sustains the quality of the U.S. dollar banknote, helps to deter counterfeiting and provides an efficient and effective mechanism for the distribution of those notes in our largest market, the market outside of the United States. We estimate that up to two-thirds of our currency, or over $400 billion, circulates outside of the United States.

The ECI program involves the use of financial institutions, mainly commercial banks, that are highly active in the international currency distribution business as Federal Reserve contractors. These institutions agreed to extend the Federal Reserve's reach into major financial centers of other countries and hold inventory of our most popular product, that is the Federal Reserve note. They do this by holding in custody for us in their vaults U.S. dollar notes that we expect to distribute abroad or old and unfit notes that we wish to repatriate. The, quote, "extended custodial inventory," unquote, facility, helps to assure the quality of our product and its efficient distribution.

With respect to quality, the ECI facility performs two important functions. First, it positions us to better monitor and control the quality of our product by identifying counterfeit notes. The ECIs are well situated to detect such notes, to remove them from circulation, to provide intelligence to law enforcement authorities, both here and abroad, and to distribute new authentic notes. They perform similar functions with respect to what we at the Federal Reserve call unfit notes, which is a cash-processing codeword for worn and dirty.

As for the efficiency of our distribution network, through our ECI contract partners, we are positioned in high-volume, wholesale banknote markets. Currently, these markets are located in London, Frankfurt, Zurich, Hong Kong and Singapore. At the present time, we have ECI contracts with American Express Bank, Bank of America, HSBC Bank USA, the Royal Bank of Scotland and United Overseas Bank. Our ECI contractors bring into the markets they

8

serve new fit notes quickly, and with similar expedition, they repa-
triate unfit or old-design notes to the United States for destruction.

They have ready a substantial inventory of notes to satisfy the
periodic spikes in supply and demand encountered in a world full
of uncertainties. Because these notes are Federal Reserve property,
the ECI contractors do not have to finance the inventory when it
is not needed. This leads me to my first point.

The experience that we have had with UBS does not change the
fact that the ECI program is a success, nor should it detract from
the importance of the program to the Federal Reserve, the Treas-
ury, and the Secret Service. I hasten to add that I am in no way
trying to minimize what UBS did. The breach by UBS of our con-
tract was wrongful, and the concerted acts of deception by UBS
carried out over a long period of time, violated our laws.

The Federal Reserve terminated the contract with UBS in Octo-
ber of 2003. And we assessed a $100 million civil money penalty
against UBS on May 10, thereby remedying the breach and pun-
ishing UBS's deception. This leads to my second point, which looks
at how we respond when someone doing our business performs
badly.

The prompt corrective action taken to terminate the Federal Re-
serve's contractual relationship with UBS and to punish deception
by UBS with a large monetary penalty demonstrates a resolve that
Federal Reserve operations will be conducted to the highest stand-
ards and in full compliance with U.S. legal requirements. In this
regard, it is noteworthy that our ECI contracts in essence export
U.S. legal requirements, including OFAC restrictions, to offshore
facilities. The U.S. sanctions regime generally cannot be applied
extra-territorially.

When the Federal Reserve learned that UBS breached its con-
tractual obligations to abide by the restrictions of the U.S. sanc-
tions program and engaged in U.S. dollar transactions with imper-
missible jurisdictions, we acted swiftly and surely. We terminated
our contract with UBS and debited UBS's account with us for the
entire inventory maintained in the Zurich vault.

In a day, UBS lost an entire business line that had been profit-
able throughout the 8 years that UBS served as an ECI contractor.
The forfeiture of profitable business is a financial consequence.
UBS also suffered a reputational injury. Through the related action
of our colleagues at the Swiss Federal Banking Commission, UBS
is forbidden from reentering the wholesale external banknote busi-
ness without the permission of the commission. This leads to my
third point.

The Federal Reserve will not tolerate deception. We will not tol-
erate deception from those banking organizations that we super-
vise, and we will not tolerate deception from those with whom we
contract to execute important Federal programs. The ECI program
is one such program. To transact business out of the Zurich facility
with Iran, Cuba, Libya, and Yugoslavia, as UBS did, UBS per-
sonnel needed to act covertly and to hide their activity from the
Federal Reserve. The people who engaged in such conduct in Swit-
zerland have lost their jobs. The business franchise is no more. In
the civil money penalty that we announced on May 10, UBS paid

9

a heavy price for the deceit of the banknote personnel which it formally employed.

Turning for just a moment back to the ECI program, the imposed penalty gave our remaining ECI operators 100 million reasons to be truthful. And on top of all of that, the Swiss Federal Banking Commission issued a formal, public, quote, "reprimand," unquote to the largest bank in Switzerland. The banknote personnel of UBS deceived people at the Banking Commission just as they deceived us. Our colleagues at the Banking Commission joined with us in finding such deception inexcusable and warranting that reprimand. This brings me to my fourth and my final point.

At the Federal Reserve, we are dedicated to continuous improvement, and we know that all internal controls can be bolstered through the lessons of experience, including our own unfortunate experience in the UBS matter. That experience has shown that our primary control for compliance with the country restrictions in the contract, namely, truthful monthly reporting of currency transactions by country, was just not sufficient. With the country reports that we received from UBS, we did not follow the old audit admonition, quote, "trust but verify," unquote. Since February of this year, our ECI contracts have a number of new features that enhance the control environment and provide for the necessary verification. One is the requirement that management of our ECI contractors attest yearly on contract compliance and accurate reporting and that an independent public accounting firm certify to the Federal Reserve that the management attestation is fairly stated. This Sarbanes-Oxley inspired change shows our commitment to continuous improvement.

Another new feature is a 17-point procedural program that spells out the ECI contractor's responsibilities for OFAC and anti-money laundering compliance. This program provides for OFAC risk-assessments, requires the implementation of ECI program internal controls, establishes operational responsibility for compliance and specifies internal and external audit requirements. Moreover, each ECI operators policies and procedures directed at OFAC's compliance will be reviewed by a team of experts from both the New York Feds and OFAC.

Let me conclude by summarizing my four points. The ECI program is important and successful because it fosters the excellent quality of U.S. currency, and it has efficient distribution outside the United States. When someone performs poorly in the ECI program, you can be assured that the Federal Reserve will respond with prompt force, full corrective action. If there is deception in addition to poor performance, as was the case with UBS, the consequences will be severe. Finally, we will strive to continuously improve our internal controls and the ECI program by borrowing the best ideas and by learning lessons from our experiences. Thank you for your attention. And I look forward to answering any questions you may have.

[The prepared statement of Thomas Baxter Jr. can be found on page 36 in the appendix.]

Chairwoman KELLY. Thank you Mr. Baxter. I am sure there will be questions.

10

I am going to turn to you, Mr. Stipano. I have seen news reports that indicate that your agency was aware of compliance problems at Riggs as far back as 1998, 1997 or 1999 and I see your testimony says late 1990s. When exactly, what month and year, did the OCC recognize problems and violations were occurring at Riggs?

Mr. STIPANO. Well, I can't give you the month, but I can give you the year. As far back as 1997, we cited the bank for deficiencies in its Bank Secrecy Act compliance program. The types of deficiencies that were flagged at the time tended to have to do with the individual elements of a compliance program, in other words, with training, internal controls, testing, et cetera. Those deficiencies were somewhat technical in nature and were not really at a level that would normally require use of formal enforcement action to correct.

Chairwoman KELLY. Is there—Mr. Stipano, I am going to ask you this again.

Mr. STIPANO. Okay.

Chairwoman KELLY. I would like to know a month. If it was 1997, what month?

Mr. STIPANO. I don't have that information at my fingertips. We would be happy to provide it to you though.

Chairwoman KELLY. I would appreciate if you will do that.

[Subsequently Mr. Stipano advised Mrs. Kelly that the month was August of 1997.]

Mr. STIPANO. We will do that.

Chairwoman KELLY. I think that is important for us to know.

Mr. STIPANO. Understood.

Chairwoman KELLY. The problems you just outlined, training, testing, internal controls, why did it take 6 years for the SAR reports, that problem not to come to light? Your agency knew that there were violations at Riggs. It took an unusual step in 2003 to put a full-time examiner on-site, but it wasn't until 2004 that you took some action by assessing a fine.

I think you would agree that eradicating terror financing is one of the most time-sensitive issues that has ever faced our financial regulatory system. I want to know why the agency dawdled before taking any real action if you knew about these problems. You knew about them 3 years before 9/11. But even after that wake-up call, it took another 2 years before you got a full-time examiner on site, and the violations were still continuing with your full-time examiner.

I just—you know, I just—it boggles my mind. I am sure it probably boggles yours. But I would like to know why the agency dawdled in not taking any real action here.

Mr. STIPANO. I don't know that I would characterize us as having dawdled.

But I would agree that, with hindsight, there certainly were judgments that we made that turned out not to be the correct ones. Let me go back a little bit in time because I think it is useful to look at our supervision of Riggs, both pre-9/11 and post 9/11. Pre-9/11, we did many examinations of the bank focusing on the adequacy of their BSA compliance program, which is our charge. The bank had a program and was in compliance with the regulation. In

11

other words, the regulation requires that all banks have a program in place and that it cover four areas. The bank had that. But it didn't perform on each of those elements as well as it needed to. There were deficiencies. The training needed to be better. The controls needed to be beefed up. What we did not know at that time were the types of substantive violations of the BSA that were discovered as a result of our examination in 2003.

I think there are a couple of reasons for that. And I will be very up front with you. The first is that we trusted management too much to get the problems fixed. In the vast majority of cases where you have these types of violations, the examiners bring them to the attention of management and the board, and the problems get fixed. And that is usually the end of it. That didn't happen at Riggs. There was an effort made to fix the problems, but the effort took a long time. It took longer than it should have, and we were willing to give management too much slack.

The other error in judgment that was made during that time frame was that we under-estimated the risk in the Embassy accounts. Pre-9/11, embassy accounts were not viewed by the OCC or anyone else that I know of as high-risk accounts. The types of things that we were focusing on for in-depth examinations were foreign private banking, foreign correspondent, accounts, accounts with Russian entities, accounts with countries that are on the Financial Action Task Force list, but not embassy accounts. As it turned out, there was a lot of risk in those embassy accounts, but it did not come to light until after 9/11.

Chairwoman KELLY. I am looking now at an OCC examination. It is entitled Bank Secrecy Act, the OCC Examination Coverage of Trust and Private Banking Services issued by the Office of Inspector General, November 29, 2001. In there, there is a chart that lists your rate of coverage and testing high-risk transactions for foreign correspondent banking at 0 percent. In other words, in November of 2001, the IG's report says you weren't even looking at this stuff. And that's November of 2001. You still weren't looking at this. With unanimous consent, I am going to insert this into the record.

[The following information can be found on page 74 in the appendix.]

Chairwoman KELLY. But that, sir, begs the question about what those people were doing between 2001, November, and 2003, when you finally put somebody in the bank. I am not asking you a question. I am simply making a statement here that there had to be some knowledge somewhere, institutionally within the OCC I suspect, that would have brought to bear some more information gathering and better oversight on foreign transactions.

What kind of an interaction did you have with bureaus like FinCEN and the Fed after the OCC became aware of the Riggs problems? When did the law enforcement get involved? And I would like to know what—it was a result of the investigation into the report of the financial link between the Saudi ambassador's wife and the 9/11 hijackers. Was that what triggered this? What triggered this?

Mr. STIPANO. Maybe it would be useful for me to walk you through the chronology, post 9/11. You are absolutely correct; 9/11 turned the world on its head, including our world in the regulatory

12

agencies. Our immediate response in the aftermath of 9/11 was to
work with law enforcement to identify where the accounts of the
9/11 hijackers were, as well as where the accounts of other individ-
uals and entities that were linked with the hijackers were.

A process was put into place 5 weeks after 9/11 whereby the FBI
could provide us with the names of suspected terrorists and people
who were linked to terrorism, and we would blast it out by e-mail
to every one of our financial institutions, who would then be obli-
gated to report back and identify the account. So that was some-
thing we did immediately after 9/11.

Another major initiative at that point was to implement the PA-
TRIOT Act, which was passed a few weeks after 9/11. It put some
requirements in place very quickly. But very little of that statute
was self-effectuating. It required that regulations be written. So we
worked on various work teams with the Treasury Department and
the other Federal financial institutions regulators to write regs to
implement the PATRIOT Act.

Another step that had to be taken was to write new exam proce-
dures. Pre-9/11, our focus in this area was on money laundering.
Post-9/11, now we are looking at something relatively new, ter-
rorist financing. So we needed new exam procedures. These were
all things that were done in the immediate month after 9/11.

In the summer of 2002, we embarked on a series of anti-terrorist
financing reviews at most of our large banks and our other high-
risk banks, including Riggs. The purpose of those reviews was to,
determine the extent of compliance with the PATRIOT Act require-
ments that were in place as of that time, and to see what the
banks were doing to deter and prevent terrorist financing. And to
the extent that we discerned weaknesses, we would then follow up
with a more full-scope exam.

Riggs was, as I said, part of that group that was examined with
these anti-terrorist-finance exams. And it disclosed weaknesses. So
that was part of our impetus for doing the January of 2003 exam.

Now, in the meantime, that fall, there were published accounts
of Riggs accounts related to the Saudi Embassy that may have
been used to funnel information to people associated with the hi-
jackers. Obviously, became aware of that and that caused us to
focus with particularity on the Saudi Embassy accounts. Up to that
point, other than the normal types of supervisory interactions that
we would have with the Fed on any bank that has a holding com-
pany, there was not extensive contact with other agencies. There
was not with FinCEN, and to my knowledge, there was not with
the FBI.

Once that examination began, that all changed. The exam we did
in January of 2003 involved some of our best agency experts. It
went on for 5 months. It was an intensive drill-down type of look
at the Saudi accounts, and it discovered all kinds of problems,
mainly a lack of sufficient know-your-customer documentation and
a failure to file suspicious activity reports in noncompliance with
the BSA.

This information was provided to the FBI. We had many meet-
ings with the FBI. I shared a lot of information with them, and at
the conclusion of the examination, we made a referral to FinCEN

13

for the assessment of civil money penalties under the Bank Secrecy Act.

Chairwoman KELLY. Okay. I think that we can talk about that further because it brings questions in my mind about when you say that there was no contact between your agency, FinCEN, FBI and the Treasury prior to this. It just—I hope that that has changed.

Mr. STIPANO. But at that point, there really wouldn't have been a reason to. I mean, we would normally make a referral to FinCEN under guidelines that FinCEN and the banking agencies agreed to many years ago. Prior to that January 2003 exam, systemic BSA violations had not been discovered, so there would not have been a basis for a referral to FinCEN. And we were unaware of any criminal violations that would have necessitated a contact with the FBI.

Chairwoman KELLY. Well, in 1997, there were some areas of concern. And it didn't improve, and it continued to not improve. I think we should—I think we should maybe get into another dialogue about this, and I will have some further follow-up questions on it as I think.

But the report that was—a report that was issued by the Treasury Inspector General found that you really lacked, as I pointed out, sufficient testing of the high risk transactions that were commonly associated with money laundering or lacked review and evaluation of critical BSA reports that banks are required to file. Now, that is—I am quoting from the inspector general's report that I put into the record. Specifically, examiners did not test wire transfers, transactions with foreign correspondent banks, currency transaction reports or suspicious activity reports. In fact, when they looked at that, you had a 0 percent score.

The report concluded that the OCC should ensure that examiners complete transactional testing of high-risk BSA areas, and this was November 2001. And it notes that the OCC management concurred with that recommendation. So the management, the OCC knew in 2001 that there were shortcomings there. And, you know, if you—the OCC scored 0 percent in high-risk areas. You wonder then, there are some other things on that chart. You wonder about some of these other areas. And if you thought you were performing at a certain standard, you think that you maybe now might be overstating your ability to handle the issues? I was adding up this—your testimony, the number of people who worked for the OCC. You have taken on a lot. And I am wondering if you are overstating your ability to handle the issues.

In the Riggs case, that bank is located just a couple miles from its own regulator, the OCC, in a high-threat area with the largest embassy banking clientele. You begin to wonder how many warning signs it takes, how many IG reports it takes. And you begin to wonder that—how can the American people have any confidence to handle this financial oversight? You know, banking regulators have had every warning and every opportunity, and I am not so sure we can win any longer.

On a scale of 1 to 10, how would you rate banking regulators' ability to oversee the BSA compliance right now?

Mr. STIPANO. 9. This is not a new area for us, Chairwoman Kelly. This is something that we have been doing for decades. And I am

14

not saying that we are perfect and that—I am not saying that the supervision that we did in Riggs was perfect. But our job is to ensure that banks have strong anti-money laundering programs, and banks have been under that requirement for 17 years.

The OCC has been very aggressive and vigorous in this area. For example, since 1998, we have taken 78 formal enforcement actions against banks and their institution-affiliated parties that were based in whole or in part on violations of the Bank Secrecy Act. Some of those cases are among the most significant money-laundering cases that the United States Government has ever brought, and the OCC played a key role in those cases.

As a consequence of our vigilance in this area, most banks have excellent BSA compliance programs, and some of the largest national banks have programs that are among the best in the world. They are the model that nonbanking financial institutions are trying to achieve.

And, frankly, I think the real area of concern and one of the best things that the PATRIOT Act did was it extended the types of requirements that banks are under, like the compliance program requirement and the SAR filing requirement, to a whole host of industries that previously had not been subject to those requirements: money transmitters, pawn brokers, broker-dealers, et cetera. And the task now is to get those industries up to the level where the banks are.

Chairwoman KELLY. Finally, I look inside here, and you say you have nearly 17,000 examiners in the field. It seems to me that what happened with Riggs may not be an isolated case. I think that there may be difficulty in communications with other agencies. I think that maybe it might be time, for the sake of the American people's trust in our financial system, to let the agency egos be put aside and start recommitting to working together so that you can share information.

I am very concerned that information has not and may still not be shared between agencies. The problem is, one, when a regulator goes in and begins to look at the things they are charged to look at, they get very involved in the paper work, the appropriate forms filled out, the appropriate forms filed and the appropriate filing cabinets. It does us no good, in terms of bank regulation and enforcement, to have everything go into a filing cabinet and not be enforced. And I am very concerned that we maybe think about not only civil but criminal enforcement and possibly think about ensuring that compliance is assisted by a criminal enforcement program within the Treasury.

Do you think it would have made a difference last year, if Riggs—when Riggs was kind of shamelessly flaunting all your regulations in your face—if someone had been able to pick up in Treasury, at that moment, and had criminal enforcement powers for the BSA? I mean, right now, the IRS is the only one that has that power. Wouldn't it be helpful that maybe we have criminal enforcement capability with people who are familiar with the controls and the systems of the financial institutions to put it all together?

When your reports come in and say, wait a minute, this is a red flag, something needs to happen. What do you think about that?

15

Mr. STIPANO. I think it would be very, very difficult for another agency or group of agencies to duplicate or improve on the job that the banking agencies do when it comes to assessing the adequacy of a BSA compliance program for a couple of reasons. One is that we have at our disposal thousands of bank examiners who are skilled experts at doing this, and that would not be true with another agency. And the type of work that is involved, assessing controls, assessing training, testing, is within the particularized skill sets of most bank examiners. So handing that function to another agency, in my view, would be a step backward and would not improve compliance in the anti-money laundering area.

That said, I agree with you that there is room for improvement when it comes to coordination among Government agencies and information-sharing. One area where I think that the Government is lacking is that information-sharing often is a one-way street from the banks and from the banking agencies to criminal law enforcement. There has been improvement since the PATRIOT Act. The process that I described to you previously, of sending out the control list, has now been codified under Section 314 of the PATRIOT Act. That is a significant development that has made it much easier for law enforcement to target accounts of potential terrorists. But that is relatively new.

What I think would help the banking agencies probably more than anything would be for the Treasury Department and FinCEN in particular to better utilize the data that they have to provide us with analytical reports that would allow us to be better at identifying the risks and concentrating our resources on the high-risk banks and the areas within the banks that pose the greatest degree of risk. That is something that I understand is a very high priority with FinCEN presently and something that they hope to accomplish.

Chairwoman KELLY. Well, right now, FinCEN doesn't have the ability to enforce anything. They are collecting. And they are collecting information. Streamlining and centralizing.

I heard you talk about streamlining, but I think also maybe we need to think about centralizing information so that it can be appropriately examined with one oversight and be responded to, so we don't have another instance where it has taken since 1997 before people throw up their hands and said, "Oh my goodness, there is something happening here." that is—streamlining and centralizing might be good. It is not necessarily always one of the things that we do with the Federal Government, but in this instance, it might be a good thing. So maybe we can talk about that also.

Mr. STIPANO. I just want to be clear on this point though because our view is that, while errors in judgment were made on Riggs, Riggs was an anomaly and the system as a whole presently functions very well. It can be improved, and we hope to improve it. And the way to improve it is through better coordination among agencies and increased information-sharing. The solution, in our view, is not to junk the present system and replace it with something else, because I don't believe that you will replace it with a system that is better than the one you have right now.

Chairwoman KELLY. Well, Mr. Stipano, I am not interested in junking the present system, but I am interested in making sure

16

that we don't walk out of here this afternoon and find that, on the front pages of the newspapers tomorrow morning, there is another Riggs situation.

I think it is very important that we look at how the examinations are being done, how information is being collected, how it can be better collected in a place so that it can be reacted to by the people who have the enforcement capability. And if there is not an appropriate enforcement capability at the agency in charge, which in this case is the Treasury, then the Treasury probably should have that enforcement capability. And it may be something that we want to think about.

It is just—I am just throwing this out here, because I think it is clear there was a break down in the system. And when that happens, we need—it is right and appropriate for us to take a look at how to better that system so that doesn't happen again.

Mr. Baxter, I would like to ask you a couple of questions. There are indications that the Fed saw hints of OFAC related problems at UBS early in the ECI program and had some conversations with the bank. Please tell us if those concerns were ever communicated to OFAC. Also, please tell us why there was not much more stringent attention to the problem if there was even a hint of OFAC-related problems.

Mr. BAXTER. Chairwoman Kelly, first, with respect to whether we had an early warning of a problem at UBS involving OFAC, the answer is no.

In 1998, following the merger between UBS and Swiss Bank Corporation, Federal Reserve officers felt it was appropriate to remind the UBS management that came in at the time of the responsibilities for OFAC compliance under the contract. But that was triggered not by concern that there was a compliance failure. It was a concern about management change that attended the merger of Swiss Bank Corp and UBS.

With respect to notification to the office of foreign assets control, we first learned of an OFAC problem on June 25 of 2003 when an officer who was visiting the Zurich facility learned that there had been transactions of cash with Iran, which of course was not permitted under the contract in early July. All of that information was communicated to our colleagues at OFAC, and I should emphasize that we communicated the information that we had at the time, information that was not correct in several different respects, but the information was timely communicated by the Federal Reserve to OFAC as soon as we learned that we had a problem.

Chairwoman KELLY. Did the Fed send correspondence after the UBS merger to warn them of interaction with OFAC-listed countries?

Mr. BAXTER. I wouldn't characterize it as a warning. I would characterize it as a reminder, and the concern was specifically generated by the fact that anytime there is a merger, particularly a merger of the dimension of the UBS-Swiss Bancorp that with management change come new people, and the new people might not be mindful of the special contractual requirements that we exported through our contract to Switzerland. And in Switzerland there were no prohibitions on transactions by Swiss banks with Cuba, with Iran; there were restrictions with Libya and Yugo-

17

slavia. So it was appropriate for us to remind periodically not only UBS, but other ECI operators that there were special restrictions exported from the United States by contract.

Chairwoman KELLY. I just turned to Mr. Gutierrez, because earlier in his opening statement he talked about whether or not the ECI should be with American-owned banks only.

Why wouldn't some aggressive steps, having been taken in 1996, make certain that ECIs around the world were operated by U.S. banks? Why wouldn't they, by definition, have to observe the OFAC sanctions? Is there some reason why that didn't happen?

Mr. BAXTER. First, with respect to the point about U.S. institutions—and it is a very good point because, as U.S. persons, branches abroad of U.S. banking organizations are subject to OFAC requirements, so they would not need to be reminded or they would not need to be required in a contract. But there are also specific reasons why the Federal Reserve looks to foreign institutions in certain locations. And let me give you a case in point, and the case in point happens to be UBS.

At the time we started our ECI program, we were particularly concerned about replacing a $100 note with a new note, and one of the places that the old $100 note was very, very popular was in the former Soviet Union. At that point in time, there was an American bank called Republic National Bank that was serving the former Soviet Union. That American bank decided that it was no longer interested in the Russian business. And so we were in the position of wanting to reach into Russia to deal with the replacement of the $100 note, and we needed to find an ECI contractor who could do that.

UBS was the contractor who stepped forward. So in that particular case, we looked to a foreign institution to fill in for a U.S. institution that no longer exists, but at the time it was withdrawing voluntarily from that particular business, business that the Federal Reserve, the Treasury, and the Secret Service and the American ambassador at the time felt was very important to pay attention to with respect to the replacement of that $100 note.

So there are reasons that we look to particular foreign institutions to extend our reach into certain jurisdictions, like Zurich back in 1996, like Singapore with respect to United Overseas Bank; and those are reasons to look to foreign institutions to service us. And what we do with the foreign institutions is, we basically apply through the contract the OFAC restrictions.

Chairwoman KELLY. Thank you.

Mr. Gutierrez.

Mr. GUTIERREZ. Thank you very much. Welcome to you all and thank you for your testimony. I want to go back to Mr. Stipano.

The chairwoman and you, through her questions, spoke a little bit about the Riggs situation in 1998 and 1999. Now, I will put words in your mouth, so you can correct anything that you said, that one of the reasons was that your auditors believed what was being said by the answers that were given by Riggs employees back to your regulators and auditors; is that what you said?

Mr. STIPANO. I don't know if I would characterize it exactly that way.

18

Mr. GUTIERREZ. Why don't you recharacterize it, because I want to know exactly what happened.

Chairwoman Kelly said, well, what happened, you were there for 1 year, 2 years, 3 years; and you said, well, one of the reasons was—I understood that they lied to you. And you kind of phrased it a little nicer and said, they didn't quite—we kind of believed them.

Mr. STIPANO. I wouldn't say that they lied to us, but I think that what was going on in that pre-9/11 period was that our examiners were finding deficiencies with the bank's BSA compliance program at every exam. They weren't the kinds of deficiencies that were flagged in the 2003 exam where we looked in depth at the Saudi Embassy accounts, but there were problems, and we brought these problems to the attention of bank management and the board. They were discussed during the exams. They were written up in the exam reports, and we secured what we believed was a commitment from bank management to fix them.

What would happen is really what I would term more accurately as "foot dragging." The changes that we wanted to have made were made, but they were made slowly. There was not a real responsiveness. And looking back at this with hindsight, I think that——

Mr. GUTIERREZ. You trusted them.

Mr. STIPANO. We trusted them. And in hindsight, we shouldn't have done it.

Mr. GUTIERREZ. I guess we finally found a word to describe why it might have taken the OCC as long, because you trusted them. But it seemed to me that an organization such as yours, which is safety and soundness and is the regulator, there shouldn't be issues of trust. I mean, you know, was it trust but verify? And I don't think you were verifying, because similar things popped up later on.

It should have been caught earlier. And just so that we don't think it is the chairwoman and I who have decided, because they sent you down here—they usually send one of the counsels down here. Mr. Hawke is good at doing that, but he acknowledged, and these are his words in the New York Times, he says "We should have gotten tougher earlier, and I don't make any excuses for it. It's a fair criticism of our supervision of Riggs that we let things go on too long."

So when you describe a situation, which is a 9, in which Mr. Hawke, who I would characterize as a very self-assured person—I wouldn't say arrogant, but self-assured person, doesn't take much from anybody, right, tough—says, we took too long and which his deputy counsel, yourself, said, we trusted them too much, I think you can start wondering.

I mean, if the FBI came and said, yeah, we talked to the terrorists, but we trusted them and so the buildings came down, I think people might think it wasn't a 9-out-of-ten system that was working there. I mean, just understand that from our point of view that—just we trusted them, they took too long, there was foot dragging. You are the boss. I mean, when a regulator sends down bank examiners, I want them to shake up that bank. I want them to go all the way up the chain of command and say, we have a problem and we have to clean it up or—I think you know what the problem

19

is, Mr. Stipano, it is always the "or." Maybe they take the risk of getting caught and the fines and the penalties, which was one of my earlier questions.

We have to think of new fines and new penalties. I mean, this is like risk: What is my risk as a financial institution if I foot drag? What is the most that the OCC—maybe we need tougher penalties, and we have been doing some of that.

So it just seems to me that to say we trusted them, especially in this new age after we passed the PATRIOT Act, you can't trust anybody anymore. We can't trust the Riggs. We can't trust UBS.

I am sure the folks at the Federal Reserve Bank trusted them. They said, what a great company, they are really going to come on and do this job. And we can't do that. We need to monitor them, don't you think?

So 9 out of ten, I don't think in this particular case to say that this is just one. Which are the other cases in which you are trusting people today that tomorrow we are going to find out that that trust was ill conceived?

Mr. STIPANO. First of all, I always agree with Mr. Hawke. So I'd like to get that on the record.

Mr. GUTIERREZ. I don't, and in that, we don't share a common opinion.

Mr. STIPANO. Secondly, while I would characterize our overall efforts in this area as a 9, I certainly would not characterize our efforts with respect to Riggs as a 9. We made errors in judgment, and I think they are obvious and we have discussed them. But I don't think that Riggs is emblematic of our supervision broadly in any area and certainly not in the BSA area.

Mr. GUTIERREZ. Let me ask you a question. Do you still trust people? Do you still send your bank auditors out and say, we trust them, and walk away?

Mr. STIPANO. I believe you have to trust but verify.

Mr. GUTIERREZ. Okay. Well, I would like to know what kind of things you are doing differently, given that Riggs started in 1997, 1998, 1999, and finally, voila, this year we got a fine. So that is a long time, as we sit here, to watch an institution such as yours, that wants to expand.

Now you are sending out preemption notices to the States saying, not only do we want to do all the great things we did while Riggs was doing all of these nefarious things, we want to expand our authority; but we don't want to actually charge any more fees to our customers, the banks, in order to hire more employees in order to expand that authority.

So I see an institution that walks up here and says, we are doing everything fine, we are doing everything so great—this is Mr. Hawke, of course, not yourself—doing everything so great and now we want to preempt attorneys general and bank regulators and other people at the State level from issues and consumer complaints, that you want to now preempt stateside.

So I think you get my worry.

Let me just say that I read your testimony, and it was like on page 19 on the top that says "The examiners found that, as with the Saudi Embassy accounts, the bank lacked sufficient policies,

20

procedures and controls to identify suspicious transactions concerning the bank's relationship."

You found out about those irregularities at the Equatorial Bank, or did the Riggs people tell you about them or the FBI tell you about them? Because as I read that, it kind of sounds like, voila, our examiners found out about it. Did your examiners find out about it as I was led to believe when I first read that paragraph or did others bring it to your attention?

Mr. STIPANO. Let me give you an answer to that question. First of all, I don't think the sentence says that we found problems in the Equatorial Guinea accounts.

Mr. GUTIERREZ. It says "The examiners found that, as with the Saudi Embassy accounts, the bank lacked sufficient policies, procedures and controls," "the examiners found."

Mr. STIPANO. Right.

Mr. GUTIERREZ. Did the FBI or Riggs find it?

Mr. STIPANO. No. The examiners found that, just like with the Saudi accounts, the bank did not have policies and procedures with respect to Equatorial Guinea. What happened with Equatorial Guinea was that this was actually something that was going to be looked at during the January 2003 examination. There were published accounts of problems——

Mr. GUTIERREZ. I just read it and I just want to see. So if you can only find something once between the OCC, the FBI—what agency, who brought it to public attention first? Did the bank examiners show up and say, voila, we found this or did Riggs say it?

Mr. STIPANO. The examiners did not find the problems at Equatorial Guinea.

Mr. GUTIERREZ. That's what I am trying to say. So then, in other words, when I read your testimony and when I first read it, I said, hey, look, the examiners did a great job. They found this.

Actually, they didn't find it.

Mr. STIPANO. Congressman, with all due respect, I don't believe that is what that sentence says. The sentence says that they didn't find adequate policies and procedures with respect to those accounts, just as they didn't find adequate policies and——

Mr. GUTIERREZ. But really Riggs is the one that brought this to the attention of the OCC about the lack of procedures?

Mr. STIPANO. Not exactly.

Mr. GUTIERREZ. Fine. It is all right. What is, is. It will come up again——

Mr. STIPANO. Can I just finish the answer?

At the conclusion of the 2003 examination, we told the bank that the next time we are in there, this was going to be an area that we were going to look at. So the bank was on notice that this was priority and, frankly, that was one of the problems. And the reason for such a big sum of money penalty was that despite having been put on notice, they still did not clean up those accounts.

Mr. GUTIERREZ. All right. Let me just say that when your boss, Mr. Hawke, says nonsense about what banks are going to do, and I hear you give yourself a 9 out of 10, and I think that I with my staff kind of set the tone. So if I am out there saying that Congress, even though there has been a vote of the Banking Committee saying basically, the OCC is wrong, this committee has voted—and we

21

are kind of elected, the last time I checked. At least with everybody else there was no dispute in their election by the people.

When he says, nonsense, and this committee says to Mr. Hawke, let's sit down, which we have done on a number of occasions, and let's sit down with bank regulators and let's sit down with attorneys general and let's sit down with this committee and let's try to resolve our differences after this committee has taken a vote—not the Congress, but this committee has taken a vote—saying we think you have exceeded your authority and he says, no, nonsense, everything is fine, I guess that can, I believe, create a sense of arrogance within the institution when the boss basically says to Congress, after it has taken a vote in the committee, and uses those kinds of words when we believe we have a concern—and not only we, but a lot of other people think that there is concern.

Let me just ask you that when consumers now call you folks up, have a consumer complaint, am I right that those phones only operate Monday through Thursday from 9:00 to 4:00?

Mr. STIPANO. Congressman Gutierrez, I have to confess here. I am not the expert on our Customer Assistance Group.

Mr. GUTIERREZ. We called on a Friday, and it said it was closed. So you won't dispute that?

Mr. STIPANO. I don't know whether it is or not.

Mr. GUTIERREZ. Let me just tell you, we tried it, and it said 9:00 to 4:00 Monday through Thursday.

I was a former city council member back in Chicago, and I loved that job a lot, and one of the things that kept us very close was that if your cable didn't come on because the city council would authorize who got the cable license, people would call me up and say, I called the cable company and they won't fix it; and if I told them that I was allowing the cable company, which I had voted, as the city council, to only open up their offices from Monday through Thursday from 9:00 to 4:00, I don't know how long I would have stayed in the city council.

I think if people call up the gas company in Chicago or Commonwealth Edison that has the franchise to serve electricity, and they were only going to open from 9:00 to 4:00, as a matter of fact, if I decided that my city council office or my congressional office tomorrow was only going to operate from 9:00 to 4:00 Monday through Thursday, I think you would agree with me that I would have a problem in doing that.

And I think that you should understand that you have a problem and that when people complain to us that their complaint is well grounded, that government should work Monday through Friday 9:00 to 4:00—maybe that is not an 8-hour day—and that if you need more help, since you want to expand your authority and preempt the States, that maybe you should say, Congress, we don't agree with you, but we are going to open Monday through Friday.

Does it sound legitimate to you as the deputy counsel that you should operate Monday through Friday?

Mr. STIPANO. I do not deal with the Customer Assistance Group. I am open Monday through Friday, and I don't leave at 4:00. And I get calls from people all the time. In fact, usually if there is a problem in the BSA area, the call ultimately comes to me. I am not suggesting that I want to function as a shadow Customer Assist-

22

ance Group, but there are other people in the agency that can take calls——

Mr. GUTIERREZ. But the rest of the agency functions Monday through Friday, right?

Mr. STIPANO. The agency functions Monday through Friday.

Mr. GUTIERREZ. I suggest that all parts of the agency should function Monday through Friday, and I think we can probably give a lot of different examples about what would be wrong with not functioning Monday through Friday. It seems to me that that is the work week and that the financial institutions are open and people have problems; and it is wrong for agencies such as yours to want to preempt States and then say, we are only going to open our offices from Monday through Thursday from 9:00 to 4:00. It should be a better operation so that the public, which I have a concern about, is well served so that we are not getting messages that say we don't have to deal with you, Attorney General, the OCC says that has been preempted; let's call their offices, only to find your offices aren't open.

Because you want to know something. My State bank regulators in Illinois are open Monday through Friday. The attorney general of the State of Illinois is open Monday through Friday. And across this country I have yet to find a State bank regulator or attorney general, which your agency wishes to preempt, that is not open Monday through Friday. So I would expect that if you want to take over the responsibilities of those State agencies that at least you afford the public the same customer service that is currently being afforded them by attorneys general and State bank examiners, that we don't reduce the quality of service to the American people which you and I have made a vocation to carry out. I guess that is our point.

I have other questions, and we will submit them for the record. Thank you very much, Madam Chairman.

Chairwoman KELLY. Okay. Thank you.

Mrs. Maloney.

Mrs. MALONEY. Thank you, Madam Chair, for your hard work on this, and Ranking Member Gutierrez.

Welcome, Chief Counsel Stipano and General Counsel Baxter. I request that my opening statement be put in the record. I really would like to ask Mr. Stipano what aspects of the PATRIOT Act could help avert a repeat of the Riggs problem.

Mr. STIPANO. I think that there are provisions in the PATRIOT Act that are helpful and will be helpful going forward. But I think that the problems——

Mrs. MALONEY. Specifically, which ones would be helpful going forward?

Mr. STIPANO. I think that, first of all, section 312, which is the provision that requires due diligence and enhanced due diligence procedures for foreign private banking and correspondent accounts, that would be something that would be helpful because even though the Saudi Embassy accounts were not technically private banking accounts, in some ways they were operated like they were private banking accounts.

There is an interim final rule in place implementing section 312. My understanding is that the Treasury Department will soon be

23

issuing a final regulation which will codify this requirement, and
I think——

Mrs. MALONEY. Why is it taking so long? We passed the PA-
TRIOT Act and the anti-money laundering provisions almost 3
years ago. And we still haven't put the rule in place? I mean this
is really outrageous.

Mr. STIPANO. We have all the other ones in place. I am not a
spokesman for the Treasury Department, though. The Treasury
Department has the pen on this particular regulation, and it is the
Treasury Department that has to issue the rule. So maybe this is
a question for your hearing next week. I don't really know the an-
swer to that.

Mrs. MALONEY. Well, then when you were looking at Riggs,
under what standard did you examine Riggs regarding the due dili-
gence and the opening of accounts with the diplomatic community?
Were you using the standard before 312 or the intent of 312, sec-
tion 312?

Mr. STIPANO. We have a requirement that all banks have a com-
pliance program, and among the things that are required as part
of a compliance program are satisfactory internal controls. That
would include due diligence procedures for all accounts and en-
hanced due diligence procedures for high-risk accounts.

The embassy accounts—at least the Saudi Embassy account is a
high-risk account; and what the bank should have done was, first
of all, they should have had better systems in place so that they
knew the number of accounts that they had. Secondly, they needed
to have better information on how those accounts would be used,
what the sources of funds would be, where the funds would go.

Mrs. MALONEY. But when you knew about this in 1998 and
1999—it was well known to the OCC that they were not in compli-
ance with the Bank Secrecy Act at Riggs—did you go to them and
suggest that they have standards and procedures and due dili-
gence, and then go back and just make sure they got the job done?
I mean, this is serious stuff right now.

Every time I pick up the paper, New York, where I live, is Code
Red, at least Code Orange. They are announcing terrorist attacks
any day now, and we all know you can't attack without money. So
if you crack down on the shipment of money, we can crack down
on the ability of terrorists to act.

I mean, this is extremely serious and not to put the regs in place
or even to have followed them or to have gone back—you talk about
all the people you have in the field. What about who you have in
Washington? You don't even have to leave the office. You are right
here in Washington with Riggs. You can walk across the street and
see them, practically.

And we knew, since 1998, they had problems with these high-
risk accounts, and yet we didn't come in and crack down on it
more. I mean, I find it quite frankly scandalous.

Mr. STIPANO. I couldn't agree with you more as to the serious-
ness of this matter, but what we knew in 1998 was very different
from what we knew in 2003; and in 1998 what our examinations
revealed were deficiencies in the compliance program, not whole-
sale violations of the Bank Secrecy Act. It was a much less grave
type of violation.

24

They were brought to the attention of management. They were written up in the exam report. Commitments to fix the problems were obtained. But as I testified earlier, bank management did not follow through on these changes as quickly as they needed to, and hence, there were repeat violations.

There is no question, looking back at it with hindsight, we should have been more forceful with that bank at that point and not waited until 2003 to take a formal enforcement action.

Mrs. MALONEY. What does your enforcement action mean? Will they be fined? What is going to happen?

Mr. STIPANO. There actually are three actions that the OCC has taken. The first one was in July of last year, and that was a cease and desist order. It is a public enforcement document. It is about 20 pages long. It requires the bank basically to take steps to improve its anti-money laundering program.

That cease and desist order was supplemented by a second cease and desist order that was issued a few weeks ago and——

Mrs. MALONEY. What I don't understand is, why didn't you issue a cease and desist order the minute that the FBI alerted you to the problems at Riggs? It almost makes it sound as if the OCC doesn't take the Banking Secrecy Act issue seriously.

Is it a priority at the OCC, the BSA?

Mr. STIPANO. It absolutely is a priority. We were not alerted by the FBI. We found escalating problems with the bank's program through our exam process and because of published reports about connections between the Saudi accounts and the hijackers. That triggered this very extensive examination that we did last year which formed the basis for our subsequent enforcement actions.

Mrs. MALONEY. But you say that the BSA issues are a high priority of the OCC, but I am told that they are not even part of the National Bank Examiners Handbook, that most of the regulations that were issued in 2002 aren't even part of the examiners handbook. Now is that true——

Mr. STIPANO. No, that is not true. The——

Mrs. MALONEY.—that it is not fully updated? That the handbook is not fully updated?

Mr. STIPANO. We are in the process of updating it, and there should be a revised version out shortly, but——

Mrs. MALONEY. Why didn't you update it the minute that we passed the PATRIOT Act? This is serious business.

I can't tell you how quickly New York reacted in a thousand ways. We totally rebuilt the command center that was destroyed, within 19 hours, completely rebuilt it, and I can't believe you can't get the handbook updated with the information that we passed to combat money laundering and terrorist dollars flowing through our country. I mean, really it is beyond—it is a disgrace, I think, an absolute disgrace.

Mr. STIPANO. The PATRIOT Act required us to make lots of changes in our examination procedures and to write regulations, and that took time. We could have come out with a revised handbook earlier, but if the procedures weren't done and the regulations weren't written, it probably would not have been of great value to the examiners.

25

Mrs. MALONEY. It would not have been. Well, what more should we be doing to make sure that the type of actions at Riggs don't happen again?

Mr. STIPANO. I think there are a number of steps that the OCC is prepared to take.

Mrs. MALONEY. Such as?

Mr. STIPANO. Comptroller Hawke has directed our Quality Management Division to do a stem-to-stern review of the Riggs matter to find out what happened and to see what lessons we can learn from it. But even before that review is done, there are several steps that we can take right now, and we are taking them.

Mrs. MALONEY. When is your report on lessons learned from Riggs going to be due? In another 3 years?

Mr. STIPANO. No, it will not be. It will be a matter of months. In fact, the review has already begun.

Mrs. MALONEY. I would respectfully request that when it is done, it would be handed in to the chairwoman so she can give it to all of us, so we can all read it.

Chairwoman KELLY. Mr. Stipano, I would concur with that. We would like that report delivered as soon as possible.

Mr. STIPANO. As soon as it is completed, we will deliver it.

Chairwoman KELLY. I thought you said it was completed, sir.

Mr. STIPANO. No, no. I said the review has begun.

Chairwoman KELLY. The review has been done?

Mr. STIPANO. The review has begun.

Chairwoman KELLY. Has begun. And I am sorry, if the gentlewoman would yield, her question was how long do you expect that to take?

Mr. STIPANO. I don't know exactly how long it will take. My guess is it will probably be several months.

Chairwoman KELLY. Would you please inform us of the progress of that report on a regular basis?

Mr. STIPANO. Yes, we will.

The due date, by the way, is September 1.

Mrs. MALONEY. Reclaiming my time, what other steps can we take that are concrete to crack down on the terrorist money business?

Mr. STIPANO. We need to become better at identifying risk. One of the big problems with Riggs was that neither our examiners nor law enforcement nor anyone else recognized the risks in these embassy accounts.

There are a number of steps that we are taking to do that. One of them is the nationwide implementation of a risk identification system that has been developed by one of our district offices. It involves gathering information on products and services and various types of activities that banks are involved in and putting it in spreadsheet form and developing a methodology to quantify risks and identify banks that may be outliers.

We are also working on a new database that would use national bank-filed SARS to pinpoint operational risks generally, but also risks in the BSA area.

Third, we are working with FinCEN and the other banking agencies on ways to better use BSA data. FinCEN is sitting on a gold mine of information with the SARS data and the CTR data and

26

other data that they have. The ability of the government to connect the dots and provide that information to the banking agencies is absolutely essential because once we have that kind of information, we can target our resources to the areas of banks that are truly high risk.

As I mentioned earlier, we have also completed our examination procedures on three sections of the PATRIOT Act and we are about to come out with new procedures on a fourth section.

Mrs. MALONEY. Quite frankly, you don't need a database or a spreadsheet to know that Riggs, the international bank for most of the foreign governments in the country and the foreigners in the country, is a high-risk bank. I mean, it is common sense, and yet it was not looked at. So I hope that you improve. This should be a priority.

And I know you have a lot of smart people working in the OCC, and I have great respect for Comptroller Hawke. But it doesn't sound like the BSA issues are at the top of your concerns, and I think it should jump ahead of any concerns that you have to change your charter and everything else you have been trying to do, because this is critically national security and, really, the security of our people is at stake.

But I would like to go to Mr. Baxter and I would like to ask you about the Basle Capital Accords that are coming out that the Fed has been working on with the international community. When we finally solidify and come forward with these decisions on various capital requirements and so forth, do you think having an international standard is going to help us spotlight and see the type of problems that were at UBS? Do you think that would be helpful, or is that really not an issue? What is your feeling on that?

Mr. BAXTER. One of the things we see in the UBS matter is an example of operational risk, a failure of people, a failure of controls. These failures were observed not here in the United States, but in the operation that was being conducted in Zurich. It is a good illustration of operational risk as a type of risk being addressed in Basle II, and here is one vivid demonstration of operational risk.

It also, I think, Congresswoman, has relevance to what is being done at the Basle Committee because this occurred in a multinational banking organization.

UBS is an organization that conducts its operations in many countries. It has 65,000 employees around the world; 22,000 of them are in the United States. So you can see an operational risk problem and an institution that conducts its operation cross-border. So it is a good illustration of why operational risk is an important part of the risk quotient that is addressed in Basle II. It is also a good illustration of why the effort needs to be multinational and because this Basle II is being imposed on institutions that conduct their operation cross-border.

Mrs. MALONEY. Well, I was encouraged somewhat that the U.S. And Swiss authorities worked in cooperation with the U.S. management of UBS to investigate and correct the UBS systemic risk management lapses in Zurich.

But one of your statements earlier was alarming to me when you said one of the problems is that the personnel at the bank were not informed of the laws of the United States of America, of how we

treat these accounts, and that we certainly shouldn't be transferring money and so forth to Libya, et cetera, and these other countries. And it seems to me that that would have to be part of the protocol, to let people know what the laws are.

I mean, I find that an incredible—I can't believe that someone is that stupid that they don't inform everyone that this is the standard, because it is a U.S. bank, too, even though it is dealing with many different countries and just merged with the Swiss bank and so forth.

What is your comment on that? It is the stupidity defense, "I just didn't know." I think if you read the paper, you would have known that—any intelligent person reading the paper would have known that we had these certain guidelines and rules about transferring accounts and moneys and so forth to various countries.

Mr. BAXTER. Congresswoman, you are absolutely right that the people in the bank note trading area of the UBS in Zurich, they knew about the restrictions that were exported in our contract to them. They knew that they had to conceal what they were doing. They had to conceal what they were doing not only from the Federal Reserve, but also from the Swiss Federal Banking Commission, from the more senior management at UBS and from UBS's external and internal auditors.

They did it because they were willing to lie. They did it because they were willing to violate the law, and they paid a price for that. But there is no question that they knew of the limitations in that bank note trading area, and they knew they had to hide. And hide they did.

Mrs. MALONEY. Well, I misunderstood you in your earlier comments. I thought you stated that they did not know, that there were people with the Swiss bank, and they just merged with another bank and they weren't familiar.

But you say it is just a matter of just crime, and I am glad that we have cracked down on it, but what could we do in the future to make sure that doesn't happen again? How could we improve our oversight and our monitoring?

Mr. BAXTER. Well, it won't happen again with UBS because they are no longer in the——

Mrs. MALONEY. No longer in business, right. But other banks?

Mr. BAXTER. With the other five contractors, what we have done is implement this 17-point program through contract changes that were effective in February of this year.

In addition, we are planning visitations to each of our five contractors to review policies and procedures dealing with anti-money laundering and OFAC compliance in our offshore facilities.

Now, it will come as no surprise that we have heightened attention in those five contractors now, who have watched the $100 million penalty being assessed against UBS and have taken careful notice. So while this iron is hot, we going to make those visitations, we are going to review with our colleagues at OFAC the policies and procedures that are in place, and we are going to make suggestions to our ECI contractors as to how they can be improved.

So those are the things that we have got in train. We are also expecting in the late summer/early fall to start to receive the public accounting firm certifications, and those certifications will be at-

28

testing to the management representations we will receive both with respect to contract compliance and with respect to accurate reporting. And the check of those independent public accounting firms, in our view, is significant. It is significant in a Sarbanes-Oxley context and it is significant because we know those public accounting firms are very mindful of their own liability; and they will be making certifications directly to the Federal Reserve, and we will have a say in our contracts as to who those public accounting firms are and then the policies and procedures that they will follow with respect to their certifications.

So all of those things are in train, and all of those things, we expect, will give us much greater assurance that we will not see a repetition of the conduct we found with UBS in any of our other contractors.

Mrs. MALONEY. Did the Fed ever consider using only U.S. banks operating abroad for these functions? Wouldn't that have made things simpler since U.S. Banks are not allowed to deal with countries on the OFAC list?

Mr. BAXTER. You're right, Congresswoman. It does make things simpler, but that, in itself, is no guarantee of perfect compliance. Again, we get to that old audit admonition about trust but verify. So we feel that even with respect to our U.S. ECI contractors—and most of them are U.S. Institutions—that we can't only trust them, we have to trust and verify.

So the procedures that I mentioned with respect to the new contracts and the external certified public accounting firm attestations, those we are going to implement across the board regardless of nationality. They will apply to the U.S. institutions and the non-U.S. institutions.

With respect to the specific question, have we considered using only U.S. flag institutions, yes, we have considered that. The difficulty is to penetrate certain markets around the world, we feel we need to turn to some of our foreign commercial institutions for the reasons that led us to the UBS in 1996. And that is why, in Singapore, we are doing business with the United Overseas Bank.

So we are certainly mindful that the U.S. flag institution might be simpler and has some legal difficulties that are less than we find with the foreign flag carriers or institutions, but we haven't made the decision to use only American institutions at this point.

Mrs. MALONEY. Thank you very much. And I yield back the balance of my time, although I think I used it all up.

Chairwoman KELLY. That is quite all right. I thank you both.

But I have one follow-up question for you, Mr. Stipano. What happened to the auditors that failed to find the problems at Riggs? Are they still at OCC?

Mr. STIPANO. It is hard to answer that because we are talking about——

Chairwoman KELLY. I thought it was a fairly straight question. Are they still at OCC?

Mr. STIPANO. There are a lot of examiners who have examined Riggs during this time period. Some of them are still at OCC and some of them are not.

29

Chairwoman KELLY. What mechanism do you have in place to assess the performance of the bank examiners regarding the BSA compliance?

Mr. STIPANO. We have a couple of mechanisms. One is the performance appraisal process that the OCC uses for examiners and for other types of employees and another is the Quality Management Division. That is the division that Comptroller Hawke has directed to do a review of the Riggs matter and to report back on what went wrong.

Chairwoman KELLY. How long was that Quality Control Division in place?

Mr. STIPANO. I don't know offhand. It is not something recent.

Chairwoman KELLY. Years? Months?

Mr. STIPANO. In some form, I would say years.

Chairwoman KELLY. I think that this has been a very interesting hearing. I am interested that you were talking about the great amount of information that FinCEN has and talk about the ability to connect the dots. If we streamline what is going on with regard to regulatory agencies and perhaps centralize them, then they perhaps can have access to each other's information in a much more direct way that will result in better oversight, more rapid response. And certainly we don't want to see this kind of thing happen again for such an extended period of time.

We don't live in the world that we lived in prior to 9/11/2001. We live in a very different world. And part of that world is that we now—those of us who are charged with the responsibility of making sure that our country is safe and that our banking system is safe, we must think outside of the box, look outside of the box for solutions; that we will never let this kind of thing happen that happened with the Riggs Bank again.

I am concerned with not only what happened with OCC, but I also am concerned with the Fed in one aspect. The fine of $100 million sounds like a lot of money, but when you have a bank with more than $1 trillion in assets, that fine seems a mere slap on the wrist. I would hope that when an institution is fined, especially an institution that had in place people who were supposed to find this kind of malfeasance, I would hope that that institution would pay a much steeper price for not regulating and controlling their own employees' behavior.

Here in the United States we put people like that in jail when there is a fraud in a bank. We have bank fraud laws; those people go to jail. $100 million, it seems they got by on the cheap, and I am quoting a lot of other people who have also mentioned that to me.

I would hope that when you are considering fines of this nature again that the Fed would consider a healthier fine for any kind of malfeasance that is occurring.

This is a blow to our financial system in a way—both of these are blows to our financial system in a way that American people have a right to expect should not happen when we have institutions in place whose charge it is to make sure that it doesn't happen.

I appreciate the fact that you came here today. I appreciate the fact that you spent so much time with us, helping us understand

30

what did happen, what went wrong, and helping us understand how it is possible that we might be able to get through this and come out on the other end with a much better regulatory environment that will help protect America and America's financial institutions in a better way.

The Chair notes that some members may have additional questions for this panel which they may wish to submit in writing. So, without objection, the hearing record will remain open for 30 days for members to submit written questions to these witnesses and place their responses in the record.

I thank the witnesses for their appearances here today. This hearing is adjourned.

[Whereupon, at 3:57 p.m., the subcommittee was adjourned.]

EXHIBIT 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MOSES STRAUSS, PHILIP STRAUSS,                    :
BLUMY STRAUSS, AARON STRAUSS,                     :
ROISIE ENGELMAN, JOSEPH STRAUSS,                  :
TZVI WEISS, LEIB WEISS, MALKE WEISS,              :
YITZCHK WEISS, YERUCHAIM WEISS,                   :
ESTHER DEUTSCH, MATANYA NATHANSEN, :
CHANA NATHANSEN, MATANYA AND                      :
CHANA NATHANSEN FOR THE ESTATE OF                 :
TEHILLA NATHANSEN, YEHUDIT                        :
NATHANSEN, SHOSHANA NATHANSEN,                    :
HEZEKIEL TOPOROWITCH, PEARL B.                    :
TOPOROWITCH, YEHUDA TOPOROWITCH,                  :
DAVID TOPOROWITCH, SHAINA CHAVA                   :
NADEL, BLUMY ROM, RIVKA                           :
TOPOROWITCH, EUGENE GOLDSTEIN,                    :
LORRAINE GOLDSTEIN, BARBARA                       :
GOLDSTEIN INGARDIA, RICHARD                       :
GOLDSTEIN, MICHAEL GOLDSTEIN, CHANA :
FREEDMAN, HARRY LEONARD BEER AS                   :
EXECUTOR OF THE ESTATE OF ALAN BEER, :
HARRY LEONARD BEER, ANNA BEER,                    :
PHYLLIS MAISEL, ESTELLE CARROLL,                  :
SARRI ANNE SINGER, JUDITH SINGER, ERIC :
M. SINGER, STEVEN AVERBACH, JULIE                 :
AVERBACH, TAMIR AVERBACH, DEVIR                   :
AVERBACH, SEAN AVERBACH, ADAM                     :
AVERBACH, DAVID AVERBACH, MAIDA                   :
AVERBACH, MICHAEL AVERBACH, EILEEN :
SAPADIN, DANIEL ROZENSTEIN, JULIA                 :
ROZENSTEIN SCHON, JACOB STEINMETZ,                :
DEBORAH STEINMETZ, AMICHAI                        :
STEINMETZ, NAVA STEINMETZ, ORIT                   :
STEINMETZ, NATANEL STEINMETZ,                     :
ROBERT L. COULTER, SR. FOR THE ESTATE :
OF JANIS RUTH COULTER, DIANNE                     :
COULTER MILLER, ROBERT L.                         :
COULTER, SR., ROBERT L. COULTER, JR.,             :
LARRY CARTER AS THE ADMINISTRATOR                 :
OF THE ESTATE OF DIANE LESLIE CARTER, :
LARRY CARTER, SHAUN COFFEL, RICHARD :
BLUTSTEIN AND KATHERINE BAKER                     :
FOR THE ESTATE OF BENJAMIN                        :
BLUTSTEIN, RICHARD BLUTSTEIN,                     :

**THIRD AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

KATHERINE BAKER, REBEKAH BLUTSTEIN,  :
NEVENKA GRITZ FOR THE ESTATE OF          :
DAVID GRITZ, NEVENKA GRITZ,              :
GLORIA KUSHNER, JACQUELINE               :
CHAMBERS AS THE ADMINISTRATOR OF         :
THE ESTATE OF ESTHER BABLAR,             :
JACQUELINE CHAMBERS, LEVANA COHEN        :
HAROOCH, GRETA GELER AS THE              :
ADMINISTRATOR OF THE ESTATE OF           :
HANNAH ROGEN, TEMIMA SPETNER             :
GOULD, JASON KIRSCHENBAUM, ISABELLE      :
KIRSCHENBAUM, MARTIN KIRSCHENBAUM,:
JOSHUA KIRSCHENBAUM, SHOSHANAH           :
BURGETTE, DAVID KIRSCHENBAUM,            :
DANIELLE TEITELBAUM, NETANEL MILLER,:
CHAYA MILLER, ARIE MILLER, ALTEA         :
STEINHERZ, JONATHAN STEINHERZ,           :
BENNETT AND PAULA FINER AS LEGAL         :
GUARDIANS FOR CHANA NACHENBERG,          :
DAVID NACHENBERG, SARA NACHENBERG, :
BENNETT FINER, PAULA FINER, ZEV FINER, :
SHOSHANA FINER OHANA, MINA DORA          :
GREEN, HOWARD M. GREEN, STEVEN           :
GREENBAUM FOR THE ESTATE OF JUDITH       :
GREENBAUM. STEVEN GREENBAUM,             :
ALAN HAYMAN, SHIRLEE HAYMAN,             :
DAVID DANZIG. REBECCA DANZIG,            :
NEIL DANZIG, HAYYIM DANZIG, SARAH        :
DANZIG, CLARA BEN-ZAKEN LASER,           :
NETANEL HERSKOVITZ, MARTIN               :
HERSKOVITZ, PEARL HERSKOVITZ,            :
YAAKOV HERSKOVITZ, JOSHUA FAUDEM         :
ZOHAR FATER, BRUCE MAZER, ORLY ROM, :
RICHARD COFFEY, GAL GANZMAN              :
JUDITH BUCHMAN-ZIV, ORA COHEN            :
MIRAV COHEN, DANIEL COHEN, ORLY          :
COHEN, SHIRA COHEN, EYAL NOKED,          :
KAREN GOLDBERG, CHANA GOLDBERG,          :
ESTHER GOLDBERG, YITZHAK GOLDBERG, :
SHOSHANA GOLDBERG, ELIEZER               :
GOLDBERG,YAAKOV MOSHE GOLDBERG,          :
and TZVI YEHOSHUA GOLDBERG               :
                                         :
              Plaintiffs,                :
                                         :
      -against-                          :

2

CRÉDIT LYONNAIS, S.A.                    :
                                         :
                                         :
            Defendant.                   :
---------------------------------------------------------------x

Plaintiffs Moses Strauss, Philip Strauss, Blumy Strauss, Aaron Strauss, Roisie Engelman, Joseph
Strauss, Tzvi Weiss, Leib Weiss, Malke Weiss, Yitzchk Weiss, Yeruchaim Weiss, Esther
Deutsch, Matanya Nathansen, Chana Nathansen, Matanya and Chana Nathansen for the Estate of
Tehilla Nathansen, Yehudit Nathansen, Shoshana Nathansen, Hezekiel Toporowitch, Pearl B.
Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Blumy Rom,
Rivka Toporowitch, Eugene Goldstein, Lorraine Goldstein, Barbara Goldstein Ingardia, Richard
Goldstein, Michael Goldstein, Chana Freedman, Harry Leonard Beer as Executor of the Estate of
Alan Beer, Harry Leonard Beer, Anna Beer, Phyllis Maisel, Estelle Carroll, Sarri Anne Singer,
Judith Singer, Eric M. Singer, Steven Averbach, Julie Averbach, Tamir Averbach, Devir
Averbach, Sean Averbach, Adam Averbach, David Averbach, Maida Averbach, Michael
Averbach, Eileen Sapadin, Daniel Rozenstein, Julia Rozenstein Schon, Jacob Steinmetz,
Deborah Steinmetz, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz, Natanel Steinmetz,
Robert L. Coulter, Sr. for the Estate of Janis Ruth Coulter, Dianne Coulter Miller, Robert L.
Coulter, Sr., Robert L. Coulter, Jr., Larry Carter as Administrator of the Estate of Diane Leslie
Carter, Larry Carter. Shaun Coffel, Richard Blutstein and Katherine Baker for the Estate of
Benjamin Blutstein, Richard Blutstein, Katherine Baker, Rebekah Blutstein, Nevenka Gritz for
the Estate of David Gritz, Nevenka Gritz, Gloria Kushner, Jacqueline Chambers as the
Administrator for the Estate of Esther Bablar, Jacqueline Chambers, Levana Cohen Harooch, and
Greta Geler as the Administrator for the Estate of Hannah Rogen, Temima Spetner Gould, Jason
Kirschenbaum, Isabelle Kirschenbaum, Martin Kirschenbaum, Joshua Kirschenbaum, Shoshanah
Burgette, David Kirschenbaum, Danielle Teitelbaum, Netanel Miller, Chaya Miller, Arie Miller,
Altea Steinherz, Jonathan Steinherz, Bennett and Paula Finer as Guardians for Chana
Nachanberg, David Nachenberg, Sara Nachanberg, Bennett Finer, Paula Finer, Zev Finer,
Shoshana Finer Ohana, Mina Dora Green, Howard M. Green, Steven Greenbaum for the Estate
of Judith Greenbaum, Steven Greenbaum, Alan Hayman, Shirlee Hayman, David Danzig,
Rebecca Danzig, Neil Danzig, Hayyim Danzig, Sarah Danzig, Clara Ben-Zaken Laser, Netanel
Herskovitz, Martin Herskovitz, Pearl Herskovitz, Yaakov Herskovitz, Joshua Faudem, Zohar
Fater, Bruce Mazer, Orly Rom, Richard Coffey, Gal Ganzman, Judith Buchman-Ziv, Ora Cohen,
Mirav Cohen, Daniel Cohen, Orly Cohen, Shira Cohen, Eyal Noked, Karen Goldberg, Chana
Goldberg, Esther Goldberg, Yitzhak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Yaakov
Moshe Goldberg, and Tzvi Yehoshua Goldberg, by their attorneys, allege the following upon
information and belief:

## NATURE OF THE ACTION

1.      This is a complaint for damages arising out of the conduct of defendant Crédit

Lyonnais, S.A. ("Crédit Lyonnais"). Defendant is a financial institution incorporated and

headquartered in France that knowingly provides financial services and collects and transmits

money for the benefit of HAMAS[1], a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")), and thereby substantially assists in the commission of acts of international terrorism as defined by 18 U.S.C. § 2331. By its actions, the defendant aided and abetted the commission of acts of international terrorism that injured the plaintiffs, violated the criminal prohibitions on providing material support for acts of international terrorism set forth in the Antiterrorism Act ("ATA") as amended by the AEDPA (see e.g., 18 U.S.C. §§ 2339B and 2339C) and is civilly liable under § 2333(a) of the ATA to the plaintiffs who have been injured in their person and property by reason of acts of international terrorism perpetrated by HAMAS.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 2333 and 2334, as a civil action brought by citizens of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

4.      Crédit Lyonnais is subject to personal jurisdiction in the United States pursuant to Fed.R.Civ.P. 4(k) because, among other things, it continuously and systematically does business in the United States. Defendant is also subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2339B(d)(1)(D) because it has committed tortious acts within the United

---

[1]      HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" also known as the "Islamic Resistance Movement."

4

States by transferring funds through the United States for the benefit of HAMAS, and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

## THE PARTIES

### A.    The Plaintiffs

### THE JERUSALEM EGGED BUS #2 BOMBING – AUGUST 19, 2003

5.    On August 19, 2003, Raed Abdul Hamid Misk, a HAMAS suicide bomber, detonated explosives on Egged bus #2.

6.    Twenty three (23) people were killed, and over one hundred thirty (130) people were injured in the attack.

**The Strauss Family**

7.    Plaintiff Moses Strauss, age 23, is a citizen of the United States and a resident of the State of New Jersey.

8.    Mr. Strauss was studying in Israel in 2003, and was planning to return to the United States in April 2004.

9.    At around 9:00 pm on August 19, 2003, he boarded Egged bus #2 in Jerusalem after praying at the Kotel (also known as the "Western Wall" or "Wailing Wall").

10.    Approximately 15 minutes into the bus ride, Mr. Strauss heard a deafening boom when Misk had detonated the explosives on the bus.

11.    Mr. Strauss fell forward as a result of the explosion. His eye glasses, jacket, hat and cell phone flew off his body.

12.    As Mr. Strauss regained his bearings and realized what had occurred, he witnessed people screaming and crying and he saw blood and body parts all around him.

5

13.   Mr. Strauss's clothes were covered with blood and his hearing was severely impaired.

14.   To exit the bus, Mr. Strauss stepped over bodies and in a state of shock made his way towards his apartment. As he reached the corner near his apartment, he saw a friend, and they went into his friend's apartment and telephoned Mr. Strauss's father, plaintiff Philip Strauss to tell him he had been in an attack, but was alive. After making the telephone call, the friend drove Moses to Hadassah Hospital.

15.   As a result of the explosion, Mr. Strauss's body ached, especially his right ear and hand. After arriving at the hospital Mr. Strauss underwent numerous tests, and doctors removed the shrapnel from his ear and hand.

16.   Days after the attack, Mr. Strauss still experienced agonizing pain in his ear, and his hearing loss did not improve.

17.   After the attack, Mr. Strauss returned to the United States without completing his studies in Israel.

18.   Mr. Strauss has been examined by medical specialists in both Israel and the United States. Both physicians confirmed that Mr. Strauss would require surgery on his ear.

19.   In the winter of 2004, Mr. Strauss underwent ear surgery in the United States. His ear is still not completely healed, and he has been told that his condition will never improve. An ear specialist continues to monitor his condition.

20.   Mr. Strauss continues to relive the attack, the images of the attack replaying in his mind daily.

21.   As a result of the attack, plaintiff Moses Strauss has suffered severe physical and mental anguish and extreme emotional distress.

6

22.    Plaintiffs Philip Strauss and Blumy Strauss are citizens of the United States and residents of the State of New York. They are the parents of plaintiff Moses Strauss.

23.    After hearing of the attack, Blumy Strauss attempted unsuccessfully to reach her son on his cell phone. When she tried to reach him at his apartment, someone else answered the telephone and said that her son was not there. Blumy Strauss grew increasingly concerned.

24.    Upon learning that her son was injured in the bombing, Blumy Strauss's distress grew.

25.    As a result of the attack, plaintiffs Philip Strauss and Blumy Strauss have suffered severe mental anguish and extreme emotional distress.

26.    Plaintiff Aaron Strauss is a citizen of the United States and a resident of the State of New York. He is a brother of plaintiff Moses Strauss.

27.    Plaintiff Roisie Engelman is a citizen of the United States and a resident of the State of New Jersey. She is the sister of plaintiff Moses Strauss.

28.    Roisie Engelman was on vacation when she received a telephone call advising her that there had been a bombing in Israel. Roisie attempted to contact her brother on his cellular telephone, but was unable to reach him. She also telephoned her other brother, Aaron, attempting to locate Moses or her parents.

29.    When Roisie finally received the news that her brother had been injured in the bus bombing, she was very concerned and extremely anxious.

30.    Plaintiff Joseph Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

31.    Joseph learned of the attack while watching the news on an airplane. He was aware that the bombing had occurred near the neighborhood where his brother lived. Upon

7

arriving in California, Joseph spoke to his parents and learned of Moses's condition. During the hours of the plane flight, Joseph experienced great anxiety because he was uncertain at that time if his brother had been present at the bombing.

32.    Roisie Engelman, Joseph Strauss and Aaron Strauss experienced great anxiety after learning of the attack that caused the injuries that their brother sustained.

33.    As a result of the attack, plaintiffs Roisie Engelman, Joseph Strauss and Aaron Strauss have suffered severe mental anguish and extreme emotional distress.

## The Weiss Family

34.    Plaintiff Tzvi Weiss, age 20, is a citizen of the United States and a resident of the State of New York.

35.    Tzvi was in Israel studying at a rabbinical college in 2003 and was planning to return to the United States on August 21, 2003.

36.    On the evening of August 19, 2003, he boarded Egged bus #2 in Jerusalem after having visited the Kotel, Judaism's holiest site, to pray. He was on his way to a friend's wedding.

37.    As the bus arrived at Shmuel Hanavi Street he heard a terrible explosion. Everything went black, and he could not hear anything but a deafening ringing in his ears.

38.    In the panicked aftermath of the explosion, Tzvi jumped out of a window of the bus and began to run, stumbling over dead bodies and body parts as he fled the scene.

39.    Tzvi was covered with blood and his hand had been cut. His body was shaking from the shock of the experience, and he had a constant terrible ringing in his ears.[2]

40.    Once he got his bearings, Tzvi telephoned his brother, plaintiff Yitzchk Weiss, and waited for his brother to arrive to accompany him to the hospital.

---

[2]    The medical term for the condition is tinnitus.

8

41.   An ambulance transported Tzvi to Bikur Cholim Hospital where he underwent tests. He later learned that both of his eardrums had been shattered as a result of the explosion.

42.   Both eardrums had been completely torn. and his hearing in his left ear was severely impaired. He continued to experience severe pain in his hand and was unable to bend his fingers.

43.   Tzvi decided to return home to the United States to be near his family while he began recovering from the injuries and the effects of having been a victim of a terrorist attack. He returned to the United States the following day and visited an ear specialist within hours of his arrival. He underwent tests and was advised to have surgery on his left ear to attempt to regain some of his hearing loss in that ear. Tzvi obtained a second opinion from another doctor who agreed with the diagnosis.

44.   After a number of examinations by the initial physician, and after treatment with antibiotics, Tzvi underwent surgery on his left ear. After the surgery, the incessant ringing in his ears became louder and worse than before.

45.   Tzvi also visited another physician for treatment of the severe pain in his hand. He was told the injuries might require surgery.

46.   Tzvi continued to visit doctors on numerous occasions to assess his ears, and underwent many tests, but the agonizing ringing continued. Eventually, it was determined that the surgery on Tzvi's left ear had not been successful. Tzvi suffered numerous panic attacks because of his injuries and the symptoms that continued to affect him.

47.   As a result of the injuries that he sustained in the attack, combined with the memories of the attack itself, Tzvi's mental health deteriorated. The suffering that Tzvi has endured as a result of the injuries he sustained in the attack is ongoing and relentless. It has

9

negatively impacted every aspect of his life.

48.    Tzvi enrolled in rabbinical college upon his return to the United States, but the injuries and their symptoms prevented him from concentrating on his schoolwork, and he could no longer achieve the academic success that he had achieved prior to the attack.

49.    As a result of the attack, plaintiff Tzvi Weiss has suffered severe physical and mental anguish and extreme emotional distress.

50.    Plaintiffs Leib and Malke[3] Weiss are citizens of the United States and residents of the State of New York. They are the parents of plaintiff Tzvi Weiss.

51.    Plaintiff Yitzchk Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

52.    Plaintiff Yeruchaim Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

53.    Plaintiff Esther Deutsch is a citizen of the United States and a resident of the State of New York. She is the sister of plaintiff Tzvi Weiss.

54.    Leib Weiss, Malke Weiss, Yitzchk Weiss, Yeruchaim Weiss and Esther Deutsch experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that Tzvi has endured as a result of his injuries.

55.    As a result of the attack, plaintiffs Leib Weiss, Malke Weiss, Yitzchk Weiss, Yeruchaim Weiss and Esther Deutsch have suffered severe mental anguish and extreme emotional distress.

**The Nathansen/Toporowitch Family**

56.    Tehilla Nathansen was a citizen of the United States and a citizen of the State of

---

[3]    Although spelled "Malka" in the Complaint, Mrs. Weiss's name, as it appears on her U.S. passport, is actually spelled "Malke."

10

Israel. She was three (3) years old and sitting on her mother's lap when she was murdered in the suicide bomb attack on August 19, 2003.

57.    The Nathansen family had boarded the bus at the Kotel in Jerusalem, where they had just completed their prayers.

58.    Plaintiff Chana Nathansen, Tchilla's mother, is a citizen of the United States and a citizen and resident of the State of Israel.

59.    Plaintiff Matanya Nathansen, Tchilla's father, is a citizen and resident of the State of Israel.

60.    Plaintiffs Matanya and Chana Nathansen bring this action both individually and on behalf of their 3 year old daughter's estate.

61.    Chana Nathansen was severely injured in the explosion that killed her daughter and is partially crippled as a result of her injuries. Chana Nathansen had 7 ball bearings that left holes in her chest, leg and arm removed from her body. She is also now hearing impaired in one ear.

62.    As a result of the attack, plaintiff Chana Nathansen sustained severe physical and mental anguish and extreme emotional distress from the injuries she sustained, from witnessing and experiencing first-hand the death of her three year old daughter, Tchilla, and witnessing the severe injuries sustained by her daughters, plaintiff Shoshana Nathansen and plaintiff Yehudit Nathansen.

63.    As a result of the explosion, Matanya Nathansen suffered fractures in both feet and in his collar bone, and sustained injuries to his lungs, eye and finger. He is now hearing impaired and can no longer walk properly.

11

64.    In addition to these injuries he sustained as a result of the explosion, plaintiff Matanya Nathansen has sustained physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of his 3 year old daughter, Tehilla, as well as the severe injuries sustained by his wife and young daughters (all of whom are U.S. citizens).

65.    Plaintiff Yehudit Nathansen is a citizen of the United States and a citizen and resident of the State of Israel. She is the 8 year old sister of Tchilla Nathansen and the daughter of Matanya and Chana Nathansen.

66.    At the time of the explosion, Yehudit was sitting with her aunt, a few seats away from her parents.

67.    Yehudit sustained physical injuries from the explosion and was treated at Bikur Cholim Hospital in Jerusalem.

68.    As a result of the attack, plaintiff Yehudit Nathansen has suffered physical and severe mental anguish and extreme emotional distress due to her own injuries and from witnessing and experiencing first-hand the death of her three year old sister, Tchilla, as well as the severe injuries sustained by her mother and baby sister, and the injuries to her father.

69.    Plaintiff Shoshana Nathansen is a citizen of the United States and a citizen and resident of the State of Israel. She is the 2 year old sister of Tchilla Nathansen.

70.    Shoshana Nathansen was sitting on her mother's lap at the time of the explosion. Shoshana was 5 months old at that time. As a result of the explosion, Shoshana suffered fractures in her leg and hip, deep lacerations in her arm that have left permanent scars, and scars on her face and legs. She also sustained severe physical injuries requiring the removal of numerous ball bearings from her legs. The full effect of her injuries, including her ability to walk, will not be fully known until she is older.

12

71.    As a result of the terrorist attack, plaintiff Shoshana Nathansen has suffered severe physical and mental anguish and extreme emotional distress.

72.    Plaintiff Hezekial Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel. He is the father of plaintiff Chana Nathansen and the grandfather of the three Nathansen girls.

73.    Plaintiff Pearl B. Toporowitch is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Chana Nathansen and the grandmother of the three Nathansen girls.

74.    In the middle of the night, Hezekial and Pearl were notified by telephone of the bombing that had killed their granddaughter, Tehilla Nathansen, and crippled their daughter, Chana Nathansen. That night they traveled to Jerusalem. Pearl attempted to obtain further details about the condition of her son-in-law and her granddaughters.

75.    In the aftermath of the bombing, Chana, her husband, and her children were transferred to different hospitals thereby complicating the family's efforts to locate them.

76.    Hezekial was supposed to travel to the central morgue in Holon to attempt to identify his granddaughter's body, but was in too much shock to do so. He was initially told to identify the bodies of _two_ granddaughters since Shoshana had not yet been identified at the hospital and was thought to be deceased.

77.    As a result of the terrorist attack, plaintiff Hezekial Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of his 3 year old granddaughter, Tehilla, as well as the severe injuries sustained by his daughter, and injuries sustained by his granddaughters and son-in-law.

78.    As a result of the terrorist attack, plaintiff Pearl B. Toporowitch, has suffered

13

severe mental anguish and extreme emotional distress from experiencing the death of her 3 year old granddaughter, Tehilla, as well as the severe injuries sustained by her daughter and other granddaughter and injuries to her son-in-law.

79.    Plaintiff Yehuda Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel.

80.    Yehuda Toporowitch is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

81.    In the middle of the night he was notified by telephone of the bombing that had killed his niece and crippled his sister.

82.    He had been working at a resort when he received the telephone call, and quickly rushed to a nearby television where graphic images of the bombsite were being broadcast by Israeli television.

83.    Yehuda rushed home, traveled with his parents to the Tel Aviv area and stopped at the home of one of his sisters. He took a taxicab to the central morgue and attempted to identify Tehilla's remains, but could not positively identify them because of the nature and extent of Tehilla's injuries.

84.    Yehuda then made arrangements for necessary DNA testing, which ultimately confirmed his niece's identity.

85.    As a result of the terrorist attack, plaintiff Yehuda Toporowitch has suffered severe mental anguish and extreme emotional distress from the death of his 3 year old niece, Tehilla, and the attempt to identify her remains. He has also suffered severe mental anguish and extreme emotional distress as a result of the severe injuries sustained by his sister and other niece and injuries to his brother-in-law.

14

86.     Plaintiff David Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel. He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

87.     David was not present when his parents were notified by telephone of the bombing that killed his niece and crippled his sister. Instead, he had to piece together the events by himself after his family had already left for Jerusalem.

88.     Like the rest of his immediate family, David visited his sister and niece in the hospital and experienced the shock and severe mental anguish and extreme emotional distress resulting from the emotional trauma of burying his young niece and dealing with the pain and loss experienced by his sister.

89.     As a result of the terrorist attack, plaintiff David Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of his 3 year old niece, Tchilla, as well as the severe injuries sustained by his sister and other niece.

90.     Plaintiff Shaina Chava Nadel is a citizen of the United States and a citizen and resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

91.     Like the rest of her immediate family, Shaina visited her sister and niece in the hospital and experienced the shock and mental anguish resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her sister.

92.     As a result of the terrorist attack, plaintiff Shaina Chava Nadel has suffered severe mental anguish and extreme emotional distress from experiencing the death of her 3 year old niece, Tehilla, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

15

93.     Plaintiff Blumy Rom is a citizen of the United States and a citizen and resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

94.     Like the rest of her immediate family, Blumy visited her sister and niece in the hospital and experienced the shock and mental distress resulting from the emotional trauma of burying her young niece, Tehilla, and dealing with the pain and loss experienced by her younger sister.

95.     As a result of the terrorist attack, plaintiff Blumy Rom has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

96.     Plaintiff Rivka Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel. She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

97.     Like the rest of her immediate family, Rivka visited her sister and niece in the hospital and experienced severe mental anguish and extreme emotional distress from burying her young niece and dealing with the pain and loss experienced by her older sister and injuries to her brother-in-law.

98.     She stayed with her baby niece Shoshana, caring for her during the two weeks that she was hospitalized and for two months after her discharge from the hospital. Having to change the dressings on her niece's wounds, care for her various injuries, and take her to doctors, has deeply affected her.

99.     As a result of the terrorist attack, plaintiff Rivka Toporowitch has suffered severe

16

mental anguish and extreme emotional distress from experiencing the death of her three year old niece, Tehilla, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

**The Cohen Family**

100.    Plaintiff Ora Cohen, age 46, is a citizen of the United States and a citizen of the State of Israel.

101.    Mrs. Cohen and her husband had decided to celebrate their ninth wedding anniversary on August 19, 2003 by visiting the Western Wall with their five children.

102.    At around 9:00 p.m., after praying at the Western Wall, the Cohen family boarded Egged bus #2 to return home.

103.    As the bus made its way down Shmuel Hanavi Street, Raed Misk detonated his explosive charge. Just prior to the explosion, Mrs. Cohen had seen the bomber, who was seated behind her.

104.    As a result of the explosion, Mrs. Cohen sustained shrapnel wounds, burns to her body, and a broken jaw. She also suffered nasal trauma, and severe hearing loss.

105.    Mrs. Cohen was taken to the hospital and remained hospitalized until August 29, 2003.

106.    Mrs. Cohen was subsequently hospitalized for follow-up treatment from November 6, 2005 to November 10, 2005.

107.    Mrs. Cohen continues to suffer from ongoing jaw pain, and her hearing problems have continued to worsen.

108.    Mrs. Cohen has been treated by numerous medical providers and her treatment is ongoing.

109.    As the Cohen family rode the bus, Mrs. Cohen had been holding her infant son,

17

Elchanan on her lap. When the blast went off, Elchanan was thrown from her arms and presumed dead. He was found alive several hours after the attack, buried beneath a pile of corpses.

110.    After the explosion, the entire Cohen family was separated in the chaos. Mrs. Cohen spent several hours unaware if her children were alive or dead.

111.    Due to the trauma she experienced as a passenger seated close to the bomber, witnessing the horrible aftermath of the attack, and being separated from her family following the attack, Mrs. Cohen suffered and continues to suffer severe emotional repercussions including depression, insomnia and nightmares. She experiences crippling fears for herself and her family.

112.    Mrs. Cohen has received and continues to receive psychiatric treatment to help cope with the negative emotional effects she continues to experience as a result of the attack.

113.    Mrs. Cohen also struggles with the day-to-day care of her large family, including the ongoing medical and emotional treatment of her five young children, all of whom were present at and injured in the terrorist attack.

114.    As a result of the terrorist attack, plaintiff Ora Cohen has suffered severe physical and mental anguish and extreme emotional distress.

115.    Plaintiff Mirav Cohen, age 12, is a citizen of the United States and a citizen of the State of Israel. She is the daughter of plaintiff Ora Cohen.

116.    Mirav Cohen had visited the Western Wall with her parents and siblings on August 19, 2003. She also boarded Egged bus #2 with her family.

117.    As a result of the terrorist's blast, Mirav Cohen sustained facial burns and lacerations, lung damage, hearing loss in both ears, and shrapnel wounds. She also witnessed the chaos and carnage after the attack.

18

118.    Mirav Cohen was taken to the hospital and remained hospitalized until August 28, 2003. She was separated from her family at the site of the attack and was not reunited with the rest of her family for hours.

119.    Mirav Cohen's hearing has continued to worsen, and now requires that she wear a hearing aid.

120.    Mirav Cohen has been treated by numerous medical providers and her treatment is ongoing.

121.    Mirav Cohen has experienced depression, has had numerous nightmares, and has had bed wetting incidents as a result of the attack. She has received and continues to receive psychiatric treatment to help cope with the negative emotional effects she continues to experience since the attack.

122.    As a result of the terrorist attack, plaintiff Mirav Cohen has suffered severe physical and mental anguish and extreme emotional distress.

123.    Plaintiff Daniel Cohen, age 10, is a citizen of the United States and a citizen of the State of Israel. He is the son of plaintiff Ora Cohen.

124.    Daniel Cohen had visited the Western Wall with his parents and siblings on August 19, 2003. He also boarded Egged bus #2 with his family.

125.    He witnessed the chaos after the attack and was separated from his family for several hours.

126.    Daniel Cohen was taken to the hospital and remained hospitalized until August 28, 2003.

127.    As a result of the explosion, Daniel Cohen sustained facial lacerations, lung damage, hearing loss in both ears, and shrapnel wounds to his feet.

19

128.    Daniel Cohen's hearing has continued to worsen. Daniel Cohen has been treated by numerous medical providers, and his treatment is ongoing.

129.    Daniel Cohen has had many nightmares since the terrorist attack. He has suffered and continues to suffer severe emotional distress including anger and severe aggression as a result of what he experienced during and subsequent to the terrorist attack.

130.    Daniel Cohen has received and continues to receive psychiatric treatment to help alleviate the negative emotional effects he continues to experience since the attack.

131.    As a result of the attack, plaintiff Daniel Cohen has suffered severe physical and mental anguish and extreme emotional distress.

132.    Plaintiff Orly Cohen, age 8, is a citizen of the United States and a citizen of the State of Israel. She is the daughter of plaintiff Ora Cohen.

133.    Orly Cohen had visited the Western Wall with her parents and siblings on August 19, 2003. She also boarded Egged bus #2 with her family.

134.    She witnessed the chaos after the attack and was separated from her family for several hours.

135.    As a result of the explosion, Orly Cohen sustained hearing loss, eye infections, and shrapnel wounds to her spine and feet.

136.    Orly Cohen was taken to the hospital and remained hospitalized until August 28, 2003.

137.    Orly Cohen has been treated by numerous medical providers, and her treatment is ongoing. She continues to hear white noise in her ears and suffers from back pain. She will require additional procedures to remove the shrapnel that remains in her body.

138.    Orly Cohen suffered and continues to suffer severe emotional distress including

depression and obsessive recollections of the attack and her resulting suffering.

139.   Orly Cohen has received and continues to receive psychiatric treatment to help address and alleviate the negative emotional effects she continues to experience since the attack.

140.   As a result of the attack, plaintiff Orly Cohen has suffered severe physical and mental anguish and extreme emotional distress.

141.   Plaintiff Shira Cohen, age 5, is a citizen of the United States and a citizen of the State of Israel.

142.   Shira Cohen had visited the Western Wall with her parents and siblings on August 19, 2003. She was being held by her father on Egged bus #2 at the time of the blast.

143.   After the explosion, Shira Cohen had to be forcibly removed from the arms of her father, who had been rendered unconscious. Shira was also separated from her parents and siblings in the chaos.

144.   Shira Cohen sustained severe physical injuries including nerve damage and permanent damage to her left eye. She had additional shrapnel wounds, hearing loss, and lost many teeth as a result of the attack.

145.   Shira Cohen was taken to the hospital and remained hospitalized until September 19, 2003. Over one hundred pieces of glass were extracted from her eyes and face. She underwent three surgeries to her right eye, which doctors were able to save. The damage to her left eye was rendered essentially useless.

146.   Shira Cohen has been treated by numerous medical providers, and her treatment is ongoing. Since the month she spent in the hospital immediately after the attack, Shira Cohen has been hospitalized on four subsequent occasions for additional medical procedures relating to the attack.

147.    Shira Cohen has difficulty coping with her perceived "ugliness" caused by her injuries. She also continues to hear white noise in her ears, and will continue to require surgeries and medical procedures and treatment for the wounds to her eye, ears, and face.

148.    Shira Cohen suffered and continues to suffer severe emotional effects including nightmares and an obsessive fixation on the attack. She also has an obsessive fixation concerning her useless eye and own self-perceived ugliness.

149.    Shira Cohen has received and continues to receive psychiatric treatment to help address the negative emotional effects she continues to experience after the attack.

150.    As a result of the attack, plaintiff Shira Cohen has suffered severe physical and mental anguish and extreme emotional distress.

## SHOOTING ATTACK ON ROUTE #60 – JUNE 20, 2003

### The Goldstein Family

151.    Howard Goldstein was a citizen of the United States and a citizen of the State of Israel.

152.    He was murdered on June 20, 2003, while driving his car with his parents on Route #60 in Israel.

153.    HAMAS was responsible for the attack.

154.    Howard was in the process of picking up his parents from Jerusalem where they had stayed the previous night following the wedding of Howard's son, David Goldstein.

155.    Howard's father, Eugene Goldstein, was seated in the front passenger seat, and his mother, Lorraine Goldstein, was seated behind her husband.

156.    At some point, as Howard was driving, Eugene noticed two individuals on the side of the road with their backs turned toward the car. As their car approached, the men turned around and began rapidly firing their guns at the Goldsteins' vehicle.

22

157.    Howard was shot in the chest, left lung, kidney and liver.

158.    He died almost immediately and his body slumped over the wheel.

159.    Plaintiffs Eugene and Lorraine Goldstein are citizens of the United States and are residents of the State of New York. They are the parents of Howard Goldstein.

160.    Eugene was shot in the back, head and shoulder.

161.    The top of the bullet that struck Eugene grazed his head. The remainder exploded in one of his lungs, leaving behind shrapnel in his lung, liver and kidneys. The bullet lodged between his heart and lungs.

162.    Somehow, Eugene managed to steer the car until it ultimately overturned in a ditch.

163.    As a result of the terrorist attack, Eugene still has several bullet fragments lodged in his chest. He must undergo an x-ray every three months to monitor the condition of the bullet fragments encapsulated in his chest.

164.    He has since returned to his job where he missed three months of work as a result of his injuries.

165.    Lorraine was also shot and severely injured.

166.    She was struck by a bullet that entered her body through her back, grazed her carotid artery and lodged in her jaw bone. She has three bullet holes in her back.

167.    Shrapnel also lodged throughout her body, especially in her back. She also suffered a shattered nose and septum as well as various lacerations resulting from the car crash.

168.    Eugene and Lorraine Goldstein remained in Jerusalem at Hadassah Hospital for approximately 10 days and were unable to return home when they were discharged from the hospital because the airline did not give Eugene permission to fly due to the poor condition of his

lungs.

169.    Lorraine still requires physical therapy because the scar tissue in her jaw prevents her from opening it fully. She still suffers from pain and headaches.

170.    She has had 11 teeth pulled and undergone extensive periodontal and dental work. She must also deal with the harmful effects of shrapnel lodged throughout her body.

171.    As a result of the terrorist attack, plaintiffs Eugene Goldstein and Lorraine Goldstein have suffered severe physical and mental anguish and extreme emotional distress.

172.    The Goldstein family in New York received notice of the attack from two cousins, one of whom saw images of the attack on the internet and sent an instant message to the immediate family.

173.    The Goldstein family sat in horror as they watched images of the attack on the Cable News Network (CNN) shortly after the attack occurred. The video broadcast showed Howard, Eugene and Lorraine Goldstein being pulled from the wreckage of the car Howard Goldstein had been driving.

174.    Lorraine's face and hair were covered with blood.

175.    Plaintiff Richard Goldstein is a citizen of the United States and a resident of the State of New York. He is a son of plaintiffs Eugene and Lorraine Goldstein and a brother of Howard Goldstein.

176.    After learning of the attack, plaintiff Richard Goldstein telephoned his sister, plaintiff Barbara Goldstein Ingardia, at work and asked her to return home immediately. When she arrived, her extended family was present. They shared the tragic news that their parents and brother had been attacked. Barbara then made plans to fly to Israel to care for her parents.

177.    As a result of the terrorist attack, plaintiff Richard Goldstein has suffered mental

anguish and extreme emotional distress caused by the death of his brother and the life-threatening injuries to both of his parents.

178.    Plaintiff Barbara Goldstein Ingardia is a citizen of the United States and a resident of the State of New York. She is the daughter of plaintiffs Eugene and Lorraine Goldstein and the sister of Howard Goldstein.

179.    Barbara left her job and her immediate family behind and traveled to Israel to care for her parents in Israel during their recovery and to mourn the loss of her brother.

180.    In addition to grappling with the devastating emotional consequences of her brother's death, she was forced to deal with the uncertainty of her mother's recovery due to her severe injuries and age.

181.    At one point during her hospital stay, Lorraine was placed on life support.

182.    Barbara blames herself for encouraging her parents to attend the wedding. As a result of the terrorist attack, plaintiff Barbara Goldstein Ingardia has suffered severe mental anguish and extreme emotional distress.

183.    Plaintiff Michael Goldstein is a citizen of the United States and a resident of the State of Florida. He is a brother of Howard Goldstein and a son of plaintiffs Eugene and Lorraine Goldstein.

184.    As a result of the terrorist attack, plaintiff Michael Goldstein has suffered severe mental anguish and extreme emotional distress because of the death of his brother and the life-threatening injuries of both of his parents.

185.    Plaintiff Chana Freedman is a citizen of the United States and a citizen and resident of the State of Israel. She is the daughter of Howard and Michal Goldstein.

186.    Chana and her husband were eating lunch at a mall in Jerusalem when they

learned that her father and grandparents had been involved in what they believed to be an automobile accident.

187.    Chana's husband received a telephone call from his father informing the couple to go directly to Hadassah Hospital.

188.    When Chana and her husband arrived at Hadassah Hospital, a social worker informed them that Chana's father had died in the terrorist attack.

189.    Chana informed her brother Daniel and his wife, who had just been married, of the attack when they arrived at the hospital.

190.    As a result of her father's death, plaintiff Chana Freedman has suffered severe mental anguish and extreme emotional distress.

## THE JAFFA ROAD BUS #14A BOMBING - JUNE 11, 2003

191.    At approximately 5:30 p.m. on June 11, 2003, Abdel Madi Shabneh, a HAMAS suicide bomber dressed as a religious Jew, boarded Egged bus #14A at the Mahane Yehuda market.

192.    A short while after Shabneh boarded the bus, as the bus drove down Jaffa Road near the Davidka Square, Shabneh detonated his bomb, wrecking the bus and killing sixteen (16) of its passengers. Over one hundred (100) people were wounded, including dozens of bystanders.

193.    Shabneh, an 18-year old high school student from Hebron, was initially recruited by HAMAS while playing on a local Jihad Mosque soccer team.

### The Beer Family

194.    Alan Beer, a citizen of the United States, was on the bus returning from a condolence call to his friend's family when the bomber detonated his explosives and killed him.

195.    Alan's friend, to whom he had paid the condolence call, learned of the bus

bombing and telephoned plaintiff Harry Leonard Beer, Alan's brother, in Cleveland, Ohio. Harry quickly telephoned his sister, plaintiff Phyllis Maisel, whose son happened to be on the scene of the bombing earlier. Harry then telephoned his other sister, plaintiff Estelle Carroll and informed her of the terrorist attack.

196.    After speaking with her brother, Phyllis asked her son to return to the crime scene and identify Alan's body.    Thereafter, plaintiffs Anna Beer, Harry Leonard Beer and Estelle Carroll flew to Israel to attend Alan's funeral.

197.    Plaintiff Harry Leonard Beer is a citizen of the United States and a resident of the State of Ohio.

198.    Plaintiff Harry Leonard Beer brings this action both in his individual capacity and as the executor of the Estate of Alan Beer.

199.    As a result of the terrorist attack, plaintiff Harry Leonard Beer has suffered severe mental anguish and extreme emotional distress as well as the loss of his brother's companionship, advice and counsel.

200.    Plaintiff Estelle Carroll is a citizen of the United States and a resident of the State of Virginia.

201.    Plaintiff Phyllis Maisel is a citizen of the United States and a resident of the State of Israel.

202.    Plaintiffs Estelle Carroll and Phyllis Maisel have experienced emotional pain and suffering and the loss of their brother's companionship, advice and counsel.

203.    As a result of the terrorist attack, plaintiffs Estelle Carroll and Phyllis Maisel have suffered severe mental anguish and extreme emotional distress.

204.    Plaintiff Anna Beer is a citizen of the United States and a resident of the State of

27

Ohio. She is the mother of Alan Beer.

205.    As a result of the terrorist attack, plaintiff Anna Beer has experienced the loss of her youngest child's society, companionship, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Singer Family**

206.    Plaintiff Sarri Anne Singer is a citizen of the United States and a resident of the State of New Jersey.

207.    On June 11, 2003, Sarri boarded bus #14A in Jerusalem to meet a friend for dinner. Soon thereafter, the suicide bomber detonated his bomb only two to three seats away from where Sarri was seated. When the explosives were detonated, Sarri felt a shockwave across her face. The roof of the bus had fallen in and the man in front of her was not moving. Everyone sitting and standing near Sarri had been killed.

208.    Sarri was struck with shrapnel, which entered her shoulder and broke her clavicle. After the blast she was unable to open her left eye, and her right eye was extremely restricted. She was unable to hear because of a loud ringing in her ears and her ruptured eardrums. Barely walking, she was taken to an ambulance.

209.    She sustained injuries to her face and legs resulting in scarring. She has undergone physical therapy and will require surgery in the future. In addition, shrapnel had lodged in her gums, moving her teeth. She will require dental work in the future.

210.    As a result of the attack, plaintiff Sarri Anne Singer has suffered severe physical and mental anguish and extreme emotional distress.

211.    Plaintiff Judith Singer is a citizen of the United States and a resident of the State of New Jersey. She is the mother of plaintiff Sarri Anne Singer.

28

212.    Judith learned of the attack when her son telephoned her at work.

213.    As a result of the attack plaintiff Judith Singer has suffered severe mental anguish and extreme emotional distress.

214.    Plaintiff Eric M. Singer is a citizen of the United States and a resident of the State of New Jersey. He is the brother of plaintiff Sarri Anne Singer.

215.    Eric first learned of the attack when he received an emergency phone call from his father while Eric was having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

216.    As a result of the attack, plaintiff Eric M. Singer has suffered severe mental anguish and extreme emotional distress.

## COMMUTER BUS BOMBING – MAY 18, 2003

### The Averbach Family

217.    Plaintiff Steven Averbach is a citizen of the United States and a citizen and resident of the State of Israel.

218.    He is 39 years old and presently resides near Tel Aviv, Israel, after spending nearly a year in the hospital and a rehabilitation center. He is a married father of four sons ranging in age from 5 to 15. Steve and his wife, Julie, were married in 1994 and have two sons together, Sean (age 10) and Adam (age 5).

219.    Steve's older sons, Tamir (age 15) and Devir (age 12), are from a prior marriage.

220.    On May 18, 2003, Steve was seated on a commuter bus heading for Jerusalem when he noticed an Arab dressed as a religious Jew board the bus. Steve became immediately suspicious.

221.    As Steve approached him, the HAMAS suicide bomber detonated his explosives.

29

222.    The bomber was later identified by his family as Bassem Jamil Tarkrouri.

223.    Seven (7) people ranging in age from 35 to 68, were killed by the explosion. Steve was one of twenty (20) people injured.

224.    Steve absorbed a substantial amount of the impact of the explosion and multiple pieces of shrapnel.

225.    Steve sustained a critical wound when a ball bearing originally packed together with the bomber's explosives penetrated through the skin and muscles of his neck and lodged between his C3 and C4 vertebrae. The ball bearing lodged in his spinal canal causing severe compression damage to his spinal cord. The object was eventually removed during surgery, but not before it had caused severe damage to his spinal cord that rendered him a quadriplegic.

226.    Following surgery, Steve was moved to intensive care where he almost died several times because of an extremely high fever and from the blast injury to his lungs. He has since undergone numerous operations to his back, groin and gastric intestines. He has also undergone a tracheotomy and had a gastric feeding tube inserted as a result of the damage caused by the tracheotomy.

227.    Steve has returned to the Intensive Care Unit several times with complications.

228.    Steve is paralyzed from his neck down.

229.    On more than one occasion, Steve pleaded with his doctors and family members to take him off of life support.

230.    To this day, Steve does not have the use of his arms or legs, and cannot brush his own teeth or scratch his own nose.

231.    He is completely dependent on the 24-hour care provided to him, and has no foreseeable hope of recovery.

30

232.    He lives in constant pain and battles depression.

233.    Plaintiff Steve Averbach has suffered severe physical and mental anguish and extreme emotional distress as a result of the attack.

234.    Plaintiff Julie Averbach is a citizen and resident of the State of Israel. She is the wife of Steve Averbach and the mother of Sean and Adam Averbach.

235.    As the result of the injuries sustained by Steve, Julie has had to relocate her family to be closer to the rehabilitation center where Steve resided for nearly a year. Steve moved home from the rehabilitation center in July 2004, but requires continuous 24-hour care. Julie is now, in most respects, a single parent and cannot enjoy the normal companionship, day-to-day assistance and mutual support that she previously received from her husband.

236.    As a result of the attack, plaintiff Julie Averbach has suffered severe mental anguish and extreme emotional distress.

237.    Plaintiff Tamir Averbach is a citizen of the United States and a citizen and resident of the State of Israel.

238.    He is the 15 year old son of Steve Averbach and Steve's first wife.

239.    Plaintiff Tamir Averbach has experienced severe mental anguish and extreme emotional distress from witnessing his father's relentless and painful suffering, his repeated surgeries and brushes with death, his negative prognosis and his permanent physical condition.

240.    Plaintiff Devir Averbach is a citizen of the United States and a citizen and resident of the State of Israel. He is the 12 year old son of Steve Averbach and Steve's first wife.

241.    Devir and his elder brother, Tamir, remember what it was like when their father was an able-bodied man.

242.    As a result of the attack, plaintiff Devir Averbach has suffered severe mental

31

anguish and extreme emotional distress as a result of his father's relentless and painful suffering, repeated surgeries and brushes with death, his negative prognosis and his permanent physical condition.

243.    Plaintiff Sean Averbach is a citizen of the United States and a citizen and resident of the State of Israel. He is the 10 year old son of plaintiffs Steve and Julie Averbach.

244.    As a result of the brutal attack on his father, he has been emotionally traumatized and has lost the sense of protection and safety he once enjoyed from his father.  Due to the severity of his father's injuries, ordinary companionship and simple pleasures of traveling with or playing sports with his father have been denied to him, and will in all likelihood be denied to him for the remainder of his father's life.

245.    As a result of the attack, plaintiff Sean Averbach has suffered severe mental anguish and extreme emotional distress.

246.    Plaintiff Adam Averbach is a citizen of the United States and a citizen and resident of the State of Israel. He is the 5 year old son of plaintiffs Steven and Julie Averbach.

247.    As a result of the brutal attack on his father he has been emotionally traumatized and will in all likelihood never possess memory of a time when his father was capable of using his arms and legs. Due to the severity of his father's injuries, ordinary companionship and simple pleasures of walking together, playing sports together, or driving in a car with his father have been denied to him and will in all likelihood be denied to him for the remainder of his father's life.

248.    As a result of the attack, plaintiff Adam Averbach has suffered severe mental anguish and extreme emotional distress.

249.    Plaintiffs Dr. David Averbach and Maida Averbach are United States citizens and

32

residents of the State of New Jersey. They are the parents of plaintiff Steven Averbach.

250.    They returned home late on May 17, 2003, from a dinner honoring David. Soon thereafter, Maida switched on Fox News and learned that a bus had been bombed in Jerusalem on Sunday morning in Israel. Maida recognized her son's hand leaning out of a stretcher on the news footage but decided not to inform her husband until the next morning.

251.    After a sleepless night, Maida received a telephone call on Sunday morning at 5:50 a.m. from her daughter-in-law and a social worker from Hadassah Hospital. They explained that Steve had been grievously wounded by the explosion and a ball bearing had lodged between his C3 and C4 vertebrae.

252.    As a respected surgeon with many years of experience, David immediately understood the severity of his son's injuries.

253.    Dr. and Mrs. Averbach have partially retired from their jobs so that they may spend more time with Steve and his children.

254.    Plaintiffs David Averbach and Maida Averbach have experienced severe mental anguish and extreme emotional distress as a result of the terrorist attack, and in the case of Maida Averbach, from the moment she saw her son's hand on television in the early morning hours of May 18, 2003.

255.    Steve's continued inability to use his hands and legs, his inevitable battle with depression and the emotional effect it has had on Steve's four children are a constant source of continued anguish to both of his parents.

256.    Plaintiff Michael Averbach is a citizen of the United States and a resident of the State of New Jersey. He is the brother of plaintiff Steven Averbach.

257.    Michael Averbach has always looked up to his brother and admired him. The

injuries that his brother has sustained have been a severe emotional blow to Michael.

258.    Since the date of the attack Michael has flown to Israel repeatedly, often at his brother's request, simply to sit by Steve's bedside and talk.

259.    As a result of the terrorist attack, plaintiff Michael Averbach has suffered severe mental anguish and extreme emotional distress.

260.    Plaintiff Eileen Sapadin is a citizen of the United States and a resident of the State of New Jersey. She is the sister of plaintiff Steven Averbach.

261.    Eileen was staying at her parents' home with her husband and three of her four children on the morning her mother received notification of the attack.

262.    Eileen has experienced tremendous emotional pain and sadness as a result of the severity of the injuries that Steve sustained as a result of the attack.

263.    She suffers from anxiety and depression, has trouble sleeping and cries every day.

264.    Since the attack, she lost more than thirty pounds and has suffered physical exacerbations of a colitis condition that was in remission prior to the attack that severely injured her brother.

265.    As a result of the terrorist attack, plaintiff Eileen Sapadin has suffered severe physical and mental anguish and extreme emotional distress.

## THE MIKE'S PLACE BOMBING IN TEL AVIV - APRIL 30, 2003

### The Rozenstein Family

266.    On April 30, 2003, a HAMAS suicide bomber, Asif Muhammad Hanif, entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his explosives,[4] killing two (2) people and injuring

---

[4]    There were actually two bombers, both British nationals sent by HAMAS, but the explosive belt on one of the terrorists failed to detonate.

34

approximately sixty (60) others.

267.   Hanif, 22, was a British citizen who entered Israel through Jordan.

268.   Plaintiff Daniel Rozenstein is a citizen of the United States and a citizen and resident of the State of Israel.

269.   Daniel was seated inside the bar and decided to step outside when he crossed paths with the suicide bomber in the entry way just as he detonated his explosives.

270.   As a result of the attack, Daniel suffered third degree burns over his entire body. Since his back was to the bomber, Daniel's back bore the brunt of the explosion.

271.   After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for over a week. He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

272.   Since the bombing he has sustained severe hearing loss. He cannot maintain his balance, is often dizzy, and frequently experiences black outs. Much of his body is covered by scar tissue, including his back and hands. His right hand no longer functions properly because it is covered in scar tissue.

273.   As a result of the attack, plaintiff Daniel Rozenstein has suffered severe physical and mental anguish and extreme emotional distress.

274.   Plaintiff Julia Rozenstein Schon is a citizen of the United States and a citizen and resident of the State of Israel. She is the sister of plaintiff Daniel Rozenstein.

275.   On the night of the bombing, Julia received a telephone call from the father of Daniel's girlfriend. She was told there had been an attack and that no one was certain of Daniel's condition.

276.   When Julia first saw Daniel she did not recognize him because his body was

35

horribly burned and his face and ears were swollen beyond recognition. She spent many days in the hospital, and was there when her brother slipped into a coma.

277.    Julia still suffers nightmares and is traumatized by the attack. Even now, she calls her brother compulsively to be certain that he is not in danger.

278.    As a result of the attack, plaintiff Julia Rozenstein Schon has suffered severe mental anguish and extreme emotional distress.

**Joshua Faudem**

279.    Plaintiff Joshua Faudem, age 32, is a citizen of the United States and a citizen of the State of Israel.

280.    Mr. Faudem, a documentary filmmaker, was working in Israel in the spring of 2003, filming what would be produced as "Blues by the Beach," a documentary on everyday life for young Israelis.

281.    On the night of the attack, Mr. Faudem was enjoying an evening of live music at Mike's Place and was filming the crowd and performances there.

282.    At approximately 1:00 in the morning, Asif Hanif detonated his explosives at the entrance to Mike's Place.

283.    Amidst the terror and chaos in the wake of the explosion, Mr. Faudem assisted his then-girlfriend to the bar's back storeroom, away from the carnage.

284.    At some point during the bombing's aftermath, Mr. Faudem realized his video camera was still recording. He picked up the camera and began filming the scene around him and the people outside of the bar.

285.    When he realized that everyone needed to evacuate the building, Mr. Faudem assisted his girlfriend out of the bar. They had to wade through spilled blood, body parts, and

36

pieces flesh to get outside. As they exited, Mr. Faudem saw the dead bodies of his friends and the mangled corpse of the suicide bomber. Mr. Faudem attempted to shield his girlfriend's eyes from the horrors that surrounded them, but she slipped in a pool of blood, fell on her back, and gazed directly at the bomber's headless torso.

286.    Mr. Faudem and his girlfriend were taken by ambulance to the hospital, where they were released later that morning.

287.    Mr. Faudem remains haunted by the images that fill his mind. As a filmmaker, he travels the world showing his film "Blues by the Beach" and sharing his story with others. Although this can be somewhat therapeutic, it is also immensely painful for Mr. Faudem to continually relive his experience by sharing his story and movie with audiences.

288.    As a result of the terrorist attack, plaintiff Joshua Faudem has suffered severe mental anguish and extreme emotional distress.

**Zohar Fater**

289.    Plaintiff Zohar Fater, age 31, is a citizen of the United States and a citizen of the State of Israel.

290.    Ms. Fater, a regular attendee of the Mike's Place musical jam sessions, was enjoying an evening of live music the night of the attack.

291.    When Asif Hanif detonated his explosives at the entrance to Mike's Place, the force of the blast threw Ms. Fater several feet through the air where she landed on the pavement between two cars outside of the bar. She instinctively shut her eyes to prevent herself from witnessing any of the horrible sights she knew surrounded her.

292.    Ms. Fater was rapidly losing blood as a result of a leg wound caused by the explosion. A friend sat with Ms. Fater and kept her talking in an effort to keep her conscious

37

until medical personnel arrived.

293.    Ms. Fater was one of the last victims to be loaded into an ambulance and by that time she was having difficulty breathing, was nearly fainting, and could only feel her fingers.

294.    Ms. Fater remained hospitalized for two weeks after the attack, during which time she underwent several surgeries on her knee and leg.

295.    After her release from the hospital, Ms. Fater remained wheelchair-bound for two months. Thereafter, she had to walk with the assistance of crutches.

296.    To this day Ms. Fater has limited mobility, must wear special shoes, and continues to experience pain in her injured leg.

297.    On account of her restricted mobility, Ms. Fater had serious difficulty maintaining her longstanding job with the Tel Aviv Orchestra. Although she was also employed as a fashion model, she can no longer reveal her leg due to the scarring and has thus been unable to model anymore.

298.    Due to the traumatic physical experience she underwent coupled with her exposure to the horrible sounds and smells of a bombing site, Ms. Fater has also suffered psychological trauma.

299.    As a result of the attack, plaintiff Zohar Fater has suffered severe physical and mental anguish and extreme emotional distress.

**Bruce Mazer**

300.    Plaintiff Bruce Mazer, age 46, is a citizen of the United States and a citizen of the State of Israel. He is also a resident of the State of Missouri.

301.    Mr. Mazer was living in Tel Aviv in the spring of 2003. On the night of the terrorist attack, Mr. Mazer was celebrating a friend's birthday and enjoying an evening of live

music at Mike's Place.

302.    Mr. Mazer heard Asif Hanif detonate his explosives, but Mr. Mazer initially believed the noise to be firecrackers. He spun around and witnessed the havoc the bombing caused. He saw blood everywhere and slipped in it as he exited the bar. Once outside, Mr. Mazer reunited with his roommate and they helped each other remove scattered bits of flesh and viscera from their clothes.

303.    That night, Mr. Mazer was examined at the intensive care unit of the hospital. After the examination and an evaluation by a psychiatrist, he was discharged.

304.    Mr. Mazer continues to suffer emotionally as a result of the trauma he experienced. Loud noises trigger an automatic recollection of the events of April 30, 2003, and generate bouts of depression.

305.    As a result of the attack, plaintiff Bruce Mazer has suffered severe mental anguish and extreme emotional distress.

**Orly Rom**

306.    Plaintiff Orly Rom, age 25, is a citizen of the United States and a citizen of the State of Israel.

307.    Ms. Rom was living in Tel Aviv in the spring of 2003. On the night of the attack, Ms. Rom was celebrating her boyfriend's birthday and enjoying an evening of live music at Mike's Place when the terrorist detonated his explosives.

308.    Ms. Rom suffered a temporary hearing loss as a result of the explosion's deafening noise.

309.    Although she sustained no serious physical injuries, Ms. Rom witnessed the graphic sight of the bombing's aftermath.

39

310.    That night, Ms. Rom was examined at the intensive care unit at the hospital. After that examination and a conversation with a psychiatrist, Ms. Rom was discharged.

311.    Ms. Rom continued to suffer emotionally as a result of the trauma she experienced. She has suffered from depression and insomnia and has attended group therapy sessions with a social worker.

312.    As a result of the terrorist attack, plaintiff Orly Rom has suffered severe mental anguish and extreme emotional distress.

**Richard Coffey**

313.    Plaintiff Richard Coffey, age 43, is a citizen of the United States and a citizen of the State of Israel.

314.    Mr. Coffey was living in Tel Aviv in the spring of 2003 and working as a bartender at Mike's Place. He also performed frequently as a singer at the club. On the night of the attack, Mr. Coffey was celebrating his birthday at Mike's Place and was enjoying an evening of camaraderie and performances of jam sessions.

315.    As a result of the bomber's blast, Mr. Coffey sustained minor injuries to his back and head. He has also endured the ongoing emotional trauma of having witnessed the graphic images of the bombing's aftermath, including the sights of deceased and injured friends and colleagues.

316.    That night, Mr. Coffey was examined at the intensive care unit at the hospital. After that examination, Mr. Coffey was discharged.

317.    Mr. Coffey continued to suffer emotionally as a result of the trauma he experienced. He has suffered from depression and insomnia and has attended group therapy sessions with a social worker.

318.    As a result of the terrorist attack, plaintiff Richard Coffey has suffered severe mental anguish and extreme emotional distress.

## Gal Ganzman

319.    Plaintiff Gal Ganzman, age 33, is a citizen of the United States and a citizen of the State of Israel. He is a resident of Manila, Philippines.

320.    Mr. Ganzman was the owner of Mike's Place in the spring of 2003. On the night of the terrorist attack, Mr. Ganzman was bartending and performing his usual duties as bar owner and manager.

321.    When Asif Hanif detonated his explosives, Mr. Ganzman was pouring a beer for a customer. Mr. Ganzman heard noises similar to fireworks, followed by silence.

322.    Mr. Ganzman suffered temporary hearing loss as a result of the explosion's deafening noise.

323.    Mr. Ganzman witnessed the graphic sights of the bombing's aftermath, including viscera, blood, and the bomber's scattered remains. His exposure to the images and smells of violent death has left him traumatized.

324.    That night, Mr. Ganzman was examined at the intensive care unit at the hospital. After that examination and a conversation with a psychiatrist, Mr. Ganzman was discharged.

325.    Mr. Ganzman's girlfriend and two friends were present at the attack. Each of them died en route to the hospital. Mr. Ganzman has been profoundly affected by the loss of these individuals.

326.    Following his experience on the night of April 20, 2003, Mr. Ganzman continued to suffer emotionally for some time as a result of the trauma he survived. He suffered from Post-Traumatic Stress Disorder and has experienced panic attacks.

41

327.    As a result of the terrorist attack, plaintiff Gal Ganzman has suffered severe mental anguish and extreme emotional distress.

**Judith Buchman-Ziv**

328.    Plaintiff Judith Buchman-Ziv, age 54, is a citizen of the United States and a citizen of the State of Israel. She is a resident of the State of New York.

329.    In the spring of 2003 Ms. Buchman-Ziv was living in Tel Aviv, where she worked as a legal assistant. She also performed regularly as a singer and guitarist at Mike's Place. On the night of the attack, Ms. Buchman-Ziv was performing in the weekly jam sessions at Mike's Place.

330.    As she tried to exit the bar after the explosion, Ms. Buchman-Ziv was exposed to horrible sights of body parts and the bomber's mangled corpse. She slipped and fell in human blood and remains. She exited the bar in a state of shock and went home.

331.    Ms. Buchman-Ziv continues to suffer emotionally as a result of the trauma she experienced. She suffered and continues to suffer from severe Post-Traumatic Stress Disorder, Acute Stress Disorder, Anxiety Disorder, panic attacks, depressive episodes, nightmares, nervousness, and hysteria. She continues to receive regular counseling in the United States.

332.    As a result of the attack, plaintiff Judith Buchman-Ziv has suffered severe mental anguish and extreme emotional distress.

## SHOOTING ATTACK ON ROUTE #60 - JANUARY 29, 2003

**The Steinmetz Family**

333.    Plaintiffs Jacob Steinmetz and Deborah Steinmetz are citizens of the United States and citizens and residents of the State of Israel.

334.    On January 29, 2003, Jacob was driving their car on Route #60. Deborah sat in

42

the front passenger seat of the car. As their car made a turn, two masked men began shooting at the car. The entire driver's side of the car was riddled with bullets.

335.   HAMAS perpetrated this attack.

336.   Two bullets hit Jacob. One shot passed through the car seat and lodged in his leg. The other shot entered his arm and passed through his elbow.

337.   After arriving at the hospital and over the next few days, Jacob underwent a number of operations.

338.   Four metal spikes were surgically inserted into his bone in order to restrain his arm. The spikes remained there for three months and severely restricted his arm's mobility. Additional plastic surgeries were performed. Jacob received a skin graft from his leg to cover the opening in his elbow.

339.   In 2003, Jacob underwent a complete elbow replacement that included the placement of a large metal hinge.

340.   Presently, the use of Jacob's arm is greatly limited.

341.   As a result of the attack, plaintiff Jacob Steinmetz has suffered severe physical and mental anguish and extreme emotional distress.

342.   As a result of being in the car that terrorists targeted, plaintiff Deborah Steinmetz experiences great anxiety and has suffered severe mental anguish and extreme emotional distress.

343.   Plaintiffs Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz and Natanel Steinmetz are citizens of the United States. They are the children of plaintiffs Jacob and Deborah Steinmetz.

344.   As a result of the attack, plaintiffs Amichai Steinmetz, Nava Steinmetz, Orit

43

Steinmetz and Natanel Steinmetz have suffered severe mental anguish and extreme emotional distress.

## THE HEBREW UNIVERSITY CAFETERIA BOMBING - JULY 31, 2002

345.    On the afternoon of July 31, 2002, approximately 100 people were eating lunch in the Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem. A bomb planted inside the cafeteria exploded, killing nine (9) people and injuring as many as eighty-five (85) others. Five Americans were killed in the attack, including Janis Ruth Coulter, Benjamin Blutstein, Diane Leslie Carter and David Gritz.

346.    HAMAS planned and carried out the attack.

347.    Mohammed Odeh, who worked at Hebrew University as a painter for an Israeli contractor, set off the bomb.

348.    Odeh received the explosives from accomplices in the West Bank town of Ramallah, where the HAMAS cell command was located. On the night before the attack, Odeh had jumped over a fence on the campus and hid the explosives under a bush. The next morning, he walked through the main gate using his employee permit, picked up the bomb and planted it in the cafeteria. He remote-detonated the explosives with a cell phone.

349.    Familiar with the university, Odeh had chosen the Frank Sinatra Cafeteria as the site for the bombing, knowing that few Arabs went to the cafeteria and that foreign students frequently dined there.

### The Coulter Family

350.    Janis Ruth Coulter, a 36 year old citizen of the United States, was in the cafeteria when the bomb exploded, killing her and injuring her friend who was eating lunch with her.

351.    Janis was the assistant director of the Hebrew University's Rothenberg

44

International School's Office of Academic Affairs in New York.

352.    Janis had arrived in Israel just one day before the bombing to accompany a group of 19 American students who were scheduled to attend classes at the university.

353.    Plaintiff Robert L. Coulter, Sr. is a citizen of the United States and a resident of the State of Massachusetts. He is the father of Janis Ruth Coulter. He brings this action both individually and on behalf of the Estate of Janis Ruth Coulter.

354.    Plaintiff Robert L. Coulter, Sr. was watching television news that morning in the United States when he saw a "news flash" about a bombing at Hebrew University. Thinking he saw Janis's head lying in an unsealed body bag, he called his other daughter, plaintiff Dianne Coulter Miller. Dianne called Janis's boss in New York and both Mr. Coulter and his daughter desperately tried to reach Janis on her cell phone without success.

355.    Plaintiff Dianne Coulter Miller is a citizen of the United States and a resident of the State of Massachusetts. She is the sister of Janis Ruth Coulter.

356.    Plaintiff Robert L. Coulter, Jr. is a citizen of the United States and a resident of the State of Massachusetts. He is the brother of Janis Ruth Coulter.

357.    Plaintiff Robert Coulter, Jr. had heard about the bombing on the radio on the way to work, but didn't make the connection with Janis's visit to Israel. His father called him at work about the possibility that Janis was at the cafeteria, whereupon he drove immediately to his father's house.

358.    Initially, Janis was identified only through the numbers on her medical alert bracelet. Eventually, the family retrieved Janis's dental records and faxed them to Israel where, later that evening, her death was confirmed.

359.    As a result of Janis's death, plaintiff Robert L. Coulter, Sr. has experienced

45

emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

360.    As a result of Janis's death, plaintiff Dianne Coulter Miller has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

361.    As a result of Janis's death, plaintiff Robert L. Coulter, Jr. has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Carter Family**

362.    Diane Leslie Carter, a 38 year old citizen of the United States, was eating lunch in the cafeteria when the bomb exploded.

363.    Diane was killed by the bomb blast.

364.    In 1990, Diane had moved to Israel, where she worked as a librarian and archivist in the National Library on the Givat Ram campus of Hebrew University in Jerusalem.

365.    Plaintiff Larry Carter is a citizen of the United States and a resident of the State of North Carolina. He is the father of Diane Leslie Carter. He brings this action both individually and as Administrator of the Estate of Diane Leslie Carter.

366.    Larry learned of his daughter's death from a journalist who called his home. After conferring with his ex-wife, Diane's mother, Larry was able to confirm that his daughter was, in fact, killed in the bombing.

367.    Plaintiff Shaun Coffel is a citizen of the United States and a resident of the State of Virginia. She is the sister of Diane Leslie Carter.

368.    Both Larry and Shaun learned that Diane had been buried in Israel only moments

46

before the funeral was scheduled to begin. Neither of them had the opportunity to say goodbye to Diane.

369.    As a result of Diane's death, plaintiff Larry Carter has suffered severe mental anguish and extreme emotional distress.

370.    As a result of Diane's death, plaintiff Shaun Coffel has suffered severe mental anguish and extreme emotional distress.

**The Blutstein Family**

371.    Benjamin Blutstein, a 25 year old citizen of the United States, was killed in the blast.

372.    Benjamin had come to Israel for a two-year study program at the Pardes Institute in Jerusalem to become a teacher.

373.    Benjamin was scheduled to fly home to visit his family in Pennsylvania the day after he was murdered by HAMAS terrorists. Instead, two days after the attack, Benjamin's body was flown home and buried in his parents' home town of Harrisburg, Pennsylvania.

374.    Plaintiffs Dr. Richard Blutstein and Dr. Katherine Baker bring this action both individually and on behalf of the Estate of Benjamin Blutstein. They are the parents of Benjamin Blutstein.

375.    Plaintiff Richard Blutstein is a citizen of the United States and a resident of the State of Pennsylvania.

376.    Plaintiff Katherine Baker is a citizen of the United States and a resident of the State of Pennsylvania.

377.    Plaintiff Rebekah Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. She is the sister of Benjamin Blutstein.

47

378.    Richard first heard about the attack while watching Fox News early in the morning. He then called Benjamin's cell phone and heard a recording. Shortly thereafter he contacted friends in Israel to ascertain if Benjamin had been injured in the attack. After a friend made a positive identification, Richard received a call confirming Benjamin's death.

379.    Katherine learned that her son had been killed in the attack when she received a call from a representative of the American Embassy. She was too overwhelmed with emotion to call her husband. Richard received the call from a neighbor, who was with Katherine. Katherine then composed herself enough to inform her daughter, Rebekah.

380.    As a result of Benjamin's death, plaintiff Richard Blutstein has experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

381.    As a result of Benjamin's death, plaintiff Katherine Baker has experienced emotional pain and suffering, loss of Benjamin's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

382.    Although Rebekah's father had informed her about the attack, Rebekah learned that her brother had died when her mother telephoned her.

383.    As a result of Benjamin's death, plaintiff Rebekah Blutstein, has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, protection, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Gritz Family**

384.    David Gritz, a 24 year old dual citizen of the United States and France, was killed in the explosion. He had come to Israel for the first time with the help of a scholarship from the Hartman Institute to study philosophy and write his doctorate.

48

385.    He died after being in Israel for only two weeks.

386.    Plaintiff Nevenka Gritz is a citizen and resident of France. She is the mother of David Gritz, who was an only child.

387.    Plaintiff Nevenka Gritz brings this action both individually and on behalf of the Estate of David Gritz.

388.    Nevenka and her husband, Norman Gritz, were in New York on the day their son was murdered. Friends informed them that television reports had indicated that a bombing had taken place at Hebrew University. Nevenka and her husband attempted to reach their son by phone, and then called the Israeli consulate in the hopes of getting more information. Eventually, confirmation came from the Israeli consulate that David's body had been identified.

389.    As a result of David's death, plaintiff Nevenka Gritz has experienced emotional pain and suffering, loss of her only child's society, companionship, comfort, advice and counsel and suffered severe mental anguish and extreme emotional distress.

## NETANYA SUICIDE BOMBING – MAY 19, 2002

**Gloria Kushner**

390.    Plaintiff Gloria Kushner is a citizen of the United States and a citizen of the State of Florida.

391.    On May 19, 2002, Gloria was walking in an open air market in Netanaya, Israel, when a HAMAS suicide bomber blew himself up between the stalls. The bomber killed three (3) people and injured more than fifty (50) others, including Gloria.

392.    HAMAS jointly planned and perpetrated the attack together with another Palestinian terrorist organization.

393.    Gloria was approximately one hundred and fifty feet away from the suicide

49

bomber when he detonated the bomb. As the bomb exploded, nails, screws and bolts flew in every direction and glass shattered on the main street from the buildings surrounding the market.

394.    Gloria was thrown against a vegetable stand, injuring her spine, right knee and right ear. The permanent bridge in her mouth cracked and a shard of glass imbedded itself in her chin.

395.    She had to undergo surgery to remove the resulting lump and she continues to suffer from headaches and numbness in her fingers due to the injury to her neck.

396.    She suffers from post traumatic stress disorder and still has flashbacks and nightmares whenever she hears an ambulance or fire truck.

397.    As a result of the terrorist attack, plaintiff Gloria Kushner has experienced severe physical and mental anguish and extreme emotional distress.

### THE SHEFFIELD CLUB BOMBING OF MAY 7, 2002

398.    On the night of May 7, 2002, a HAMAS suicide bomber entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club (social club) and detonated a bomb.

399.    Eyewitnesses reported that the bomb blast propelled many of the victims through the club's windows and on to parked cars in the parking lot three floors below.

400.    Fifteen (15) people were killed in the attack including Esther Bablar, a citizen of the United States. Although Esther had initially survived the attack, she died of her injuries the following morning.

401.    Esther had returned to Israel after 30 years to marry her childhood sweetheart, Yitzhak, who was also killed in the attack.

402.    HAMAS perpetrated the attack.

50

**The Bablar Family**

403.    Plaintiffs Jacqueline Chambers and Levana Cohen Harooch are citizens of the United States and residents of the State of Florida. They are the daughters of Esther Bablar.

404.    Plaintiff Jacqueline Chambers brings this action both individually and on behalf of the Estate of Esther Bablar.

405.    Esther had spent the month before the bombing in Florida with her youngest daughter, plaintiff Levana Cohen Harooch, who had just given birth to Esther's grandchild.  The day before the attack she had been in New York visiting her daughter, Jacqueline.

406.    On the day of the attack, a member of the Bablar family in Israel contacted Esther's sister in New York and told her the bad news. Eventually Esther's daughters were notified and they quickly made arrangements to fly to Israel with their aunt and uncle.

407.    As a result of the terrorist attack, plaintiffs Jacqueline Chambers and Levana Cohen Harooch have experienced emotional pain and suffering, and the loss of their mother's society, companionship, comfort, protection, attention, advice and counsel.

## PASSOVER MASSACRE AT THE PARK HOTEL IN NETENAYA - MARCH 27, 2002

**The Rogen Family**

408.    On March 27, 2002, a HAMAS suicide bomber blew himself up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of Passover, and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends.

409.    Thirty (30) people were murdered in the bombing, including Hannah Rogen, who was severely wounded in the attack.  Hannah died of her wounds six days later, on April 2, 2002. One hundred forty (140) others were injured.

51

410.    Hannah Rogen was a Holocaust survivor who immigrated to the United States after World War II. She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

411.    Hannah was a citizen of the United States at the time of her death.

412.    Plaintiff Greta Geler is the great niece of Hannah Rogen. She brings this action as Administrator of the Estate of Hannah Rogen.

## THE BEN YEHUDA STREET BOMBINGS: DECEMBER 1, 2001

413.    In the late evening of December 1, 2001, Nabil Halabiya and Osama Mohammad Id Bahr, two HAMAS suicide bombers, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing (followed by a coordinated car bombing). A large quantity of nails was packed with each of the bombs. Eleven (11) people were murdered and over one hundred (100) people were injured. Bahr had been recruited by Jamal al-Tawil, the chairman of the Al-Islah Charitable Society since 2000. The Al-Islah Charitable Society is one of HAMAS's key charitable front organizations in the West Bank.

414.    Subsequent to the two suicide bombings terrorists detonated a car bomb near the site of the first two attacks. HAMAS also claimed responsibility for this attack.

### Temima Spetner Gould

415.    Temima Spetner Gould is a citizen of the United States and a resident of the State of Missouri.

416.    On December 1, 2001, Temima was walking down the pedestrian mall in Jerusalem when one of the suicide bombers detonated his explosives approximately 10 yards from where she was standing. Temima was hit by shrapnel on her arms and fingers. While bleeding heavily, and with clothing soaked in blood, Temima began running up the walkway and

52

fell. Someone came to her aid and attempted to stop the bleeding until ambulances arrived at the scene.

417.    As a result of the terrorist attack, the femoral artery of Temima's right leg was severed. She was transported to the hospital where doctors operated on her to stop the bleeding. The following day it was determined that Temima's intestines had been punctured by shrapnel, and she underwent another operation to repair her intestines and remove most of the shrapnel. Temima remained in the hospital for ten days.

418.    There is significant scarring on Temima's thigh and the lower part of her abdomen. She continues to experience numbness in her right leg and is highly sensitive to pain in that leg. Temima has also experienced psychological trauma as a result of the attack.

419.    As a result of the attack, plaintiff Temima Spetner Gould has suffered severe physical and mental anguish and extreme emotional distress.

**The Kirschenbaum Family**

420.    Plaintiff Jason Kirschenbaum is a citizen of the United States and a resident of the State of New York.

421.    Jason Kirschenbaum was on Ben Yehuda Street in Jerusalem on December 1, 2001 when the double suicide bombing took place.

422.    As a result of the first explosion, Jason was thrown to the ground. As he stood up, the second suicide bomber detonated his explosives and Jason was thrown in another direction.

423.    When he got up the second time he felt numb. Jason saw his left arm dangling back and forth and held it because he thought it might fall off. When he began running up the street for help, he felt a sharp pain in his leg and back.

424.    Jason was taken to Shaare Tzedek Hospital in Jerusalem where he underwent two

53

operations. Surgeons removed 8 metal bolts from his arm, leg and back.

425.  Jason had to undergo several months of physical therapy for the injuries to his arm, leg and back. He still has scarring where he was branded by the bolts that penetrated his skin.

426.  As a direct result of the terrorist attack, plaintiff Jason Kirschenbaum has suffered severe physical and mental anguish and extreme emotional distress.

427.  Plaintiff Isabelle Kirschenbaum is a United States citizen and a citizen of the State of New York. She is the mother of Jason Kirschenbaum.

428.  Isabelle first learned of the double suicide bombing while watching the Cable News Network (CNN). After numerous telephone conversations, she ultimately received a telephone call confirming that Jason had been injured in the attack.

429.  As a result of the attack, plaintiff Isabelle Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

430.  Plaintiff Martin Kirschenbaum is a citizen of the United States and a resident of the State of New York and of the State of Israel. He is the father of Jason Kirschenbaum.

431.  Martin learned of the attack when he and Isabelle Kirschenbaum received the telephone call confirming that Jason had been injured in the attack.

432.  As a result of the attack, plaintiff Martin Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

433.  Plaintiff Joshua Kirschenbaum is a United States citizen and a citizen of the State of New York. He is a brother of Jason Kirschenbaum.

434.  Joshua Kirschenbaum was in Tel Aviv at the time of the attack. Martin and Isabelle Kirschenbaum telephoned Joshua to advise him that his brother, Jason had been injured

54

in the attack in Jerusalem. Hours later, he finally located his brother in the emergency room at Shaare Tzedek Hospital in Jerusalem.

435.    As a result of the terrorist attack, plaintiff Joshua Kirschenbaum has suffered severe mental anguish and extreme emotional distress

436.    Plaintiff Shoshanah Burgette is a citizen of the United States and a resident of the State of New York. She is a sister of Jason Kirschenbaum.

437.    As a result of the attack, plaintiff Shoshanah Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

438.    Plaintiff David Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of Jason Kirschenbaum.

439.    As a result of the attack, plaintiff David Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

440.    Plaintiff Danielle Teitelbaum is a citizen of the United States and a resident of the State of New Jersey. She is a sister of Jason Kirschenbaum.

441.    As a result of the attack, plaintiff Danielle Teitelbaum has suffered severe mental anguish and extreme emotional distress.

**The Miller Family**

442.    Plaintiff Netanel Miller, age 22, is a citizen of the United States and a resident of the State of Florida.

443.    Plaintiff Chaya Miller is a citizen of the United States. Plaintiff Arie Miller is a citizen of the State of Israel. They are the parents of plaintiff Netanel Miller and they reside in Israel.

55

444. On the evening of December 1, 2001, plaintiff Netanel Miller was with friends enjoying ice cream at the pedestrian mall in Jerusalem. One of the suicide bombers detonated his explosives a few feet from Netanel and his friends. Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

445. A bolt from the bomb lodged in the upper part of Netanel's leg. Other bolts hit him in the back, resulting in burns. His hand and knee were also injured.

446. Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg. After walking approximately 30 feet, Netanel collapsed on the sidewalk. Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg. His attempts to use pressure to stop the bleeding were unsuccessful.

447. Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, plaintiffs Arie and Chaya Miller. Netanel spoke to his father, who had been an Army medic. Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

448. Ultimately, Netanel was taken to the Shaare Zedek Hospital by ambulance. Since Netanel had lost a great deal of blood, he was given a blood transfusion.

449. Arie came to the hospital. Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

450. Netanel was admitted to the hospital and remained there for two days.

451. Netanel endured the pain in his leg for nearly two years.

452. The pain in Netanel's leg became so severe he had to undergo surgery, and the bolt that was still lodged in his leg was finally removed.

453.    As a result of the flashbacks and severe pain, Netanel also underwent treatment by a mental health professional.

454.    As a result of the attack, plaintiff Netanel Miller has suffered severe physical and mental anguish and extreme emotional distress.

455.    Upon learning that their son, Netanel, had been injured in the bombing, and knowing he has suffered as a result of those injuries, plaintiffs Chaya Miller and Arie Miller experienced great concern and anxiety.

456.    As a result of the attack, plaintiffs Chaya Miller and Arie Miller have suffered severe mental anguish and extreme emotional distress.

**The Steinherz Family**

457.    Plaintiff Altea Steinherz and plaintiff Jonathan Steinherz are citizens of the United States and residents of the State of Israel. They are husband and wife.

458.    On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby. A short time later they heard another bomb explode. Believing the bombing was over, they began to walk home.

459.    While walking in the street they saw a crazed man run past them. Altea insisted that the couple turn around, away from the direction from which the man had come. They heard a third explosion from where the man had run. They later learned that the explosion was the result of a car bomb.

460.    As they began to run, Altea fell twice, and broke her arm as a result of one the falls.

461.    Until her son, Yitzhak, was born 11 days later, Altea and Jonathan feared for the

condition of their unborn child.

462.    Having personally seen the emergency efforts and fears of individuals at the hospital after the attack, Altea no longer feels she can continue to volunteer at the hospital as she had done previously. She has become more fearful in general.

463.    As a result of the attack, plaintiff Altea Steinherz suffered severe physical anguish and extreme emotional distress.

464.    As a result of the attack, plaintiff Jonathan Steinherz suffered severe mental anguish and extreme emotional distress.

## THE SBARRO'S PIZZERIA MASSACRE – AUGUST 9, 2001

465.    On August 9, 2001, a HAMAS suicide bomber detonated a bomb packed with nails and metal bolts at the Sbarro's Pizzeria in Jerusalem.

466.    Fifteen (15) people were killed in this attack, including Judith Greenbaum, and approximately one hundred thirty (130) people were injured.

467.    The suicide bomber was identified as Izz Ad-Din Shuhail Ahmad Al-Masri.

468.    As recently as January 10, 2005, HAMAS activists at Bir Zeit University paid tribute to Al-Masri as a champion of the Palestinian cause.

### The Nachenberg/Finer Families

469.    On August 9, 2001, Chana and Sara Nachenberg were seated at the Sbarro's Pizzeria in Jerusalem with plaintiffs Howard Green and Mina Dora Green.  Soon after being seated in the restaurant a suicide bomber detonated a bomb.

470.    Plaintiff Chana Nachenberg is a citizen of the United States and a citizen of the State of Israel.  Chana is 34 years old and presently resides in Tel Aviv, Israel, at a full care facility. Chana is represented by her parents, plaintiffs Paula and Bennett Finer, as her legal

58

guardians because she remains in a coma.

471.    Chana and her husband, plaintiff David Nachenberg, have a 7 year old daughter, plaintiff Sara Nachenberg.

472.    As a result of the explosion, a nail and a metal bolt entered Chana's body. The nail severed one of her major arteries and became lodged in her chest cavity. Chana suffered extensive internal bleeding. The severance of the artery caused the sac around her heart to fill with blood, causing her heart to stop beating, thus curtailing the blood flow to her brain.

473.    Chana Nachenberg never regained consciousness after the attack. On route to the hospital Chana's heart stopped beating before it restarted.

474.    For more than seven weeks, Chana's condition was unstable. She remained on a respirator. At the end of those seven weeks Chana was moved to another hospital in Tel Aviv. She remained on respirators for the first year and a half after the attack. She now lives on a respirator in a permanent vegetative state, requiring full time care and daily physical therapy.

475.    Since the attack Chana has been placed on and off respirators and other machines. Throughout the last four and one half years, Chana has repeatedly contracted pneumonia and endured high fevers.

476.    Plaintiff David Nachenberg is a citizen of the United States and a citizen and resident of the State of Israel. He is the husband of Chana Nachenberg and the father of Sara Nachenberg.

477.    At the time of the attack, David was working at Bank Hapoalim. David received a telephone call from his brother-in-law, Zev Finer, who informed him that there had been a terror attack. Zev advised David that he thought that Sara was not physically injured, but he had no information as to Chana's condition or whereabouts. David became emotionally distraught.

59

After numerous telephone calls and assistance from other employees at the bank, David learned that his wife and daughter were at Hadassah Ein Kerem hospital. Upon his arrival at the hospital, David was told that Chana had suffered a severe edema to the brain and was in a coma.

478.    For the first 24 hours, David was uncertain if his wife would survive the attack. After that time it appeared that Chana would live, but never regain consciousness.

479.    David is now essentially a single parent since Chana remains in a permanent vegetative state and is therefore incapable of assisting in the rearing of their daughter in any manner. He cannot enjoy the normal companionship, day to day assistance and mutual support that he previously received from his wife.

480.    David and his daughter Sara often visit Chana at her residential medical facility. The facility is located approximately half an hour from their home by bus.

481.    As a result of the attack, plaintiff David Nachenberg has lost the material services, affection, companionship, consortium and the customary amenities of married life and has suffered severe mental anguish and emotional distress.

482.    Plaintiff Sara Nachenberg is a citizen of the State of the United States and the State of Israel. She is the 7 year old daughter of plaintiffs David Nachenberg and Chana Nachenberg.

483.    At the time of the attack Sara and her mother were seated at the Sbarro's Pizzeria in Jerusalem. After the bombing both she and her mother were transported by ambulance to the hospital.

484.    Miraculously, Sara was not outwardly physically injured during the bombing. Sara now visits her mother at the full care facility. She brushes her mother's hair and draws pictures for her. She speaks to her but cannot receive any reply. Sara's only memories are from

60

a time when Chana was already in her current comatose state.

485.    As a result of the attack, plaintiff Sara Nachenberg has experienced emotional pain and suffering, permanent loss of his mother's society, protection, companionship, comfort and advice and has suffered severe mental anguish and extreme emotional distress.

486.    Plaintiffs Paula and Bennett Finer are citizens of the United States and of the State of Israel and are the parents of plaintiff Chana Nachenberg. They presently reside in Israel.

487.    Paula and Bennett Finer are plaintiffs in their own capacity and as the legal guardians of their daughter, Chana Nachenberg.

488.    After the bombing Paula Finer received a telephone call from plaintiff Howard Green, who told her that there had been an attack and that Chana had been hurt. He said nothing about the condition of Paula's granddaughter, Sara Nachenberg.

489.    Paula and Bennett were driven in their son-in-law's car and began to search from hospital to hospital to try to locate their daughter and granddaughter. After over two hours of searching they finally discovered that Chana and Sara had been brought to Hadassah Hospital. They found Sara in the children's ward in shock and covered with debris. She seemed unable to speak.

490.    Eventually they located Chana, whose face was so swollen that Bennett was almost unable to recognize her. She was in a coma and had many tubes connected to her.

491.    For more than seven weeks, Paula and Bennett spent every day at the hospital with their daughter for more than ten hours each day, day and night. After Chana was moved to the hospital in Tel Aviv, Paula and Bennett continued to visit the hospital for many hours each day.

492.    Prior to the attack Paula was a teacher. She has not returned to work since the

attack because she attends to her daughter on a daily basis.

493.    As a result of the attack, Bennett did not work for the first two years after the attack. He has recently returned to work, but still visits Chana in the morning prior to going to work.

494.    Paula and Bennett Finer have been unable to communicate with their daughter since the bombing put Chana into a coma.

495.    Paula and Bennett also assist in the care of their granddaughter, Sara. They help her get ready for school, and pick her up afterwards when her father is unable to do so.

496.    As a result of the attack, plaintiffs Paula and Bennett Finer have experienced severe mental anguish, extreme emotional pain and suffering, loss of their daughter's society, companionship, advice and counsel.

497.    Plaintiff Shoshana Finer Ohana is a citizen of the United States and a citizen and resident of the State of Israel. She is the sister of plaintiff Chana Nachenberg.

498.    Shoshana Ohana first learned of the bombing when plaintiff Howard Green telephoned the home of her parents, plaintiffs Paula and Bennett Finer. Shoshana tried desperately to locate the hospital where her sister and niece had been taken for treatment. Finally, hours later, Shoshana learned the severity of her sister's injuries when her parents contacted her by telephone.

499.    Shoshana and Chana shared a very close relationship. Shoshana visits her sister often, but her sister is unable to respond to her visits.

500.    As a result of the attack, Shoshana Finer Ohana has experienced severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel.

501.    Plaintiff Zev Finer is a citizen of the United States and citizen and resident of the State of Israel. He is the brother of plaintiff Chana Nachenberg.

502.    Zev learned of the attack when his wife telephoned him at work. Upon learning of the attack and the fact that his sister and niece were present at the Sbarro's Pizzeria, he telephoned his brother-in-law, David Nachenberg, and learned the extent of his sister's injuries.

503.    Since the attack Zev is fearful of going out to restaurants and crowded places.

504.    As a result of the attack, plaintiff Zev Finer has experienced severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel.

### The Green Family

505.    Plaintiffs Howard Green and Mina Dora Green are citizens of the United States and citizens and residents of the State of Israel.

506.    On August 9, 2001, Howard and Mina were seated at the Sbarro's Pizzeria in Jerusalem with plaintiffs Chana and Sara Nachenberg. Soon after being seated in the restaurant a suicide bomber detonated a bomb.

507.    As a result of the explosion, Howard Green was hit in the head with an extremely hot piece of an air conditioning duct. The metal hit him on the right side of the head resulting in second degree burns as well as a punctured ear drum.

508.    Although not physically injured, Mina has suffered from depression since the attack. Both she and her husband suffer from post traumatic stress disorder.

509.    As a result of the attack, plaintiff Howard Green has suffered severe physical and mental anguish and extreme emotional distress.

510.    As a result of the attack, plaintiff Mina Dora Green has suffered severe mental

63

anguish and extreme emotional distress.

**The Greenbaum/Hayman Family**

511    Judith Greenbaum, a United States citizen, was a 31 year old graduate student participating in a summer foreign study program in Israel.

512.    Judith was having lunch in the Sbarro's Pizzeria when the bomber detonated the explosive device loaded with shrapnel and nails.

513,    As a result of the explosion, Judith Greenbaum was mortally wounded. At the time of her death, Judith had been married just 16 months and was three months pregnant with her first child. Judith had been a beloved teacher for many years and left a lasting impression upon hundreds of students.

514.    Plaintiff Steven Greenbaum is the husband of Judith Greenbaum and a citizen of the United States. He brings this action both individually and as the representative of Judith's estate.

515.    Steven has experienced emotional pain and suffering, the loss of his wife's society, companionship, comfort, protection, marital care, attention, and advice and counsel.

516,    As a result of the terrorist attack, plaintiff Steven Greenbaum has lost the material services, affection, companionship, consortium and the customary amenities of married life and has suffered severe mental anguish and emotional distress.

517.    Plaintiffs Alan and Shirlee Hayman are citizens of the United States. They are the parents of Judith Greenbaum.

518.    On the morning of the bombing plaintiff Steven woke up in New Jersey and spoke with his wife on the telephone. After he arrived at work he received a call from his father-in-law, plaintiff Alan Hayman, telling him that there was a bombing in Israel and that he had tried,

unsuccessfully, to locate Judith on her cell phone. Throughout the day, Steven and Alan were in contact by phone as Alan called relatives, friends and the school where Judith was a graduate student. As the day went on, they realized that no one in Israel could find Judith. Approximately eight hours after the bombing, Judith's uncle called and told Alan that he had located Judith's body at the morgue.

519.    Thereafter, Judith's uncle telephoned Steven, and advised him of Judith's death and inquired of Steven's wishes for Judith. At 7:00 p.m. that evening, Steven boarded a plane to Israel. Steven was met at the airport by a representative from the U.S. State Department who assisted Steven in passing through Customs so that he could go straight to the cemetery to attend his wife's funeral.

520.    Because Judith's family desired that she be buried according to Jewish tradition, her funeral had to be scheduled for the next day. Plaintiffs Alan and Shirlee Hayman lived in California making it impossible for them to fly to Israel in time for their daughter's funeral. Being unable to attend the funeral caused them tremendous additional grief and anguish.

521.    Every time Alan and Shirlee travel to Jerusalem, they can see their daughter's gravesite from the highway, which adds to the pain and suffering they will carry with them for the rest of their lives.

522.    As a result of the terrorist attack, plaintiffs Alan Hayman and Shirlee Hayman have experienced severe mental anguish, extreme emotional pain and suffering, loss of their only child's society, companionship, comfort, advice and counsel.

**The Danzig Family**

523.    Plaintiff David Danzig is a citizen of the United States and a resident of the State of Pennsylvania.

65

524.    On August 9, 2001, the day after David had arrived in Jerusalem, he was sitting with a friend at the Sbarro's Pizzeria when the bomber detonated his explosives a few feet from where David was seated.

525.    Miraculously, David was not seriously injured in the blast, but in order to escape from the scene, David had to climb through the wreckage of debris and dead bodies and through the broken windows of the restaurant.

526.    As a result of the explosion, David's legs and hands received gashes and he had cuts from flying glass over much of his body. David also temporarily lost his hearing, and he was in a state of severe shock.

527.    David received many stitches up and down his legs from the injuries caused by the glass. After being treated for his wounds at the hospital, David was released.

528.    David was later diagnosed with severe post traumatic stress syndrome. David's condition required countless therapy treatments and medication. He often has flashbacks and images of the attacks that cause him to experience severe emotional trauma. He has recurring nightmares and continues to have great difficulty sleeping.

529.    Upon his return to the United States, David was incapable of continuing his studies in college. He withdrew from his classes and was admitted to a day clinic for depression and anxiety as an outpatient. Although he returned to college for the spring semester, he has been unable to complete his course load.

530.    As a result of the attack, plaintiff David Danzig has suffered severe physical and mental anguish and extreme emotional distress.

531.    Plaintiffs Rebecca Danzig and Neil Danzig are citizens of the United States and residents of the State of Pennsylvania. They are the parents of David Danzig.

532.   Plaintiff Hayyim Danzig is a citizen of the United States and a resident of the State of Pennsylvania. He is the younger brother of David Danzig.

533.   On the day of the attack, Rebecca and Neil Danzig received a telephone call from their son, Hayyim, informing them that there had been a bombing in Jerusalem and inquiring as to whether David had been involved.

534.   Rebecca telephoned her father and step-mother, who reside in Jerusalem, to ascertain David's whereabouts. After receiving no information, Rebecca called again, and was told that David had been at the bombing and had been brought to the hospital.

535.   As a result of the attack, plaintiffs Rebecca Danzig and Neil Danzig have suffered severe mental anguish and extreme emotional distress.

536.   Plaintiff Sarah Danzig is a citizen of the United States and a resident of the State of Pennsylvania. She is the sister of plaintiff David Danzig.

537.   Sarah learned that her brother had been injured in the bombing when her parents notified her at a camp for children diagnosed with cancer.

538.   Each of the members of the Danzig family has attended therapy sessions to address the emotional trauma caused by the attack.

539.   As a result of the attack, plaintiffs Hayyim Danzig and Sarah Danzig have suffered severe mental anguish and extreme emotional distress.

**Clara Ben-Zaken Laser**

540.   Plaintiff Clara Ben-Zaken Laser is a citizen of the United States and a citizen and resident of the State of Israel.

541.   On August 9, 2001, Clara had been waiting for a friend outside of the crowded pizzeria shortly before the attack. Suddenly, she heard a loud explosion and the body of a dead

man flew through the window of Sbarro's Pizzeria and landed on top of her. Clara pulled herself free of the corpse and ran away from Sbarro's Pizzeria.

542.    She later went to the hospital where she was treated for her cuts and bruises.

543.    As a result of the attack, plaintiff Clara Ben-Zaken Laser has suffered physical and severe mental anguish and extreme emotional distress.

## GAS STATION BOMBING NEAR KFAR SAVA – MARCH 28, 2001

### The Herskovitz Family

544.    In the early morning of March 28, 2001, Fadi Attallah Yusuf Amer, a HAMAS suicide bomber, blew himself up outside a gas station near Kfar Sava, killing two teenagers waiting for a bus to take them to the Bnei Hayil Yeshiva in Kedumim. Four (4) other people were injured. A large quantity of nails was packed with the bomb.

545.    Plaintiff Netanel Herskovitz, who was 16 years old at the time of the terrorist attack, is a citizen of the United States and a citizen of the State of Israel. He was sitting and eating a sandwich outside the gas station when Amer blew himself up.

546.    Netanel was struck in the shoulder and forehead by shrapnel, and glass fragments penetrated one eye, leaving him partially blind. Netanel has also experienced partial hearing loss and suffers from post traumatic stress disorder.

547.    As a result of the attack, plaintiff Netanel Herskovitz has suffered severe physical and mental anguish and extreme emotional distress.

548.    Plaintiffs Martin Herskovitz and Pearl Herskovitz are citizens of the United States. They are the parents of plaintiff Netanel Herskovitz.

549.    Martin and Pearl learned of the attack and the fact that their son was injured from the family of another boy who had also been injured at the scene and called home on his cell

68

phone. Pearl works at the hospital where Netanel was taken for treatment and quickly located her son in the emergency room area.

550.    Plaintiff Yaakov Herskovitz is a citizen of the State of the United States and the State of Israel. He a brother of plaintiff Netanel Herskovitz.

551.    Yaakov was at home when the family received word that Netanel had been seriously injured in a terrorist attack.

552.    As a result of the attack, plaintiffs Martin Herskovitz, Pearl Herskovitz and Yaakov Herskovitz have suffered severe mental anguish and extreme emotional distress.

### THE TEL ROMEDA SHOOTING IN HEBRON - OCTOBER 22, 2003

553.    On October 22, 2003, HAMAS gunman Rafiq Ziyad Qunaybi opened fire from his porch at two (2) passersby in Tel Romeda, Hebron.

554.    Both men were wounded in the shooting.

**Eyal Noked**

555.    Plaintiff Eyal Noked, age 37, is a citizen of the United States and a citizen of the State of Israel.

556.    Mr. Noked, a foreman for a building company, was living and working in Hebron with his wife and six children in the fall of 2003.

557.    On October 22, 2003, Mr. Noked was traveling with a friend near the entrance to Hebron's Admot Yishai neighborhood when Rafiq Qunaybi opened fire, significantly wounding Mr. Noked.

558.    Mr. Noked sustained serious physical injuries, including a gunshot wound to the left shoulder, a shattered left arm, and shrapnel wounds to his head and back.

559.    Mr. Noked was taken to the hospital for emergency medical treatment and

remained hospitalized until October 30, 2003. He underwent surgery to remove the shrapnel from his body and to reaffix his injured left arm. Mr. Noked's left arm remains paralyzed.

560. Mr. Noked was treated by numerous medical providers and participated in a lengthy period of physical rehabilitation.

561. Due to the traumatic physical effects of the attack, Mr. Noked has also sustained psychological trauma. He has suffered and continues to suffer from severe emotional effects of the attack. He experiences fear, anxiety, panic attacks, and cold sweats. He also has recurring nightmares and visions of the shooting attack and its aftermath. Mr. Noked has participated in counseling sessions with rabbinical councils to help alleviate the emotional effects.

562. As a result of the attack, plaintiff Eyal Noked has suffered severe physical and mental anguish and extreme emotional distress.

### THE BOMBING OF BUS NUMBER 19: JANUARY 29, 2004

563. On January 29, 2004 Ali Ju'ara, a Palestinian policeman from the Aida refugee camp on the outskirts of Bethlehem, boarded Bus No. 19 ("Bus 19") in Jerusalem and seated himself at the back of the bus. The Bus's usual route commences at Hadassah Hospital Ein Kerem, in the Ein Kerem neighborhood of Jerusalem, and thereafter travels through the center of Jerusalem to Hadassah Hospital and Hebrew University on Mount Scopus. On that day, January 29, shortly before 9 a.m. Israeli time, Bus 19 reached the corner of Gaza and Arlozorov streets in Jerusalem. At that moment, Ali Ju'ara detonated the bomb he was carrying. The resulting explosion killed 11 people and wounded 50 others, including Stuart Scott Goldberg.

564. After the Bus 19 attack, both HAMAS and the Al Aqsa Martyrs Brigades claimed responsibility for the attack.

565. In 2004, the Israeli Military Court in Judea issued an indictment against Nufal

70

Adawin. The indictment identifies Adawin as a HAMAS member, and charges Adawin for his role in connection with the January 29, 2004 Bus 19 bombing.

566.    Specifically, count 27 of the Adawin indictment charges that Adawin recruited Ali Ju'ara on HAMAS's behalf for the purpose of arranging for Ju'ara to carry out a suicide bombing. Adawin planned the attack with Ali Ju'ara and Muhammad Nashash, another member of HAMAS. Adawin also helped to prepare the bomb for the attack. Adawin was in the process of transporting Ali Ju'ara to carry out the attack when they had to turn back because of a roadblock.

567.    Thereafter, Adawin advised Ali Ju'ara that he had been in contact with another Palestinian terrorist group, Tanzim-Fatah, in connection with carrying out the attack they planned. Adawin informed Ali Ju'ara that he intended to seek Tanzim-Fatah's assistance in order to carry out the attack.

568.    After the attack, Adawin sent pictures and video he had previously taken of Al Ju'ara to a TV station in Bethlehem. Adawin, on HAMAS's behalf, claimed responsibility for the Bus 19 attack.

569.    Stuart Scott Goldberg, 41, a Canadian citizen, was killed in the Bus 19 Attack. He is survived by his wife Karen Goldberg, and their seven children Chana Goldberg, Esther Goldberg, Yitzchak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Yaakov Moshe Goldberg and Tzvi Yehoshua Goldberg (referred to herein collectively as "the Goldberg Children Plaintiffs"). Mr. Goldberg was a therapist who specialized in helping teens at risk and their families. He also wrote a column in *The Jewish Press* called Lifeline.

570.    Plaintiff Karen Goldberg is a citizen of the United States and citizen and resident of the State of Israel. She was Stuart Scott Goldberg's wife. As a result of her husband's death

71

she has lost material services, affection, companionship, consortium and the customary amenities of married life. As a result of the attack, she has suffered severe mental anguish and extreme emotional distress.

571. The Goldberg Children Plaintiffs are all citizens of the United States and citizens and residents of the State of Israel.

572. As a result of the Bus 19 Attack and their father's murder, the Goldberg Children Plaintiffs have permanently lost the benefits of his companionship, comfort, protection, attention, advice and counsel for the balance of their lives. As a result of the attack, they have all suffered severe mental anguish and extreme emotional distress.

**B.    The Defendant**

573. Crédit Lyonnais was founded in 1863 in Lyons, France. In 2003, it was acquired by Crédit Agricole, another French bank. In 2004, the investment banking business of Crédit Lyonnais was spun off to an existing subsidiary of Crédit Agricole, but Crédit Lyonnais continues to exist as a retail bank.

574. Crédit Lyonnais maintains its principal place of business in Paris, France.

575. Crédit Lyonnais conducts business in the United States and maintains an office at 601 Brickell Key Drive, Miami, Florida, 33131. Crédit Lyonnais is also registered with state banking authorities in Florida, and its Miami office is listed as its registered address.

## FACTUAL ALLEGATIONS

### The Islamic Resistance Movement ("HAMAS")

#### A.    The Founding of HAMAS

576. In December 1987, Sheik Ahmed Yassin formed the Palestinian Islamic Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic

72

group founded in Egypt before World War II.

577.    Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of international terrorism in Israel and the Gaza Strip, including the attacks that injured the plaintiffs.

### B.    Formal Designations of HAMAS as a Terrorist Organization

578.    In 1989, the Government of Israel declared HAMAS a terrorist organization and also declared it an "unlawful organization" because of its terrorist acts. Notice of the designation was placed in the official Government of Israel publication, the *Announcements and Advertisements Gazette.*

579.    Initially, HAMAS specialized in kidnapping and executing people suspected of cooperating with Israel. It quickly evolved and broadened its operations so that by the early 1990s, it specialized primarily in murdering civilians in Israel.

580.    For example, on April 6, 1994, a HAMAS suicide bomber blew up a bus in Afula, killing eight (8) people.

581.    On April 13, 1994, a HAMAS suicide bomber blew up a bus in Hadera, killing five (5) people.

582.    On October 19, 1994, a HAMAS suicide bomber blew up a bus in Tel Aviv killing twenty-two (22) people.

583.    On January 23, 1995, President Clinton issued Executive Order 12947. President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

584.    Executive Order 12947 designated HAMAS a Specially Designated Terrorist

73

("SDT"). Executive Order 12947 blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including HAMAS.

585.    On February 25, 1996, a HAMAS suicide bomber blew up a bus in Jerusalem killing twenty-six (26) people, three (3) of whom were U.S. citizens, and injuring eighty (80) people, three (3) of whom were U.S. citizens. HAMAS claimed responsibility for the bombing.

586.    On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the AEDPA. This designation has been renewed every two years since 1997.

587.    After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States." Executive Order 13224 designated HAMAS a Specially Designated Global Terrorist ("SDGT"). Executive Order 13224 blocked all property and interests in property of the SDGTs, including HAMAS.

### C.    HAMAS's Organizational Structure

588.    HAMAS's terrorist operations depend upon its religious and social activities to recruit, educate and train terrorists and to collect material and aid. Its terrorist operations and social activities operate side-by-side and support each other.

#### 1.    The "Dawa"

589.    HAMAS's infrastructure in the Palestinian Authority-controlled territory ("the PACT") is comprised of two interwoven components: its terrorist apparatus and its religious and social infrastructure, which is responsible for recruiting and training terrorists. This patchwork of

charitable and social institutions is commonly referred to by HAMAS as the "Dawa."

590.    For the purpose of raising funds for its operations, HAMAS has established "charity" committees across the PACT and abroad, including committees in Ramallah, Jenin, and Tulkarem that are controlled by HAMAS agents and collect and distribute their funds on behalf of HAMAS.[5]

591.    At all relevant times, Crédit Lyonnais was (and is) generally aware of HAMAS's structure and the connection between HAMAS and its "charity" committees.

592.    The charity associations and committees channel funds to pay expenses and assist the families of terrorist operatives who are arrested, injured, or killed.

593.    The charity associations also provide housing subsidies to the families of suicide bombers whose homes are often demolished by the Israeli army after the bomber's identity has been confirmed.

594.    The network of these "charities" and other "charitable" associations not only helps raise funds for HAMAS's terrorist operations, but also helps it identify and recruit potential terrorists. The network assists recruitment, in part, by funneling money to pay benefits to the families of terrorist operatives who are arrested, injured, or killed.

595.    HAMAS, like other foreign terrorist organizations, collects funds under the guise of political or humanitarian activities. This fundraising ultimately supports the kind of terrorist activities that injured the plaintiffs herein.

### 2.    Terrorism Financing

596.    Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities. As Congress found when passing the AEDPA: "Foreign

---

[5]    There are approximately 80 such "charitable" committees in the West Bank and Gaza Strip nominally supervised by the Palestinian Authority's Ministry of Waqf and Religious Affairs.

organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301(a)(7), 110 Stat. 1247.

597.    HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, operated by the Muslim Brotherhood. Comité de Bienfaisance et de Secours aux Palestinians, a/k/a Comité Bienfaisance pour la Solidarité avec la Palestine, ("CBSP") is a member of the Union of Good and is one of its most significant fund raising arms.

### a.    The Union of Good

598.    I'Tilafu Al-Khayr a/k/a the Union of Good is an umbrella organization established by the Muslim Brotherhood in October 2000, immediately following the outbreak of the ongoing violent Palestinian-Israeli confrontation commonly termed the "Second Intifada."

599.    The Union of Good is a principal fundraising mechanism for HAMAS. The Union of Good's primary "charitable" purpose is to provide financial support for HAMAS and its agents in the PACT.

600.    The Union of Good is comprised of more than fifty (50) Islamic charitable foundations worldwide. The U.S. Government has designated several of these foundations, including CBSP, as Specially Designated Global Terrorists ("SDGTs").

601.    For example, in recent months, plaintiffs discovered that the Union of Good's "101 Days Campaign" maintains its own website at www.101days.org. The campaign solicits funds for HAMAS and directs prospective donors to donate via various Union of Good charities, including CBSP, which maintains a link to www.101days.org on its own website.

602.    The 101 Days Campaign website did not identify Crédit Lyonnais as the bank

76

used by CBSP to collect donations.

603.    The board of directors of the Union of Good includes three senior HAMAS figures: Sheikh Hamid al-Bitawi, Dr. Essam Salhoub, and Bassam Jarrar.

604.    The Union of Good is headed by Dr. Yussuf al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar, whose views and activities have been a matter of public record for many years.[6]

605.    Through his many public appearances and popular television program, al-Qaradawi has never concealed his views about the moral rectitude of murdering Jews and Israelis.

606.    To take just one example, in the September 1999 edition of the *Palestine Times*, in an article entitled "Sheikh Yousuf al-Qaradawi: Hamas and the Islamic Jihad represent the glorious face of the Islamic Umma - Interview" al-Qaradawi blessed "the martyrdom operations in which a given Moslem fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy. . . If we can't carry out acts of *Jihad* [holy war] ourselves, we at least should support and prop up the Mujahideen [holy warriors] financially and morally so that they will be steadfast until God's victory."

607.    In 2001, al-Qaradawi publicly described the activities of the Islamic charitable societies sustaining the Intifada against Israel as a "new type of *jihad*, financial *jihad*, through which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

608.    Al-Qaradawi is not an obscure figure. On the contrary, he has his own weekly television program on *Al Jazeera* and has publicly issued an Islamic religious edict (*fatwa*)

---

[6]    Al-Qaradawi was the subject of massive publicity in Great Britain when he was invited to London by its mayor in July 2004, but his prominence long predates that event.

authorizing suicide bombing attacks against Israel.[7]

609.    In fact, on April 14, 2002, al-Qaradawi appeared on *Al Jazeera* extolling "jihad and martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other terrorist organizations.

610.    Upon information and belief, Crédit Lyonnais is aware of Al-Qaradawi's support for terrorism, his connection to the Union of Good, and its relationship with Crédit Lyonnais's client, CBSP.

### b.    Le Comité de Bienfaisance et de Secours aux Palestinians ("CBSP")

611.    Le Comité de Bienfaisance et de Secours aux Palestinians ("CBSP") is a non-profit corporation organized in 1990, with its headquarters in France.

612.    Crédit Lyonnais has publicly stated that Comité de Bienfaisance et de Secours aux Palestinians opened accounts with Crédit Lyonnais in 1990. See Exhibit A attached.

613.    CBSP was originally incorporated under the name Le Comité de Bienfaisance et de Solidarité avec la Palestine, but changed its corporate name to CBSP in 2001.

614.    CBSP has four branches in France, located in Paris, Lille, Lyon, and Marseilles.

615.    CBSP is a member of the Union of Good and is part of HAMAS's fundraising infrastructure.

616.    The two leading figures in CBSP are Mahmoud Hussein al-Bughani, its former chairman, and Khaled Muhammad Ahmad al-Shouli, its current chairman and director.

617.    In 1997, the Government of Israel declared CBSP an "unlawful organization"

---

[7]    Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the second Intifada, as cited in HAMAS's official website: http://www.palestine-info.info/arabic/fatawa/alamaliyat/qaradawi.htm.

because of its affiliation with HAMAS and the support it provided to HAMAS front organizations. Notice of the designation was placed in the official Government of Israel publication, the *Announcements and Advertisements Gazette*.

618.    CBSP was further designated a terrorist organization in January 1998 by the Government of Israel. Notice of the designation was placed in the official publication, the *Announcements and Advertisements Gazette*.

619.    Upon information and belief, at all relevant times after December 2000, Crédit Lyonnais knew of the Israeli designation.

620.    Crédit Lyonnais has publicly admitted that in late 2000 it began to notice "unusual activity occurring in [CBSP's] main account, but Crédit Lyonnais did not close CBSP's accounts or freeze any funds in CBSP's main account at that time. See Exhibit A attached.

621.    On March 28, 2001, Fadi Attallah Yusuf Amer, a HAMAS-trained terrorist, blew himself up outside a gas station near Kfar Sava, killing two teenagers, and injuring plaintiff Netanel Herskovitz.

622.    In July 2001, the French police launched an initial investigation of CBSP.

623.    On August 9, 2001, Iz Aldin Al Masri, a HAMAS suicide bomber, massacred fifteen (15) people, including seven (7) children, and injured more than one hundred (100) people when he detonated his explosives at the Sbarro's Pizzeria in downtown Jerusalem. Al Masri murdered Judith Greenbaum and severely injured plaintiffs Chana Nachenberg, Howard Green, Mina Dora Green, David Danzig, and Clara Ben-Zaken Laser.

624.    Despite readily available public information regarding CBSP's connections to HAMAS and the Union of Good, Crédit Lyonaiss continued to provide financial services to CBSP and transfer funds to HAMAS.

625.    On December 1, 2001, plaintiffs Jason Kirschenbaum, Altea Steinherz, Temima Spetner Gould, and Netanel Miller were injured on or near Ben Yehuda Street in Jerusalem during a double suicide bombing followed by a coordinated car bombing, all perpetrated by HAMAS. These attacks killed ten (10) people and injured more than one hundred (100) people.

626.    In January 2002, the Palestinian Authority froze wire transfers from Khaled Muhammad Ahmad al-Shouli, CBSP's chairman, to the well-known HAMAS front known as Al-Mujama al-Islami because of its connections to HAMAS. This "charity" was established by the late Sheik Yassin, who is regarded as the spiritual leader of HAMAS.

627.    According to Crédit Lyonnais, in January 2002, more than a year after it first noted "unusual activity" in CBSP's accounts, Crédit Lyonnais "began a process of closing these accounts." See Exhibit A attached. This the process began more than six months after plaintiff Judith Greenbaum was murdered by HAMAS and plaintiffs Netanel Herskovitz, Chana Nachenberg, Sara Nachenberg, Howard Green and David Danzig were injured by HAMAS. By its own admission, Crédit Lyonnais did not complete the "process" of closing the accounts until September 2003, almost two years after reporting the "unusual activity," and after HAMAS killed Hannah Rogen, Esther Bablar, Janis Ruth Coulter, Diane Leslie Carter, Benjamin Blutstein, David Gritz, Alan Beer and Tehilla Nathansen and injured plaintiffs Altea Steinherz, Netanel Miller, Jason Kirschenbaum, Temima Spetner Gould, Gloria Kushner, Jacob Steinmetz, Daniel Rozenstein, Steven Averbach, Sarri Anne Singer, Eugene Goldstein, Lorraine Goldstein, Chana Nathansen, Matanya Nathansen, Yehudit Nathansen, Shoshana Nathansen, Tzvi Weiss and Moses Strauss.

628.    During this time period, Crédit Lyonnais transferred funds to institutions that belong to HAMAS's financial infrastructure in the PACT, including many entities declared

unlawful by the Government of Israel. The Palestinian Authority had also publicly acknowledged several of these entities as sources of HAMAS financing.

629.    These institutions include, but are not limited to, the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Charitable Society in the Gaza Strip, Al-Salah Society, and the Muslim Youth Association of Hebron.[8]

630.    The Orphan Care Society of Bethlehem was outlawed by the Government of Israel in February 2002. Most of its chief functionaries, including its director Dr. Ghassan Harmass, are HAMAS terrorists. The Orphan Care Society pays subsidies to the children of HAMAS "martyrs" and imprisoned HAMAS members.

631.    The Al-Islah Charitable Society in Ramallah-Al-Bireh was founded in 1997. The Government of Israel declared the Al-Islah Charitable Society an "unlawful organization" in February 2002. The Al-Islah Charitable Society regularly transfers money for the benefit of the families of HAMAS "martyrs," and subsidizes the renovation of homes destroyed by Israel that belong to the families of suicide bombers. The Al-Islah Charitable Society supports the families of "martyrs," HAMAS prisoners in Israeli jails, and deported HAMAS members.

632.    The Jenin Charity Committee was declared an "unlawful organization" by the Government of Israel in February 2002. This "charity" is run by HAMAS terrorists, and it provides aid to HAMAS terrorists, the families of "martyrs, and Palestinians wounded or imprisoned as a result of violent confrontations with Israel.

633.    The Tulkarem Charity Committee was founded in 1981. The Government of

---

[8]    The Jenin Charity Committee and Tulkarem Charity Committee are specifically identified as HAMAS controlled organizations by the United States Government in the 2004 criminal indictment of Holy Land Foundation for Relief and development in the Northern District of Texas.

Israel declared the Tulkarem Charity Committee an "unlawful organization" in February 2002. The Tulkarem Charity Committee is headed by a HAMAS terrorist.

634.    Having decided to close the relevant accounts in January 2002, Crédit Lyonnais was, upon information and belief, aware of the designation by Israel of various HAMAS fronts in February 2002 but nonetheless continued transmitting funds to them.

635.    On March 27, 2002, a HAMAS suicide bomber detonated explosives in the Park Hotel in Netanya, killing thirty (30) people, including Hannah Rogen, who was severely wounded in the attack and died from the wounds six days later, on April 2, 2002.

636.    In May 2002, the state prosecutor in Nancy asked the Regional Service of the Judiciary Police in France to investigate CBSP after receiving a briefing from "Tracfin" (the French government agency acronym for "Traitement du renseignment et action contre les circuits financiers" or "agency for intelligence processing and action against clandestine financial networks").    Crédit Lyonnais was not publicly mentioned in connection with the investigation.

637.    On May 7, 2002, a HAMAS suicide bomber detonated a bomb in the Sheffield Club. Fifteen (15) people were killed, including Esther Bablar.

638.    On May 19, 2002, a HAMAS suicide bomber detonated a bomb, killing three (3) people, and wounding more than fifty (50) people, including plaintiff Gloria Kushner.

639.    On July 31, 2002, Mohammed Odeh detonated explosives in the Hebrew University Cafeteria, killing nine (9) people, including Janis Ruth Coulter, Diane Leslie Carter, Benjamin Blutstein, and David Gritz, and injuring as many as eighty-five (85) others. HAMAS was responsible for the attack.

640.    According to published reports, in 2002 alone, CBSP raised nearly $4,000,000.00,

most of it after Crédit Lyonnais decided to close its accounts, but failed to actually do so.

641.    On January 29, 2003, plaintiff Jacob Steinmetz was injured while driving a car on Road #60 when two masked men began shooting at the car. HAMAS perpetrated this attack.

642.    In the spring of 2003, the French newspaper *Le Figaro* reported that the public prosecutor's office in Paris had referred its concerns about CBSP to the Counter-Terrorist National Division based on another report by Tracfin. The report did not mention the name of CBSP's bank.

643.    On April 30, 2003, a HAMAS suicide bomber entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his bomb killing three (3) people and injuring approximately sixty (60) people, including plaintiff Daniel Rozenstein.

644.    On May 18, 2003, a HAMAS suicide bomber dressed as a religious Jew boarded a commuter bus heading for Jerusalem. Plaintiff Steven Averbach was seated on the bus when the bomber detonated his explosives. Seven (7) people were killed by the explosion, and twenty (20) people were injured, including plaintiff Steven Averbach.

645.    On June 11, 2003, a HAMAS suicide bomber dressed as a religious Jew boarded Egged bus #14A. As the bus drove down Jaffa Road he detonated his bomb, wrecking the bus and killing sixteen (16) of its passengers, including Alan Beer. Over one hundred (100) people were wounded, including plaintiff Sarri Anne Singer and dozens of bystanders.

646.    On June 20, 2003, plaintiffs Eugene and Lorraine Goldstein were shot, and their son Howard was murdered, during a roadside ambush perpetrated by HAMAS.

647.    On August 19, 2003, a HAMAS suicide bomber blew up Egged bus #2, killing twenty-three (23) people, including seven (7) children like Tehilla Nathansen, and injuring more

than one hundred thirty (130) people, including plaintiffs Moses Strauss, Tzvi Weiss, Chana Nathansen, Matanya Nathansen, Yehudit Nathansen and Shoshana Nathansen.

648.    On August 22, 2003, pursuant to Executive Order 13224, President Bush identified CBSP as a HAMAS fundraising entity and placed it on the Office of Foreign Assets Control ("OFAC") list as an SDGT.

649.    The Statement of President Bush reads as follows:

> At my direction, the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS. By claiming responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people.

650.    The President thereby publicly linked the activities of CBSP and other fundraising organizations designated that day as SDGTs with the bombing that injured the plaintiffs.

651.    Pursuant to that designation, OFAC issued a "Blocking Notice," freezing all of CBSP's funds, accounts and real property. All transactions involving property in which CBSP had any interest were prohibited without specific authorization from OFAC.

652.    A month later, and almost three years after it had first reported 'unusual activity' in CBSP's accounts, and 19 months after it decided to close the account, Crédit Lyonnais (allegedly) closed CBSP's accounts with the bank in September of 2003.

653.    During the relevant 33 months, HAMAS murdered nine (9) people whose family members are plaintiffs herein, and also wounded twenty-two (22) other plaintiffs in this action.

## THE DEFENDANT'S CONDUCT

654.    At all relevant times, Crédit Lyonnais maintained an account for CBSP in Paris and provided HAMAS with material support in the form of financial services.

84

655.  As indicated above, CBSP is a pivotal part of HAMAS's fundraising infrastructure and a significant source of HAMAS's financing, and at all relevant times Crédit Lyonnais knew (and knows) this.

656.  Crédit Lyonnais knowingly continued to maintain accounts for CBSP and provide financial services to HAMAS even though CBSP was outlawed by the Government of Israel in May 1997.

657.  Crédit Lyonnais also knowingly transferred significant sums of money to HAMAS-controlled entities both prior to and subsequent to their designation by the Government of Israel as unlawful.

658.  Crédit Lyonnais has transferred significant sums of money to HAMAS-controlled entities declared unlawful by the Government of Israel even after the United States Treasury Department designated CBSP a global terrorist in the wake of the bombing that killed 3 year old Tehilla Nathansen and injured plaintiffs Moses Strauss and Chana Nathansen, and other plaintiffs.

659.  Crédit Lyonaiss has transferred funds on behalf of CBSP to HAMAS that have been routed through the United States.

660.  By knowingly providing valuable financial services to HAMAS, Crédit Lyonnais has provided material support within the definition set forth in 18 U.S.C. § 2339A(b) to a designated FTO, and has provided substantial assistance to HAMAS in the commission of acts of international terrorism in Israel, including the terrorist attacks that injured the plaintiffs.

661.  The provision of financial services to HAMAS violates both the criminal provisions of 18 U.S.C. §§ 2339B and 2339C and gives rise to civil liability under 18 U.S.C. § 2333(a) as set forth below.

85

## THE PLAINTIFFS' KNOWLEDGE CONCERNING DEFENDANT'S CONDUCT

662.    Plaintiffs Temima Spetner Gould, Jason Kirschenbaum, Isabelle Kirschenbaum, Martin Kirschenbaum, Joshua Kirschenbaum, Shoshanah Burgette, David Kirschenbaum, Danielle Teitelbaum, Netanel Miller, Chaya Miller, Aric Miller, Altea Steinherz, Jonathan Steinherz, Bennett and Paula Finer as Legal Guardians for Chana Nachenberg, David Nachenberg, Sara Nachenberg, Bennett Finer, Paula Finer, Zev Finer, Shoshana Finer Ohana, Mina Dora Green, Howard M. Green, Steven Greenbaum for the Estate of Judith Greenbaum, Steven Greenbaum, Alan Hayman, Shirlee Hayman, David Danzig, Rebecca Danzig, Neil Danzig, Hayyim Danzig, Sarah Danzig, Clara Ben-Zaken Laser, Netanel Herskovitz, Martin Herskovitz, Pearl Herskovitz, and Yaakov Herskovitz do not speak or read French or Arabic fluently.

663.    None of the plaintiffs listed in paragraph 537 were aware of the fact that CBSP, which had been designated as an illegal organization by the Israeli government 2 or 3 years prior to the terrorist attacks in which they were injured, had a financial relationship with the defendant or that defendant had provided, and continued to provide, material support to HAMAS. Such information could not have been obtained through the exercise of reasonable diligence by the plaintiffs.

664.    Upon information and belief, prior to January 2006, defendant had never publicly disclosed that CBSP was its customer, nor did it disclose the nature of the financial services it provided to CBSP or the beneficiaries of wire transfers it sent to third parties on behalf of CBSP. Accordingly, plaintiffs could not have discovered the defendant's identity as either CBSP's bank or as a bank providing material support to HAMAS from publicly available material within 4 years of the dates they were respectively injured.

665.     Plaintiffs do not possess expert or technical knowledge concerning the specific means by which HAMAS and its various fronts, CBSP and other entities and organizations, which pursuant to U.S. and international laws and regulations, have been placed upon "watchlists" or "blacklists" as, inter alia, actual or potential FTOs, SDGTs, SDTs, or fronts or alter-egos who receive or transfer funds from persons or entities in Europe to HAMAS, and did not have access to non-public information concerning defendant's relationships or conduct with respect to any entities and organizations that appear on any such watchlists or blacklists.

666.     Plaintiffs also could not, through the exercise of reasonable diligence, have been advised of whether any suspicious activity reports or their international equivalents were generated with respect to CBSP, because such reports are confidential. Further, plaintiffs did not have, nor could they have had, access to international banking and wire transfer records, or French police and intelligence reports concerning HAMAS, CBSP, or banks providing financial services to these entities.

667.     In fact, plaintiffs could not have discovered, through the exercise of reasonable diligence, that Crédit Lyonnais provided financial services to either CBSP or HAMAS at any time before the second quarter of 2005, when non-public information regarding defendant's relationship with CBSP first became available to plaintiffs.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### AIDING AND ABETTING THE MURDER OR ATTEMPTED MURDER OF UNITED STATES CITIZENS OR CAUSING THE COMMISSION OR ATTEMPTED COMMISSION OF PHYSICAL VIOLENCE UPON UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c); AND 18 U.S.C. § 2333(a)

668.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

669.    Plaintiffs have been injured in their person by reason of acts committed by HAMAS that involve violence and are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

670.    The acts of HAMAS in killing and attempting to kill U.S. nationals and other persons were intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by intimidation or coercion; and (c) affect the conduct of the Government of Israel by mass destruction and murder.

671.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attacks and extreme emotional distress to the family members of those who were killed or injured by reason of the acts.

672.    The financial services that the defendant knowingly provided to HAMAS by collecting and transmitting funds on behalf of HAMAS (with the knowledge that CBSP fundraises funds for HAMAS) assists HAMAS in its recruiting, rewarding, and providing

incentives to suicide bombers and other terrorists. These financial services facilitate acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the plaintiffs.

673.    The defendant knows that it has provided material support to HAMAS, a Foreign Terrorist Organization, and that HAMAS commits horrific terrorist attacks of the kind that have maimed and murdered American citizens such as plaintiffs.

674.    From at least the time when the defendant itself acknowledges its concerns about its CBSP account in December 2000, the defendant was, and to this date remains aware that CBSP collects, receives, transmits, and provides funds for the benefit of HAMAS, which has committed numerous criminal acts, including the suicide bombings and shooting attacks that injured the plaintiffs.

675.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person and property, the defendant is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

676.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

677.    By knowingly providing financial services to HAMAS, the defendant has provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

678.    Defendant knows of HAMAS's terrorist activities.

89

679.    Defendant knows that HAMAS had been designated a Foreign Terrorist Organization by the Government of the United States.

680.    Defendant knew as of December 2000, the nature and identity of CBSP and its connection to HAMAS, and nonetheless proceeded to provide financial services to HAMAS.

681.    By knowingly providing material support to a designated Foreign Terrorist Organization, the defendant is civilly liable for damages to the plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

### THIRD CLAIM FOR RELIEF

### COLLECTING AND TRANSMITTING FUNDS ON BEHALF OF A TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333(a)

682.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

683.    Defendant has wilfully and unlawfully provided financial services to HAMAS, by collecting, receiving, transmitting, and providing funds with the knowledge that such funds have been, and will be, used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint.

684.    The terrorist acts committed against the plaintiffs were intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by intimidation or coercion; and (c) affect the conduct of the Government of Israel by mass destruction and murder.

685.    The defendant was at all relevant times aware of HAMAS's terrorist activities and the fact that it was transferring millions of dollars to entities controlled by HAMAS.

686.    Therefore, defendant is liable to each of the plaintiffs who have suffered injuries

90

to their person and property by reason of such acts under 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

     (a)    Enter judgment against the defendant and in favor of each plaintiff for compensatory damages in amounts to be determined at trial;

     (b)    Enter judgment against the defendant and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

     (c)    Enter judgment against the defendant and in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

     (d)    Enter an Order declaring that the defendant has violated, and is continuing to violate, the Antiterrorism Act, 18 U.S.C. § 2331 et seq.; and

     (e)    Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: January 28, 2008
      Oradell, New Jersey

                        OSEN & ASSOCIATE, LLC

                  By    /s/ Gary M. Osen
                        Gary M. Osen, Esq.
                        Joshua D. Glatter, Esq.
                        Aaron Schlanger, Esq.
                        Peter Raven-Hansen, Esq., Of Counsel
                        700 Kinderkamack Road
                        Oradell, New Jersey 07649
                        Telephone: (201) 265-6400
                        Facsimile: (201) 265-0303

                        Attorneys for Plaintiffs

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard, Esq.
Neil L. Glazer, Esq.
One South Broad Street
Philadelphia, PA 19107
Telephone: (215) 238-1700


GLANCY BINKOW & GOLDBERG
Andrew D. Friedman, Esq., Of Counsel
Neal A. Dublinsky, Esq., Of Counsel
430 Park Avenue
New York, New York 10022
Telephone: (212) 308-6300


McINTYRE, TATE, LYNCH & HOLT, LLC
David J. Strachman, Esq.
321 South Main Street, Suite 400
Providence, Rhode Island 02903
Telephone: (401) 351-7700


NITSANA DARSHAN-LEITNER & ASSOCIATES
Nitsana Darshan-Leitner, Esq.
11 Havatikim Street
Petah Tikva, 49389 Israel
Telephone: (Israel Tel. (972) 3-933-4472)


MOTLEY RICE, LLC
Ronald L. Motley, Esq.
Donald Migliori, Esq.
Michael Elsner, Esq.
Justin B. Kaplan, Esq.
John M. Eubanks, Esq.
Elizabeth Smith, Esq.
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone: (843) 216-9000

# EXHIBIT A



# CERTIFICATE

## OF ACCURACY

STATE OF NEW YORK )

                          SS:

COUNTY OF KINGS )

This is to certify that the attached document:

**Press Release from Le Crédit Lyonnais website, dated January 6, 2006**

is, to the best of my knowledge and belief, a true, complete, and accurate translation from the French language into the English language.

Benardette McEvoy

Sworn to and subscribed before me

this ___ day of January 2006

Notary Public

VIGDIS ERIKSEN
Notary Public, State of New York
No. 01ER4805461
Qualified in Kings County
Commission Expires April 30, 2006

January 6, 2006

BRIEFING

Press Release

Crédit Lyonnais, which has been summoned to appear before a court in New Jersey by an American family, the victim of a terrorist attack during their stay in Israel, wishes to make the following statements of fact.

In 1990, accounts in the name of the "Comité de Bienfaisance pour la Solidarité avec la Palestine" [Committee for Palestinian Charity and Aid] were opened in France in strict observance of applicable regulations. The association in question was designated non-profit, in accordance with French law 1901.

In late 2000, in view of unusual activity occurring in the association's main account, Crédit Lyonnais reported such activity as required by law.

In January 2002, in keeping with the bank's own internal regulations, Crédit Lyonnais began a process of closing these accounts, which was finalized in September 2003.

It should be pointed out that the association in question, which still does not appear on any European lists of enterprises linked to terrorism, was not mentioned on American lists until August 2003.

**All press releases**

Home          News          Press Release
Crédit Agricole S.A. |    Legal information    |    Site map
© 2005 LCL – LE CRÉDIT LYONNAIS



PORTAIL LCL    RECHERCHER    CONTACTER L

DEMANDEZ PLUS A VOTRE ARGENT

Nous connaître  |  Communication  |  Actualités  |  Dossiers LCL  |  Recrutement

A · A · A |

> Actualités

> Communiqués de presse

> Vie des agences

> Partenariats

> Nous trouver

06 janvier 2006

# MISE AU POINT

**Communiqué de presse**

Le Crédit Lyonnais, assigné devant un tribunal du New Jersey par une famille américaine victime d'attentat lors d'un séjour en Israël, souhaite préciser les faits suivants.

Dans le strict respect de la réglementation en vigueur, des comptes ont été ouverts en France en 1990 au nom de l'association "Comité de bienfaisance pour la solidarité avec la Palestine". Il s'agissait d'une association à but non lucratif "loi 1901".

Fin 2000, en présence de mouvements inhabituels enregistrés sur le compte principal, le Crédit Lyonnais a procédé aux déclarations nécessaires conformément à la réglementation.

Le Crédit Lyonnais a engagé en janvier 2002, dans le respect de ses règles internes de fonctionnement, une procédure de clôture des comptes qui s'est finalisée en septembre 2003.

Il faut noter que cette association, qui ne figure pas à ce jour sur les listes européennes d'entreprises liées au terrorisme, n'a été citée sur les listes américaines qu'en août 2003.

Tous nos communiqués de presse

---

Accueil    Actualités    Communiqués de presse

Crédit Agricole S.A. |  Informations légales |  Plan du site | Tous nos sites en un clic !

© 2005 LCL - LE CRÉDIT LYONNAIS

## CERTIFICATE OF SERVICE

I, Aaron Schlanger, hereby certify that I am over the age of 18 years, am employed by the law firm of OSEN & ASSOCIATE, LLC and that on January 28, 2008, I caused the attached Third Amended Complaint to be served in accordance with the Federal Rules of Civil Procedure, and/or the Court's Local Rules, and/or the Rules on Electronic Service, upon the following counsel by indicated means:

**Counsel for Defendant Crédit Lyonnais, S.A. By Electronic Mail**

Lawrence B. Friedman, Esq.
(lfriedman@cgsh.com)
Jonathan I. Blackman, Esq.
(jblackman@cgsh.com)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006


/s/ Aaron Schlanger
Aaron Schlanger

EXHIBIT 7



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- X
ROBERT L. COULTER, SR. FOR THE ESTATE :
OF JANIS RUTH COULTER, DIANNE :
COULTER MILLER, ROBERT L. COULTER, SR. :
ROBERT L. COULTER, JR., DR. LARRY CARTER, :
SHAUN COFFEL, DR. RICHARD BLUTSTEIN AND :
DR. KATHERINE BAKER FOR THE ESTATE OF :      Case No.
BENJAMIN BLUTSTEIN, DR. RICHARD BLUTSTEIN, :
DR. KATHERINE BAKER, REBEKAH BLUTSTEIN, :
NORMAN: AND NEVENKA GRITZ FOR THE ESTATE :
OF DAVID GRITZ, NORMAN GRITZ, NEVENKA :      **COMPLAINT**
GRITZ, BENNET AND PAULA FINER AS LEGAL :
GUARDIANS FOR CHANA NACHENBERG, DAVID :
NACHENBERG, SARA NACHENBERG, BENNETT :
FINER, PAULA FINER, ZEV FINER, SHOSHANA :
FINER OHANA, MINA DORA GREEN, HOWARD M. :
GREEN, STEVEN GREENBAUM FOR THE ESTATE :
OF JUDITH GREENBAUM, STEVEN GREENBAUM, :
ALAN HAYMAN, SHIRLEE HAYMAN, DAVID :
DANZIG, REBECCA DANZIG, NEIL DANZIG, :
HAYYIM DANZIG, SARAH DANZIG, YITZHAK :
BEN-YISHAI AND MIRIAM I. BEN-YISHAI FOR THE :
ESTATE OF SHOSHANA BEN-YISHAI, YITZHAK :
BEN-YISHAI, MIRIAM I. BEN-YISHAI, JACOB :
BEN-YISHAI, ISRAEL CHAI BEN-YISHAI, CHANA :
BEN-YISHAI, YAEL BEN-YISHAI, ABIEL :
BEN-YISHAI, SHABTAI SCOTT SHATSKY, JOANNE :
CHAVA SHATSKY, TZIPPORA SHATSKY, YOSEF :
SHATSKY, SARA SHATSKY TZIMMERMAN, :
MIRIAM SHATSKY, DAVID SHATSKY, CHANA :
FRIEDMAN, ILAN FRIEDMAN, MIRIAM FRIEDMAN, :
YEHIEL FRIEDMAN, ZVI FRIEDMAN, BELLA :
FRIEDMAN, GINETTE LANDO THALER FOR THE :
ESTATE OF RACHEL THALER, GINETTE LANDO :
THALER, MICHAEL THALER, LEOR THALER, ZVI :
THALER, ISAAC THALER, HILLEL TRATTNER, :
RONIT TRATTNER, ARON S. TRATTNER, SHELLEY :
TRATTNER, STEVEN BRAUN, DANIEL :
ROZENSTEIN, JULIA ROZENSTEIN SCHON, :
NETANEL HERSKOVITZ, MARTIN HERSKOVITZ, :
PEARL HERSKOVITZ, YAAKOV HERSKOVITZ, :
TEMIMA SPETNER, ALTEA STEINHERZ, :
JONATHAN STEINHERZ, DR. ALAN J. BAUER, :
REVITAL BAUER, YEHONATON BAUER, :

CV 05    365

GERSHON, J.

CHREIN, J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★  JAN 2 1 2005  ★
BROOKLYN OFFICE

BINYAMIN B. BAUER, DANIEL Y. BAUER,    :
YEHUDA BAUER, JACOB STEINMETZ, DEBORAH    :
STEINMETZ, AMICHAI STEINMETZ, NAVA    :
STEINMETZ, ORIT STEINMETZ, NATANEL    :
STEINMETZ, HARRY LEONARD BEER AS    :
EXECUTOR OF THE ESTATE OF ALAN BEER,    :
HARRY LEONARD BEER, ANNA BEER, PHYLLIS    :
MAISEL, ESTELLE CARROLL, SARRI ANNE SINGER,:
JUDITH SINGER, ERIC M. SINGER, GALIT    :
LEIBOVITCH, SHLOMO LEIBOVITCH, HILA    :
LEIBOVITCH, MOSHE LEIBOVITCH, NATANIEL    :
LEIBOVITCH, SHIRA LEIBOVITCH, AVIGAIL LEWIS :
BITON AS THE ADMINISTRATOR OF THE ESTATE    :
OF GAVRIEL BITON, AVIGAIL LEWIS BITON,    :
ELYASHIV BITON, TAMAR BITON, NOAM BITON,    :
ORIYA BITON, SHILO BITON, ADI PENINA BITON,    :
RACHEL ASSRAF, ELI ASSRAF, MOSHE ASSRAF,    :
LESLYE KNOX, FOR THE ESTATE OF AHARON    :
BEN-YISRAEL ELLIS, LESLYE KNOX, JORDAN    :
TERRELL ELLIS, REUVEN CARTER, SHANON    :
CARTER, SHAYRAH CARTER, YOSHAVYAH    :
CARTER, AMITAI CARTER, PRINCE ELKANNANN    :
BEN SHALEAK, MELLO NEE ELLIS, SHEMARIA    :
ELLIS, FRANCINE ELLIS, LYNNE ELLIS,    :
YEHONADAV ELLIS, TSAPHRIRAH ELLIS, SHAYNA :
EILEEN GOULD, RONALD ALLAN GOULD, ELISE    :
JANET GOULD, JESSICA RINE, SHOSHANA ZELCER,:
SHMUEL WALDMAN, HENNA NOVACK WALDMAN,:
MORRIS WALDMAN, EVA WALDMAN, CHANIE    :
BODENSTEIN, SHAINDY WEINBERGER, PHILIP    :
WALDMAN, ABRAHAM WALDMAN, DASSIE    :
WALDMAN, OZ JOSEPH GUETTA, VARDA GUETTA,:
SARA GUETTA KLEITMAN, LEONARD    :
MANDELKORN, NURIT MANDELKORN, EZRA    :
KESSLER, CHANA B. KESSLER, FORTOUNA    :
BRIGITTE KESSLER, SHALOM KESSLER, KLILA    :
KESSLER, MARK I. SOKOLOW, RENA M. SOKOLOW,:
JAMIE A. SOKOLOW, LAUREN M. SOKOLOW,    :
ELANA R. SOKOLOW, REUVEN GILMORE AND    :
SHEILA GILMORE AS ADMINISTRATORS OF THE    :
ESTATE OF ESH KODESH GILMORE, REUVEN    :
GILMORE, SHEILA GILMORE, INBAL GILMORE    :
RATZ, TALYA GILMORE, MALKITZEDEK GILMORE, :
TIFERET GILMORE, HEFTIZBAH GILMORE, ELIANA :
GILMORE, DROR GILMORE, KAREN GOLDBERG,    :
CHANA GOLDBERG, ESTHER GOLDBERG,    :

YITZHAK GOLDBERG, SHOSHANA GOLDBERG,        :
ELIEZER GOLDBERG, YAAKOV MOSHE              :
GOLDBERG, TZVI YEHOSHUA GOLDBERG, GRETA     :
GELER AS THE ADMINISTRATOR FOR THE ESTATE   :
OF HANNAH ROGEN, JACQUELINE CHAMBERS AS     :
THE ADMINISTRATOR OF THE ESTATE OF ESTHER   :
BABLAR, JACQUELINE CHAMBERS, LEVANA         :
COHEN HAROOCH, GILA ALUF, YIFAT ALUF, URI   :
ALUF, TAMAR ALUF, BARAK ALUF and RUTH       :
ALUF,                                       :
                        Plaintiffs,         :
            -against-                       :
                                            :
                                            :
ARAB BANK, PLC,                             :
                        Defendant.          :
------------------------------------------------X

Robert L. Coulter, Sr. for the Estate of Janis Ruth Coulter, Dianne Coulter Miller, Robert
L. Coulter, Sr.  Robert L. Coulter, Jr., Dr. Larry Carter, Shaun Coffel, Dr. Richard
Blutstein and Dr. Katherine Baker for the Estate of Benjamin Blutstein, Dr. Richard
Blutstein, Dr. Katherine Baker, Rebekah Blutstein, Norman and Nevenka Gritz for the
Estate of David Gritz, Norman Gritz, Nevenka Gritz, Bennett and Paula Finer as Legal
Guardians for Chana Nachenberg, David Nachenberg, Sara Nachenberg, Bennett Finer,
Paula Finer, Zev Finer, Shoshana Finer Ohana, Mina Dora Green, Howard M. Green,
Steven Greenbaum for the Estate of Judith Greenbaum, Steven Greenbaum, Alan
Hayman, Shirlee Hayman, David Danzig, Rebecca Danzig, Neil Danzig, Hayyim Danzig,
Sarah Danzig, Yitzhak Ben-Yishai and Miriam I. Ben-Yishai for the Estate of Shoshana
Ben-Yishai, Yitzhak Ben-Yishai, Miriam I. Ben-Yishai, Jacob Ben-Yishai, Israel Ben-
Yishai, Chana Ben-Yishai, Yael Ben-Yishai, Abiel Ben-Yishai, Shabtai Scott Shatsky,
JoAnne Chava Shatsky, Tzippora Shatsky, Yosef Shatsky, Sara Shatsky Tzimmerman,
Miriam Shatsky, David Shatsky, Chana Friedman, Ilan Friedman, Miriam Friedman,
Yehiel Friedman, Zvi Friedman, Bella Friedman, Ginette Lando Thaler, Michael Thaler,
Leor Thaler, Zvi Thaler, Isaac Thaler, Hillel Trattner, Ronit Trattner, Aron S. Trattner,
Shelley Trattner, Steven Braun, Daniel Rozenstein, Julia Rozenstein Schon, Netanel
Herskovitz, Martin Herskovitz, Pearl Herskovitz, Yaakov Herskovitz, Temima Spetner,
Altea Steinherz, and Jonathan Steinherz, Dr. Alan J. Bauer, Revital Bauer, Yehonaton
Bauer, Binyamin B. Bauer,  Daniel Y. Bauer, Yehuda Bauer, Jacob Steinmetz, Deborah
Steinmetz, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz, Natanel Steinmetz, Harry
Leonard Beer as Executor of the Estate of Alan Beer, Harry Leonard Beer, Anna Beer,
Phyllis Maisel, Estelle Carroll, Sarri Anne Singer, Judith Singer, Eric M. Singer, Galit
Leibovitch, Shlomo Chaim Leibovitch, Hila Leibovitch, Moshe Nataniel Leibovitch,
Shira Leibovitch, Avigail Lewis Biton as the Administrator of the Estate of Gavriel Biton,
Avigail Lewis Biton, Elyashiv Biton, Tamar Biton, Noam Biton, Oriya Biton, Shilo
Biton, Adi Penina Biton, Rachel Assraf, Eli Assraf, Moshe Assraf, Leslye Knox for the
Estate of Aharon Ben-Yisrael Ellis, Leslye Knox, Jordan Terrell Ellis, Reuven Carter,

Shanon Carter, Shayrah Carter, Yoshavyab Carter, Amitai Carter, Prince Elkannann Ben Shaleak, Mello Nee Ellis, Shemaria Ellis, Francine Ellis, Lynne Ellis, Yehonadav Ellis, Tsaphrirah Ellis, Shayna Eileen Gould, Ronald Allan Gould, Elise Janet Gould, Jessica Rine, Shoshana Zelcer, Shmuel Waldman, Henna Novack Waldman, Morris Waldman, Eva Waldman, Chanie Bodenstein, Shaindey Weinberger, Philip Waldman, Dassie Waldman, Abraham Waldman, Oz Joseph Guetta, Varda Guetta, Sara Guetta Kleitman, Rabbi Leonard Mandelkorn, Nurit Mandelkorn, Ezra Kessler, Forlouna Brigitte Kessler, Chana B. Kessler, Shalom Kessler, Klila Kessler, Mark I. Sokolow, Rena M. Sokolow, Jamie A. Sokolow, Lauren M. Sokolow, Elana R. Sokolow, Reuven Gilmore and Sheila Gilmore as Administrators of the Estate of Esh Kodesh Gilmore, Reuven Gilmore, Sheila Gilmore, Inbal Gilmore Ratz, Talya Gilmore, Malkitzedek Gilmore, Tiferet Gilmore, Heftizbah Gilmore, Eliana Gilmore, Dror Gilmore, Karen Goldberg, Chana Goldberg, Esther Goldberg, Yitzhak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Yaakov Moshe Goldberg, Tzvi Yehoshua Goldberg, Greta Geler as the Administrator for the Estate of Hannah Rogen, Jaqueline Chambers as the Administrator of the Estate of Esther Bablar, Jaqueline chambers, Levana Cohen Harooch,Gila Aluf, Yifat Aluf, Uri Aluf, Tamar Aluf, Barak Aluf, Ruth Aluf, by their attorneys, allege the following upon information and belief:

## NATURE OF THE ACTION

1.  This is a complaint for damages and equitable relief arising out of the conduct of the Arab Bank, PLC ("Arab Bank") – a Jordanian bank headquartered in Amman, Jordan with a federally licensed and regulated branch office in the state of New York – pursuant to which it has and is continuing to knowingly and willfully provide, distribute, and administer the distribution of financial benefits, money and financial services to (a) terrorists who have killed, injured and maimed civilians, or attempted to do so, (b) the families and beneficiaries of such terrorists, and (c) Foreign Terrorist Organizations (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")), as part of a scheme to encourage and facilitate acts of international terrorism as defined by 18 U.S.C. § 2331.

2.  By these acts, defendant Arab Bank aided and abetted and conspired to commit said acts of international terrorism, resulting in the killing, attempted killing and maiming of

4

scores of American citizens in Israel since September 2000, and has violated the prohibitions

on providing material support for acts of international terrorism set forth in the Anti-

Terrorism Act as amended by the AEDPA ("ATA") (see e.g., 18 U.S.C. §§ 2339A, 2339B

and 2339C) and is civilly liable under § 2333(a) of the ATA to those American citizens (and

their estates, survivors and heirs) who have been killed or injured in their person, property or

business by reason of such acts of international terrorism.

## JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331, 28 U.S.C. § 1332(a)(2), and 18 U.S.C. §§ 2333(a) and 2334, as a civil action brought by

citizens of the United States, their estates, survivors, and heirs who have been killed or injured

by reason of acts of international terrorism. This Court also has subject matter jurisdiction

over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The

matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. §

1367(a).

4.  Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C.

§§1391(b) and 1391(d).

5.  Arab Bank is subject to personal jurisdiction in the state of New York pursuant to

N.Y. CLPR § 301 because, among other things, it continuously and systematically does

business in the state of New York. Arab Bank also is subject to personal jurisdiction in the

State of New York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein

and upon information and belief, Arab Bank (a) transacts business within the State of New

York; (b) contracts to supply goods and services in the State of New York; (c) has committed

5

tortious acts within the State of New York and (d) has committed tortious acts outside the
State of New York causing injury within the State of New York and (i) derives substantial
revenue from goods used or consumed in the State of New York or (ii) expected or should
reasonably have expected such acts to have consequences in the State of New York and
derived substantial revenue from international commerce. Arab Bank also is subject to
personal jurisdiction pursuant to 18 U.S.C. § 2334(a).

## THE PARTIES

**A.    The Plaintiffs**

### THE HEBREW UNIVERSITY CAFETERIA BOMBING - JULY 31, 2002

6.    On the afternoon of July 31, 2002 approximately 100 people were eating lunch in the
Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem. A
bomb planted inside the cafeteria exploded, killing nine people and injuring as many as 85
others. Five Americans were killed in the attack, including Janis R. Coulter, Benjamin
Blutstein, Marla Bennett, Diane Carter and David Gritz. HAMAS claimed responsibility for
the attack.

7.    According to published reports, Mohammed Odeh carried out the attack at Hebrew
University where he worked for an Israeli contractor as a painter.

8.    On the night before the attack, Odeh jumped over a fence on the campus and hid the
explosives under a bush. The next morning, he walked through the main gate using his
employee permit, picked up the bomb and planted it in the cafeteria. He then remote detonated
the explosives with a cell phone.

9.    Familiar with the university, Odeh chose the Frank Sinatra Cafeteria as the site for the
bombing knowing that few Arabs frequented the cafeteria and that foreign students frequently

6

dined there, Odeh received the explosives from accomplices in the West Bank town of
Ramallah, where the HAMAS cell command was located.

**The Coulter Family**

10. Janis Ruth Coulter, a 36 year old United States citizen, was in the cafeteria when the
bomb exploded. She was, at that time, the assistant director of the Hebrew University's
Rothenberg International School's Office of Academic Affairs in New York.

11. Janis had arrived in Israel just one day before the bombing to accompany a group of
19 American students who were scheduled to attend classes at the university. She was killed
while eating lunch in the cafeteria with a friend, who was injured in the blast.

12. Plaintiff Robert L. Coulter, Sr. was watching television news that morning in the
United States when he saw a "news flash" about a bombing at Hebrew University. Thinking
he saw his daughter's head lying in an unsealed body bag. He, then, called his other daughter,
plaintiff Dianne Coulter Miller. Dianne called Janis's boss in New York and both Mr. Coulter
and his daughter desperately tried to reach Janis on her cell phone without success.

13. Plaintiff Robert Coulter, Jr., had heard about bombing on the radio on the way to
work, but didn't make the connection with Janis's visit to Israel. His father called him at
work about the possibility that Janis was at the cafeteria and he then drove immediately to his
father's house.

14. Initially, Janis was identified through only through the numbers on her medical alert
bracelet. Eventually, the family retrieved Janis's dental records and faxed them to Israel
where, later that evening, her death was confirmed.

15. Plaintiff, Robert L. Coulter, Sr., is a United States citizen and a resident of the State of
Massachusetts. He brings this action both individually and on behalf of the Estate of Janis

7

Ruth Coulter.

16. Plaintiff, Dianne Coulter Miller, is a United States citizen and resident of the State of Massachusetts.

17. Plaintiff, Robert L. Coulter, Jr., is a United States citizen and a resident of the State of Massachusetts.

18. As a result of Janis's death, plaintiff, Robert L. Coulter, Sr., has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

19. As a result of Janis's death, plaintiff, Dianne Coulter Miller, has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

20. As a result of Janis's death, plaintiff Robert L. Coulter, Jr. has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel has suffered severe mental anguish and extreme emotional distress.

**The Carter Family**

21. Diane ("Dina") Carter, a 38 year old native of North Carolina and a United States citizen was eating lunch in the cafeteria when the bomb exploded. Ms. Carter moved to Israel in 1990 where she worked as a librarian and archivist in the National Library on the Givat Ram campus of Hebrew University in Jerusalem.

22. Diane Carter was killed by the bomb blast.

23. Her father, Dr. Larry Carter, is a United States citizen and a resident of the State of North Carolina. He learned of his daughter's death from a journalist who called his home.

After conferring with his ex-wife, Diane Carter's mother, Dr. Carter was able to confirm that his daughter was, in fact, killed in the bombing.

24. Diane's sister, plaintiff Shaun Coffel, is a United States citizen and a resident of the State of Virginia.

25. Both Dr. Carter and his daughter Shaun learned that Diane had been buried in Israel only moments before the funeral was scheduled to begin. Neither of them had the opportunity to say goodbye to Diane.

26. As a result of Diane Carter's death, plaintiff Larry Carter, has suffered severe mental anguish and extreme emotional distress.

27. As a result of Diane Carter's death, plaintiff Shaun Coffel, has suffered severe mental anguish and extreme emotional distress.


**The Blutstein Family**

28. Benjamin Blutstein, a 25 year old United States citizen and resident of Pennsylvania, was killed in the blast.

29. He came to Israel for a two-year study program at the Pardes Institute in Jerusalem to become a teacher.

30. Benjamin was scheduled to fly home to visit his family in Pennsylvania the day after he was murdered by HAMAS terrorists. Instead, two days after the attack, Benjamin's body was flown home and buried in his parents' home town of Harrisburg, Pennsylvania.

31. Plaintiffs, Dr. Richard Blutstein and Dr. Katherine Baker, bring this action both individually and on behalf of the Estate of Benjamin Blutstein.

9

32.  Plaintiff, Dr. Richard Blutstein, is a United States citizen and a resident of the State of Pennsylvania.

33.  Plaintiff, Dr. Katherine Baker, is a United States citizen and a resident of the State of Pennsylvania.

34.  Plaintiff, Rebekah Blutstein, is a United States citizen and a resident of the State of Pennsylvania. She is the sister of Benjamin Blutstein.

35.  Dr. Blutstein first heard about the attack while watching FOX News early in the morning. He then called Benjamin's cell phone and got a recording. Shortly thereafter he contacted friends in Israel to ascertain if Benjamin had been injured in the attack. After a friend made a positive identification, he received a call confirming Benjamin's death.

36.  Dr. Baker learned that her son had been killed in the attack when she received a call from a representative of the American Embassy. She was too overwhelmed with emotion to call her husband. Dr. Blutstein received the call from a neighbor, who was with Katherine. Benjamin's mother then composed herself enough to inform her daughter, Rebekah.

37.  As a result of Benjamin's death, plaintiff Richard Blutstein has experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

38.  As a result of Benjamin's death, plaintiff, Katherine Baker, has experienced emotional pain and suffering, loss of Benjamin's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

39.  Rebekah Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. She is the younger sister of Benjamin Blutstein. Although her father had informed her about the attack, Dr. Baker was the one who told her that her brother had died.

10

40. As a result of Benjamin's death, plaintiff Rebekah Blutstein, has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, protection, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

## The Gritz Family

41.    David Gritz, a 24 year old dual U.S. and French citizen was killed in the explosion. He had come to Israel for the first time with the help of a scholarship from the Hartman Institute to study philosophy and write his doctorate.

42.    He died after being in Israel for only two weeks.

43.    Plaintiff, Norman Gritz, is a citizen of the United States and France and a resident of Paris. He is the father of David Gritz. Plaintiff, Nevenka Gritz, is a citizen and resident of France. She is the mother of David Gritz, who was an only child.

44. Plaintiffs, Norman and Nevenka Gritz, bring this action both individually and on behalf of the Estate of David Gritz. Mrs. & Mrs. Gritz were in New York on the day their son was murdered. Friends of theirs informed them that television reports had indicated that a bombing had taken place at Hebrew University. The Gritzs attempted to reach their son by phone, and then called the Israeli consulate in the hopes of getting more information. Eventually, confirmation came from the Israeli consulate that David's body had been identified.

45. As a result of David's death, plaintiffs, Norman and Nevenka Gritz, have experienced emotional pain and suffering, loss of their only child's society, companionship, comfort, advice

11

and counsel and suffered severe mental anguish and extreme emotional distress.

## THE SBARRO PIZZERIA MASSACRE – AUGUST 9, 2001

46. On August 9, 2001, a suicide bomber detonated a bomb packed with nails and metal bolts.

47. Fifteen (15) people were killed in this attack and approximately 130 people were injured.

48. The suicide bomber was identified as Izz Ad-Din Shuhail Ahmad Al-Masri, a terrorist acting on behalf of HAMAS.

49. The Al-Masri family received at least two (2) payments on account of this act of terrorism through their account at the Arab Bank. The first payment from the Saudi Committee was for twenty thousand (20,000) Riyals converted into five thousand three hundred and sixteen dollars and sixteen cents ($5,316.16) and was designated as Receipt of Transfer No. 1195545058 in its records. The second payment to the family was made to their Arab Bank account through the Al-Ansar charity which made arrangements with the bank manager of the local branch of the Arab Bank to deposit six thousand dollars ($6,000.00) into the Al Masri family account.

50. As recently as January 10, 2005, HAMAS activists at Bir Zeit University paid tribute to Al Masri as a champion of the Palestinian cause.

### The Nachenberg/Finer Families

51. On August 9, 2001, Chana and Sara Nachenberg were seated at the Sbarros restaurant in Jerusalem with plaintiffs Mr. and Mrs. Green. Soon after being seated in the restaurant a

suicide bomber detonated a bomb.

52. Plaintiff, Chana Nachenberg, is a citizen of the United States and a citizen of the State of Israel. Chana is 34 years old and presently resides in Tel Aviv, Israel at a full care facility. Chana is represented by her parents, Paula and Bennett Finer, as her legal guardians because she remains in a coma.

53. Chana and her husband, plaintiff David Nachenberg, have a daughter, Sara, age 6.

54. As a result of the explosion, a nail and a metal bolt entered Chana's body. The nail severed one of her major arteries and became lodged in her chest cavity. Chana suffered extensive internal bleeding. The severance of the artery caused the sac around her heart to fill with blood, causing her heart to stop beating, thus curtailing the blood flow to her brain.

55. Chana Nachenberg never regained consciousness after the attack. On route to the hospital Chana's heart stopped beating before it restarted.

56. For over seven weeks, Chana's condition was unstable. She remained on a respirator. At the end of those seven weeks Chana was moved to another hospital in Tel Aviv. She remained on respirators for the first year and a half after the attack. She now lives in a permanent vegetative state, requiring full time care and daily physical therapy and lives on a respirator.

57. Since the attack Chana has been placed on and off respirators and other machines. Throughout the last three and one half years, Chana has repeatedly contracted pneumonia and endured high fevers.

58. Plaintiff, David Nachenberg, is a citizen of the United States and a citizen and resident of the State of Israel. He is the husband of Chana Nachenberg and the father of Sara Nachenberg.

59. At the time of the attack, David was working at Bank Hapoalim. David received a telephone call from his brother-in-law, Zev Finer, who informed him that there had been a terror attack. Zev advised David that he thought that Sara was not physically injured, but he had no information as to Chana's condition or whereabouts. David became emotionally distraught. After numerous telephone calls and assistance from other employees at the bank, David learned that his wife and daughter were at Hadassah Ein Kerem hospital. Upon arrival at the hospital, David was told that Chana had suffered a severe edema to the brain and was in a coma.

60. For the first 24 hours, David was uncertain if his wife would survive the attack. After that time it appeared that Chana would live, but never regain consciousness.

61. David is now essentially a single parent since Chana remains in a permanent vegetative state and is therefore incapable of assisting in the rearing of her daughter in any manner. He cannot enjoy the normal companionship, day to day assistance and mutual support that he previously received from his wife.

62. David, and his daughter Sara, often visit Chana at her residential medical facility. The facility is located approximately half an hour from their home by bus.

63. As a result of the attack, David Nachenberg has lost the material services, affection, companionship, consortium and the customary amenities of married life and has suffered severe mental anguish and emotional distress, loss of companionship and loss of consortium.

64. Plaintiff, Sara Nachenberg, is a citizen of the State of the United States and the State of Israel. She is the six (6) year old daughter of plaintiffs, David Nachenberg and Chana Nachenberg.

65. On the day of the attack Sara and Chana were seated at the Sbarros restaurant in

14

Jerusalem. After the bombing both she and her mother were transported by ambulance to the hospital.

66. Miraculously, Sara was not outwardly physically injured during the bombing. Sara now visits her mother at the full care facility. She brushes her mother's hair and draws pictures for her. She speaks to her but cannot receive any reply. Sara's only memories are from a time when Chana was already in her current comatose state.

67. As a result of the attack, plaintiff Sara Nachenberg has experienced emotional pain and suffering, permanent loss of his mother's society, protection, companionship, comfort and advice and has suffered severe mental anguish and extreme emotional distress.

68. Plaintiffs, Paula and Bennett Finer, are citizens of the United States and of the State of Israel and are the parents of plaintiff, Chana Nachenberg. They presently reside in Israel.

69. Paula and Bennett Finer are plaintiffs in their own capacity and as the legal guardians of their daughter, Chana Nachenberg.

70. After the bombing Paula Finer received a telephone call from plaintiff, Howard Green, who told her that there had been an attack and that Chana had been hurt. He said nothing about the condition of Paula's granddaughter, Sara Nachenberg.

71. Mr. and Mrs. Finer were driven in their son-in-law's car and began to search from hospital to hospital to try to locate her daughter and granddaughter. After over two hours of searching they finally discovered that their daughter, Chana Nachenberg and their granddaughter had been brought to Hadassah Hospital. They found Sara in the children's ward, covered with debris and in shock. She seemed unable to speak.

72. Eventually they located Chana, whose face was so swollen that Mr. Finer was almost unable to recognize her. She was in a coma and had many tubes connected to her.

15

73. For over seven weeks, Mr. and Mrs. Finer spent every day at the hospital with their daughter for over ten hours each day, day and night for the first weeks. After Chana was moved to the hospital in Tel Aviv, Mr. and Mrs. Finer continued to visit the hospital for many hours each day.

74. Prior to the attack Mrs. Finer was a teacher. She has not returned to work since the attack because she attends to her daughter on a daily basis.

75. As a result of the attack, Mr. Finer did not work for the first two years after the attack. He has recently returned to work, but still visits Chana in the morning prior to going to work.

76. Paula and Bennett Finer have been unable to communicate with their daughter since the bombing put Chana into a coma.

77. Mr. and Mrs. Finer also assist in the care of the granddaughter, Sara. They help with getting her ready for school and picking her up afterwards when her father is unable to do so.

78. As a result of the attack, Mr. and Mrs. Finer have experienced severe mental anguish, extreme emotional pain and suffering, loss of their daughter's society, companionship, advice and counsel.

79. Plaintiff, Shoshana Finer Ohana, is a citizen of the United States and a citizen and resident of the State of Israel. She is the sister of plaintiff Chana Nachenberg.

80. Shoshana Ohana first learned of the bombing when plaintiff, Howard Green, telephoned the home of her parents, plaintiffs Paula and Bennett Finer. Shoshana tried desperately to locate the hospital where her sister and niece had been taken for treatment. Finally, hours later, Shoshana learned the severity of her sister's injuries when her parents contacted her by telephone.

81. Shoshana and Chana shared a very close relationship. She visits her sister often, but

16

her sister is unable to respond to her visits.

82. As a result of the attack, Shoshana Finer Ohana has experienced severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel.

83. Plaintiff, Zev Finer, is a citizen of the United States and citizen and resident of the State of Israel. He is the brother of plaintiff, Chana Nachenberg.

84. Zev learned of the attack when his wife telephoned him at work. Upon learning of the attack and the fact that his sister and niece were present at the Sbarros restaurant, he telephoned his brother-in-law, David Nachenberg, and learned the extent of his sister's injuries.

85. Since the attack Zev is fearful of going out to restaurants and crowded places.

86. As a result of the attack, Zev Finer has experienced severe mental anguish, extreme emotional pain and suffering, loss of society, companionship, comfort, advice and counsel.

**The Green Family**

87. Plaintiffs, Howard Green and Mina Dora Green, are citizens of the United States and citizens and residents of the State of Israel.

88. On August 9, 2001, Mr. and Mrs. Green were seated at the Sbarros restaurant in Jerusalem with plaintiffs Chana and Sara Nachenberg. Soon after being seated in the restaurant a suicide bomber detonated a bomb.

89. As a result of the explosion, Mr. Green was hit in the head with an extremely hot piece of an air conditioning duct. The metal hit him on the right side of the head resulting in second degree burns as well as a punctured ear drum.

17

90. Although not physically injured, since the attack plaintiff, Mina Dora Green, has suffered from depression. Both she and her husband suffer from post traumatic stress disorder.

91. As a result of the attack, plaintiff Howard Green has suffered severe physical and mental anguish and extreme emotional distress.

92. As a result of the attack, plaintiff Mina Green has suffered severe mental anguish and extreme emotional distress.

**The Greenbaum Family**

93. Judith Greenbaum, a United States citizen, was a 31 year old graduate student participating in a summer foreign study program in Israel. At the time of her death, Judith Greenbaum had been married just 16 months and was three months pregnant with her first child. Mrs. Greenbaum had been a beloved teacher for many years and left a lasting impression upon hundreds of students.

94. Judith was having lunch in the Sbarro Pizzeria at or about 2:00 p.m. local time, when Izz Ad-Din Shuhail Ahmad Al-Masri walked into the restaurant and detonated an explosive device loaded with shrapnel and nails.

95. As a result of the explosion, Judith Greenbaum was mortally wounded.

96. Plaintiff, Steven Greenbaum, is the husband of Judith Greenbaum and a citizen of the United States. He brings this action both individually and as the representative of his wife's estate. Mr. Greenbaum has experience emotional pain and suffering, the loss of his wife's society, companionship, comfort, protection, marital care, attention, and advice and counsel.

97. As a result of the terrorist attack, Steven Greenbaum has suffered severe mental anguish and extreme emotional distress.

98. Plaintiffs, Alan and Shirlee Hayman, are the parents of Judith Greenbaum. They are citizens of the United States.

99. Plaintiff, Steven Greenbaum, woke up on the morning of the bombing in New Jersey and spoke with his wife. After he arrived at work he received a call from his father-in-law, Plaintiff Alan Hayman, telling him that there was a bombing in Israel and that he had tried, unsuccessfully, to locate Judith Greenbaum on her cell phone. Throughout the day, Steven Greenbaum and Alan Hayman were in contact by phone as Alan Hayman called relatives, friends and the school where Judith Greenbaum was a graduate student. As the day went on, they realized that no one in Israel could find Judith. Approximately eight hours after the bombing, Judith Greenbaum's uncle called and told Alan Hayman that he had located Judith Greenbaum's body at the morgue.

100. Thereafter, Judith Greenbaum's uncle telephoned Steven Greenbaum, and advised Steven Greenbaum of Judith's death and inquired of Steven's wishes for Judith. At 7:00 p.m. that evening, Steven Greenbaum boarded a plane to Israel. Steven was met at the airport by a representative from the U.S. State Department who assisted Steven in passing through Customs so that he could go straight to the cemetery to attend his wife's funeral.

101. Because Judith Greenbaum's family desired that she be buried according to Jewish tradition, her funeral had to be scheduled for the next day. Plaintiffs, Alan and Shirlee Hayman, lived in California making it impossible for them to fly to Israel in time for their daughter's funeral. This result caused them tremendous additional grief and anguish.

102. As a result of the terrorist attack, plaintiffs Alan and Shirlee Hayman have experienced severe mental anguish, extreme emotional pain and suffering, loss of their only child's society, companionship, comfort, advice and counsel. Every time Mr. and Mrs.

19

Hayman travel to Jerusalem, they can see their daughter's gravesite from the highway, which adds to the pain and suffering they will carry with them for the rest of their lives.

**The Danzig Family**

103. Plaintiff David Danzig is a citizen of the United States and a resident of the State of Pennsylvania.

104. On August 9, 2001, the day after David had arrived in Jerusalem, he was sitting with a friend at the Sbarro Pizzeria when the bomber detonated his explosives a few feet from where David was seated.

105. Miraculously, David Danzig was not seriously injured in the blast, but in order to escape from the scene, David had to climb through the wreckage of debris and dead bodies and through the broken windows of the restaurant. As a result of the explosion, David's legs and hands received gashes and he had cuts from flying glass over much of his body. David also temporarily lost his hearing and he was in a state of severe shock.

106. David received many stitches up and down his legs from the injuries caused by the glass. After being treated for his wounds at the hospital, David was released.

107. David Danzig was later diagnosed with severe post traumatic stress syndrome. David's condition required countless therapy treatments and medication. He often has flashbacks and images of the attacks that cause him to experience severe emotional trauma. He has recurring nightmares and continues to have great difficulty sleeping.

108. Upon his return to the United States, David was incapable of continuing his studies in college. He withdrew from his classes and was admitted to a day clinic for depression and anxiety as an outpatient. Although he returned to college for the spring semester, he has been unable to complete his course load.

109.  As a result of the attack, plaintiff, David Danzig has suffered severe physical and mental anguish and extreme emotional distress.

110.  Plaintiffs, Dr. Rebecca Danzig and Dr. Neil Danzig, are citizens of the United States and residents of the State of Pennsylvania.  They are the parents of David Danzig.

111.  Plaintiff Hayyim Danzig is a citizen of the United States and a resident of the State of Pennsylvania.  He is the younger brother of David Danzig.

112.  On the day of the attack, Rebecca and Neil Danzig received a telephone call from their son, plaintiff Hayyim Danzig, informing them that there had been a bombing in Jerusalem and inquiring as to whether David had been involved.

113.  Rebecca Danzig telephoned her father and step-mother, who reside in Jerusalem, to ascertain David's whereabouts.  After receiving no information, Mrs. Danzig called again, and was told that David had been at the bombing and had been brought to the hospital.

114.  Plaintiff, Sarah Danzig, is a citizen of the United States and a resident of the State of Pennsylvania.

115.  Sarah learned that her brother had been injured in the bombing when her parents notified her at a camp for children diagnosed with cancer.

116.  Each of the members of the Danzig family has attended therapy sessions to address the emotional trauma caused by the attack.

117.  As a result of the attack, plaintiffs Rebecca Danzig, Neil Danzig, Hayyim Danzig and Sarah Danzig have suffered severe mental anguish and extreme emotional distress.

## JERUSALEM BUS SHOOTING: NOVEMBER 4, 2001

### The Ben-Yishai Family

118.  On November 4, 2001, Shoshana Ben-Yishai, a 16 year old eleventh grade student

21

boarded Egged Bus #25 to return home from school.  At approximately 3:45p.m. a gunman, armed with an M-16 rifle, opened fire at the bus as it waited at a stop light.

119.  Shoshana Ben-Yishai was shot in the head and killed in the attack.  Another student was killed and twenty-five people, mostly students, were injured.

120.  The terrorist was a member of the Palestinian Islamic Jihad (PIJ).  He was eventually killed fleeing the scene of the attack.

121.  The terrorist was later identified as Hatem Yaqin Ayesh Al-Sheweikeh .  For his murderous acts, his family received a payment through its account at the Arab Bank from the Saudi Committee for twenty thousand (20,000) Riyals which was converted into U.S. dollars and paid to the family's Arab Bank account as five thousand three hundred and sixteen dollars and sixteen cents ($ 5,316.16).

122.  Plaintiff, Miriam Ben-Yishai, is a citizen of the United States and a citizen and resident of the State of Israel.  She is the mother of Shoshana Ben-Yishai.  Plaintiff, Yitzhak Ben-Yishai is a citizen and resident of the State of Israel and is the father of Shoshana Ben-Yishai.  Miriam and Yitzhak Ben-Yishai bring this action individually and on behalf of the Estate of Shoshana Ben-Yishai.

123.  Plaintiff Yitzhak Ben-Yishai heard news on the radio that there had been an attack on Bus #25.  Knowing that Shoshana took this bus, he rushed to the scene.  The news report had indicated that people had been only slightly wounded.  He attempted to contact Shoshana on her mobile phone, but there was no response.  He was permitted to look for Shoshana, but could not find her.

124.  After hearing about the attack, plaintiff, Miriam Ben-Yishai, telephoned many hospitals, searching for news of her daughter.  Someone finally advised Miriam that Shoshana

had received head injuries and had been taken to Share Tzedek Hospital in Jerusalem.

125.  Upon arrival at the hospital Miriam met her husband and they identified Shoshana's body, which they found on the floor of the hospital morgue, covered by a sheet.

126. As a result of the attack, and the death of their daughter, plaintiffs, Miriam and Yitzhak Ben-Yishai, have experienced severe mental anguish, extreme emotional pain and suffering, loss of their daughter's society, companionship, comfort, advice and counsel.

127.  Plaintiffs, Jacob Ben-Yishai,  Israel Chai Ben-Yishai, Chana Ben-Yishai, Yael Ben-Yishai and Abiel Ben-Yishai are citizens of the United States and are siblings of Shoshana Ben-Yishai.

128.  As a result of the attack, and the death of their sister, plaintiffs, Jacob Ben-Yishai, Chana Ben-Yishai, Yael Ben-Yishai , Israel Chai Ben-Yishai and Abiel Ben-Yishai have experienced severe mental anguish, extreme emotional pain and suffering, loss of their sister's society, companionship, comfort, advice and counsel.

### THE KARNEI SHOMRON PIZZERIA BOMBING OF FEBRUARY 16, 2002

129.  Three teenagers were killed and 28 other people wounded, six seriously, when a suicide bomber blew himself up next to a crowded pizzeria on Saturday night, February 16, 2002 in the Yovelim shopping mall in Karnei Shomron. Two of the teenagers murdered and several of the injured were U.S. citizens.

130.  The terrorist was an operative of one of the paramilitary factions of the Palestine Liberation Organization (PLO).

131.  The terrorist was later identified as Sadiq A'id Mahmud Abd al-Hafez.

132.  The al-Hafez family of Qalqiliya received a payment through its account at the Arab

Bank from the Saudi Committee for twenty thousand (20,000) Riyals converted into five thousand three hundred and sixteen dollars and sixteen cents (S 5,316.16) ) which was designated as Receipt of Transfer No. 2195593571.

**The Shatsky Family**

133. On February 16, 2002, 14-year old Keren Shatsky was sitting in a pizzeria with plaintiff Chana Friedman and other friends when a Palestinian terrorist detonated a large bomb, killing one other child immediately and injuring dozens of others. Keren was hit by shrapnel in the back of her neck and was killed as a result of the attack.

134. Plaintiff, Shabtai Scott Shatsky, is a citizen of the United States and a citizen and resident of the State of Israel. He is the father of Keren Shatsky.

135. Plaintiff, JoAnne Chava Shatsky, is a citizen of the United States and a citizen and resident of the State of Israel. She is the mother of Keren Shatsky.

136. Immediately after the attack plaintiff, Shabtai Scott Shatsky, learned there had been a bombing at the nearby shopping mall. As a member of the emergency response team he went to the site unaware that his 14-year old daughter, Keren had been a victim of the bombing that took place at the pizzeria.

137. While at the site he learned that Keren's friends had been at the mall but he returned home. There, he and his wife, plaintiff, JoAnne Chava Shatsky, made numerous calls to determine Keren's whereabouts. Eventually, he and JoAnne learned that Keren had died as a result of the attack.

138. Shabtai and JoAnne went to the morgue and identified Keren's body.

139. As a result of the attack and the death of their daughter, plaintiffs, Shabtai Scott Shatsky and JoAnne Shatsky, have suffered have experienced severe mental anguish,

extreme emotional pain and suffering, loss of their daughter's society, companionship, comfort, advice and counsel.

140. Plaintiffs, Tzippora Shatsky, Yosef Shatsky, Sara Shatsky Tzimmerman, Miriam Shatsky and David Shatsky, are citizens of the United States and citizens of the State of Israel. They are siblings of Keren Shatsky.

141. As a result of the attack, and the death of their sister, plaintiffs, Tzippora Shatsky, Yosef Shatsky, Sara Shatsky Tzimmerman, Miriam Shatsky and David Shatsky, have experienced severe mental anguish, extreme emotional pain and suffering, loss of their sister's society, companionship, comfort, advice and counsel.

**The Friedman Family**

142. Plaintiff, Chana Friedman, is a citizen of the United States and a citizen of the State of Israel.

143. Chana, the late Keren Shatsky and some of her other friends went out for pizza on Saturday night. While seated at the table Chana saw a man coming towards the table and he detonated his explosives, and there was a loud explosion. Chana remembers running down the road where a bus spotted her and she told the bus driver that the mall had been bombed. The bus driver took Chana to a local Magen David Adom (Red Cross) station which drove her to an intensive care unit.

144. Chana sustained second degree burns and shrapnel wounds in her face, legs, chest and right eye. Her eardrum had also ruptured as a result of the blasts. She underwent an operation to remove shrapnel from her body which resulted in the formation of a deep hole in her leg. It was impossible to safely remove all of the shrapnel from her body.

145. Chana required outpatient treatments for six months and lost more than a year of

school as a result of her injuries. She continues to experience severe psychological trauma not only from being a victim of the bombing, but from the loss of her closest friend, Keren Shatsky.

146.   As a result of the bombing, plaintiff, Chana Friedman, has suffered severe physical and mental anguish and extreme emotional distress.

147.   Plaintiff, Bella Friedman, is a citizen of the United States and a citizen of the State of Israel. She is the mother of plaintiff, Chana Friedman.

148.   On the night of the attack, Mrs. Friedman received a telephone call from her son, Ilan, who had heard there had been a bombing in the neighborhood. Not knowing where Chana was, Mrs. Friedman drove to the mall and ran to the location of the explosion. No one at the scene seemed to know where Chana was. Finally, she asked someone to go into the remains of the pizzeria and determine if Chana was inside.

149.   Shortly thereafter, Keren Shatsky's sister informed Mrs. Friedman that Keren had been located and had been sent to a hospital in Kfar Saba. At the time both Keren's sister and Mrs. Friedman thought Keren was injured, not deceased. Since the neighborhood nurse had told the Friedmans that one girl had died at the scene, and knowing that the girls were together, Mrs. Friedman was certain that Chana had  been killed.

150.   Mrs. Friedman eventually received a telephone call from Chana letting her know that she had survived.

151.   Plaintiff, Bella Friedman, has suffered an economic loss since she was unable to work for two months in order to care for Chana. She also took additional time off from work to take Chana to many doctor appointments.

152.   As a result of the terrorist attack, plaintiff, Bella Friedman, has suffered severe

mental anguish and extreme emotional distress.

153. Plaintiffs, Yehiel Friedman, Zvi Friedman, Ilan Friedman and Miriam Friedman, are citizens of the United States and citizens of the State of Israel. They are the siblings of Chana Friedman.

154. As a result of the injuries sustained by their sister as a result of the attack, plaintiffs Yehiel Friedman, Zvi Friedman, Ilan Friedman and Miriam Friedman, have suffered severe mental anguish and extreme emotional distress.

**The Thaler Family**

155. Rachel Thaler was a citizen of the United States.

156. Ginette Lando Thaler is a citizen of Great Britain and of the State of Israel. She is the mother of Rachel Thaler and plaintiffs Leor and Zvi Thaler.

157. Ginette LandoThaler brings this action both individually and on behalf of the Estate Rachel Thaler.

158. On February 16, 2002, plaintiff, Ginette Lando Thaler, brought her 16-year old daughter, Rachel Thaler, to the mall to spend time with some friends. Less than half an hour later, a Palestinian terrorist detonated a large bomb packed with nails and metal bolts in a pizzeria, killing two children immediately and injuring dozens of others.

159. As a result of the bombing, shrapnel lodged in her skull, and the main artery in her neck was virtually severed, rendering her brain dead. Rachel sustained multiple injuries all over her body, most significantly to her face, head and neck. Her body was covered with first and second degree burns. Rachel never regained consciousness and died eleven days after the attack.

160. Rachel's 14-year old brother, plaintiff Leor Thaler, was also at the site of the attack

27

when the explosion was detonated. Leor was there with his best friend, who was killed as a result of the bombing.

161. As a result of the attack, Leor Thaler was hit by several nails and bolts. Many nails were lodged in his stomach and he also received serious second degree burns. His arms and legs were covered with shrapnel wounds.

162. Leor underwent a number of operations including ones to remove the nails in his stomach and the removal of his spleen.

163. Leor continues to suffer from hearing loss and still has shrapnel lodged in his body.

164. As a result of the death of his sister, his best friend and the pain and suffering caused by his own injuries, Leor suffered both severe physical and mental anguish and extreme emotional distress.

165. Ginette Thaler heard the sound of the bomb when it was detonated. She knew Rachel was at the mall but believed that Leor was at a friend's house.

166. Upon arrival at the scene she was not permitted to search for her children.

167. While at the site, she learned that Leor and his friend were at the mall but could not be found. Finally, a few hours later she learned the name of the hospital to which Rachel had been taken. While on route she was told that Leor had been taken to a different hospital and was in critical condition.

168. For five days, Ginette traveled back and forth from hospital to hospital to check on the condition of her two children. A few days later Leor was transferred to the hospital that was caring for Rachel.

169. As a result of the death of her daughter and the injuries sustained by her son, Ginette Thaler suffered severe mental anguish and extreme emotional distress. The death of Rachel

Thaler has caused her mother severe mental anguish, extreme emotional pain and suffering, loss of her daughter's society, companionship, comfort, advice and counsel.

170. Plaintiff, Michael Thaler, is a citizen of the United States and a citizen of the State of Israel. He is the father of Rachel Thaler and plaintiffs Leor Thaler, Zvi Thaler, and Isaac Thaler.

171. At the time of the attack Michael resided in Jacksonville, Florida. At around 8:30pm Michael turned on the website "News from Israel" and learned there had been a bombing at the mall near where his children lived. He immediately tried to call Ginette, but there was no answer even though it was after 2:00 in the morning Israel time. This caused Michael great concern and distress.

172. Thereafter, Ginette contacted Michael and informed him that both Rachel and Leor had been injured in the bombing. He was told his daughter was unconscious and in very serious condition, and that his son had nails in his body as a result of the blast.

173. Michael boarded the first flight available to Israel the following morning. While on the airplane he read about the bombing in the newspaper, realizing that the unidentified girl described to be unconscious and the boy who had significant injuries including nails in his body were, in fact, his own children.

174. Upon arrival in Israel, Michael immediately went to the hospital to see Rachel. He found her unconscious and hooked up to numerous machines. When he saw Leor, Michael found him badly burned over his face and hands and in poor condition.

175. Michael remained in Israel to attend the burial of his 16-year old daughter, Rachel and assist in Leor's slow recovery.

176. As a result of the death of his daughter and the injuries sustained by his son, Michael

Thaler suffered severe mental anguish and extreme emotional distress. Rachel's death has caused Michael Thaler to experience severe mental anguish, extreme emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel.

177. Plaintiff, Zvi Thaler, is the younger brother of Rachel Thaler and plaintiff Leor Thaler. He is a citizen of the United States and of the State of Israel.

178. He has lost the companionship of his sister, Rachel.

179. As a result of the death of his sister and coping with the injuries sustained by his brother Leor, Zvi Thaler has suffered severe mental anguish, extreme emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel.

180. Plaintiff, Isaac Thaler, is the older half brother of Rachel Thaler and Leor Thaler. He is a citizen of the United States and a citizen of the State of Israel. He is a resident of the State of Florida.

181. Prior to the attack, Isaac maintained a very close relationship with his sister and brothers. When visiting in the United States, his brothers and sister would spend time together with him.

182. Isaac learned of the bombing that killed his sister and injured his brother when his father contacted him by telephone. He flew to Israel to sit by Rachel's bedside and attended his younger sister's funeral a few days later.

183. Isaac continues to experience a great feeling of loss since the attack that killed his sister and injured his brother.

184. As a result of the death of his sister and the injuries sustained by his brother Leor, Isaac Thaler has suffered severe mental anguish, extreme emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel.

**The Trattner Family**

185. Plaintiff, Hillel Trattner, is a citizen of the United States and a resident and citizen of the State of Israel.

186. Plaintiff, Ronit Trattner, is a citizen and resident of the State of Israel.

187. On February 16, 2002, plaintiffs, Hillel Trattner and Ronit Trattner, stopped to eat at a local pizzeria when a Palestinian terrorist detonated a large bomb, killing Keren Shatsky and Rachel Thaler and injuring dozens of others, including the Trattners.

188. As a result of the explosion, Hillel Trattner was struck in the head by shrapnel and sustained nerve damage to his left eye. His left eardrum was ruptured requiring Hillel to undergo an operation on that ear. The surgery was only partially successful and he continues to suffer from hearing loss in his left ear. Hillel further suffered from an impairment of his speech for a period of time.

189. To this day, shrapnel remains lodged in Hillel's brain and it remains unclear whether the shrapnel will cause further injury to him in the future.

190. The heat of the blast burned his face and hands. He sustained nerve damage to his fingers and the sole of his foot. Shrapnel remains in his right hand and was removed from his ankle.

191. After the attack, Hillel was taken to the hospital where he remained for ten days before being transferred to a rehabilitation center, but after a bad reaction to the prescribed medication, he returned to the hospital for an additional two weeks before returning to the rehabilitation center for nearly three months. The reaction to the medication also caused serious liver damage, requiring Hillel to spend a week in the intensive care unit. He also underwent physical therapy throughout this time.

31

192. Hillel no longer has vision in his left eye. He continues to have his eye examined every three months to determine if the damage has spread to his right eye.

193. As a result of the attack, Hillel Trattner has suffered severe physical and mental anguish and extreme emotional distress.

194. Plaintiff, Ronit Trattner, was seated next to Hillel when the bomber detonated his bomb. She sustained burns to her face, legs, and hands. She was also hit with shrapnel which remains lodged in her legs. She has required additional treatment for the burns and scarring on her feet.

195. As a result of the attack, Ronit Trattner has suffered severe physical and mental anguish and extreme emotional distress.

196. Plaintiffs, Aron Trattner and Shelley Trattner, are citizens of the United States. They are the parents of Hillel Trattner.

197. On the evening of the attack, Aron and Shelley Trattner heard an explosion. Their television showed that there had been a bombing nearby. They attempted to call Hillel on his cell phone, but there was no response.

198. They went to the location of the bombing and found Hillel's car, but there was no sign of their son. They eventually learned that Hillel had been transported to the hospital. Once Mr. and Mrs. Trattner located Hillel in the hospital, they could barely recognize him. His face and eye area were horribly swollen. He was unconscious and could only be recognized by his wristwatch.

199. As a result of the attack, Aron Trattner and Shelley Trattner have suffered severe mental anguish and extreme emotional distress.

32

**Steven Braun**

200. Plaintiff, Steven Braun, is a citizen of the United States and a citizen of the State of Israel.

201. On February 16, 2002, he was standing outside a store window not far from the pizzeria at the Karnei Shomron mall when A'id Mahmud Abd al-Hafez detonated his explosives.

202. Steven was thrown back as a result of the blast, and immediately felt extreme pain in his legs. His pants had been torn, and both of his legs had been hit by flying shrapnel which resulted in numerous cuts and bruises. In addition to blood, Steven saw pieces from a human body on his right leg. At first, Steven believed his leg had been ruptured, but later realized that the pieces of flesh belonged to the bomber or another victim of the attack.

203. After the initial shock, Mr. Braun attempted to assist other victims and the paramedics that arrived on the scene. He personally witnessed the carnage and saw the bodies of dead girls and many maimed and injured survivors.

204. As a result of the attack, Steven Braun has difficulty sleeping and suffers from post-traumatic stress and has experienced both physical anguish and severe mental anguish and extreme emotional distress.

## THE MIKE'S PLACE BOMBING; TEL AVIV, APRIL 30, 2003

**The Rozenstein Family**

205. On April 30, 2003 a suicide bomber entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv.[1]

---

[1] There were actually two (2) bombers, both British nationals sent by HAMAS, but the explosive belt on one of them failed to detonate.

206. The attack was perpetrated by Asif Muhammad Hanif, 22, a British citizen who entered Israel through Jordan. He was sent by HAMAS.

207. Plaintiff Daniel Rozenstein is a citizen of the United States. He was seated inside the bar and decided to step outside when he crossed paths with Asif Muhammad Hanif in the entry way just as Hanif detonated his explosives.

208. As a result of the attack, Daniel suffered 3rd degree burns over his entire body. Since his back was to the bomber, Daniel's back bore the brunt of the explosion.

209. After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for over a week. He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

210. Since the bombing he sustained severe hearing loss. He cannot maintain his balance, is often dizzy, and frequently experiences black outs. His right hand, no longer functions properly as it is covered in scar tissue. Much of his body is covered by scar tissue, including his back and hands.

211. As a result of the attack, plaintiff, Daniel Rozenstein, has suffered severe physical and mental anguish and extreme emotional distress.

212. Plaintiff, Julia Rozenstein Schon, is a citizen of the United States. She is the sister of plaintiff, Daniel Rozenstein.

213. On the night of the bombing, Julia received a telephone call from the father of Daniel's girlfriend. She was told there was an attack but that no one was certain of Daniel's condition.

214. When Julia first saw Daniel she could not recognize him because his body was horribly burned and his face and ears were swollen beyond recognition. She spent many

days in the hospital, and was there when her brother slipped into a coma.

215. Julia still suffers nightmares and is traumatized by the attack. Even now, she calls her brother compulsively to be certain that he is not in danger.

216. As a result of the attack, plaintiff, Julia Rozenstein Schon, has suffered severe mental anguish and extreme emotional distress.


## GAS STATION BOMBING NEAR KFAR SAVA – MARCH 28, 2001

### The Herskovitz Family

217. In the early morning of March 28, 2001, Fadi Attallah Yusuf Amer, a HAMAS trained terrorist blew himself up outside a gas station near Kfar Sava, killing two teenagers waiting for a bus to take them to the Bnei Hayil Yeshiva in Kedumim. A large quantity of nails was packed with the bomb. HAMAS claimed responsibility and issued a statement.

218. The Amer family of Qalqilya received a payment through its account at the Arab Bank from the Saudi Committee for twenty thousand (20,000) Riyals which was converted by Arab Bank into five thousand three hundred and sixteen dollars and sixteen cents (S 5,316.16) with the designated Receipt of Transfer No.1195545071.

219. Plaintiff, Netanel Herskovitz, who was sixteen (16) years old at the time of the terrorist attack, is a citizen of the State of the United States and the State of Israel. He was sitting, eating a sandwich outside the gas station when Fadi Attallah Ynsuf Amer blew himself up. Netanel was struck in the shoulder and forehead by shrapnel and glass fragments penetrated one eye, leaving him partially blind. Netanel Herskovitz has also experienced partial hearing loss and suffers from post-traumatic stress disorder. As a result of the attack

35

plaintiff, Netanel Herskovitz, has suffered severe physical and mental anguish and extreme emotional distress.

220.  Plaintiffs Martin & Pearl Herskovitz are citizen of the State of the United States and the parents of Netanel Herskovitz. They learned of the attack and the fact that their son was injured from the family of another boy who had been lightly injured at the scene, and called home on his cell phone. Plaintiff, Pearl Herskovitz, works at the hospital where Netanel was taken for treatment and quickly located her son in the emergency room area.

221.  Plaintiff, Yaakov Herskovitz, is a citizen of the State of the United States and the State of Israel the older brother of Netanel. He was home when the family received word that Netanel had been seriously injured in a terrorist attack.

222.  As a result of the attack, plaintiffs Martin Herskovitz, Pearl Herskovitz and Yaakov Herskovitz have suffered severe mental anguish and extreme emotional distress.

## THE BEN YEHUDA BOMBINGS: DECEMBER 1, 2001

223.  In the late evening of December 1, 2001, Nabil Halabiya and Osama Mohammad Id Bahr, two HAMAS trained terrorists blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing (followed by a coordinated car bombing). A large quantity of nails was packed with each of the bombs. Eleven people were murdered and over one hundred people were injured. Mr. Bahr had been recruited by Jamal al-Tawil the chairman of the Al-Islah Charitable Society since 2000. The Al-Islah Charitable Society is one of HAMAS's key charitable front organizations in the West Bank,

224. Subsequent to the two suicide bombings terrorists detonated a car bomb near the site of the first two attacks. HAMAS also claimed responsibility for this attack.

225. The Bahr family of Abu Dis, near Jerusalem received a payment through its account at the Arab Bank from the Saudi Committee for twenty thousand (20,000) Riyals converted into five thousand three hundred and sixteen dollars and sixteen cents ($ 5,316.16).

**The Spetner Family**

226. Temima Spetner is a citizen of the United States and a resident of the State of Missouri. She was walking down the pedestrian mall in Jerusalem when one of the suicide bombers detonated his explosives approximately 10 yards from where she was standing. While bleeding heavily, and with clothing soaked in blood, Temima began running up the walkway and fell. Someone came to her aid and attempted to stop the bleeding until ambulances arrived at the scene. Additionally, Temima was hit by shrapnel on her arms and fingers.

227. As a result of the terrorist attack, the femoral artery of Temima's right leg was severed. She was transported to the hospital where doctors operated on her to stop the bleeding. The following day it was determined that Temima's intestines had been punctured by shrapnel and she underwent another operation to repair her intestines and remove most of the shrapnel. Temima remained in the hospital for ten days.

228. There is significant scarring on Temima's thigh and the lower part of her abdomen. She continues to experience numbness in her right leg and is highly sensitive to pain in that leg.

229. Temima has also experienced psychological trauma as a result of the attack. As a result of the attack, plaintiff, Temima Spetner, has suffered severe physical and mental

anguish and extreme emotional distress.

### The Steinherz Family

230. Plaintiff Altea Steinherz and plaintiff Jonathan Steinherz are citizens of the United States.

231. Plaintiff's, Jonathan and Altea Steinherz, are husband and wife.

232. On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby. A short time later they heard another bomb explode. Believing the bombing was over, they began to walk home.

233. While walking in the street they saw a crazed man ran past them. Altea insisted that the couple turn around, away from the direction from which the man had come. They heard a third explosion from where the man had run. They later learned that the explosion was the result of a car bomb.

234. As they began to run, Altea fell twice, and broke her arm as a result of the fall.

235. Until her son, Yitzhak, was born eleven days later, Altea and Jonathan feared for the condition of their unborn child.

236. Having personally seen the emergency efforts and fears of individuals at the hospital after the attack, Altea no longer feels she can continue to volunteer at the hospital as she had done previously. She has become more fearful in general.

237. As a result of the attack, Altea Steinherz and Jonathan Steinherz have suffered severe mental anguish and extreme emotional distress.

38

## THE KING GEORGE STREET BOMBING: MARCH 21, 2002

### The Bauer Family

238. Plaintiff, Dr. Alan Bauer, is a citizen of the United States. He is the father of plaintiff, Yehonaton Bauer.

239. Plaintiff, Yehonaton Bauer, is a citizen of the United States and of the State of Israel.

240. On March 21, 2002 Dr. Alan Bauer and his son, Yehonaton Bauer, were walking home when a suicide bomber got out of a car and detonated explosives near where Alan and Yehonaton were standing.

241. The Al Aqsa Martyrs' Brigades took responsibility in a telephone call to the Associated Press, and identified the bomber as Muhammad Hashaika, 22, of Taluza, north of Nablus. The attack killed at least two people and wounded more than eighty others, including a woman pregnant with twins and her husband.

242. Dr. Bauer was thrown to the ground and saw smoke everywhere.

243. He finally located his son, who was on the ground, unconscious. Yehonaton was struck by part of a screw that had been packed with the explosives. The screw passed through his brain from the back to the front of his head.

244. Dr. Bauer was struck by two nails that severed two arteries in his left arm. One passed through and the other was lodged in his arm.

245. Both Dr. Bauer and his son were operated on after the attack.

246. Yehonaton remained in the pediatric Intensive Care Unit for three and a half weeks. He was later transferred to a children's rehabilitation center for two months and continued with outpatient care.

247. Yehonaton continues to experience physical difficulties as a result of the attack. He

limps on his left side and his motor skills in his left hand are limited. His vision is impaired as well.

248. As a result of the attack plaintiff Yehonaton Bauer has suffered severe physical and mental anguish and extreme emotional distress.

249. Dr. Bauer continues to experience restrictive use of his left arm. He has had two skin grafts to cover the scarring in that injured area.

250. As a result of the attack plaintiff Dr. Alan Bauer has suffered severe physical and mental anguish and extreme emotional distress.

251. Plaintiff Revital Bauer is a citizen of the State of Israel. She is the wife of plaintiff Alan Bauer and the mother of plaintiff Yehonaton Bauer.

252. Immediately after the attack Alan Bauer telephoned Revital informing her that he and Yehonaton had been in an attack. The conversation was unclear and she could not hear all of the information. She had to wait for a further call from the hospital.

253. Half an hour later she received a telephone call from the hospital informing her as to the location of her husband, but the hospital had no word on the condition of her son.

254. Revital's brother drove her to the hospital and saw Yehonaton prior to his surgery. Since Alan was also undergoing an operation, she spent hours going between the two operating rooms.

255. Revital had to wait to learn the extent of her son's brain injuries.

256. As a result of the attack plaintiff Revital Bauer has suffered severe mental anguish and extreme emotional distress.

257. Plaintiffs, Binyamin B. Bauer, Daniel Y. Bauer, and Yehuda Bauer are citizens of the United States. They are the sons of plaintiffs Alan Bauer and Revital Bauer and the

younger brothers of plaintiff Yehonaton Bauer.

258.  As a result of the attack plaintiffs, Binyamin Bauer, Daniel Bauer, and Yehuda Bauer, have lost their brother's companionship for an extended period of time and have suffered severe mental anguish and extreme emotional distress.

## SHOOTING ATTACK ON ROAD #60: JANUARY 29, 2003

### The Steinmetz Family

259.  Plaintiffs, Jacob Steinmetz, and Deborah Steinmetz are citizens of the United States.

260.  On January 29, 2003 Jacob Steinmetz was driving their car on Road #60.  Mrs. Steinmetz sat in the front passenger seat of the car.  As their car made a turn, two masked men began shooting the car.  The entire driver's side of the car was covered with bullets.

261.  It is believed that HAMAS was responsible for the attack.

262.  Two bullets hit Mr. Steinmetz. One shot passed through the car seat and lodged in his leg.  The other shot entered his arm and passed through the elbow.

263.  After arriving at the hospital and over the next few days, Mr. Steinmetz underwent a number of operations.

264.  Four metal spikes were surgically inserted into his bone in order to restrain the arm. This remained for three months and severely restricted the mobility of his arm. Additional plastic surgeries were performed.  Mr. Steinmetz received a skin graft from his leg to cover the opening in his elbow.

265.  In 2003, Mr. Steinmetz underwent a complete elbow replacement that included the placement of a large metal hinge.

266.  Presently, the use of Mr. Steinmetz's arm is greatly limited.

41

267. As a result of the attack, Mr. Steinmetz has suffered severe physical and mental anguish and extreme emotional distress.

268. As a result of being in the car that terrorists targeted, Mrs. Steinmetz experiences great anxiety and has suffered severe mental anguish and extreme emotional distress.

269. Plaintiffs, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz and Natanel Steinmetz, are the children of Jacob and Deborah Steinmetz.

270. As a result of the attack, Amichai Steinmetz, Nava Steinmetz, Orit Steinmetz and Natanel Steinmetz have suffered severe mental anguish and extreme emotional distress.


## THE JAFFA ROAD BUS #14A BOMBING: JUNE 11, 2003

271. At approximately 5:30 p.m. on June 11, 2003, the bomber, a HAMAS operative dressed as an ultra-Orthodox Jew, boarded Egged bus No. 14A at the Mahane Yehuda market, and a short while later, as the bus drove down Jaffa Road near the Davidka Square, detonated his bomb, wrecking the bus and killing 16 of its passengers. Over 100 people were wounded, including dozens of bystanders.

### The Beer Family

272. Alan Beer, a citizen of the United States, was on the bus returning from a condolence call to his friend's family when the bomber detonated his explosives. He was one of the at least sixteen (16) commuters killed by the blast.

273. Mr. Beer's friend, to whom he had paid the condolence call, learned of the bus bombing and telephoned plaintiff, Harry Leonard Beer, in Cleveland, Ohio. Harry Leonard Beer quickly telephoned his sister, plaintiff Phyllis Maisel, whose son happened to be on the scene of the bombing earlier. He then telephoned his other sister, plaintiff Estelle Carroll, of

Virginia and informed her of the terrorist attack.

274. After speaking with her brother, Mrs. Maisel asked her son to return to the crime scene and identify Alan Beer's body.   Thereafter, plaintiffs Anna Beer, Harry Leonard Beer and Estelle Carroll flew to Israel to attend Alan Beer's funeral.

275. Plaintiff, Harry Leonard Beer, brings this action both in his individual capacity and as the Executor of the Estate of Alan Beer. He has experienced emotional pain and suffering, the loss of his brother's companionship, advice and counsel.

276. As a result of the terrorist attack, Harry Leonard Beer has suffered severe mental anguish and extreme emotional distress.

Plaintiffs, Estelle Carroll and Phyllis Maisel are both U.S. citizens. Each of them has experienced emotional pain and suffering, the loss of their brother's companionship, advice and counsel. As a result of the terrorist attack, they have suffered severe mental anguish and extreme emotional distress.

277. Plaintiff, Anna Beer, is a U.S. citizen and a resident of the State of Ohio. She has experienced emotional pain and suffering, the loss of her youngest child's companionship, advice and counsel. As a result of the terrorist attack, she has experienced the loss of her youngest son's society, companionship, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Singer Family**

278. Plaintiff, Sarri Anne Singer, is a citizen of the United States and is a resident of the State of New Jersey.

279. On June 11, 2003, Sarri Anne Singer boarded bus number 14A in Jerusalem to meet a friend for dinner. It was around 4:45pm, and the bus was filled with rush hour commuters.

43

Eventually she was able to take a seat near the window.

280.  Soon thereafter a suicide bomber detonated his bomb only two to three seats away from where she was seated.  The bomber killed everyone sitting and standing near her.  The roof of the bus had fallen in and the man in front of her was not moving.  When the explosives were detonated, Sarri felt a shockwave across her face.  At least sixteen (16) people were killed in the attack, and over 100 were injured.

281.  The attack was perpetrated by a HAMAS bomber, identified as Abdel Madi Shabneh, an 18-year old high school student from Hebron.  He had boarded the bus disguised as an Orthodox Jew.

282.  Shabneh was initially recruited by HAMAS while playing at a local Jihad Mosque soccer team.

283.  Sarri was struck with shrapnel from the explosion, which entered her shoulder and broke her clavicle.  After the blast she was unable to open her left eye, and her right eye was extremely restricted.  She was unable to hear because of a loud ringing in her ears, and her eardrums ruptured.  Barely walking, she was taken to an ambulance.

284.  She received wounds to her face and legs resulting in scarring.  She has undergone physical therapy and will require surgery in the future.  Shrapnel had lodged in her gums moving her teeth. She will have need of dental work in the future.

285.  As a result of the attack, Sarri Anne Singer has suffered severe physical and mental anguish and extreme emotional distress.

286.  Plaintiff, Judith Singer, is a citizen of the United States and a resident of the State of New Jersey.  Mrs. Singer is the mother of Sarri Anne Singer.

287.  Mrs. Singer learned of the attack when her son telephoned her at work.

44

288.  As a result of the attack Judith Singer has suffered severe mental anguish and extreme emotional distress.

289.  Plaintiff, Eric M. Singer, is a citizen of the United States and a resident of the State of New Jersey and the brother of Sarri Anne Singer.

290.  Eric first learned of the attack when he received an emergency phone call from his father while having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

291.  As a result of the attack, Eric Singer has suffered severe mental anguish and extreme emotional distress.


## SHOOTING ATTACK ON THE TRANS-ISRAEL HIGHWAY: JUNE 17, 2003

### The Leibovitch Family

292.  On June 17, 2003, Shlomo and Galit Leibovitch were driving in their car with their four children, Hila (age 16), Moshe (age 11), Noam (age 7) and Shira (age 3). While driving on the highway, terrorists began shooting at the car, killing Noam Leibovitch and injuring her 3-year old sister, plaintiff Shira Leibovitch.

293. One shot hit Noam on her right side and traveled through her body and exited at her left hip. The bullet continued traveling through Shira's wrist and lodged itself in Shira's back, only a few millimeters from her spinal cord.

294.  Although the family members tried to resuscitate Noam, she did not survive and was pronounced dead at the scene of the attack.

295.  An Islamic Jihad terrorist cell was later apprehended in connection with the attack.

296.  Shlomo and Galit Leibovitch are citizens of the State of Israel. They are the parents

of Noam and Shira Leibovitch. Shira Leibovitch is a citizen of the United States.

297. Shira underwent surgery and the bullet was removed from her back and doctors attempted to repair her hand. Shira remained in the hospital for two weeks where she underwent a regimen of physical therapy. She still has significant limitations of movement in her right hand and wrist. She has also undergone an additional subsequent operation to improve the use of her fingers. The surgery was only partially successful. Testing has recently shown that her injured hand is not growing at the same rate as her other hand.

298. As a result of the attack, plaintiff, Shira Leibovitch, has experienced severe physical and mental anguish and extreme emotional distress and has lost her sister's society, companionship, advice and counsel.

299. As a result of the attack, plaintiffs, Shlomo and Galit Leibovitch, have experienced severe mental anguish and extreme emotional distress and have forever lost their daughter's society and companionship.

300. As a result of the attack, Hila Leibovitch, Moshe Leibovitch have experienced severe physical and mental anguish and extreme emotional distress and have lost their sister's society, companionship, advice and counsel.


## THE KFAR DAROM BUS SHOOTING: NOVEMBER 20, 2000

### The Biton Family

301. Gavriel Biton boarded a bus on the morning of November 20, 2000 that transported children to school. Three Palestinian terrorists directly propelled a large bomb, comprised of a 122-mm mortar shell as the bus drove near the Magen Junction in Gaza. Two adults, including Gavriel Biton were killed in the attack. Nine (9) others were injured, including a

number of children who lost limbs as a result of the explosion.

302. Plaintiff, Avigail Lewis Biton, is the wife of Gabriel Biton and is a citizen of the United States and of the State of Israel.

303. Plaintiff, Avigail Biton, attempted to contact her husband on his cell phone once she learned of the attack, but had no success. A few hours after the attack members of her community came to her home and informed Avigail that her husband had been killed.

304. As a result of the death of her husband, Avigail Biton has lost the material services, affection, companionship, consortium and the customary amenities of married life and has suffered severe mental anguish and extreme emotional distress.

305. Plaintiffs, Elyashiv Biton, Tamar Biton, Noam Biton, Oriya Biton, Shilo Biton, and Adi Penina Biton, are citizens of the State of Israel. They are the children of plaintiff, Avigail Biton and Gavriel Biton.

306. Each of Avigail and Gavriel Biton's children has lost their father and the benefits of his companionship, comfort, protection, financial support, attention, advice and counsel for the balance of their lives.

307. As a result of the death of their father, Elyashiv Biton, Tamar Biton, Noam Biton, Oriya Biton, Shilo Biton, and Adi Penina Biton have suffered severe mental anguish and extreme emotional distress.

**The Assraf Family**

308. Plaintiff, Rachel Assraf, is a citizen of the United States and a citizen and resident of the State of Israel. Plaintiff Eli Assraf is a citizen of the State of Israel. He is the husband of Rachel Assraf.

309. On the morning of November 20, 2000, Rachel Assraf was a passenger on the Kfar

Darom bus and was 12 weeks pregnant at the time.

310. After the explosion, Rachel lost her hearing and she felt a surge of heat on her back. The bus continued to move and came to a stop at a military base. Rachel saw that her friend's head had been partially severed as a result of the explosion. She also saw children she knew on the floor of the bus in a tangle of missing limbs.

311. As the bus continued on the road Rachel was able to telephone her husband, Plaintiff Eli Assraf, and let him know that she had been in an attack. Upon arrival at the military base Rachel had to exit the bus, stepping over victims' bodies and limbs, including her friend who had been partially decapitated.

312. Rachel Assraf sustained severe burns on her back as well as burns and cuts on her hand. She lost feeling in some of the fingers in her right hand. In addition to post traumatic stress, Rachel also experienced great anxiety over the health and safety of her unborn child.

313. Even a month after the attack, Rachel continued to have a numbing sensation in her hand. She had an additional operation on her hand to remove a piece of metal that was lodged there. Her hand is scarred and continues to have limited functioning.

314. For months after the attack Rachel had great difficulty sleeping. She had frequent nightmares about the health of her unborn child, and would wake up screaming. She continues to have panic attacks at night.

315. As a result of the attack, Rachel Assraf has suffered severe physical and mental anguish and extreme emotional distress.

316. For 17 years prior to the attack, Eli Assraf was in charge of security in Kfar Darom. He would be among the first individuals on the scene of a terrorist attack to assist with the victims and the emergency personnel.

48

317.  After the attack Eli took a few months off to assist in the care of his wife and attend to the needs of his family.

318.  Since the attack, Eli has been unable to return to his work, finding it too difficult emotionally.

319.  As a result of the attack and viewing the injuries to his wife and the others whom he knew on the bus, Eli Assraf has suffered severe mental anguish and extreme emotional distress.

320.  Plaintiff Moshe Assraf is a citizen of the State of Israel.  He is the son of Rachel and Eli Assraf.

321.  Moshe has experienced difficulties coping with the attack that resulted in injuries to his mother and others he knew on the bus.

322.  As a result of the attack Moshe Assraf has suffered severe mental anguish and extreme emotional distress.

## THE HADERA BAT MITZVAH MASSACRE: JANUARY 17, 2002

### The Ellis/Knox Families

323.  Aharon Ben-Yisrael Ellis was a citizen of the United States and of the State of Israel.  On January 17, 2002, Aharon Ellis was performing as a singer at a Bat Mitzvah reception at a banquet hall in Hadera.  A terrorist named Abd As-Salam Sadeq Hassouna entered the banquet hall and opened fire on the 180 guests with an assault rifle, killing five people including Aharon Ellis.

324.  Plaintiff, Leslye Knox, was the common law wife of Aharon Ellis.  Leslye Knox is a citizen of the United States and a resident of the State of Georgia.  She brings this action both

individually and on behalf of the Estate of Aharon Ben-Yisrael Ellis.

325. In the middle of the night on January 17-18, 2002, plaintiff Leslye Knox, received a telephone call waking her up and informing her that Aharon had been killed. She was completely devastated when she learned the news.

326. Leslye and Aharon had been together for six years prior to the attack. They had a son together, plaintiff Jordan Terrell Ellis. Jordan Terrell Ellis is a citizen of the United States and resident of the State of Georgia.

327. Following the death of Aharon Ellis, Leslye returned to the United States and all but one of her children reside with her in Georgia.

328. As a result of the death of Aharon Ellis, Leslye Knox has lost material services, affection, companionship, consortium and the customary amenities of married life and suffered severe mental anguish and extreme emotional distress.

329. As a result of the terrorist attack and his father's murder, Jordan Terrell Ellis will never have a memory of his father and has permanently lost the benefits of his companionship, comfort, protection, attention, advice and counsel for the balance of his life.

330. As a result of the death of his father, Jordan Terrell Ellis has suffered severe mental anguish and extreme emotional distress.

331. Plaintiffs, Prince Elkannann Ben Shaleak and Mello Nee Ellis, are United States citizens and residents of Israel. They are the parents of Aharon Ben-Yisrael Ellis. They learned of the attack that killed their son when Prince Elkannann's friend heard the news and went to their home and woke them in the middle of the night. They listened to the radio all night long to confirm the details of the attack.

332. Plaintiff, Yehonadav Ellis, identified the body of his brother, Aharon, at the

morgue.

333. As a result of the death of their son, plaintiffs Prince Elkannann Ben Shaleak and Mello Nee Ellis have suffered severe mental anguish and extreme emotional distress.

334. Plaintiffs, Francine Ellis, Lynne Ellis, Shemariah Ellis, Tsaphrira Ellis and Yehonadav Ellis are the siblings of Aharon Ben-Yisrael Ellis. They are all citizens of the United States and residents of the State of Israel.

335. As a result of the death of their brother, Francine Ellis, Lynne Ellis, Shemariah Ellis, Tsaphrira Ellis and Yehonadav Ellis have suffered severe mental anguish and extreme emotional distress.

336. Plaintiffs, Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavya Carter, and Amitai Carter, are citizens of the United States. They are the children of plaintiff, Leslye Knox and the step-children of Aharon Ben-Yisrael Ellis.

337. For the six years prior to the attack, Aharon Ben-Yisrael Ellis served as their father.

338. Plaintiffs, Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavya Carter, and Amitai Carter, have permanently lost the benefits of their step-father's companionship, comfort, protection, attention, advice and counsel for the balance of their lives.

339. As a result of the death of their step-father, Reuven Carter, Shanon Carter, Shayrah Carter, Yoshavya Carter, and Amitai Carter have suffered severe mental anguish and extreme emotional distress.

## SHOOTING RAMPAGE AT JERUSALEM BUS STOP: JANUARY 22, 2002

340. On January 22, 2002, at approximately 4:30 p.m. local time in Jerusalem, Sa'id Ibrihim Ramadan, a PLO operative belonging to the Al Aqsa Martyrs Brigades, opened fire at

51

a crowded bus stop on the corner of Jaffa Street and Lunz Street. He was eventually gunned down by police, but not before killing two bystanders and injuring more than 40 people.

### The Gould Family

341.  Shayna Eileen Gould is a citizen of the United States and a resident of the State of New York was waiting at the bus stop, talking to her friend on her cell phone when she was shot once in the chest by the gunman.

342.  Although she was initially pronounced dead upon arrival at the hospital they managed to revive her and she underwent surgery and one of her lungs had to be removed. One of her back muscles was removed to save her life. During the operation Shayna's heart stopped. She had lost a great deal of blood. The surgeons were unable to remove all of the bullet fragments because they were too close to vital organs.

343.  Shayna remained in the hospital for two weeks and continued treatment as an outpatient for one month. Subsequent to the initial surgery, Shayna has undergone additional operations to correct complications. Three separate 3-inch gaps in her ribs were removed, and no replacement surgery is available to correct the condition. These gaps are located over her heart, which makes her condition more precarious.

344.  There are still pavement fragment wounds imbedded in Shayna's leg. She continues to suffer from extreme pain. She often has difficulty breathing, especially when there is a change in the weather. The attack has also necessitated extensive meetings with a psychologist.

345.  As a result of the attack Shayna Gould has suffered severe and physical and mental anguish and extreme emotional distress.

346.  Plaintiff, Ronald Allan Gould, is a citizen of the United States and a resident of the

State of Illinois. He is the father of plaintiff Shayna Gould.

347. Mr. Gould received a telephone call from the college in Jerusalem where Shayna Gould was attending classes. Initially, Mr. Gould was informed that his daughter had died at the scene. He subsequently telephoned his wife, plaintiff Elise Gould, and his daughter, plaintiff Jessica Rine. He initially informed the family that Shayna had been injured in an attack, even though he then believed that she was deceased. Plaintiff, Jessica Rine, then organized the family's emergency trip to Israel.

348. Mr. Gould is a professional commercial photographer who was engaged in photographing medical procedures.

349. As a result of the terrorist attack plaintiff, Ronald Gould, is no longer psychologically able to photograph medial procedures and has experienced severe mental anguish and extreme emotional distress.

350. Plaintiff, Elise Gould, is a citizen of the United States and a resident of the State of Illinois. She is the mother of plaintiff Shayna Gould.

351. As a result of the terrorist attack that grievously injured her daughter, Elise Gould has suffered severe mental anguish and extreme emotional distress.

352. Plaintiff, Jessica Rine, is a citizen of the United States and a resident of the State of Illinois. She is the older sister of plaintiff Shayna Gould.

353. As a result of the terrorist attack that grievously injured her sister, Jessica Rine has suffered severe mental anguish and extreme emotional distress.

**Shoshana Zelcer**

354. Plaintiff Shoshana Zelcer is a citizen of the United States and a resident of the State of New York.

53

355.  On January 22, 2001, Shoshana Zelcer was standing at the bus stop on Jaffa Road in Jerusalem with her friend, plaintiff Shayna Gould, when a Palestinian terrorist opened fire with an M-16 automatic rifle.  Shoshana was standing under the awning at the bus stop while Shayna was talking on her cell phone.

356.  When the shooting began, she crouched down in the bus shelter then ran toward the alley behind the bus stop and found herself standing in front of the terrorist, looking straight at his face.  As she began to run away, the terrorist shot her. Shoshana initially felt pain in her left thigh because a bullet had ricocheted off the pavement and lodged itself in her lower back, knocking Shoshana to the ground. Shoshana was also hit by shrapnel all over her body, including some that injured her Achilles tendon.

357.  Shoshana was sent by ambulance to the hospital where she underwent x-rays and waited as the area around the bullet was irrigated for hours.  Eventually, the bullet was removed.  However, there was too much shrapnel to remove it all from her body.

358.  As a result of the injury to her Achilles tendon, Shoshana was immobile for a week.  She was still experiencing severe pain and was unable to get out of bed.  As time passed, she was gradually able to regain strength in her leg; however, she still is incapable of running due to the pain and fear that the injury will worsen.

359.  Apart from her physical injures, Shoshana has experienced extreme psychological trauma and has been diagnosed with post traumatic stress disorder.  She continues to have nightmares and was treated by a therapist for over two years.

360.  As a result of the attack, Shoshana Zelcer has suffered severe physical and mental anguish and extreme emotional distress.

54

### The Waldman Family

561. Shmuel Waldman is a citizen of the United States and the State of New Jersey.

562. On January 22, 2002, as Shmuel Waldman boarded a bus in Jerusalem when a Palestinian terrorist opened fire with an M-16 automatic rifle. He was shot twice in his leg at point blank range, rupturing his leg.

563. He immediately telephoned his wife to inform her of the attack and his condition.

564. Two women were killed in the attack, and over 40 were injured. The perpetrator of the attack was killed at the scene.

565. Shmuel has undergone a number of operations to repair the injuries to his leg. Due to the extensive nerve damage to his leg, Shmuel has little sensation in his right leg. For over three years Shmuel has attended therapy sessions. As a result of the traumatic experience of the attack, Shmuel felt he could no longer reside in Israel and has relocated to New Jersey.

566. As a result of the attack, Shmuel Waldman has suffered severe physical and mental anguish and extreme emotional distress.

567. Plaintiff, Henna Novack Waldman, is a citizen of the United States and a resident of New Jersey as well as a citizen of the State of Israel.

568. After the attack, Henna met her husband at the hospital and found him in extreme pain.

569. As a result of the attack Henna Waldman has suffered severe mental anguish and extreme emotional distress.

570. Plaintiffs Morris Waldman and Eva Waldman are citizens of the United States and residents of New York. They are the parents of plaintiff Shmuel Waldman.

571. While on route to the hospital to visit his father, Morris Waldman received a

telephone call from his daughter informing him that Shmuel had been shot. Morris then telephoned his wife, Eva, to inform her.

372. By 6:00pm that evening, Morris was on a plane to visit his son in Israel. When he arrived, he found his son's leg very swollen and saw his son experiencing great pain. Morris closed his business for two weeks to stay in Israel with his son.

373. Morris continues to experience fear when ever he hears of any type of terrorist attack in Israel.

374. As a result of the attack, Morris and Eva Waldman have suffered severe mental anguish and extreme emotional distress.

375. Plaintiff Chanie Bodenstein is a citizen of the United States. She currently resides in the State of Israel. She is the older sister of Shmuel Waldman.

376. On the evening of the attack, Chanie heard sirens and emergency vehicles heading to the area where her brother worked. She attempted to contact him by telephone, but received no answer on his cellular telephone. Finally, she learned that he was in the hospital and had been shot.

377. She visited her brother the following day, finding him in excruciating pain, extremely pale, and his leg incredibly swollen.

378. Since the attack Chanie Bodenstein has become very nervous and will no longer go to crowded areas and becomes very anxious when she is near a bus stop.

379. As a result of the attack Chanie Bodenstein has suffered severe mental anguish and extreme emotional distress.

380. Plaintiff Shaindy Weinberger is a citizen of the United States. She currently resides in the State of Israel. She is the younger sister of Shmuel Waldman.

381. As a result of the attack Shaindy Weinberger has suffered severe mental anguish and extreme emotional distress.

382. Plaintiff Philip Waldman is a citizen of the United States and is a resident of the State of New York. He is the younger brother of Shmuel Waldman.

383. Philip and Shmuel are very close brothers. Each time there is another terrorist attack in Israel, Philip again experiences the distress and anxiety he experience when he first learned of the attack that injured his brother.

384. As a result of the attack Philip Waldman has suffered severe mental anguish and extreme emotional distress.

385. Plaintiffs Abraham Waldman and Dassie Waldman are citizens of the United States and residents of the State of New York. Abraham and Dassie Waldman are the younger siblings of plaintiff Shmuel Waldman.

386. As a result of the attack, Abraham Waldman and Dassie Waldman have suffered severe mental anguish and extreme emotional distress.


## SHOOTING ATTACK IN GIVAT ZEEV: JANUARY 8, 2001

### The Guetta Family

387. Oz Joseph Guetta is a citizen of the United States and of the State of Israel. He is currently 16 years old.

388. Varda Guetta is a citizen of the State of Israel. She is the mother of plaintiff Oz Joseph Guetta.

389. On January 8, 2001 Oz was in a car with his mother, Varda Guetta, having dropped one of Oz's friends off at his home. While returning to their home they stopped at a

stop sign in Givat Zeev. While waiting at the stop sign four men drove their car alongside Varda and Oz's car and began shooting at the car. Nineteen (19) bullets hit the car.

390. One shot damaged the engine of the car so Varda was unable to move the car from the scene.

391. Two bullets hit Oz in his left hand. Another struck him in the left foot. Bullet fragments remained in his hand.

392. Oz was taken to the hospital by ambulance, and upon arrival he was taken to the trauma room. He was x-rayed and it was determined that a shot had broken his elbow. He was placed in a cast. While in the hospital he had an infection and endured fevers. He remained in the hospital for ten days.

393. After returning home he had significant problems with his hands; he was unable to move his fingers or hand. He underwent surgery removing nerve from his leg and transplanting it into his hand, and he remained in the hospital for eight days. Although the surgery improved his hand movement somewhat he has developed numbness in his leg. He was an exceptional soccer player, and he is unable to play this or any sports he used to play prior to the attack.

394. For over 10 months after the accident Oz required physical therapy five days each week.

395. He continues to have difficulty sleeping every night. He has nightmares and wakes up screaming. He will not travel unaccompanied.

396. Varda also has become very fearful. She and Oz do not go out at night. They do not even attend family events if they occur at night. Since the shooting Varda has not worked, for she must take Oz to and from school since he will not travel alone or on a bus.

397. As a result of the attack plaintiff Varda Guetta and Oz Joseph Guetta have suffered severe physical and mental anguish and extreme emotional distress.

398. Sara Guetta Kleitman is a citizen of the United States and of the State of Israel. She is a resident of the State of Florida. She is the daughter of Varda Guetta and the sister of Oz Joseph Guetta.

399. Sara first learned of the attack when her mother telephoned her. A neighbor brought Sara to the site of the attack and she accompanied her mother and brother to the hospital by ambulance. Sara experienced first-hand the extent of the injuries to her brother and witnessed the numerous bullet holes in her family's car.

400. In addition to watching her brother undergo surgeries and physical recovery from his injuries, Sara has painfully witnessed the psychological trauma that has affected her brother and radically altered his behavior and mental state. She has been unable to cope with the changes in her brother's behavior and no longer resides at home.

401. As a result of the attack, Sara Guetta Kleitman has experienced severe mental anguish and extreme emotional distress.


## THE BUS STOP SUICIDE BOMBING AT THE FRENCH HILL: JUNE 19, 2002

## The Mandelkorn Family

402. Rabbi Leonard Mandelkorn is a citizen of the United States and of the State of Israel. He is the father of Shaul Mandelkorn. Shaul Mandelkorn is a citizen of the State of Israel. Nurit Mandelkorn is a citizen of the State of Israel, and is the mother of Shaul Mandelkorn and the wife of Leonard Mandelkorn.

403. On June 19, 2002, Shaul Mandelkorn exited a bus after returning from a school trip to the Golan Heights. After he got off the bus he headed toward the bus stop just as a suicide bomber detonated his explosives.

404. As a result of the explosion, Shaul was thrown down and covered in blood and shrapnel. He sustained a serious injury to the artery of his right arm. He was hit by shrapnel over his left eye and sustained a hole in his right leg. He also suffered from hearing loss.

405. He was taken to the hospital and underwent operations to address his varied injuries. He also had surgery to determine if he had sustained internal injuries as a result of the blast and it was soon discovered that his lungs had been injured from the blast. Shaul gained consciousness two days after the attack. He underwent physical therapy and received special treatment for his lung injuries.

406. Doctors discovered blood in the retina of his left eye greatly limiting the eye's ability to function properly. He continues to be unable to focus accurately in that eye. Shaul remained in the hospital for 40 days. He continued physical therapy after being released.

407. Six months after the attack additional shrapnel was found in his right eye. He underwent high-risk surgery in that eye. Although the shrapnel was removed, it remains unclear whether or not difficulties will develop with that eye in the future.

408. More recently Shaul has begun remembering more about the attack, resulting in additional psychological trauma. He continues to receive therapy for the anxieties he experiences as a result of the attack.

409. Sometime after 8:00pm on the night of the attack Mrs. Mandelkorn informed Rabbi Mandelkorn that their neighbor's son was missing after the bombing. While assisting the neighbor, Rabbi Mandelkorn received word that Shaul's name had appeared on a list at the

hospital among those injured. Rabbi and Mrs. Mandelkorn drove to the hospital in Jerusalem where they learned that Shaul was in surgery. At that time they learned the extent of Shaul's injuries.

410.   As a result of the attack that injured their son, Rabbi Leonard Mandelkorn and Nurit Mandelkorn have experienced severe mental anguish and extreme emotional distress.

**The Kessler Family**

411.   Gila Sara Kessler was a citizen of the State of Israel.

412.   On June, 19, 2002, the 19-year old was waiting at the bus stop when the suicide bomber detonated his explosives. As a result of the explosion, Gila sustained severe damage to her brain. However, she was still breathing as she was placed in the ambulance to the hospital.

413.   Gila was pronounced dead upon arrival at the hospital, and despite the doctors' attempts to massage her heart, she never regained consciousness and died as a result of the attack.

414.   Plaintiff Ezra Kessler is the father of Gila Kessler and United States citizen and resident of New York.

415.   As a result of the death of his beloved daughter, plaintiff Ezra Kessler has suffered severe mental anguish and extreme emotional distress

416.   Plaintiff Chana B. Kessler is a citizen of the United States and a citizen and resident of the State of Israel. She is the 16-year old younger sister of Gila Sara Kessler.

417.   Plaintiff Fortouna Brigitte Kessler is a citizen and resident of the State of Israel. She is the mother of Gila Kessler, and the mother and legal guardian of Chana Kessler.

418. Earlier in the evening of the attack, Mrs. Kessler spoke with Gila and discussed her daughter's plans to come home later that evening. Mrs. Kessler was home at the time with Chana and her other children.

419. Prior to the attack, Gila telephoned her mother from the bus stop. Within a few minutes after the attack, Mrs. Kessler received a telephone call from one of Gila's friends, informing her of the attack, and inquiring as to Gila's whereabouts. Mrs. Kessler attempted to contact Gila, but there was no answer on her cell phone. Mrs. Kessler tried to contact Gila's employer at work, but received no information.

420. Eventually, Mrs. Kessler learned the hospital where Gila had been taken. She identified her daughter's body by looking at her hands, but was advised not to look at her daughter's face because of the disfigurement caused by the explosion. Gila's uncle and her employer also identified the body. Gila's identity was ultimately confirmed through a blood test.

421. As a result of the death of her beloved daughter, plaintiff Fortouna Brigitte Kessler has suffered severe mental anguish and extreme emotional distress

422. Plaintiff Shalom Kessler is a citizen of the State of Israel and is the brother of Gila Kessler. Plaintiff Klila Kessler is a citizen of the State of Israel and is the younger sister of Gila Kessler.

423. On the evening of the attack, Chana, Shalom and Klila were home with their mother. They knew there had been an attack, and were told their mother was going to the hospital to check on Gila's condition. When their mother returned, Mrs. Kessler informed their children that Gila had been killed in the attack.

424. As a result of the death of their sister, plaintiffs Chana Kessler, Shalom Kessler and Klila Kessler have suffered emotional pain and suffering, loss of companionship, comfort, advice and severe mental anguish and extreme emotional distress.

## THE JERUSALEM BOMBING OF JANUARY 27, 2002

### The Sokolow Family

425. Plaintiff Mark I. Sokolow and Rena M. Sokolow are United States citizens and residents of the State of New York.

426. They were vacationing in Israel where their oldest daughter was spending a year in school. On the last day of their trip, Sunday, January 27, 2002, the Sokolows together with their two younger daughters, Plaintiff Jamie A. Sokolow and Plaintiff Lauren M. Sokolow walked to a shoe store not far from their hotel. Upon existing the store, they were knocked to the ground by a bomb blast. Wafa Ali Khalil Idris, a female suicide bomber dispatched by the PLO had detonated her explosive belt. Ms. Idris was the first female suicide bomber of the Second Intifada.

427. According to the leading Palestinian newspaper *Al Quds* (March 1, 2002):

> "Senior officials in the Fatah Movement [PLO] have said that the Shahid Brigades of Al-Aqsa..." has recently created a woman's brigade, in order for women to take an active part in the war being fought in the Palestinian areas. The purpose of this brigade is to carry out attacks on the Israeli home front. The troop has been named "the brigade in honor of the Martyr Wafa Idris."

428. In addition to inspiring a popular song and a children's book published in Egypt, after the suicide bombing Wafa Idris became a household name within the Palestinian media and a perverse "feminist" icon and role model for future female terrorists. Wafa Idris's family received its payment from the Saudi Committee in the form of twenty thousand (20,000) Riyals converted into five thousand three hundred and sixteen dollars and sixteen cents

($5,316.16). The amount was paid to the family's Arab Bank account and designated with Receipt of Transfer No. 2195593712.

429. After the blast, Plaintiff Mark I. Sokolow gathered himself and began looking for his wife and children. Eventually, he walked to the nearby hospital where he was treated for shrapnel injuries and released the following day. As a result of the blast, Mr. Sokolow sustained damage to his eardrum and a loss of hearing. He had to have follow up surgery for a burst eardrum and still experiences ringing in his ears.

430. After the blast, Plaintiff Rena M. Sokolow gathered herself mentally and began looking around for her husband and children and saw instead, the severed head of Wafa Idris. Mrs. Sokolow could not move because of the severe injury to her leg and the agonizing pain. She was hospitalized for ten (10) days and required extensive surgery to be able to walk again. It took five months for Mrs. Sokolow to walk again and a year of physical therapy to regain partial movement in her leg. Rena Sokolow still cannot move her toes or ankle fully and experiences permanent nerve damage and numbness in parts of her leg.

431. Plaintiff Jamie A. Sokolow was twelve year old U.S. citizen at the time of the attack. She was hospitalized for a week with shrapnel wounds to her face and eye. Jamie sustained a torn iris and had surgery to remove glass from her eye. She also underwent plastic surgery to repair her face, but she still retains facial scarring from the blast.

432. Plaintiff Lauren M. Sokolow was a sixteen year old U.S. citizen at the time of the attack. She was hospitalized for three days with shrapnel wounds and burns and lost some of hearing as a result of a burst eardrum. Lauren also has permanent scars on her face and legs and had to have additional surgery to repair her hearing.

64

433. As a result of the attack plaintiffs Mark I. Sokolow, Rena M. Sokolow, Lauren M. Sokolow and Jamie A. Sokolow have suffered severe physical and mental anguish and extreme emotional distress.

434. Plaintiff Elana R. Sokolow is the daughter of Mark and Rena Sokolow and the sister of Jamie and Lauren Sokolow. As a result of the attack plaintiff Elana R. Sokolow has suffered severe mental anguish and extreme emotional distress.


## MURDER AT THE NATIONAL INSURANCE INSTITUTE: OCTOBER 30, 2000

### The Gilmore Family

435. On October 30, 2000, shortly after noon, a man entered the offices of the National Insurance Institute on Asfani Street in the heart of eastern Jerusalem. From close range, he fired a number of shots at the two security guards seated in the first floor waiting room, hitting them in the head, chest, and abdomen. The assailant then fled. The security guards received initial treatment from a doctor from an adjacent clinic before an ambulance arrived and rushed them to Hadassah-University Hospital, Ein Kerem. One of the security guards, Esh Kodesh Gilmore, a U.S. citizen, died almost immediately upon arrival at the hospital. His estate brings this action to recover for his wrongful death and his pain and suffering.

436. Plaintiffs Reuven Gilmore and Sheila Gilmore are the parents of Esh Kodesh Gilmore and the Administrators of the estate of their son's estate. Plaintiffs Reuven Gilmore and Sheila Gilmore are citizens of the United States and citizens and residents of the State of Israel. As a result of the death of their son, they have both suffered severe mental anguish and extreme emotional distress.

437. Plaintiff Inbal Gilmore Ratz is a citizen and resident of the State of Israel. She

learned of her husband's death from a phone call. As a result of the murder of her husband, Inbal lost material services, affection, companionship, consortium and the customary amenities of married life.

438. Plaintiff Talya Gilmore was a year and half old when her father was murdered. As a result of the terrorist attack and her father's murder, she will never have any memory of her father and has permanently lost the benefits of his companionship, comfort, protection, attention, advice and counsel for the balance of her life.

439. Plaintiffs Malkitzedek Gilmore, Tiferet Gilmore, Heftziba Gilmore, Eliana Gilmore and Dror Gilmore are the siblings of Esh Kodesh Gilmore and are all citizens of the United States and citizens and residents of the State of Israel. As a result of the attack, they have all suffered severe mental anguish and extreme emotional distress.

## THE BOMBING OF BUS NUMBER 19: JANUARY 29, 2004

### The Goldberg Family

440. On January 29, 2004 Ali Ja'ara, a member of the Al-Aksa Martyrs Brigades from the Aida refugee camp on the outskirts of Bethlehem blew himself up on a Jerusalem bus, killing 11 people and wounding 50 others.

441. Stuart Scott Goldberg, 41, a Canadian from Toronto was one of the fatalities. He is survived by his wife and seven children. Mr. Goldberg was a therapist who specialized in helping teens at risk and their families.

442. Plaintiff Karen Goldberg is a citizen of the United States and citizen and resident of the State of Israel. As a result of her husband's death she has lost material services, affection, companionship, consortium and the customary amenities of married life. As a result

of the attack, she has suffered severe mental anguish and extreme emotional distress.

443. As a result of the terrorist attack and their father's murder, Stuart and Karen's seven children, plaintiffs Chana Goldberg, Esther Goldberg, Yitzchak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Yaakov Moshe Goldberg and Tzvi Yehoshua Goldberg have permanently lost the benefits of his companionship, comfort, protection, attention, advice and counsel for the balance of their lives. As a result of the attack, they have all suffered severe mental anguish and extreme emotional distress.

## PASSOVER MASSACRE AT THE PARK HOTEL: MARCH 27, 2002

### The Rogen Family

444. On March 27, 2002 a HAMAS suicide bomber blew himself up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of Passover and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends. Thirty (30) people were murdered in the bombing, including Hannah Rogen, who was severely wounded. She died of her wounds six days later, on April 2, 2002. Mrs. Rogen was a Holocaust survivor who emigrated to the United States after World War II. She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

445. Mrs. Rogen was a U.S. citizen at the time of her death.

446. Plaintiff Greta Geler is the great niece of Mrs. Rogen and the Administrator of her estate.

### THE SHEFFIELD CLUB BOMBING OF MAY 7, 2002

447. On the night of May 7, 2002 a Palestinian suicide bomber entered the third floor

of a building in Rishon Letzion's new industrial area which housed the Sheffield Club an unlicensed social club and gambling parlor.

448.   Eyewitnesses reported that bomb blast propelled many of the victims through the club's windows and on to parked cars in the parking lot three floors below.

449.   Fifteen (15) people were killed by the attack including Esther Bablar, an American citizen who had returned to Israel after thirty (30) years to marry her childhood sweetheart, Yitzhak, who was also murdered in the attack. Esther Bablar died of her injuries the following morning. Mrs. Bablar was survived by three children.

**The Bablar Family**

450.   Plaintiffs Jacqueline Chambers and Levana Cohen Harooch are citizens of the United States and residents of the State of Florida.  They are the daughters of Esther Bablar.

451.   Plaintiff Jacqueline Chambers brings this action both individually and on behalf of the Estate of Esther Bablar.

452.   Mrs. Bablar had spent the month before the bombing in Florida with her youngest daughter, plaintiff Levana Cohen Harooch who had just given birth to Mrs. Bablar's grandchild and had been in New York visiting plaintiff Jacqueline Chambers the day before the attack.

453.   On the day of the attack, a member of the Bablar family in Israel contacted Esther Bablar's sister in New York and told her the bad news. Eventually both of Mrs. Bablar's daughters were notified and they quickly made arrangements to board a flight to Israel with their aunt and uncle.

454. As a result of the terrorist attack, plaintiffs Jacqueline Chambers and Levana Cohen Harooch have experienced emotional pain and suffering, the loss of their mother's

society, companionship, comfort, protection, attention, advice and counsel.

## PATT JUNCTION BUS # 32A BOMBING: JUNE 18, 2002

### The Aluf Family

455.  At approximately 7:50 a.m. on June 18, 2002, a HAMAS terrorist named Mohammed al-Ghoul boarded bus number 32A from the Gilo neighborhood of Jerusalem and almost immediately detonated the large bomb which he carried in a bag stuffed with ball bearings. The blast destroyed the front half of the bus, packed with people on their way to work and a group of schoolchildren. HAMAS claimed responsibility for the attack and identified the bomber, Mohammed al-Ghoul as an Islamic law student at An-Najah University. His father later told the British Broadcasting Company that his son was "a quiet person and very polite - but God chose him for that act. God will put him in paradise."

456.  Plaintiff Gila Aluf is a U.S. citizen and a citizen and resident of the State of Israel. Her husband, Boaz Aluf, a citizen of the State of Israel, was going to work in the computer department of Jerusalem's Bank Tefahot when Muhamed al-Ral blew himself up on the morning of June 18, 2002, killing Boaz Aluf.

457.  Gila and Boaz Aluf have five children, plaintiff Yifat Aluf, Uri Aluf, Tamar Aluf, Barak Aluf and Ruth Aluf – all of whom are Israeli citizens.

458.  As a result of the terrorist attack that murdered Boaz Aluf, plaintiff Gila Aluf has lost the material services, affection, companionship, consortium and the customary amenities of married life and has suffered severe mental anguish and extreme emotional distress. Plaintiffs Yifat Aluf, Uri Aluf, Tamar Aluf, Barak Aluf and Ruth Aluf have suffered severe mental anguish and extreme emotional distress.

69

**B.**    **The Defendant**

459.  Defendant Arab Bank is Jordanian bank with headquarters in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange.  Arab Bank is majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company.  Arab Bank and Arab Bank Group constitute a single Jordanian banking institution.  Arab Bank owns, controls and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority controlled territories and a wholly owned branch office located at 520 Madison Avenue, New York, New York, that is regulated by the Controller of the Currency of the United States Treasury Department.  Arab Bank conducts business in, and is registered to conduct business under, the laws of the state of New York.

460.  Arab Bank has operated its federally chartered branch in New York since 1983.  The New York branch is designated as a wholesale bank, and among the banking and financial services that it conducts in New York is the provision of clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also owned and/or controlled by the Arab Bank Group as well as other foreign banks.

461.  Arab Bank and Arab Bank Group are majority owned and/or controlled by members of the Shoman family, including Abdul Majeed A.H. Shoman, who is the Chairman of Arab Bank and Arab Bank Group, Abdel Hamid A.M. Shoman, who is Deputy Chairman and Chief Executive Officer of Arab Bank and Arab Bank Group.

## FACTUAL ALLEGATIONS

### The Al Aqsa Intifada or Intifada Al Quds

462.  Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terror organizations launched a broad-based terror campaign against the State of Israel at the end of September 2000.

463.  This explosion of violence was widely termed the so-called *Al Aqsa Intifada* or *Intifada Al Quds* (Hereinafter: "Second Intifada").

464.  This Second Intifada was both qualitatively and quantitatively different from prior waves of Palestinian terrorism.

465.  Whereas the total number of attacks from 1993-2000 totaled less than 1,000, since September 2000 various Palestinian terrorists have attempted approximately 23,000 attacks, which have claimed more than 8,000 casualties, including over 1,000 civilian deaths. These indiscriminate acts of violence have likewise resulted in the deaths of at least 30 U.S. citizens and caused serious bodily injury to scores of others.

466.  The preferred method of mass murder used by Palestinian terrorist groups is the suicide bombing which involves an individual carrying an explosive device which he or she detonates in a bus, restaurant or other crowded public gathering place.

467.  The device is typically packed with nails, bolts and ball bearings, which, when detonated, lodge themselves deep within the bodies of those unfortunate individuals who happen to be inside the blast radius, causing cruel and horrific injuries. The suicide bomber is thereby regarded as a "martyr" (or "Shahid" in Arabic) by the terrorist groups and their sympathizers.

468.  In fact, because many suicide bombers are stopped and killed before they can

71

successfully detonate their explosive charges and others have died as a result of premature or accidental detonations, the term "martyr" has generally been used by these organizations to include both suicide bombers and all others killed in the course of attempts to commit acts of violence against Israeli or Western targets.

469. The objectives of the Al Aqsa Intifada terror campaign include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli government by compelling Israel to withdraw from territory it presently controls.

470. The eruption of the Al Aqsa Intifada in late September 2000 changed the dynamics of Palestinian terrorism in four material respects:

A. The Second Intifada, from its inception, was marked by a massive escalation of violence, which quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.

B. The unrestrained violence of the Second Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.

C. The main rival terrorist groups began cooperating and coordinating their activities.

D. The Second Intifada coalesced Saudi financial support for HAMAS into a more ambitious and more formal structure through the formation of the Saudi Committee in Support of the Intifada Al Quds.

**The Primary Palestinian Terrorist Groups**

471. Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Palestinian Islamic Jihad (the "PIJ") and the Islamic Resistance Movement ("HAMAS"). PIJ and HAMAS are both primarily radical Islamist terrorist organizations that are committed to the globalization of Islam through violent "Jihad" or holy

war.

472. Both groups are formally committed to the destruction of the State of Israel and to achieving their objectives by violent means, including acts of terrorism. The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

473. In addition, the nominal proto-government within Palestinian-controlled territory known as the Palestinian Authority ("PA") operates several paramilitary organizations through its political organization, the Palestinian Liberation Organization ("PLO"). Through the PLO's various permutations, including its "security services", the Palestinian Authority has competed with PIJ and HAMAS to commit terrorist attacks against civilian targets in Israel, including attacks that have killed and injured United States citizens including Shayna Gould, Shoshana Zelcer and Shmuel Waldman.

**The Palestinian Islamic Jihad**

474. The PIJ knowingly, willfully, and unlawfully combines, conspires, confederates, and agrees together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

475. For example, the organization has committed numerous terrorist attacks, including several that have killed and injured American citizens. Since September 2000, the PIJ has conducted and taken credit for at least 28 murderous attacks, including at least seven mass murder atatcks that have killed at least ninety five (95) civilians, including U.S. citizens such as Shoshana Ben-Yishai.

73

476. On October 8, 1997, the PIJ was designated as a Foreign Terrorist Organization by the U.S. government under the AEDPA. The designation has since been renewed every two years, including in 2003.

## The Islamic Resistance Movement (HAMAS)

477. HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement, which was founded in December 1987.

478. The organization is nominally divided into two separate wings, the political wing which supports the so-called "Dawa" (its social service or humanitarian component) and the paramilitary wing known as the Izz-el-Din al Qassam Brigades. Although these two components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole.

479. HAMAS' social services are, in large part, administered by local "zakat," committees and other charitable organizations ("Zakat" means charity in Arabic). These committees and organizations are controlled by HAMAS by, inter alia, HAMAS members, operatives and activists sitting as members of their governing committees.

480. Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of monies collected externally under charitable and humanitarian banners are routed for HAMAS' military and other operational uses, in addition to being used to free up other funds for specific terrorists acts. HAMAS uses such funds for, among other things, the provision of weapons, explosives, transportation services, safehouses, training and salaries for its terrorist operatives and for terrorist recruiters.

481. Like PIJ, HAMAS is a foreign organization dedicated to radical Islamist principles

74

and the destruction of the State of Israel. It also uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people.

482.   HAMAS knowingly, willfully, and unlawfully combines, conspires, confederates and agrees to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 1331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

483.   On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act (the "INA") and the AEDPA. The formal designation has been renewed every two years since 1997, including a renewal in August 2003.

484.   Since September 2000, HAMAS has launched hundreds of attacks targeting civilians that have resulted in the deaths and injury of hundreds of individuals, including over twenty (20) mass murders that have killed more than three hundred and seventy (370) civilians, including numerous American citizens. HAMAS has claimed responsibility for the attacks that killed Janis R. Coulter, Benjamin Blutstein, Diane Carter, David Gritz, Judith Greenbaum, Hannah Rogen, Alan Beer and several other plaintiffs in this action.

## The Al Aqsa Martyrs Brigade and Other PLO Militia

485.   The PA and PLO controlled terrorist groups include, the Tanzim, Popular Front for the Liberation of Palestine ("PFLP") and the Al Aqsa Martyrs Brigade ("AAMB").

486. Tanzim is the armed component of Fatah, which is one of the constituent political groups of the PLO. AAMB is a nom de guerre used by cells of the Tanzim.

487. The PFLP is another constituent group of the PLO, which conducts both its terrorist activities and its political activities in its own name.

488. While these groups are organizationally part of the PLO, their weapons, training and funding is provided by the PA, and many of their members serve in PA security and intelligence forces. The groups carry out terrorist attacks pursuant to the instructions of both the PLO and the PA.

489. Tanzim, PLFP and AAMB's political lineage is therefore secular and not Islamist in orientation, but since at least September 2000 these PLO and PA controlled groups have adopted both the religious rhetoric of their radical Islamist counterparts and their murderous tactics.

490. The Al Aqsa Martyrs Brigade emerged at the outset of the Second Intifada. AAMB knowingly, willfully, and unlawfully combines, conspires, confederates and agrees together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

491. For example, the organization has committed numerous terrorist attacks, including several that have killed and injured Americans citizens. Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately a hundred others and a string of other attacks that have killed more than 70 civilians and

wounded more than five hundred (500) others, including U.S. citizens such as plaintiff Yonatan Bauer.

492.    On March 21, 2002, the Secretary of State of the United States officially designated AAMB as a Foreign Terrorist Organization pursuant to Section 219 of the INA and the AEDPA.

## The Conspiracy to Finance Palestinian Terrorism

### The Shoman Family

493.    In 1984, the Shoman family that owns and controls Arab Bank Plc published a biography of Mr. Abdulhameed Shoman (the bank's founder) entitled, The Indomitable Arab in which he consistently set forth his antipathy towards Jews, Zionists and the State of Israel. He also clearly describes his abhorrence for the United States, which he claimed to have once admired, but then loathed because of its support for Israel.

494.    Prior to the establishment of Arab Bank, its founder Abdulhameed Shoman described his great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy.  In his biography he is quoted as saying that "…within a few years Zionism will have grown strong enough to control the entire economy.  I believe that all business dealings with the Jews – buying, selling or banking transactions – are damaging to our country's best interests."

495.    In his final speech before four hundred employees of Arab Bank, Mr. Shoman also explained his hatred for Americans that had developed over the years:

> I liked the Americans. I once bore their nationality, and gathered my fortune in their country. But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them. It was not the Jews, but the Americans, who fought us.

496.  Mr. Shoman's son, Abd Majeed Shoman is presently the chairman of the Arab Bank and a vocal supporter of the Second Intifada.

497.  He is, for example, the chairman of the Popular Committee in Support of the Palestinian Intifada which was established during the first Intifada in 1987-1988. The Committee managed to raise approximately eight millions Jordanian Dinar (JOD 8,000,000) or approximately $11,000,000 for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's family and 300 JOD ($425) to each Palestinian injured in the violence. From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the martyrs' families of the first Intifada.

498.  At an October, 2000 meeting , the committee's chairman, Mr. Abd Majeed Shoman, and the its other members discussed the need for a new mechanism to distribute the new donations to the Second Intifada which had not yet been transferred to the martyrs' families and the injured of the Intifada as of that date.

499.  They decided to bestow financial support to the martyrs' families on the same terms as before and to call upon the Jordanian government to make the donations tax-exempt. The committee's chairman, Abd Majeed Shoman, the Chairman of the Arab Bank, opened the meeting saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it. There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman]. The Welfare Association received donations and it has funds. I received phone calls and donations from benevolent people and the Arab Bank's board and bank's employees decided to donate 5% from October's salaries [for the Intifada]. In spite of the fact that donations were collected and are available nothing was transferred to anybody. It is our duty to act and therefore I summoned this meeting to hear from you.

500.  Mr. Shoman objected to locating the committee's office in the Arab Bank's Amman headquarters building but he left open the possibility of "loaning" an accountant to

the committee.

501.  Ultimately, it was decided that the committee's office would be located in the Amman Chamber of Industry headquarters where it in fact opened on November 1, 2000.

502.  As referenced by Mr. Shoman in his speech, on or about October 7, 2000, the Arab Bank announced that it would bestow financial donations to Palestinians injured during the Second Intifada. Its employees donated 5% of their monthly salary (for the month) to the Palestinian cause.

503.  All of this activity was conducted publicly in Jordan.


### The Saudi Committee in Support of the Intifada Al Quds

504.  Similarly, on or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia.

505.  According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."

506.  The Saudi Committee also established a website to promote its activities.

507.  The website has since been revamped and the committee's name has been sanitized on the English language version of the website.

508.  However, even the sanitized Arabic version of the website continues to state that the committee's activities include: "support of the families of martyrs and wounded, as well as the handicapped, orphans and prisoners, as well as homeowners whose houses were destroyed and landowners whose land was bulldozed, as well as support of a number of

Palestinian social institutions and sponsorship of needy families ..."

509.  In practice, the Saudi Committee constitutes a professional fundraising apparatus intended to subsidize the Intifada Al Quds, i.e., to subsidize the Palestinian terror campaign and to bankroll HAMAS and the PIJ and their related front organizations in the West Bank and Gaza.  These goals are accomplished in two ways, both of which depend on the knowing participation and substantial assistance of the defendant Arab Bank.

510.  The first goal is accomplished by providing a comprehensive insurance benefit of $5,316.06 for the families of Palestinian terrorists such as Izz Ad-Din Suhail Ahmad Al-Masri who murdered Judith Greenbaum, put JoAnne Nachenberg into a permanent vegetative state as well as "martyrs" like Hatem Yaqin Ayesh Al-Sheweikeh who murdered sixteen year old Shoshana Ben-Yishai and guaranteeing universal terrorist death and dismemberment insurance coverage to terrorists and their beneficiaries whenever a terrorist is killed.

511.  Lesser benefits are also provided if the terrorist is injured either by Israeli security forces or captured as a result of his or her criminal conduct.

512.  The Saudi Committee has provided millions of dollars as benefits to the families of the so-called "martyrs," i.e., the families of suicide bombers, and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts, and to the families of Palestinians wounded during violent confrontations with Israel's security forces, as well those activists held in Israeli custody.  This type of support is critical to HAMAS' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure solidifying HAMAS's position within Palestinian society.

513.  Moreover, the insurance benefit not only provides universal terrorist death and dismemberment insurance coverage for specific members of preferred terrorist organizations

80

such as HAMAS, but is intended as universal terrorist death and dismemberment insurance coverage available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding <u>all</u> terrorists in Israel and eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations. Thus, the family of Shoshana Ben Yishai's murderer received payment notwithstanding his affiliation with PIJ. The family of Wafa Ali Khalil Idris was compensated for blowing up bystanders on a Jerusalem street, including four members of the Sokolow family from New York notwithstanding her being dispatched by the PLO.

514. Defendant Arab Bank administers the comprehensive terrorist death and dismemberment insurance scheme by receiving, transmitting and distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage."

515. Arab Bank actively participates in a formalized process which requires the families of so-called martyrs to obtain an official certification of their deceased relative's status as a bona fide martyr, replete with an individualized identification number.

516. Arab Bank, in turn, is provided relatively detailed lists consisting of the names of the martyrs, personal information and details concerning the date and manner of death and other information provided to it by the Saudi Committee and representatives of the leading terrorist groups via their charitable front organizations.

517. Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible under this universal terrorist death and dismemberment insurance plan, receives the funds for the plan, and opens a dollar account for each beneficiary. Every Palestinian family eligible under this universal

81

terrorist death and dismemberment insurance coverage plan is encouraged to collect the terrorism benefits through a local branch of the Arab Bank in the West Bank or Gaza.

518. If they choose to collect the insurance benefit, the families are required to present to the bank an "official" certification from the Palestinian Authority (replete with a unique identification number) establishing the bona fides of the martyr.

519. If the documentation proves satisfactory and the designated family member presents satisfactory photo identification, Arab Bank issues a receipt to the designated recipient of the martyrdom insurance benefit. For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001 on behalf of HAMAS. He was designated Palestinian Authority Martyr No. 449. His father, Hussien Mohamed Farah Tawil, presented the "official" certification to the defendant Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

520. The conspiracy between Arab Bank, the Saudi Committee and HAMAS and others is ultimately designed to provide substantial material support to Palestinian terrorist organizations and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance." Arab Bank knew, and knows, that the purpose of the conspiracy and acts taken pursuant thereto is to encourage others to engage in terrorist activities, and to support the continued commission of terrorist activities.

521. Arab Bank was and is aware of the methods and means by which HAMAS, PIJ and other Foreign Terrorist Organizations seek to carry out their objectives.

522. In fact, Arab Bank's own support and commitment to the violent goals of its co-conspirators are embodied by the personal commitment of Arab Bank's founder, Abdul

82

Hamid Shoman  and its present chairman, Abdul Majeed Shoman.

523.  Thus on November 22, 2000, Arab businessmen, held a meeting with Yassir
Arafat, at which time a new entity was formed, the Fund for Support of the Persistence of the
Palestinian People to further bankroll the Palestinian Authority and the Second Intifada.

524.  Defendant Arab Bank pledged $2,000,000.00.

525.  Mr. Shoman pledged $500,000.00, personally.

526.  The Shoman family's altruism towards the Second Intifada continued in June of
2001 when the Cultural Center of the Abdul Hamid Shoman Institute launched an exhibition
on the subject of "the martyrs of the Palestinian Intifada" The stated purpose of the exhibit
was to "honor to the martyrs of the blessed al-Aqsa intifada" by means of conveying the
human and spirited image of their lives. The exhibit featured presentations of the martyrs'
personal belongings that had been collected, such as clothing and "tools" they used, along
with a introduction to their lives and deeds until the day of their 'martyrdom'.

527.  Accordingly, the Bank's financial and ideological support for the Second Intifada
is a matter of public record and its participation in diligently implementing the universal
terrorist death and dismemberment insurance scheme is knowing and deliberate.

528.  Defendant Arab Bank knowingly, willingly and substantially assists in the
recruitment of terrorists.

529.  Any person who chooses to participate in a suicide bombing or other terrorist
attack does so secure in the knowledge that if he or she is killed in that attack, the financial
needs of his or her family will be more than met for some time.

530.  All of the families of all of the terrorists who killed or injured the plaintiffs in this
action were eligible to receive the terrorist death and dismemberment insurance payments

outlined above and administered by Arab Bank.

531. This is equally true of the families of terrorists who were injured or apprehended.

532. In short, the Saudi Committee raises funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocates payments to defendant Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists.

533. The terrorist organizations, through their charitable fronts, collect data on their own operatives as well as all other terrorists killed, injured or in Israeli custody and transmit the information to the Saudi Committee and defendant Arab Bank.

534. Through the program administered by Arab Bank, the Saudi Committee paid and transmitted death benefits to at least approximately 200 fallen "martyrs" in the first year of its existence alone. As of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries. According to Arab Bank's Chief Banking Officer, Shukry Bishara, Arab Bank has transmitted $90,000,000.00 to Palestine on behalf of the Saudi Committee to "institutions and individuals alike."

535. In fact, Arab Bank serves as the exclusive administrator for the Saudi Committee's universal terrorist death and dismemberment insurance plan for Palestinian terrorists and their families.

536. Indeed, in its original website, the Saudi Committee openly declared that its funds were transmitted and distributed to the families of martyrs through local branches of the Arab Bank in Palestine. Although it has since been removed from the internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

537. Item number ten (10) on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine."

538. The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

539. Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 11, 2001, the Saudi Committee identifies payments made to Palestinian prisoners as well as Palestinian "martyrs." Notably, Table 4, Column 10 of the report helpfully identifies the cause of death for each martyr.

540. For example, Musa Abd al-Qadir Ghanimat, the HAMAS operative who perpetrated a suicide attack at the Apropo restaurant in Tel Aviv is listed as an illustrative martyr.

541. Accordingly, the terrorist death and dismemberment insurance plan includes the families of suicide bombers and the defendant Arab Bank and its senior management possess knowledge of this fact.

542. Defendant Arab Bank provides a convenient means for transmitting and distributing this universal terrorist death and dismemberment insurance coverage plan across Palestinian controlled territories that would be far more difficult if attempted by other means such as courier. Israeli territory separates Gaza from the West Bank and Israeli military checkpoints often separate one Palestinian city from another.

543. Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign.

544. Arab Bank knows the criminal purpose that the accounts it opens and maintains for

the Saudi Committee are intended to serve.

545. The Saudi Committee and local HAMAS charitable front organizations have publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which are known to or should be known to Arab Bank and all of which are calculated to – and do – reach terrorists and potential terrorists. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Second Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein to go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 ...."

546. Since the Saudi Committee raises its funds in Saudi currency, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds are primarily converted into U.S. dollars through the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank. Arab Bank's role is material and essential to the furtherance of the criminal conspiracy in two (2) important respects.

547. First, Arab Bank provides both professionalism and transparency to the

process thereby reassuring wealthy Saudi and Gulf State donors that the money they are contributing will not be siphoned off by corrupt officials, but will in fact reach the families of terrorists as intended.

548. Second, Arab Bank, through its network of local branches in the West Bank and Gaza, provides an ideal distribution system that offers both convenience to the families of the terrorists who are able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier and the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

549. By knowingly and actively participating in this process, Arab Bank and its co-conspirators, the Saudi Committee and others, have knowingly aided and abetted each and every terrorist act committed by Palestinian terrorists since the formation of the Saudi Committee's universal terrorism death and dismemberment insurance coverage scheme in October 2000 in violation of 18 U.S.C. § 2332, 18 U.S.C. § 2339A, 18 U.S.C. § 2339B and 18 U.S.C. § 2339C and common law torts of aiding and abetting, conspiracy and intentional infliction of emotional distress. Arab Bank has knowingly participated in the process for the purpose of supporting and providing financial assistance to terrorists, including, but not limited to HAMAS and other designated Foreign Terrorist Organizations, agents of HAMAS and other HAMAS controlled organizations, families of HAMAS operatives and the families of other terrorists.

**Defendant Arab Bank Provides Material Support To Foreign Terrorist Organizations**

**1. The Middle East**

550. Both HAMAS and the PIJ raise funds to support their terrorist acts through charitable front organizations which they control.

551. Arab Bank knowingly provides banking services to these charitable committees and affirmatively assists them in collecting, receiving, transmitting and distributing funds to support the Second Intifada terror campaign.

552. Arab Bank knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut which collects funds directly in the name of HAMAS, and through charitable front organizations controlled by HAMAS which Arab Bank affirmatively assists in distributing funds to support the terror campaign.

553. The United States Department of Justice has, for example, identified the website: www.palestine-info.com as the "official" website of HAMAS[2]. The website itself solicits funds and asks contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at the Arab Bank in Beirut, but it also asks donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

554. This request is necessary because Account # 3-810-622473-0330 is one of the few accounts that Arab Bank operates on behalf of HAMAS and which HAMAS controls and maintains directly.[3]

555. To assist it in carrying out its terrorist activities, HAMAS has established numerous front organizations, including, but not limited to:

        i.  Al-Ansar Charity;

        ii.  Ramallah Charitable Committee;

        iii.  Tulkarem Charitable Committee;

        iv.  the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya;

2 The website has since migrated to a new "URL" and can be found at www.palestine-info.info
3 According to the defendant, since the filing of the initial related case of *Linde v. Arab Bank Plc* in July of 2004, the bank has investigated this allegation and has since closed the account, frozen its funds and "reported it to the appropriate authorities."

     v.   Al Mujama Al-Islami;

     vi.   Nablus Charitable Committee;

     vii.   Jenin Charitable Committee;

     viii.   Islamic Charity Society of Hebron;

     ix.   Islamic Charitable Society Al-Bireh; and

     x.   Al Islah Charitable Society

556.  Arab Bank provides direct financial services to Al-Ansar Charity, Ramallah Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya, Nablus Charitable Committee, Al Mujama Al-Islami, Jenin Charitable Committee, Islamic Charitable Society Al-Bireh and Al Islah Charitable Society.

557.  The Tulkarem Charitable Committee, Nablus Charitable Committee, Ramallah Charitable Committee, Jenin Charitable Committee and Islamic Charity Society of Hebron have all been identified by United States Department of Justice as HAMAS front organizations and the management of each of these "charities" is in fact controlled by HAMAS operatives.

558.  The Tulkarem, Ramallah and Jenin Charitable Committees and Islamic Charity Society of Hebron were all designated as "Unlawful Organizations" by the government of Israel in February 2002 because of their connection to HAMAS.

559.  Arab Bank provides financial services to agents of HAMAS through the following accounts in the West Bank and Gaza Strip:

     (1)   Tulkarem Charity Committee a/k/a Lajna Zakat Tulkarem
         Account No. 9070-500010-6-510.
     (2)   Tulkarem Charity Committee
         Account No. 510/0/500010/970.
     (3)   Tulkarem Charity Committee (Jordanian Dinar)

Account No. 500/0/106500.

(4)   Tulkarem Charity Committee (Euro Account)
      Account No. 500010-6/596. See, Exhibit L.
(5)   Charity Committee of Ramallah a/k/a  Ramallah Zakat
      Committee. Account No.510/0/610686
(6)   Charity Committee of Ramallah
      Account No. 510/0/610686-9030
(7)   Charity Committee of Ramallah
      Account No. 510/2/610686
(8)   Nablus Zakat Committee
      Account No. 500/0/400336-0193
(9)   Islamic Charitable Society Al-Bireh
      Account No. 510/7/602835
(10)  Al-Mujama al-Islami
      6-5/500
(11)  Al-Mujama al-Islami
      6-0/510
(12)  Islamic Charity Society of Hebron
      Account No. 510/0/9040-750049
(13)  Islamic Charity Society of Hebron
      Account No. 510/2/9030- 610686

560. The PIJ has established numerous front organizations, including:

   i.  Al-Ihsan Charitable Society;

   ii. Dar al-Huda Society and

   iii. Islamic An-Naqqa Society for Women, Bethlehem.

561. Arab Bank provides direct financial services to Al-Ihsan Charitable Society and knowingly maintains accounts for Dar al-Huda Society in US Dollars, Israeli Shekel and Jordanian Dinar.

562. Arab Bank has also provided financial services to the PLO's al-Aqsa Martyrs Brigades. For example, Munir al-Maqdah, also known as Abu Hasan, transferred between $40,000 and $50,000 for weapons, expenses, and bomb-making materials to the Arab Bank account of Nasser Aweis, a senior Fatah operative and instructed him to report back by telephone on the success of his attacks, such as the January 17, 2002 assault on the Hadera

90

banquet hall that resulted in the death of plaintiff Aharon Ben-Yisrael Ellis. Arab Bank is

generally aware that it provides financial services to the PLO's al-Aqsa Martyrs Brigades and

its operatives as well as other PLO controlled terrorist cells.

563. The terrorist affiliations of the various charitable front organizations is hardly

clandestine nor are there activities unknown to the management of Arab Bank. For example,

the HAMAS charitable front, Al-Ansar Charity maintains a website proclaiming that:

> Al-Ansar Society opens its doors to the families of the martyrs who intend
> to register their dead who, with their splendid blood, saturated pure
> Palestine and drew the lines of liberty and the coming dawn. The Al-
> Ansar Society is following in their footsteps and shares in the sorrow and
> the hopes of the families of the martyrs and their relatives.

564. The website further boasts that it has given money to Palestinians whom were

wounded, incarcerated or killed during the Second Intifada, including $6,000.00 to the family

of Iz Aldin (also spelled: "Azzadin") Al Masri, the suicide bomber who massacred 15 people,

including 7 children. Al Masri also murdered and maimed several Americans including Judith

Greenbaum and JoAnne Nachenberg at the Sbarro pizzeria in downtown Jerusalem on August

9, 2001.

565. The website of Al-Ansar helpfully explains that:

> The Director General of the Al-Ansar Charitable Society and
> the person in charge of the portfolio for the care of the
> martyrs at the Society's website said that the Society has
> furnished the management of the Arab Bank with lists of
> names of the martyrs and the families of the entitled
> beneficiaries, in order to pay the monies to which the martyrs
> are entitled.

566. Al-Ansar maintains an account with the Arab Bank in Gaza.

### 2. Europe

567. Arab Bank provides financial services to agents of HAMAS by maintaining bank

accounts for the following **designated Foreign Terrorist Organizations affiliated with HAMAS**:

> (1) The Association de Secours Palestinien (ASP) –Arab Bank, Zurich
>
> (2) Commite de Bienfaisance et de Secours aux Palestiniens (CBSP) – Arab Bank, Paris
>
> (3) Palestinian Association in Austria – Arab Bank, Paris

### 3. New York

568.  Defendant Arab Bank has also knowingly laundered funds for the Holy Land Foundation For Relief and Development ("HLF"), a Texas based "charity" which has raised funds in the United States for HAMAS for more than a decade. Arab Bank, in turn, channeled tens of thousands of dollars for HLF through its New York branch to the Ramallah Charitable Committee, the Tulkarem Charity Committee and the Charitable Society of Hebron, all agents of HAMAS.

569.  On March 15, 1996, a feature article in The New York Times detailed the financing of HAMAS by so-called charitable organizations. The article specifically discussed Israeli government claims that HLF was a "key fundraising operation" for HAMAS.

570.  On May 6, 1997, the government of Israel designated HLF as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …."

571.  Arab Bank nonetheless claims to have a "highly professional relationship" with Israeli authorities.

572.  On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations. HLF's Gaza office was one of the entities

(temporarily) closed by the Palestinian Authority. The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a Jerusalem Post news account on September 28, 1997.

573. HLF and its officers have been criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated Foreign Terrorist Organization (HAMAS) – including for specific transactions involving payments made by HLF to the Ramallah Charitable Committee, Tulkarem Charitable Committee, and the Islamic Charity Society of Hebron.

574. The indictment specifies particular financial transactions initiated by HLF which resulted in monetary transfers to the Ramallah Charitable Committee, Tulkarem Charitable Committee, and the Islamic Charity Society of Hebron which violate 18 U.S.C. §2339B.

575. On January 10, 2001 a federal district court in Illinois rendered a decision declining to grant a motion to dismiss in a case initiated by the parents of David Boim, who was killed by a HAMAS terrorist in 1997. The Boims had sued, among others, HLF, for providing material support to HAMAS, a designated Foreign Terrorist Organization.

576. Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front even after the *Boim* case placed the defendant on further notice of HLF's criminal activities.

577. Similarly, the New York branch of the Arab Bank has facilitated the transfer of significant sums to the Tulkarem Charitable Committee and other agents of HAMAS despite the fact that in some cases both the "donor" of the funds as well as the recipient had been previously formally designated as "Unlawful Organizations" by the government of Israel.4

---

4 One of the signatories on the Tulkarem Charitable Committee account is Ammar Tawfiq Ahmad Badawi, a prominent member of the Muslim Scholars Association who was a signatory on the infamous *Fatwa* -- or Islamic

578.  Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to HAMAS and the Islamist movement.

579.  Nonetheless, Arab Bank and its New York branch continue to convert substantial sums of money and forward tens of thousands of dollars from New York to the Tulkarem account of the Tulkarem Charitable Committee at the Arab Bank and to other known HAMAS fronts.

### Cultivation of the Culture of Death

580.  The charitable front organizations play a central role in financing the terror campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for terrorist organizations.

581.  As set forth in an internal HAMAS memorandum recently captured by the Israeli army during a raid of the offices of the Hebron Charitable Committee, HAMAS has arranged for the "transfer [of] large sums" to the charitable committee and other HAMAS front organizations through the "charity activities" of their operatives abroad.

582.  The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that the HAMAS will:

> invest efforts to transfer money for the martyrs (the shahids) and prisoners, via the transfer [to] charitable institutions. This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in

religious ruling – declaring that suicide bombings are permitted by Islamic law. Mr. Badawi is a leading figure in HAMAS.

the level of the movement's performance.

583. The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its front organizations by, among other things, *"taking advantage of the conditions and the atmosphere of death."*

584. The financial support provided by the Saudi Committee via the Arab Bank as well as the accounts maintained by the terror organizations' charitable fronts constitutes the backbone of the donor base and operational budgets of HAMAS and the PIJ, and has allowed them to expand their operations, attract more recruits, and professionalize their financial distribution channels.

585. Each of these front organizations officially holds itself out to the public as a charitable organization with a purely humanitarian and benign purpose. In fact, however, the primary mission of these organizations is to raise and launder funds for terrorist organizations and otherwise to coordinate and conduct activities that are essential to the conduct of terrorist operations and to the material support of terrorist operations.

586. Funds raised by the charitable front organizations are fungible and are allocated in part to terrorist activities or used to free up other funds that are then allocated for terrorist activities.

587. In addition to the Saudi Committee's universal terrorist death and dismemberment insurance coverage plan, contributions from individual and corporate sponsors abroad are primarily made to the charitable front organizations. The front organizations make those contributions available to HAMAS and the PIJ in accordance with the instruction of their leaders. These organizations then disburse a percentage of the funds they receive from their front organizations to purchase weapons and explosive materials, to recruit and train

operatives and otherwise to plan and carry out terrorist attacks.

588. By knowingly providing banking and administrative services to charitable front organizations that are controlled and directed by designated Foreign Terrorist Organizations, including collecting, transferring and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted HAMAS and the PIJ in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2332 and has committed numerous overt acts in furtherance of the conspiracy.

589. Indeed, had the doors of Arab Bank not been opened to HAMAS or the PIJ during the past fourf years, the leaders of these terrorist organizations would have had to make far more onerous arrangements for transfer of foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER AND SERIOUS BODILY INJURIES TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c)  AND 18 U.S.C. § 2333(a)

590. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

591. Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involve violence or are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily

injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

592.   The acts of the Palestinian terrorists in killing, and attempting to kill U.S. nationals and other persons were and are intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.

593.   The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

594.   The extraordinary financial and administrative services that Arab Bank has provided to the terrorists and their families, and to HAMAS, the PIJ and AAMB, including administering universal terrorist death and dismemberment insurance coverage to the families of suicide bombers and other terrorists, provides substantial assistance to HAMAS, the PIJ and AAMB and others in recruiting and incentivizing suicide bombers and other terrorists and because money is fungible, in freeing up funds for use in military operations and the commission of violent acts resulting in death and injury, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the plaintiffs.

595.   The defendant Arab Bank knows that it is providing material support for acts of international terrorism, as is evidenced by its close contact with the Saudi Committee and its coordination of the payment schedules and lists of martyrs, and the repeated public advertisement of the activities of the Saudi Committee in various Palestinian newspapers as set forth above.

596. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

597. Throughout the period in which it has provided these extraordinary financial and administrative services to HAMAS, the PIJ, AAMB and to individual terrorists and their families, the Arab Bank knew that the charitable front organizations of the terrorist organizations have played a major role in raising funds for HAMAS and the PIJ, which have committed numerous criminal acts including suicide bombings intended to intimidate and coerce the civilian population of Israel and to influence the policy of the Israeli Government.

598. Throughout the period in which it has been involved in activities assisting the PIJ, HAMAS and AAMB and individual terrorists and their families, Arab Bank knew that those activities have substantially assisted and encouraged dangerous and criminal acts set forth herein.

599. By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

### CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333(a)

600.  Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

601.  Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involved murder or attempted murder in violation of the criminal laws of the United States, including the prohibition on killing or attempting to kill U.S. citizens as set forth in 18 U.S.C. § 2332.

602.  The acts of the Palestinian terrorists in killing or attempting to kill U.S. citizens and other persons were intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.

603.  The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within the close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

604.  Arab Bank agreed to combine with other persons to act unlawfully, in the manner set forth in this complaint and committed overt acts in furtherance of the conspiracy.  At all relevant times, Arab Bank knew of the conspiracy and knew and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy. Arab Bank knowingly and purposefully agreed to perform extraordinary banking and administrative services for the Saudi Committee, HAMAS, the PIJ and AAMB with the knowledge, and for the purpose, that such services facilitate the activities of its leaders and

support terrorist activities pursuant to a common scheme to encourage and incentivize acts of terrorism. Arab Bank's actions, in fact, facilitated the conspiratorial scheme because, as set forth more fully above, but for the actions of the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage for terrorists and their families would have been substantially more difficult to implement.

605. By conspiring to act with the Saudi Committee, HAMAS the PIJ and AAMB, and their respective charitable front enterprises to support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured each plaintiff's respective person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

### THIRD CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333(a)

606. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

607. The extraordinary financial and administrative services that Arab Bank has knowingly provided to the terrorists, their families, and HAMAS, the PIJ and AAMB, including serving as the exclusive administrator of universal terrorist death and dismemberment insurance coverage plan to the families of suicide bombers and other terrorists, provides material support to the preparation and carrying out of numerous acts of international terrorism which have caused direct injury to the plaintiffs.

608. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance plan for terrorists and

the families of terrorists would have been substantially more difficult to implement.

609.   By participating in the commission of violations of 18 U.S.C. § 2339A that have caused each of the plaintiffs to be injured in his or her person, business or property, defendant Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## FOURTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

610.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

611.   By knowingly transferring funds from and to agents of HAMAS, including the Holy Land Foundation, maintaining accounts for and collecting, receiving and transmitting funds for designated Foreign Terrorist Organizations affiliated with HAMAS such as the Association de Secours Palestinien (ASP);  the Commite de Bienfaisance et de Secours aux Palestiniens (CBSP); and the Palestinian Association in Austria; by maintaining accounts for and collecting, receiving and transmitting funds for known agents of HAMAS such as the Tulkarem Charitable Committee and the Ramallah Charitable Committee, defendant Arab Bank and its New York branch office have provided material support to designated Foreign Terrorist Organizations under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(a)(1).

612.   As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

613.  Based on the defendant's level of sophistication and presence as a federally regulated financial institution in the United States, defendant Arab Bank not only knew of the unlawful activities of HAMAS but also knew or recklessly disregarded its actual designation as a Foreign Terrorist Organization and the designation of Association de Secours Palestinien (ASP);  the Commite de Bienfaisance et de Secours aux Palestiniens (CBSP); and the Palestinian Association in Austria as a Foreign Terrorist Organizations.

614.  By maintaining accounts for and collecting, receiving and transmitting funds for known agents of PIJ such as the Al-Ihsan Charitable Society and the Dar al-Huda Society, defendant Arab Bank  has provided material support to a designated Foreign Terrorist Organizations under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(a)(1).

615.  By providing material support to a designated Foreign Terrorist Organizations, Arab Bank is therefore civilly liable for damages to all plaintiffs killed or injured by HAMAS and PIJ pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(2) AND 18 U.S.C. § 2333(a)

616.  Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

617.  By knowingly transferring funds from and to agents of HAMAS, including  the Holy Land Foundation, the Tulkarem Charitable Committee and the Ramallah Charitable Committee, defendant Arab Bank's New York branch office has provided material support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective Death

Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(2).

618.   Based on the defendant's level of sophistication and presence as a federally regulated financial institution in the United States, defendant Arab Bank not only knew of the unlawful activities of HAMAS but also knew or recklessly disregarded its actual designation as a Foreign Terrorist Organization. The defendant also knew or recklessly disregarded information that would have caused it to know that HLF and the Tulkarem Charitable Committee were agents of HAMAS.

619.   As a federally regulated financial institution in the United States, defendant Arab Bank had and legal obligation to retain possession of, or maintain control over, all funds belonging to or destined to be transferred to agents of HAMAS  and to report to the Secretary the existence of such funds in accordance with regulations issued by the Secretary. By failing to do so, Arab Bank has violated 18 U.S.C. § 2339B(a)(2) and has proximately caused injury to, and is therefore civilly liable for damages to all plaintiffs killed or injured by HAMAS pursuant to 18 U.S.C. § 2333(a).

## SIXTH CLAIM FOR RELIEF

### FINANCING OF TERRORISM IN VIOLATION
### OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333(a)

620.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

621.   The financial services that Arab Bank has willfully and unlawfully provided to HAMAS, the PIJ, AAMB and the Saudi Committee include the giving, raising, collecting and transmitting of funds with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed

conflict.

622. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

623. By willfully violating 18 U.S.C. § 2339C, Arab Bank is therefore jointly and severally liable to the plaintiffs who have suffered injuries to their business, person or property by reason of such acts under 18 U.S.C. § 2333(a).

## SEVENTH CLAIM FOR RELIEF
## COMMITTING ACTS OF INTERNATIONAL TERRORISM
## IN VIOLATION OF 18. U.S.C. § 2333(a)

624. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

625. Defendant Arab Bank's acts of providing banking and other services, including the provision of death benefits, to HAMAS, the PIJ, the AAMB and other international terrorists, were "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population . . . to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

626. The extraordinary financial and administrative services that Arab Bank has provided to the terrorists, their families, and HAMAS, the PIJ and AAMB including administering universal coverage insurance to the families of suicide bombers and other terrorists, provides substantial assistance to HAMAS, the PIJ, AAMB and others in recruiting and incentivizing suicide bombers and other terrorists and thereby preparing and facilitating

acts of international terrorism in violation of 18 U.S.C. § 2333(a) that have caused injuries to the plaintiffs.

627. Arab Bank's acts were dangerous to human life, by their nature and as evidenced by their consequences.

628. Arab Bank's acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

629. Accordingly, Arab Banks' acts constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333(a).

630. Arab Bank knowingly provided substantial assistance to acts of international terrorism and accordingly, its acts constitute aiding and abetting acts of international terrorism.

631. Arab Bank also agreed to combine with other persons to act unlawfully in the manner set forth above and committed overt acts in furtherance of the conspiracy. At all relevant times, Arab Bank knew of the conspiracy and knew, and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

632. The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

105

disregard for the consequences of such actions.

638. As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal terrorist death and dismemberment insurance coverage plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

639. Arab Bank's conduct was unreasonable and outrageous and exceeds the bounds usually tolerated by decent society, and was done willfully, maliciously and deliberately, or with reckless indifference, to cause Plaintiff severe mental and emotional pain, distress, and anguish and loss of enjoyment of life.

640. As a direct, foreseeable and proximate result of the conduct of Defendant Arab Bank as alleged hereinabove, plaintiffs have suffered non-pecuniary damages in amounts to be proven at trial.

641. Arab Bank's actions were undertaken willfully, wantonly, maliciously and in reckless disregard for Plaintiff's rights, and as a direct, foreseeable and proximate result thereof plaintiffs suffered economic and emotional damage in a total amount to be proven at trial, therefore plaintiffs seeks punitive damages in an amount sufficient to deter Arab Bank and others from similar future wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

      (a)     Accept jurisdiction over this action;

      (b)     Enter judgment against Arab Bank and in favor of each plaintiff for compensatory damages in amounts not less than those set forth herein and additional sums in amounts to be determined at trial;

(c)    Enter judgment against Arab Bank and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)    Enter judgment against Arab Bank and in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(e)    Order such preliminary and permanent injunctive relief as may be necessary and appropriate to prevent Arab Bank from continuing to engage in the unlawful practices set forth herein, including but not limited to:

      (i)    Freezing certain identified accounts maintained by Arab Bank that are owned and/or controlled by HAMAS, other Foreign Terrorist Organizations or their agents for use by HAMAS or other designated Foreign Terrorist Organizations;

      (ii)    Freezing the accounts of, and barring the execution of any further transactions for, on behalf of, or for the benefit of entities that have provided funds to HAMAS or other Foreign Terrorist Organizations or their agents; and

      (iii)    Compelling Arab Bank to fulfill the various statutory reporting requirements with respect to all funds in its possession, custody or control ". . . in which a [Foreign Terrorist Organization], or its agent, has an interest." 18 U.S.C. § 2339B(a)(2).

(f)    Enter an Order declaring that Arab Bank has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

(g)    Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: January 21 , 2005
          Oradell, New Jersey

                                              OSEN & ASSOCIATE, LLC

                                              By _____
                                                  Gary M. Osen (GO-5790)
                                                  Peter Raven-Hansen, Of Counsel
                                                  700 Kinderkamack Road
                                                  Oradell, New Jersey 07649
                                                  (201) 265-6400

                                                  Attorneys for Plaintiffs

WECHSLER HARWOOD LLP
Andrew D. Friedman
488 Madison Avenue
New York, New York 10022
(212) 935-7400

KOHN, SWIFT & GRAF, P.C.
Robert Swift
Steven Steingard
One South Broad Street
Philadelphia, PA 19107
(215) 238-1700

MCINTYRE, TATE, LYNCH & HOLT, LLC
David J. Strachman, Esq.
321 South Main Street, Suite 400
Providence, Rhode Island 02903
(401) 351-7700

NITSANA DARSHAN-LEITNER & ASSOCIATES
Nitsana Darshan-Leitner, Esq.
11 Havatikin Street
Petah Tikva, 49389 Israel

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Robert L. Coulter, Sr. for the Estate of Janis R. Coulter

**(b)** County of Residence of First Listed Plaintiff  **Barnstable County, MA**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Gary M. Osen, Osen & Associate, LLC, 700 Kinderkamack Road, Oradell, NJ 07649 Tel. (201) 265-6400

## DEFENDANTS

Arab Bank

CV 05 365

County of Residence of First Listed Defendant   New York County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)
Mr. Kevin Walsh, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166-4193 Tel. (212) 294-6700

**GERSHON**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

**ORIGINAL**

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability |  | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty |  |  | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other |  |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition |  |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
The action is brought pursuant to 18 U.S.C. 2333(a) – the civil remedy under the Anti-Terrorism Act

Brief description of cause:
Plaintiffs seek damages for injuries resulting from acts of international terrorism

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)    JUDGE  Nina Gershon    DOCKET NUMBER  CV 04 2799

DATE
01/21/2004

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT #       AMOUNT       APPLYING IFP       JUDGE       MAG. JUDGE

365

## ARBITRATION CERTIFICATION

I, Gary M. Osen _____, counsel for plaintiffs Robert L. Coulter,
Sr., et al. _____ do hereby certify pursuant to the Local Arbitration Rule 83.10 that to the best of
my knowledge and belief the damages recoverable in the above captioned civil action exceed the
sum of $150,000 exclusive of interest and costs.
_____ Relief other than monetary damages is sought.

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its
stocks:

_____

Did the cause arise in Nassau or Suffolk County? NO

If answered yes, please indicate which county. _____

County of residence of plaintiff(s)     (1) Barnstable, MA
                                        (2) There are more than 20
                                        (3) plaintiffs

County of residence of defendant(s)     (1) New York County
                                        (2)
                                        (3)

I am currently admitted in the Eastern District of New York and currently a member in
good standing of the bar of this court.

Yes_  ✔                                        No_       .

Are you currently the subject of any disciplinary action(s) in this or any other state or
federal court?

Yes_       (If yes, please explain)            No_  ✔    .

Please provide your E-MAIL Address and bar code below. Your bar code consists of the initials
of your first and last name and the first four digits of your social security number or any other
four digit number registered by the attorney with the Clerk of Court.
(This information must be provided pursuant to local rule 11.1(b) of the civil rules).
ATTORNEY BAR CODE: GO5790

E-MAIL Address: gmo@osen.us

I consent to the use of electronic filing procedures adopted by the Court in Administrative Order
No. 97-12, "In re Electronic Filing Procedures(EFP)", and consent to the electronic service of all
papers.

Signature: _____

EXHIBIT 8

## woshingtonpost.com

# Iran Feels Pinch As Major Banks Curtail Business

U.S. Campaign Urges Firms to Cut Ties

Advertisement

By Robin Wright
Washington Post Staff Writer
Monday, March 26, 2007; A10

More than 40 major international banks and financial institutions have either cut off or cut back business with the Iranian government or private sector as a result of a quiet campaign launched by the Treasury and State departments last September, according to Treasury and State officials.

The financial squeeze has seriously crimped Tehran's ability to finance petroleum industry projects and to pay for imports. It has also limited Iran's use of the international financial system to help fund allies and extremist militias in the Middle East, say U.S. officials and economists who track Iran.

The U.S. campaign, developed by Treasury Secretary Henry M. Paulson Jr. and Secretary of State Condoleezza Rice, emerged in part over U.S. frustration with the small incremental steps the U.N. Security Council was willing to take to contain the Islamic republic's nuclear program and support for extremism, U.S. officials say. The council voted Saturday to impose new sanctions on Tehran, including a ban on Iranian arms sales and a freeze on assets of 28 Iranian individuals and institutions.

"All the banks we've talked to are reducing significantly their exposure to Iranian business," said Stuart Levey, Treasury's undersecretary for terrorism and financial intelligence. "It's been a universal response. They all recognize the risks -- some because of what we've told them and some on their own. You don't have to be Sherlock Holmes to see the dangers."

The new campaign particularly targets financial transactions involving the

NEWPORT-NEWS.COM

Iranian Revolutionary Guard Corps, which is now a major economic force beyond its long-standing role in procuring arms and military materiel. Companies tied to the elite unit and its commanders have been awarded government contracts such as airport management and construction of the Tehran subway. The practice has increased since the 2005 election of Iranian President Mahmoud Ahmadinejad, U.S. officials say. The Revolutionary Guard -- of which Ahmadinejad is a former member -- is part of the hard-line leader's constituency.

"The Revolutionary Guard's control and influence in the Iranian economy is growing exponentially under the regime of Ahmadinejad," Levey said in a speech in Dubai this month.

The campaign differs from formal international sanctions -- and has proved able to win wider backing -- because it targets Iran's behavior rather than seeking to change its government. "This is not an exercise of power," Levey said in the interview. "People go along with you if it's conduct-based rather than a political gesture."

Iranian importers are particularly feeling the pinch, with many having to pay for commodities in advance when a year ago they could rely on a revolving line of credit, said Patrick Clawson, a former World Bank official now at the Washington Institute for Near East Policy. The scope of Iran's vulnerability has been a surprise to U.S. officials, he added.

The financial institutions cutting back business ties are mainly in Europe and Asia, U.S. officials say. UBS last year said it was cutting off all dealings with Iran. London-based HSBC (which has 5,000 offices in 79 countries) and Standard Chartered (with 1,400 branches in 50 countries) as well as Commerzbank of Germany have indicated they are limiting their exposure to Iranian business, Levey said. The rest have asked the United States not to publicize their names.

Ahmadinejad's rhetoric -- from denying the Holocaust to comparing Iran's stock exchange to gambling -- has helped, experts say. "There is very little foreign investment in Iran not because of sanctions, but because of the atmosphere created by Ahmadinejad's crazy statements," said Jahangir Amuzegar, former Iranian finance minister and executive director of the International Monetary Fund.

Paulson kicked off the effort to warn major financial institutions and government officials about the long-term costs of doing business with Iran during the annual International Monetary Fund and World Bank meetings in Singapore in September. Paulson, Levey and Treasury Deputy Secretary Robert M. Kimmitt have all held dozens of meetings with banks to explain how Iran is using dummy companies and deceptive practices through banks to finance its non-traditional or illicit business activities, U.S. officials say.

Both the Iranian government and the private sector have increasingly tried to persuade financial institutions to keep the name of "Iran" or the originating bank in Iran off transactions so they are not traced to the Islamic republic, U.S. officials say.

In a related effort, the Bush administration has warned "relevant companies and countries" about the risks of investing in Iran's oil and gas sector, R. Nicholas Burns, undersecretary of state for political affairs, said in congressional testimony Wednesday. Washington is generally trying to drive home to Tehran that its policies will lead to serious "financial hardship," he said.

In December, Iranian oil minister Kazem Vaziri Hamaneh acknowledged that Tehran was having trouble financing petroleum development projects. "Currently, overseas banks and financiers have decreased their cooperation," he told the oil ministry news agency Shana.

The Bush administration has taken several other actions in recent months to contain Iran, including deploying two Navy carrier strike groups near the Persian Gulf, arresting operatives of the Revolutionary Guards' al-Quds Force in Iraq and pressing for two U.N. resolutions to punish Iran for not suspending its uranium enrichment program.

© 2007 The Washington Post Company

Ads by Google

Iran Prophecies
Find Out What Nostradamus Says About The Years 2008 - 2012
www.NostradamusOnline.com

Federal Government Grants
$30,000 in Free Government Grants Never Repay! - Get Your Free Kit.
FederalGovnt.FreeGrantKit.net

Outer Banks Rentals
75% Off On Outer Banks Rentals Compare Offers on Vacation Rentals

11Offers.net

EXHIBIT 9

**FREQUENTLY ASKED QUESTIONS**

# When was OPEC formed?

OPEC was formed at a meeting held on September 14, 1960 in
Baghdad, Iraq, by five Founder Members: Iran, Iraq, Kuwait, Saudi
Arabia and Venezuela. OPEC was registered with the United Nations
Secretariat on November 6, 1962 (UN Resolution No 6363).

Frequently asked questions
about crude oil

Frequently asked questions
about OPEC

Frequently asked questions
about the petroleum industry

© 2008 Organization of the Petroleum Exporting Countries | Terms and Conditions

**Warning!** Fraudulent use of the official logo and/or name of the Organization of the Petroleum Exporting Cou

EXHIBIT 10

# TIMESONLINE

From The Times

December 22, 2006

## Iran turns from dollar to euro in oil sales

Carl Mortished, International Business Editor

Iran is selling more of its oil for payment in euros than dollars as it seeks to shift its foreign currency reserves away from the depreciating currency of its political enemy, the United States.
The world's fourth-biggest oil exporter has inserted a clause in its oil contracts allowing it to request payment in alternative currencies.

Gholanhossein Nozari, the managing director of National Iranian Oil Company, said that 57 per cent of Iran's income from oil exports was now received in euros.

The move reflects a political desire for less reliance on the dollar, as well as a need to avoid further depreciation in currency reserves. Iran's dollar holdings are thought to have fallen from 40 per cent of currency reserves to just a third.

Iran announced plans in 2004 to develop an Iranian oil bourse, a commodity exchange that would become a Middle Eastern rival to the major exchanges in New York, London and Singapore, which set benchmark oil prices.

The Iranian bourse would also challenge the petrodollar by setting oil prices in euros. However, there has been little progress in establishing the bourse, which failed to launch as planned last March.

A spokesman for National Iranian Oil Company said that the switch to euros for oil payments would not affect the pricing of Iranian oil. "Our oil contracts are still based on the dollar because the international market assessments are in US dollars," he said.

Iran's decision to switch currencies extends a trend among big oil exporters moving from the dollar as they seek protection from a continuing slide in the petrocurrency's value. In October Russia said it would diversify its currency reserves into Japanese yen. Overall, Russia is believed to have let its dollar holdings slip and they are now equal with euros.

The dollar's slide protected non-dollar oil importers from the escalation in the price of fuel early this year. Oil was $63 per barrel at the beginning of January, rose to $74 at the start of July and has fallen back to $63 per barrel this month. However, translated into euros, the rise is less impressive — from €53 a barrel to a peak of €58 before a sharp decline to €48.

The fall in the dollar against major currencies has had a dramatic impact on the revenues of oil exporters and has exacerbated the rumbling anti- American feeling in the Gulf.

Although Gulf Arab states are predominantly dollar export earners, they mainly purchase in euros and yen, buying food, consumer goods and manufactured products from Europe and the Far East.

In March the United Arab Emirates said that it would switch 10 per cent of its currency reserves from dollars to euros, a decision that closely followed the attempt by the US Congress to block the acquisition by Dubai Ports World of a number of ports in the United States.

Contact our advertising team for advertising and sponsorship in Times Online, The Times and The Sunday Times. Search globrix.com to buy or rent UK property.

© Copyright 2008 Times Newspapers Ltd.

This service is provided on Times Newspapers' standard Terms and Conditions. Please read our Privacy Policy. To inquire about a licence to reproduce material from Times Online, The Times or The Sunday Times, click here. This website is published by a member of the News International Group. News International Limited, 1 Virginia St, London E98 1XY, is the holding company for the News International group and is registered in England No 81701. VAT number GB 243 8054 69.

EXHIBIT 11





| Data supply | Editing and design |
|---|---|
| Head, Data Services Department | Head, PR & Information Department |
| Fuad Al-Zayer | and Editor-in-Chief |
| | Dr Omar F. Ibrahim |
| Statistical Systems Analyst | |
| Dene Tampubolon | Senior Co-ordinator, Editorial |
| | Umar Gbobe Aminu |
| Statisticians | |
| Firouz Azarnia | Editor |
| Monica Psenner | Jerry Haylins |
| Gertrud Schmidt | |
| Hannes Windholz | Art Designer |
| Pantelis Christodoulides | Alaa Al-Saigh |
| | |
| Statistical Assistant | Production Assistant |
| Sheela Kriz | Diana Lavnick |
| | |
| Computer Systems Analyst | |
| Bagus Prihastono | |
| | |
| Applications Analyst/Programmer | |
| Zairul Arifin | |

#### Questions on data

Although comments are welcome, OPEC regrets that it is unable to answer all enquiries concerning the data in the ASB

#### Advertising

The OPEC Annual Statistical Bulletin now accepts advertising. For details, please contact the Editor-in-Chief at the following address:

Organization of the Petroleum Exporting Countries
Obere Donaustrasse 93, A-1020 Vienna, Austria
Tel: +43 1 211 12/0
Fax: +43 1 216 43 20
PR & Information Department fax: +43 1 214 98 27
E-mail: prid@opec.org
Web site: www.opec.org

© 2005 Organization of the Petroleum Exporting Countries
ISSN 0475-0608

Printed in Austria by Ueberreuter Print und Digimedia

# CONTENTS

Foreword
OPEC crude oil production ceiling allocations

Summary tables and basic indicators

| Table | | Page |
|---|---|---|
| 1 | OPEC Members' mid-year population | 9 |
| 2 | Area, density and GDP per capita in OPEC Members | 10 |
| 3 | OPEC Members' GDP at current market prices | 11 |
| 4 | OPEC Members' values of exports | 12 |
| 5 | OPEC Members' values of petroleum exports | 13 |
| 6 | OPEC Members' values of imports | 14 |
| 7 | OPEC Members' current account balances | 15 |
| 8 | Annual average exchange rates for OPEC Members | 16 |
| 9 | OPEC proven crude oil reserves | 17 |
| 10 | World proven crude oil reserves by region | 18 |
| 11 | OPEC proven natural gas reserves | 19 |
| 12 | World proven natural gas reserves by region | 20 |
| 13 | Crude oil production in OPEC Members | 21 |
| 14 | World crude oil production by region | 22 |
| 15 | Marketed production of natural gas in OPEC Members | 23 |
| 16 | World marketed production of natural gas by region | 24 |
| 17 | Refinery capacity in OPEC Members | 25 |
| 18 | World refinery capacity by region | 26 |
| 19 | Output of refined products in OPEC Members | 27 |
| 20 | World output of refined products by region | 28 |
| 21 | Consumption of refined products in OPEC Members | 29 |
| 22 | World consumption of refined products by region | 30 |
| 23 | Crude oil exports by OPEC Members | 31 |
| 24 | OPEC crude oil exports by region | 32 |
| 25 | Share of total OPEC crude oil exports by region | 33 |
| 26 | World crude oil exports by region | 34 |
| 27 | Exports of refined products by OPEC Members | 35 |
| 28 | World exports of refined products by region | 36 |
| 29 | Exports of crude oil and refined products by OPEC Members | 37 |
| 30 | World exports of crude oil and refined products by region | 38 |
| 31 | Natural gas exports by OPEC Members | 39 |
| 32 | World natural gas exports by region | 40 |

Oil and gas data

| | Exploration and reserves | |
|---|---|---|
| 33 | World proven crude oil reserves by country | 42 |
| Graph 1 | World proven crude oil reserves | 43 |
| Graph 2 | Crude oil reserves by region | 43 |
| Graph 3 | Crude oil reserves to production ratios | 43 |
| 34 | World proven natural gas reserves by country | 44 |
| 35 | Active rigs in OPEC Members and in world | 45 |
| 36 | Wells completed in OPEC Members | 46 |
| 37 | Producing wells in OPEC Members | 48 |
| Graph 4 | OPEC cumulative production and net addition to reserves | 49 |

| | Crude oil and natural gas production | |
|---|---|---|
| Graph 5 | OPEC crude oil production | 49 |
| 38 | Cumulative crude oil production in OPEC Members. | 50 |
| | Algeria, Graph 6 | 50 |
| | Indonesia, Graph 7 | 51, 52 |
| | IR Iran, Graph 8 | 52, 53 |
| | Iraq, Graph 9 | 54 |

| Table | | Page |
|---|---|---|
| | Kuwait, Graph 10 | 55 |
| | SP Libyan AJ, Graph 11 | 56 |
| | Nigeria, Graph 12 | 57 |
| | Qatar, Graph 13 | 58 |
| | Saudi Arabia, Graph 14 | 59 |
| | United Arab Emirates, Graph 15 | 60 |
| | Venezuela, Graph 16 | 60, 61 |
| 39 | World crude oil production by country | 62 |
| Graphs 17–24 | World crude oil production | 63 |
| 40 | Natural gas production in OPEC Members | 64 |
| 41 | World marketed production of natural gas by country | 66 |
| Graph 25 | World marketed gas production | 67 |
| Graph 26 | World natural gas reserves to production ratios | 67 |
| | | |
| | Share of production by company | |
| 42 | Crude oil production by companies in OPEC Members: | 68 |
| | Algeria, Indonesia, IR Iran | 68 |
| | Iraq, Kuwait, SP Libyan AJ, Nigeria | 69 |
| | Qatar, Saudi Arabia, United Arab Emirates, Venezuela | 70 |
| 43 | Parent companies' percentage equity in companies holding producing rights in OPEC Members | 71 |
| 44 | Parent companies' estimated gross share of crude oil production in OPEC Members | 73 |
| | | |
| | Refining | |
| 45 | Refinery capacity in OPEC Members by location | 75 |
| 46 | World refinery capacity by country | 77 |
| 47 | Output of refined products by type in OPEC Members | 78 |
| 48 | World output of refined products by country | 80 |
| Graphs 27–28 | Output of refined products vs refinery capacity by OPEC and non-OPEC | 81 |
| | | |
| | Consumption | |
| 49 | Consumption of refined products by type in OPEC Members | 82 |
| 50 | World consumption of refined products by country | 84 |
| Graphs 29–30 | Production and consumption of refined products by OPEC and non-OPEC | 85 |
| | | |
| | Exports | |
| 51 | OPEC Members' crude oil exports by destination: | 86 |
| | Algeria, Graph 31 | 86, 87 |
| | Indonesia, Graph 32 | 86, 87 |
| | IR Iran, Graph 33 | 87 |
| | Iraq, Graph 34 | 88, 89 |
| | Kuwait, Graph 35 | 88, 89 |
| | SP Libyan AJ, Graph 36 | 89 |
| | Nigeria, Graph 37 | 90, 91 |
| | Qatar, Graph 38 | 90, 91 |
| | Saudi Arabia, Graph 39 | 91 |
| | United Arab Emirates, Graph 40 | 92 |
| | Venezuela, Graph 41 | 93 |
| 52 | World crude oil exports by country | 94 |
| Graphs 42–49 | Crude oil exports, total and by region | 95 |
| 53 | OPEC refined product exports by destination: | 96 |
| | Algeria, Indonesia | 96 |
| | Kuwait, Saudi Arabia, Venezuela | 97 |
| 54 | World exports of refined products by country | 98 |
| 55 | World natural gas exports by country | 99 |
| | | |
| | Imports | |
| 56 | World imports of crude oil by country | 100 |
| 57 | World imports of refined products by country | 101 |
| 58 | World imports of natural gas by country | 102 |

2

| Table | | Page |
|---|---|---|
| **Transportation** | | |
| | Tanker fleet | |
| 59 | Tanker fleet development in OPEC Members | 103 |
| 60 | World tanker fleet by age | 104 |
| 61 | World liquid gas carrier fleet by size and type | 105 |
| 62 | Liquid gas carrier fleet in OPEC Members | 105 |
| 63 | World combined carrier fleet by size | 106 |
| 64 | World laid-up tanker and combined carrier tonnage by size | 106 |
| | Tanker freight rates | |
| 65 | Average spot freight rates for all routes | 107 |
| 66 | Freight costs in the spot market | 108 |
| 67 | Spot tanker freight rates for oil sizes | 109 |
| | Pipelines | |
| 68 | Crude oil pipelines in OPEC Members: | 110 |
| | Algeria, Indonesia, IR Iran | 110 |
| | Iraq, Kuwait, SP Libyan AJ | 111 |
| | Nigeria, Qatar | 112 |
| | Saudi Arabia, United Arab Emirates | 113 |
| | Venezuela | 114 |
| 69 | Gas pipelines in OPEC Members | 115 |
| 70 | Product pipelines in OPEC Members | 117 |
| | **Prices** | |
| 71 | Spot OPEC Reference Basket prices | 119 |
| 72 | Spot crude oil prices | 120 |
| Graph 30 | Spot OPEC Reference Basket and other spot crude oil prices | 124 |
| Graph 31 | Spot price differences of WTI, Brent and Dubai to OPEC Basket | 124 |
| Graph 32 | Spot price of Bonny Light and Arab Heavy | 124 |
| Graph 33 | Spot price differences of Bonny Light and Arab Heavy to OPEC Basket | 124 |
| 73 | Crude oil prices in nominal and real terms | 125 |
| 74 | Spot refined products prices in major markets | 126 |
| 75 | Retail prices of refined products in OPEC Members | 127 |
| 76 | Composite barrel and its components in major consuming countries | 128 |
| Graph 34 | Crude oil prices in nominal and real terms | 129 |
| Graph 35 | Composite barrel and its components | 129 |
| **Major oil companies** | | |
| 77 | Principal operations of the major oil companies | 130 |
| 78 | Revenue, operating costs, deductions, taxation and net income of the major oil companies | 131 |
| 79 | Costs, deductions, taxation and net income as a percentage of revenue of the major oil companies | 132 |
| 80 | Capital and exploratory expenditure of the major oil companies | 133 |



General notes
  Definitions
  Country groupings
  Economic organizations
  Abbreviations
  Sources
Conversion factors

  Subject index

Map  OPEC flows of crude and refined oil

4

OPEC Members' values of exports, 1969–2004 (m $)

| | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 1977 |
|---|---|---|---|---|---|---|---|---|---|
| Algeria | 934 | 1,009 | 857 | 1,304 | 1,887 | 4,687 | 4,700 | 5,259 | 5,944 |
| Indonesia | 854 | 1,108 | 1,234 | 1,777 | 3,211 | 7,426 | 7,102 | 8,547 | 10,853 |
| IR Iran | 2,100 | 2,403 | 3,824 | 4,041 | 6,207 | 21,541 | 20,181 | 23,541 | 24,076 |
| Iraq | 1,045 | 1,098 | 1,556 | 1,086 | 1,942 | 6,602 | 8,298 | 9,273 | 9,650 |
| Kuwait | 1,540 | 1,655 | 2,507 | 2,989 | 3,810 | 10,963 | 9,184 | 9,846 | 9,754 |
| SP Libyan AJ | 2,164 | 2,379 | 2,694 | 2,938 | 4,003 | 8,259 | 6,834 | 9,554 | 11,411 |
| Nigeria | 891 | 1,249 | 1,886 | 2,184 | 3,601 | 9,684 | 8,305 | 10,117 | 12,367 |
| Qatar | 223 | 240 | 315 | 397 | 628 | 2,015 | 1,805 | 2,211 | 2,072 |
| Saudi Arabia | 2,110 | 2,424 | 3,809 | 5,491 | 8,985 | 35,556 | 29,679 | 38,287 | 43,464 |
| United Arab Emirates | 407 | 523 | 842 | 1,174 | 2,156 | 7,380 | 7,218 | 8,891 | 10,062 |
| Venezuela | 3,083 | 3,169 | 3,124 | 3,166 | 4,891 | 11,153 | 8,800 | 9,299 | 9,551 |
| OPEC | 15,351 | 17,256 | 22,648 | 26,546 | 41,322 | 125,265 | 119,106 | 134,824 | 149,202 |

| | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|---|---|
| Algeria | 6,326 | 9,551 | 13,871 | 14,396 | 13,170 | 12,703 | 13,592 | 13,671 | 8,255 |
| Indonesia | 11,643 | 15,590 | 23,950 | 25,165 | 22,328 | 21,146 | 21,888 | 18,587 | 14,805 |
| IR Iran | 22,476 | 19,807 | 12,328 | 11,821 | 20,452 | 21,507 | 17,087 | 14,175 | 7,171 |
| Iraq | 11,064 | 21,572 | 26,349 | 10,140 | 10,033 | 8,161 | 9,317 | 10,409 | 7,465 |
| Kuwait | 10,427 | 18,404 | 19,842 | 16,300 | 10,961 | 11,574 | 12,280 | 10,997 | 7,251 |
| SP Libyan AJ | 9,895 | 16,076 | 21,910 | 15,571 | 13,984 | 12,341 | 11,148 | 12,314 | 7,711 |
| Nigeria | 10,445 | 16,733 | 25,934 | 17,837 | 12,176 | 10,363 | 11,849 | 13,111 | 5,083 |
| Qatar | 2,391 | 3,789 | 5,672 | 5,691 | 4,348 | 3,345 | 4,513 | 3,419 | 1,849 |
| Saudi Arabia | 40,659 | 63,428 | 101,577 | 112,419 | 74,219 | 45,861 | 37,545 | 27,476 | 20,183 |
| United Arab Emirates | 9,832 | 14,801 | 21,967 | 21,792 | 18,224 | 15,391 | 15,990 | 14,764 | 10,129 |
| Venezuela | 9,187 | 14,317 | 19,221 | 20,980 | 16,590 | 13,937 | 15,997 | 14,438 | 8,660 |
| OPEC | 144,345 | 214,069 | 292,621 | 272,112 | 216,480 | 176,328 | 171,206 | 152,961 | 98,561 |

| | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|---|---|---|
| Algeria | 9,470 | 8,429 | 10,222 | 14,707 | 13,313 | 12,147 | 10,864 | 9,946 | 11,178 |
| Indonesia | 17,206 | 19,509 | 22,974 | 26,807 | 29,635 | 33,796 | 36,607 | 40,222 | 47,454 |
| IR Iran | 11,916 | 10,709 | 13,081 | 19,305 | 18,661 | 19,868 | 18,080 | 19,434 | 18,360 |
| Iraq | 9,705 | 9,609 | 12,284 | 10,314 | 377 | 518 | 457 | 453 | 496 |
| Kuwait | 8,264 | 7,758 | 11,476 | 7,042 | 1,088 | 6,572 | 10,246 | 11,260 | 12,780 |
| SP Libyan AJ | 7,986 | 6,673 | 8,034 | 13,225 | 11,234 | 10,793 | 8,544 | 7,865 | 8,510 |
| Nigeria | 7,560 | 6,877 | 7,844 | 13,673 | 12,264 | 11,886 | 11,590 | 11,319 | 12,248 |
| Qatar | 1,985 | 2,210 | 2,687 | 3,579 | 3,047 | 3,736 | 3,181 | 3,146 | 3,481 |
| Saudi Arabia | 23,198 | 24,376 | 28,369 | 44,416 | 47,697 | 50,287 | 42,395 | 42,614 | 50,041 |
| United Arab Emirates | 12,765 | 12,250 | 17,596 | 23,544 | 24,436 | 24,756 | 23,640 | 27,390 | 29,176 |
| Venezuela | 10,577 | 10,244 | 13,286 | 17,497 | 15,155 | 14,185 | 14,686 | 16,089 | 18,457 |
| OPEC | 120,631 | 118,644 | 147,853 | 194,058 | 176,907 | 188,544 | 180,290 | 189,738 | 212,181 |

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|
| Algeria | 14,066 | 14,657 | 11,090 | 12,522 | 21,650 | 19,132 | 18,820 | 24,105 | 32,324 |
| Indonesia | 50,188 | 56,297 | 50,370 | 51,242 | 65,407 | 57,365 | 59,165 | 64,109 | 71,785 |
| IR Iran | 22,391 | 18,381 | 13,118 | 21,030 | 28,345 | 23,904 | 28,186 | 33,768 | 44,628 |
| Iraq | 781 | 4,602 | 5,500 | 13,067 | 20,380 | 16,510 | 13,250 | 7,990 | 18,490 |
| Kuwait | 14,889 | 14,222 | 9,553 | 12,165 | 19,436 | 16,212 | 15,351 | 20,675 | 28,729 |
| SP Libyan AJ | 10,155 | 9,576 | 6,032 | 7,961 | 12,716 | 11,337 | 11,487 | 14,050 | 20,203 |
| Nigeria | 16,142 | 16,525 | 11,346 | 13,227 | 26,449 | 17,688 | 18,573 | 24,047 | 35,050 |
| Qatar | 3,752 | 3,791 | 4,880 | 7,061 | 11,424 | 10,156 | 10,978 | 13,193 | 15,510 |
| Saudi Arabia | 60,728 | 60,732 | 38,822 | 50,690 | 77,481 | 67,973 | 72,464 | 93,245 | 110,609 |
| United Arab Emirates | 33,613 | 34,014 | 31,059 | 36,495 | 49,878 | 48,773 | 52,163 | 65,826 | 80,873 |
| Venezuela | 23,060 | 21,624 | 17,193 | 20,190 | 31,413 | 25,353 | 25,890 | 27,170 | 36,200 |
| OPEC | 249,715 | 254,421 | 198,960 | 245,650 | 364,579 | 314,403 | 326,327 | 388,199 | 494,401 |

Note: Totals may not add up due to independent rounding. Revisions have been made throughout the time series. All figures fob.

.

# EXHIBIT 12

# Bloomberg.com



## Iran Is Cutting Dollar Reserves, Central Bank Says (Update1)

By Stephanie Phang and Soraya Permatasari

March 27 (Bloomberg) -- Iran is cutting its U.S. dollar reserves to less than 20 percent of total foreign currency holdings, and will buy more euros and yen as tensions with the U.S. increase, Central Bank Governor **Ebrahim Sheibany** said.

``We are trying to diversify our reserves and of course it is very natural to switch to currencies other than U.S. dollars,'' Sheibany said today in Kuala Lumpur, adding that Iran has no ``meaningful'' economic relations with the U.S. About 20 percent of the country's $50 billion to $100 billion of foreign reserves is in dollars, he said.

Tensions between Western nations and Iran have increased because of the Islamic republic's refusal to suspend its nuclear program. The United Nations Security Council on March 24 gave Iran 60 days to suspend any uranium enrichment program and voted to freeze assets of a state-owned bank and impose penalties on some military commanders.

The UN asked nations and international lenders such as the World Bank to stop giving grants, loans and other financial aid to Iran, except for humanitarian or development purposes. The U.S. on Jan. 9 blocked Bank Sepah, the state-owned Iranian bank, from accessing the American financial system, accusing it of aiding Iran's weapons programs.

The latest U.S. sanctions won't damage Iran's economy because they are limited to ``some special areas'' and the country is ``used to this sort of activity,'' Sheibany said in Malaysia, where he is attending an Islamic finance conference.

Oil, Agriculture

Iran's economy probably expanded between 5.8 percent and 6 percent in the fiscal year ended March 20, driven by oil, agriculture and the industrial sector, Sheibany said. The economy grew 4.5 percent in the previous year. Iran earned about $45 billion from oil sales in the last fiscal year, he said.

The country can sell its oil in euros or any other currency, Sheibany told reporters. Buyers ``don't mind to switch because they need our oil,'' he said.

Iran exports 60 percent of its crude to Asia, 32 percent to Europe and 8 percent to Africa. It is the world's fourth-largest oil exporter and the second-largest producer among the Organization of Petroleum Exporting Countries.

Crude oil for May delivery rose 63 cents, or 1 percent, to close at $62.91 a barrel yesterday, and traded at $62.67 a barrel at 2:29 p.m. Kuala Lumpur time. Oil is trading near its highest price this year as the U.K. demanded Iran release 15 servicemen, raising concern the dispute may escalate and disrupt oil supply from the Middle East.

The British personnel were seized on March 23 while inspecting vessels in the Persian Gulf. Iran will hold the sailors and marines to account for violating its territorial waters, the Islamic republic's deputy foreign minister said on state-run television yesterday.

Rates to Rise?

Inflation in Iran is expected to slow this fiscal year, from between 13.1 percent and 13.2 percent last

year, Sheibany said.

``We have very traditional and conventional tools that all central banks have," he said. ``We are also working with our government to reduce its expenditure'' to contain money supply and inflation.

Sheibany said the central bank is discussing a possible interest rate increase with the government, though the government ``doesn't agree'' that rates should rise.

Iran will probably sell euro-denominated Islamic bonds either this year or next year, he said, without giving a value for the proposed sale.

To contact the reporter on this story: **Stephanie Phang** in Kuala Lumpur at **sphang@bloomberg.net;
Soraya Permatasari** in Kuala Lumpur at **soraya@bloomberg.net**

*Last Updated: March 27, 2007 03:05 EDT*





© 2008 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

EXHIBIT 13

# News Archive

- May 1996 - Iran - Central Asia rail link opened
- May 1996 - Junction for Planet Opens on Turkmen-Iranian Border
- Feb 1997 - Iran assures its participation in Trans-Asian rail project
- Mar 1997 - RAJA Passenger Trains Operating Company
- May 1997 - Mashhad-Ashkhabad passenger train to start service in May 1997
- Nov 1997 - Central Asian steering group formed
- Dec 1997 - Iranians to build AC diesels
- May 1998 - Tehran Metro News
- Dec 1998 - Golden Route Intermodal Freight Corridor
- Mar 1999 - Ardakan-Chadormalu railway inaugurated
- Mar 1999 - Tehran-Karaj Commuter Railway opened
- Mar 1999 - Tehran-Qom Express Railway opened
- Jun 1999 - Qom-Esfahan bidding soon
- Jul 1999 - Iranians seek long-distance DMUs
- Dic 1999 - History and Status of Tehran Metro (Expenses, Future Projects)
- Jan 2000 - THROUGH freight and passenger trains between Turkey, Iran, Turkmenistan, Uzbekistan and Kazakhstan
- Feb 2000 - First Tehran metro line inaugurated
- Feb 2000 - Iranian Railways, the Safest in the World
- Mar 2000 - Modernizing Iranian Railways - Simorgh train inaugurated
- Jun 2000 - Iran - Turkey passenger service resumed
- Sep 2000 - Iran, Syria agree to launch Tehran-Damascus train
- Jan 2001 - Asian shuttle starts on Jan 10th after signing
- Mar 2001 - Istanbul-Tehran rail link resume after 8 years suspension
- Aug 2001 - Khatami inaugurates Tehran's north-south subway
- Mar 2002 - Northern half of Tehran Subway inaugurated
- Nov 2002 - Tehran plans four more subway lines

## Iran - Central Asia rail link opened

**Legend:** 'An historic legend comes to life, the Silk Road was not only about a route but was about the coming together of various nations,' says Demirel

**Turkish Daily News**

**TEHRAN** May 1996 - Iranian President Hashemi Rafsanjani on Monday inaugurated a new rail link between Iran and Central Asia which he said revived the old Silk Road as a symbol of East-West relations.

The Iranian president and 11 heads of state later flew to Sarakhs, on the border with Turkmenistan. Other dignitaries and officials boarded the train, dubbed "Pride," making its first journey from Mashhad to Sarakhs. "The Silk Road railway ... shortens the great distance between Chinese ports and the Persian Gulf, is the bridge for the region and the world and is a clear example of Iran's priority on regional cooperation," Rafsanjani said in a ceremony in Sarakhs, broadcast live on Iranian television.

Turkish President Suleyman Demirel, who attended the meeting, was quoted by the Anatolia news agency as saying that the route would be tied to Turkey. "This will eventually be tied to Turkey, thus linking Turkey with Central Asia," Demirel said after his meeting with Georgian President Eduard Shevardnadze. But the Turkish president fervently praised the project, saying: "An historic legend comes to life, the Silk Road was not only about a route but was about the coming together of various nations."

"It is not only a railway being inaugurated today, but continents and peoples of various continents are being connected," Demirel said. The heads of state were to go later to Tedzhen in Turkmenistan.

The Mashhad-Sarakhs-Tedzhen railway opens up new trade routes between regions which under Soviet communism were hermetically sealed, joining Iran's Gulf ports to the former Soviet hinterland. Iran and Turkmenistan agreed in 1991 to tie their rail networks. Iran self-financed the $171 million, 165 kilometer (100 mile) Mashhad-Sarakhs stretch, which it completed in 42 months. Turkmenistan's Sarakhs-Tedzhen link, running for 130 kilometers (80 miles), was finished late last year at a cost of $45 million. Transport capacity initially will be 500,000 passengers a year and 2 million metric tons of goods, rising eventually to 1 million passengers and 8 million tons.

Iran, subject to a U.S. economic embargo, is hailing the railway as the first concrete achievement in a strategy to build its role as a regional economic power. It has shrugged off the sanctions and is seeking to build its role as a regional player through the Economic Cooperation Organization -- known as ECO. ECO was founded by Iran, Pakistan and Turkey and later expanded in 1992 to include the five former Soviet Central Asian states -- Uzbekistan, Kazakhstan, Tajikistan, Turkmenistan and Kyrgyzstan -- plus Azerbaijan and Afghanistan. Heads of state will hold ECO's fourth summit on Tuesday and Wednesday in the Turkmen capital Ashkabad and are expected to agree to a redrafting of the ECO founding treaty already hammered out by foreign ministers. At the same meeting, Turkey will take over for four years the permanent secretariat of the organization. ECO foreign ministers said on Saturday the group was not yet fit to compete with Asian, American and European blocs. Iran called for tariffs to be scrapped outright.

(TDN, 14.05.1996, page 1)

top

---

## Junction for Planet Opens on Turkmen-Iranian Border

*Bruce Pannier for OMRI*
*05/13/96* The greatly publicized rail link between Turkmenistan and Iran was officially opened on 13 May, according to Western and Russian sources. The 300 km line, agreed to in 1991, will for the first time connect Iran to the Central Asian rail network, and is expected to cut travel time between Europe and southeast Asia by up to 10 days. Iranian President Akbar Hashemi Rafsanjani and his Turkmen counterpart, Saparmurad Niyazov, hosted an opening ceremony for the line attended by 12 heads of state and 700 other officials and journalists. The $216 million Meshhed-Sarakhs-Tedzhen railway will be used by some 500,000 passengers and 2 million metric tons of goods in its first year of operation, and those figures are expected to rise in the near future, Reuters reported.

## *Reuter* Original Report



SARAKHS, Turkmenistan -- Iran and Turkmenistan opened a rail link Monday which leaders said would unite Europe and Asia and revive the Silk Road trade route between the two continents.

Heads of state from 12 countries attended a colorful ceremony in northern Iran before crossing the border in a special train, dubbed "Pride," to the gas-rich desert republic of Turkmenistan.

The new railroad, from the northern Iranian city of Mashhad to the Turkmen town of Tedzhen, links Iran's Gulf ports to the former Soviet hinterland and a network which stretches to China and the Pacific coast. Iran, subject to a U.S. economic embargo, is hailing the railroad as the first concrete achievement in a strategy to build its role as a regional economic power. The Silk Road came into use 2,000 years ago. It was the main link between China and Europe for several centuries until sea travel became practical.

top

## Iran assures its participation in Trans-Asian rail project

Feb. 4. 97- The Iranian Islamic Republic Railways (IIRR) has assured its participation in the Trans-Asian railway project, reported Indian newspaper 'The Economic Times'. The Trans-Asian railway project is expected to link Europe and the Commonwealth of Independent States (CIS) countries to major emerging economies of Asia. Speaking to The Economic Times, acting president and board member of IIRR, Nasser Pour-Mirza, said Iranian railway was speeding up the process of connecting the missing link between Kerman and Zahedan before the year 2000. The missing link between Kerman and Zahedan will cost about dlr. 584 million, which will be funded by the government's own revenues, he said. Mirza said that his company will play an important role in connecting Europe with Asia as well as the CIS countries, which would help boost trade between countries in the two continents. He also said that already co-operation exists between the three Islamic countries of Turkey, Iran and Pakistan.

*from* IRAN Weekly Press Digest

top

## RAJA Passenger Trains Operating Company

Passenger Trains Operating Company, RAJA, is a joint stock company affiliated to Islamic Republic of Iran's Railway Company (RAI). It was established in October 1996 as a part of RAI restructuring process, aimed at separating passenger and freight train operations management from infrastructure maintenance and development. There are 3225 personnel serving, in 13 regions, in passenger transport and passenger fleet maintenance activities. The company carried 9 million passengers between March 1996 and March 1997, mostly travelling on long-distance trains with average journey length of approximately 778 kilometres. The company's performance was 7 billion passenger-kilometres in the same year.

Passengers can benefit from a computerised reservation system to book seats one month prior to their travelling time. The system is in operation by private travel agencies accross the country and also by customer service offices of RAJA situated in major stations.
RAJA has recently started a tourist attrative service connecting the capital-Tehran- to the cities en route in the north of the country, in Mazandaran and Gorgan, the two provinces which are well known for beautiful villages, forests, and beaches.

*by* RAJA

top

## Mashhad-Ashkhabad passenger train to start service in May 1997

March 30. 97 - Simultaneous with the first anniversary of the inauguration of Mashhad-Sarakhs-Tajan railroad, a passenger train service between Mashhad and Ashkhabad will become operational on May 14, said the manager of Khorasan Railway Company, Majid Roshdi, on Sunday. He added that some 2.500 million tons of cargo are to be imported to Iran via Mashhad-Sarakhs-Tajan railroad from central Asian states. The goods include cotton, lumber, iron wares, asbestos pipes, gasoline and furnace oil, he said. Last year, he added, 200,000 tons of commodities were imported to Iran from central Asian states by train, of which 140,000 tons were carried to Bandar Abbas and 60,000 tons to Mashhad./-

*from* IRAN Weekly Press Digest

top

## Central Asian steering group formed

TURKMENISTAN President S Niyazov has set up an international project group to push ahead with development of two corridors linking the Central Asian states and the Persian Gulf. His intention is to make Turkmenistan the centre of the region's rail network.

The north-south corridor will integrate the Tedjen -- Sarakhs line to Iran, completed two years ago, with the planned 450 km link from Turkmenbashi to Yeralivo in Kazakhstan (RG 11.97 p725). The east-west corridor uses a train ferry to link the ex-SZD route from Toshkent to Turkmenbashi via Ashgabat with the trans-Caucasian corridor between Baku and Poti.

Completion of Iranian Islamic Republic Railways' direct route from Mashhad to Bafgh, linking into the line to the Gulf port of Bandar Abbas, which is expected to generate up to 15 million tonnes a year. The Sarakhs transfer station handled 500,000 tonnes of freight in its first year, and is currently transhipping 130 wagonloads a day. Construction of a new bogie exchange installation and container terminal are expected to boost throughput to 2 million tonnes in 2000, and eventually to 7 million.

*by* Reed Business Information 1997

top

## Iranians to build AC diesels

ISLAMIC Iranian Republic Railways (RAI) has ordered 100 diesel locomotives from GEC Alsthom to haul 140km/h passenger trains and freights at up to 110km/h. The 4300hp AD43C Co-Cos will be powered by Ruston 16RK215 diesel engines using Onix IGBT-based asynchronous traction drives.

Under the US$125m contract announced on December 23, the first 20 locos will be assembled at GEC Alsthom's Belfort works in France. The next five will be shipped to Iran as kits for assembly by Wagon Pars, which will then build the remaining 75 using components manufactured by French and Iranian suppliers. The deal includes a four-year maintenance provision.

The first loco is scheduled to leave Belfort 18 months after the contract becomes effective, with the 25 French-built units to be delivered within eight months and the last during 2003.

*by* Reed Business Information 1997

top

## Tehran Metro News

### Tehran looks to trains to ease traffic

*by* Barry May TEHRAN, April 24 1998 (Reuters)

The tunnels are dug, the stations are being built and the trains are on their way. But there is no sign yet that Tehran's metro system will be ready to carry passengers to ease the city's chronic traffic congestion and pollution any time soon. No track has been laid, say engineers involved in the underground railway project. Revolution, war and shortages of funds have delayed the project, designed in the 1970s during the reign of the shah to ease congestion and reduce pollution. Since then, Tehran's population has more than doubled from less than three million to more than seven million, with at least a million more commuting in each day from outlying areas. The first shipment of equipment including six 88-tonne electric locomotives and 24 double-deck carriages left Shanghai for Iran last week. The Chinese rolling stock will be used to establish a commuter service between Tehran and the city of Karaj, 45 km (28 miles) west of the capital.

QUARTER CENTURY OF WORK

A $550 million agreement with three Chinese companies to supply machinery needed to complete the network of commuter services in and around Tehran is the largest construction project in Iran. It is also among China's biggest project overseas. It includes supplying power, signalling, ventilation and maintenance equipment for two subway lines and a separate ground-level track to the suburbs. The Chinese firms are China North Industries, China National Technology Import and Export Corp, and China International Trust and Investment Corp. China's Changchun Rolling Stocks Works will eventually supply 218 passenger cars for the metro. But for now, only the yellow and orange subway signs at strategic points around the city indicate that Tehran's mass transit system is a little closer to becoming a reality after a quarter century of intermittent work. Construction in north Tehran by France following an ambitious study that suggested seven lines totalling 143 km was blocked, first by Iran's 1979 Islamic revolution and then the 1980-88 Iran-Iraq war. After the turmoil, Iran itself started boring two lines under the city in 1986 -- one north-south, the other east-west. The 34 km north-south line was designed to have 22 stations. The 20 km east-west line, 21. Both lines are entirely under ground. A separate ground-level extension of the east-west route runs from Azadi (Freedom) Square near Tehran's Mehrabad international airport to Karaj, a commuter city of about one million people.

LARGE DEMAND FOR PUBLIC TRANSPORT

Between 10 to 12 percent of the 10.7 million passenger trips in Tehran each day are expected to shift to the two lines, said Ali Atabak, a transportation engineer involved in designing the lines. "There is a large demand for public transport in Tehran but much depends on the fare structure," he said. "Most construction in Iran has stopped because of budget shortfalls, but the metro is going ahead," he added. The pollution that hangs over Tehran and chokes the lungs of its people is measured on electronic graphs around the city for all to see. Studies show that 70 percent of it is caused by traffic, much of it old and poorly maintained cars. About 100,000 new cars were produced in Iran last year -- but few old vehicles were taken off the roads. Two out of every five cars now in use were made and licensed before the revolution. Besides the city's 24,000 licensed taxis, some 85,000 private vehicles are used as pirate taxis and add to the congestion, according to an unofficial survey three months ago. City officials have tried to ease congestion and speed up public transport by imposing restrictions on a 22 square km (26 square yards) zone in downtown Tehran where drivers must buy a permit to enter.

**sad news!**

# Tehran metro plans go under

*by* Front Page
Wednesday, May 13, 1998 Published at 16:59 GMT 17:59 UK
World: S/W Asia

There's been a set-back to plans for the first underground railway in Iran: the Teheran Metro.

The Iranian newsagency said the first batch of locomotives was destroyed at sea, when the Chinese ship carrying them collided with another vessel. Iran had ordered more than two-hundred carriages and a large number of engines from China, at a cost of more than five-hundred-million dollars -- the biggest deal the two countries have signed. The agency said the head of the Teheran Metro Company, Mohsen Hashemi, had gone to China to discuss the matter. The Teheran Metro is due to open in the next few months, to ease intense traffic congestion in the capital.

*from* BBC World Service

top

# Golden Route starts in Dubai

AN INTERMODAL freight corridor between the Persian Gulf and the CIS countries in Central Asia was due to start operating in October, under a concession awarded by the Iranian Land Transport Ministry. The service is

being retailed by Dubai-based Silver Seas Shipping, which charters trains from RAI, and is expected to cut transit times from 40 to 10 days.

Silver Seas has an initial two-year concession, automatically renewable up to 10 years, to market the service in the Gulf region, southeast Asia and the Far East. Traffic arriving in Dubai is consolidated and forwarded by ship to Bandar Abbas and Bandar Imam Khomeini for transfer to rail. Trains will initially run on alternate days, but Silver Seas Managing Director Tayseer Salamah hopes to increase this frequency in the future. Company staff will travel with each consignment to protect the goods, handle paperwork and formalities, and arrange for door-to-door delivery at the final destination. Silver Seas expects to handle up to 40,000 containers per year.

*by* Reed Business Information 1998

top

## Ardakan-Chadormalu railway inaugurated

yazd, march 4, irna -- President Mohammad Khatami inaugurated Ardakan-Chadormalu railway on thursday. The 221 km track has the capacity of transporting five million to ten million tons of cargo and 300,000 passengers annually. It cost rls 192 billion plus dlrs 38 million to build over a period of seven years.

Once the extension to the railway is completed to connect it with tabas, it will be capable of transporting cargo and passenger from yazd and isfahan provinces and shiraz (fars) to mashhad and from there to central asian republics.

The president arrived in provincial city of chadormalu on thursday to also inaugurate chadormalu iron ore complex. Prior to inauguration of the complex, the president told a huge audience of people that operation of ardakan-chadormalu track and its connection to central asian railway through bafq-mashhad railway will relieve the region from isolation, bringing with it further prosperity for the people.

*by* IRNA Iranian News Agency 1999

top

## Tehran-Karaj Commuter Railway opened

tehran, march 7, irna -- tehran-karaj express electric train was inaugurated by President Mohammad Khatami sunday. The president and his accompanying delegation including the interior minister Abdolvahed Mousavi Lari, the governor general of Tehran, and managing director of the Tehran subway as well as a number of senior officials of the country and a group of domestic and foreign reporters were first passengers of the train. They took the 31.4-km train route from malard (karaj) station to azadi square, in western tehran.

Over 100 million passengers annually will be able to use the transportation service. The railway has one track and three stops at Azadi square, Vardavard and Malard. Some 11 more stops are to be made available in the future. The train will be active from monday, carrying passengers from Karaj to tehran and vice versa every day. Its working hours will be temporarily from 11:00 to 14:00 and the train will make one trip to Karaj and another to Tehran on a daily basis. The one way ticket is sold at rls 1,500 at the railway stations. Every train has 1,400 seats for passengers.



top

## Tehran-Qom Express Railway opened

Tehran, march 16, irna -- In the presence of president Mohammad Khatami, Tehran-Qom express railway went into operation tuesday afternoon. There are five stations along the 137 km railway. Some 23 million dollars in addition to 210 billion rials have been spent so far on the railway. The railroad project is expected to need an additional 65 billion rials for completion. The second line of the railway, to become operational by the first half of the coming year, would help transport 5.5 million passengers and eight million tons of cargo annually.

Speaking at the inaugural ceremony of the railway, president Khatami said railroad is an efficient means of transportation which is also environmentally clean. However, the president regretted that Iran in terms of railways is not at a satisfactory level. He further noted that the country's railroads have increased to more than 6700 km from the 5,000 before the 1979 Islamic Revolution. Khatami lauding the efforts of the engineers and workers who had a role in construction of the Tehran-Qom express railroad, hoped for advancement and comprehensive development of the country specially in transportation sector. Prior to khatami's remarks, managing director of the Islamic 

Republic railway, Rahman Dadman, said 90 trains will carry 45,000 passengers daily during the new year holidays.

*by* IRNA Iranian News Agency 1999

top

## Qom -- Esfahan bidding soon

IRANIAN Islamic Republic Railways is hoping to call tenders later this year for construction of the second phase of the Tehran -- Qom -- Esfahan direct line. The first section as far as Qom was opened to passenger services on March 23 following its inauguration by President Mohammad Khatami (RG 4.99 p196).

European manufacturers including Siemens, Alstom and Bombardier have expressed interest in building the line as a turnkey project with local civil engineers. Siemens SGP has a long-standing technology transfer agreement with Iranian rolling stock builder Wagon Pars and has obtained export credit funding from the Austrian government for several projects in the region.

The Qom -- Esfahan line will be around 250 km long, and has been costed at US$500m. Designed for operation at 160 km/h, the new line will cut around 150 km off the Tehran -- Esfahan route and bring journey times down by several hours.

*by* Reed Business Information 1999

top

## Iranians seek long-distance DMUs

Iranian Islamic Republic Railways has called tenders for the supply of a fleet of air-conditioned diesel multiple-units to operate long-distance services. Bids were invited at the beginning of June for 10 four-car DMUs, with electric or hydraulic transmissions.

RAI Vice-President, Fleet Affairs, A Pourbassir says the intention is to use the trains on routes of 500 to 1,000 km serving the east and south of the country.

Provisional closing date for the tender is August 3.
Further details of tender 11-18-05 may be obtained from:
Purchasing Department
Railways of the Islamic Republic of Iran (RAI)
Shahid Kalantari Building

Rah Ahan Square
PO Box 13185-1498
Tehran, Iran
**Fax: +98 21 654 7086 or +98 21 565 0532**

*by* Reed Business Information 1999

top

---

## THROUGH freight and passenger trains between Turkey, Iran, Turkmenistan, Uzbekistan and Kazakhstan

### ECO backs Asian links

THROUGH freight and passenger trains between Turkey, Iran, Turkmenistan, Uzbekistan and Kazakhstan are due to start next year, with the backing of the Economic Co-operation Organisation which groups 10 Central Asian countries.

Meeting in Lahore, six of the transport ministers agreed to launch an Almaty - Toshkent - Mashhad - Tehran - Tabriz - Ankara - Haydarpasa passenger service on January 5 2001. Freight trains will be targeted at intermodal traffic. A meeting in Almaty was scheduled for December to discuss the setting up of information systems for ticketing and data exchange.

In Lahore, Iranian and Pakistani railway representatives discussed development of a transhipment complex at Mirjawa on the Pakistan border. RAI confirmed that work was under way on six out of 24 sections of the standard-gauge link from Kerman to Mirjawa, which would replace the existing broad gauge line from Zahedan. PR is keen to see completion of the route, to connect it into the emerging ECO rail network.

PR General Manager Mohammad Aslam has suggested that the Pakistan Inter-Regional Railway Training College in Lahore should be developed to create a common ECO facility.

*by* Reed Business Information 2000

top

---

## 8/28/01 Khatami inaugurates Tehran's north-south subwayFirst Tehran metro line inaugurated



Exellent fotos of the new metro can be found on metropla.net

tehran, feb. 21, irna -- the first line of the tehran inter-city railway network (metro) was inaugurated monday in the presence of president mohammad khatami and visiting chinese foreign minister. The 10-km railway line services nine stations starting from the city center to a station in the western part of tehran. eight of the stations are already operational while the last remaining one (majlis station) is slated for inauguration next year.

The electric trains used by the system will have a stoppage time of 60 seconds in each station which will be reduced to 30 seconds gradually. total transport capacity of the line is 640,000 passengers per day. The trains of the western half of the line are each made up of 11 compartments and seven wagons, with a total capacity of 1,290 seated and standing passengers. The maximum speed of the trains is 80 km per hour which will be tempered to an average of 37 km per hour due to stoppages at stations along its route.

After the inauguration ceremony president khatami boarded one of the electric trains to inspect its various compartments, later disembarking at one of the stations. he also took off a train at another station and was greeted by an enthusiastic group of school students waving the three-color iranian flag and chanting "my soul, my body, my life iran." Minister of the interior abdolvahed mousavi lari, tehran mayor morteza alviri, managing director of tehran metro mohsen hashemi and the chinese foreign minister tang jiaxuan were among those who were with the president in the ceremony.

*by* irna 21/02/2000 12:43

top

## Simorgh train inaugurated

tehran, march 15, irna -- president mohammad khatami here wednesday inaugurated a project to expand the railway network that will provide more transportation facilities to passengers. A total of rls. 300bn and 4mn deustche marks have been spent on the expansion project which includes private-sector investors.

The ten railway expansion projects include the building of 11 new stations on the tehran-qom and bafq-bandar abbas routes, equipping 10 stations with electronic signs on the rey-shahroud route, and installation of the simorgh train equipped with advanced telecommunication and service facilities.

Building a factory for the production of concrete railway sleepers in shahroud, adding an extra 150 kms to the two-line railway tracks on the tehran-mashhad route, building a passenger station in bandar abbas, building a third passenger platform and cargo stop in mashhad and building a mosque in tehran's station are among the other expansion projects.

In addition, the president also viewed an exhibition in tehran's railway station on aspects of the railway organization's expansion and promotion projects and its performance in the past twenty years. Likewise, he also inaugurated the first `simorgh' passenger train (a train equipped with service and telecomunication facilities) which travels to and from mashhad.

*by* irna 15/03/2000 13:53

top

## Istanbul-Ankara-Tabriz-Tehran passenger service resumed

0803|[TR]|[IR] (istanbul Haydarpasa - Ankara -) Tatvan - train-ferry - Van - Özalp - Kapiköy TCDD - Razi RAI (- Tehran): (R.0233, 0258) In June 2000 the Istanbul - Ankara - Tatvan - Tehran *Vangölü Ekspresi* (= Lake Van Express) was booked to leave Istanbul three days a week (MWSO) and arrive Tatvan WFMO, with TCDD stock. The line from Tatvan Gar (= station) to Tatvan Iskele (= quay) may or may not be used on Mondays and Fridays, but it is served on Wednesday afternoons, when the train-ferry takes the passengers and a single TCDD baggage-car east across the lake to Van Iskele (km0.0). Van Gar is at km6.8. At Van, the baggage-car is coupled

to some eight Iranian Acm-type first-class couchettes, and the train then calls at Özalp and Kapiköy before crossing the Turkey-Iran frontier at km116.7, continuing towards Tehran. The westbound ferry-boat working is on Wed night/Thu morning. TCDD have no booked freight trains east of lake Van in summer 2000.

*by* Branch Line Society (BLS) International News June 2000

top

## Iran, Syria agree to launch Tehran-Damascus train

Damascus, Sept. 13, IRNA -- Iran and Syria have struck a deal to commission Tehran-Damascus return train through the Turkish territory, wrote a Syrian weekly here Tuesday.

The Damascus-based Arabic `Al-Baath Al-Eqtesadi' wrote the train would travel back and forth from Tehran to Damascus once a week.

The agreement reached during a recent meeting between Iran-Syria railway officials provides the railways of the two countries to cooperate in such fields as transportation, public utility services, transit of goods, production of railway machinery, exchange of experts, and establishment of a joint research center in Halab.

The weekly also reported that Syrian and Iranian railway officials are to invite the Turkish side to a joint meeting in Halab to further prepare the ground for commissioning the Tehran-Damascus train.

*by* irna 13/9/2000

top

## Asian shuttle starts after signing

JANUARY 10 is due to see the launch of a container shuttle service from Uzbekistan to the Gulf via Sarakhs, following the signing of an accord in Tehran during November between Uzbekiston Temir Yollari and Iranian Islamic Republic Railways.

According to UTY Operations Director Farhod Jalalov, the shuttle will run from Akaltyn, in Uzbekistan's Syrdarya region, through Turkmenistan to Sarakhs, and then to the Iranian port of Bandar Abbas. He says Uzbek firms are interested in shipping cotton products via the service. The train will initially operate weekly, with 26 wagons each conveying two containers. End-to-end journey time is put at 84h.

UTY has also signed a co-operation protocol with Kazakhstan Railways for introduction of container shuttle services on the Almaty - Tehran - Istanbul route.

UTY Chairman Ravshan Zohidov has been appointed head of the country's Traceca commission, negotiating with neighbouring governments for development of the so-called Transport Corridor Europe - Caucasus - Asia, which was formally launched by an intergovernmental summit in Baku in 1998.

*by* Reed Business Information 2001

top

## Istanbul-Tehran rail link resume after 8 years suspension

Ankara, March 5, IRNA -- Following eight years of suspension, the first train service between Tehran and Istanbul will be launched in a special ceremony on March 12, Turkish Rail Road Organization announced on Monday.

The report said that the train will depart Tehran for Istanbul March 13.

According to the agreement between the two countries, the train service on the Tehran-Van-Istanbul will operate once in a week.

The train will leave Istanbul on Monday, March 12 and reach Tehran on Wednesday, March 14. The train from Tehran will depart on March 13 and arrive in Istanbul on March 15.

The first train between Tehran-Damascus via Turkey will leave Tehran on March 10 and arrive in Damascus on March 12, said the report.

The Damascus-Tehran train will leave Damascus on March 10 and reach Tehran on March 12, the report added.

Iran and Turkey reached an agreement to resume services on the routes during the recent visit to Tehran by Turkish Minister of Transport and Communications Enis Oksuz.

*by* IRNA Iranian News Agency

top

---

## 8/28/01 Khatami inaugurates Tehran's north-south subway

 *picture by* Hamshahri

Tehran, Aug 28, IRNA -- President Mohammad Khatami here Tuesday inaugurated the first line of a three-phase subway network currently under construction to connect the 12-million city's down-trodden south to the plush north.

The "No. 1" line covers a 10-kilometer track starting at Ali-Abad station in the south and ending in Darvazeh Dowlat (government) station, near the former U.S. Embassy.

The second line, scheduled for inauguration in winter, will start from the vicinity of the embassy and end in Mirdamad Street in the north.

The third line will take passengers from Ali-Abad station to the mausoleum of the founder of the Islamic Revolution, Imam Khomeini, in the far south.

The project, built by Iranian experts and Chinese know-how, has cost 2,500 billion rials thus far. The country is said to be spending 800 million dollars annually on the project.

The "number 2" east-west line, built on a 10-kilometer track, was inaugurated last year.

Tehran's first subway, the "number five," became operational two years ago and whisks residents from Karaj, 40 kilometers (24.8 miles) west of Tehran, to the capital.

The subway network is hoped to ease traffic jam in this megacity, one of the world's most polluted and congested.

Roughly two million cars, burning 10 million liters of fuel each day, commute on the city's streets.

Some 4,600 people in Tehran die every year from pollution-related illnesses, according to official statistics.

Much of the pollution is blamed on dilapidated cars which jam the city's highways and streets. Most cars plying the city's streets are unequipped to use lead-free petrol.

Tehran subway director Mohsen Hashemi was earlier quoted as saying that following Tuesday's inauguration, Tehran will have a 60-kilometer (37.2 miles) train network with 30 service stations.

"Unfortunately, this is still very insufficient," Hashemi was cited as saying.

"Eight other stations must be constructed to respond to the needs of the city," he said, adding that construction work on the project could still take decades to complete.

"Thus far, 300,000 people use the subway. Once the entire project is completed, the figure could surpass one billion annually," he was cited as saying.

## President: Iran will stand 20th in metro transport in next 4 years

Tehran, Aug 28, IRNA -- President Mohammad Khatami said on Tuesday that Iran will stand 20th in the world in the next four years in terms of metro transport facility.

Inaugurating the new line of Tehran Metro, the president said that three years ago Tehran had no metro transport, with the launching of 50 km metro line, Tehran now ranks 33rd among 110 large cities and with the completion of the second phase of Line One, Tehran Metro will bring metropolis Tehran to the 30th rank by the end of the current Iranian year in March 2002.

He said that 30 km subway line will be added to Tehran's metro in the next three years so that the capital will rank 20th compared with the large cities of the world in the next four years.

The president said that construction of subway was a dream of the Iranian officials and people adding that the metro will help lower air pollution, sound pollution and hence safeguard public health as well as cut down on time and fuel consumption.

He said that lack of metro transport in Tehran had made city life difficult and air pollution caused by car fuels had posed threat to public health, therefore, previous governments should have built metro in Tehran several years ago.

President Khatami said that launching the metro in Tehran helped save 28 million hours time of the people and 60 million liters of petrol in the past single year indicating the urgency of metro for Tehran from the economic perspective, one one hand, and the life safety standard, on the other.

He said that Iran's petrol consumption stood at 15 billion liters annually, part of which is being imported. The metro will help lower petrol consumption so that Iran will be able to export petrol rather than import it.

President Khatami appreciated former President Akbar Hashemi Rafsanjani's contribution to the metro project and the hard efforts put in by Iranian experts since the Iranian year of 1356 (March 1977-March 1978) in

cooperation with a Chinese firm.

The president said that bonds worth rls 500 billion will be sold to the public to finance the construction of metro networks in six large Iranian cities this year.

*by* IRNA Iranian News Agency

*other article at* CNN.com

top

## 3/18/02 Northern half of Tehran Subway inaugurated



*picture by* Hemshahri

Tehran, March 18, IRNA -- The northern half of the Tehran inter-city railway network (metro) was inaugurated Monday with Chairman of the Expediency Council Hojjatoleslam Akbar Hashemi Rafsanjani as the guest of honor.

The 7-km railway line services eight stations starting from Mirdamad street in northern Tehran to a station somewhere in the center of the city.

Tehran Mayor Hassan Malek-Madani, former mayor Morteza Alviri, Managing Director of Tehran Subway Mohsen Hashemi, the Chinese deputy prime minister, a member of the Iran-China Joint Economic Commission, Ms W. Uyi, and a number of Majlis deputies were among those who attended the inaugural ceremony of the northern phase of the Tehran subway project. FS/LS

*by* IRNA Iranian News Agency

top

## Nov 2002 - Tehran plans four more subway lines

PROPOSALS for expansion of the Tehran metro were unveiled last month by the Chairman & Managing Director of Tehran Urban & Suburban Railway Co Hashemi Bahramani. He confirmed that TUSRC expects to complete its initial five-line network by March 2005.

Two urban metro lines and the suburban route to Karaj are already in service, totalling 55·5km and 29 stations. The sections now under construction will add 35km and 23 stations.

According to Hashemi, the long-term plans include four more lines and five extensions, which would link the capital to nearby towns. He hopes to put together a public-private partnership under which the municipal authorities would fund the tunnelling, the private sector the stations and national government the mechanical and electrical equipment.

Line 1 would be extended north from Mirdamad to Shariati and south from Haram-e-Motahar to Imam Khomeini Airport, with a suburban feeder continuing to Vavan. Line 2 would continue east from Dardasht to connect with a suburban line to Damavand and Pardis. Line 3 would be extended southwest from Javadieh to Sharyar, and Line 4 from Azadi Square to the domestic airport. Suburban Line 5 would be extended west from Mehrshahr to Hashtgerd.

Line 6 is planned to link Bokharaei in the southeast with Sadeghieh in the northwest, parallelling parts of Lines 1 and 2. Line 7 would loop through the southwest part of the city, connecting Takhti Stadium with Yousef Abad. Line 8 would parallel Line 7, connecting Moshiryeh with Azadi Square via Nazi Abad. Line 9 would also start from Moshiryeh and provide an outer orbital in the northeast sector. Another suburban route would run southeast from Moshiryeh to Varamin.

*by* Reed Business Information 2002

top

EXHIBIT 14

 **HATCH**™

# KARUN II, III, AND IV DEVELOPMENT PROJECTS

**CLIENT:**
Iran Water and Power Resources
Development Company (IWPC)

Ministry of Energy Islamic Republic
of Iran

**LOCATION:**
Khuzestan Province, Iran

(Joint Venture)



## SCOPE OF SERVICES:
Since 1977, Hatch Energy predecessor company, Acres, has been providing engineering for proposed hydroelectric developments which will utilize the 300-m drop of the Karun River over a river length of about 100 km above the reservoir of the existing Karun I Dam. The Karun River is the largest remaining source of hydroelectric power in Iran.

## PROJECT DESCRIPTION:
Hatch Energy was involved in the project definition and feasibility phases of the project in which the prime objective was to determine whether a single 300-m high dam at Karun II, either rock-fill or concrete arch, was technically and economically feasible. However, the alternative scheme using two lower dams, at Karun II and III, was selected. Hydrological and reservoir operation studies, geological investigations, power demand forecasts, transmission line routing studies, and dam and power facility layouts were all included in the work. The dams will harness the power potential and provide storage and river regulation which will permit the development of irrigation for more than 100 000 ha.

The projects are located in folded Oligocene and Miocene age sedimentary rocks in the Western Zagros Mountains with local relief varying from 1000 to 2000 m. The area is tectonically active with a significant level of seismicity. The region is underlain by carbonate, evaporite and argillaceous sedimentary rocks. However, the project structures will be founded mostly on limestone and marly limestone. Physical investigation work at the damsites upstream from Karun I included exploratory drilling, adits and topographic and geologic mapping. The first phase of the work consisted of project definition studies which examined the various power and irrigation options and selected the preferred development scheme for optimal  benefits. This was followed by a comprehensive feasibility study of the selected scheme, Karun III.

In 1989, Mahab Ghodss-Acres provided final engineering design services for the Karun III hydroelectric development, supervised additional geotechnical investigations at the Karun II site, and prepared project definition studies for Karun II and Karun IV. In 1990 Hatch Energy was also commissioned to provide project management services for a turnkey contract option for Karun III. Tender documents for a possible turnkey design, finance, construction, installation and commissioning contract were prepared for international tenders. Mahab Ghodss-Acres carried out tender evaluations and assisted in the contract negotiations.

The project, one of the largest in the world, includes a 205-m high double curvature arch dam, a two-bay service spillway, a large concrete-lined plunge pool, a 50-m high mass concrete ogee tail pond dam and a 2000-MW underground powerhouse complex.

 **HATCH**    | KARUN II, III, AND IV DEVELOPMENT PROJECTS

By the end of 2002, construction of this project completed its fifth year following new diversion. At that time, essentially all of the underground excavations had been completed and significant amounts of concrete had been placed in the main power tunnels, inlet valve gallery, powerhouse cavern, transformer cavern and tailrace tunnels. Also, installation of turbine parts for all eight units are in various stages of completion along with generated installations for two units. In the arch dam, over 500 000 m³ of the projected 1 000 000 m³ of concrete and 60 percent of the grout curtain had been completed. In addition concreting has commenced on the service spillway.

### KARUN III – FINAL DESIGN
The Karun III project is about 415 km upstream from the provincial capital, Ahwaz, and 120 km from the next existing development downstream, the Shahid Abbaspour Dam (Karun I).

The project comprises a 205-m high arch dam and spillway facilities designed to handle flood flows of 22 350 m³/s. Flows for power generation are conveyed through power tunnels which are about 700 m long and vary in size from 12.6 m to 5 m in diameter. Adjacent to the powerhouse the penstocks are steel lined. The underground powerhouse is planned to have a total installed capacity of 3000 MW. However, the initial development consists of 2000 MW provided by eight units, each of 250 MW. An underground powerhouse was selected after comparison with a surface option. Flows from the powerhouse are conveyed to the river through two tailrace tunnels of 14 m maximum diameter.

The switchyard for the project is of the SF₆ gas-insulated type, located within the underground complex. Station output is delivered by four 400-kV transmission lines to the Iranian national grid.

Hatch Energy's services include

- geotechnical investigations

- seismic studies

- hydraulic studies including physical modeling

- detailed design

- engineering drawings

- scheduling and cost estimating

- contract packaging and preparation of tender documents

- procurement

- project management

- technology transfer and training.

### KARUN II – PROJECT DEFINITION STUDIES
The Karun II development, approximately 53 km downstream from Karun III, consists of a 144-m high earth- and rock-fill dam, spillway facilities to accommodate 21 300-m³/s floods, and a powerhouse with an installed capacity of 760 MW. Mahab Ghodss-Acres supervised additional geotechnical investigations to confirm the site selected at the definition stage and to establish the project layout for the feasibility stage.

### KARUN IV – PROJECT DEFINITION STUDIES
The Karun IV site is 55 km upstream of Karun III and will comprise a 198-m high dam and associated flood handling and power generation facilities. Hatch Energy assisted Mahab Ghodss in preparing a project definition study for the Karun IV site, consisting of

**⊠ HATCH™** | KARUN II, III, AND IV DEVELOPMENT PROJECTS

- assessment of dam heights and types

- hydroelectric potential of the site

- economic analysis

- estimated construction costs and schedule.



EXHIBIT 15

Home • Projects • South Pars.

# South Pars, Qatar North Field, Iran

✉ Email Article    ▶ Print



🔑 Key Data

| | |
|---|---|
| **Area** | 500 square miles |
| **Depth** | 3,000m below the seabed |
| **Water Depth** | 65m |
| **Total Field** | 436 trillion cubic feet |
| **Phases** | 30 phases |

Full specifications

The Iranian South Pars field is the northern extension of Qatar's giant North Field. It covers an area of 500 square miles and is located 3,000m below the seabed at a water depth of 65m. The Iranian side accounts for 10% of the world's and 60% of Iran's total gas reserves. Iran's portion of the field contains an estimated 436 trillion cubic feet.

"The Iranian South Pars field is the northern extension of Qatar's giant North Field."

The field is planned to be developed in around 30 phases, each of which will require an initial investment of around $1bn.

The first 12 phases of the development are underway and will have the capacity of one billion cubic feet and 40,000 barrels of condensate a day.



⊡ Expand Image
**The Iranian South Pars field is the northern extension of Qatar's giant North Field.**

## PHASE I

The $770m development is operated by Petropars (NIOC Pension Fund 60%, Industrial Development and Renovation Organisation 40%). Around $300m worth of contracts were signed with Samsung and Sadra. The utility facilities started operating in 2002 and the process facilities were operating by July 2003, giving a total output of one billion cubic feet of gas a day and 40,000bpd of gas condensates.

## PHASES II AND III

This $2bn development came on stream in 2002. Two identical unmanned platforms, SPD 3 and SPD 4, were placed in 65m of water. Each platform receives gas from ten deviated wells, all within a radius of 3,000m. The platforms are linked to the onshore treatment system by two, 32in diameter, 105km-long multiphase lines. It initially produced 13.5 million cubic feet of gas a day rising to 60 million cubic feet a day.



⊡ Expand Image
**Fabrication of the phase I platform.**

It will eventually be ramped up with the second and third phases of the project to an output of about two billion cubic feet of natural gas a day and 80,000bpd of condensates. The field is operated by TotalFinaElf (40%) on behalf of Petronas (30%) and Gazprom (30%). The project was officially inaugurated in February 2003.

## PHASES IV AND V

The development of the phases IV and V was awarded in 2000 to a consortium formed by Agip (60%) and Petropars (40%, on a buy-back basis). The project was officially inaugurated in April 2005 and is producing more than one billion cubic feet of sour gas a day. Iran's construction share of the project was more than 44%, equivalent to S850m.

## PHASES VI TO VIII

These phases constitute a single project and are divided into onshore and offshore sections. The contract for this $2.65bn scheme was awarded to Petropars as the general contractor and the Pars Oil and Gas Company as the client in July 2000. The field was appraised by a three-well programme in 2001, estimating the field to contain three billion cubic feet of gas, 120,000 barrels of condensate and 3,300t of LPG a day.

"The South Pars field is planned to be developed in around 30 phases."

In December 2002, Statoil of Norway was named the operator of the offshore section on behalf of its Iranian partner Petropars, the operator for the land side of the development. Statoil has been responsible for building three production platforms for installation about 100km from land and has also laid a 31in pipeline from each platform to a gas treatment plant on the Iranian coast.

Condensate and LPG will be separated from the gas stream at the treatment plant and exported via a terminal nearby. The lean gas will then be transported through a 500km pipeline to the Agha Jari field for injection as pressure support to help maintain oil production.

The contract for fabrication and installation of jackets was awarded through an EPC contract to Iranian company ISOICO; the work was completed in January 2004. The refinery project was awarded through an EPC contract in May 2002 to the TIJD consortium of Toyo of Japan, IDRO of Iran, JGC of Japan and Daelim of Korea.

In March 2008 the Iranian Oil Ministry said phases VI to VIII would come on stream during the next Iranian Year, which started on 20 March, and production is expected to run at about 4,500t of LPG and about 160,000barrels of condensate a day.


Expand Image
**Phase I's $770m development is operated by Petropars.**


Expand Image
**Schematic of phases II and III.**

Expand Image

# PHASES IX AND X

The contracts for these phases were signed in September 2002 with a consortium of LG Korea, OIEC (Oil Industries Engineering and Construction) company of Iran and IOEC (Iranian Offshore Engineering and Construction Company) and represent and investment value of more than ☐2bn.

As with phases VI to VIII, phases IX and X are expected to come on stream in the year beginning 20 March 2008, and are expected to produce 25 million cubic metres of gas a day, 1,500t of butane and propane (LPG 40), 1,000barrels of gas condensate and 1,350t of ethane a day.

# PHASES XI AND XII

Phase XI will produce sour gas for the Pars LNG plant. The contract for this phase has gone to Total and Petronas, although delays forced the Iranian Oil Ministry to issue an ultimatum to Total in April 2008 to commit to the deal by the June or the contract would go to a rival.

Phase XII is designed to yield a daily production of 84 million cubic metres of gas. The first of three jackets for the wellhead platforms will be ready to be rolled up by mid-May 2008. The contract for developing this phase was given to Petropars in mid-2005, and the IOEC has also concluded a contract with the POGC, valued at $745m, for laying the offshore pipelines. Another contract worth $386m has been signed with the IOEC for building the marine platforms for this phase.

"The South Pars oil and gas field covers an area of 500 square miles and is located 3,000m below the seabed."

# PHASES XIII TO XVIII

Phases XIII and XIV are dedicated to the Persian LNG project, and are a joint development between the NIOC, Shell and Repsol. They are scheduled to come on stream in 2012, each producing eight million tons of LNG a year.

Again though, in April 2008, delays in proceeding with development of these phases forced the Iranian Oil Ministry to issue an ultimatum to Shell to commit to the deal by the June or risk losing the contract.

Development for phases XV and XVI has been awarded to a consortium of Aker Kvaerner, of Norway, and Iranian companies Ghorb and Sadra. These phases are designed to produce about 50,000,000m³ of natural gas a day for domestic consumption plus one million tons of LPG a year for export. The cost of these two phases will be $2bn and they are expected to start production in 2012.

**The SPD wellhead platform operated by TotalFinaElf.**





☐ Expand Image
**Schematic of phase VI, operated by Statoil.**

☐ Expand Image
**The no3 treatment train at Assaluyeh.**

Development for phases XVII and XVIII has been assigned to a consortium consisting of OIEC, IOEC and Petropars. These phases are expected to produce about 50,000,000m³ of gas and 11,000,000m³ of condensates a day when they come on stream, also scheduled for 2012.

Post to:
Delicious   Digg   reddit   Facebook   
StumbleUpon

**offshore-technology.com**

SPG MEDIA

offshore-technology.com is a product of SPG Media Limited Copyright 2008 SPG Media Limited, a subsidiary of SPG Media Group PLC

Home | New On This Site | Industry Projects | Special Features | Products & Services | Industry News | Newsletter | Events & Exhibitions | Organisations | Advertise With Us |

Suppliers

Home
New On This Site
Products & Services
Company A-Z
Industry Projects
Special Features
White Papers
Jobs & Careers
Industry News
Advertise With Us
Events & Exhibitions
Newsletter
About Us

 BOOKMARK

The Website for the Offshore Oil and Gas Industry

Search

EXHIBIT 16

# OFFSHORE BANKING, CORRUPTION, AND THE WAR ON TERRORISM

# HEARING

BEFORE THE

## SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

OF THE

## COMMITTEE ON INTERNATIONAL RELATIONS HOUSE OF REPRESENTATIVES

ONE HUNDRED NINTH CONGRESS

SECOND SESSION

———

MARCH 29, 2006

———

**Serial No. 109–154**

———

Printed for the use of the Committee on International Relations



Available via the World Wide Web: http://www.house.gov/international_relations

———

U.S. GOVERNMENT PRINTING OFFICE

26–777PDF                    WASHINGTON : 2006

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

## COMMITTEE ON INTERNATIONAL RELATIONS

### HENRY J. HYDE, Illinois, *Chairman*

JAMES A. LEACH, Iowa
CHRISTOPHER H. SMITH, New Jersey, *Vice Chairman*
DAN BURTON, Indiana
ELTON GALLEGLY, California
ILEANA ROS-LEHTINEN, Florida
DANA ROHRABACHER, California
EDWARD R. ROYCE, California
PETER T. KING, New York
STEVE CHABOT, Ohio
THOMAS G. TANCREDO, Colorado
RON PAUL, Texas
DARRELL ISSA, California
JEFF FLAKE, Arizona
JO ANN DAVIS, Virginia
MARK GREEN, Wisconsin
JERRY WELLER, Illinois
MIKE PENCE, Indiana
THADDEUS G. McCOTTER, Michigan
KATHERINE HARRIS, Florida
JOE WILSON, South Carolina
JOHN BOOZMAN, Arkansas
J. GRESHAM BARRETT, South Carolina
CONNIE MACK, Florida
JEFF FORTENBERRY, Nebraska
MICHAEL McCAUL, Texas
TED POE, Texas

TOM LANTOS, California
HOWARD L. BERMAN, California
GARY L. ACKERMAN, New York
ENI F.H. FALEOMAVAEGA, American Samoa
DONALD M. PAYNE, New Jersey
SHERROD BROWN, Ohio
BRAD SHERMAN, California
ROBERT WEXLER, Florida
ELIOT L. ENGEL, New York
WILLIAM D. DELAHUNT, Massachusetts
GREGORY W. MEEKS, New York
BARBARA LEE, California
JOSEPH CROWLEY, New York
EARL BLUMENAUER, Oregon
SHELLEY BERKLEY, Nevada
GRACE F. NAPOLITANO, California
ADAM B. SCHIFF, California
DIANE E. WATSON, California
ADAM SMITH, Washington
BETTY McCOLLUM, Minnesota
BEN CHANDLER, Kentucky
DENNIS A. CARDOZA, California
RUSS CARNAHAN, Missouri

THOMAS E. MOONEY, SR., *Staff Director/General Counsel*
ROBERT R. KING, *Democratic Staff Director*

---

### SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

#### DANA ROHRABACHER, California, *Chairman*

EDWARD R. ROYCE, California
JEFF FLAKE, Arizona, *Vice Chairman*
MARK GREEN, Wisconsin
MIKE PENCE, Indiana
JOE WILSON, South Carolina

WILLIAM D. DELAHUNT, Massachusetts
HOWARD L. BERMAN, California
BETTY McCOLLUM, Minnesota
ADAM B. SCHIFF, California

GREGG RICKMAN, *Subcommittee Staff Director*
GREGORY McCARTHY, *Professional Staff Member*
CLIFF STAMMERMAN, *Democratic Professional Staff Member*
EMILY ANDERSON, *Staff Associate*

# CONTENTS

Page

## WITNESSES

Arthur D. Middlemiss, Esq., Assistant District Attorney, Bureau Chief, Investigations Division Central, New York County District Attorney's Office ........ 30
Mr. Michael Herde, Managing Director, Region Americas Head of Compliance, UBS Investment Bank ...................................................................................... 39
Mr. Rodney M. Gallagher, OBE, Partner, Gaffney, Gallagher & Philip ............ 61
Mr. Robb Evans, Principal, Robb Evans & Associates ...................................... 67
John Moscow, Esq., Partner, Rosner Moscow & Napierala, LLP ...................... 73
Jonathan M. Winer, Esq., Partner, Alston & Bird, LLP .................................... 85

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

The Honorable Dana Rohrabacher, a Representative in Congress from the State of California, and Chairman, Subcommittee on Oversight and Investigations: Prepared statement .................................................................................. 3
Arthur D. Middlemiss, Esq.: Prepared statement ............................................. 34
Mr. Michael Herde: Prepared statement ........................................................... 41
Mr. Rodney M. Gallagher, OBE: Prepared statement ...................................... 63
Mr. Robb Evans: Prepared statement ............................................................... 69
John Moscow, Esq.: Prepared statement ........................................................... 75
Jonathan M. Winer, Esq.: Prepared statement ................................................. 87

39

along with the SEC, announced a settlement with J.P. Morgan Chase and Citigroup, concluding an eighteen-month investigation into $8.3 billion in loans that had been structured by the banks in such as way that permitted Enron to account falsely for the transactions in its financial statements.

Our investigation showed that the loans to Enron were structured as prepaid forward commodities transactions between the banks, Enron, and ostensibly independent counterparties offshore. In fact, the offshore parties were so-called "Special Purpose Entities" located in the Isle of Jersey and the Caymans which the banks controlled and which were involved in the deals only to make them look like commodities trades; this was done to accommodate Enron's desire to be able to account for the revenue as cash flows from operations rather than cash from bank financings. These sham transactions contributed to Enron's collapse, which had disastrous effects for thousands of Enron's employees and shareholders.

---

As Mr. Morgenthau points out in his public remarks, which themselves are the source of the vast majority of information provided herein, there are international aspects to many, if not most, sophisticated frauds. In today's global economy, it is increasingly rare to encounter a significant financial crime that is strictly a local matter. Prosecutors pursue these cases to extent we can, but criminal investigations and prosecutions are far from a complete answer to the problem.

Law enforcement cannot do the job of policing illegal money flows alone. We need the cooperation of the money service and banking industries to know who they are dealing with and to help identify other businesses that may be operating illegally. And, we need the regulators to make certain that money transmitters and the banks are doing what the law requires. Finally, we need authorities here in the United States and abroad to make it more difficult for criminals and other lawbreakers to avoid proper scrutiny by conducting their financial affairs in offshore secrecy jurisdictions. These are difficult problems, and law enforcement needs all the help we can get.

Mr. ROHRABACHER. Thank you very much. I know we are going to have quite a few questions for you when we return, but maybe not as tough as questions we will have for Mr. Herde.

You may proceed, Mr. Herde.

## STATEMENT OF MR. MICHAEL HERDE, MANAGING DIRECTOR, REGION AMERICAS HEAD OF COMPLIANCE, UBS INVESTMENT BANK

Mr. HERDE. Mr. Chairman, thank you for inviting UBS to this hearing.

Mr. ROHRABACHER. Would you mind moving a little closer to the mike?

Mr. HERDE. Thank you for inviting UBS to this hearing. I am Michael Herde, Head of Compliance for the UBS Investment Bank in the Americas.

UBS is a New York Stock Exchange listed company with more than 26,000 employees in the Americas operating through 420 offices.

I will discuss our AML (Anti-Money Laundering) compliance program, our global sanctions policy, and our failings in connection with the ECI program.

Last year, we adopted an unparalleled worldwide economic sanctions policy. The policy combines EU, United States, UN and Swiss measures against companies, regimes, terrorists and others, and applies all of them globally to our businesses.

UBS operates a comprehensive anti-money laundering program. I would like to highlight three aspects of this program.

First, know your customer. Knowing your customer is the first line of defense in preventing money laundering. UBS does not accept business with accounts in fictitious names. It does not accept

40

accounts with businesses that are shell companies and it does not accept business with money changers.

We have global standards on the identification of client beneficial ownership, on clients connected to higher risk countries, and on politically exposed persons. We seek to understand the source of each client's assets.

Second, monitoring. UBS has invested heavily in intelligent technology and human resources to implement our controls. This technology includes sophisticated monitoring tools designed to screen payments to comply with our sanctions policies and to identify suspicious transactions.

Third, culture of compliance. Our employees in the United States and all over the world appreciate the important role that financial institutions play in the prevention, detection and reporting of money laundering.

We provide regular training to employees and a firm-wide culture that emphasizes compliance with our policies and the law.

Mr. Chairman, I want to make clear that when we suspect money laundering activity we take action. We investigate the activity, report our suspicions, and we support law enforcement authorities all over the world in their investigations.

United States authorities, for example, may access Swiss Bank customer information through well established processes for mutual legal assistance. Senior United States officials have repeatedly observed that Swiss financial privacy laws are not an obstacle in the war on terror.

UBS is committed to being a strong ally in the fight against money laundering and terrorist financing. I would like to take a moment to discuss our failings in connection with the ECI program.

Between 1996 and 2003, UBS participated in the Federal Reserve Bank's Extended Custodial Inventory program. One aim of the ECI program was to exchange old U.S. bank notes for new ones, which are more difficult to counterfeit. UBS acted unacceptably in its operation of the ECI facility. Some former employees engaged in bank note transactions with countries that were subject to U.S. economic sanctions. These transactions were improper in light of our obligations to the Federal Reserve Bank of New York. UBS deeply regrets these failings.

UBS, with the assistance of Swiss counsel and United States counsel, conducted a full investigation and fully cooperated with the investigations of United States and Swiss authorities. Our investigation found no evidence that any of these bank note exchanges involved money laundering or terrorist financing.

UBS has learned a great deal from its ECI-related failings. First, we accepted full responsibility for the ECI matter and took severe disciplinary action, including dismissing several employees.

Second, we ended our international bank notes trading business.

Third, as you noted, we paid a $100 million civil penalty to the Federal Reserve and accepted additional inspections and a reprimand from the Swiss Federal Banking Commission. Our actions were the subject of comprehensive hearings in both the House and Senate in 2004.

41

More recently, UBS adopted a worldwide economic sanctions compliance program. Our new policy tracks economic sanctions imposed by the United States, Switzerland, the EU and the UN and applies them all globally to all of our businesses. We took this step for a number of reasons, including the increasing globalization of our business.

As a result, UBS has decided to exit business in Iran, Cuba, Syria, Sudan, North Korea, and Myanmar. Limited business, where permitted by law, including United States law, is accepted. No other non-U.S. bank has to our knowledge taken a similar step.

To conclude, Mr. Chairman, first, UBS deeply regrets its failings related to the ECI program. It has sought to learn from them. Second, UBS has developed what we believe is a leading global sanctions compliance program and is committed to maintaining a leading AML compliance program. Third, UBS is committed to participating effectively in the fight against money laundering and terrorist financing.

Thank you and I would be happy to answer any questions to the best of my ability.

[The prepared statement of Mr. Herde follows:]

PREPARED STATEMENT OF MR. MICHAEL HERDE, MANAGING DIRECTOR, REGION AMERICAS HEAD OF COMPLIANCE, UBS INVESTMENT BANK

Mr. Chairman, thank you for inviting UBS to participate in this hearing regarding international banks and their role in the global fight against money laundering. I am Michael Herde, a Managing Director and Head of Compliance for the Americas, at UBS' Investment Bank. Previously I was Head of Compliance for the Investment Bank in Europe, the Middle East and Africa, based in London. As you may know, Mr. Chairman, UBS AG is a financial institution incorporated in Switzerland and operating globally, including through over 420 offices in the U.S. UBS employs more than 70,000 employees globally, with over 26,000 in the U.S. In addition to investment banking, we offer wealth management, asset management, and business banking services. Our three primary regulators are the Swiss Federal Banking Commission, the Federal Reserve System, and the U.K.'s Financial Services Authority.

We are pleased to have the opportunity to discuss our firm's extensive anti-money laundering and compliance programs, and in particular, our groundbreaking global sanctions policy. In the words of our Chairman, Marcel Ospel,

We recognize that for criminals to benefit from their crimes, the proceeds derived must be secure and accessible to them, and banks are naturally targeted to provide these services. Banks like UBS have long recognized the need for concerted action in denying criminals access to our services. We also recognize the more profound need to protect the integrity of the global financial system of which we form part.

September 2004

We believe that UBS' anti-money laundering policies and procedures are among the most stringent in the world. We know, however, we must always be looking for ways to further improve our operations as new threats are posed by those wishing to test the integrity of the world financial system. With this in mind, in 2005, we adopted an unparalleled, uniform, worldwide economic sanctions policy that combines U.S., E.U., U.N. and Swiss measures against countries, regimes, terrorists, narcotics traffickers, and proliferators of weapons of mass destruction. We apply these measures collectively and globally to all our businesses.

UBS' AML PROGRAM

UBS operates a comprehensive series of anti-money laundering controls focusing on key risk areas and dedicates substantial resources towards preventing criminals, corrupt officials, and terrorist financiers from using the firm's services. These compliance initiatives are designed to meet the highest international standards, including those established by the USA PATRIOT Act, the EU 3rd Money Laundering Directive, and the Swiss Money Laundering Ordinance.

42

I will highlight three primary areas that we focus on as we implement our programs:

1. *Know Your Customer:* Knowing our customers and their financial profiles is a critical first step in assessing our relationships with current and potential clients. As such, UBS does not accept business with anonymous accounts, accounts in fictitious names, or shell companies or trusts lacking transparency as to the beneficial owner. As part of our standard process, every effort is made to identify the source of account assets. We have global standards on the establishment of beneficial ownership and dedicated compliance teams focusing on clients connected to countries of higher risks and on Politically Exposed Persons. In short, we go to great lengths to know potential customers before deciding whether or not to do business with them.

2. *Monitoring and Intelligence:* We need the best intelligence to assess our current and potential customers. Therefore, UBS has made substantial investments in intelligent technology and human resources to implement our controls. This technology includes sophisticated monitoring tools designed to screen payments to comply with our sanctions policy and to identify suspicious transactions. UBS now employs approximately 1,750 legal and compliance professionals, of which a substantial number are focused primarily on money laundering prevention.

3. *Culture of Compliance:* Having the best policies is important, but they can only be truly effective by establishing a culture among our employees to embrace and implement these policies. Our employees in the United States and all over the world, from senior management on down, appreciate the important and unique role that financial institutions must play in the prevention, detection, and reporting of money laundering. We provide regular training of employees and a firm-wide culture that emphasizes compliance with our policies and the law.

UBS is a founding member of the Wolfsberg Group. The Wolfsberg Group is named after the UBS training center in Switzerland where, in 2000, groundbreaking global industry AML standards on private banking were formulated. The Wolfsberg Group is an association of twelve global financial institutions including Citigroup, Goldman Sachs and JP Morgan Chase, working together to develop state-of-the-art financial services industry standards in the areas of Anti-Money Laundering and controls to Counter Terrorist Financing. The Group has produced statements of industry standards on areas such as correspondent banking, suppression of financing of terrorism, and dealing with Politically Exposed Persons.

Mr. Chairman, I want to make clear that when we suspect money laundering activity, we take action. We investigate potential suspicious activity, file suspicious activity reports, and we support law enforcement authorities all over the world in providing requested banking information. UBS has no higher priority than to be a strong ally in the fight against money laundering and terrorist financing.

UBS fully supports law enforcement authorities around the world against money laundering and the war against terrorism. For example, U.S. authorities may obtain access to Swiss bank customer information through well-established, cross-border channels allowing for mutual legal assistance. As a result, senior U.S. officials have repeatedly observed that Swiss financial privacy laws are not an obstacle in the war on terror. For example, speaking in the wake of September 11, 2001, former U.S. Attorney General John Ashcroft said:

> The Swiss banking system is well known as an example to the world. But one of the myths once held around the world was that the system was somehow incapable of acting to support law enforcement against terrorists and organized crime. That myth has been dispelled by the constructive conduct of the Swiss government and the Swiss banking system.
> Switzerland is an intersection on the world's financial highways, and Switzerland operates this intersection very responsibly.
> The world should take note of the responsible way in which the Swiss have acted . . . The world is a safer place because of the Swiss approach.[1]

UBS welcomes the close working relationship it has developed with U.S., Swiss, and other law enforcement authorities, and we will continue to support their efforts.

---

[1] John Ashcroft, Press conference in Bern, 12 June 2002

43

ECI PROGRAM FAILURES

Our commitment to build a cooperative relationship with U.S. banking regulators is evident in the work undertaken by our senior management in 2003 and 2004 in response to the discovery of failures in our administration of a contract with the Federal Reserve Bank of New York. From March 1996 through October 2003, under a contract with the Federal Reserve, UBS participated in the Extended Custodial Inventory Program, known as ECI. The ECI has several purposes, one of which is to exchange old U.S. banknotes, held internationally, for new U.S. banknotes, which are more difficult to counterfeit.

UBS acted unacceptably in operating its ECI facility. In breach of the ECI contract, some of our employees engaged in banknote transactions with countries that were subject to U.S. economic sanctions. UBS deeply regrets these failures.

Upon learning of this problem, our senior management instituted its own internal investigation and fully cooperated with the investigations underway by the U.S. and Swiss authorities.

Our investigation has found no evidence that any of these banknote exchanges involved money laundering or terrorist financing.

Our firm has learned a great deal from its ECI-related challenges. We have committed ourselves to enacting the proper remedies to correct our deficiencies and improve our compliance programs.

First, we accepted full responsibility for the ECI matter and we instituted severe disciplinary actions, including dismissing several employees.

Second, we ended our international banknotes trading business.

Third, UBS was sanctioned by our U.S. and Swiss regulators. We paid a $100 million civil penalty to the Federal Reserve and accepted additional inspections and a reprimand from the Swiss Federal Banking Commission. Our actions were the subject of two comprehensive hearings in both the House and Senate in 2004.

More recently, UBS adopted a uniform worldwide economic sanctions compliance policy. Our new policy tracks economic sanctions imposed by the United States, Switzerland, the European Union, and the resolutions of the United Nations' Security Council. It applies them collectively and globally in all of our businesses in all jurisdictions in which we operate.

As part of this unique initiative, UBS has made the business decision to exit business in Iran, Cuba, Syria, Sudan, North Korea, and Myanmar, with limited exceptions and only where they are permitted by law, including U.S. law. Permissible transactions include activities that are specifically authorized by law or exempt from the economic sanctions: for example, financial transactions in support of authorized humanitarian work by international organizations in Sudan.

To conclude, Mr. Chairman:

First, UBS deeply regrets its failures relating to the ECI program.

Second, we have developed what we believe is a leading global sanctions compliance program, and we are committed to maintaining one of the most stringent AML programs in the industry.

Third, UBS is committed to being an effective participant in the fight against money laundering and terrorist financing, supporting efforts to prevent use of the international banking system to further illicit activities.

Thank you for your attention to our testimony today. I will be pleased to respond to any questions you may have.

Mr. ROHRABACHER. How long have you been with UBS?

Mr. HERDE. I joined the bank in January 1999.

Mr. ROHRABACHER. So about 6 years, 7 years now?

Mr. HERDE. Yes, sir.

Mr. ROHRABACHER. All right. Thank you.

I will proceed with a few questions here.

Mr. Middlemiss, you have charged several of these banks with crimes and you have actually convicted and had recent convictions. You talked about $100 million that went from Brazil into this bank in New York and then it was headed for Vietnam.

What happened to the money?

Mr. MIDDLEMISS. Well, first of all, Mr. Chairman, with respect to money coming from Brazil and going to Vietnam, let me just clarify that those two sets of cases are not linked, they are two separate cases, each of which involved money remitters.

44

Mr. ROHRABACHER. Okay. When you get a bad guy and you have found somebody trying to transfer money, what happens to the money?

Mr. MIDDLEMISS. Well, I can give you two examples. With respect to the money that went to Vietnam, to state the obvious, the $132 million that was transmitted went to Vietnam. In fact, money remissions I think is perhaps the second largest component of the Vietnamese economy. So, for example——

Mr. ROHRABACHER. Let us not move on. So Vietnam is now becoming a destination place for dirty money? Is that right?

Mr. MIDDLEMISS. I think the point is, Mr. Chairman, that we do not know how much of the $132 million is dirty or not dirty. It would be unfair to say that the entire amount is in fact dirty. The problem and the E felony——

Mr. ROHRABACHER. We do know that it is not transparent, right? They are seeking to go through New York and other ways to try to make this not transparent.

Mr. MIDDLEMISS. This is the gravamen of the offense. The business itself is prosecuted because it is illegally moving the money and not keeping to the regulatory requirements.

Mr. ROHRABACHER. The chances of it, it is possible that somebody just does not want to pay their taxes, but it is also possible that this could be really dirty money. This could be organized crime, gangster money from Brazil, drug money, any number of things, or it could be just somebody not wanting to pay their taxes, but it is still dirty money.

Mr. MIDDLEMISS. Yes, that is exactly the point. And it is very difficult because these corrupt enterprises do not keep the proper records to drill down and get to the ultimate person who is transferring the money and to identify the reasons why.

Mr. ROHRABACHER. So to go back to the question, is Vietnam becoming a center for receiving dirty money?

Mr. MIDDLEMISS. I certainly cannot tell based on the data that I have in front of me, based on these cases. I can tell you that it is fair to infer that large sums of money, we know not from where, are being sent to Vietnam. I can tell you that I suspect that businesses in New York may well be funneling off their assets and not paying taxes on the money that they earn and sending it directly and secretly to Vietnam.

Mr. ROHRABACHER. And now what we need to do also, then, is find out how many banks in Switzerland or other places get transactions from Vietnam, right?

Mr. MIDDLEMISS. Well, I think what you are leading me to is that I would have no idea how to do that because I would not be able to get records from the Vietnamese bank.

Mr. ROHRABACHER. Right. Correct. And, again, back to the dirty money idea, let us say you get somebody and you finally have got them, their money is somewhere, it is probably in some bank somewhere, does the bank end up with the money? You do not know how much it is, you do not know——

Mr. MIDDLEMISS. The banks that we have looked at and the tools that we have in New York are slightly different than those available to Federal prosecutors. For example, one of the money remitters, going back to the Brazilian set of cases, was a company called

45

Transmar and essentially it was a doleiro in Brazil. It was in the business of helping its Brazilian clients illegally move money out of Brazil. The money went into the New York Transmar account, and millions of dollars flowed through the account. Sometimes, the money went to other dollar dealers. Sometimes, it went offshore to the Caribbean. Sometimes it went to other accounts, but at the end of the day, when we got to the account, despite the fact that—I think the amount is listed I my remarks, but millions of dollars had flowed through the account, we were left with $158,000 that we could seize.

Mr. ROHRABACHER. I see.

Mr. MIDDLEMISS. There was no money there.

Mr. ROHRABACHER. The rest of the money is off in the electronic world of somebody's account somewhere.

Mr. MIDDLEMISS. Exactly.

Mr. ROHRABACHER. In the never never land of international banking.

Mr. MIDDLEMISS. What we have tried to do is shut one of the windows through which that money can flow.

Mr. ROHRABACHER. I guess what I am asking you, can we assume that some banks have ended up with a lot of money throughout this process, in the process and in the end?

Mr. MIDDLEMISS. Yes.

Mr. ROHRABACHER. How much? We are saying a lot of money, let us say $100 million, how much of it is going to end up—can you estimate? Even if they are not caught, of course, you have a certain amount of money that is being made by the client and banks are making profit all the way along the line on this, right? That is why they are doing it. They would not be doing it because it is a public service.

Mr. MIDDLEMISS. Yes, I think that with each particular transaction that takes place, there is a fee. But also, for example, with Israel Discount Bank of New York, one of the reasons why these transactions were enabled was so that the bank itself could grow its presence in South America—so that it could facilitate transactions with people that they wanted to have other relationships with, perhaps more profitable ones, such as loaning them money, rather than merely doing them the service of wiring their money from place to place.

Mr. ROHRABACHER. So we have people at these financial institutions who are making money and that is off bad money, so to speak, but then we have bad guys who the reason they want to sometimes take money from one place to another is so they can accomplish evil things, like blowing up buildings or destroying people in certain places that they do not like them or growing poppies or cocoa or whatever, which is all facilitated by this transfer.

Mr. MIDDLEMISS. That is correct. And, again, it is hard to get to the ultimate bad guy, although because we have been able to share information with our Brazilian colleagues, our Brazilian prosecutors and police officers have taken information that we have developed in New York and successfully prosecuted a lot of bad guys in Brazil.

Mr. ROHRABACHER. So we have a lot of folks in $2000 suits and driving fancy sports cars, pillars of their community in different

46

parts of the world who are bankers but are really accomplices in some of the most horrific crimes we could imagine. Is that correct?

Mr. MIDDLEMISS. I do not think that is an unfair statement. Yes.

Mr. ROHRABACHER. All right. That is all I needed to hear.

Let us get over to Mr. Herde now.

Nothing of what I just said needs to reflect badly on you or your bank, first of all, let me note, but let me ask about a specific thing.

Your bank was fined $100 million for violating the Extended Custodial Inventory program. Now, can you explain to me why the employees of your bank chose to violate the program? What did they expect to get out of it? Why would they do that?

Mr. HERDE. The investigation that was conducted with both United States and Swiss outside counsel reached the conclusion that none of the employees involved stood to gain personally in a pecuniary way from their transgression.

Mr. ROHRABACHER. That makes it even more damning on the bank, I might add. If they did not do it for their own personal gain, you would understand that they were gaming their employer, but they must have thought that your bank was going to be the beneficiary, then.

Mr. HERDE. At best, the investigation reached the conclusion that those employees had the misunderstanding, I should say, that operational efficiencies in the short term would be in the interests of the bank. Those employees have been fired. Our senior management has definitively spoken and made clear that operational shortcuts are not an acceptable means of advancing the bank's business.

Mr. ROHRABACHER. Why would they think it would be in the interests of your bank?

Mr. HERDE. They thought they were saving some money.

Mr. ROHRABACHER. Saving some money?

Mr. HERDE. They thought that by conducting the ECI facility in the way that they did they were saving literally tiny sums of money in operational processes.

Mr. ROHRABACHER. What was the level of business that your bank held in Iran and Cuba outside of the ECI program?

Mr. HERDE. Specifically—I am not sure if I can recall specifically the total amounts. If you took all the countries where there are U.S. economic sanctions involved and put them together, whether by assets or revenues, it would amount to about 1/20 of 1 percent of our overall business, so it is a tiny sum.

The scale of businesses outside of the ECI program relative even to these particular areas were 1.5 percent of——

Mr. ROHRABACHER. But in terms of your management of that program, this was a huge percentage of those particular accounts. Maybe a minuscule amount of the overall accounts, but of these two accounts, Iran and Cuba, what we have here is probably—because they are so minuscule in relationship to the ECI, the ECI must have been a significant part of your dealings with them, right?

Mr. HERDE. Certainly there were large volumes of transactions with those two countries or the banks in those two countries through and related to the ECI program.

47

Mr. ROHRABACHER. And then would not these employees who lost their jobs, they were the ones who were just in charge of those two countries for the ECI account, right?

Mr. HERDE. No, sir. The ECI program as administered by the U.S. Government sought to recirculate new U.S. dollar bills into the international economy. Our business, I think, was $170 billion. I think that we did. And we did that with France, Germany, Italy, Spain. Also Cuba, also Iran. That was wrong, no question. And the individuals who were involved in doing this operational business on a day-to-day business did the whole program, ECI, non-ECI, all of the physical bank notes trading business.

Mr. ROHRABACHER. Well, were the employees that we are talking about here, were they trying to protect UBS's business outside of the ECI program by giving these bank notes to Iran and Cuba? Was there some sort of business that they were trying to promote or to protect that your bank is involved in in order to transfer these notes? Was there any indication of that?

Mr. HERDE. The best and most solid indication that we have is that—and this is what the investigation, I believe, found, was that the employees thought that they were gaining some operational efficiencies primarily.

Mr. ROHRABACHER. But not necessarily protecting investments in other economic activities that the bank was involved in in Cuba and Iran.

Mr. HERDE. I do not think there has been any evidence to suggest that there is a linkage between these businesses and the other businesses.

Mr. ROHRABACHER. I will return. I have used more than my time, but we will have a second round of questioning.

Mr. Delahunt, go right ahead.

We have been joined by Mr. Royce, Chairman of the Terrorism and Non-Proliferation Subcommittee.

We appreciate your presence here, Ed.

Mr. ROYCE. Thank you, Mr. Chairman.

We will have Mr. Delahunt now and proceed.

Mr. DELAHUNT. Mr. Middlemiss, it would appear to me, and I guess I am stating the obvious, that the significant issue here is the issue of secrecy and lack of transparency. In your experience, has there been any improvement in terms of the international relationships that currently exist in terms of more transparency?

Mr. MIDDLEMISS. In terms of more transparency?

Mr. DELAHUNT. Are we trending in the right direction, I guess is the question. I know there exists a convention, but reading your testimony and that of Mr. Moscow and recognizing the experience that you have, how do we go about achieving the level of transparency that would be necessary so that the issue of money laundering and our concerns, which are justifiable, would be obviated? Give me the solution.

Mr. MIDDLEMISS. I wish I could do that. I wish there was an easy answer and I think if there was one, someone smarter than me would have already given you that answer. I can talk about the importance of information such as the beneficial owner of a trust needing to be available. I can talk to you about the importance of

48

there not being bearer share corporations and suggesting to you
that——

Mr. DELAHUNT. But this would have to be achieved in conjunc-
tion with other nations, it would have to be done via a new inter-
national convention. Is that a fair statement?

Mr. MIDDLEMISS. I think it would be, or one of the ones that exist
presently.

Mr. DELAHUNT. Amending or enhancing?

Mr. MIDDLEMISS. Right. But certainly asking a prosecutor in
New York now to do our job, which essentially is to trace the
money, in the current international climate—that is impossible to
do.

Mr. DELAHUNT. That is the reality. It is impossible.

Mr. MIDDLEMISS. There are significant difficulties tracing money
around the world——

Mr. DELAHUNT. Particularly if we have hostile relationships with
another nation state.

Mr. MIDDLEMISS. Not necessarily even hostile relations, but you
still have to go through an inordinate amount of paperwork and
time to get the most basic records out of certain countries.

Mr. DELAHUNT. Just for the record, I would note that under Sec-
tion 311 of the USA PATRIOT Act, there have been eight inter-
national banks that have received so-called special measures, one
in Macau, two in Latvia, First Merchant Bank of the Turkish Re-
public of Northern Cyprus, the Info Bank of Belarus, a bank in
Syria, a bank in Lebanon, a bank in Burma, the Asian Wealth
Bank, and the jurisdictions we are talking about are Burma in No-
vember 2003, Ukraine in 2002, and I did not even know that this
nation existed, Nauruo in December 2002. As the Chairman indi-
cated in his remarks, he was going to be educated, but I can only
see this issue being resolved by an agreement on an international
level to enhance transparency and removing these impediments
that allow the kind of progress, I think, that we all would embrace.

Have you had any dealings with OFAC?

Mr. MIDDLEMISS. Not directly, no.

Mr. DELAHUNT. Okay. Let me ask you a question. Is it customary
for a wholly-owned subsidiary of a U.S. company to use offshore
banks essentially as a mail drop for their purposes?

Mr. MIDDLEMISS. I cannot speak as to whether or not it is cus-
tomary, although I believe I can think of an example where I saw
something at least very similar to that.

Mr. DELAHUNT. If you could, then, relate that example. I am re-
ferring, of course, to the use of—I guess it was the Cayman Islands
for a subsidiary of Halliburton to be utilized, I guess, according to
this report, as a mail drop for the parent company of Halliburton.

Mr. MIDDLEMISS. I am not familiar with that particular fact pat-
tern, although I can give you an example of a similar situation.

Mr. DELAHUNT. As a prosecutor, would that raise concerns for
you, whether there was a potential violation of the sanctions law?

Mr. MIDDLEMISS. Is that something that I would look at?

Mr. DELAHUNT. Yes.

Mr. MIDDLEMISS. I think as a New York County prosecutor, per-
haps not. As a Federal prosecutor, I would hope so.

49

Mr. DELAHUNT. As a Federal prosecutor, you would hope so. If in fact at that particular office in the Cayman Islands, if there was nobody there—let me give you a hypothetical. If there was nobody there, there was an office and a telephone and the phone never rang and mail was forwarded to the parent company that was headquartered or at least had an office in Dubai, and we are familiar with Dubai, we have been reading about Dubai for the past month or so, and this company was doing business in Iran, a rogue state, providing some $40 million worth of services to enhance their ability in the energy field, and the law stated that the subsidiary had to operate independently, and that is the legal term, would you infer that maybe the parent company was operating there rather than the subsidiary and that the subsidiary was a fiction and that this company was doing business with a rogue nation, a member of the Axis of Evil club? Would that come to your mind?

Mr. MIDDLEMISS. I think it is an issue——

Mr. DELAHUNT. If you were a Federal prosecutor, Mr. Middlemiss.

Mr. MIDDLEMISS. Well, actually, with respect to being a state prosecutor, the issues that you raise are very similar to ones that involve the Enron case, where certain entities that were shams were used to take part in transactions that were designed to bolster Enron's books and records in real ways.

Mr. DELAHUNT. Right. Right.

Mr. MIDDLEMISS. With respect to the issue of the subsidiary, I cannot speak to it.

Mr. DELAHUNT. I cannot, either. I would like to hear, though, from representatives of the parent company and the subsidiary, but I have a strong suspicion that I will not have an opportunity to ask a representatives of either Halliburton or Halliburton's subsidiary that was doing business to the tune of tens of millions of dollars with a rogue state, but with that I will yield back.

Mr. ROHRABACHER. Thank you very much.

If somebody is transferring $100 million from Brazil to a bank in New York and then it goes on to Vietnam, how much money does the bank in New York make on doing that?

Mr. MIDDLEMISS. I cannot state with specificity, Mr. Chairman, but I can say that with respect to wire transfers I believe that banks make a very small amount of money based on that business alone.

Mr. ROHRABACHER. Okay. So you are not talking about $10 million to transfer $100 million, you may be talking about $100,000?

Mr. MIDDLEMISS. No, I do not think so. I think it is less than that.

Mr. ROHRABACHER. Less than that?

Mr. MIDDLEMISS. Less than that. Yes.

Mr. ROHRABACHER. All right.

Ileana?

Ms. ROS-LEHTINEN. Thank you so much.

Mr. Rohrabacher, thank you very much for letting me participate in your Subcommittee hearing on this important topic and I look forward to being a part of the upcoming hearings as well.

Mr. Herde, I had some questions for you. In your testimony before us today and in your written testimony as well, you use these

50

exact phrases: Its failings, its failures, acted unacceptably, improper actions, deficiencies. Then, after Mr. Rohrabacher's questions, you used the phrase operational shortcuts, and finally the word wrong. Nowhere is the word illegal.

Did you pay a $100 million for deficiencies, shortcuts, or were you paying a fine because of illegal transactions? Was UBS breaking the law?

Mr. HERDE. We owed certain obligations to the Federal Reserve Bank of New York. Those obligations——

Ms. ROS-LEHTINEN. Did UBS commit an illegal act when it was involved in these ECI transactions with OFAC sanctioned countries? Was it illegal for UBS to be involved in these operations?

Mr. HERDE. Non-United States banks and foreign incorporated subsidiaries of United States banks may permissibly engage in transactions, for example, with Iran. Had UBS conducted those transactions away from its ECI program, it would not have violated its obligations.

Ms. ROS-LEHTINEN. Why is it that you paid a $100 million civil penalty to the Federal Reserve and accepted the reprimand?

Mr. HERDE. Because we undertook certain obligations to the Federal Reserve Bank in New York and we failed to meet those obligations and that is a very serious matter. We also——

Ms. ROS-LEHTINEN. Were there two sets of books, one internal that UBS had, where, I imagine, the reports have indicated you kept good records of what Cuba was sending and other countries that are sanctioned countries that could not participate in this program—one set of internal records and another set of records that were given to the Federal regulators? Were there two sets of records?

Mr. HERDE. There was one set of records, but there was a series of false reports submitted by the bank staff that——

Ms. ROS-LEHTINEN. False reports. Is that an illegal activity? Where does the word illegal come into play with what is going on? And I hope that it is in the past tense, but I am not so sure. It is so hard to pinpoint you and it has been so difficult after so many months to have you say what it is that you were involved with. And I do not mean you personally.

Mr. HERDE. Of course.

Ms. ROS-LEHTINEN. I meant the institution you represent.

Mr. HERDE. Of course. I stand here on behalf of UBS. There is no question. UBS is not happy with its conduct.

Ms. ROS-LEHTINEN. Not happy with its conduct. Well, what kind of conduct was it? Illegal conduct?

Mr. HERDE. We failed to meet our obligations to the Fed.

Ms. ROS-LEHTINEN. Failed to meet the obligations. So when the Federal regulators were investigating UBS, the level of cooperation by UBS, months and months and months of pushing UBS for money laundering, terrorism financing, illegally using the ECI program, having different books, and then UBS has the position that it was some minor employees, eight employees, perhaps, and they were fired and that the problem is taken care of.

If we could go back to the relationship between the ECI program and other business dealings with Cuba, for example, you are saying that you did not pursue ECI programs with the regime in the hope

51

of getting more business out of it with Cuba or any other rogue
states?

Are you saying that you are satisfied with UBS's relationship
with the Castro regime and does that mean that UBS had an ex-
tensive relationship with Cuban entities and the regime?

What is the nature or what was the nature of this transaction?
Can I ask you again, did UBS employees violate the ECI program
with the intent of enhancing UBS business relationships with Iran,
Cuba or other rogue regimes?

Mr. HERDE. As I believe I indicated previously, the investigation
concluded that a primary driver for the activity by the individuals
who were involved was a misguided perception that operational ef-
ficiencies would be in the interests of the institution.

Ms. ROS-LEHTINEN. Misguided perception that operational effi-
ciencies? I just want to make sure—misguided perception by the
employees of UBS who were doing that transaction?

Mr. HERDE. Yes.

Mr. ROHRABACHER. The Chairman would like to interrupt. That
does sound like very suspicious language, pardon me for being a
former journalist, but when I hear a corporate representative use
that description, I would be very suspicious of it.

Mr. HERDE. Let me be quite clear. UBS is not proud of its
failings in connection with the ECI program. I use that word quite
deliberately. We failed. We believe that we have taken responsi-
bility. We have settled with the United States Government. We
have cooperated with all inquiries. We have settled with the Swiss
Government. And we believe that we have taken a number of cor-
rective actions, including most recently the introduction of a unique
global economic sanctions program which we do not believe any
other non-U.S. bank has undertaken.

We also believe, and I would note, that foreign incorporated sub-
sidiaries of U.S. banks can engage in activities with Iran in the
same way that non-U.S. banks can.

Ms. ROS-LEHTINEN. Thank you.

I wanted to ask you about operational efficiency. If what you are
saying is that these eight employees or so were dealing with OFAC
sanctioned countries knowingly, they knew that these countries
were countries that should not have participated in the ECI pro-
gram, no doubt, why was dealing with them a way to get to oper-
ational efficiency? What is that operational shortcut? I do not un-
derstand how dealing with sanctioned companies was a way of get-
ting to operational—this is your phrase, operational efficiency.

What about those transactions would lead one to operational effi-
ciency?

Mr. HERDE. There was a way that UBS could have set up its
business operations that would have involved duplicate sets of
bank notes businesses: One a completely ECI-compliant business
and the other, the non-U.S. bank, foreign bank note dealing oper-
ation. In the same way that other international banks today deal
with these countries and re-transmit the bank notes to the U.S.
Government, UBS could have done that. For whatever improper
reason, the employees involved did not do that and they have been
held responsible for that and anybody who was involved in both
those activities and the——

52

Ms. ROS-LEHTINEN. Anyone involved in those activities, in addition to those employees that are at the lower level, would you state that no administration or higher officials in UBS knowingly participated in these illegal transactions, that it was only these eight individuals and no one higher up than that?

Mr. HERDE. I am satisfied that appropriate disciplinary action, including termination or separation from employment, was taken against all individuals who had an active hand in either——

Ms. ROS-LEHTINEN. What about an inactive hand? What about someone who might have known about the transaction? See, we are being led to believe that these individuals did it on their own for operational shortcuts and for operational efficiencies and not to enhance UBS's dealing with Iran, Cuba and other sanctioned countries. It is hard to believe that others did not know.

Mr. HERDE. You are correct. Actually, individuals who had knowledge but were not involved in the process at all were also fired.

Ms. ROS-LEHTINEN. How many individuals were fired as a result of this illegal activity?

Mr. HERDE. Fired and separated from employment, right? Two slightly different categories. I do not know. Between eight, ten, eleven in total. There were some people who were fired outright and there were some people who left the bank.

Ms. ROS-LEHTINEN. So how many of them were fired and how many of them left the bank?

Mr. HERDE. I would be happy to go back and provide that information.

Ms. ROS-LEHTINEN. I do not have a very good track record with UBS in providing me any information, so we can say fine and I will not be holding my breath.

Mr. ROHRABACHER. Ileana——

Ms. ROS-LEHTINEN. Just one more question.

Mr. ROHRABACHER. Certainly, but if I could amplify?

Ms. ROS-LEHTINEN. Oh, yes. Go right ahead.

Mr. ROHRABACHER. Was your answer that individuals with knowledge were disciplined or is your answer all individuals with knowledge were disciplined, higher up?

Mr. HERDE. To the best of my knowledge and belief, right? To the best of my knowledge and belief, all the individuals who had knowledge of the ongoing activities are no longer working for the bank.

Mr. ROHRABACHER. All right. And the caveat to the best of my knowledge was certainly a good caveat for you.

Go right ahead.

Ms. ROS-LEHTINEN. Thank you, Mr. Chairman.

I am interested, Mr. Middlemiss, the bank says they have a few employees who were involved in the transaction, the higher ups did not know, they were fired or left their employment, whatever phrase you want to use, the bank pays $100 million in fines and that is it. Do we have a system in prosecution for if you have a lot of money you pay your way out of whatever problems, whatever—let me see, what was the phrase? Whatever operational shortcuts you were involved with, whatever unacceptable behaviors, whatever deficiencies, whatever failures, you pay a fine, $100 million,

53

that is it. You can pay to get out of trouble, do not have to face any criminal charges.

Is there an ongoing criminal investigation of UBS's misconduct in the ECI program that you know of?

Mr. MIDDLEMISS. I do not know, Congresswoman.

Ms. ROS-LEHTINEN. Well, who would be handling that?

Mr. MIDDLEMISS. I would think the Department of Justice, if there is one.

Ms. ROS-LEHTINEN. And I know that Mr. Morgenthau has taken on some big cases in the past. Do you have right now in the New York County any open investigations of UBS's transactions related to any of the items that we have discussed?

Mr. MIDDLEMISS. I do not think I can speak to that.

Ms. ROS-LEHTINEN. All right. I know I have taken up a lot of time. I have a lot of other questions.

Mr. ROHRABACHER. We may have a second round.

Ms. ROS-LEHTINEN. Thank you.

Mr. ROHRABACHER. Mr. Royce, you may proceed.

Mr. ROYCE. Thank you, Mr. Chairman.

Obviously, there have been some questionable transactions brought to light here today and, indeed, I think bank examiners at the Fed and at the OCC (Office of the Comptroller of the Currency) have become much more aggressive about potential money laundering activities by U.S. regulated banks.

Additionally, the Financial Services Committee, the other Committee that I serve on, has spent a great deal of time reviewing anti-money laundering enforcement issues.

With that said, presently, I am concerned about proactive measures banks and the regulatory community are taking to prevent future transactions and transgressions of these types.

Today, we have heard from one bank as to what corrective measures they have taken to help combat money laundering, including closing its bank note trading operations, its new global sanctions policy, and a closer working relationship with United States- and Swiss-based regulators.

I would ask what measures have major international banks taken to combat money laundering? In other words, are the major financial institutions that are domiciled in Europe following United States anti-money laundering prohibitions?

What are we doing to put leverage on that and how do we exert such leverage? Mr. Middlemiss?

Mr. MIDDLEMISS. With respect to what banks are doing in Europe, Mr. Royce, I do not think I am positioned to speak to that. What I hope does happen from the cases that have been investigated and prosecuted by the DA's office is that we bring attention to the importance of the underlying measures that already exist in terms of antimoney laundering controls in the United States. I hope that that sends a message to banks that are based elsewhere that do business here that the United States takes that regime seriously. And I hope that a message that we can tell them is that real application of the KYC (Know Your Customer) rules, filing suspicious activity reports and CTRs works. And one of the things we can tell those financial institutions, both abroad and here, is that when the do diligently filed suspicious activity reports, it

54

works. People do read them. The Manhattan DA's office, for example, has prosecuted many cases, the basis of which the start of were suspicious activity reports themselves.

So I hope that that, to some extent, answers at least part of your question regarding what, if anything, we can do to encourage banks to—I do not want to say do better, but to live up to the regulatory regimes presently in existence.

Mr. ROYCE. Mr. Herde, did you have anything to add to that?

Mr. HERDE. Thank you very much, Congressman. I would suggest that the global standard that UBS has to acquire the identification of beneficial ownership is a key control and one that is in place in the EU and in Switzerland and is an expectation here in America. I think a suggestion would be rigorous application of that discipline to account opening.

Mr. ROYCE. And just for a moment, how would we expand that to application worldwide? In your view, Mr. Middlemiss, can you think of any way to make certain that the EU and the US——

Mr. MIDDLEMISS. I think that Mr. Delahunt touched on it before, Mr. Royce, in that it requires international cooperation to create a regime worldwide where everyone is playing by the same rules. If we do that, we would have success. How to do that is not a question I can answer.

Mr. ROYCE. Moving over to some of our efforts that gave rise to some of the laws that brought us to where we are today was the attempt to choke off the flow of funds used by various terrorist networks around the globe. Al-Qaeda, in particular, no longer has its finance committee operational but, on the other hand, in its place are small cells that move resources to radical terrorist organizations around the country, and that, it seems to me, can only be confronted through international cooperation in addition to applying our laws here.

But one of the issues that I think is going to beset us is what we go about Gulf state societies that move that money through terror finance. Some in those societies move a great deal of money, in the hundreds of millions of dollars, in some cases billions, that go through madrassas, the educational institutions across West Africa, North Africa, and Central Asia, in which the next generation of al-Qaeda operatives will be graduates once they learn jihad in those institutions.

One of the real questions is how the international community gets enough leverage on Saudi Arabia and other Gulf states to make certain that they get the transparency necessary so that we know where this money is being moved. The only way I can think this is going to happen is by elevating a position in transparency of an under secretary with enough power to sit on the IMF (International Monetary Fund) and World Bank and every other international institution where we have a presence with basically the exercise of the veto power against that state that will not force compliance with its financial institutions to these international standards.

That is going to take a much more robust and aggressive posture on the part of your department and on, frankly, the part of the Administration and Congress and the EU in order to make certain that we all reach the common agreement that unless we see com-

55

pliance out of the Gulf states that are the originators of most of the money—there are prominent families in these societies that fund these types of activities—until we see a system that brings enough pressure on those governments so that those governments decide to enforce transparency through their own banking regulations, we are not going to be able to get to the root of the problem, and I would just like your observations on that Mr. Middlemiss.

Mr. MIDDLEMISS. Mr. Royce, I have to say that, as a local prosecutor, we prosecute the crimes that we see. In terms of help to do that, the international cooperative efforts and regime that you describe would be most helpful. Again, how to create that, as a local prosecutor, I do not think it is for me to opine on that.

Mr. ROYCE. And I guess my last question, since you are on the front lines, is how you feel the cooperation is going with foreign governments in terms of the assistance given you, the information and the tools that you need in real time in order to track this. Do you feel you are getting full cooperation, or could you point to any countries or principalities or any islands where you are not getting that assistance?

Mr. MIDDLEMISS. I can only speak anecdotally. I can say that the cooperation that we have had with Brazilian authorities has been excellent. In terms of getting information, Mr. Morgenthau has praised in the past the Channel Islands for their cooperation and the Isle of Mann. On the other hand, jurisdictions such as the Caymans and the Bahamas, in my experience, have been particularly problematic.

Mr. ROYCE. Bad actors. Can you think of a way that we could change our laws, or the international banking community could change their laws, to make it the case that banks would not want to open branches there or that individuals would not want to risk laundering their money through their branches? Is there a way that we could move in concert to make it very, very difficult for any bank to operate in the two countries that you just cited?

Mr. MIDDLEMISS. Again, as a matter of policy, Mr. Royce, I am hoping that some of the panelists who are going to come after me will have specific answers to that question. In terms of making other sovereign nations provide information required, that, again, becomes an issue of national politics.

Mr. ROYCE. But we can add into that the branching of banks doing business in the United States that branch into the Cayman Islands, and that is where I think the nexus may exist for us to put certain conditions on operations in the United States and in Europe, which would then dictate what kinds of operations could exist for branches in these countries.

Mr. MIDDLEMISS. There are laws presently in New York with respect to subpoena practice that if you are a branch of a foreign bank doing business in New York, and we serve you with a subpoena, you get into a conflict-of-laws question, where the bank can either produce documents that are located abroad, but doing so might violate that other nation's law. On the other hand, if they do not produce the documents in New York, and the corporate structure is such that they are a branch, they are going to violate New York law.

56

So the way, as a prosecutor, you like to think about it is that you are providing a choice to the financial institution. You can comply with New York law, or you can choose not to do business in New York. Now, unfortunately, the way that these decisions get made in the real world is a lot more complicated than that, because asking a major financial institution to leave New York is a question that probably is not going to be answered in the context of in the matter of an investigation of the business affairs of John Doe.

Mr. ROYCE. That is why we have oversight, and that is why we have an opportunity for you, Mr. Middlemiss, to raise that issue and for us to consider changing the laws and bringing the leverage and moving in concert. The EU is on the Hill today, and we certainly are going to have the opportunity later today with some of the EU members to talk about some of the issues that you brought up. Mr. Chairman, thank you.

Mr. ROHRABACHER. We certainly appreciate your leadership, Mr. Royce, in trying to find some specific reforms that will help protect us against terrorists using our international financial institutions as a vehicle to achieve their own objectives, their own blood objectives, I might add. So I appreciate your personal involvement in this issue.

Mr. ROYCE. Thank you, Mr. Chairman.

Mr. ROHRABACHER. We will have a very short round. Everybody will have about 1 minute to ask a couple of questions just in follow up, and that will be the end.

I would like to note that I know Ileana has had trouble about getting subpoenas fulfilled and paid attention to. Let me note that we cannot sometimes even get the President to pay attention to our appeals and things like that. So we have got a lot of work to do when it comes to making sure that the legislative branch has the information that we need, and, again, we appreciate Mr. Herde and your bank for being here to answer these questions. That is, again, a sign of good faith, and we appreciate that.

Do you have another minute or so?

Mr. DELAHUNT. I do, Mr. Chairman. Let me just associate myself with the import of the questions that were posed by my friend from California, Mr. Royce. I think he is headed in the right direction. It is an international problem, and unless we can get people on the same page, and we should be utilizing our leverage. I would hope that the United States, through the Administration, would have leverage with the Cayman Islands, for example.

What I would suggest to my friend is that, you know, whether it be financial services or whatever, we design our own good guy/bad guy list based upon the testimony and the input from those prosecutors.

But before you leave, Mr. Middlemiss, my colleague from Florida, Ms. Ros-Lehtinen, or maybe it was the Chairman, asked a question about existing investigations relative to UBS, and you said, I cannot comment. I just want to kind of clarify that a bit. I presume that you are restricted by the canons of ethics about commenting upon any investigations.

Mr. MIDDLEMISS. Yes, sir.

Mr. DELAHUNT. Okay. Am I hearing you right?

57

Mr. MIDDLEMISS. You should not infer one way or the other from my answer what investigation, if any, we have.

Mr. DELAHUNT. I do agree that we should have an answer to that question, and I do not know if there is anyone here from OFAC, but I think that they would be an appropriate agency, and I think the gentlelady deserves to have an answer. So is there anybody here from OFAC? We do not have anybody monitoring this hearing, but I know, Mr. Chairman, in the future that you will ensure that we have a representative of OFAC so we can determine how efficient and effective—it would be good to hear from the Administration in this regard.

One final question for you, Mr. Herde. You are out of the business of any relationship with the Government of Iran?

Mr. HERDE. We are in the process of exiting all of our business with clients and others in Iran. It is not a complete process.

Mr. DELAHUNT. What about Cuba?

Mr. HERDE. The same.

Mr. DELAHUNT. Because there was a statement made by the CEO of Halliburton that they, too, were going to exit from their relationship with Iran, and yet they kind of left a little bit of wiggle room, and I want to know if you are in the same position. Are you going to leave some wiggle room? To let me quote the CEO here, Mr. Leser, he said, "If the United States sanctions are lifted in the future or . . .," and this is what I find rather interesting, "more of our customers go there, we will return to this market." Is that the same position that you hold? Are you out of Iran and Cuba permanently?

Mr. HERDE. Yes. And to answer specifically related to Cuba, that relationship is terminated and gone and finished, and we have no intention of revisiting our policy as it now stands.

Mr. ROHRABACHER. Okay. How about Vietnam? So you are out of Cuba, out of Iran, but on to Vietnam. Okay. That is all right.

Have either one of you fellows been in the Cayman Islands?

Mr. HERDE. I have not.

Mr. MIDDLEMISS. No, sir.

Mr. ROHRABACHER. You guys must have been in the Cayman Islands.

Mr. DELAHUNT. Neither have I, Mr. Chairman, unfortunately.

Mr. ROHRABACHER. Now, let me note that I have been in the Cayman Islands, and I think something that is interesting in the Cayman Islands is that they have a thing called Ray Bay. Raise your hands in the audience if you have been to the Cayman Islands.

Mr. DELAHUNT. There are a lot of bankers out there, Mr. Chairman.

Mr. ROHRABACHER. A lot of bankers out there. So in the Cayman Islands, they have a thing called Ray Bay, and they have taught these vicious sting rays—I am a surfer, and I will tell you, if you step on a little sting ray, you are in big trouble, and I have stepped on a sting ray out surfing one time, and it is horrific. But these sting rays are beyond anything you could imagine. They are huge, like three and four feet across, and in the Cayman Islands, they have trained these rays to eat out of people's hands. You get into the water, and they come all around you, and they have taught

58

these deadly creatures to eat right out of your hand and to cozy up to you.

My guess is that if they can do that with sting rays, they probably do that with those who are designed to regulate international financial institutions because somebody is not using their stinger, and obviously this has been a very interesting way to open the door.

I appreciate both of you testifying, and I will have to say that whoever briefed you, Mr. Herde, did a good job, and you did a good job, but even as professionally as they can brief you on how to say something specifically that does not create a liability—being a former journalist, I hear reasonable words of how to get around certain things. It is not you. I understand you are here representing your institution, and you did a fine job, but there were some questions that I believe were brought up by the way you answered certain things, "to the best of my personal knowledge, blah, blah," which indicates to me that there is probably someone very high up in the bank who knew everything and is still there.

Mr. HERDE. Sir, if I could take a moment to correct that.

Mr. ROHRABACHER. Sure. Absolutely.

Mr. HERDE. I would not want you to be left with the misimpression that those who were responsible were not treated appropriately and disciplined. The investigation found and allocated responsibility, and senior management acted on that. So everything that the investigation found was acted upon by management or by our regulators. I am not aware of any person who has escaped.

Mr. ROHRABACHER. "I am not aware" is a very good caveat, as I say. Ms. Ros-Lehtinen?

Ms. ROS-LEHTINEN. Thank you so much, Mr. Chairman, again.

Mr. Herde, your bank has stated that you now see the wisdom in not doing business with U.S.-sanctioned countries. I am interested in what the factors were that contributed to this earth-shaking decision and why it took so long. January is when you made the decision, January. Correct?

Mr. HERDE. I believe it was in November.

Ms. ROS-LEHTINEN. November. November——

Mr. HERDE [continuing]. Of last year.

Ms. ROS-LEHTINEN [continuing]. Of last year. How many months ago was that?

Mr. HERDE. That is about 6 months when the decision was formally finished.

Ms. ROS-LEHTINEN. Now, before that November date—we have this Congressional Research Service, and it has a timeline of the scandals, investigations, and violations involving UBS, and it is quite lengthy, and it goes page after page, and it is just surprising to me that it had taken so long. Here is the timeline that they had put out. UBS promised to cooperate with investigations into money laundering from Iran and Cuba. The National Association of Securities Dealers looking into UBS. A French investigation reported that Osama bin Laden had use of an account at UBS. All of these—I mean, it is just page after page. Serbian President Milosevic was reported to have profited. Here is another one, a Federal lawsuit.

59

It is just ongoing, and yet November, 6, 7 months ago, was when you finally put out your position statement. Here, a *60 Minutes* report named UBS as one of the banks holding Saddam Hussein's hidden assets. A bank spokesman described the charge as most unlikely.

So much was going on, and it is just page after page of so many activities. So what were the factors that contributed to your decision that it is not good business to do business with U.S.-sanctioned companies and what took you so long?

Mr. HERDE. Thank you, Congresswoman. I think, most importantly, we are quite proud of the fact that we are the first non-U.S. bank to take this step, and we do not think it took that long at all. In fact, no other bank, to our knowledge, has taken a similar step.

Second, as of today, everyone in the world except those in the United States and UBS are able to deal with Iran freely. There are not any sanctions outside of the United States on that country. We are wholly supportive of our global sanctions compliance program. We think it is the right step, and we think we took it for the appropriate reasons.

Ms. ROS-LEHTINEN. In April 2004 is when the Federal Reserve imposed a civil fine of $100 million. Is that correct? At 5/2004?

Mr. HERDE. Yes.

Ms. ROS-LEHTINEN. And then 6 months ago, you formed your position paper.

Thank you, Mr. Chairman.

Mr. ROHRABACHER. All right. Before we call the next set of witnesses, I saw some heads shaking yes or no out there, did Milosevic ever have a personal account with your bank?

Mr. HERDE. Milosevic. I have no knowledge.

Mr. ROHRABACHER. Well, there is another caveat. What about bin Laden? Did he have an account at your bank?

Mr. HERDE. I do not believe so.

Mr. ROHRABACHER. A caveat. Saddam Hussein; did he have an account at your bank?

Mr. HERDE. No, I do not think so.

Mr. ROHRABACHER. No, I do not think so, or I do not think so, no?

Mr. HERDE. I would be very happy to take these queries and answer them specifically.

Mr. ROHRABACHER. Okay. Now, let me ask you this, then. If we asked you those questions, can the answer get back within 2 weeks? Ileana has had a pretty rough time.

Ms. ROS-LEHTINEN. Thank you, Mr. Chair.

Mr. HERDE. My colleague advises me the answer is no to all three questions.

Mr. ROHRABACHER. No to all three questions. Of course, your colleague is not sworn in, but that is all right.

Mr. HERDE. That is true, but I am happy to——

Mr. ROHRABACHER. We will accept those. Again, I appreciate the fact that you are here. This has been a very illuminating hearing so far. We have got a second panel. You have done a good job by those people who are paying you. I want everybody out there to hear this. He has done a good job at representing his bank and his employers. That is not to say we have the same interests because

60

we do not. We are here to represent the interests of the people of the United States of America, and we are trying to do a good job, too. But we can see that you are well intended, and you are doing a good job for those who are employing you, and we appreciate the good faith in having you here to answer these questions.

Ms. Ros-Lehtinen. And I include that as well, Mr. Rohrabacher.

Mr. Herde. Mr. Chairman, I would like to reiterate my thanks to you for inviting us to participate in this hearing, and I mean that in a genuine way. You have made clear a number of times that you have appreciated the good faith that the bank has extended, and it is our full intention to cooperate with all——

Mr. Rohrabacher. Okay. Well, I am hoping that this set of hearings will open up a doorway to the world to start getting at some real international bad guys, some real evil people that are doing this throughout this globe and pilfering billions and billions of dollars that belong to the poor people of this world or even the regular people of this world. If you are going to be on our side in that, we do not care if anybody has made mistakes in the past. We are very happy to have your active support and cooperation in that effort. Mr. Middlemiss?

Ms. Ros-Lehtinen. Mr. Chairman, if I could add, I hope that in the next set of hearings, we do not have to threaten anyone with any subpoenas to get them to be so cooperative, so I look forward to that.

Mr. Rohrabacher. But in the next set of hearings, we are going to be investigating the Administration. I am just kidding.

Mr. Delahunt. I can assure you that will not happen. We will never investigate this Administration until I am sitting in that chair, and he is sitting over here.

Mr. Middlemiss, would you please convey my warm regards and best wishes to District Attorney Morgenthau?

Mr. Middlemiss. That will be my pleasure.

Mr. Rohrabacher. And thank you very much for your good work. Okay? Thank you very much. This panel is dismissed, and we have a second panel.

[Pause.]

Mr. Rohrabacher. All right. We are back in session, the International Relations Committee, Subcommittee on Oversight and Investigations. We now have a panel, and for the record, we will be putting your entire bios in the record rather than have me read them right now.

We have with us Rodney Gallagher of Gaffney, Gallagher & Philip. We have Mr. Robb Evans of Robb Evans & Associates. We have with us John Moscow, who is a partner with Rosner Moscow & Napierala, and then Jonathan Winer, a partner of Alston & Bird.

So with that said, if you can make it 5 minutes and facilitate a discussion, that would be much appreciated. So, Mr. Gallagher, you may proceed.

Mr. Gallagher. Thank you, sir.

Mr. Rohrabacher. And it would be very good to get the thing close to your mouth so that everybody in the hall can hear.

EXHIBIT 17

# CIVIL WRONGS

## FULL TEXT TRANSLATIONS OF THE

### CIVIL WRONGS ORDINANCE [NEW VERSION]

### CIVIL WRONGS (LIABILITY OF THE STATE) LAW 5712-1952

### CIVIL WRONGS REGULATIONS (LIABILITY OF A PUBLIC SERVANT) 5766-2006

### CIVIL WRONGS REGULATIONS (LIABILITY OF THE STATE) (WRITTEN NOTICE OF DAMAGE) 5763-2003

### LAW FOR THE AMENDMENT OF CIVIL WRONGS LEGISLATION (AMELIORATING BODILY HARM) 5724-1964

## INCORPORATING ALL CHANGES

## UP TO AN INCLUDING APRIL 10, 2006

## ARYEH GREENFIELD – A. G. PUBLICATIONS
### June 2006

Case 1:08-cv-04414-JSR    Document 9-3    Filed 07/02/2008    Page 53 of 142

# INTRODUCTION

We here present the English translation of Israel's legislation on torts and civil wrongs, fully up-to-date with all amendments incorporated, and including the regulations published on April 10, 2006.

This Ordinance is based on an enactment legislated in 1944 by the British Mandate authorities. In 1968 that measure, including all its amendments until then, was replaced by a completely reedited Hebrew language "New Version", which in turn has been amended several times. In preparing English translations of all the measures in these pages we worked from the official text published in Sefer Ha-chukkim and in Kovetz Ha-takkanot, and were also guided by the consolidated Hebrew texts published by Dinim ve-Od, a major service that covers all Israel legislation.

**Although we exert considerable efforts to ascertain the correctness, completeness and relevance of all our publications, the translator, editor, publisher and distributors have made no warranty and can assume no responsibility whatsoever on that account.**

**Readers are also cautioned that no translation of Israel legal measures has any standing under Israel legal practice; the Courts and other authorities will concern themselves only with the original and official Hebrew text. For this and other reasons readers are advised to consult qualified professional counsel before making any decision in connection with the enactments, which are here presented in translation for their general information only.**

*Aryeh Greenfield – A. G. Publications*

Copyright 1998, 2006 by
Aryeh Greenfield – A. G. Publications
P.O. Box 7422, 31-070 Haifa, Israel
Tel. 972-4-825-5104, Fax 972-4-826-1182

# CONTENTS

Introduction                                                              2

CIVIL WRONGS ORDINANCE [NEW VERSION]                                      4
Chapter One:          Interpretation                                      4
Chapter Two:          Rights and liabilities in civil wrongs              5
Chapter Three:        Civil Wrongs                                       12
    Article One:      Assault                                            12
    Article Two:      Imprisonment                                       14
    Article Three:    Trespass                                          .15.
    Article Four:     Negligence                                         16
    Article Four "A": Injury by a Dog                                    18
    Article Five:     Nuisances                                          18
    Article Six:      Misappropriation                                   20
    Article Seven:    Fraud                                              21
    Article Eight:    Persecution                                        21
    Article Nine:     Causing Breach of Contract                         22
    Article Ten:      Breach of Statutory Obligation                     22
Chapter Four:         Fault                                              23
Chapter Five:         Reliefs for civil wrongs                           24
Chapter Six:          Miscellaneous                                      29
Schedule                                                                 30

CIVIL WRONGS REGULATIONS (LIABILITY OF A PUBLIC
    SERVANT) 5766-2006                                                   31
Chapter One:          Interpretation                                     31
Chapter Two:          Notice of Action Brought Against a Public Servant  31
Chapter Three:        Notice by the State Recognizing the Employee's
                      Act as Performed as Part of his Governmental
                      Responsibilities                                   32
Chapter Four:         Bringing Action against a Public Servant Who Is a
                      Public Authority Employee                          33
Chapter Five:         Submitting and Deciding a Petition on the
                      Applicability of Conditions of Immunity            33
Chapter Six:          Miscellaneous                                      35
Schedule                                                                 35

CIVIL WRONGS (LIABILITY OF THE STATE) LAW 5712-1952                      37
Schedule                                                                 43

CIVIL WRONGS REGULATIONS (LIABILITY OF THE STATE)
    (WRITTEN NOTICE OF DAMAGE) 5763-2003                                 44
Schedule                                                                 46

LAW FOR THE AMENDMENT OF CIVIL WRONGS LEGISLATION
    (AMELIORATING BODILY HARM) 5724-1964                                 49

References                                                               51

# CIVIL WRONGS ORDINANCE
# (NEW VERSION)

## CHAPTER ONE: INTERPRETATION

### Interpretation

1.  This Ordinance shall, subject to the Interpretation Ordinance, be interpreted according to the principles of legal interpretation customary in England, and terms used in it shall be assumed to have the meaning of corresponding terms in English Law and shall be so interpreted, as far as that is consistent with the context and there being no other explicit provision. *(Note: Under the Law and Administration Ordinance (Amendment No. 14) Law 5732-1972, this proviso on the interpretation of the Law is no longer binding).*

### Definitions

2.  In this Ordinance –

    "parents" – including parents' parents and step parents;

    "animal" – including birds, fish, insects and reptiles;

    "wild animal" – an animal, which in Israel is not usually kept captive or under human control;

    "child" – including grandchild, stepchild, fetus, child born out of wedlock, or adopted child; in reaching a conclusion on the degree of family relationship, which under the provisions of this Ordinance is included in the definitions of the terms "parents" and "child", a child born out of wedlock and an adopted child shall be deemed the lawful offspring of its mother and of the man known to be its father, or of its adopter, all as the case may be;

    "movables" – inanimate or animate, including money, the fruit of trees and vines, grains, vegetables and other crops and water, whether or not attached to land;

    "employer" – a person who, in his relations with another person, has complete control over the manner in which that person performs work for him, while he himself is not subject to similar authority in respect of that work, and "employee" is a person whose work is subject to aforesaid control; however, a person in the service of the State, of a local authority or of another person shall not be deemed an employer or an employee of another person in that service;

    "real estate" – land, trees, houses, buildings and walls or other structures;

    "damage" – a loss of life, a loss of an asset, of comfort, of bodily welfare or of reputation, or a detraction from any of these, and any similar loss or detraction;

"monetary damage" – an actual loss or expense, which can be assessed in terms of money and on which particulars can be provided;

"asset" – real estate or movable;

"defendant" – including a defendant in a counter suit or a cross action;

"injury" – unlawful interference with a legal right;

"plaintiff" – including a plaintiff in a counter suit or a cross action;

"occupant" – a person who lawfully occupies real estate, or who is entitled – as against the owner of the real estate – to occupy and use it, and when there is no such person – the owner of the real estate.

## CHAPTER TWO: RIGHTS AND LIABILITIES IN CIVIL WRONGS

### Civil wrong and right to relief

3.  The matters enumerated below in this Ordinance constitute civil wrongs and – subject to the provisions of the Ordinance – any person injured or damaged by a civil wrong committed in Israel is entitled to the relief specified in the Ordinance from the person who committed the wrong or was responsible for it.

### Trivial act

4.  An act shall not be deemed a civil wrong, if – were it repeated – it would not establish an adverse claim, and if a reasonable person of ordinary temperament would not have complained of it under the given circumstances.

### Voluntary exposure to risk

5.  (a)  In an action brought for a civil wrong, it shall be a defense that the plaintiff knew and appreciated – or may be assumed to have known and appreciated – the state of affairs that caused the damage and that he voluntarily exposed himself or his property to that state of affairs.

    (b)  The provisions of this section shall not apply to an action brought for a civil wrong that stems from the failure to perform an obligation incumbent upon the defendant by virtue of an enactment.

    (c)  A child below age twelve shall not be deemed capable of knowing or appreciating the state of affairs that caused the damage and of voluntarily exposing himself or his property to that state of affairs.

### Act under enactment

6.  In an action brought for a civil wrong other than negligence, it shall be a

defense that the act complained against was under and in accordance with the provisions of an enactment, or that it was carried out within the bounds of a legal authorization or in the reasonable belief in good faith that legal authorization existed; in this section, "act" includes an omission.

---

*Note: In respect of actions brought until February 10, 2006 –*

1. *section 6 shall be read as if* "the act complained against" *said* "the act or omission complained against" *and without the closing passage that begins with* "or that it was carried out".
2. *Section 7 shall be deemed to read as follows:*
   *"Public servant*
   7. (a)  A public servant is responsible for any civil wrong committed by him, and if sued therefor he shall be sued personally; however, without derogating from the provisions of sections 6 and 8, it shall be a defense for the public servant – in any action that is not for negligence – if the act was within the scope of his lawful powers or that he committed it in good faith, believing that he acted within the scope of his lawful powers.
   (b)  A public servant shall not be responsible for any civil wrong committed by an agent appointed by him or by another public servant, unless he explicitly authorized or ratified the civil wrong."
3. *Sections 7A to 7F are not to be taken into account*

*Sections 7 to 7F, as presented below, are in effect for actions brought after February 10, 2006.*

---

**Definitions**
7.   In sections 7A to 7F –
     "act" includes an omission;
     "State employee" – including an organ of the State and every person who under an enactment performs a public function in the name of the State, including persons who serve in the Israel Defense Forces, in the Israel Police, in the Prisons Service and in other security organizations of the State, and exclusive of a contracting party, within its meaning in section 15;
     "public authority employee" – including an organ of the public authority and every person who under an enactment performs a public function in the name of the public authority, and exclusive of a contracting party, within its meaning in section 15;
     "public servant" – a State employee or a public authority employee, as the case may be;

"public authority" – a local authority, and every body corporate set up by Law, which is listed in the Schedule;

"governmental function" – a statutory public function, within its meaning in section 15(d)(2) of the Basic Law: Administration of Justice.

## Immunity of public servants

7A.  (a)  Action shall not be brought against a public servant for an act that raises liability in tort and that he performed in the course of performing his governmental function as a public servant; this provision shall not apply to a said act that was knowingly committed with the intention to cause damage, or with indifference to the possibility that the said act will cause damage.

(b)  The provisions of subsection (a) shall not derogate from the liability of the State or of a public authority under sections 13 and 14 and under any statute.

(c)  The immunity under this section shall also apply to whoever was a public servant when the act, which is the subject of the action, was committed.

## Action against a State employee

7B.  (a)  When action has been brought against a State employee for an act committed as part of his function as State employee, and if the State argued in a notice to the Court that immunity under section 7A applies to the employee's act, if the act was committed, then the State shall be joined to the proceeding, if it was joined as a defendant.

(b)  If, in its notice under subsection (a), the State requested that the action against the State employee be dismissed, then the action against him shall be dismissed, and the action shall be deemed to have been brought against the State by virtue of its liability under sections 13 and 14 for the act of the State employee, and the State employee's act shall be deemed to have been committed in the course of performing his function.

(c)  Notwithstanding the provisions of subsection (b), within a period to be determined in regulations the plaintiff may petition that the Court determine that the conditions of immunity under section 7A do not apply; if the Court determined as aforesaid, then the action against the State employee shall not be dismissed and the provisions of subsection (b) shall not apply.

(d)  If the State did not give a notice said in subsection (a) or if it did not request that the action against the State employee be dismissed as said in subsection (b), then within a period to be determined in regulations the State employee may petition that the Court determine that the conditions of immunity under section 7A do apply; if the employee petitioned as aforesaid, then the

State shall be joined to the proceeding, if it was joined as a defendant; if the Court determined that the conditions of immunity said in section 7A do apply, then the action against the State employee shall be dismissed and the provisions of subsection (b) shall apply, mutatis mutandis; if the Court determined that the State employee committed the act not in the performance of his function, then the action against the State shall be dismissed.

(e)   The Court shall immediately decide on a plaintiff's petition under subsection (c) or a State employee's petition said in subsection (d).

### Action against a public authority employee

7C.  (a)  When action has been brought against a public authority employee for an act committed as part of his function as State employee, then within a period to be determined in regulations the public authority or the employee may petition the Court that it determine that the conditions of immunity under section 7A apply to the employee's act, if the act was committed; when a said petition was submitted, then the public authority shall be joined to the proceeding, if it was not joined to it as a defendant, and the Court shall determine whether the conditions of immunity under section 7A apply.

(b)  If the Court determined that the conditions of immunity under section 7A apply, then the action against the public authority employee shall be dismissed and the provisions of section 7B(b) shall apply, mutatis mutandis; if the Court determined that the public authority employee committed the act not in the performance of his function, then the action against the public authority shall be dismissed.

(c)  The Court shall immediately decide on the public authority's or the employee's petition under subsection (a).

### Joining a public servant as defendant in an action

7D.  A public servant may join as defendant an action brought against the State or a public authority, as the case may be, for an act for which he would have been liable, if not for the provisions of section 7A(a), or he may – notwithstanding the provisions of sections 7A to 7C – maintain his position as defendant in an action brought against him.

### Regulations

7E.  The Minister of Justice may, with approval by the Knesset Constitution, Law and Justice Committee, make regulations for the implementation of the provisions of sections 7B to 7D, also in respect of –

(1)  Law procedure and times;

(2)   the obligation of informing the State or the public authority that action has been brought;

(3)   the conditions for delivery of notice by the State, as said in section 7B(a), and who is authorized to approve its delivery.

## Compensation or indemnification of the State or of the public authority

7F.  (a)   If a public servant acted in gross deviation from a public servant's proper behavior, then the State or the public authority, as the case may be, is entitled, notwithstanding the provisions of section 7A –

(1)   if the public servant committed an act against it that creates liability in tort – to compensation from him;

(2)   if it was found liable for the act committed by the public servant – to indemnification from him.

(b)   In proceedings for indemnification under this section, the amount of indemnification shall be as determined by the Court according to justice and equity.

## Judicial authority

8.   If a person constitutes a Court or Tribunal or is one of its members, or if he lawfully performs the obligations of a said person, and if any other person performs judicial functions, including an arbitrator, then no action shall be brought against him for any civil wrong committed by him in the performance of his judicial function.

## Minor

9.  (a)   No action shall be brought against any person for a civil wrong which he committed before he reached age twelve.

(b)   A person who has not reached age eighteen can bring action for a civil wrong and – subject to subsection (a) – action therefor can be brought against him; however, no action shall be brought against him for a civil wrong that stems – directly or indirectly – from a contract made by him.

## Body corporate

10.   A body corporate shall not recover compensation for a civil wrong, unless it caused it damage.

## Joint tort-feasors

11.   If under the provisions of this Ordinance each of two or more persons is liable for a specific act, and if the act constitutes a civil wrong, then they shall be jointly liable for that act as joint tort-feasors and they can be sued for it jointly or severally.

## Liability of participant or enticer

12.   If a person participates, assists, advises or entices in or to an act or

omission committed or about to be committed by another person, or if he orders, authorizes or ratifies them, then − for purposes of this Ordinance − he shall be liable for them.

## Employer's liability

13.  (a)  For purposes of this Ordinance, an employer shall be liable for an act committed by his employee −
    (1)  if he authorized or ratified the act;
    (2)  if the employee committed the act in the course of his employment; however −
        (a)  an employer shall not be liable for an act committed by a person who is not one of his employees, to whom one of his employees transferred his task without the employer's explicit or implicit authorization;
        (b)  a person who was statutorily obligated to use the services of a person he was not free to select, then he shall not be liable for any act committed by that person in the course of that employment.
    (b)  An act shall be deemed to have been committed in the course of an employee's employment, if the employee committed it while performing the ordinary tasks of his employment and those connected with it, even though the employee's act was an improper performance of an act authorized by the employer; however, an act shall not be so deemed if it was performed for the employee's own purposes and not in the employer's interest.
    (c)  For purposes of this section, "act" includes omission.

## Liability of principal

14.  If a person employs an agent who is not his employee for the performance of an act or of a category of acts for him, then − for purposes of this Ordinance − he shall be liable for everything the agent does in the performance of that act or category of acts, and for the manner in which he performs them.

## Liability of a contracting party

15.  If a person makes a contract with another person who is not his employee or agent, so that he will perform a certain act for him, then − for purposes of this Ordinance − he shall not be liable for any civil wrong that arises while that act is being performed; this provision shall not apply in any of the following cases:
    (1)  he was negligent in choosing the person with whom he made the contract;
    (2)  he interfered in the contracting party's work in a manner that caused the injury or damage;
    (3)  he authorized or ratified the act that caused the injury or damage;

    (4)    by virtue of an enactment he was responsible performing the act, performance of which he delegated to an independent contractor;

    (5)    the act, the performance of which was contracted, was unlawful.

### Saving of liability

16.    The provisions of sections 12, 14 and 15 shall not derogate from any person's liability for an act committed by him, and the provisions of section 13 shall not derogate from the employee's liability for an act he performed.

### Agent's or employee's knowledge

17.    Wherever knowledge is to be argued or proven under this Ordinance, an agent's or employee's knowledge shall be treated like his principal's or employer's knowledge, on condition that the knowledge was acquired by the agent while he acted for his principal, or by the employee in the course of his employment in respect of the matter or thing about which the knowledge is required.

### Spouse

18.    A spouse shall not be liable for a civil wrong committed by his spouse, except under the provisions of sections 11 to 16.

### Effect of death on grounds for action

19.    (a)    When a person has died, then all grounds for an action for a civil wrong that existed for or against him shall remain in effect – subject to the provisions of this section – to the benefit of or against his estate, all as the case may be.

    (b)    If grounds for an action remain in effect as aforesaid to the benefit of the deceased person's estate, and if the act or omission that created the grounds caused his death, then the compensation that can be recovered to the benefit of the estate shall be calculated without regard for the profit or loss caused to the estate in consequence of the death, but an amount for funeral expenses may be included in it.

    (c)    If damage was suffered because of an act or omission that could have been grounds for an action for a civil wrong against a person, except that that person died before or while the damage was caused, then – for purposes of this Ordinance – the grounds for action which would have existed against him because of the act or omission, if he had died after the damage was caused, shall be deemed to have existed against him before he died.

    (d)    The rights conferred by this Ordinance on a deceased person's estate shall add to and not derogate from the rights available to the deceased person's dependents under this Ordinance or under any other enactment.

**Insolvent estate**

20.   If an action under section 19 can be brought against an insolvent estate, then every obligation for the grounds of the action shall be deemed a debt that can be proven against the estate, even if – by its nature – it is a claim for an unspecified amount of compensation for damage which does not stem from a contract, an undertaking or a breach of trust.

**Bankrupt**

21.   Notwithstanding the provisions of the Bankruptcy Ordinance 1936, a bankrupt can be a plaintiff or a defendant for a civil wrong, but no action for a civil wrong shall be brought to the credit of or against the assets of a bankrupt; however –

   (1)   the right to bring action for a civil wrong that caused monetary damage to the assets of a bankrupt shall pass to the trustee or shall be realized by him;

   (2)   a judgment against a bankrupt for a civil wrong, which was made before the receiving order was made may be proven in bankruptcy;

   (3)   this section is subject to the provisions of section 19.

**No endorsement of a civil wrong**

22.   The right to any relief for a civil wrong, as well as the liability for it cannot be endorsed to another, except by operation of Law.

## CHAPTER THREE: CIVIL WRONGS

### Article One: Assault

**Assault**

23.   (a)   Assault is the intentional use of any kind of force – directly or indirectly – against a person's body by hitting, touching, moving it or in any other manner without that person's consent or with his consent that was obtained by deceit, and also an attempt or threat – by act or gesture – to use aforesaid force against a person's body, when the person who makes the attempt or threat causes the other person to assume – for reasonable cause – that he then has the intention and the ability to carry out his intent.

      (b)   "Use of force" includes, for purposes of this section, the use of heat, light, electricity, gas, odor or any other thing or material, if it is used to a degree that can cause harm.

**Special defense**

24.   In an action for assault, it shall be a defense for the defendant if –

   (1)   he committed the act reasonably in order to defend himself or another person against injury to body, freedom or property and if the proportion will be reasonable between the damage he could assume will be caused by the act and the damage that he could assume will prevented by him;

   (2)   he used a reasonable measure of force to prevent the plaintiff from entering real estate unlawfully or in order to remove him therefrom after he entered it or stayed on it unlawfully, all while the defendant was its occupant or acted by the occupant's authority; however, if the plaintiff entered or tried to enter the real estate without use of force, then the defense shall be conditional on the defendant having first asked the plaintiff not to enter, or to leave after he entered, and on having given him a reasonable opportunity to comply peaceably with his request;

   (3)   he used a reasonable degree of force to defend his possession of movables which he is entitled to hold, or to retrieve them from the plaintiff who took them or held them unlawfully; however, if the plaintiff took or tried to take the movables without use of force, then the defense shall be conditional on the defendant having first asked the plaintiff not to take them, or to return them after he took them, and on having given him a reasonable opportunity to comply peaceably with his request;

   (4)   he committed the act while he executed or assisted in the lawful execution of an arrest order, search warrant, committal, imprisonment order or detention order issued by a Court or by another authority authorized to do so, on condition that the act against which complaint is lodged was permitted by those orders, even if there was a defect in them or in their issue;

   (5)   the plaintiff was insane or mentally or physically impaired and the degree of force used by the defendant was reasonable or appeared to be reasonable to the degree required in order to protect the plaintiff himself or to protect other persons, and that force was used in good faith and without malice;

   (6)   the defendant and the plaintiff both were soldiers in the Israel Defense Forces and the defendant acted by virtue of a statute that applies to the Forces and under that statute;

   (7)   repealed

   (8)   he performed in good faith an act which he had reason to believe would be to the plaintiff's benefit, but was not able to obtain the plaintiff's consent before he performed it, because – under the given circumstances – the plaintiff was not able to indicate his consent or the person lawfully in charge of him was not able to consent on his behalf, and the defendant had grounds to

conclude that the plaintiff's welfare required that the act not be postponed.

25. Repealed

## Article Two: Imprisonment

**False imprisonment**

26. False imprisonment is the unlawful total deprivation – for any time whatsoever – of a person's freedom, either by physical force or by pretending to hold authority.

**Special defense**

27. In an action for false imprisonment, it shall be a defense of the defendant if –

(1)  he committed the act while he executed or lawfully assisted in the execution of an arrest order, search warrant, committal, imprisonment order or detention order issued by a Court or by another authority authorized to do so, on condition that the act against which complaint is lodged was permitted by those orders, even if there was a defect in them or in their issue;

(2)  the plaintiff was under lawful detention under provisions of an enactment;

(3)  the plaintiff being insane or mentally or physically impaired, the denial of his liberty was or appeared to be reasonably necessary to protect the plaintiff himself or to protect other persons, and it was performed in good faith and without malice;

(4)  the person who committed the act about which the plaintiff complains would have been liable to penalties under any enactment, had he failed to perform it;

(5)  the defendant and the plaintiff both were soldiers in the Israel Defense Forces and the defendant acted by virtue of the statute that applies to the Forces and under that statute;

(6)  the defendant is the plaintiff's parent, guardian or teacher, or his relationship with the plaintiff is similar to that of his parent, guardian or teacher, and he denied the plaintiff's freedom only temporarily for a time reasonably necessary for his correction.

28. Repealed

## Article Four: Negligence

### Negligence
35. If a person committed an act which a reasonable and prudent person would not have committed under the same circumstances, or if a person refrained from committing an act which a reasonable and prudent person would have committed under the same circumstances, or if, in a certain occupation, he did not use the skill or exercise the degree of caution that a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances – then that constitutes neglect; if he was negligent as aforesaid in respect of another person, toward whom under those circumstances he is under obligation not to act as he did, then that constitutes negligence, and a person who by his negligence causes damage to another commits a civil wrong.

### Obligation toward all persons
36. The obligation said in section 35 is toward all persons and toward the owner of any asset, to the extent that under the same circumstances a reasonable person would have foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission specified in that section.

### Responsibility of real estate owner toward trespasser
37. The responsibility under sections 35 and 36 of an owner or occupant of real estate in respect of the condition, maintenance and repair of the real estate, shall not obtain toward a person who entered the real estate as a trespasser, unless the plaintiff proves that he entered in good faith and without intention to commit an offense or a civil wrong.

### Obligation toward trespasser in a military area
37A. (a) The responsibility under sections 35 and 36 in respect of the condition, maintenance and repair of a military area or in respect of its use shall not obtain toward a person who entered that area as a trespasser, unless the plaintiff proves that he entered in good faith and without intention to commit an offense or a civil wrong, and that the person responsible for that area or the one who acts on his behalf at the entrance knew that the person who entered was present in that area when the damage was caused.

(b) In this section, "military area" –

(1) real estate occupied by the Israel Defense Forces or by any other branch of the defense establishment approved for this purpose by the Minister of Defense;

(2) real estate used for a defense purpose, a guard having been

posted at its entrance or entry to it having been restricted by notice displayed outside it;

(3)　real estate on which there are installations intended to prevent entry into or exit from Israel; for this purpose, certification by a person authorized for this purpose by the Minister of Defense, that the installation is intended to prevent entry into or exit from Israel, shall be conclusive evidence of that fact.

(c)　This section shall apply only during a period in which there is a state of emergency in the State, by virtue of a declaration under section 9(a) of the Law and Administration Ordinance 5708-1949.

## Burden of proof of negligence when damage is caused by dangerous objects

38.　If action was brought for damage, and if it was proved that the damage was caused by a dangerous object, other than fire or an animal, or by the escape of anything that is liable to cause damage by escaping, and that the defendant was the owner of that object or was in charge of it or occupied the asset from which the object escaped, then the defendant shall bear the burden of proving that – in respect of the dangerous or escaped object – there was no neglect for which he is liable.

## Burden of proof of negligence in respect of fire

39.　If action is brought for damage, and if it is proved that the damage was caused by fire or in consequence of fire and that the defendant lit the fire or was responsible for lighting the fire, or that he occupies the real estate or is the owner of the movables from which the fire emerged, then the defendant shall bear the burden of proving that in respect of the source or spread of the fire there was no neglect for which he is liable.

## Burden of proof of negligence in respect of animals

40.　If action is brought for damage, and if the following two points are proved in its respect –

(1)　that the damage was caused by a wild animal, or by an animal that is not a wild animal, but the defendant knew or should have known that it is liable to do whatever caused the damage;

(2)　that the defendant was the owner of one of the aforesaid animals or was in charge of it;

then the defendant shall bear the burden of proving that in its respect there was no neglect for which he is liable.

## Burden of proof in case of negligence when the facts speak for themselves

41.　If action is brought for damage, and if it is proven that the plaintiff had

no information and could not have any information of the actual circumstances that caused the event which caused the damage, and that the damage was caused by an asset over which the defendant had full control, and if it appears to the Court that the occurrence of the event which caused the damage is more consistent with the conclusion that the defendant did not take reasonable precaution, rather than with the conclusion that he did take reasonable precaution – then the defendant shall bear the burden of proving that in respect of the event that caused the damage there was no neglect for which he is liable.

## Article Four "A": Injury by a Dog

### Damage caused by a dog
41A. In an action for bodily injury caused by a dog, the dog's owner or the person who regularly kept the dog (hereafter: the owner) shall compensate the injured person, and it does not matter whether or not there was neglect on the part of the owner.

### Defenses
41B. In an action under this Article the owner shall have no defense, unless the damage was caused in consequence of one of the following:
  (1)    the injured person provoked the dog;
  (2)    the injured person assaulted the owner, his spouse, parent or child;
  (3)    the injured trespassed on the owner's real estate.

### Saving of statutes
41C. This Article shall not derogate from other rights under this Ordinance or under any other statute.

## Article Five: Nuisances

### Public nuisance
42.   A public nuisance is an unlawful act or the omission of a legal obligation, when that act or omission endangers the life, safety, health, property or comfort of the public, or when it interferes with the public's use of a common right.

**Action for public nuisance**
43.    An action for a public nuisance shall be brought only –
     (1)    by the Attorney General or his representative, in order to obtain
            an injunction;
     (2)    by a person who suffered monetary damage from it.

**Private nuisance**
44.    (a)    A private nuisance is the conduct of a person, the management of
              his business or the use of real estate occupied by him in a
              manner that constitutes real interference with the reasonable use
              or reasonable enjoyment of another person's real estate, taking
              their location and character into consideration; however, a person
              shall not recover compensation for a private nuisance, unless he
              suffered damage from it.
       (b)    The provisions of this section shall not apply to an obstruction of
              sunlight.

**Special defense**
45.    In an action for a private nuisance, it shall be a defense that the act
       complained of was committed in compliance with the terms of a
       contract or agreement that obligates the plaintiff and operates to the
       defendant's benefit.

**Existing nuisance**
46.    In an action for a private nuisance, the mere fact that the nuisance
       existed before the plaintiff acquired or occupied the real estate in
       question shall not be a defense.

**Saving of other enactments**
47.    The provisions of sections 42 to 46 shall add to and not derogate from
       provisions on nuisances prescribed in any other enactment.

**Obstruction of sunlight**
48.    A person commits a civil wrong if – by blocking or by other means – he
       prevents an owner or occupant of real estate from enjoying a
       reasonable amount of sunlight, taking the location and character of the
       real estate into consideration, after the owner or occupant or their
       predecessor continuously enjoyed that light – otherwise than on the
       terms of a contract or agreement – during at least fifteen years
       immediately before the blockage or prevention.

**Denial of support**
48A.   If real estate provides support for neighboring real estate, then any act
       that prevents or denies that support constitutes a civil wrong.

### Use needed for the public interest

48B. If use of any real estate is needed in the public interest, then it shall not constitute a nuisance within the meaning of this Article, even if it causes damage to neighboring real estate or deprives the owner of neighboring real estate of the full enjoyment thereof, on condition that the damage caused not exceed tolerable proportions and that the user took reasonable steps to reduce the damage as far as possible; however, the Court may award compensation – either in a lump sum or in recurrent payments – if monetary damage is caused to the owner of the real estate.

## Article Six: Misappropriation

### Unlawful retention of asset

49. Unlawful retention consists of withholding movables from a person who is entitled to their immediate possession.

### Burden of proof

50. In an action brought for unlawful retention the defendant shall bear the burden of proving that the withholding was lawful.

### Return of retained property

51. In an action brought for unlawful retention the Court may order – according to the circumstances – that the retained property be returned, in addition to any other relief prescribed in this Ordinance or in place of a said relief.

### Robbery

52. Robbery consists of the unlawful transfer by the defendant for his own use of movables which the plaintiff is entitled to hold, by way of the defendant taking, retaining, destroying or delivering them to a third person, or by denying them to the plaintiff in some other manner.

### Special defense

53. In an action brought for robbery it shall be a defense for the defendant if he bought the movables in good faith in accordance with section 34 of the Sale Law 5728-1968.

### Right of third person is not a defense

54. In an action brought for robbery the defendant shall not be able to raise the right of a third person in his defense against the person entitled to possess the movables immediately.

*CIVIL WRONGS - Ordinance, Law and Regulations - 2006*                    21

**Return of robbed property**

55.   In an action brought for robbery the Court may order – according to the circumstances – that the robbed property be returned, in addition to any other relief prescribed in this Ordinance or in place of said relief.

## Article Seven: Fraud

**Deceit**

56.   Deceit is the false representation of a fact, made in the knowledge of its falsehood or without belief in its truth or recklessly, the presenter being indifferent to whether it is true or false, and with the intention that the person deceived by the presentation act in accordance with it; however, no action shall be brought for a said presentation, unless it was intended to mislead the plaintiff, did mislead him and the plaintiff acted according to it and thereby suffered monetary damage.

**Restriction on action for certain deceits**

57.   No action shall be brought for a presentation said in section 56, which was made about a person's character, conduct, credit, ability, craft or occupation in order to obtain credit, money or goods for him, unless the presentation was in writing and signed by the defendant himself.

**Injurious lie**

58.   (a)   An injurious lie consists of the malicious publication – orally or in any other manner – of a false statement about a person's business, occupation, profession, goods or property rights; however, a person shall not recover compensation for such publication, unless he suffered monetary damage from it.

      (b)   For purposes of this section, "publication" – within its meaning in section 2 of the Prohibition of Defamation Law 5725-1965.

59.   Repealed

## Article Eight: Persecution

**Persecution**

60.   Persecution consists of actually and maliciously bringing against a person a senseless proceeding – criminal, for bankruptcy or for winding up – without reasonable or probable cause, and the proceeding injured his credit or reputation or if it endangered his freedom and was concluded in his favor, if it was likely to be so concluded; however,

action shall not be brought against a person for persecution only because he delivered information to a competent authority, which instituted proceedings.

61.  Repealed

## Article Nine: Causing Breach of Contract

### Unlawfully causing breach of contract

62.  (a)  If a person knowingly and without sufficient justification causes a person to break a legally binding contract between him and a third person, then he commits a civil wrong toward that third person; however the third person cannot recover compensation for that civil wrong, unless he suffered monetary damage from it.

   (b)  For purposes of this section, the relations created by marriage shall not be deemed a contract, and strikes and lockouts shall not be deemed breaches of contract.

## Article Ten: Breach of Statutory Obligation

### Breach of statutory obligation

63.  (a)  A person commits a breach of a statutory obligation if he does not comply with an obligation imposed on him under any enactment – other than this Ordinance – if the enactment, properly interpreted, is intended for the benefit or protection of another person, and if the breach caused that person damage of the kind or nature of damage intended by the enactment; however, the other person shall not – in respect of the breach – be entitled to relief specified in this Ordinance, if the enactment, properly interpreted, intends to exclude that relief.

   (b)  For purposes of this section an enactment shall be deemed to have been enacted for the benefit or protection of a certain person, if – as properly interpreted – it is intended for the benefit or protection of that person, or for the benefit or protection of persons in general or of persons of a category or definition to which that certain person belongs.

## CHAPTER FOUR: FAULT

### Causing damage by fault

64.  "Fault" consists of a person's act or omission, which constitutes a civil wrong under this Ordinance, or constitutes a civil wrong that involves damage, or constitutes neglect that caused harm to himself, and a person shall be deemed to have caused damage by his fault if the fault was the cause or one of the causes of the damage; however, he shall not be so deemed if one of the following holds true:

   (1)  the damage was caused by an unusual natural event, which a reasonable person could not have foreseen and even reasonable caution could not have prevented its results;

   (2)  another person's fault was the decisive cause of the damage;

   (3)  he is a child and has not yet reached age twelve, and he is the one who suffered damage after another person invited him or allowed him to be on the asset on which or in connection with which the damage occurred, or permitted him to be so near to that asset so that – in the ordinary cause of events – he was liable to be injured because of that person's fault.

### Plaintiff's conduct

65.  If a defendant caused damage by fault, but the fault was caused by the plaintiff's conduct, then the Court may exempt him from the liability to compensate the plaintiff, or it may reduce the compensation to an extent deemed just by the Court.

### Defendant's conduct

66.  If both the plaintiff and the defendant caused damage by their fault, but the plaintiff's fault was caused by the defendant's conduct, then the Court may increase the compensation which the defendant would have been liable to pay, were it not for the provisions of section 64, on condition that it not exceed the amount which he would have been liable to pay, had not also the plaintiff caused the damage by his fault.

### Definition of a person's fault

67.  A person's fault for purposes of sections 64 to 66 includes the fault of anybody for whom that person is responsible, and that when no other meaning has to be drawn from the context.

### Contributory fault

68.  (a)  If a person suffered damage, in part because of his own fault and in part because of the fault of some other person, then a suit for

compensation shall not fail only because of the fault of the person who suffered the damage, but the compensation to be paid shall be reduced by a proportion which the Court finds appropriate and just, taking onto account the degree of responsibility of the person who sues because of the damage; however, the aforesaid shall not impede a defense derived from a contract, and if a contract or enactment that restricts liability applies to the claimant, then the person who sues for compensation shall not be paid more than was prescribed as aforesaid.

(b) If compensation was reduced as said in subsection (a), then the Court shall determine and record the total amount of compensation which the claimant could have been paid, if not for his fault.

(c) The provisions of sections 11 and 83 shall apply whenever two or more persons are liable under subsection (a) for damage caused to a person, or who would have been liable if they had been sued.

### Contributory fault that caused death

69. If a person died in consequence of his own and of another person's fault, and if – had suit been brought under section 19 for the benefit of the estate – the Court would have reduced the compensation under section 68(a), then – if action is brought for the benefit of that person's dependents under section 78 – the compensation shall be reduced proportionately.

### Argument of prescription

70. In every instance to which section 68(a) applies and in which one of the persons at fault denies his liability toward a certain person at fault or toward his legal representative by relying on the law of prescription, then he shall not be entitled to recover compensation or participation by virtue of that section from that certain person or from his representative.

## CHAPTER FIVE: RELIEFS FOR CIVIL WRONGS

### Every Court competent to give relief

71. Every civil Court shall be competent within its jurisdiction to give relief against a civil wrong under this Ordinance, subject to the provisions of every legislative enactment that applies to that Court, and it may make an injunction in respect of a civil wrong, even if no compensation or other relief was sued for or adjudged.

**Injunction**

72.  An injunction can be a mandatory order or a restraining order, temporary or permanent.

**Conditions for making an injunction**

73.  The Court shall make a temporary injunction only if it is satisfied – by affidavit or in some other manner – that there is a substantive question which must be considered, and that it is fairly certain that the plaintiff will be entitled to relief, and that it will be difficult or impossible to do justice fully at a later stage, if a temporary injunction is not made.

**When an injunction must not be made**

74.  The Court shall not make an injunction when it believes that the injury or damage done to the plaintiff is small, that it can be evaluated in monetary terms, that it can be adequately compensated for by the payment of money, and that making an injunction would constitute harassment of the defendant; however, it may adjudge compensation.

**Saving of powers**

75.  The provisions of sections 72 to 74 shall add to the Court's powers to make injunctions under any other legislative enactment, and they shall not derogate from them.

**Compensation**

76.  Compensation may be adjudged alone, in addition to an injunction or in its place; however –

(1)  if the plaintiff suffered damage, then compensation shall be given only for that damage which occurred in the natural course of events and resulted directly from the defendant's civil wrong;

(2)  if the plaintiff suffered monetary damage, then compensation for the damage shall be given only if he provided particulars thereof in or attached to the statement of claim

**Relief taken only once**

77.  (a)  Subject to the provisions of sections 83 to 85, if a person recovered compensation or other relief for a civil wrong, and if a person claims through or by virtue of an aforesaid person, then he shall not recover additional compensation for the same civil wrong.

(b)  A person shall not recover compensation or other relief for a civil wrong, if it also involves the violation of a contract or the violation of an obligation that is similar to a contractual obligation, and if a Court, tribunal or arbitrator already adjudged compensation for that violation to the same person or to the person by whose virtue he sues.

    (c)    A person shall not recover compensation or other relief for the violation of a contract or the violation of an obligation that is similar to a contractual obligation, if that violation also constitutes a civil wrong and if a Court already adjudged compensation for that civil wrong to the same person or to the person by whose virtue he sues.

### Dependents' right to compensation

78.    If a civil wrong caused a person's death and if that person – had he not died – would at that time have been entitled to compensation under this Ordinance for a bodily injury caused to him by the civil wrong, then his spouse, parents and children shall be entitled to compensation from the person responsible for the civil wrong.

### Who is entitled to bring action

79.    An action for compensation under section 78 shall be brought by the executor of the will, the estate administrator or the heirs of the deceased, for the benefit of his spouse, parents and children or to the benefit of those among them who still are alive; if no aforesaid action was brought within six months after the injured person's death, then any person to whose benefit it could have been be brought is entitled to bring it in the name of all or of some of them.

### Compensation and its calculation

80.    In an action under section 78 particulars must be given about the people for whose benefit it is being brought and about the monetary loss each of them suffered in consequence of the injured person's death; compensation shall be given for the monetary loss which they actually suffered or which they actually will suffer in the future, including the costs of his burial; after legal expenses not collected from the defendant are deducted from the amount of compensation, the Court shall – when it makes its judgment – prescribe the share of the remaining amount to which each is entitled.

### Amounts not to be taken into account

81.    When determining the amount of compensation, the following shall not be taken into account:
    (1)    an amount received or to which there is entitlement upon the deceased person's death under an insurance contract;
    (2)    an amount paid or which must be paid because of mourning for the deceased.

### Compensation and National Insurance benefits

82.    (a)    In the case of a person insured under Chapter Two of the National Insurance Law 5714-1953 (hereafter in this Chapter: the

Law) or of his dependent, as said in section 22(b) of the Law, who in consequence of an event is entitled both to compensation under this Ordinance from the employer and to a benefit under Chapter Two of the Law, then the benefit shall be subtracted from the amount of compensation that would have been due to them from their employer, if not for this section.

(b) For purposes of this section –

"benefit" – the monetary value of benefits, exclusive of benefits in kind. given or to be given in the future under Chapter Two of the Law, including injury allowance payable under section 38 of the Law, and it shall be deemed that a benefit reduced or denied because of an act or omission by the employee or nor given because another benefit was chosen under the Law was given or will be given in the future in its entirety; provisions by the Minister of Labor under section 49(b) of the Law on the capitalization of pensions and on the calculation of the monetary value of benefits in kind shall also apply to the determination of the monetary value of benefits under this subsection;

"employer" – a person who under the Law is under obligation to pay the insurance contributions for the insured person, including a person for whose acts the employer is responsible under section 13 of this Ordinance.

(c) Under the circumstances said in subsection (a) the employer shall not – for purposes of section 70 of the Law – be deemed a third party, rights against whom are transferred to the National Insurance Institute.

**Suit against and indemnification from joint tort-feasors**

83. (a) If a person suffered damage in consequence of a civil wrong, then a judgment given against a person liable for that damage shall not prevent action being brought against another person who – had he been sued – would have been liable for that same damage as a joint tort-feasor.

(b) If several actions were brought for the same damage by the person who suffered it or to the benefit of his estate, his spouse, parent or child against tort-feasors liable for that damage – whether as joint tort-feasors or in some other manner – then the total amounts that can be recovered as compensation in judgments to be given in those actions shall not exceed the amount of compensation given in the judgment that was first handed down and was not cancelled on appeal, or as it was changed on appeal; and the plaintiff shall not be entitled to costs in all those actions, except in that in which the first said judgment was handed down, unless the Court believes that there was a

reasonable basis for bringing the action; if the first judgment was against an employer, within the meaning of the term in section 82 and under the circumstances specified there, then for purposes of this subsection the amount of compensation in the first judgment shall be replaced by the amount that would have been adjudged, if not for section 82.

### Indemnification between tort-feasors

84.  (a)  Every tort-feasor who is liable for a damage is entitled to recover participation from every other tort-feasor who is liable, or who – if sued – would have been liable for that damage as a joint tort-feasor or in some other manner; however, no person shall be entitled to recover participation under this subsection from a person entitled to indemnification from him for the liability in respect of which the participation is claimed.

(b)  In proceedings on participation under this section the participation shall be in an amount to be prescribed by the Court on the basis of justice and fairness, taking into consideration the degree of the person's responsibility for the damage; the Court is competent to exempt a person from the obligation to participate or to order that a person's participation amount to full indemnification.

### Definition

85.  "Civil wrong", in sections 83 and 84 – whether or not it constitutes a criminal offense, and the provisions of those sections shall not affect criminal proceedings for an unlawful act and they shall not make any agreement on indemnification enforceable, if it would not have been enforceable without those sections.

### Amount of insurance not to be taken into account of compensation

86.  When compensation that must be paid for a civil wrong is assessed, any amount paid or due in respect of that civil wrong under an insurance contract shall not be taken into account.

### Compensation for slander in a newspaper

87.  (a)  If a plaintiff won a Court case against the owner of a newspaper for the publication of a slander in that newspaper, and if he demonstrates to the Court before which the action was heard that he cannot cause the judgment to be implemented by way of execution against the defendant's real estate or movables, then the Court may order the judgment to be executed against the persons who signed the guaranty provided by or on behalf of the defendant under section 5(1)(3) of the Press Ordinance and the guaranty given by the signatories of that document to be exercised, on condition that the signatories' liability not exceed their liability under the guaranty.

(b)   A plaintiff said in subsection (a) shall serve a copy of the Court order under this section on the Minister of Finance.

(c)   The Minister of Justice may make regulations to regulate the practice and law procedure in proceedings under this section, and he may prescribe the fees to be paid in them.

**Civil wrong that also is an offense**

88.   If the facts on which an action for a civil wrong is based also constitute a criminal offense, then that shall not bar the action; however, if the Court that hears the action finds, at any stage of the proceedings, that the facts constitute or are liable to constitute a felony, then the Court shall stay continuation of the proceedings until it ascertains that the facts were communicated to or are known by the police.

**Beginning of period of prescription**

89.   For purposes of the period of prescription in an action for a civil wrong, "the day on which grounds for the action arose" shall be one of the following:

(1)   if the grounds for the action are some act or omission – the day on which that act or omission occurred; if the act or omission is continuous – the day on which it ceased;

(2)   if the grounds for the action are damage caused by some act or omission – the day on which that damage occurred; if the damage was not discovered on the day on which it occurred – the day on which the damage was discovered, but in the latter case the action shall be prescribed if it was not brought within ten years after the day on which the damage occurred.

## CHAPTER SIX: MISCELLANEOUS

**Saving of enactments**

90.   Nothing in this Ordinance shall be deemed to interfere with jurisdiction under Admiralty Law which is vested in a Court in Israel, or with the provisions of the Civil Law Procedure Amendment Law (The State as a Party) 5718-1958 or of any enactment repealed by it.

**Provisions on the adjudgment of "diyet"**

91.   A Court, which is not a Moslem religious tribunal or a tribal tribunal shall not adjudge "diyet"; an aforesaid Court shall not adjudge "diyet" for an act for which compensation was adjudged under this Ordinance, and a Court shall not adjudge compensation under this Ordinance for an act in respect of which "diyet" was adjudged.

*CIVIL WRONGS - Ordinance, Law and Regulations - 2006*                    **30**

92. The Minister of Justice may, with approval by the Knesset Constitution, Law and Justice Committee, change the Schedule.

**Effect**
93. This New Version shall go into effect on October 1, 1968.

# SCHEDULE
(Section 92)
**Bodies Corporate Established by Law**

1. Bank of Israel
2. National Insurance Institute
3. Employment Service
4. Nature Preservation and National Parks Authority
5. Agricultural Supervision Authority
6. Securities Authority
7. Antiquities Authority
8. Second Authority for Television and Radio

# CIVIL WRONGS REGULATIONS (LIABILITY OF A PUBLIC SERVANT) 5766-2006

By virtue of my powers under sections 7B(c) and (d), 7C(a) and 7E of the Civil Wrongs Ordinance [New Version] 5744-1984 (hereafter: the Ordinance), and with approval by the Knesset Constitution, Law and Justice Committee I make these regulations:

## CHAPTER ONE: INTERPRETATION

**Definition**
1.   In these regulation, "Law Procedure Regulations" – the Civil Law Procedure Regulations 5744-1984.

## CHAPTER TWO: NOTICE OF ACTION BROUGHT AGAINST A PUBLIC SERVANT

**Obligation to give notice of action brought against a public servant**
2.   (a)   When action has been brought against a public servant who is a State employee, as said in section 7B of the Ordinance, then the plaintiff shall give notice that it was brought to the office of the Attorney of the District, in which the Court that hears the action sits, or to the legal counsel of the Knesset, as the case may be; a copy of the writ of claim shall be attached to the notice.
     (b)   When action has been brought against a public servant who is a public authority employee, as said in section 7C of the Ordinance, then the plaintiff shall give notice that it was brought to the to the legal counsel of the public authority; a copy of the writ of claim shall be attached to the notice.
     (c)   A notice under subregulation (a) or (b) shall be drawn up according to Form 1 in the Schedule.

**Time and manner of delivering the notice**
3.   A notice said in regulation 2 shall be served on the State or on the public authority, as the case may be, at the time at which the writ of claim is served on the public servant; the provisions of Chapter 32 of the Law Procedure Regulations shall apply to service of the notice, mutatis mutandis and subject to the provisions of these regulations.

*CIVIL WRONGS - Ordinance, Law and Regulations - 2006*                                32

## CHAPTER THREE: NOTICE BY THE STATE RECOGNIZING THE EMPLOYEE'S ACT AS PERFORMED AS PART OF HIS GOVERNMENTAL RESPONSIBILITIES

**Conditions for giving notice of recognition of the act**
4.　　In respect of a public servant that is a State employee, the State shall give the Court notice that it recognizes that the act performed by the employee was performed in the course of exercising his governmental function, as said in section 7B(a) of the Ordinance (hereafter: notice of recognition), if all the following hold true:
　　(1)　the act was performed as part of the employee's Governmental function;
　　(2)　the act was not performed knowingly with the intent to cause damage or with indifference to the possibility that damage would be caused by the said act.

**Serving a notice of recognition**
5.　　A notice of recognition in respect of –
　　(1)　a State employee – shall be served by the Attorney General or by a person he authorized to do so;
　　(2)　a State employee that is a Knesset employee – shall be served by the  legal counsel of the Knesset.

**Drawing up a notice of recognition and the period for its service**
6.　　(a)　If the State is a party to the action, then the notice of recognition shall be submitted to the Court together with the writ of defense on behalf of the State, and a copy thereof shall be served on the parties.
　　(b)　If the State is not a party to the action, then the notice of recognition shall be submitted to the Court within the period prescribed in the Law Procedure regulations for the submission of writs of defense and a copy thereof shall be served on the parties; the writ of defense on behalf of the State shall be submitted within thirty days after the day on which the Court ordered the State to be joined as a party to the action, under the provisions of section 7B(a) of the Ordinance.
　　(c)　A notice of recognition shall be drawn up according to Form 2 in the Schedule; certification by the Attorney General or by the legal counsel of the Knesset shall be attached.

**Times for the submission of petitions under section 7B of the Ordinance**
7.　　(a)　A plaintiff's petition under section 7B(c) of the Ordinance, that the Court determine that the conditions of immunity under section 7A do not apply, shall be submitted to the Court within 14 days after

submission of the State's petition under section 7B(b) of the Ordinance to dismiss the action against the State employee.

(b) The State employee's petition, that the Court determine that the conditions of immunity under section 7A do apply, shall be submitted to the Court within 14 days after the last day for the submission of a notice as said in regulation 6.

## CHAPTER FOUR: BRINGING ACTION AGAINST A PUBLIC SERVANT WHO IS A PUBLIC AUTHORITY EMPLOYEE

### Certification by the legal counsel of the public authority

8. A public authority's petition under section 7C(a) of the Ordinance, that the Court determine that the conditions of immunity under section 7A do apply, shall be submitted to the Court after certification by the legal counsel of the public authority was obtained; the certification by the legal counsel of the public authority shall be attached to the petition.

### Times for the submission of petitions under section 7C of the Ordinance

9. A public authority's petition or a public authority employee's under section 7C(a) of the Ordinance, that the Court determine that the conditions of immunity under section 7A do apply, shall be submitted to the Court within thirty days after the writ of claim was served on the public authority or on the public authority employee, as the case may be; a copy of the petition shall be served on the parties.

## CHAPTER FIVE: SUBMITTING AND DECIDING A PETITION ON THE APPLICABILITY OF CONDITIONS OF IMMUNITY

### Submitting a petition under sections 7B(b), 7B(d) or 7C(a)

10. The provisions of Article One of Chapter Twenty of the Law Procedure regulations shall apply to the submission of petitions under sections 7B(c) or (d) or 7C(a) of the Ordinance, mutatis mutandis and subject to the provisions of these regulations.

### Decision on a petition

11. (a) All makers of affidavits shall appear on the prescribed date for interrogation on their affidavits, unless the Court decides otherwise.

(b) Hearings on a petition shall be completed on one day; if the Court

deems it necessary, it may set days, in sequence as far as possible, for additional hearings, until the witnesses' interrogation has been concluded.

(c) Until seven days before the date set for hearings, the parties may submit to the Court, in writing, lists of legal documentation and main points of argument; the parties' arguments shall be summarized orally on the day of the hearing, after presentation of evidence was concluded.

(d) The Court shall hand down its decision on a petition, at the latest within 14 days after hearing the petition was concluded, and before making any other decision on the action.

### Submitting a writ of defense in an action against a public authority employee

12. If the Court decided under section 7C(a) of the Ordinance – on the petition by the public authority or by the public authority employee – that the conditions of immunity under section 7A do apply, then the public authority shall submit a writ of defense within thirty days after the Court's decision was handed down, if it had not submitted it previously; if the Court decided that the conditions of immunity do not apply, then the employee shall submit a writ of defense within thirty days after the Court's decision was handed down.

### Submitting a writ of defense in an action against a government employee

13. If the State did not submit a notice of recognition, and if on the employee's petition under section 7B(d) of the Ordinance the Court decided that the conditions of immunity under section 7A do apply, then the State shall submit a writ of defense within thirty days after the Court's decision was handed down, if it had not submitted it previously; if the State submit a writ of defense, and if the on petition by the plaintiff under section 7B(c) of the Ordinance the Court decided that the conditions of immunity under section 7A do not apply, then the State employee shall submit a writ of defense within thirty days after the Court's decision was handed down.

### Appeal

14. The time for bringing appeal or petitioning for permission to appeal, as the case may be, against a decision by the Court on petitions under sections 7B(c) or (d) and 7C(a) of the Ordinance, is thirty days after the decision was handed down.

## CHAPTER SIX: MISCELLANEOUS

### Applicability of the Civil Law Procedure Regulations

15.   The Court shall deal with any procedural matter, for which there is no provision in these regulations, according to the provisions of the Civil Law Procedure Regulations.

### Effect

16.   These regulations shall be in effect from February 10, 2006.

## SCHEDULE

**Form 1**
**(Regulation 2(c))**

To the _____ Court
in _____ .
file _____

_____
vs.

_____
Notice of action brought against a public servant
Notice is hereby given that on _____ action was brought against a public servant who is a State / public authority employee (cross out the superfluous) in the Court in _____ under the Civil Wrongs Regulations (Liability of a Public Servant) 5766-2006 (hereafter: the regulations).

*    If the public servant is a State employee, then under regulation 6 a written notice of recognition must be submitted to the Court no later than on _____ and a copy thereof shall be served on the parties

*    If the public servant is a public authority employee, then under regulation 9 written application must be made no later than on _____, asking the Court to determine whether conditions of immunity under section 7A of the Civil Wrongs Ordinance apply, and a copy thereof shall be served on the parties and to the public authority (if it is not a party).

Date: _____ .     Name of person who gives the notice: _____ .

Signature:____ _____ .

*CIVIL WRONGS - Ordinance and Regulations*                                   36

**Form 2**
**(Regulation 6(c))**

To the _____ Court
in _____
file _____


_____
vs.

_____

### Notice that immunity under section 7A of the Civil Wrongs Ordinance [New Version] (hereafter: Civil Wrongs Ordinance) applies, and petition to dismiss the action against the defendant No. _____.

(1) Under the provisions of section 7B of the Civil Wrongs Ordinance, notice is hereby given that the defendant no._____., Mr. / Ms._____ , ID No_____, has immunity against actions for a civil wrong in respect of the event that is the subject of the action, in accordance with the provisions of section 7A of the Civil Wrongs Ordinance.

(2) The reasons for the immunity are as follows: (specify why the conditions of immunity apply): _____
_____

(3) The Honorable Court is requested to dismiss the action against him / her.


Date: _____

Name and position of person who gives the notice _____

Signature: _____

# CIVIL WRONGS (LIABILITY OF THE STATE) LAW 5712-1952

### Interpretation
1.    In this Law –
"the Ordinance" means the Civil Wrongs Ordinance 1944;
"act" includes "omission";
"liability in tort" means liability under the Ordinance for an act committed after this Law went into effect;
"act of war" – includes any act of combating terrorism, hostile acts or uprisings, and also acts for the prevention of terrorism, hostile acts or uprisings carried out under circumstances that endanger life and limb;
other terms shall have the meaning they have in the Ordinance.

### The State's liability in tort
2.    In respect of liability in tort the State shall be treated like any incorporated body, except for the provisions below in this Law.

### Acts In the scope of lawful authorization
3.    The State shall not be liable in tort for any act performed within the scope of a lawful authorization, in reasonable confidence in good faith of the existence of lawful authorization; however, it is responsible for actual negligence.

4.    Repealed

---
*NOTE: In respect of actions brought until February 10, 2006, sections 3 and 4 shall still be deemed to read as follows:*

> **" Acts in the scope of lawful authorization**
> 3.    The State shall not be liable in tort for an act carried out within the scope of lawful permission, or in good faith while using what appears to be lawful permission; however, it is responsible for actual negligence.
>
> **Slander**
> 4.    The State is not liable in tort for slander."

---
### Act of war
5.    The State is not liable in tort for any act performed by an act of war of the Israel Defense Forces.

### Actions because of Israel Defense Force activities in an area

5A. Any action against the State or against any agent of the State in respect of damage caused in an area in consequence of any act performed by the Israel Defense Forces (in this section : action) shall be heard subject to the provisions of this section.

(1) In this section –

"area" – each of the following: Judea, Samariah and the Gaza district;

"Israel Defense Forces" – including other security forces of the State of Israel, which operate in an area;

(2) (a) a Court shall hear an action only if the injured person or his guardian or someone else on his behalf gave written notice of the act that is the subject of the action, as shall be prescribed in Regulations;

(b) the notice shall be given within sixty days after the act; however, if the plaintiff or his guardian could not – because of the state of his health or because of some other justified reason – give the notice within the said time, then the notice shall be given within 30 days after the hindrance was removed;

(c) if the plaintiff died and the notice was not given while he still was alive, and if the time for giving the notice said in subsection (b) has not yet passed, then the notice shall be given by his dependents or by his estate or by some other person on their behalf within 60 days after his death;

(d) notwithstanding the provisions of this paragraph, the Court may – because of special reasons that shall be recorded – hear an action in respect of an act of which notice was not given on time;

(3) a Court shall not hear an action brought later than two years after the act that is the subject of the action, but the Court may – if it is satisfied that the plaintiff had no reasonable opportunity to bring the action within the said period – extend the period by not more than one additional year; if the plaintiff was a minor on the day the act was performed, then the said extension shall not be longer than three years;

(4) the provisions of sections 38 and 41 of the Civil Wrongs Ordinance [New Version] shall not apply to hearings of an action, but the Court may decide that the provisions of the said sections shall apply, if it concludes that that is justified under the circumstances of the case and for reasons that shall be recorded;

(5) if the Court concludes that the State was denied a fair opportunity to defend against an action, in consequence of the fact that the Palestine Council did not comply with the provisions on legal aid in accordance with the agreement, then it may – after it has given the parties an opportunity to present their arguments on that

matter – dismiss the action;in this paragraph –

"the agreement" – as defined in the Extension of Emergency Regulations (Judea, Samariah and the Gaza District – Adjudication of Offenses and Legal Aid) Regulations 5728-1967;

"Palestine Council" – like the definition of "Council" in the said Law;

(6) The Minister of Defense is charged with the implementation of this section and he may – in consultation with the Minister of Justice and with approval by the Knesset Constitution, Law and Justice Committee – make regulations on anything connected with its implementation.

### Action by an enemy or member of a terrorist organization

5B. (a) Notwithstanding the provisions of any statute, the State is not liable in tort for damage caused to a person specified in paragraphs (1), (2) or (3), other than damage caused in categories of actions or to categories of plaintiffs said in Schedule One –

(1) a subject of an enemy state, unless he is in Israel legally;

(2) an activist or member of a terrorist organization;

(3) a person harmed while he acted for or on behalf of the subject of an enemy state, of a member or activist of a terrorist organization.

(b) In this section –

"enemy" and " terrorist organization" – as defined in section 91 of the Penal Law 5737-1977;

"the State" – including any authority, body or person that acts on its behalf.

### Actions in a confrontation area

5C. (a) Notwithstanding the provisions of any statute, the State is not liable in tort for damage caused in a confrontation area because of an act performed by security forces, other than damage caused in categories of actions or to categories of plaintiffs said in Schedule Two.

(b) (1) The Minister of Defense shall appoint a committee, which shall be authorized to approve – under special circumstances – ex gratia payment to applicants to whom subsection (a) applies, and to set the amount thereof.

(2) The committee's members shall be –

(1) an advocate qualified to be appointed district judge, and he shall be the chairman; the Minister of Defense shall appoint the chairman in consultation with the Minister of Justice;

    (2) a representative of the Ministry of Defense;

    (3) a representative of the Ministry of Justice;

  (3) The Minister of Defense shall, in consultation with the Minister of Justice and with approval by the Knesset Constitution, Law and Justice Committee, prescribe the threshold conditions for submitting applications to the committee, the manner of submitting the application, the committee's procedure and the criteria for making ex gratia payments.

(c) The Minister of Defense may declare an area to be a confrontation area; when the Minister has so declared, then in the declaration he shall set the boundaries of the confrontation area and the period, during which the declaration shall apply; notice of the declaration shall be published in Reshumot.

(d) When notice under section 5A(2) (in this section: written notice) has been given, then the following provisions shall apply:

  (1) if the Minister of Defense declared the area in which the damage was caused to be a confrontation area – then within 30 days after the notice was received by the Ministry of Defense the declaration shall be brought to the knowledge of the person who gave the written notice;

  (2) if the Minister of Defense did not declare the area in which the damage was caused to be a confrontation area, then he may – within 90 days after receipt of the written notice – declare the area to be a confrontation area; when he has so declared, then within the said 90 day period he shall bring the declaration to the knowledge of the person who gave the written notice; if the Minister of Defense declared the said area to be a confrontation area after the said 90 day period, then the Court may – for special reasons that shall be recorded – accept the argument that the damage that is the subject of the notice was caused in a confrontation area;

  (3) not bringing the declaration of a confrontation area to the knowledge of the person who gave written notice, as said in paragraphs (1) and (2), shall not derogate from the effect of the declaration under subsection (c);

  (4) The Minister of Defense, in consultation with the Minister of justice, shall prescribe the manner in which the declaration of an area as a confrontation area to the knowledge of a person who gave a written notice.

(e) In this section –

  "confrontation area" – an area outside the area of the State of Israel, in respect of which the Minister of defense declared as said in subsection (c), in which the defense forces operated or which is an area that is part of the confrontation;

"the State" – including any authority, body or person who acts in
its name;

"confrontation" – a state of affairs in which one or several events
of a military nature occur between the security forces and
regular or irregular factors hostile to Israel, or a state of
affairs in which hostile acts by an organization hostile to
Israel are carried out.

## Change of Schedules

5D.  The Minister of Defense may, after consultation with the Minister of
Justice and with approval by the Knesset Constitution, Law and Justice
Committee, change Schedule One and Schedule Two by order.

## Damage caused during military service

6.    (a)    The State is not liable in tort for any harm caused to a person or
for any disease or for the aggravation of any disease to which a
person was subjected during the period of his military service or in
consequence of his military service.

(b)    "Military service", in this section – within its meaning in the
Invalids (Pension and Rehabilitation) Law 5709-1949.

## Death caused in the military service

7.    (a)    The State is not liable in tort for the death of any person caused
by any harm he suffered or by any disease or by the aggravation
of any disease caused him during the period of his military service
in consequence of his military service.

(b)    "Military service", in this section, within its meaning in the Fallen
Soldiers' Families (Pensions and Rehabilitation) Law 5710-1950.

## Prescription for purposes of rehabilitation laws

7A.   If an action in tort was brought against the State and was rejected by
virtue of sections 6 and 7, then the period of prescription for the
submission of applications for grants and benefits under the Invalids
(Pension and Rehabilitation) Law 5719-1959 [Consolidated Version]
and the Fallen Soldiers' Families (Pensions and Rehabilitation) Law
5710-1950 shall end at the time prescribed in them or six months after
a final judgment that is not subject to further appeal was handed down,
whichever is later, on condition that the action in tort was brought not
later than one year after the end of the prescription period prescribed in
those Laws.

## Exemption from liability in tort of agents of the State

7B.   (a)    In instances, in which the State is not liable in tort under one of
the sections 5 to 7, then the person, because of whom the State
would have been liable in tort if not for the said sections, shall also

be exempt as aforesaid.

(b)   This section also applies to any act or omission carried out before the day on which it went into effect, but it shall not affect any final judgment made before the said day.

**The State's entitlement to indemnification**

7C.   The provisions of section 7B shall not derogate from any entitlement of the State for indemnification from any person who would have been liable to it, if not for the said provisions.

**Assets vested in the State**

8.   The State is not liable in tort as an owner of assets vested in it only by virtue of Law, as long as it has not taken possession of the asset.

**Saving of specific provisions of Laws**

9.   The provisions of this Law shall not derogate from any provision in any of the enactments enumerated below, which determines, restricts or denies the liability of the State or of its institutions:

(1)   the Lands Ordinance (Settlement of Property Rights);
(2)   the Post Office Ordinance;
(3)   the Government Railways Ordinance 1936;
(4)   the Absentees' Property Law 5710-1950;
(5)   the German Property Law 5710-1950;
(6)   the Postal Bank Law 5711-1951.

**Saving of statutes**

9A.   The provisions of section 5B and 5C shall not derogate from any defense, immunity or exemption available to the State under any statute.

**Repeal**

10.   Section 4(1) of the Ordinance is repealed.

**Amendment**

11.   The Governmental Trials Ordinance shall be amended as follows:

(1)   in paragraph (c), replace the period at its end with a comma, followed by "or";
(2)   insert the following paragraph –
        "(d)   civil wrongs".

## SCHEDULE ONE
### (Section 5B(a))

An action, for which the grounds are harm caused to a person said in section 5B(b), while he was in the custody of the State of Israel as an arrestee or prisoner, and after he was in custody was not again an activist of member of a terrorist organization or acted on the behalf or as agent of any of them.

## SCHEDULE TWO
### (Section 5C(a)

1. An action, for which the grounds are harm caused in respect of an act performed by a person who serves in the defense forces, on condition that he was convicted of an offense in respect of that act by a Military Tribunal or by a Court in Israel; for this purpose, "offense" – other than an offense of the category of offenses of enhanced liability, within its meaning in section 22 of the Penal Law 5737-1977; in an action under this subsection, for the purpose of the period of prescription for bringing the action, as said in section 5A(3), the day on which the judgment became final shall be the day on which the subject of the action was committed.

2. An action, for which the grounds are harm caused in a confrontation area to a person who was in the custody of the State of Israel as an arrestee or prisoner, and after he was in custody was not again an activist of member of a terrorist organization or acted on the behalf or as agent of any of them.

3. An action, for which the grounds are an act of the Civil Administration, as defined in the Law for the Implementation of the Agreement on the Gaza District and Jericho Area (Economic Arrangements and Miscellaneous Provisions) (Law Amendments) 5755-1994, or an act of the Governance, Coordination and Liaison Administration, on condition that the act was not performed as part of a confrontation.

4. A road accident, within its meaning in the Road Accident Victims Compensation Law 5735-1975, in which a security forces vehicle is involved and its license number or the identity of the person who drove it at the accident is known, unless the accident occurred in the course of the vehicle's operational activity or of the injured person's hostile activity against the State or against the civilian population.

5. Property damage caused by a vehicle in the course of a road accident, within its meaning in the Road Accident Victims Compensation Law 5735-1975, even if in that accident no bodily injury was caused, on condition that the other conditions of section 4 of this Schedule are complied with.

# CIVIL WRONGS REGULATIONS (LIABILITY OF THE STATE) (WRITTEN NOTICE OF DAMAGE) 5763-2003

By my authority under section 5a(2)(a) and (6) of the Civil Wrongs (Liability of the State) Law 5712-1952 (hereafter: the Law), in consultation with the Minister of Justice and with approval by the Knesset Constitution, Law and Justice Committee, I make these regulations:

**Notice form**
1.    A written notice, within its meaning in section 5A(2) of the Law (hereafter: notice) shall be given according to the form in the Schedule, which shall be in Hebrew and in Arabic (hereafter: the form).

**Full particulars**
2.    (a)    The person who gives notice under section 5A(2)(a) or (c) of the Law, as the case may be (hereafter: the person who gives notice) must fill in all the particulars, as required on the form.
      (b)    The Ministry of Defense shall – in respect of a form on which the required particulars are filled in as said in subregulation (a) – send acknowledgment of its receipt to the person who gives notice.
      (c)    If particulars are not filled in as aforesaid, the dispatch of the form shall not be deemed a notice, as required in section 5A(2) of the Law; the Ministry of Defense shall send to the person who gave the notice notification to that effect (hereafter: rejection notice).
      (d)    Notwithstanding the provisions of subregulation (c), the Ministry of Defense may – at its discretion – demand that the particulars missing on the form be completed (hereafter: the demand); if the particulars were not completed within 45 days after the demand was sent, then sending the form shall not be deemed giving notice, as required in section 5A(2) of the Law.

**Sending an acknowledgment of notice or a demand**
3.    An acknowledgment of notice, a rejection notice or a demand, as the case may be, shall be sent by registered mail or by facsimile to the return address stated on the form; certification by the post office that a letter had been received for dispatch by registered mail or certification of a facsimile transmission, as the case may be, shall be decisive evidence of the said dispatch.

**Sending the form**
4.    (a)    The form shall be sent in one of the following manners to the Claims and Insurance Section,  Administration, Property and

Finance Division in the Ministry of Defense (in these regulations:
Ministry of Defense) for the purpose stated in the form:

(1)  by registered mail with certification of delivery;

(2)  by facsimile or in person, on condition that the person who
     gave the notice received certification from the Ministry of
     Defense that the notice had reached the Ministry, stating the
     date of arrival (hereafter: date certification); the said date
     shall be the date on which notice was given; date
     certification does not constitute acknowledgment of receipt
     within its meaning in regulation 2(b).

(b)  A form, including the completion of particulars under regulation
     2(d), sent or delivered in a manner different from those said in
     subregulation (a), shall not be deemed a giving of notice for
     purposes of the Law.

(c)  If an action within its meaning in section 5A of the Law is brought,
     then certification of delivery or date certification, as well as
     certification of receipt and a copy of the notice shall be attached
     to the writ of claim.

**Effect**

5.   These regulations shall go into effect thirty days after their publication.
     *(Date of publication: March 16, 2003 – Tr.*

# SCHEDULE
## (Regulation 1)
## Civil Wrongs (Liability of the State) Regulations (Written Notice of Damage) 5763-2003

[    The person who gives notice must fill in the required particulars]
[on the form.  If the particulars are not filled in as required, sending]
[the form will not be deemed giving notice, as required by the Law.]

To the
Claims and Insurance Section
Administration, Property and Finance Division
Ministry of Defense
Hakirya
Tel Aviv
Fax: 03-6934083, 03-6977101, 03-6976622
If there is a change of address, the Ministry of Defense will publish an update in a daily
newspaper and on the Ministry of Defense internet site; the updated particulars will be
binding as of the date of publication.

### Written Notice Form

The particulars required on the form must be filled in on the appropriate lines. Mark X in the appropriate squares.

## A.    Particulars of the injured person

Full name of the injured person:

| first name | father's name | grandfather's name | family name |

ID number _____
Date of birth _____
Family status _____ (single/married/divorced/widowed)
Residential address _____
                    (town/village, quarter, neighborhood, street, number)
Address for correspondence _____
            (residential address, other address, fax number)
The injured person's parents:
        the injured person's father - full name _____
                                ID number _____
        the injured person's mother - full name _____
                                ID number _____

**B.  Particulars of event in consequence of which the damage was caused**

Date _____

Hour of the injury _____

Circumstances of the act, in which the injury occurred, including description of the claimant's acts when he was injured _____

_____

The place where the injury occurred (specify where the injured person and the person who caused the injury were when the injury occurred) _____

_____

Who caused the injury (describe, as far as possible, the human factor that caused the injury - IDF soldier/ Border Policeman, give their number)

_____

What caused the injury (bullet/rubber bullet/splinters/shell/explosion/missile impact/other; if injury was by a military vehicle, give particulars of vehicle and driver, as far as possible) _____

_____

Specify names, residential addresses and ID numbers of witnesses to the circumstances of the injury, if any _____

_____

**C.  Particulars of the damage**

[ ]  Bodily harm

Describe the injury _____

_____

[ ]  Property damage

Describe the property (building, vehicle, other), its address/location _____

_____

If the property is owned by a legal entity (company, partnership, nonprofit society) - specify the names of share holders/partners _____

_____

Describe the damage and its extent, as far as known when the notice is being given _____

_____

*CIVIL WRONGS - Ordinance and Regulations*                                    48

**D.    Additional particulars**
1.    Evacuation for medical treatment (specify only if evacuated)_____

_____    _____    _____    _____

Who evacuated _____ (private, ambulance of an organization)
To which medical institution _____    _____    _____

2.    Submitted a complaint/notice of the event (specify only if submitted) __

_____    _____    _____    _____
Complaint was submitted on _____    to _____    _____
(agency of the State of Israel/security forces/nonprofit or other organization)


**E.    Particulars of person who gives the notice**
       (fill in only if notice is not given by the injured person)
Full name:

_____    _____    _____    _____
ID number _____
Residential address _____    _____    _____ .
                    (town/village, quarter, neighborhood, street, number)
Address for correspondence    _____    _____
             (residential address, other address, fax number - on this form state only one address
             for correspondence, in Part A or Part E)
Connection of person who gives the notice to the injured person:
[ ]    guardian
[ ]    other person on behalf of the injured person ___    _____    _____
       (specify the connection)

In case of the injured person's death:
       when did the injured person die _____ ____
[ ]    dependent of the injured person _____
       (specify the dependent's connection to the deceased - parent/child/other)
[ ]    in the name of the estate

       Signature of person who gives the notice _____ __
       Date_____

# LAW FOR THE AMENDMENT OF CIVIL WRONGS LEGISLATION (AMELIORATING BODILY HARM) 5724-1964

## Definitions
1.   In this Law –

"amelioration of harm" – expenses incurred or services provided in order to remedy bodily harm, to prevent aggravation of the harm or additional harm and to ease the injured person's suffering, including support provided to the injured person for his and his household's livelihood, such as became necessary because of the harm, and if the injured person died – aforesaid support extended to persons entitled to compensation therefor from the person who caused the damage;

"bodily harm" includes illness, physical or mental disability and death.

## Benefactor's right to collect from person who caused the harm
2.   If a person caused bodily harm to another, then the person who alleviated the harm is entitled to be paid by the person who caused the harm for alleviating the harm, up to the amount that the person who caused the harm would have owed the beneficiary under any statute for having caused the bodily harm, had the harm not been alleviated by the benefactor.

3.   Repealed

## Extent of the right
4.   For the purposes of this Law it does not matter whether the benefactor acted under a statutory or contractual obligation or voluntarily; and it does not matter if the benefactor is a cooperative society of which the beneficiary is a member; but if the beneficiary is a body corporate that engages in insurance business – other than a body corporate that insures only its members – and if it acted under an insurance contract with the injured person or the beneficiary, then it shall not be entitled to collect under this Law, but this provision shall not derogate from its right under another Law.

## Reasonability of damage amelioration
5.   Under this Law only reasonable expenses, service fees and support payments may be collected; salary and wages, which an employer continues to pay to his employee while the employee is not able to work because of the bodily harm, shall – for the present purpose – be deemed a reasonable expense, but no more shall be collected than the salary or wages that the employee would have received, had be been

capable of working; the living expenses provided and the pay paid by the State to a soldier while he is not capable of serving shall also be deemed a reasonable expense.

**Right toward insurer**

6.    If the person who caused the damage is insured in respect of his liability to the beneficiary, then the beneficiary may, under this Law, collect from the insurer, to the extent that the insurer is liable for the person who caused the damage.

**Right of beneficiary**

7.    The benefactor shall not be entitled to claim under this Law from the person who caused the damage any amount of the damage amelioration paid to him by the beneficiary, and the beneficiary may collect that amount from the person who caused the damage.

**Saving of other claims**

8.    This Law shall not derogate from a benefactor's right to claim the amelioration of damage on other grounds, on condition that under all his claims he collect no more than the amount of damage amelioration.

**Evidence from a Court**

9.    When a Court hears an action under this Law, then it may – on application by the beneficiary – accept as evidence of responsibility for the harm and of contributory negligence any decision on this matter that is included in the judgment of a compensation claim in consequence of that same damage, which can no longer be appealed.

**Applicability**

10.    This Law shall also apply to the State.

# R E F E R E N C E S

The sources of the legal acts mentioned in this translation are listed below for our readers' convenience. Whenever possible we refer to English language versions, both those issued by the Ministry of Justice (LSI) and the consolidated law translations published by Aryeh Greenfield – A.G. Publications.

The following abbreviations are used here and elsewhere in these pages.

| | |
|---|---|
| AG | Aryeh Greenfield – A. G. Publications |
| LSI | Laws of the State of Israel (translated) |
| NV | Laws of the State of Israel – New Version (translated) |
| KT | Kovetz Hatakkanot (Hebrew original) |
| SH | Sefer Ha-chukkim (Hebrew original) |

Basic Law: Administration of Justice – in AG, Israel's Written Constitution, 5th ed., 2006

Civil Law Procedure Amendment Law (The State as a Party) 5718-1958 – LSI XII, p. 138

Civil Law Procedure Regulations 5744-1984 – AG, 7th ed., 2005

Civil Wrongs (Liability of the State) Law 5712-1952 – SH 5712, p. 339; Amendments: SH 5723, p. 27; SH 5732, p. 134; SH 5749, p. 16; 5762, p. 514; SH 5764, p. 92; SH 5765, p. 952

Civil Wrongs Ordinance (New Version) – NV II, p. 5
Amendments – SH 5728, p. 101 – LSI XXII, p. 112;  LSI XXIII, p. 165; LSI XXIII, p. 312; LSI XXIV, p. 127; LSI XXVIII, p. 97; LSI XXX, p. 144; SH 5752, p. 153; SH 5759, p. 151; SH 5760, p. 213; SH  5765, p. 950; KT5767, p. 76

Civil Wrongs Regulations (Liability of a Public Servant) 5766-2006 - KT 5766, p. 704

Civil Wrongs Regulations (Liability of the State) (Written Notice of Damage) 5763-2003 – KT 5763, p. 614

Fallen Soldiers' Families (Pensions and Rehabilitation) Law 5710-1950 – SH 5710, p. 162

Interpretation Ordinance – in AG, Interpretation Law 5741-1981

Invalids (Pension and Rehabilitation) Law 5709-1949 – SH 5709, p. 278

Invalids (Pension and Rehabilitation) Law 5719-1959 [Consolidated Version] – SH 5719, p. 276

Law and Administration Ordinance 5708-1949 – LSI I, p. 7

Law and Administration Ordinance (Amendment No. 14) Law 5732-1972 – LSI XXVI, p. 52

Law for the Amendment of Civil Wrongs Legislation (Ameliorating Bodily Harm) 5724-1964 – SH 5724, p. 77; Amendment: SH 5739, p. 42

National Insurance Law 5714-1953 – AG, 6th ed., 2004

Penal Law 5737-1977 – AG, 5th ed., 2005

Prohibition of Defamation Law 5725-1965 – in AG, The Press, 2003

Road Accident Victims Compensation Law 5735-1975 in AG, Motor Vehicle Insurance 2003

Sale Law 5728-1968 – in AG, Transactions, 3rd ed., 2002

EXHIBIT 18

# Israel

by Israel Gilead
Hebrew University of Jerusalem,
Academic College of Law, Ramat-Gan

This text is up-to-date as of May 2002

In memory of my parents, Ester and Ovadia Greenberg

2003

## KLUWER LAW INTERNATIONAL
THE HAGUE / LONDON / NEW YORK

*Published by Kluwer Law International*
P.O. Box 85889
2508 CN The Hague, The Netherlands
Tel.: +31 70 308 1500
Fax: +31 70 308 1515
sales@kluwerlaw.com
http://www.kluwerlaw.com

*Sold and distributed in North, Central and South America by*
Aspen Publishers, Inc.
7201 McKinney Circle
Frederick, MD 21704
USA
Customer Care is: 877-529-5427
Direct Dial Number is: 301-698-7100
Fax number is: 301-698-7159
e-mail: customer.care@aspenpubl.com

*Sold and distributed in all other countries by*
Kluwer Law International
Libresso Distribution Centre
P.O. Box 23
7400 GA Deventer, The Netherlands
Tel.: +31 570 673560
Fax: +31 570 670898
customerservice@kluwer.nl

*Printed on acid-free paper*

90 YQM 000 91
The monograph *Israel* is an integral part of *Tort Law* in the *International Encyclopaedia of Law* series

© 2003, Kluwer Law International

*Tort Law* was first published in 2001

Kluwer Law International incorporates the imprint of Martinus Nijhoff Publishers.

This publication is protected by international copyright law.
All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior permission of the publisher.

# The Author



Professor Israel Gilead, Bora Laskin Chair in Law, is the Dean of the Law Faculty of the Hebrew University of Jerusalem, Israel, since 1999. He also teaches at the Academic College of Law, Ramat-Gan. Professor Gilead was born in Jerusalem, Israel, in 1951. He studied Law (LL.B, 1978, LL.D. 1984) and Economics (B.A. 1982) at the Hebrew University of Jerusalem, where he served as the Editor-in-Chief of the law review.

Professor Gilead is a member of the European Group on Tort Law (The Tilburg Group) and a fellow of the European Center of Tort Law and Insurance Law. He is a member of Israeli law reform committees: the Codification Committee, the Tort Law Committee and the Committee on Limitation of Civil Actions.

Professor Gilead published numerous articles on Torts, Economic Analysis of Tort Law, Limitation of Civil Actions and Bills and Notes.

**The Author**

# Table of Contents

| | |
|---|---|
| The Author | 3 |
| List of Abbreviations | 17 |
| General Introduction | 19 |
| §1. GENERAL BACKGROUND OF THE COUNTRY | 19 |
| I. The Different Layers of Israeli Law | 19 |
| II. Israeli Law – a Unique Mix | 21 |
| III. The Judiciary | 21 |
| §2. ORIGINS, STRUCTURE AND FUNCTION OF THE LAW OF TORTS | 23 |
| I. Origins of Israeli Tort Law | 23 |
| II. The Structure of Tort Law – the Problem of Overlap and Conflict | 25 |
| §3. RELATIONSHIP BETWEEN TORTS AND CRIMINAL LAW | 28 |
| §4. RELATIONSHIP BETWEEN CONTRACTUAL RESPONSIBILITY AND TORTIOUS RESPONSIBILITY | 29 |
| I. The Concurrence of Causes of Action and the Interrelation between Different Branches of Private Law | 29 |
| II. Tort and Contract – from Separation to Coexistence | 31 |
| §5. PROTECTED INTERESTS | 35 |
| §6. PRIMACY OF LEGISLATION AND CODIFICATION | 36 |
| §7. CONSTITUTIONAL ASPECTS | 37 |

**Table of Contents**

Bibliography                                                                    41

Part I.  Liability for One's Own Acts                                           43

Chapter 1.  General Principles                                                  43

§1.  UNLAWFULNESS AND FAULT                                                     44

    I. Unlawfulness and Wrongfulness                        44
    II. Unlawfulness as a Breach of a Statutory Duty         44

§2.  CONCEPT OF FAULT                                                           45

    I. Fault-based Liability and the Tort of Negligence       45
    II. Elements of Negligence – in General                   45
    III. Carelessness and the Objective Standard of the Reasonable Person   46
    IV. Relaxing the Standard -- Gross Negligence and Lack of Good Faith   49

§3.  DUTY OF CARE                                                               49

    I. Duty of Care – a Monitoring Device on the Scope of Liability   49
    II. Duty of Care – Justifications                          50
    III. Elements of Duty of Care                             51
    IV. *Prima Facie* Duty of Care?                           52
    V. Notional Duty and Duty-in-fact                         52
    VI. Duty Owed to the Claimant                             53
    VII. Duty of Care – Pure Economic Loss                    54
    VIII. Duty of Care – 'Pure' Non-pecuniary Loss            60
    IX. Duty of Care – 'Pure' Omissions                       62

§4.  BREACH OF STATUTORY DUTY                                                   63

    I. The Definition, Role and Development of the Tort of Breach of Statutory Duty   63
    II. Enacted Duties                                        65
    III. An Enactment Intended for the Benefit or Protection of the Person Suffering Damage   67
    IV. The Loss Suffered and the Manner of its Infliction   68
    V. Exclusion of Tortious Liability?                       69
    VI. Enacted Duties that have Generated Tort Liability     69

§5.  CAPACITY                                                                   70

**Table of Contents**

Chapter 2.  Specific Cases of Liability                                72

§1.  LIABILITY OF PROFESSIONALS                                        72

    I.  Medical Practitioners                                     72
    II.  Legal Practitioners                                      76
    III.  Builders and Architects                                 78
    IV.  Others                                                   80

§2.  LIABILITY OF PUBLIC AUTHORITIES                                   81

    I.  Introduction                                              81
    II.  Statutory Immunities                                     82
    III.  Judicial Review – Public Law and Tort Law Compared      86
    IV.  Judicial Review by Tort Law – Policy Considerations      87
    V.  Controlling Liability – Legal Tools                       88
    VI.  The Restrictive Approach – until the Late 1970s          89
    VII.  The Expansion of Liability – from the Early 1980s to the Mid 1990s    90
    VIII.  The *Levi* Decision                                    91
    IX.  The Aftermath of *Levi*                                  93
    X.  The Effect of the Basic Law: Human Dignity and Freedom   94
    XI.  On the Personal Liability of Employees, Agents and Organs    94

§3.  ABUSE OF RIGHTS                                                   96

§4.  INJURY TO REPUTATION – DEFAMATION                                 97

    I.  Defamation – Introduction                                97
    II.  Defamatory Matter – Definition                          99
    III.  Defamation – the Claimant                               100
    IV.  Definition of 'Publication'                             101
    V.  Permitted Publications                                   101
    VI.  Plea of Truth                                           103
    VII.  Plea of Good Faith – in General                        104
    VIII.  Fair Comment – Public Matter                          105
    IX.  Publication Made Under Duty                             107
    X.  Other Pleas of Good Faith                                108
    XI.  Remedies                                                110

§5.  PROTECTION OF PRIVACY                                             112

    I.  Source of Protection                                     112
    II.  Definition                                              113
    III.  The Sanctity of the Home versus the Right of Assembly  114
    IV.  Data Bases                                              115

**Table of Contents**

|  |  |  |
|---|---|---|
| V. Defenses | | 115 |
| VI. Evidence and Remedies | | 116 |

§6. INTERFERENCE WITH CONTRACTUAL RELATIONS    117

I. The Tort of 'Causing Breach of Contract' – Definition    117
II. Legally Binding Contract    117
III. Breach of Contract    118
IV. Causing a Breach    118
V. Knowingly    118
VI. Without Sufficient Justification    119
VII. Exceptions to Liability    120

§7. UNFAIR COMPETITION    120

I. Introduction    120
II. Passing-off    121
III. Injurious Falsehood    123
IV. Property Law – Trademarks    124
V. Unjust Enrichment    124
VI. Additional Liabilities under the Commercial Torts Law, 1999    125

§8. FRAUD, NON-DISCLOSURE AND CONSUMER PROTECTION    127

I. Tort Liability Arrangements Securing the Reliability of Information    127
II. Fraud    128
III. Consumer Protection Laws    130

§9. LIABILITY ARRANGEMENTS PROTECTING PERSONAL RIGHTS    132

I. Bodily Injuries in the Workplace    132
II. Liability for Dangerous Premises    133
III. Parents and Schools    135
IV. Assault    136
V. False Imprisonment    139
VI. Public Nuisance    140
VII. Prevention of Sexual Harassment    140
VIII. Prevention of Discrimination – Admission into Public Places and
Supply of Goods and Services    141

§10. TORTS AND LIABILITY ARRANGEMENTS PROTECTING PROPERTY    143

I. Trespass to Immovable Property    143

**Table of Contents**

| | | |
|---|---|---|
| II. | Private Nuisance | 145 |
| III. | Protection of Interests in Goods | 148 |
| IV. | Road Accidents: Property Damage | 151 |
| V. | Computers | 152 |

**Part II.  Liability for Acts of Others** — 153

**Chapter 1.  Vicarious Liability** — 153

**§1. EMPLOYEE/EMPLOYER** — 153

| | | |
|---|---|---|
| I. | Vicarious Liability Distinguished from Personal Liability | 153 |
| II. | Employer's Vicarious Liability – Elements of Liability and Justifications | 154 |
| III. | Employment | 155 |
| IV. | Commission of Tort by the Employee | 156 |
| V. | Employee's Tort Committed 'in the Course of Employment' | 156 |
| VI. | Limitations on Vicarious Liability | 159 |

**§2. VICARIOUS LIABILITY OF A PRINCIPAL WHO IS NOT AN EMPLOYER** — 159

| | | |
|---|---|---|
| I. | Nature of Liability and Justifications | 159 |
| II. | The Agency Relations | 160 |

**§3. INDEPENDENT CONTRACTORS** — 162

| | | |
|---|---|---|
| I. | The Rule and its Exceptions | 162 |
| II. | Liability Under the Exceptions – Vicarious or Personal? | 162 |
| III. | Personal Liability for Loss Caused by Independent Contractors | 164 |

**§4. LIABILITY OF ENTITIES FOR ACTS OF THEIR ORGANS** — 165

| | | |
|---|---|---|
| I. | Kinds of Corporations | 165 |
| II. | Modes of Liability | 166 |
| III. | The Organ Doctrine – Merely a Sword or also a Shield? | 167 |

**§5. JOINING IN OR PROCURING ACT** — 170

**Table of Contents**

Chapter 2. Liability of Parents, Teachers and Instructors and
        Liability for Handicapped Persons        173

Chapter 3. Liability for Things and Animals      174

§1. NATURE OF LIABILITY AND SPECIAL RULES OF EVIDENCE    174

§2. THE FACTS SPEAK FOR THEMSELVES – *RES IPSA LOQUITUR*   174

§3. DANGEROUS THINGS    176

§4. ESCAPING THINGS    177

§5. LIABILITY FOR FIRE AND ANIMALS    178

Chapter 4. Joint and Several Liability – Categories    179

§1. JOINT AND SEVERAL TORTFEASORS    179

§2. JOINT AND SEVERAL LIABILITY – CLAIMANT V. TORTFEASOR    180

§3. JOINT AND SEVERAL LIABILITY – CONTRIBUTION    180

§4. JOINT AND SEVERAL LIABILITY – ROAD ACCIDENTS    182

Part III. Forms of Strict Liability    185

Chapter 1. Road and Traffic Accidents    186

§1. FROM FAULT-BASED LIABILITY TO ABSOLUTE LIABILITY BACKED AND
    SUPPLEMENTED BY INSURANCE    186

§2. THE MAIN FEATURES OF THE SYSTEM    187

§3. HOW THE SYSTEM FUNCTIONS – AN EXAMPLE    190

§4. WHAT IS A 'ROAD ACCIDENT'?    190

§5. RESTRICTION OF ENTITLEMENTS    193

§6. ADJUSTMENT OF LIABILITY AND INSURANCE    194

§7. SPECIAL RULES OF PROCEDURE AND EVIDENCE    195

**Table of Contents**

Chapter 2.  Product Liability                                    197

§1.  FROM NEGLIGENCE TO STRICT LIABILITY                          197

§2.  NEGLIGENCE                                                   197

§3.  BACKGROUND AND AIMS OF STRICT PRODUCT LIABILITY              198

§4.  FAULT AND STRICT LIABILITY DISTINGUISHED – CARELESSNESS VERSUS
     DEFECTIVENESS                                                198

§5.  'DEFECTIVENESS' – THE STATUTORY DEFINITION                   199

§6.  DESIGN DEFECTS: CARELESSNESS, DEFECTIVENESS AND THE 'STATE OF
     THE ART' DEFENSE                                             200

§7.  FAILURE TO PROVIDE ADEQUATE WARNINGS AND DIRECTIONS          202

§8.  MANUFACTURING (CONSTRUCTION) DEFECTS                         203

§9.  BURDEN OF PROOF AND COLLECTIVE LIABILITY                     203

§10. DEFENSES                                                     204

§11. DEFINITION OF 'MANUFACTURER' AND 'PRODUCT'                   205


Chapter 3.  Liability for Services                               206


Chapter 4.  Environmental Liability                              207

§1.  SOURCES OF LIABILITY                                         207

§2.  PUBLIC NUISANCE                                              207

§3.  STATUTORY NUISANCE – THE ABATEMENT OF NUISANCE LAW, 1961     208

§4.  STATUTORY NUISANCE – THE ABATEMENT OF ENVIRONMENTAL NUISANCES
     (CIVIL ACTIONS) LAW, 1992                                    209


Chapter 5.  Other Forms of Strict Liability                      211

§1.  DANGER AS A SOURCE OF STRICT LIABILITY                       211

§2.  BREACH OF A STATUTORY DUTY AS A SOURCE OF STRICT LIABILITY   211

**Table of Contents**

§3.  Protection of Consumers and Investors                                    212

§4.  Strict Liability Components – Particular Torts                           212

§5.  Other Pockets of Strict Liability                                        212


Part IV.  Defenses and Exemption Clauses                                      215

Chapter 1.  Limitation of Actions                                             215

§1.  Sources, Structure and Nature of the Defense                            215

§2.  When Does the Cause of Action Accrue?                                    216

§3.  The Discovery Rule and the 'Long Stop' Period                           217


Chapter 2.  Grounds for Justification                                         219

§1.  Consent                                                                  219

        I.   The Statutory Defense – Voluntary Exposure to Known Risk        219
        II.  Elements of the Defense                                         220


§2.  Necessity                                                                221

§3.  Self-help                                                                222

§4.  Other Defenses                                                           222

§5.  Contributory Negligence                                                  224

        I.    The Defense and its Elements                                    224
        II.   Policy Considerations Regarding the Scope of the Defense        225
        III.  Standard of Self-protection v. Fault-based Liability            226
        IV.   Standard of Self-protection v. No-fault Liability               227
        V.    Intentional Torts                                               228
        VI.   Criteria for Apportionment                                      228
        VII.  Contributory Negligence of Children                            229
        VIII. Contributory Negligence of the Disabled                        230
        IX.   Intentional Self-damage                                        230
        X.    Identification, Subrogation and Dependants                     231
        XI.   Statutory Contributory Negligence                              232
        XII.  Burden of Proof, Pleading and Appeal                           232

**Table of Contents**

§6.  EXEMPTION CLAUSES                                                    232

Part V.  Causation                                                       235

Chapter 1.  Cause-in-Fact and the Different Types of Legal
            Causation                                                     235

Chapter 2.  Cause-in-Fact                                                 237

§1.  THE *CAUSA SINE QUA NON* TEST AND ITS SHORTCOMINGS                   237

§2.  MULTIPLICITY OF CAUSES – 'OVERTAKING' CAUSES                         237

§3.  HYPOTHETICAL 'OVERTAKING' CAUSES                                     238

§4.  ESTABLISHING ACTUAL CAUSATION – COLLECTIVE LIABILITY? COLLECTIVE
     ENTITLEMENT?                                                         239

§5.  ESTABLISHING FACTUAL CAUSATION – BURDEN OF PROOF, RISK AND LOST
     CHANCES OF HEALING                                                   240

§6.  INDIVISIBLE LOSS?                                                    241

§7.  LIABILITY FOR 'EVIDENTIAL LOSS'?                                     242

Chapter 3.  Legal Causation: Causal Link between Fault and
            Initial Loss                                                  244

§1.  THE STATUTORY TEST                                                   244

§2.  'IMPORTED' TESTS: FORESEEABILITY, SCOPE OF RISK AND COMMON SENSE     244

§3.  STATUTORY NEGATION OF LEGAL CAUSATION                                246

§4.  BURDEN OF PROOF                                                      247

Chapter 4.  Remoteness and Mitigation of Damage                          248

§1.  REMOTENESS OF DAMAGE                                                 248

§2.  MITIGATION OF DAMAGE                                                 249

**Table of Contents**

Part VI.  Remedies                                                    251

Chapter 1.  General Principles                                        251

§1.  TYPES OF REMEDIES                                                251

§2.  COMPENSATION – THE NORMATIVE BASIS                               251

§3.  COMPENSATION AND LIABILITY DISTINGUISHED                         252

§4.  COMPENSATION – AIMS AND GOVERNING PRINCIPLES                     253

§5.  DEFINITION OF 'DAMAGE' AND ITS CLASSIFICATION                    254

Chapter 2.  Kinds of Damage                                           256

§1.  INDIVIDUAL VERSUS COLLECTIVE DAMAGE                              256

§2.  DIRECT AND INDIRECT LOSSES                                       256

§3.  PECUNIARY AND NON-PECUNIARY LOSSES                               256

§4.  ACTUAL AND FUTURE DAMAGE                                         257

§5.  COSTS OF ASSESSING DAMAGE AND OBTAINING PAYMENTS                 257

§6.  MITIGATION OF DAMAGE                                             258

Chapter 3.  Assessment and Compensation of Damages                   259

§1.  OBJECTIVE VERSUS SUBJECTIVE                                      259

§2.  CONCRETE VERSUS ABSTRACT                                         260

§3.  METHODS OF ASSESSING DAMAGE                                      261

§4.  EQUITABLE LIMITATIONS OF DAMAGES                                 261

§5.  METHODS OF PAYMENT – LUMP SUM VERSUS ANNUITY                     262

§6.  INTERVENTION OF APPELLATE COURT                                  264

Table of Contents

## Chapter 4.  Personal Injury and Death — 265

§1. PECUNIARY LOSS — 265

   I. Loss of Earnings — 265
   II. Special Aspects of Lost Earnings — 268
   III. Personal Injury – Expenses — 270
   IV. Survival of Cause of Action: the Heirs' Claim — 270
   V. The Dependants' Claim — 271
   VI. The Time Dimension — 276

§2. NON-PECUNIARY LOSS — 278

   I. Pain and Suffering — 278
   II. Loss of Life Expectancy — 279
   III. Statutory Caps — 279
   IV. Assessment — 280

## Chapter 5.  Other Types of Damage — 282

§1. DAMAGE TO PROPERTY — 282

§2. 'PURE' LOSSES — 283

§3. THE TIME DIMENSION — 284

## Chapter 6.  Interference with Collateral Benefits — 285

§1. INSURANCE — 287

   I. Types of Insurance Benefits — 287
   II. Indemnity — 287
   III. Accumulation — 288

§2. SOCIAL SECURITY – THE NATIONAL INSURANCE LAW — 288

   I. Kinds of Benefits — 288
   II. Indemnity — 288
   III. Accumulation — 289
   IV. Reduction — 290

**Table of Contents**

§3. Health Maintenance Organizations    290

§4. Other Benefits that Repair Bodily Injury    291

    I. Indemnity – Repair of Bodily Harm Law    291
    II. Rights of Reimbursement – Statutory Election Arrangements    292

## Chapter 7.  Other Remedies    293

§1. Restitution    293

§2. Injunctive Relief    293

§3. Punitive Damages    295

§4. Joint and Several Liability    296

## Index    297

207 – 208

# Part II.  Liability for Acts of Others

## Chapter 1.  Vicarious Liability

### §1. Employee/Employer

### I. Vicarious Liability Distinguished from Personal Liability

*207. Personal liability.* The governing principle of Israeli Tort Law is that of personal liability. A person does *not* incur liability for the act of a third party unless he is personally liable to the defendant by committing a tort against her. The conduct of a third party is only a factor in the chain of events and circumstances which establishes personal liability. If an employee, for example, is injured by another employee, the employer is to be held personally liable for the injury inflicted by his employee only if he himself was negligent in failing to prevent the injury, or he himself breached a statutory duty. Whether or not the other employee committed a tort is irrelevant – the employer is liable for his own conduct and not for the conduct of the employee. It therefore follows that in order to hold the employer personally liable for the conduct of another employee there is no need for special or additional liability arrangements. The employer, in the above example, may be held liable under the torts of Negligence or Breach of Statutory Duty.

*208. Vicarious liability.* Vicarious liability for the conduct of a third person, by contrast, is an extension of the liability of that third party. The defendant is liable to the injured party not because he himself committed a tort but because a) the third party committed a tort, and b) there are special, vicarious, relations between the defendant and the third party that justify the extension of liability. In the above example, the employer is vicariously liable for the injury inflicted by one of his employees to another employee because a) the former committed a tort against the latter, and b) there were vicarious relations between the employer and the liable employee. Whether the employer himself committed a tort – by being negligent or breaching a statutory duty – is irrelevant to his vicarious liability. Vicarious liability, unlike personal liability, requires special statutory arrangements to define the (vicarious) relations and conditions which allow and justify the extension of liability from the third party to the 'vicar'. Hence, to establish the vicarious liability of an employer, the applicable statutory conditions must be met.

*209. Overlap.* As personal liability and vicarious liability are independent sources of tort liability, they may coincide. If, for example, an employee is injured by the negligent act of another employee, the employer may be personally liable for negligently failing to ensure safety in the workplace and also vicariously liable for the tort committed by his employee in the course of his work.

## II. Employer's Vicarious Liability – Elements of Liability and Justifications

*210. Elements of liability.* Under the CWO, three requirements must be met to establish the employer's vicarious liability.[1] First, the third party who actually inflicted the loss must have been 'an employee' of the defendant, so that the latter may be considered 'an employer', at the time the loss was inflicted. Second, the employee must have committed a tort against the claimant and be personally liable to her. The third requirement links the former two. The claimant must establish that the tort was committed by the employee 'in the course of employment'. In other words, there must be a sufficient factual and legal relation between the employment and the tort committed by the employee. The justification for this kind of vicarious liability lies in this nexus.

   1. CWO, Sec. 13.

*211. Justifications.* Why should an employer who did not commit any tort, be liable for the tort of his employee along with the employee himself? The answer lies in the cumulative weight of the following justifications. First, the employee acts as an 'agent' of the employer, for the furtherance of the employer's interests. The employer should be liable for the torts, the acts of his employee,[1] in a manner analogous to the liability of a principal for legal acts performed on his behalf by an agent, under the law of agency that deals with legal acts.[2] Second, justice and fairness require that the employer who both initiates the activity causing injury and benefits from it, should also bear its risks (enterprise liability). Third, the employer is best situated to minimize the risks of the activity, and the deterrent effect of liability will induce him to take the necessary measures to prevent damage (deterrence). Fourth, the employee often lacks the resources to compensate the victim, and it is the employer who can incur the burden, and, more importantly, spread the loss either through liability insurance or by raising market prices (loss-spreading).

The three elements of the employer's vicarious liability are derived from its underlying justifications. The notions of the justifications of agency, enterprise liability and deterrence exist only when the employer is held liable for a tort that his employee committed 'in the course of employment'.

   1. However, the analogy is only partial. There are major differences between the law of agency and vicarious liability. Under agency law, for example, usually only one party to the relation is liable: either the principal (since the agent leaves the picture after performing her agency), or the agent (when exceeding her authority, rendering the principal not liable). By contrast, vicarious liability is an extension of the employee's liability to his employer, rendering both liable.
   2. *See* Agency Law, 1965.

### III. Employment

*212.* An 'employer' is defined as 'a person who, in relation to another, has complete control over the way in which such other performs his work for such person and is not himself subject to any similar authority in respect of the same work.' 'Employee', in this context, refers to a person whose work is so controlled.[1]

The 'complete control' or 'right to control' test originated in England at a time in which knowledge was handed down from employer to employee, and employers did, in fact, have complete control over their employees. This, as the sole test, has become obsolete in an age in which more and more employees are specialists, in possession of professional skills and knowledge, making control by their employers impossible. Israeli courts recognized long ago that the traditional 'complete control' test is no longer adequate as a conclusive test,[2] and that it should be adjusted to the needs of modern society. Tort Law, as well as other fields of law which deal with the notion of 'employment' such as Labor Law and Taxation, have been adjusted accordingly. The new, more inclusive, test takes into account administrative and technical aspects of the control over the third party, as well as other characteristics of the relationship, and examines whether the employee's work is an integral part of the employer's business, or merely accessorial or external to it.[3] The 'integration' yardstick has a negative element – a person may not be considered an employee when integrated into other activities, especially when conducting a business of his own. Under the extended control/integration test, courts take various factors into account, including: the way the relations are formed and terminated, the duration and frequency of the relations, methods of payment (salary or fees), income tax payments,[4] deduction for social security funds and provision of working tools. All of the above are factors that should be balanced and weighed as a whole, given the goals of the relevant legislation. It has been held, for example, that contractual relations are not a precondition.[5] Accordingly, soldiers are recognized as employees of the state.[5] Volunteers may also be a source for their 'employer's' vicarious liability. Neither the duration of the employment relationship,[6] the way in which it is described by the parties,[7] nor the manner of payment are conclusive factors.[8]

Can one employee have more than one vicariously liable employer simultaneously? Under the extended test, the answer might have been affirmative. One person may in principle be integrated into the business of more than one employer. However, as complete control is the exclusive and binding statutory test, courts cannot apply the integration and organization concepts independently but only as extensions or interpretations of the statutory definition.[9] Since only one employer may have 'complete' control at a given time, the rule is that only one employer may be considered liable.[10] When two employers are involved, it is presumed that the regular employer retains control unless proved otherwise.[11]

1. CWO, Sec. 2.
2. *Water Works Co. v. Segal* (1960) 14 P.D. 1939, at 1949. It should be noted that the term 'employee' has different meanings in different legal contexts, thus 'an employee' in the context of rights to benefits under labor law is not necessarily an employee with regard to vicarious tort liability. *See* J.M. Edrey, 'The Definition of Employee for Income Tax Purposes' (1982) 17 *Is. L. Rev.* 290.

3. *See Ha'poel Tiberias v. Pkid Hashuma* (1994) 48(ii) P.D. 416 (a taxation case), at 432–433 and *Mor v. National Labor Court* (1996) 50(iv) P.D. 628 (labor law case), at 641.
4. This is relevant in Israel, where employees' income tax payments are deducted directly from their salaries by their employer.
5. *State of Israel v. Madar* (1961) 15 P.D. 1569, at 1574–75.
6. *Tzabari v. Amidar* (1961) 15 P.D. 281; *State of Israel v. Nissim* (1981) 35(iv) P.D. 748.
7. *National Insurance Institution v. Zinger* (1964) 18(ii) P.D. 299, at 302.
8. *State of Israel v. Nissim, supra*, para. 212, n. 6.
9. *Ibid.*, at 758.
10. *Eilon v. Yadi* (1958) 12 P.D. 1459.
11. *Ibid.*

## IV. Commission of Tort by the Employee

*213.* As explained, the employer's vicarious liability is an extension of his employee's liability. The employer cannot be held vicariously liable unless his employee actually committed a tort.[1] It therefore follows that when the employee is protected by a substantive defense or immunity, vicarious liability cannot arise. On the other hand, a merely procedural limitation preventing action against the employee does not relieve the employer of liability. Although the employee cannot be sued, he is still liable in tort, and this liability can be extended to his employer.[2]

The employer and employee are liable jointly and severally and the injured person can sue each of them for her entire loss. Each has a right of contribution or indemnity against the other.[3] In practice, however, it is usually the employer who is sued and pays compensation whilst it is very unusual for the employer to sue his employee for contribution or indemnity. In other words, the secondary, derivative liability of the employer has actually become the primary liability. This phenomenon is in harmony with the justifications of vicarious liability: agency, enterprise liability, deterrence and loss-spreading.

1. Sec. 13 of the CWO provides that an employer shall be liable for any 'act' committed by his employee. An 'act' does not necessarily amount to a tort. Does it follow that the employer may be held vicariously liable even though his employee did *not* commit a tort? To establish such a mixed vicarious/personal liability, the law should attribute to the employer the acts and the mental state of his employee. This approach may find support in Section 17 of the CWO which imputes the employee's knowledge to the employer. The court once mentioned the imposition of such personal liability, and the matter has since been left undecided – *State of Israel v. Madar, supra* para. 212, n. 5, at 1587–90. An explicit statutory arrangement which attributes to a party of a contract the acts of his/her independent contractor is found in the Bailees Law, 1967, which provides: 'Where the bailee has delivered the property to a sub-bailee, the acts and the omissions of the sub-bailee are deemed to be the acts and omissions of the bailee...' (Sec. 7 (a)).
2. *Meorer v. Upper Galilee Regional Council* (1966) 20(iii) P.D. 645.
3. *See* para. 249 *et seq.*

## V. Employee's Tort Committed 'in the Course of Employment'

*214.* The employer is vicariously liable only if the employee's tort was commit-

ted 'in the course of employment'.[1] As mentioned above, this requirement reflects the rationale underlying enterprise liability in general and employer liability in particular. The employer is held liable because he is the beneficiary of the activity which creates risks to third parties, has the greatest degree of control over such risks, and is best suited to absorb the burden of compensation and to spread the loss. These justifications are weakened or invalidated when the employee's tort is committed outside of the course of employment.

The CWO provides that 'an act shall be deemed to have been done in the course of an employee's employment if it was done by him in his capacity as an employee and whilst he was performing the usual duties of and incidental to his employment, notwithstanding that the act was an improper mode of performing an act authorized by the employer; but an act shall not be deemed to have been so done if it was done by an employee for his own ends and not on behalf of the employer.'[2] Accordingly, the basic principle is that an employer is liable for torts committed within the sphere of employment, but not for torts committed outside of this sphere. Whether a given tort was committed within or without the sphere of employment is a mixed question of fact and policy. This may serve as a legal device to control the scope of vicarious liability, as illustrated by the following rules.

    1.  CWO, Sec.13(a)(2). For a detailed discussion of this requirement, *see* A. Barak, 'The Servant's Course of Employment' (1966) 1 *Is. L. Rev.* 8.
    2.  CWO, Sec. 13 (b).

*215. Unauthorized or forbidden act.* An act unauthorized or forbidden by the employer may still be deemed to have been performed in the course of employment. Under the above statutory provision, the question is whether the prohibition only limited the mode in which an authorized act should be performed, or whether it prohibited the act itself, thereby excluding it from the sphere of employment. The employer may be held liable for the former but not for the latter.[1] When a given prohibition can be interpreted either way, policy considerations determine the outcome. When the courts wish to impose liability on the employer on grounds of deterrence, loss spreading or enterprise liability, they tend to define the unauthorized act as an improper mode of performance.

    1.  *State of Israel* v. *Tuaf* (1964) 18(iii) P.D. 673.

*216. Employee's ends.* Under the statutory definition, an employee who acts for his own ends and not on behalf of his employer is not acting in the course of employment. An employee's act, however, may serve both his own purposes and the interests of the employer. An employee may, for example, go to the bank for private reasons but also to pay the employer's bills. The statutory provision relieves the employer of liability only when the act does not serve the employer's interest in any way. Policy considerations may justify a different rule such that employer liability should be denied whenever the promotion of the employee's ends is the *causa sine qua non* of the act. If an act serves both interests, but was carried out only to serve the employee's ends, perhaps the employer should not be held liable. Indeed, it has been suggested that, notwithstanding the wording, the employer should be absolved of vicarious liability for an employee's act which serves the

ends of both, if the employee's 'governing' or 'dominant' purpose was to promote his own objectives.[1]

1. *State of Israel* v. *Madar, supra*, para. 212, n. 5, at 1584.

*217. Extending employer's liability – degree of deviation.* Israeli law has adopted the 'degree of deviation' rule, which broadens the employer's vicarious liability. The rule states that if an act deviates from the scope of employment but such deviation is minor – a mere detour from the authorized course – it is deemed to have been performed within the scope of employment. If the deviation is substantial – a 'frolic' – the act is considered to have been performed outside the scope of employment.[1] When the court determines whether a given deviation is minor or substantial, it may be guided by the policy considerations underlying vicarious liability.

1. *Ibid*, at 1582–83.

*218. Extending employer's liability – 'employment by representation'.* Another rule which appears to broaden an employer's vicarious liability is 'employment by representation'. Under this rule, an employer will be held vicariously liable for an act carried out outside the scope of employment if he represented the employees as acting in the scope of employment, and the claimant relied on such representation and suffered damage as a result.[1] This rule is closely related to the 'agency' justification for strict liability. Under the Agency Law, 1965, which deals with agency to legal acts, 'agency is conferred', *inter alia*, 'by the conduct of the principal' toward the third party.[2] 'Agency by representation' for legal action is also based on the general obligation to act in good faith: a person who misleads others by introducing someone as his agent is later barred from alleging that his own representation was false.[3] To the extent that these rules of agency for legal acts, also known as the apparent or ostensible rules, are applied to a person who represents someone as his employee, as his 'agent' for physical acts,[4] the former is barred from denying his status as an employer. The extent of the 'employment by representation' rule is yet unclear, given the few cases in which it has arisen. Arguably, this rule should extend the scope of vicarious liability only to the extent justified by the whole spectrum of its underlying justifications, including enterprise liability, deterrence, and loss-spreading, rather than only in relation to notions of agency.

1. *Sultan Bros.* v. *Yafora* (1967) 21(i) P.D. 515, at 521; *Mekorot* v. *Sapir* (1956) 10 P.D. 156; *State of Israel* v. *Madar, supra*, para. 212, n. 5, at 1576–78; *The Official Receiver as the Liquidator of North America Bank* v. *Shtibei* (1990) 44(iii) P.D. 331.
2. Agency Law, Sec. 3 (a).
3. Note that, while under the good-faith concept 'agency by representation' requires at least fault on the part of the representing party, under Section 3 (a) of the Agency Law, liability may be strict.
4. An employee is usually 'an agent' for physical acts and not for legal acts, which means that the Law of Agency is not directly applicable.

*219. A proposed extension – examining the employee's motive.* It may be suggested that there is a further category of cases in which an employer should be held

vicariously liable for a tort committed by his employee outside of 'the course of employment'. This is a category based on an examination of the employee's motive. If an employee committed a tort that *objectively* was not in the course of employment, but he nevertheless *subjectively* believed that he was acting in the course of employment and in the promotion of his employer's interests, it may be argued that the employer should be held vicariously liable. Such an extension is in accordance with the rationales of enterprise liability, deterrence and loss spreading, but may be inconsistent with the notion of 'agency'.

## VI.  Limitations on Vicarious Liability

*220.*  Under the CWO, an employer is not held vicariously liable for an assault, false imprisonment, or malicious prosecution committed by his agent or employee unless he expressly ratified the act.[1] These provisions mainly protect governmental authorities from tort liability for acts of arrest and prosecution by public officers.[2] These exemption clauses are absolutely unjustified and should be abolished. To the extent that assault, false imprisonment and malicious prosecution are committed 'in the course of employment', the employer or principal should be held vicariously liable. Until these provisions are abolished, as has indeed been proposed by a pending bill, courts limit their scope by interpreting the term 'express ratification' in a broad manner. In this way, the courts are able to impose vicarious liability on employers based on the judicial assumption that they did expressly ratify the tortious act, even if express ratification was in fact absent.[3] Whether or not the claimant may sue the employer or agent for the assault, false imprisonment or malicious prosecution, under the tort of Negligence in order to circumvent these exemption clauses, remains unanswered.[4] In this way, the requirement of express ratification does not apply and the employer or principal may be sued as vicariously liable for the negligence of their employees or agents.[5]

1. CWO, Secs. 25, 28 and 61. These provisions also apply to the vicarious liability, discussed below, of a principal.
2. In fact, this was the most likely origin of these exceptions – an attempt by British Mandatory legislators to protect the British government from liability for its soldiers' actions.
3. *Biton* v. *Ziv* (1992) 46(ii) P.D. 651.
4. *See supra*, para. 212, n. 7.
5. *See Carmeli* v. *State of Israel* (1987) 41(iii) P.D. 757, at 776–778.

## §2.  Vicarious Liability of a Principal Who is not an Employer

## I.  Nature of Liability and Justifications

*221.*  Vicarious liability, under Israeli law, is not limited to employer-employee relations. An additional category of vicarious liability is based on principal-agent relations. The CWO provides that 'any person who employs an agent, not being his employee, to do any act or class of acts on his behalf shall be liable for anything done by such agent in the performance of, and for the manner in which such agent

does such act or class of acts.'[1] Agency in this context includes both physical and legal acts.[2]

Why, and to what extent, should a person who is not an employer be vicariously liable for the torts of an 'agent' who is not an employee? The answer may be found in the cumulative weight of the same justifications that underlie the employer's vicarious liability. First, as with employers' liability, the agency relations, namely, the fact that the agent acts in the furtherance and for the promotion of the principal's interests, serves as a justification for levying vicarious liability. The rationale behind the Law of Agency, 1965, which renders a principal liable for the legal acts of his agent, can be extended to agency which includes physical acts as well.[3] Agency *per se*, however, is not conclusive in this context. The case for vicarious liability becomes stronger when the principal is the entrepreneur and beneficiary, has effective control over the risk (deterrence), and is best situated to spread the loss.

What kinds of relations other than employer-employee relations constitute agency relations that justify vicarious liability?[4]

1. CWO. Sec. 14.
2. *Sulina Bros* v. *Yafora* (1967) 21(i) P.D. 515.
3. The analogy, as mentioned (*supra*, para. 211, n. 2) is only partial. Vicarious liability is an extension of, and an addition to, the agent's liability; while under the Law of Agency usually only one party to the relation is liable: either the principal (as the agent leaves the picture after performing his agency), or the agent (when exceeding his authority, so that the principal is not liable).
4. Interestingly, this category of vicarious liability is more developed in Israeli law than in English Law, its parent. In English law 'There are undoubtedly other instances in the law of tort of vicarious liability for persons who are not servants, and who are sometimes described as agents, but these seem to rest less on any general principle of agency than upon an *ad hoc* judgement...' – W.V.H. Rogers, *Winfield & Jolowicz on Tort* (15th ed., Sweet & Maxwell, 1998), at 716–717. The CWO, in Sec. 14, 'elevated' these *ad hoc* judgements to the category of vicarious liability. Some decisions, however, refer to a specific category of 'agency' in English law, liability of a car owner for the driver's negligence, as the source of this liability. *See Cohen* v. *Kavliyo* (1954) 8 P.D. 1401, at 1410-1, referring to *Ormrod* v. *Crosville Motor Services Ltd.* [1953] 1 W.L.R. 1120 (C.A.).

## II. The Agency Relations

*222.* The agency relations, as defined by the CWO, are located somewhere between employer/employee relations, on the one hand, and mere contractual relations on the other. Where exactly are these relations located? What characteristics of the agency relationship distinguish it from contractual relations and from the employer-employee relationship? These questions are admittedly difficult. In this context, agency cannot be accurately defined, and each case should be determined based on its circumstances.[1] Nevertheless, several guidelines have been developed by the courts.[2]

A person is considered to be an agent when he acts as the surrogate or 'long arm' of another. When this activity is not a part of the person's business, for example, when he is only doing the other a favor, the case is relatively clear cut and the agency relationship will usually be recognized. When the activity is conducted for

**Vicarious Liability, Part II, Ch. 1**                                   **223**

business purposes, namely, when a person sells his services to another, the question is whether this activity has the characteristics of an independent business, or whether it lacks this independent character and should be considered a part of another person's business. In this regard the court may take into account such parameters as the degree of control exercised by the other, the question of who supplies the tools, who incurs the costs or the risks of the activity, the method of payment and the relative size of the businesses.[3] A person whose business is not sufficiently independent is an agent. Consequently, the person for the sake of whose business the agent's activity is conducted is vicariously liable as a principle for torts committed by the agency.

A person may be the agent of more than one principal, and therefore several principals may be held vicariously liable for a tort committed by one agent, provided that it was committed during the performance of these agencies.[4] When an agent, without exceeding his authority, authorizes another to act on the principal's behalf, the principal alone will be vicariously liable for the tort of the sub-agent.[5]

Given the above, it appears that the agency relations are, in a sense, a weakened version of the employer-employee relations. Both relations are determined by the 'control/integration' test.[6] Even though the degree of control and integration required to establish agency relations is less than that required to establish employer-employee relations, it is still sufficient to generate and justify vicarious liability. Further down this continuum lies the borderline between vicarious liability and personal liability. Beyond this borderline, the lesser degree of integration and control renders the relations strictly contractual and insufficient to establish and justify vicarious liability. Though courts strenuously attempt to determine the proper, balanced, boundaries of vicarious liability, the contours of this borderline remain vague.

1. *Kashany v. Rasco* (1968) 22(ii) P.D. 455, at 460.
2. The leading cases are *Kashany v. Rasco, ibid.*, and *State of Israel v. Nissim*, (1981) 35(iv) P.D. 748.
3. *See*, e.g., *Kuzahinof v. Metrom* (1961) 15 P.D. 144, at 150; *State of Israel v. Nissim, ibid.*
4. *State of Israel v. Nissim, ibid*, at 760–61.
5. *'Hadassah' v. 'Nativ'* (1956) 10 P.D. 422.
6. *See supra*, para. 212.

*223. Should an independent attorney be considered 'an agent'?* The 'agency' problem is illustrated by attorney-client relations. Is the client of a law firm vicariously liable for torts committed by his attorney while the latter performs his duties as an attorney? Under the statutory formula the attorney is undoubtedly an agent – a person employed by his client 'to do any act or class of acts on his behalf'. Furthermore, the agency test justification for vicarious liability points in the same direction: the attorney acts as the 'long arm' of the client. However, the integration/control test, as well as the other justifications for vicarious liability, point in the opposite direction. The law firm is an independent business, neither integrated into the client's business nor controlled by him. The client is *not* the entrepreneur nor the major beneficiary of the law firm's activity. The client is not the one who controls the risk or the one best situated to spread losses. Indeed, thus

far clients have not been held vicariously liable for torts committed by independent attorneys. Nevertheless, a lawyer permanently retained by a large corporation (an 'in-house' lawyer) should be treated as a regular employee in this context.

*224. Liability of partnership and partners.* Partners are considered agents of other partners and of the partnership itself (which is considered an independent legal entity). Under the Partnership Ordinance, when a partner commits a tort in the ordinary course of the partnership's business, other partners and the partnership itself share liability with the tortfeasor, jointly and severally.[1]

> 1. Partnership Ordinance [New Version], 1975, Secs. 18, 20; *Matityahu v. Shafil* (1997) 51(iv) P.D. 769, at 789.

## §3. INDEPENDENT CONTRACTORS

## I. The Rule and its Exceptions

*225.* The general rule under the CWO is that a party to a contract is not liable for the torts committed by a contractor who is not his employee or agent in the performance of the contract. 'A person who enters into any contract with any other person, not being his employee or agent, to do any act on his behalf shall not be liable for any civil wrong arising during the doing of such act.'[1]

Yet, there are several exceptions to this general rule.[2] It is stated that the rule of no liability 'shall not apply if –

(1) such person was negligent in the selection of such contractor, or
(2) such person interfered with the work of the contractor in such a way as to cause the injury or damage, or
(3) such person authorized or ratified the act causing injury or damage, or
(4) such person was under any enactment responsible for the doing of an act the performance of which was delegated by him to an independent contractor;
(5) the thing for the doing of which the contract was entered into was unlawful.'

> 1. CWO, Sec. 15.
> 2. These exceptions are enumerated in the last part of Sec. 15.

## II. Liability Under the Exceptions – Vicarious or Personal?

*226. The question.* Under the above exceptions, a party to a contract is liable for the torts committed by his contractor if the case falls into one or more of the five exceptions to the no-liability rule. Is this a form of vicarious liability? In other words, do the five exceptions constitute five additional types of vicarious relations alongside the recognized employer-employee and agency relations? Or, do these exceptions merely constitute personal liability for the contractor's conduct? And if so, in what way does this personal liability differ from the one already imposed by the CWO through the various torts?

It appears that the difference between the vicarious/personal liability alternatives lies mainly in the causation requirement. If liability within the exceptions is vicarious, there is no need to establish the causal link between the vicarious relations and the inflicted damage. If liability is personal, the causal link must be established. One example of this is when a party to a contract was negligent in the selection of the contractor (exception 1). Under the vicarious interpretation, such negligence constitutes vicarious relations, and he may be held liable for a tort committed by the contractor during the performance of the contract even though the tort is not causally related to the negligent selection. If, on the other hand, liability is personal, liability will arise only if there exists a causal link between the negligent selection and the tort committed.

227. *Case law.* Contradictory statements have been made regarding the nature of liability under the exceptions. On the one hand, it has been suggested that at least the fifth exception (unlawful contract) creates vicarious liability.[1] When the contract is unlawful, the employer will be liable for the torts committed by the contractor during the performance of the contract even though the unlawfulness was not the cause of its commission.[2] It has also been suggested that each of the exceptions should be considered vicarious.[3] On the other hand, in a more recent decision it was argued that all of the exceptions impose personal liability. In other words, there is no vicarious liability for tort committed by a contractor.[4]

1. *Friedman & Sons Ltd.* v. *Levi* (1957) 11 P.D. 145.
2. *See Medina* v. *Cohen* (1983) 37(ii) P.D. 29.
3. *Middle East Pipes Ltd.* v. *Sha'abi* (1977) 31(iii) P.D. 225, at 229.
4. *State of Israel* v. *Nissim* (1981) 35(iv) P.D. 748, at 753.

228. *The better view – no vicarious liability.* It may be suggested that the more convincing view is the latter: that a party to a contract should not be held vicariously liable for torts committed by his contractor. This should be the rule because the major justifications for vicarious liability are often absent from contractual relations with an independent contractor. The independent contractor, by definition, is not an agent and is not integrated into the business of the other party. His major concern is to promote his own interests. Moreover, often it is the independent contractor who has greater control over the risks generated by the contract, and is better positioned to spread the loss through liability insurance or market prices. Furthermore, at least with regard to the second exception, the CWO explicitly requires a causal link between the defendant's interference with contractor's work and the inflicted loss. The existence of a causal link, as has been mentioned, is a necessary element of personal liability.

229. *Personal liability under the exceptions?* Assuming that the exceptions to the no-liability rule impose personal rather than vicarious liability, the question arises whether, and to what extent, this personal liability adds to personal liability under the various other torts. Do the five exceptions create five new 'torts', which deal solely with liability for torts committed by an independent contractor? It stands to reason that the answer to this question is negative. These special 'torts' are, or should be, interpreted as overlapping or overtaken by the other torts, rendering the

former redundant. Liability for negligent selection of a contractor (the first 'tort') overlaps and is overtaken by the general tort of Negligence. Liability for interference with the contractor's work and for authorizing and ratifying his actions (the second and the third 'torts') is embodied in the general provision, discussed below, dealing with joining, aiding and procuring tortious acts.[1] Liability under enactment for the performance of the act delegated to the independent contractor (the fourth 'tort') should be interpreted as overlapping the liability imposed under the general tort of Breach of Statutory Duty,[2] or with other specific arrangements which impose liability on a party to a contract for loss caused by an independent contractor.[3] The fifth 'tort' imposes personal liability for torts committed by a contractor performing an unlawful contract and is probably intended to deter unlawful contracts with independent contractors. If such contracting is negligent, or constitutes a breach of statutory duty, these general torts provide an alternative road to liability. If the unlawful contracting is neither negligent, nor breaches a statutory duty, it is doubtful whether imposing such liability is justified.

1. CWO, Sec. 12. *See* para. 238.
2. *State of Israel v. Home Insurance Co.* (1993) 47(ii) P.D. 346, at 365–367.
3. The Bailees Law, 1967, for example, provides that 'Where the bailee has delivered the property to a sub-bailee, the acts and the omissions of the sub-bailee are deemed to be the acts and omissions of the bailee...' (Sec. 7 (a)) – *see State of Israel v. Home Insurance Co. Ltd.*, *supra*, para. 229, n. 2, at 361–362. *See also Shah v. Shani* (1995, yet unpublished) – strict liability imposed for works denying support to a neighboring land performed by a contractor.

*230. Conclusion.* The above leads to the conclusion that the statutory provision dealing with liability for the torts committed by an independent contractor[1] is redundant and should be eliminated. First, there are no grounds to interpret this provision as establishing vicarious relations and vicarious liability. Second, the personal liability it generates basically coincides with liability imposed by other torts and should not be interpreted as exceeding it.

In summation, liability for torts, acts or omissions of an independent contractor is personal. As such, it arises from, and must be predicated upon, one of the various torts. It does not emerge from special arrangements, either vicarious or personal.

1   CWO, Sec. 15.

## III. Personal Liability for Loss Caused by Independent Contractors

*231. Nature of liability.* Personal liability of a party to a contract for the wrongs of an independent contractor may originate in one of various torts. Liability is fault-based when it originates in the general tort of Negligence, or in one of the intentional torts. Liability is strict when it originates from one of the no-fault arrangements, such as Breach of Statutory Duty, the Defective Product (Liability) Law, or the traditional torts of strict liability. When liability is strict, it is sometimes referred to as liability based on *non-delegable* duties. Such liability is imposed because the duty to prevent the negligent infliction of damage cannot be delegated to the independent contractor no matter how carefully chosen. It is suggested that the expression 'non-delegable duty' is inaccurate. Duties, by definition, cannot be

delegated. They are either met or breached. Hiring a qualified independent contractor to perform a task is sometimes sufficient to meet one's duty, and is sometimes not. This depends on the strictness of the duty and not on its 'transferability'.

*232. Strict liability – safety at the workplace and nuisance.* In at least two types of cases, courts have found a party to a contract strictly liable for loss inflicted by a qualified and carefully chosen contractor: safety at the workplace and nuisance.

As has been mentioned, employers are held strictly and even absolutely liable for the injuries suffered by their employees at the workplace, usually under the tort of Breach of Statutory Duty.[1] Hiring a competent contractor to secure safety at the workplace does not relieve the employer from his no-fault duty and liability.[2]

Following English law,[3] courts have imposed strict liability for damage inflicted by competent contractors hired to perform activities affecting the highways.[4] At first, however, this liability, despite its strictness, was classified as a special case of liability under Negligence. This classification was criticized on the grounds that an employer who carefully selects his contractor is not negligent solely because the contractor has been deemed to be so. This criticism led the Supreme Court to relocate liability for non-ordinary use of the highway under the headings of nuisance, public and private, which accommodate strict or quasi-strict liability.[5] Yet, these decisions do not explicitly adopt two conditions which, under English law, narrow the employer's liability: namely that the subject matter of the contract entails a non-ordinary use of the highway, and that the contractor's tortious act be a natural and integral risk of the subject matter of the contract and not a collateral or casual act. Extending liability beyond the boundaries of these limitations seems unjustified. When the contractor is hired to perform a task which entails an ordinary use of the highway, such as transportation, the act of contracting does not amount to the creation of nuisance.

1. *See supra,* para. 172.
2. *See Shapira* v. *Attorney General* (1958) 12 P.D. 245, at 250. As to the classification of this liability, see the following paragraph.
3. *See* W.V.H. Rogers, *Winfield & Jolowicz on Tort* 15th ed., (Sweet & Maxwell, 1998), at 721.
4. *Lev* v. *Turjeman* (1962) 16 P.D. 2625 (negligence in loading a lorry); *Mazi* v. *Coca-Cola Soft Drinks Co.* (1971) 31(i) P.D. 242 (negligent installation of an advertisement sign).
5. *City of Tel-Aviv* v. *Mored* (1986) 40(iii) P.D. 71 (public nuisance), followed by *Shah* v. *Shani, supra,* para. 229, n. 3 (denial of support to neighboring land). In *State of Israel* v. *Slama* (1999) 53(iv) P.D. 721, however, it was suggested that this form of liability is limited to Public Nuisance.

## §4. LIABILITY OF ENTITIES FOR ACTS OF THEIR ORGANS

### I. Kinds of Corporations

*233.* Corporations are artificial legal entities created by law. There are two kinds of corporations: statutory and private. Statutory corporations include the State of Israel, municipalities, Planning and Zoning Authorities,[1] and other statutory corporations established by specific laws such as the National Insurance Institute, The Israel Broadcasting Authority, The Airports Authority and many others. These are

governmental bodies and their legal capacity – rights and duties – is determined and restricted by the laws establishing them and regulating their activities. Private corporations are legal entities established by individuals for commercial or non-commercial purposes. The most common form of incorporation for commercial purposes is the Limited Company, now incorporated under and regulated by the Law of Companies, 1999.[2] Other forms of private incorporations are Co-operative Societies[3] and Non-Profit Organizations.[4] Unlike statutory corporations, these private corporations have a general, unlimited legal capacity, subject only to the basic goals of incorporation (profit, non-profit) and to self imposed restrictions on the range of permitted activities.[5] In specific cases, private corporations may have a limited, specified, capacity.[6]

Both kinds of corporations are subjected, in principle, to tort liability. Tort liability of statutory corporations, when functioning in their governmental capacity, may sometimes be restricted by statutory immunities (protecting the corporations or their employees or agents), and by judicial restrictions on the scope of liability of public authorities.[7] Yet, these restrictions are limited in scope, so that the general rule remains that all corporations are liable in tort.

1. *City of Bnei-Berak v. Rotbard* (1991) 44(iv) 102.
2. Proceeded by Company Ordinance, 1983.
3. Established under the Co-operative Societies Ordinance.
4. Established under the Amutot Law, 1980. Additionally, under the Company Law, 1999, Sec. 11 (b), a Company may be established as a non-profit corporation for public purposes.
5. Sec. 11 (a) of the Law of Companies, 1999, for example, states that the aim of a company is to maximize its profits. Under Sec. 32, the company should specify in its regulations whether for this end it may engage in every legal activity, only specified activities, or all but some specified excluded activities.
6. Such as the representation of a cooperative house under the Land Law, 1969 (Secs. 61–71).
7. *See supra*, paras. 90, 93, 104.

## II. Modes of Liability

*234.* Since they are artificial legal entities with no physical existence or mental capacity, corporations are only able to commit torts through the acts of human beings. There are three ways in which human conduct generates corporate tort liability:

**Vicarious Liability**: Like any other employer, a corporation is vicariously liable for torts committed by its employees in the course of their employment. Like any other principal, a corporation is liable for torts committed by its agents while performing their agency. The rules discussed above,[1] pertaining to the employer's vicarious liability and to the principal's vicarious liability, apply in the same way to corporations. The corporation's liability is an extension of its employee's or its agent's liability.

**Personal Liability – the organ doctrine**: Under the organ doctrine, human beings are regarded as organs of the corporation. Their conduct, as well as their mental state, is attributed to the corporation and considered as its own. The corporation acts, knows, and expresses will through these human organs. It therefore follows that when a human organ commits a tort, this tort is deemed as having been

committed by the corporation itself and the corporation is personally liable, not just vicariously.[2] Furthermore, it appears that even when the organ itself does not commit a tort, the corporation may still be held personally liable for the organ's conduct and the state of mind attributed to it. Under the general tort of Negligence, for example, a duty of care to the claimant may be owed by the corporation but not by its organ. The negligent act of such an organ does not constitute his personal liability, as he does not owe a duty of care, but when attributed to the corporation the latter may well be held personally liable in Negligence.

The organ doctrine is discussed below in more detail.

**Personal, direct Liability**: A corporation may be held personally liable for an act or omission of another party provided that such an act or omission is a necessary element of the corporation's personal and direct liability. This mode of liability differs from liability under the organ doctrine in that there is no need to attribute the conduct or the state of mind of a human being to the corporation. All the elements of liability are found in the corporation itself. This kind of liability is exemplified by the strict liability of a manufacturing corporation for defective products it produces. If the law regards the corporation as 'a manufacturer', and liability is imposed merely on the production of defective products, then all the elements of personal and direct tort liability of the corporation exist. In this way a corporation may be personally and directly liable for the acts of its employees, agents and organs regardless of whether it is also liable vicariously or under the organ doctrine. It may also be held personally and directly liable for the acts of a person who is neither an employer nor an agent nor even an organ.[3]

**Accumulation of modes of liability**: A corporation may in principle be found liable, for the same loss, under more than one mode of liability. It may, for example, be vicariously liable for a tort of its agent, personally liable under the organ doctrine, if such agent is also an organ, and also personally liable, if the agent's act renders the corporation directly liable.

1.  *See supra*, para. 207 *et seq*.
2.  For tort liability of a corporation under the organ doctrine *see: Katz v. 'Katzif' Co.* (1966) 20 (iii) P.D. 533; *British Canadian Builders v. Oren* (1981) 35(iv) P.D. 253; *Fenidar, Development and Construction Investment Co. Ltd v. Kastro* (1983) 37(iv) P.D. 673; *Tzuk Or v. Car Security* (1994) 48(v) P.D. 661, at 694–704. The Companies Law, 1999, now provides explicitly that a company is held directly liable to a tort committed by its organ, without derogating from its vicarious liability (Sec. 53).
3.  An interesting question is whether this kind of direct liability is limited to strict, no-fault, liability. It may be argued that fault-based liability requires a state of mind, which can only be found in the organs, not in artificial legal entities. On the other hand, to the extent that fault-based liability is predicated on an objective standard, a corporation may deviate from an objective standard of behavior, like any human being.

### III. The Organ Doctrine – Merely a Sword or also a Shield?

*235. Who is an organ?* Whose conduct and state of mind should be attributed to the corporation? It was suggested that following test should apply:[1] An organ is a body or a person holding a senior position within the corporation. In a private company the general assembly, board of directors, the individual directors, the

general manager and the business manager are considered organs. In statutory cor-
porations, the organs are the governing bodies and the highly ranked officials. The
organs of the state, for example, are the Parliament, the cabinet, the ministers, the
director-generals of the ministries and heads of ministerial departments.[2] A person
holding a lower-ranking position may still be considered an organ if under the cor-
porate regulations, or other legal norms, the conduct of such a person or his state of
mind is regarded as that of the corporation.

An organ of a corporation may also be its employee or agent. This is the case,
not only with regard to the second aspect of the above test – persons holding lower-
ranking positions – but also when the organ is a director or a high official.
Company directors may also be its employees under a contract of employment or
otherwise,[3] and ministers are employees of the state. These double-capacity situa-
tions may lead to awkward outcomes, such as liability towards oneself, where one
person, as an organ, negligently fails to protect herself, as an employee. The practi-
cal solution is to allow the corporation, liable through its organ, to plead 'contribu-
tory negligence' against the same person as an employee.[4]

When the organ itself is an artificial legal entity and not a human being, a board
of directors for example, there may be a two-stage process of attribution. First, the
conduct or state of mind of the individual director is attributed to the organ in order
to render the organ liable. These components of liability are then attributed to the
corporation in order to render the latter liable. This complication seems unneces-
sary, as the tort liability of artificial organs is basically theoretical.[5]

1.  *Tzuk Or, supra,* para. 234, n. 2, at 697.
2.  *State of Israel v. Levi* (1994) 48(iii) P.D. 45, 52-53 (The Insurance Commissioner is the state's
    organ)
3.  *Katz v. 'Katzif' Co., supra,* para. 234, n. 2.
4.  *Ben-Shushan v. Krichba Cooperativit* (1994) 48 (i) P.D. 415. This contributory negligence
    may amount to 100 per cent – *Rosenzweig v. Rosenzweig Bakery at Even-Yehuda* (1962) 16
    P.D. 2548.
5.  There is hardly a point in suing an artificial, resourceless, organ -- compensation is paid by the
    corporation.

*236.* **The organ doctrine as a sword and as a shield.** The major goal of the
organ doctrine is to prevent a corporation from escaping tort liability by hiding
behind its artificial, virtual, characteristics. The underlying justifications are similar
to those supporting vicarious liability. The organ acts on the corporation's behalf
(agency). The corporation is the initiator and the beneficiary of the organ's activity
(enterprise liability). It controls the risk (deterrence) and is better situated to spread
the loss. For these reasons, the organ doctrine imposes liability on the corporation,
either jointly or severally with the liable organ, or as the only liable party. In this
regard, the organ doctrine serves as a sword, allowing the person who suffered loss
to sue the corporation.

Against this background, three comments may be made. First, given the
extended scope of vicarious liability under Israeli law, particularly with regard to
agents,[1] one may wonder whether the organ doctrine is indeed necessary. It
appears, as mentioned, that organs are often, if not always, either agents or employ-
ees. Second, according to the above doctrine, the corporation should be held liable
for torts committed by its organs only when these took place while the organ was

performing his duties or tasks as an organ. Third, the organ doctrine imposes liability on the corporation for the acts of the organ but not *vice versa* – an organ would not be held liable in tort just because the corporation is liable.[2]

**Does the organ doctrine functions as a shield as well?** The organ doctrine renders the corporation liable for the acts and omissions of its functioning organs. But should the organ himself be held liable? On the analytical level, the argument against organ liability is that a functioning organ becomes an integral part of the corporation and is no longer a liable individual. The organ merges with the corporation. On the normative level, the argument is that such liability is unwarranted. The same considerations that justify the corporation's liability militate against the organ's liability: the organ is only an agent, is not necessarily the initiator, the beneficiary, the one with the better control over the risk, nor the loss spreader. Furthermore, the prospect of personal liability may become a deterrent and an obstacle to the hiring of skilled personnel. These arguments find strong support in the contractual sphere: a director, agent or employee of a corporation, as a rule, is not personally liable for his contractual obligations even though the contract was actually made or breached by the organ while functioning as an organ. The corporation becomes a shield, which 'hides' the organ behind the veil of incorporation. So why should the organ be liable in tort?

The major counter argument is that Tort Law is different from Contract Law in this regard because an organ that commits a tort does something wrong, and therefore should be accountable for it, like any other tortfeasor. Wrongdoers should not be allowed to hide behind the veil of incorporation, escaping individual responsibility. Moreover, in contractual relations the other party knows and agrees in advance that the organ would not be held personally liable, which is not necessarily the case in the tort context. It is also argued that a rule exempting organs unfairly favors them over other wrongdoers, employees and agents, who do not enjoy such an exemption.[3]

It appears, however, that this distinction between Contract and Tort, based on fault, is tenuous. Tort liability may be strict and absolute whilst contractual liability is fault-based. Besides, there are grey areas between Contract and Tort and even overlapping zones. Should the liability of an organ in Tort be limited to fault-based liability? Should organs who are at fault be additionally liable in Contract?

1. *See supra*, paras. 221–2.
2. *Tzuk Or, supra*, para. 234, n. 2; *Matityahu v. Shatil* (1997) 51(iv) P.D. 769.
3. *Tzuk Or, ibid.*

237. Courts have striven to strike the right balance between these rival arguments. The general tendency is to make organs liable in Tort. In one case, the court held the managing director and owner of a construction company personally liable in Negligence for construction defects in apartments built by his company and sold to the claimants. The defendant's personal failure to monitor the construction process constituted his own liability, being unable to seek shelter behind the company's legal entity. It should be noted that the company was insolvent, and the court was reluctant to let the party at fault escape liability.[1] In another seminal case, the director and owner of an insolvent construction company was found personally liable for breaching the obligation to negotiate a contract in good faith and in a cus-

tomary manner.[2] He was found personally liable despite negotiating the contract as an organ of his company. The court reasoned that an organ cannot escape the statutory duty to negotiate a contract in good faith by hiding behind the corporation and claiming that he did not negotiate in his individual capacity. This duty,[3] which lies in the grey area between Contract and Tort, and overlaps with the torts of Negligent Misrepresentation and Deceit, is imposed on him in person. In another case, organs were also found personally liable for the tort of Passing-off committed by their company, this time a solvent company.[4] The court reaffirmed the notion that organs should not be allowed to seek shelter behind the corporation. Furthermore, it refused to follow English and Canadian authorities that limit an organ's tort liability to cases of moral fault, namely, where the organ was actually aware of the wrongfulness. It was held that an organ is subject to tort liability like any other individual, with no threshold requirements.[5]

Does it follow that organs could even be held *strictly liable*? Such a principle would be unfair and exaggerated – who would agree to become an organ?

The explanation for this far reaching extension of liability may lie in a common feature of all the above cases – the organs were actually the owners, the *alter ego*, of their companies, and the court was actually, though not admittedly, lifting the veil of incorporation in order to impose liability on the stockholders. Indeed, in a more recent decision the court took a more restrictive approach.[6] It was stated that a managing director of a company, while acting in a regular and a routine way, should not be held personally liable, as an organ, for the company's negligence to a third party. Liability would be imposed only under special circumstances, such as where the other party relies on the special skills of the organ. The court also ruled that a company that breaches a contract with a third party, its organ, who actually effectuated the breach while managing the company affairs in a routine way, should not be held liable for Causing Breach of Contract.[7] This restrictive approach, however, was not followed in a later decision that imposed personal liability on an organ who negligently failed to prevent a burglar from stealing bailed valuables.[8] It appears that the search for the adequate scope of organ liability is not yet over.

1. *British Canadian Builders* v. *Oren, supra*, para. 234, n. 2.
2. *Fenidar, supra*, para. 234, n. 2.
3. Contracts (General Part) Law, 1973, Sec. 12.
4. *Tzuk Or, supra*, para. 234, n. 2.
5. They are also liable for authorizing or commanding such acts under Sec. 12 of the CWO, which imposes liability for joining in or procuring an act. *See* para. 238.
6. *Matityahu* v. *Shatil, supra*, para. 236, n. 2.
7. *Ibid.*
8. *Rosenwasser* v. *Lloyds & Co.* (1997) 51(v) P.D. 855.

§5. JOINING IN OR PROCURING ACT

*238.* The CWO provides that 'any person who joins or aids in, authorizes, counsels, commands, procures or ratifies any act done or to be done, or any omission made or to be made, by any other person, shall be liable for such act or omission'.[1]

The liability of such a defendant, to whom we shall refer as the procurer, is

neither strictly vicarious nor strictly personal. It is not strictly vicarious because there is no prerequisite that the other person, who actually inflicted the loss, be personally liable for the commission of a tort.[2] Nor is it strictly personal ability, because the procurer himself does not commit a complete tort – the loss is inflicted by another person. For this reason, this special kind of liability is known as 'mixed liability'.[3] By virtue of this provision, the acts or omissions that the other party was induced or influenced to commit, are attributed to the defendant, who is deemed to have committed them himself. After this attribution, which is vicarious in nature, the defendant becomes personally liable for the attributed act.[4]

The defendant must have procured the tortious act itself in order for it to be attributed to him/her.[5] If he/she procures a non-tortious act, he/she will not be held liable for the tort committed by the other person while performing the procured act, unless the tortious act could and should have been foreseen as likely to occur in the natural course of the procured act.[6]

What should be the mental state of the procurer? Should it be established that he willfully or knowingly procured the commission of a tortious act, or an act which led to a tortious act, or is it sufficient that he procured an act whilst negligently failing to appreciate its tortious nature? There are contradictory statements in this regard, some indicating that negligent procurement is actionable,[7] others suggesting that that the procurer must be aware of the tortious nature of the act.[8] It remains unclear whether negligent procurement is actionable directly under the general tort of Negligence.

Another unsettled problem is the meaning of the phrase 'ratification'. Under the law of agency for legal acts, the rule of ratification applies when a person claims to act on behalf of another but is not actually authorized to do so. If the other person subsequently ratifies the act, he thereby becomes responsible for it.[9] The procurer's liability for ratification, by contrast, does not require the existence of prior agency: liability may be imposed for the mere expression of consent after the event. This approach is questionable. Why should *ex post* consent to the tortious act of another make a person liable? There is indeed a discernible trend leading towards limiting the scope of the rule by requiring prior agency,[10] a benefit to the ratifier to be derived from the tortious act,[11] or ratification that gives a legal effect to the tortious act.[12] It has been argued, and justly so, that this rule serves no appropriate legal function in imposing liability for ratification or authorization when no causal link exists between the ratification and the tortious act.[13]

1. CWO, Sec. 12.
2. Vicarious liability is an extension of the other person's liability – *see supra*, para. 208. If the other person is not liable, the procurer can not be held vicariously liable.
3. *Ruskila* v. *State of Israel* (1984) 38(iii) P.D. 337, at 348.
4. The procurer may be involved in the infliction of the loss to a degree that renders him a joint tortfeasor. In such a case, personal liability can be established without attribution under Sec. 12. *See Hilman* v *Carmi* (1987) 41(iv) P.D. 1. The determination of the degree of involvement that renders the procurer a joint tortfeasor is a complicated task. – *See Meshulam* v. *State of Israel* (1998) 52(v) P.D. 1, at 19–27, for a discussion of the distinction between mere assistance and full partnership under criminal law.
5. *Lev* v. *Turjeman* (1962) 16 P.D. 2625, at 2629.
6. *Rabinowitz* v. *Sela* (1958) 12 P.D. 1261, at 1270 (trade union's liability for torts committed in the course of a labor dispute).

**238**                                      **Part II, Ch. 1, Vicarious Liability**

7. *Vitkovsky* v. *Ben Ya'akov* (1967) 21(ii) P.D. 260, at 263; *Carmeli* v. *State of Israel* (1987) 41(iii) P.D. 757, at 780.
8. *Sulima Bros.* v. *Yafora* (1967) 21(i) P.D. 515, at 552; *Tzuk-Or Ltd,* v. *Car Security* (1995) 48(v) P.D. 661, 703.
9. Agency Law, 1965, Sec. 6 (a).
10. *Dadon* v. *Atias* (1978) 32(ii) P.D. 169, at 174.
11. *Spormas* v. *Helber* (1962) 16 P.D. 1480.
12. *Carmeli* v. *State of Israel* (1987) 41(iii) P.D. 757, at 777–78 (forced hospitalization).
13. G. Tedeschi, 'Authorization of Torts' (1969) 4 *Is. L. R.* 1.

347 – 349

## Chapter 3.  Legal Causation: Causal Link between Fault and Initial Loss

### §1.  THE STATUTORY TEST

*347.* Once a given fault passes the preliminary threshold of cause-in-fact, questions of legal causation arise. The first question, as we have seen, refers to the conditions that must be satisfied in order to establish that the fault is legally linked to the initial damage. In this regard, the CWO provides no real guidance. The first part of the section that deals with causation states only that fault is to be considered a cause of damage when it is 'the cause or one of the causes of the damage'.[1] The latter part of the section, however, is more concrete: It *negates* causal link if (i) the damage was due to the happening of some extraordinary natural occurrence, which a reasonable person would not have anticipated and the consequences of which could not have been avoided by the exercise of reasonable care, and (ii) the fault of some other person was the decisive cause of damage.

1.  CWO, Sec. 64.

### §2.  'IMPORTED' TESTS: FORESEEABILITY, SCOPE OF RISK AND COMMON SENSE

*348. The three tests.* Since the CWO does not specify 'positive' tests to establish legal causation link but only negative exclusions of causation, the court 'imported' into Israeli law the three English tests of legal causation: 'reasonable foreseeability', 'scope of the risk' and the 'common sense' test.[1]

1.  *Simon v. Menashe* (1963) 17 P.D. 449.

*349. Reasonable foreseeability.* The reasonable foreseeability test asks whether the reasonable person could and should have foreseen the manner in which the given loss eventuated from his fault. Notably, it is not the *precise* manner in which the damage was caused or the *exact* details of the damage that need to be foreseen. The claimant need only prove that the *kind* of harm, and the *general manner* in which it was caused, were reasonably foreseeable.[1] Judges may differ as to the appropriate degree of abstraction required to distinguish between unforeseeable facts that are classified as details and thereby ignored, and unforeseeable facts that constitute the *kind* of damage or *the general manner* of its infliction and therefore negate causation.[2]

An interesting question regards the manner in which the reasonable foreseeability test of legal causation is related to the reasonable foreseeability test of negligence law. It may be argued that the two tests are actually one. To determine whether the defendant was careless (negligent) we ask whether infliction of loss was a reasonably foreseeable outcome of the relevant conduct. Is it not the same question which is asked in order to determine the existence of legal causation? It is

**Legal Causation, Part V, Ch. 3**                                    **350 – 351**

suggested, however, that the reasonable foreseeability test functions differently in
these two contexts. To determine whether a given conduct is careless, foreseeability
functions as an *ex ante* test referring to *all* the risks that the given conduct gener-
ates. In the context of legal causation, in contrast, foreseeability functions as an *ex
post* test, referring only to the risk that actually materialized.[3]

1. *Ben Shimon v. Barda* (1984) 38(iii) P.D. 1.
2. *See, e.g. Ravid v. Denis* (1998) 52(iv) P.D. 529, where an injection of a pain-killer during
   dental treatment caused unusual neurological damage rather than the expected dizziness. The
   majority held that the actual damage was not within the same category as the foreseeable type.
   The minority held that it differed only in degree but was in fact of the same kind.
3. This difference is well exemplified by cases in which a weapon provided by the employer was
   used by the employee for intentional killing of a third party. *See recently State of Israel v.
   Madach* (1998) 52(iii) P.D. 550. Assuming that the killing was not reasonably foreseeable, the
   employer is not held liable. But does this denial of liability stem from lack of carelessness or
   from the absence of legal causation? The answer to this question depends on the circum-
   stances. When the foreseeable risks generated by leaving the weapon with the employee do not
   justify a finding of carelessness, liability is denied under the *ex ante* 'all risks' test of foresee-
   ability. When the *ex ante* foreseeable risks as a whole render the employer careless in leaving
   the weapon with the employee, liability is to be denied on causation grounds by the *ex post*
   test. The actual risk of intentional killing that materialized was not reasonably foreseeable
   despite the carelessness.

*350. Scope of risk.* The scope of the risk test questions whether the risk which
actually materialized (the damage and the manner in which it was caused) is num-
bered amongst the risks protected by the relevant tort.[1] Again, this is an *ex post* test.
It verifies, after the fact, that the risk causing the loss falls into the ambit of the
risks that *ex ante* rendered the conduct tortious. Under this test, the court is required
to interpret each tort in order to determine which risks fall into its scope of protec-
tion. Obviously, torts or liability arrangements that impose strict liability may
include a wider scope of risks than torts based on fault or intentional infliction of
loss. Moreover, it can be argued that the foreseeability test is just one application of
the more general 'scope of the risk' test. In Negligence, the *ex ante* risks that con-
stitute this tort are reasonably foreseeable risks, and therefore the *ex post* causation
test is reasonable foreseeability.[2]

1. *Vaknin v. Local Council of Bet Shemesh* (1983) 37(i) P.D. 113.
2. *Simon v. Menashe, supra,* para. 345, n. 1, at 465, referred to the scope of the risk test as a gen-
   eralization of the foreseeability test.

*351. The common-sense test.* In its motherland – England – the common-sense
test has traditionally denied legal causation in cases of interference involving vol-
untary human action, an act of God and mere coincidence.[1] Israeli courts inter-
preted this amorphous test in an amorphous way, namely, as inquiring whether the
characteristics of the tortious activity actually contributed to the infliction of the
loss.[2] Only recently has the court referred to this test in its traditional English
context of interfering fault, extraordinary natural occurrence and coincidence.[3]

1. H.L. Hart, T. Honore *Causation in the Law* (2ed., 1985), at 172–3.
2. *Shulman v. Zion Insurance Co.* (1988) 42(ii) P.D. 844; *Lasri v. Zion Insurance Co.* (1988)
   42(iii) P.D. 705.
3. *Pe'er v. Silobat Construction Co.* (2001) 55(iii) 493, at 500. As mentioned, the CWO explic-

Legal Causation, Part V, Ch. 3

idly refers to human acts and natural occurrences as factors which negate legal causation. *See* the discussion of Secs. 64 (1) (2) below.

*352. The domain of each test.* The interrelations between these three tests of legal causation are still vague. It has often been said that these are three worthy and applicable tests.[1] It is possible, however, that the different tests may lead to different results. In this event, which test should prevail? It has been argued that the application of the reasonable foreseeability test with regard to strict and absolute liability might undermine the legislative intent to impose liability regardless of the unforeseeability of the risks created.[2] The tendency, accordingly, has been to apply the foreseeability test in cases of negligence,[3] and the scope of the risk test in areas of strict and absolute liability,[4] such as Breach of Statutory Duty,[5] road accidents,[6] and other no-fault arrangements.[7] The common-sense test, when applied, usually plays a minor role as a background test that supplements the others.

1.  *See*, recently, *Pe'er v. Silobat, supra,* para. 351, n. 3, at 501.
2.  It can be argued, in contrast, that the foreseeability test of causation can be reconciled with strict and absolute liability as well. This is exemplified by a case of non-foreseeable defect in a product. If the inflicted loss is a foreseeable outcome of such a defect, the causal test of foreseeability is met although the defect itself is not foreseeable.
3.  *Ravid v. Denis, supra,* para. 345, n. 2.
4.  *Vaknin, supra,* para. 350, n. 6, at 146–7.
5.  *Ibid. See also supra,* para. 68.
6.  *See supra,* para. 262.
7.  *Sidaar Tanker Corp. v. Eilat Ashkelon Pipeline Co.* (1985) 39(i) P.D. 393.


§3. STATUTORY NEGATION OF LEGAL CAUSATION

*353. Extraordinary natural occurrence.* As mentioned, the CWO negates legal causation where (i) the damage was due to the happening of some extraordinary natural occurrence, and (ii) the fault of some other person was the decisive cause of damage.[1]

Extraordinary natural occurrence, which a reasonable person would not have anticipated and the consequences of which could not have been avoided by the exercise of reasonable care, negates legal causation. The problem with this provision is that it does not negate legal causation where the defendant was negligent, despite the unforeseeability of the natural occurrence.[2]

1.  Secs. 64 (1) (2).
2.  For an analysis of this problem *see Anzaleg v. Solel Boneh* (1972) 26(i) P.D. 8; *State of Israel v. Slameh* (1999) 53(iv) P.D. 721.


*354. Decisive fault.* When the loss is caused by 'decisive fault', fault that intervenes between the defendant's tortious conduct and the loss, legal causation is negated. The intervening cause may be that of a third party or that of the claimant. There are different views as to what renders intervening fault 'decisive'. According to one view, which corresponds with the origins of this provision in the common-sense test of English law, a given fault is decisive when it involves intentional or reckless infliction of loss, or gross negligence, as opposed to the defendant 'simple'

**Legal Causation, Part V, Ch. 3**                                    **355**

negligence.[1] The fault of a patient who failed to follow his doctor's firm advice to quit smoking was not characterized as decisive in this sense.[2] The more prevalent view is that fault becomes 'decisive' when it is not reasonably foreseeable.[3] The fault of a person committing suicide after being injured in a road accident was not 'decisive' as it was foreseeable in the circumstances.[4] These two interpretations of 'decisiveness' may conflict when a given fault involves intention or recklessness but is nevertheless foreseeable. Such fault is 'decisive' under the former test but not under the latter. An attempt to reconcile the two tests, not followed by recent decisions, opted for the middle ground. Fault is 'decisive' when it involves intention or recklessness, unless it is highly probable that such fault will take place (it is *highly* probable, for example, that if a guard falls asleep goods may be stolen).[5]

It should be noted that the 'foreseeability' interpretation of 'decisiveness' may be inappropriate in cases of strict and absolute liability, where foreseeability of the loss is not necessarily a barrier to liability.

1. *Simon v. Menashe, supra,* para. 348, n. 1.
2. *Berenstein v. Attyah* (1995) 49(iii) P.D. 709.
3. *Ben-Arye v. Brom* (1971) 25(ii) P.D. 598.
4. *Hadassa Medical Association v. Gilad* (1999) 53(iii) P.D. 529.
5. *State of Israel v. Avitan* (1987) 41(i) P.D. 563.

§4. BURDEN OF PROOF

*355.* The burden of establishing legal causation traditionally lies with the claimant. Two recent decisions, however, seem to shift the burden of negating causation to the defendant by transforming presumptions of fault into presumptions of causation. In one case, the *res ipsa loqitur*[1] presumption was employed to shift to a school the burden of proving that the lack of security inspections was not the cause of a bodily injury caused by a falling door that had been removed from its axles by a burglar.[2] In the other case, the presumption of medical carelessness raised by the absence of medical records[3] was extended to shift to the hospital the burden of showing that the failure to monitor blood pressure caused damage.[4]

1. *See supra,* para. 241 *et seq.*
2. *City of Kiryat Matzkin v. Dwir* (1998) 52(i) P.D. 145.
3. *See supra,* para. 74.
4. *Banger v. Hillel-Yafe Hospital* (1999) 53(iii) P.D. 172.