UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RACHEL ROTHSTEIN, *et al.*,

                Plaintiffs,

      -against-

UBS AG,

              Defendant.

No. 08-cv-4414 (JSR)

Electronically Filed

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile: (212) 326-2061

Attorneys for Defendant UBS AG

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

THE FAC'S ALLEGATIONS.................................................................................... 5

    The Parties ........................................................................................................ 5

    The Terrorist Attacks and Plaintiffs' Alleged Injuries ...................................... 5

    The ECI and the UBS Banknote Transactions.................................................. 6

    UBS's Conduct Did Not Violate OFAC Sanctions Laws................................. 8

    Iran's Alleged Role in Middle East Terrorism ................................................. 9

    The Implausible "Connection" Between the U.S. Banknote Transactions and
        Plaintiffs' Injuries ........................................................................... 11

    The FAC's Causes of Action ........................................................................... 15

ARGUMENT .......................................................................................................... 15

    I.     PLAINTIFFS LACK STANDING BECAUSE THEIR INJURIES ARE
           NOT "FAIRLY TRACEABLE" TO UBS'S CONDUCT................................... 16

    II.    PLAINTIFFS FAIL TO STATE AN ATA CLAIM........................................... 18

          A.    Intent ................................................................................................... 18

          B.    Knowledge .......................................................................................... 19

          C.    Substantial Assistance......................................................................... 21

    III.   PLAINTIFFS' CUSTOMARY INTERNATIONAL LAW CLAIM IS
           PREEMPTED BY THE ATA................................................................................ 22

          A.    ATA Section 2333 "Occupies the Field" for Tort Claims by U.S.
               Nationals Injured by Reason of an Act of International Terrorism ......... 22

          B.    Plaintiffs Fail to State a Claim for Aiding and Abetting an
               International Law Violation................................................................... 24

    IV.   THE COURT HAS NO JURISDICTION OVER THE CWO CLAIMS ........... 25

          A.    There Is No Diversity Jurisdiction........................................................ 25

          B.    The Court Should Decline To Exercise Supplemental Jurisdiction
               Over The CWO Claims......................................................................... 26

    V.    THE CWO CLAIMS ARE EITHER TIME-BARRED OR DEFICIENT
           UNDER ISRAELI LAW ..................................................................................... 27

          A.    Most of the CWO Claims are Time-Barred......................................... 27

          B.    The CWO Claims Fail Under Israeli Law ............................................ 28

               1.     Negligence ............................................................................... 28

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 2. | Breach of Statutory Duty | 29 |
| 3. | Aiding and Abetting | 30 |
| CONCLUSION | | 31 |

## TABLE OF AUTHORITIES

**Page**

### CASES

*Allen v. Wright*, 468 U.S. 737, 750, 751, 752 (1984) ............................................................ 16, 17

*Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 274-85, 292-93 (E.D.N.Y. 2007) ............. 22, 25

*Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 431 (S.D.N.Y. 1996) ................. 27

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007) ..................... 15-16

*Bell Atlantic Corp v. Twombly*, 127 S. Ct. 1955, 1965, 1974 (2007) .............................. 15, 16, 19

*Boim v Quaranic Literacy Inst.*, 291 F.3d 1000, 1010, 1023 (7th Cir. 2002) ........................ 18, 23

*Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) ........................................ 27

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) .............................................. 26

*City of Milwaukee v. Illinois*, 451 U.S. 304, 313-14, 317 (1984) ............................... 22-23, 23-24

*Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 69 (2d Cir. 1990) ........................................... 26

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167, 180-81 (2000) ............................................................................................ 16-17

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ...................................................... 16

*Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001) .......................................... 17-18

*In re Oswego Barge Corp.*, 664 F.2d 327, 335 (2d Cir. 1981) ................................................. 23

*In re Terrorist Attack on Sept. 11, 2001*,
    2007 WL 2907278, at *3 (S.D.N.Y. Oct. 5, 2007) ................................................................. 16

*Johnson & Johnson v. Am. Nat'l Red Cross*,
    528 F. Supp. 2d 462, 464 n.1 (S.D.N.Y. 2008) ....................................................................... 8

*Khulumani v. Barclay Nat'l Bank Ltd.*,
    504 F.3d 254, 260, 277, 287-89, 333 (2d Cir. 2007) ...................................................... 24, 25

*Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) .............................. 26

*Kush v. City of Buffalo*, 462 N.Y.S.2d 831, 835 (N.Y. 1983) .................................................. 29

*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 584 (E.D.N.Y. 2005) .................................... 20

*Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989) ......................................... 26

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    453 F. Supp. 2d 633, 669 (S.D.N.Y. 2006) .......................................................................... 25

*Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989) ......................................................... 27

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) ............................................. 17

*Stutts v. The De Dietrich Group*,
    2006 WL1867060, at *1, 3-4, 6 (E.D.N.Y. June 30, 2006) ................................. 18-19, 20, 21

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ....................................................... 26

*United States v. Chalmers*, 474 F. Supp. 2d 555, 565-66 (S.D.N.Y. 2007) ............................. 30

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982) ................................................................................... 16

*Weiss v. National Westminster Bank PLC,*
453 F. Supp. 2d 609, 621-22 (E.D.N.Y. 2006) ..................................................... 18

## STATUTES

18 U.S.C. § 2331 ....................................................................................................... 23-24

18 U.S.C. § 2332d ..................................................................................................... 29-30

28 U.S.C. § 1332 ............................................................................................................. 25

28 U.S.C. § 1367(a) ....................................................................................................... 26

50 U.S.C. Appx. § 2405(j) .............................................................................................. 9

N.Y. CPLR §§ 202, 208, 214(5) .............................................................................. 27, 28

N.Y. ESTATE POWERS & TRUSTS LAW § 5-4.1 .......................................................... 27

## OTHER AUTHORITIES

*Civil Wrongs Ordinance [New Version], 1968* §§ 12, 35, 36, 63, 64 ..................... 28, 29, 30-31

*Interpretation Ordinance (New Version), 1981* ..................................................... 29-30

Israel Gilead at 51, 171, 247, *Israel* (Kluwer Law International 2003) *reprinted in*
2 International Encyclopaedia of Laws, Tort Law (R. Blanpain & S. Stijins
eds., Kluwer Law International 2007) ("*Gilead*") ...................................... 28, 29, 31

31 C.F.R. PART 596 .................................................................................................. 29-30

FED. R. CIV. P. 44.1 ...................................................................................................... 28

U.S. Const. Art III § 2 ................................................................................................... 16

RESTATEMENT (SECOND) OF TORTS § 876(b) ...................................................... 25

## PRELIMINARY STATEMENT[1]

The amended complaint remains a lawyer's theoretical construct in search of a factual basis. Plaintiffs' counsel has collected forty-five victims and victim families from six Hamas and Hizbollah terrorist attacks in Israel, and seeks to hold UBS liable for the atrocities against them. The FAC contains no allegation that UBS has ever had any dealings with anyone from Hamas or Hizbollah. Nor does it allege that UBS was aware that these attacks were contemplated or that UBS intended in any way to facilitate terrorism anywhere. Nevertheless, Plaintiffs' counsel claims that UBS is somehow liable under ATA Section 2333(a), which provides a civil remedy—including treble damages and attorneys' fees—for "[a]ny national of the United States injured in his or her person, property or business by reason of an act of international terrorism."

What is Plaintiffs' counsel's theory? They rely on a May 10, 2004 consent order in which UBS admitted that a few UBS employees had breached a 1996 contract between UBS and the Federal Reserve Bank of New York. Under that contract, UBS operated a U.S. banknote depot on the Fed's behalf in Zurich, Switzerland. As UBS admitted in the 2004 consent order, UBS employees breached that contract by engaging in, and failing to report, U.S. banknote transactions with counterparties in Iran from 1996 through 2003 (transactions that UBS discovered through an internal investigation). The result was that the Fed cancelled the UBS contract and levied a $100 million civil penalty based on UBS's reporting failures. But as senior

---

[1]   For convenience, this memorandum refers to UBS AG as "UBS" and all plaintiffs collectively as "Plaintiffs." All references to "Section ____" (e.g., Section 2333(a)) are to the corresponding sections of the Antiterrorism Act ("ATA"), 18 U.S.C. §§ 2331, et seq. The First Amended Complaint is cited as "FAC." Citations to the "Cantor Decl." are to the accompanying declaration of Daniel L. Cantor, Esq., dated September 4, 2008. Unless otherwise noted, this memorandum omits internal quotation marks in citations and adds any emphasis reflected in quoted passages.

Fed and U.S. Treasury Department Office of Foreign Asset Control ("OFAC") officials testified before Congress, UBS's banknote transactions were not illegal, they were a breach of contract.

Plaintiffs are trying to parlay that contract breach into a claim that UBS knowingly and intentionally assisted the "act of international terrorism" that injured them. Their hypothesis goes as follows. First, the Iranian government is a recognized terrorism sponsor, and has funded and supported Hamas, Hizbollah and Palestinian Islamic Jihad ("PIJ"). Second, Hamas, Hizbollah and PIJ needed U.S. cash dollars to carry out terrorism. Third, UBS's banknote transactions with Iranian counterparties supplied the Iranian government with the cash dollars it needed to fund terrorism. Fourth, Iran's cash dollars enabled Hamas and Hizbollah to commit the six terrorist attacks at issue. Fifth, UBS therefore aided and abetted Iran's support and sponsorship of Hamas and Hizbollah—an "act of international terrorism," by reason of which Plaintiffs were injured.

Plaintiffs' tortured theory is riddled with logical and factual flaws. The most glaring examples are as follows:

- o   The consent order on which the FAC is based provides that UBS engaged in banknote transactions with "counterparties" in Iran, *not the Iranian government*. The FAC offers only conclusory assertions from unidentified "sources" to support Plaintiffs' leap that UBS engaged in U.S. currency transactions with the Iranian government.

- o   The FAC does not even attempt to allege that UBS intended to help Iran's terrorist activities succeed.

- o   The Iranian government had *billions* in dollar-denominated reserves during the relevant period from exporting oil to countries throughout the world. The sums involved in the UBS banknote transactions were only a tiny fraction of the dollars that Iran independently possessed. And given that there were numerous non-U.S. banks with access to U.S. currency whose foreign operations were not bound by OFAC regulations, the Iranian government hardly needed the UBS banknote transactions to fund terrorism or anything else.

    o  Numerous plaintiffs have admitted that the terrorist groups who committed these attacks had ample funding without Iran's cash. Eleven of the plaintiffs here allege in another ATA case that (i) Hamas was funded, *not by Iran*, but by a global network of charities known as the Union of Good; and (ii) Hamas and PIJ use Arab Bank PLC, a Jordanian bank, to convert Saudi currency into U.S. dollars, which are then routed to Arab Bank's West Bank branches.

In the end, Plaintiffs' counsel completely ignore their obligation to plead facts that raise a right to relief beyond the speculative level—even after getting a preview of UBS's motion to dismiss their initial complaint. Their claims are still based on conjecture, innuendo, and distorting public record facts. This case, therefore, remains a cynical attempt to capitalize on the ATA's treble damages and attorneys' fees provisions to extract a settlement from a deep pocket whose contract breaches are wholly disconnected from the unspeakable terrorist acts that victimized Plaintiffs. This Court has numerous bases to dismiss these claims.

*First*, Plaintiffs do not have Article III standing because their alleged injuries are not "fairly traceable" to the UBS banknote transactions. UBS had no connection to the numerous non-parties who independently planned and carried out the attacks. Because the FAC does not plausibly allege that the attacks would not have occurred without the U.S. banknote transactions, Plaintiffs do not have standing.

*Second*, Plaintiffs cannot state a claim for ATA Section 2333(a) aiding-and-abetting liability (First Count) or for aiding and abetting an international law violation (Second Count) because the FAC does not plausibly allege any of the three elements for an aiding and abetting claim—intent, knowledge and substantial assistance:

    o  *Intent.* The FAC makes no effort to allege that UBS intended the U.S. banknote transactions to facilitate Iran's "acts of international terrorism"—*i.e.*, its sponsorship of Hamas, Hizbollah and PIJ terrorist attacks.

    o  *Knowledge.* The FAC does not plausibly allege that UBS knowingly assisted Iran's terrorist activity. Indeed, the only basis for the FAC's claim that UBS traded U.S. banknotes directly with so-called "Iranian Government Organs" are supposed statements by insufficiently-described confidential sources. In addition,

the FAC itself establishes that Iranian banks concealed their identities to deceive trading partners, thereby negating the conclusory assertion that UBS knew it was doing business with those banks. And even if UBS knew the true identities of its trading partners, Plaintiffs have not adequately alleged that UBS also knew that the banknote transactions would assist Iran's sponsorship of terrorism. The FAC cites only third-party public statements that either post-date the UBS banknote transactions or fail to mention Iran's alleged use of U.S. banknotes to support terrorism.

   o  *Substantial assistance.* The FAC's "substantial assistance" allegations are boilerplate, devoid of any plausible facts linking the currency transactions to Iran's support for terrorism generally, much less to the attacks that injured Plaintiffs. Plaintiffs do not plausibly allege that UBS was Iran's main source for U.S. banknotes, that Iran actually used the banknotes from the UBS transactions to support Hamas and Hizbollah, and that Iran was Hamas's and Hizbollah's primary source for terrorism financing.

*Third,* Plaintiffs' Second Count for aiding and abetting an international law violation fails for the additional reason that it is preempted by the ATA's civil remedies provision, Section 2333(a). The FAC's First and Second Counts are essentially identical—both assert tort claims on behalf of U.S. nationals for injuries allegedly caused by acts of international terrorism. Because the ATA "occupies the field" for such claims, Plaintiffs' federal common law cause of action must be dismissed.

*Fourth,* once the federal claims are dismissed, this Court has no original jurisdiction over the remaining claims (Third, Fourth and Fifth Counts) brought under the Israeli Civil Wrongs Ordinance ("CWO") because many of the plaintiffs are U.S. citizens domiciled abroad, who cannot invoke the Court's diversity jurisdiction. And there is no compelling reason for this Court to exercise supplemental jurisdiction over the CWO Claims.

*Fifth,* even if the Court were to exercise supplemental jurisdiction, the CWO Claims should still be dismissed because most of the CWO Claims are time-barred and under Israeli law (i) the negligence claim fails because UBS was not in sufficient proximity to Plaintiffs to create a duty towards them, and the individual Hamas and Hizbollah terrorists (not UBS) were the

"decisive cause" of Plaintiffs' injuries; (ii) the "breach of statutory duty" claim fails because it is improperly based on UBS's purported violations of U.S. law and, in any event, UBS did not violate any laws; and (iii) the aiding-and-abetting claim fails because there is no plausible allegation that UBS knew it was assisting the actual tortfeasors—Hamas and Hizbollah.

## THE FAC'S ALLEGATIONS[2]

**The Parties**

Plaintiffs are forty-five American citizens who were allegedly injured by terrorist attacks in Israel. (FAC ¶¶ 4-43.) Only twelve plaintiffs are U.S. domiciliaries. (*Id.* ¶¶ 4-6, 9-10, 16-17, 19, 21-24.) The FAC does not identify the other plaintiffs' domiciles, but based on the FAC's allegations, they appear to be Israeli residents. (*See, e.g., id.* ¶¶ 122, 124.)

UBS is an international financial institution headquartered in Basel and Zurich, Switzerland. (*Id.* ¶ 44.) It has more than 80,000 employees worldwide, and offices in more than 50 countries.[3] The FAC does not allege that any transaction at issue occurred in the United States—rather, the only activity at issue involves banknote transactions originating in Switzerland, the laws of which the FAC never references.

**The Terrorist Attacks and Plaintiffs' Alleged Injuries**

The FAC identifies six terrorist attacks in Israel that allegedly injured Plaintiffs: (1) a July 30, 1997 Hamas suicide bombing at a Jerusalem market; (2) a September 4, 1997 Hamas suicide bombing at a Jerusalem pedestrian mall; (3) a March 28, 2001 Hamas suicide bombing at a bus stop near the town of Neve Yamin; (4) an August 9, 2001 Hamas suicide bombing at a

---

[2]    The facts are taken from the FAC, the allegations of which are assumed to be true for purposes of this motion, and publicly-available documents that this Court can consider on a motion to dismiss. A copy of the FAC is annexed as Cantor Decl. Exh. 1.

[3]    *See* UBS, *About Us,* http://www.ubs.com/1/e/about.html (last visited September 4, 2008) (Cantor Decl. Exh. 2).

5

Jerusalem pizzeria; (5) a December 1, 2001 Hamas suicide bombing at a Jerusalem pedestrian mall; and (6) multiple Hizbollah rocket attacks on the town of Safed between July 13 and July 22, 2006. (*Id.* ¶¶ 113, 115, 117, 119, 124, 126.)

Each plaintiff is an alleged victim of one attack. Twenty-one plaintiffs—Rachel Rothstein, Jenny Rubin, Daniel Miller, Abraham Mendelson, Stuart Elliot Hersh, Noam Rozenman, Netanel Herskovitz, Chana Nachenberg, Julia Katz, Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, Avishai Reuvane, Elisheva Afon, Chayim Kumen, Howard Green and Leah Stern (deceased)—claim physical, emotional and psychological injuries from the attacks. Their relatives are the remaining plaintiffs, who claim emotional and psychological injuries resulting from the attacks on their family members. (*See generally id.* ¶¶ 4-43.)

**The ECI and the UBS Banknote Transactions**

In 1996, the Fed introduced the Extended Custodial Inventory program ("ECI"). The ECI's primary purpose was to facilitate U.S. banknotes' international distribution and repatriation by setting up overseas cash depots. (FAC ¶ 62.) Private-sector banks operated these depots and held U.S. banknotes on a custodial basis for the Fed. (*Id.*) One such depot was in Zurich, Switzerland, and in 1996, the Fed contracted with UBS to operate that facility. (*Id.* ¶¶ 64-65.) According to the FAC, UBS's contract with the Fed (the "ECI Agreement") required it to provide the Fed with monthly reports of all ECI transactions and to comply with all OFAC regulations—which would not otherwise apply to a foreign bank's non-U.S. operations. (*Id.* ¶ 64.)

In June 2003, in response to Fed inquiries, UBS disclosed that several of its ECI-facility employees had engaged in U.S. banknote transactions (*i.e.*, selling and delivering actual

banknotes) with counterparties in Iran. (*Id.* ¶ 71.) Although the FAC repeatedly refers to UBS transactions with "Iran" (defined as the "Islamic Republic of Iran") and "Iranian Government Organs" (defined as "various organs, political subdivisions and agencies and instrumentalities of the government of Iran (including without limitation the Central Bank of Iran and Iranian government-owned banks …")) (*id.* ¶¶ 47, 53), the Fed itself claimed only that UBS had traded with "*counterparties in jurisdictions* subject to [OFAC] sanctions …." (*Id.* ¶ 82.) The FAC's conclusory allegation that UBS "willfully transferred millions of dollars to, among others, the Central Bank of Iran" is based solely on supposed "congressional sources familiar with UBS's activities," which the FAC neither identifies nor describes. (*Id.* ¶ 101)

The ECI Agreement's OFAC-compliance provisions prohibited the U.S. banknote transactions with Iranian counterparties, which UBS had failed to disclose on its monthly ECI reports. (*Id.* ¶ 72.) Consequently, on October 28, 2003, the Fed terminated the ECI Agreement. (*Id.* ¶ 78.) Immediately thereafter, UBS launched an internal investigation into its ECI-facility operations, and provided the Fed with confidential investigative reports on December 3, 2003, and April 16, 2004. (*Id.* ¶¶ 80-81.) The reports concluded that UBS's ECI-facility employees had deliberately concealed the improper currency transactions from the Fed. (*Id.* ¶ 84.) On May 10, 2004, UBS consented to a $100 million civil money penalty. (*Id.* ¶¶ 82-83.) As a senior Fed official made clear in his Senate testimony, that penalty served as punishment for UBS's ECI-facility employees' deception; the remedy for the improper currency transactions was terminating the ECI Agreement.[4]

---

[4]    *See Oversight of the Extended Custodial Inventory Program: Hearing on the Recent Events Involving the Union Bank of Switzerland-Zurich which Violated its ECI Agreement with the Federal Reserve Bank of New York by Engaging in U.S. Dollar Banknote Transactions with Countries Subject to Sanctions by the U.S. Department o the Treasury's Office of Foreign Assets Control, which Administers and Enforces Economic Sanctions Against Targeted*

On the day the civil penalty was announced, UBS issued a press release taking "full responsibility" and expressing regret for its employees' "very serious mistakes." (*See* FAC ¶ 84.)[5] UBS also stated that it had fired the responsible employees and disciplined others, and that it would exit the international banknote trading business. (Cantor Decl. Exh. 4.) Less than two years later, UBS became the first major non-U.S. bank to announce that it would sever global business ties with the Iranian government, its officials and related entities, Iranian banks, and all other persons or entities located in Iran.[6]

**UBS's Conduct Did Not Violate OFAC Sanctions Laws**

Contrary to the FAC's naked assertions, the U.S. banknote transactions did not violate any U.S. criminal law involving OFAC sanctions because, as then-OFAC Director R. Richard Newcombe testified, non-U.S. entities like UBS are not subject to OFAC regulations outside the United States: "we do not have jurisdiction over UBS Zurich—there's no enforcement action that we can take against that bank ... we are not involved in the ECI program. It goes to banks

---

*Foreign Countries Before the S. Committee on Banking, Housing and Urban Affairs*, 108th Cong. at 5-6 (2004) ("May 20, 2004 Senate Hearing") (statement of Thomas C. Baxter, Jr., Executive Vice President and General Counsel, Federal Reserve Bank of New York) (Cantor Decl. Exh. 3). The "hearing testimony is ... incorporated into the Complaint by reference [(FAC ¶¶ 85-88)] and constitutes a public record of which the Court can take judicial notice. The Court can therefore consider the entire hearing testimony on this motion." *Johnson & Johnson v. Am. Nat'l Red Cross*, 528 F. Supp. 2d 462, 464 n.1 (S.D.N.Y. 2008) (Rakoff, J.).

[5]  UBS statement on regulatory actions by the U.S. Federal Reserve and the Swiss Federal Banking Commission, May 10, 2004, http://www.ubs.com/1/e/media_overview/media_global/search1/search10?newsId=59058 (last visited September 4, 2008) (Cantor Decl. Exh. 4).

[6]  *See* Hugo Miller and Marc Wolfensberger, *UBS breaks ties with Iran*, INT'L HERALD TRIB., Jan. 23, 2006, *available at* http://www.iht.com/articles/2006/01/22/business/bxubs.php (Cantor Decl. Exh. 5).

over which we do not have jurisdiction."[7]  That is why, as the Fed's Thomas Baxter testified, "the [ECI] contract exported the [OFAC] restrictions . . . from the United States to our ECI facilities . . . ."[8]

**Iran's Alleged Role in Middle East Terrorism**

Since 1984, the United States government has designated Iran a state-sponsor of terrorism under 50 U.S.C. Appx. § 2405(j). (FAC ¶ 51.) According to the FAC, Iran's "continuous and official policy and goal" since becoming an Islamic regime in 1979 has been to seek the State of Israel's destruction and to bring about and cause Israeli Jews' murder or expulsion from Israel. (*Id.* ¶ 48.) To achieve its goals, Iran allegedly established the Hizbollah terrorist group in 1982 and, according to the FAC, since then has continuously "controlled, funded and operated" the group. (*Id.* ¶ 50.) In addition, since the early 1980's, Iran has allegedly provided material support and resources to the Hamas and PIJ terrorist organizations, "including hundreds of millions of dollars in funds." (*Id.*)

The FAC further alleges that Iran's support for Hamas, Hizbollah and PIJ "included tens of millions of dollars in cash annually." (*Id.* ¶ 52.) Hamas, Hizbollah and PIJ allegedly "needed cash dollars" to fund their terrorist operations because they were cut off from ordinary banking tools such as wire transfers and checks. (*Id.* ¶¶ 54-55.) Thus, the FAC concludes, without Iran's cash dollars, Hamas, Hizbollah and PIJ's terrorist activities "would have been severely crippled and limited." (*Id.* ¶ 59.) The FAC asserts that Hamas, Hizbollah and PIJ's need for cash dollars is "notorious public knowledge"; but it cites only statements regarding cash smuggling—all of which post-date the UBS banknote transactions. (*Id.* ¶¶ 56-58.)

---

[7]  May 20, 2004 Senate Hearing at 10-11 (statement of R. Richard Newcomb, Director, Office of Foreign Assets Control, U.S. Department of the Treasury) (Cantor Decl. Exh. 3).

[8]  May 20, 2004 Senate Hearing at 7 (statement of Thomas C. Baxter, Jr., Executive Vice President and General Counsel, Federal Reserve Bank of New York) (Cantor Decl. Exh. 3).

According to the FAC, Iran provided funds to Hamas, Hizbollah and PIJ both directly and through the so-called "Iranian Government Organs," including the Central Bank of Iran and Iranian government-owned banks. (*Id.* ¶ 53.) The FAC claims that the "role of ... Iranian state banks in financing and facilitating terrorist organizations is [*i.e.*, *now*] a matter of public record," citing two recent statements by Treasury Department officials. (*Id.* ¶¶ 103-04.) But the FAC does not allege that the Iranian banks' involvement in terrorism financing was "a matter of public record" in 1996-2003.

To the contrary, the FAC admits that Iran went to great lengths to conceal the role its banks played in financing terrorism. For example, the FAC cites Treasury Department Under-Secretary Stuart Levey's Congressional testimony about how Iran deceives financial institutions:

> We have ... seen how Iranian banks request that other financial institutions take their hands off of transactions when processing them in the international financial system. *This practice is intended to evade the controls put in place by responsible financial institutions and has the effect of threatening to involve them in transactions they would never engage in if they knew who, or what, was really involved. This practice is even used by the Central Bank of Iran ....*

(*Id.* ¶104.) The FAC also cites Deputy Treasury Secretary Robert M. Kimmitt's similar remarks:

> Iran's longtime integration into the international financial and commercial systems has aided the regime in supporting and carrying out its dangerous activities. The Iranian regime disguises its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection from the international community .... These deceptive practices are *specifically designed to evade the risk-management controls put in place by responsible financial institutions* and have allowed actions by Iranian banks to remain undetected as they move funds through the international financial system to pay for the Iranian regime's illicit activities. *Iran uses its state-owned banks to facilitate this conduct, and those banks engage in a range of deceptive practices.* For example, some have requested that other financial institutions take their names off transaction documents when processing them globally.

> *This practice, which makes it difficult, if not impossible, to*
> *determine the true parties in the transaction, is even used by Bank*
> *Markazi, Iran's Central Bank.*

(*Id.* ¶ 103.) Mr. Kimmitt stated in that same speech that it was not until 2006 that the U.S. began

taking action against Iranian banks and warning central banks and financial institutions about the

"inherent risks" of doing business with seemingly non-governmental Iranian entities.[9]

**The Implausible "Connection" Between the**
**U.S. Banknote Transactions and Plaintiffs' Injuries**

Plaintiffs claim that Iran provided "financial support" for each attack identified in the

FAC. Although the FAC does not allege that this "financial support" consisted of U.S.

banknotes, it asserts that the UBS banknote transactions somehow "enabled" Hamas and

Hizbollah to carry out those attacks. (*See id.* ¶¶ 114, 116, 118, 120, 125-26.) But the FAC offers

no facts to support these speculative allegations and, as demonstrated below, they are simply not

plausible given certain plaintiffs' terrorism-financing allegations in other cases and publicly-

available information concerning Iran.

The FAC's allegations that Iranian-supplied U.S. banknotes are the financial lynchpin of

Middle East terrorism (*id.* ¶¶ 52-60) are contradicted by recent allegations in a different lawsuit

by David and Sara Nachenberg, Bennett, Paula and Zev Finer and Shoshana Finer Ohana,

Howard and Mina Green, and Netanel, Martin and Pearl Herskovitz—all plaintiffs here. In

*Strauss, et al. v. Credit Lyonnais, S.A.*, No. CV-06-0702 (CPS) (E.D.N.Y.), those plaintiffs, and

others, allege that "[f]unds raised by or on behalf of HAMAS for 'charitable purposes' are used

to finance its terrorist attacks," and that "HAMAS receives a majority of its financing through

---

[9] *See* Deputy Secretary Kimmitt Remarks As Prepared For Delivery On The Challenge From
Iran And The American Response Before The Anti-Defamation League National Executive
Committee Meeting, February 8, 2008, available at www.treas.gov/press/releases/hp816.htm
(Cantor Decl. Exh. 6).

donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, operated by the Muslim Brotherhood."[10]  And in *Coulter, et al. v. Arab Bank, PLC*, No. CV-05-0365 (NG) (E.D.N.Y.), those same plaintiffs allege that "[b]oth HAMAS and PIJ raise funds to support their terrorist acts through charitable front organizations which they control."[11]  They also allege that a Jordanian bank, Arab Bank PLC, facilitates the transfer of these funds to the West Bank: "[donations in] Saudi currency, which cannot be conveniently converted into *Israeli currency (most commonly used in Palestinian controlled areas)* ... are converted into U.S. dollars through the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank."[12]  Those allegations belie the FAC's conclusory assertion that anti-Israeli terrorist activity "would have been severely crippled and limited" without U.S. banknotes from Iran.  (FAC ¶ 59.)

But even accepting the FAC's "lynchpin" assertion as true, Plaintiffs fail to offer *any* factual allegations, much less plausible allegations, establishing that the UBS ECI transactions were Iran's primary source of U.S. banknotes from 1996-2003.  As an initial matter, the United States has never prohibited *all* Iranian trade.  From 2000-2004, Iran legally sold an average of $156 million per year in goods to the United States.[13]  Moreover, non-U.S. banks are not subject to OFAC's Iran-sanctions regulations outside the United States, and Switzerland and other financial centers did not prohibit banks from doing business with Iran during the relevant

---

[10]  Third Amended Complaint ¶¶ 596-97, *Strauss, et al. v. Credit Lyonnais, S.A.*, No. CV-06-0702 (CPS) (E.D.N.Y. Jan. 28, 2008) (Cantor Decl. Exh. 7).

[11]  Complaint ¶ 550, *Coulter, et al. v. Arab Bank, PLC*, No. CV-05-0365 (NG) (E.D.N.Y. Jan. 21, 2005) (Cantor Decl. Exh. 8).

[12]  *Id.* ¶ 546.

[13]  *See* U.S. Census Bureau, Foreign Trade Division, Data Dissemination Branch, "Trade in Goods (Imports, Exports and Trade Balance) with Iran," *available at* http://www.census.gov/foreign-trade/balance/c5070.html (last visited September 4, 2008) (Cantor Decl. Exh. 9).

period.[14]  Indeed, it was not until 2006 that international banks and financial institutions—led by UBS—began voluntarily to cease doing business with the Iranian government, its officials and related entities, Iranian banks, and all other person or entities located in Iran.[15]

And industrial countries around the world have had good reason to do U.S. dollar business with Iran.  As is common knowledge, Iran has long been a leading oil exporter and is a founding OPEC member.[16]  As is also common knowledge, most of Iran's oil sales (like those of other oil exporters) were until recently paid for with U.S. dollars.[17]  From 1996-2003, Iran averaged more than $23.5 billion in annual oil exports.[18]  This enabled Iran to amass huge dollar-denominated reserves.  For example, in 2007, Iran itself estimated that even after reducing dollar-denominated reserves to just 20% of its total foreign currency reserves, it still had $10-20 billion in U.S. currency.[19]  Thus, with the assistance of non-U.S. banks free to do business with Iran, oil money provided Iran with more than ample cash to fund the "tens of millions of dollars in cash annually" that Iran is alleged to have given Hamas, Hizbollah and PIJ.  (FAC. ¶ 52.)

---

[14]  *See* May 20, 2004 Senate Hearing at 5-6, 10-11 (Cantor Decl. Exh. 3).

[15]  *See* Robin Wright, *Iran Feels Pinch As Major Banks Curtail Business*, WASH. POST., March 26, 2007, at A10, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/03/25/AR2007032501084.html (Cantor Decl. Exh. 10).

[16]  *See* OPEC FAQs, http://www.opec.org/library/FAQs/aboutOPEC/q2.htm (last visited September 4, 2008) (Cantor Decl. Exh. 11) (identifying Iran as a founding OPEC member).

[17]  *See* Carl Mortished, *Iran turns from dollar to euro in oil sales*, TIMES (London), Dec. 22, 2006, *available at* http://business.timesonline.co.uk/tol/business/economics/article 1263954.ece (Cantor Decl. Exh. 12) (noting that "Iran is selling more of its oil for payment in euros than dollars as it seeks to shift its foreign currency reserves away from the" dollar).

[18]  OPEC Annual Statistical Bulletin 2004 at 12, *available at* http://www.opec.org/library/ Annual%20Statistical%20Bulletin/asb2004.htm (relevant pages annexed as Cantor Decl. Exh. 13).

[19]  *See* Stephanie Phang and Soraya Permatasari, *Iran is Cutting Dollar Reserves, Central Bank Says*, Bloomberg, March 27, 2007, http://www.bloomberg.com/apps/ news?pid=20601083&sid=aPHQQ_BayCRg&refer=currency (Cantor Decl. Exh. 14) (quoting Iran Central Bank Governor Ebrahim Sheibany)

Moreover, Iran—like other developing countries—had numerous potential uses for cash dollars other than supporting terrorism in Israel. Iran has undertaken, for example, variety of public works projects: (i) during 1996-2002, there were multiple railway construction projects started or completed in Iran, including the Tehran subway; (ii) since 1997, Iran has been funding a project to build additional dams on the Karun River that generate hydroelectric power; and (iii) since the 1990s, Iran has spent billions of dollars developing the massive South Pars oil and natural gas field in the Persian Gulf.[20] The Karun River and South Pars projects were both built by foreign contractors, as were most, if not all, of the railway projects, and the costs of these projects were always reported in U.S. dollars.[21] As Plaintiffs tellingly acknowledge, "cash dollars are a universally accepted currency and means of payment." (*Id.* ¶ 55.)

The FAC does not allege that UBS intended the ECI banknote transactions to assist Iran's sponsorship of Hamas, Hizbollah and PIJ's terrorist attacks. To the contrary, UBS's 2004 internal investigation found that UBS's ECI employees were motivated by the belief that they were creating "operational efficiencies"—*i.e.*, saving UBS money—by not creating the duplicate structures necessary to run the ECI business separately from UBS's *other* banknote operations, which were not contractually bound by OFAC regulations.[22] As Under-Secretary Levey stated in testimony that the FAC incorporates by reference, "[b]anks don't want to jeopardize their

---

[20]  *See* http://www.msedv.at/rai/archive.html#22 (collecting articles on Iran railway construction 1996-2002) (last visited September 4, 2008) (Cantor Decl. Exh. 15); http://www.hatchenergy.com/company/expertise/PDs/p09300.pdf (last visited September 4, 2008) (discussing Karun Dam project) (Cantor Decl. Exh. 16); *See* http://www.offshore-technology.com/projects/southpars/ (discussing construction projects involving South Pars field) (last visited September 4, 2008) (Cantor Decl. Exh. 17).

[21]  *Id.*

[22]  *Offshore Banking, Corruption, and the War on Terrorism: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on International Relations*, 109th Cong. at 46, 51 (2006) (statement of Michael Herde, Managing Director, Region Americas Head of Compliance, UBS Investment Bank) (Cantor Decl. Exh. 18).

reputations, and beyond that, they really have no interest in dealing with terrorist proliferators and others of their ilk."[23]

**The FAC's Causes of Action**

The FAC contains five counts, all of which are based on the supposed connection between UBS's U.S. banknote transactions in Switzerland and the attacks that injured Plaintiffs. The First Count invokes the ATA's civil remedies provision, Section 2333(a). But the FAC does not allege that UBS itself committed an "act of international terrorism." Instead, Plaintiffs contend that by "knowingly and willfully" engaging in the U.S. banknote transactions, UBS aided and abetted Iran's acts of international terrorism—*i.e.*, sponsoring terrorism carried out by Hamas, Hizbollah and PIJ. The Second Count asserts that the banknote transactions support a federal common law claim for aiding and abetting Iran's alleged violations of customary international law. Plaintiffs contend that Iran's sponsorship of Hamas, Hizbollah and PIJ's terrorist acts—the same conduct underlying their ATA claim—constitutes "genocide, crimes against humanity and the organized and systematic use of violence and murder intended to coerce a civilian population." The Third, Fourth and Fifth Counts claim that UBS is liable under Israel's CWO for negligence, "breach of statutory duty" and aiding-and-abetting based on the banknote transactions (the "CWO Claims").

## ARGUMENT

The Supreme Court recently clarified the federal pleading standard under FED. R. CIV. P. 8. *Bell Atlantic Corp v. Twombly*, 127 S. Ct. 1955 (2007). The *Twombly* pleading standard applies regardless of the subject matter of the claims at issue. *See ATSI Commc'ns, Inc. v. Shaar*

---

[23]    *See Anti-Terrorism Financing: Progress Made and the Challenges Ahead Before the S. Finance Committee*, 110th Cong. at 5 (2008) (statement of Stuart A. Levey, Undersecretary, Office of Terrorism and Financial Intelligence, U.S. Dep't of Treasury) (LEXIS, Federal News Service File) (Cantor Decl. Exh. 19).

*Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007). Under that standard, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 127 S. Ct. at 1965 (internal citation omitted). The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Plaintiffs must plead sufficient facts to "nudge[] their claims across the line from conceivable to plausible." *Id.* at 1974. *See also In re Terrorist Attack on Sept. 11, 2001*, 2007 WL 2907278, at *3 (S.D.N.Y. Oct. 5, 2007) (dismissing ATA claim against defendant bank where plaintiff failed to allege facts sufficient to "make [her] claim plausible").

The FAC falls short of satisfying this standard. Plaintiffs' allegations rarely advance beyond "a formulaic recitation of the elements of a cause of action." *Twombly*, 127 S. Ct. at 1965. Even then, they offer nothing more than speculative conclusions, particularly as to the critical elements of causation, intent, knowledge and substantial assistance.

## I.  PLAINTIFFS LACK STANDING BECAUSE THEIR INJURIES ARE NOT "FAIRLY TRACEABLE" TO UBS'S CONDUCT

Plaintiffs do not have standing to sue UBS based on its U.S. banknote transactions with counterparties in Iran. The Constitution limits a federal court's power to resolving "cases" and "controversies." U.S. Const. Art. III, § 2; *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). The doctrine of "standing" is one of the "most important" components of the "case or controversy" requirement. *Allen v. Wright*, 468 U.S. 737, 750 (1984). Standing is a jurisdictional prerequisite; the FAC must allege facts establishing Plaintiffs' standing. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

To establish standing, Plaintiffs must allege that "(1) [they] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) *the injury is fairly traceable to the challenged action of the defendant*; and (3) it is likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000);

*Allen*, 468 U.S. at 751 ("A plaintiff must allege personal injury fairly traceable to the defendant's

allegedly unlawful conduct and likely to be redressed by the requested relief."). The "fairly

traceable" requirement tests whether "the line of causation between [defendant's allegedly]

illegal conduct and [plaintiff's] injury [is] too attenuated." *Allen*, 468 U.S. at 752. There is no

standing where it is "purely speculative" that the injury can be fairly traced to "the challenged

action of the defendant," as opposed to "the independent action of some third party not before

the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

Plaintiffs cannot establish standing here because their alleged injuries are

unconstitutionally attenuated from the UBS banknote transactions. There are an untold number

of non-parties without whose "independent action" Plaintiffs would not have been injured—

starting with the individual Hamas and Hizbollah members who allegedly planned and carried

out the attacks. *See Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001) (dismissing

for lack of standing a claim that American foreign policy resulted in terrorist attacks in Israel

because "[i]t would be difficult to imagine a clearer example of a third party's actions breaking

the causal chain. The gunshots and other violence complained of are fairly traceable to neither

Defendants' foreign policy decisions nor actions taken in accordance with those decisions."). As

discussed above (*see supra* pp. 11-14), there can be no legitimate dispute that Iran and the

terrorist groups had the means to finance and carry out the attacks without any UBS

involvement. The FAC's implausible conclusory assertions that the UBS banknote transactions

"enabled" Hamas and Hizbollah to carry out the attacks (*e.g.*, FAC ¶ 114) are insufficient.

Rather, "Plaintiffs must satisfy the burden of alleging *facts* from which it could be reasonably

inferred that absent Defendants' unlawful acts, there is a substantial probability that Plaintiffs would not have been [attacked] by a third party." *Greenberg*, 150 F. Supp. 2d at 455. Because they fail to do so, their injuries cannot be "fairly traced" to UBS's actions and, thus, they lack Article III standing.

## II.    PLAINTIFFS FAIL TO STATE AN ATA CLAIM

The FAC's First Count claims that UBS is liable under ATA Section 2333(a) for having "aided and abetted acts of international terrorism, within the meaning of 18 U.S.C. §§ 2331 and 2333, carried out by Iran." (FAC ¶ 138.) To state a Section 2333(a) aiding-and-abetting claim, Plaintiffs must allege that UBS "knew of [Iran's] illegal activities, that [it] desired to help those activities succeed, and [it] engaged in some act of helping the illegal activities." *Boim v. Quaranic Literacy Inst.*, 291 F.3d 1000, 1023 (7th Cir. 2002); *see also Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 621-22 (E.D.N.Y. 2006) (plaintiffs must allege defendant provided "substantial assistance" to terrorist group "with knowledge and with the intent to have the venture go forward and succeed"); *Stutts v. The De Dietrich Group*, 2006 WL1867060, at *6 (E.D.N.Y. June 30, 2006) (plaintiff's "failed to sufficiently allege that the Bank Defendants knew about Iraq's illegal use of chemical weapons or intended to facilitate that activity."). Because Plaintiffs have not adequately pleaded any, much less all, of the aiding-and-abetting elements, the First Count should be dismissed.

### A.    Intent

The FAC does not even suggest that UBS intended the U.S. banknote transactions to facilitate Iran's sponsorship of Hamas, Hizbollah and PIJ terrorist attacks. Plaintiffs' inability to plead facts plausibly alleging that UBS "desired to help [Iran's terrorist] activities succeed" is fatal to their aiding-and-abetting claim. *Stutts*, 2006 WL 1867060, at *6 (dismissing aiding-and-

abetting claim where plaintiffs "allege no facts to suggest that the Bank Defendants intended to further Saddam Hussein's activities.").

**B.      Knowledge**

The FAC also fails to allege plausible that UBS knowingly provided assistance for Iran's actions. As a threshold matter, the FAC improperly assumes that UBS traded U.S. banknotes directly with "Iranian Government Organs" even though the Fed's consent order refers only to "counterparties in" Iran. (FAC ¶ 82.) The only support for Plaintiffs' conclusory assertion that UBS traded with Iranian banks—rather than private businesses or individuals—are supposed "congressional sources." (*Id.* ¶ 101.) But because the FAC fails to allege facts sufficient to make it plausible that these purported sources actually exist and know the UBS counterparties' identities, the Court should not presume this allegation's truth. *See Twombly*, 127 S. Ct. at 1974 (plaintiff must allege sufficient facts to make its claim plausible, not merely conceivable). Moreover, the FAC's claim that UBS knowingly engaged in financial transactions with "Iranian Government Organs" (FAC ¶¶ 97-99) is contradicted by its own allegations that Iranian banks, including the Central Bank of Iran, employed "deceptive practices specifically designed to evade the risk-management controls put in place by responsible financial institutions." (*Id.* ¶ 103.) Absent a plausible allegation that UBS knowingly traded U.S. banknotes with the Iranian government, Plaintiffs cannot establish that UBS aided and abetted Iran's terrorist activities.

But even assuming UBS knowingly traded banknotes with "Iranian Government Organs," the FAC still fails to establish that UBS knowingly assisted Iran's ATA violation— sponsoring terrorist attacks. Indeed, the FAC does not claim that UBS knew that the U.S. banknote transactions would actually be used to fund terrorist attacks—it alleges only that UBS "foresaw the danger" that its transactions "would enable and facilitate Iran's support for and sponsorship of terrorist attacks." (FAC ¶ 134.) In other words, UBS allegedly knew that Iran

*might* use the banknotes to support terrorist attacks.  That falls short of establishing UBS's "general awareness of its role as part of an overall illegal activity." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 584 (E.D.N.Y. 2005) (describing elements of a Section 2333(a) aiding-and-abetting claim).

And this conclusory allegation is factually unsupported.  The FAC's assertion that it was "a matter of open public record" that Iran might use hard currency to fund terrorist attacks is based entirely on third-party public statements that either post-date the UBS banknote transactions or refer only to Iran's general support for terrorism.  (FAC ¶ 135.)  But knowing that Iran supports terrorism generally is not the same as knowing that Iran will provide terrorists with the U.S. banknotes. *See Stutts*, 2006 WL 1867060, at *3-4.

*Stutts* involved ATA claims by individuals exposed to toxic agents when Iraq's chemical weapons stockpile was destroyed following the 1991 Gulf War.  Among the defendants were banks that had issued letters of credit facilitating Iraq's purchase of materials allegedly needed to manufacture such weapons. *Id*. at *1.  The plaintiffs claimed that "widespread publicity" about Iraq's use of chemical weapons against its Kurdish citizens put the banks on notice that their services "were likely to be used in an unlawful and dangerous manner." *Id*. at *4.  The court rejected that assertion, holding that "general publicity [about Iraq's chemical weapons use]" does not "demonstrate that it was reasonably foreseeable" that issuing letters of credit would result in Iraq manufacturing chemical weapons. *Id*.  Thus, the Court dismissed the ATA aiding-and-abetting claim against the banks because plaintiffs "failed to sufficiently allege that the Bank Defendants knew about Iraq's illegal use of chemical weapons or intended to facilitate that activity." *Id*. at 6.  The FAC similarly fails to allege that UBS knew about Iran's use of hard currency to fund terrorist attacks or intended to facilitate that activity.

## C.    Substantial Assistance

The aiding-and-abetting claim also fails to allege adequately that UBS substantially assisted Iran's terrorist activities. The FAC makes no attempt to allege that the 1996-2003 UBS banknote transactions were a substantial factor in Iran's nearly 30-year history of continuing support for terrorism in Israel, which has allegedly included arms, training and hundreds of millions of dollars of non-cash funds. (FAC ¶¶ 50-51.) And Plaintiffs' assertion that it would have been difficult for Iran to obtain the cash allegedly provided to Hamas, Hizbollah and PIJ without the UBS banknote transactions (*id.* ¶ 61) is rank speculation. As demonstrated above, Iran indisputably had access to billions in U.S. banknotes independent of the UBS transactions: (i) Iran's oil sales generated billions of dollars in revenue every year, and (ii) there were numerous non-U.S. banks who could convert that revenue into U.S. banknotes. And the FAC does not allege that Iran actually used the U.S. banknotes from the UBS transactions to support Hamas and Hizbollah.

Nor does the FAC allege that the actual attacks that injured Plaintiffs were funded with U.S. banknotes. *See Stutts*, 2006 WL 1867060, at *6 ("[C]ourts hold that where a plaintiff fails to show a causal link between the alleged unlawful act and defendants' participation in the commission of that act, it is more difficult to demonstrate that defendants knowingly and substantially assisted in the unlawful activity."). The FAC only offers the boilerplate, conclusory allegations that "UBS' provision of cash dollars to Iran enabled [Hamas/Hizbollah] to carry out, and caused and facilitated that [attack]." (FAC ¶¶ 114, 116, 118, 120, 125-26.) And several plaintiffs have contradicted that conclusory allegation: they allege elsewhere that Hamas got most of its terrorism financing through donations to Islamic charities—not from Iran. Because it is speculative at best—and implausible—to claim that the UBS banknote transactions assisted the attacks that injured Plaintiffs, the aiding-and-abetting claim fails.

21

### III.    PLAINTIFFS' CUSTOMARY INTERNATIONAL LAW CLAIM IS PREEMPTED BY THE ATA

The FAC's Second Count simply recycles the First Count's allegations and applies a new label: aiding and abetting a violation of customary international law.  (FAC ¶¶ 143-50.)  But this federal common law claim must be dismissed because it is preempted by ATA Section 2333, the ATA's civil remedies provision.  Moreover, even if the Second Count were not preempted, the FAC's intent, knowledge and substantial assistance allegations would likewise fall short and fail to state an aiding-and-abetting claim.

### A.    ATA Section 2333 "Occupies the Field" for Tort Claims by U.S. Nationals Injured by Reason of an Act of International Terrorism

The FAC alleges that Iran's sponsorship and support of Hamas, Hizbollah and PIJ violated "peremptory norms of international customary law [*sic*]" prohibiting acts of "genocide, crimes against humanity and the organized and systematic use of violence and murder intended to intimidate or coerce a civilian population."  (FAC ¶ 145.)  UBS accepts (for purposes of this motion only) that federal common law recognizes properly pleaded causes of action for violations of the customary international law norms on which the FAC relies.  *See generally Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 274-85 (E.D.N.Y. 2007) (recognizing claims for genocide, crimes against humanity and "the organized and systematic use of violence and murder intended to intimidate or coerce a civilian population").  But the Supreme Court has "always recognized that federal common law is subject to the paramount authority of Congress [and] is resorted to [in] absence of an applicable Act of Congress."  *City of Milwaukee v. Illinois*, 451 U.S. 304, 313-14 (1984) (internal citations omitted).  Even well-established federal common law claims must yield to federal legislation because "when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears."  *Id.* at 314.  Thus, where the issue is whether federal

statutory or federal common law governs, "we start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." *Id.* at 317. "While federalism concerns create a presumption against preemption of state law, including state common law, separation of powers concerns create a presumption in favor of preemption of federal common law whenever it can be said that Congress has legislated on the subject." *In re Oswego Barge Corp.*, 664 F.2d 327, 335 (2d Cir. 1981).

Congress has indeed legislated on the subject of private tort claims by U.S. nationals injured by reason of an act of international terrorism. Section 2333(a) sets the contours of such claims. The ATA defines "international terrorism" broadly as

> activities that--
>
>> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>>
>> (B) appear to be intended--
>>
>>> (i)   to intimidate or coerce a civilian population;
>>>
>>> (ii)  to influence the policy of a government by intimidation or coercion; or
>>>
>>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>>
>> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1). And Section 2333(a)'s language and legislative history "evidence[] an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law." *Boim*, 291 F.3d at 1010. Thus, Congress "has occupied the field" of tort remedies for international terrorist acts against U.S. nationals. *See City of Milwaukee*, 451 U.S. at 317 (federal common law nuisance claim for

water pollution preempted where Congress had "occupied the field" by passing the Water Pollution Control Act Amendments of 1972).

Plaintiffs' federal common law allegations fit comfortably (albeit inadequately) within the ATA's scope. In fact, the FAC specifically describes Iran's alleged international law violations as "us[ing] and sponsor[ing] violent *acts of terrorism*." (FAC ¶¶ 143-44, 146-47.) The primary difference between the FAC's First and Second Counts is the latter's allegations of Iran's anti-Israel and anti-Jewish motives. (*Id.* ¶ 143.) But those alleged motives are consistent with ATA's "international terrorism" definition. *See* ATA Section 2331(1)(B). And Iran's motives do not change the substance of Plaintiffs' claim: the Second Count is a tort action by U.S. nationals seeking damages for injuries caused by international terrorism. Because the ATA "occupies the field" for such claims, Plaintiffs' federal common law claim is preempted.

### B.    Plaintiffs Fail to State a Claim for Aiding and Abetting an International Law Violation

Even if it were not preempted, the FAC's Second Count would still fail to state a claim. The Second Circuit has recognized a claim for aiding and abetting an international law violation. *See Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) ("in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the ATCA"), *aff'd mem. by an equally divided court sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 128 S. Ct. 2424 (2008). But the court has not ruled definitively on the claim's elements.

In *Khulumani*, Judge Katzman, joined by Judge Korman (who dissented from the result), analyzed international law sources and concluded that aiding-and-abetting liability arises "when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of the crime." 504 F.3d at 277, 333. Other courts in this circuit have employed similar tests. *See,*

*e.g., Almog*, 471 F. Supp. 2d at 292-93 (aiding-and-abetting liability under international law where defendant acted with "knowledge that its assistance would facilitate the terrorist organizations in accomplishing the underlying violations of the law of nations and that its … services substantially assisted the perpetration of those violations"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 669 (S.D.N.Y. 2006) (international law permits aiding-and-abetting liability where "defendant knew of the specific violation [and] acted with the intent to assist that violation, that is, the defendant specifically directed his acts to assist in the specific violation; … defendant's acts had a substantial effect upon the success of the criminal venture; and … defendant was aware that the acts assisted the specific violation."). The *Khulumani* majority's other member, Judge Hall, stated the test differently, however, based on RESTATEMENT (SECOND) OF TORTS § 876(b), which provides for liability where one "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *See Khulumani*, 504 F.3d at 287-89.

The FAC's aiding and abetting claim against UBS fails under either Judge Katzman's or Judge Hall's test. As demonstrated above (at pp. 18-21), the FAC does not allege facts establishing that (1) UBS engaged in the U.S. banknote transactions "with the purpose of facilitating" Iran's terrorist activities, (2) UBS knew that the U.S. banknote transactions would assist Iran's terrorist activities, and (3) the U.S. banknote transactions had a "substantial effect on," or "substantially assisted," Iran's terror-supporting activities. Accordingly, the FAC's Second Count fails to state a claim and should be dismissed.

## IV.  THE COURT HAS NO JURISDICTION OVER THE CWO CLAIMS

### A.  There Is No Diversity Jurisdiction

Once the Court dismisses the two federal claims, the only potential basis for invoking the Court's original jurisdiction would be diversity of citizenship, 28 U.S.C. § 1332. But diversity

jurisdiction does not apply here.  Because many Plaintiffs are United States citizens domiciled abroad (*see supra* p. 5), who cannot invoke this Court's diversity jurisdiction, *see Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989) ("In order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States *and* be domiciled within the State."), diversity jurisdiction is defeated as to all plaintiffs. *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 69 (2d Cir. 1990) ("three plaintiffs are United States citizens who permanently reside abroad.... [S]ince not all of the plaintiffs are entitled to sue in federal court based on the diversity statute, plaintiffs may not maintain this suit on the basis of diversity.").

**B.    The Court Should Decline To Exercise Supplemental Jurisdiction Over The CWO Claims**

Federal district courts have supplemental jurisdiction over non-federal claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a). But as the Supreme Court stated in discussing Section 1367's predecessor judicial doctrine, pendent jurisdiction, this is traditionally "a doctrine of discretion, not of plaintiff's right."  *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  Thus, a district court "may decline to exercise supplemental jurisdiction" under Section 1367(c) if it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  And the Supreme Court has declared "that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining [non-federal] claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *accord Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).

Because there is no reason to conclude that this is anything other than the "usual case," the Court should decline to exercise supplemental jurisdiction over the CWO Claims.

## V.    THE CWO CLAIMS ARE EITHER TIME-BARRED OR DEFICIENT UNDER ISRAELI LAW

Even if the Court were to exercise supplemental jurisdiction, the CWO Claims should still be dismissed because (a) all the adult plaintiffs' 1997- and 2001-attack-based claims are time-barred, and (b) the remaining claims fail to state a claim under Israeli law.

### A.    Most of the CWO Claims are Time-Barred

In determining the applicable statutes of limitations for non-federal claims, a federal court exercising supplemental jurisdiction under 28 U.S.C. § 1367 must apply the forum state's choice-of-law rules. *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989). "New York courts treat statutes of limitations as part of the forum's procedure, and therefore apply New York statutes of limitations even if the underlying claim ultimately will be governed by the substantive law of another jurisdiction." *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 431 (S.D.N.Y. 1996); *see also Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) ("federal court sitting in diversity must apply the conflict-of-laws rules of the state in which the federal court sits," including any "borrowing statute" for determining statutes of limitations). Under New York's borrowing statute, N.Y. CPLR § 202, a cause of action accruing out of state must be commenced within the limitations periods of both New York and the place where the cause of action accrued. *Id.* Plaintiffs' CWO claims are thus subject to New York's two- or three-year statutes of limitations. *See* N.Y. CPLR § 214(5) (three-year statute of limitations for personal injury claims); N.Y. ESTATE POWERS & TRUSTS LAW § 5-4.1 (two-year statute of limitations for wrongful death). Accordingly, the adult plaintiffs' 1997- and 2001-attack-based

claims are time-barred.[24]  The only potentially timely CWO Claims are the minor plaintiffs'

claims and any claims arising out of the 2006 attacks.

**B.    The CWO Claims Fail Under Israeli Law**

**1.    Negligence**

The FAC's Third Count asserts that UBS is liable for negligence because the U.S.

banknote transactions were a breach of UBS's duty of care under CWO Section 35.[25]  (FAC ¶¶

160-161.)  But as Plaintiffs acknowledge, under CWO Section 36, UBS's Section 35 duty

extends only to persons who UBS reasonably should have foreseen would be injured by UBS's

actions "in the ordinary course of events."  (*Id.* ¶158); CWO § 36.  The duty concept in Section

36 acts "as a control device in narrowing the scope of liability to limited circles of claimants,

activities and losses."[26]  The operative issue is "proximity"—*i.e.*, whether the parties "are close

to each other physically, legally, by reliance or otherwise."[27]  The FAC contains no allegations

establishing a sufficiently close relationship between UBS and Plaintiffs such that it was

reasonable for UBS to foresee that, "in the ordinary course of events," its U.S. banknote

transactions would cause physical, emotional and psychological injuries to Israeli and U.S.

residents.

Plaintiffs' negligence claim also fails because they cannot establish that UBS is "deemed

to have caused damage by [its] fault."  CWO § 64.  Section 64(2) provides that UBS "shall not

---

[24]  The statutes of limitations for the minors' claims were tolled.  *See* N.Y. CPLR § 208.

[25]  A published English translation of the CWO and other Israeli statutes is annexed as Cantor
Decl. Exh. 20.  "In determining foreign law, the court may consider any relevant material or
source, … whether or not submitted by a party or admissible under the Federal Rules of
Evidence."  FED. R. CIV. P. 44.1.

[26]  Israel Gilead, *Israel* at 51 (Kluwer Law International 2003) *reprinted in* 2 International
Encyclopaedia of Laws, Tort Law (R. Blanpain & S. Stijins eds., Kluwer Law International
2007) ("*Gilead*").  Cited portions of *Gilead* are annexed as Cantor Decl. Exh. 21.

[27]  *Id.*

be so deemed" to have caused Plaintiffs' damage if "another person's fault was the *decisive cause* of the damage." *Id.* Section 64(2) embodies the superseding cause doctrine familiar to legal systems like those of the United States and England. *See, e.g., Kush v. City of Buffalo*, 462 N.Y.S.2d 831, 835 (N.Y. 1983) ("An intervening act will be deemed a superseding cause and will serve to relieve defendant of liability when the act is of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant."). Under Israeli law, the intervening act "becomes 'decisive' when it is not reasonably foreseeable." *See Gilead* at 247. As demonstrated above (*see supra* pp. 19-20), Plaintiffs do not plausibly allege that it was reasonably foreseeable to UBS that its U.S. banknote transactions would result in Hamas and Hizbollah perpetrating the suicide bombings and rocket attacks that injured Plaintiffs. Therefore, the Third Count fails to state a claim under Israeli law.

### 2.  Breach of Statutory Duty

The FAC's Fourth Count asserts that UBS is liable for a breach of statutory duty under CWO § 63 because it allegedly violated ATA Section 2332d and the OFAC Terrorism List Governments Sanctions Regulations, 31 C.F.R. Part 596. (FAC ¶ 170.)[28] This claim fails as a matter of law because Section 63 only addresses breaches of obligations under an "enactment," which is defined by Israel's Interpretation Ordinance (New Version) to mean "every law and every regulation," with "law" and "regulation" defined as acts of "the Knesset" and "any

---

[28]  The FAC actually alleges that UBS violated "18 U.S.C. §2232(d)." But this appears to be a typo because Section 2232(d) deals with limits on criminal prosecutions, whereas Section 2332d addresses financial transactions with state sponsors of terrorism.

authority in Eretz Israel or in Israel," respectively.[29]  A violation of a U.S. statute does not give rise to Section 63 claim.

But even if U.S. law violations could support a Section 63 claim, Plaintiffs' claim would still fail because UBS did not, and could not, violate either Section 2332d or 31 C.F.R. Part 596. Both Section 2332d and 31 C.F.R. Part 596 prohibit a "United States person" from engaging in a financial transaction with the government of a country that supports international terrorism. *See* 18 U.S.C. § 2332d(a); 31 C.F.R. § 596.201.  Section 2332d(b)(2) defines "United States person" as any "(A) United States citizen or national; (B) permanent resident alien; (C) juridical person organized under the laws of the United States; or (D) any person found in the United States." The only decision interpreting Section 2332d(b)(2), *United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007), held that a foreign corporation is not a "United States person" under Section 2332d, even when it is controlled by a U.S. citizen and the alleged wrongdoing occurs in the U.S. *Id.* at 565-66.  Because UBS is a Swiss corporation (Compl. ¶ 44), it is not a "United States person" and cannot violate Section 2332d.  Moreover, Section 2332d(b)(2) is essentially identical to the OFAC regulations' "United States person" definition. *See* 31 C.F.R. § 596.313. But as discussed above, OFAC's then-Director testified in 2004 that OFAC regulations do not apply to non-U.S. entities like UBS outside the United States. (*See supra* pp. 8-9.)  Accordingly, Plaintiffs' reliance on Section 2332d and 31 C.F.R. Part 596 is misplaced and the breach of statutory duty claim should be dismissed.

### 3.    Aiding and Abetting

Plaintiffs fail to state an aiding-and-abetting claim under Israeli law.  CWO § 12 permits recovery against one who "participates, assists, advises or entices in an act or omission

---

[29]    A published English translation of the Interpretation Ordinance (New Version) and related statutes is annexed as Cantor Decl. Exh. 22.

committed or to be committed by another person . . . ." (FAC ¶ 177.) But to be liable, the defendant has to know that he is helping the eventual tortfeasor—even if he does not know that a tort will be committed. *See Gilead* at 171. The actual tortfeasors here—*i.e.*, the perpetrators of "the acts of terrorism which harmed the plaintiffs" (FAC ¶ 176)—were Hamas and Hizbollah members. But there is no plausible allegation that UBS knew that the banknote transactions would "assist" Hamas or Hizbollah attacks in any way. Therefore, Plaintiffs' aiding-and-abetting claim should be dismissed.

## CONCLUSION

The FAC remains more theory than pleading. Plaintiffs' counsel fails to connect UBS's banknote transactions with six horrific Hamas and Hizbollah terrorist attacks. Indeed, the nexus between UBS's conduct and Plaintiffs' injuries is so illusory that Plaintiffs lack Article III standing to sue UBS for those injuries. But even if Plaintiffs had standing, their claims would still fail for numerous pleading deficiencies. Plaintiffs' ATA claim does not adequately allege any, let alone all, of an aiding-and-abetting claim's intent, knowledge and substantial assistance elements. And Plaintiffs' federal common law tort claim is essentially identical to their ATA claim and, thus, fails for the additional reason that it is preempted by the ATA claim. Absent a viable federal claim, and with no basis for diversity jurisdiction, the Court should decline to exercise supplemental jurisdiction over the CWO Claims. But even if the Court were to exercise supplemental jurisdiction, it should still dismiss the CWO Claims as either time-barred or deficient under Israeli law.

UBS respectfully requests that the Court dismiss the Complaint with prejudice.

Dated: New York, New York
       September 4, 2008

O'MELVENY & MYERS LLP

By _____
        Jonathan Rosenberg
        Daniel L. Cantor

Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000
jrosenberg@omm.com
dcantor@omm.com

Attorneys for Defendant UBS AG

32