UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ROTHSTEIN, *et al.*,

                Plaintiffs,

        -against-

UBS AG,

                Defendant.

-------------------------------------------------------------------X

08 CV 4414 (JSR)

<u>Electronically filed</u>

## **PLAINITFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

### **PRELIMINARY STATEMENT**

      For decades, the Islamic Republic of Iran ("Iran") has been acting to destroy the State of Israel and expel or murder its Jewish residents. To achieve these goals, Iran has been waging a campaign of terrorism against Israel via various terrorist groups, including Hizbollah and Hamas, which are proxies of Iran. *See, e.g., Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003) ("Hizbollah is an Iranian proxy organization, controlled, funded and operated by Iran…Iran's control over Hizbollah is so far-reaching that [the federal courts have] repeatedly held Iran vicariously liable, under the doctrine of respondeat superior, for actions of Hizbollah."); *id*., at 292 (finding that between 1993 and 2003 "Iran has given Hamas massive financial support and provided professional terrorist training to hundreds of Hamas operatives."). *See also, Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003).

      Iran's involvement in terrorism has been notorious and a matter of public record for decades. Each and every year between 1996 and 2004 (the period relevant here), the annual

Patterns of Global Terrorism report issued by the State Department identified Iran as a leading sponsor of terrorism, in most years described Iran as the "premier state sponsor of terrorism" or "the most active state sponsor of terrorism," and specifically discussed Iran's provision of material support to Hizbollah and Hamas.[1]

Additionally, between 1998 and 2004, the United States federal courts issued numerous decisions finding Iran liable for terrorist attacks carried out by Iranian-sponsored terrorist groups in which United States citizens were murdered or harmed. *See, e.g., Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 23 (D.D.C. 1998); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000); *Higgins v. The Islamic Republic of Iran*, 2000 WL 33674311 (D.D.C. 2000); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128 (D.D.C. 2001); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78 (D.D.C. 2002); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260 (D.D.C. 2002); *Steen v. Islamic Republic of Iran*, 2003 WL 21672820 (D.D.C. 2003); *Dodge v. Islamic Republic of Iran*, 2004 WL 5353873 (D.D.C. 2004).

---

[1] *See:*
www.state.gov/www/global/terrorism/1996Report/overview.html;
www.state.gov/www/global/terrorism/1997Report/sponsored.html;
www.state.gov/www/global/terrorism/1998Report/sponsor.html#iran;
www.state.gov/www/global/terrorism/1999report/sponsor.html#Iran;
www.state.gov/s/ct/rls/crt/2000/2441.htm;
www.state.gov/s/ct/rls/crt/2001/html/10249.htm;
www.state.gov/s/ct/rls/crt/2002/html/19988.htm;
www.state.gov/s/ct/rls/crt/2003/31644.htm;
www.state.gov/documents/organization/45313.pdf.

Furthermore, as the result of its terrorist activities, Iran has been officially designated by the United States as a state sponsor of terrorism under the Export Administration Act continuously since 1984. The Secretary of State made this designation—which is published in the Federal Register and so also part of the public record—on the grounds that "Iran is a country which has repeatedly provided support for acts of international terrorism." 49 FR 2836-02, 1984 WL 126558 (F.R.) (January 23, 1984).

Because Iran is designated as a state-sponsor of terrorism under the Export Administration Act, all United States persons (which include "any person in the United States") are criminally prohibited from conducting financial transactions with Iran under 18 U.S.C. § 2332d.

Leaving aside the specific question (discussed below) of whether § 2332d applies to foreign corporations with United States offices (such as UBS), the provisions of § 2332d clearly placed the general public on notice that conducting financial transactions with a designated state-sponsor of terrorism such as Iran (which was so designated precisely because it "has repeatedly provided support for acts of international terrorism" 49 FR 2836-02), might enable Iran to carry out further such attacks.

Thus, as of 1996, Iran's involvement with and support for terrorism were blatant, obvious and well known to the public at large.

As alleged in plaintiffs' First Amended Complaint ("Complaint" or "Compl."), in 1996 the United States Federal Reserve entered an agreement with defendant UBS under which UBS was entrusted with this nation's currency as part of a special program known as the Extended Custodial Inventory ("ECI") program. This program was meant to protect the supply

and distribution of the United States dollar in foreign countries. Under that agreement, UBS was prohibited from providing United States banknotes to parties in Iran.

Motivated by overweening greed, between 1996 and 2004 UBS provided the Iranian government with hundreds of millions of dollars in United States banknotes in violation of the terms of its agreement with the United States and the provisions of § 2332d, and in utter disregard of the notoriously well-known fact that Iran was an active and leading practitioner and supporter of violent terrorism.

The United States banknotes provided to Iran by UBS facilitated the Iranian-sponsored terrorist attacks in which the plaintiffs were harmed, as discussed in the Complaint and below.

## ARGUMENT

UBS has moved to dismiss the Complaint under FED. R. CIV. P. 12(b)(6). For the reasons set forth below, UBS' motion should be denied.

## POINT I

## THE COMPLAINT IS NOT SUBJECT TO DISMISSAL UNDER RULE 12(B)(6)

On a motion to dismiss under FED. R. CIV. P. 12(b)(6), the Court must accept as true the allegations in the complaint and draw all reasonable inferences in favor of the plaintiffs. *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995). "Rule 8(a) requires only that the complaint give the defendants fair notice of what their claim is and the grounds upon which it rests." *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1008 (7th Cir. 2002) ("*Boim I*") (*citing Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507

U.S. 163, 168 (1993)). As described below, plaintiffs have sufficiently alleged in their Complaint that the defendant knowingly aided and abetted the torts that injured them. The Complaint therefore easily "possess enough heft," *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007), to meet the "flexible 'plausibility standard'" that the Second Circuit has held that *Twombly* requires. *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007).


## POINT II

## PLAINTIFFS HAVE ADEQUATELY PLED AIDING AND ABETTING INTERNATIONAL TERRORISM UNDER 18 U.S.C. § 2333(A)

### A.  Section 2333(a) Was Enacted to Stop the Flow of Money to Terrorists and Must Be Construed Accordingly

Plaintiffs' primary claims are premised on 18 U.S.C. § 2333(a), which provides that: "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor…."   The legislative history of § 2333(a) indicates that it was passed with the specific purpose of facilitating lawsuits by American citizens who were injured by international terrorist attacks.[2] Congress, with the support of the administration, sought to expand federal jurisdiction and to allow United States victims of terrorism to use the full reach of American tort law to pursue justice. As a State Department legal advisor explained at a 1990 Senate hearing on this issue: "this bill will provide general jurisdiction to our Federal courts and a cause of action for cases in which an American has been injured by an act of terrorism overseas. The bill is a

---

[2] Most of the legislative history for § 2333(a) is derived from the hearings on the Anti-Terrorism Act of 1990. *See Boim I*, 291 F.3d at 1009 n. 6.

welcome addition to our arsenal against terrorists."[3] In short, this statute was designed to "pave the way…for victims of terrorism to seek justice via the federal courts and the possibility of civil damages may well serve as an economic disincentive to terrorism."[4]

The Senate committee report, incorporating a summary of § 2333(a) by former Dept. of Justice attorney Joseph A. Morris, noted: "By its provisions for compensatory damages, treble damages, and *the imposition of liability at any point along the causal chain of terrorism*, it [§ 2333(a)] would interrupt, or at least imperil, the flow of money." S. Rep. No. 102-342, 102nd Cong., 2d Sess. at 22 (1992), 1992 WL 187372 (*see* Senate Hearing at 85). In *Boim* the Department of Justice again reiterated this position in an *amicus curiae* brief to affirm a decision against the financial supporters of Hamas when it noted that "the Government believes that this provision can be an effective weapon in the battle against international terrorism; it fights terrorism by discouraging those who would provide financing for this activity."[5] Thus, § 2333(a) is not merely a private tort, it was drafted and enacted with the public interest in mind to stop the flow of money to terrorists and their supporters and it must be construed to further this purpose.

---

[3] *See Antiterrorism Act of 1990*, Hearing before the Subcommittee on Courts and Administrative Practice of the Committee on the Judiciary, U.S. Senate, 101st Congress, 2d Sess., Jul. 25, 1990 (hereafter "Senate Hearing"), Statement of State Department deputy legal advisor Alan J. Kreczko, at 12.

[4] *Id.,* at 17.

[5] Brief for the United States as *Amicus Curiae* Supporting Affirmance, filed in *Boim* at 2, which is annexed as Exh. 1 to the accompanying declaration of Robert J. Tolchin ("Tolchin Decl.") The Seventh Circuit substantially adopted the government's account of the legislative history of § 2333(a) in its opinion. *Boim I*, 291 F.3d at 1010.

**B,      Plaintiffs Have Adequately Alleged They Are Victims of Acts of International Terrorism Carried Out by Iran**

Section 2333(a) provides United States nationals with a cause of action if they are injured by reason of an act of international terrorism, and § 2331(1) defines "international terrorism," in relevant part, as activities that (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States; (B) appear to be intended intimidate civilians or influence governments; and (C) occur primarily outside the territorial jurisdiction of the United States.

The Complaint alleges that Iran's actions constituted acts of international terrorism within the meaning of § 2331, and that plaintiffs were harmed by those acts. Compl. ¶¶ 129-133. UBS does not dispute that Iran's actions constitute acts of international terrorism.

Moreover, Iran has already been found liable for the bombings on August 30, 1997 and September 4, 1997 in which many of the plaintiffs were harmed. *See Stern*, 271 F. Supp. 2d 286; *Campuzano*, 281 F. Supp. 2d 258.

**C.      Plaintiffs Have Adequately Alleged UBS is Vicariously Liable for the Iranian- Sponsored Attacks in Which They Were Harmed**

Although § 2333(a) requires only that plaintiffs allege that they are victims of "international terrorism" in order to meet its jurisdictional threshold, the statute is silent about who may be sued and for this the courts must "look to tort law and the legislative history to determine who may be held liable for injuries covered by the statute." *Boim I*, 291 F.3d at 1010; *see also, Linde v. Arab Bank PLC*, 384 F. Supp. 2d 571, 583 (E.D.N.Y. 2005) (quoting *Boim I*). This was not an oversight on the part of Congress. As the Senate Report noted:

> The substance of such an action is not defined by the statute, because the fact patterns giving rise to such suits will be as varied

and numerous as those found in the law of torts. This bill opens the
courthouse door to victims of international terrorism.

S. Rep. No. 102-342, 102nd Cong., 2d Sess. at 45 (1992), 1992 WL 187372 (incorporating

testimony from Senate Hearing at 86).

The Seventh Circuit in *Boim I* specifically addressed the legislative history of

§§ 2331 and 2333 and observed it "evidences an intent by Congress to codify general common

law tort principles and extend civil liability for acts of international terrorism to the full reaches

of traditional tort law." *Boim I*, 291 F.3d at 1010. "The statute clearly is meant to reach beyond

those persons who themselves commit the violent act that directly causes the injury." *Id.,* at

1011; *see also, Linde*, 384 F. Supp. 2d at 592. In sum, the history of § 2333(a) "indicates an

intent by Congress *to allow a plaintiff to recover from anyone along the causal chain of

terrorism.*" *Boim I*, 291 F.3d at 1011. (Emphasis added).

Plaintiffs have sufficiently alleged that they are victims of "international

terrorism" and, as described below, that UBS facilitated "the causal chain of terrorism" that

resulted in their injuries. By providing Iran with substantial financial support and services when

UBS knew Iran was sponsoring international terrorism, UBS violated 18 U.S.C. § 2332d and

aided and abetted Iran's acts of international terrorism.

**D.      Section 2333(a) Incorporated General Principles of Tort Law Including Civil
Aiding & Abetting Liability**

**i.      UBS is Liable Under Aiding and Abetting Principles Reflected in
§ 876 of the Restatement (Second) of Torts**

To define the scope of liability of any defendant within the ambit of § 2333(a)

"Congress expressed an intent in the terms and history of section 2333 to import general tort law

principles, and those principles include aiding and abetting liability." *Boim I*, 291 F.3d at 1017.

*See also, id.,* at 1021 ("aiding and abetting liability is both appropriate and called for by the language, structure and legislative history of section 2333."). In particular and as noted in the government's *amicus* brief in *Boim I*, Congress intended to import "civil tort law principles as expressed in the Restatement Second of Torts, and as applied in the cases." *Id.* at 1017.

The primary case setting forth theses principles of civil aiding and abetting liability is *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which relied heavily on the *Restatement (Second) of Torts*, § 876 (1979). *See Linde*, 384 F. Supp. 2d at 583 (applying aiding and abetting principles from *Halberstam* and *Restatement* to § 2333 claims). In *Halberstam* the Court upheld a civil aiding and abetting claim for murder against a woman (Hamilton) who knowingly assisted the burglaries of her boyfriend (Welch) by providing otherwise lawful services such as banking and bookkeeping. *Halberstam*, 705 F.2d at 488. The defendant in *Halberstam* was held liable for the murder committed during a burglary by her boyfriend because even though she had no knowledge or intent to commit the murder, she knew that her activities were assisting Welch's string of burglaries and that a more serious crime could result. *Id.*

"In the almost quarter-century since *Halberstam* was decided, many state courts and Circuit Courts, including the Second Circuit, have adopted the Restatement's aiding and abetting standard." *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 288 (2nd Cir. 2007) (per curium) (concurring opinion of J. Hall). *Restatement (Second)* § 876 states in relevant part:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> * * *
>
> b)      knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to conduct himself, or

> c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Id.*

According to these principles, plaintiffs have sufficiently alleged liability under paragraphs (b) and (c) of § 876. First, with respect to paragraph (b), UBS knew that Iran was engaged in criminal conduct, yet it nevertheless continued to provide extensive financial support and services to Iran including millions of dollars in United States currency. Second, with respect to paragraph (c), UBS's own activities in transferring funds to Iran was a breach of 18 U.S.C. § 2332d for which UBS is liable. *See Linde*, 384 F. Supp. 2d at 585 (violations of 18 U.S.C. §§ 2339A, 2339B, and 2339C are sufficient to establish secondary liability under § 876(c)).

### ii.   Liability for Aiding and Abetting Iranian Sponsored Terrorism Requires Only that UBS Have Been Generally Aware of Its Role

#### 1.   Intent to Facilitate Terrorism is Not Required

UBS concedes that there is civil liability for aiding and abetting state sponsors of terrorism but asserts that the Complaint must still allege "that UBS intended the United States banknote transactions to facilitate Iran's 'acts of international terrorism.'" *See* UBS Memorandum of Law ("Def. Mem.") at 3 and at 18 (quoting *Boim I*, 291 F.3d at 1023 as requiring that defendants "desired to help those [terrorist] activities succeed"). But what UBS fails to mention is that in a later decision, the Seventh Circuit clarified that it had only imposed an intent requirement on aiding and abetting in *Boim I* because the defendants had argued that their association with Hamas and their donations to it were protected by the First Amendment. Thus, to avoid this First Amendment concern, the court applied a higher standard for aiding and

abetting derived from criminal law, which required intent. As the Seventh Circuit later noted: "We took our cue on that point from the Supreme Court's decision in [*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)], which conditions the civil liability of an organization for the violent acts of one of its members on proof that the organization had the specific intent to further the aims of the wrongdoer." *Boim v. Holy Land Foundation*, 511 F.3d 707, 728 (7th Cir. 2007) ("*Boim II*") *reh'g en banc granted*, *opinion vacated*, 2008 U.S. App. LEXIS 12925 (7th Cir. June 16, 2008).

UBS, however, has never asserted that it has a First Amendment right to conduct business with state sponsors of terrorism nor could it.

## 2.  Knowledge and General Awareness

Since the scienter requirement of § 2333(a) does not require proof of intent for civil aiding and abetting liability, plaintiffs need only satisfy the knowledge requirement for aiding and abetting in § 876 of the *Restatement (Second)*. In *Halberstam*, 705 F.2d at 477, the court reviewed § 876 and concluded:

> Aiding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must *knowingly* and substantially assist the principal violation.

*Id.* (Emphasis added).

These elements have been subsequently applied in terrorism finance cases, *see, e.g., Linde*, 384 F. Supp. 2d at 584, and as discussed in *Halberstam*, these elements do not require that a defendant know about or participate in the *specific* unlawful conduct that harms the

victim. Rather, Hamilton was civilly liable for the murder committed by her boyfriend Welch since:

> it was a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake. *It was not necessary that Hamilton knew specifically that Welch was committing burglaries.* Rather, when she assisted him, *it was enough that she knew he was involved in some type of personal property crime at night*--whether as a fence, burglar, or armed robber made no difference--*because violence and killing is a foreseeable risk in any of these enterprises.*

*Id.,* 705 F.2d at 488. (Emphasis added).

Plaintiffs' case against UBS is similar to that of *Halberstam* in that it involves a defendant that knowingly assisted a criminal engaged in unlawful activities that ultimately resulted in murder. Here, however, instead of assisting mere property crimes, UBS funneled hundreds of millions of dollars to the Iranian government, knowing that the Iranian government was directly funding numerous terrorist organizations including Hamas and Hezbollah. These allegations are more than sufficient to satisfy the knowledge requirement imposed in civil aiding and abetting cases by the court in *Halberstam* as well as by numerous other federal circuits. *See, e.g., Khulumani*, 504 F.3d at 289-90 (Hall, *J.,* concurring) (citing cases applying § 876's knowledge requirement and concluding banks could be civilly liable for supporting South Africa's apartheid regime if they provided "the principal tortfeasor with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services will be (or only could be) used in connection with that purpose."); *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 886 (3d Cir.1975) ("liability for aiding and abetting may be found on less than actual knowledge of the illegal activity.… How much or how little knowledge would seem to vary with the facts of each case."); *Camp v. Dema*,

948 F.2d 455, 459, (8th Cir. 1991) ("A party who engages in atypical business transactions…
may be found liable as an aider and abettor with a minimal showing of knowledge.")

Despite the Complaint's extensive details regarding UBS's "atypical business
transactions" with the Iranian government, UBS still argues that plaintiffs have not made a
"plausible allegation that UBS knowingly traded United States banknotes with the Iranian
government." Def. Mem. at 19. This argument ignores UBS's own concession that in 2006 it
"began voluntarily to cease doing business with the Iranian government, its officials and related
entities." Def. Mem. at 13.

Nor does UBS even begin to explain what about this allegation is implausible. On
the contrary, what is truly implausible is the assumption that UBS distributed hundreds of
millions of dollars in cash to *private* persons in Iran. UBS also appears to believe that *Twombly*
requires a plaintiff to identify in the complaint the *source* of his information. *Twombly* does
nothing of the sort.

Moreover, it is a fact of public record—one which UBS knows full well—that in
"1979, the Iranian government nationalized all Iranian banks." *Flatow v. Islamic Republic of
Iran*, 308 F.3d 1065, 1072 n. 14 (9th Cir. 2002). *See also, Reading & Bates Corp. v. U.S.*, 40
Fed.Cl. 737, 744 (Fed.Cl. 1998) ("All banks in Iran … were nationalized by the Islamic
government of Iran on June 8, 1979."). Indeed, as the Second Circuit has done, this Court can
"take judicial notice of the fact that the Iranian banks have been nationalized." *KMW Intern. v.
Chase Manhattan Bank* 606 F.2d 10, 17 (2d. Cir. 1979). Because all banks in Iran are owned by
the Iranian government, they are defined as a matter of law as agencies and instrumentalities of
Iran under the Foreign Sovereign Immunities Act ("FSIA"). *See e.g. Flatow,* 308 F.3d 1065; *Raji
v. Bank Sepah-Iran*, 139 Misc.2d 1026, 1028, 529 N.Y.S.2d 420 (Sup. Ct., N.Y. Co. 1988) (Bank

Sepah Iran is "wholly owned by the government of the Islamic Republic of Iran and thus [is] a government agency or instrumentality" within the meaning of the FSIA).

In light of the above, the allegation that UBS provided the banknotes both to Iran itself and to "agencies and instrumentalities of the government of Iran" (Compl. at ¶ 53) is not only plausible, but *extremely* plausible. It would be plainly absurd to believe that the hundreds of millions of cash dollars provided by UBS to persons in Iran were provided neither to the Iranian government itself *nor to any banks in Iran*. The *Twombly* plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" which will support the allegation. *Id.* at 1965. Since all banks in Iran are agencies and instrumentalities of Iran, there is clearly "a reasonable expectation" that discovery will reveal that UBS provided the banknotes to agencies and instrumentalities of Iran, exactly as alleged by plaintiffs.

Moreover, it is irrelevant whether UBS specifically knew that "U.S. banknote transactions would actually be used to fund terrorist attacks," Def. Mem.. at 19, as long as UBS was generally aware that Iran was unlawfully funding terrorism. As the Complaint notes at ¶ 51, it was public knowledge that Iran was funding international terrorism, and UBS is presumed to have known this information and the risks of providing funds to Iran. *See U.S. v. Bank of New England, N.A.*, 821 F.2d 844, 854-56 (1st Cir. 1987) (bank held criminally liable for the collective knowledge of its employees).

Finally, UBS argues that the publicly available information regarding the terrorism threat posed by Iran was insufficient for it to know that Iran could possibly "provide terrorists with the U.S. banknotes." Def. Mem. at 20. To support its argument UBS cites *Stutts v. De Dietrich Group*, 2006 WL 1867060 (E.D.N.Y. Jun. 30, 2006), which held that banks could

not be presumed to have known that providing letters of credit to Iraq in the 1980's would ultimately help Iraq purchase the chemical weapons components that would result in injuries to American servicemen when Iraqi chemical storage facilities were blown up in the 1990's. Def. Mem. at 20. The decision in *Stutts*, however, is distinguishable because the transactions in *Stutts* were conducted *before* Iraq was designated as a state sponsor of terrorism. *See* 55 Fed. Reg. 37793 (Sep. 13, 1990) (designating Iraq as a state sponsor of terrorism). Moreover, in *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 627 n. 15 (E.D.N.Y. 2006) the court rejected the same argument that UBS now makes and held that *Stutts* was inapplicable because banks that issue letters of credit only deal in documents and have no reason to be aware of the activities of the receipts of these letters. The court in *Weiss* therefore concluded that unlike the case in *Stutts*, a bank could reasonably foresee "that funds provided directly to known terrorist groups would be used to perpetrate terrorist attacks." *Weiss*, 453 F.Supp. 2d at 632 n. 18. So, too, when a bank provides funds directly to a known state sponsor of terrorism it can reasonably foresee the risk of terrorism this poses to the general public.

### iii.     UBS Provided Substantial Assistance to Iranian Financed Terrorism

UBS also claims in conclusory fashion that plaintiffs have failed to allege that it provided substantial assistance in support of Iranian financed terrorism. Def. Mem. at 21. This claim is baseless. The Complaint alleges that UBS provided hundreds of millions of dollars to the Iranian government which Iran, Hizbollah and Hamas need to carry out terrorism. *Id*. at ¶¶ 52-55. As noted in the Complaint (¶¶ 109-10), in the same year as Congress enacted § 2332d, it also passed the Iran and Libya Sanctions Act of 1996 ("ILSA") to prohibit even foreign companies outside the jurisdiction of the United States from providing certain forms of financial assistance to Iran. *See* Pub. L. 104-172, codified as 50 U.S.C. § 1701 note. The ILSA authorized

the President to impose sanctions on foreign corporations if their financial support to Iran was above $40 million, and the ILSA's explicit policy statement affirmed "it is the policy of the United States to deny Iran the ability to support acts of international terrorism." Similarly, a White House fact sheet released at the time of the ILSA's enactment made it clear that the purpose of this law was to deny Iran "revenues that could be used to finance international terrorism."[6] As such, the ILSA provides a solid legislative benchmark of what constitutes substantial assistance for Iranian-supported terrorism. As detailed in plaintiffs' Complaint, UBS has more than surpassed this benchmark.

**E.      Plaintiffs Have Adequately Alleged that UBS Is Part of the Causal Chain of Terrorism**

        UBS argues that plaintiffs do not have standing because they have failed to "plausibly allege that the attacks would not have occurred without the U.S. banknote transactions." Def. Mem. at 3. By arguing that its actions are not "fairly traceable" to plaintiffs' injuries, Def. Mem. at 17, UBS simply closes its eyes to the vast body case law that connects it to the casual chain of terrorism. Indeed, in *Boim I* the Seventh Circuit emphasized that because "Congress intended to import standard tort law into section 2333, causation may be demonstrated as it would be in traditional tort law." *Id.,* 291 F.3d at 1015. Subsequently, in *Boim II* the court elaborated on this law with respect to the murder of David Boim:

> A defendant's conduct need not have been the sole or predominant cause of the attack; on the contrary, consistent with the intent of Congress that liability for terrorism extend the full length of the causal chain, even conduct that indirectly facilitated Hamas's

---

[6]  http://www.usembassy-israel.org.il/publish/press/security/archive/august/ds1_8-7.htm .

-16-

> terrorist activities might render a defendant liable for the death of
> David Boim.

*Id.,* 511 F. 3d at 711.

In this regard, the court discussed the applicable principles of traditional tort law

and noted:

> but-for causation does not demand a showing that the defendant's
> conduct was the sole cause of the plaintiff's injury; the conduct
> need only be one of the causes.… Nor must the plaintiff show that
> the defendant's conduct was the predominant or primary cause of
> the injury…. A plaintiff might well be unable to show that a
> terrorist organization such as Hamas depended on a particular
> donor to support its terrorism, for example, or that one act of
> terrorism owed its existence to a specific donation. But a careful
> showing that many small donations collectively resulted in a cache
> of funds that in turn enabled a series of terrorist acts would permit
> a factfinder reasonably to infer a causal connection between the
> contribution made by a single donor and one of the terrorist acts
> made possible by that donor and others like him, even if a single
> donation would not by itself have been enough to cause that
> terrorist act.

*Id.,* at 742-43 (citations to Restatements omitted). Moreover, the court in *Boim II* summarized:

> Terrorist acts that follow within a reasonable time the donations
> and other support provided by a defendant to the perpetrators of
> those acts could be deemed to have been caused by those acts; and
> the more significant the support provided by a defendant, the more
> readily one might infer that support was a cause of later terrorist
> acts.

*Id.,* 511 F.3d at 742.

When these principles are applied to UBS's conduct it is impossible to state that

as a matter of law UBS's illicit conduct did not in some way facilitate the Iranian sponsored

terrorist attacks that harmed plaintiffs. Indeed, plaintiffs have alleged that UBS intentionally

provided hundreds of millions of dollars to Iran at the same time Iran was financially supporting the terrorist organizations that perpetrated these terrorist attacks. In fact, many of the plaintiffs in this case have already established that their injuries are directly traceable to Iranian-financed terrorist attacks that occurred after UBS began supplying Iran with millions of dollars. *See Stern*, 271 F. Supp. 2d 286; *Campuzano*, 281 F. Supp. 2d 258. In *Weiss*, 453 F. Supp. 2d at 632 the court concluded that causation was sufficiently alleged by plaintiffs when a British bank provided funds to terrorists prior to an attack because of "the fungible nature of money and the fact that it is difficult to say when the particular dollar given to a terrorist is actually used." Similar logic must surely apply when a bank willfully provides funds to a state sponsor of terror it knows is directly funding these same terrorists.

Even more important than the factual evidence that ties UBS to the casual chain of terrorism is that under traditional tort law plaintiffs are not the ones who are responsible for presenting this evidence. It is a well established principle of law that when a defendant commits a *per se* violation of a statute or regulation meant to protect a certain class of persons from harm, and a person in this class is thereafter harmed, the burden shifts to the defendant to prove that its wrongful conduct was not the cause of plaintiffs' harm. *See, e.g., Liriano v. Hobart Corp.*, 170 F.3d 264, 271 (2d Cir. 1999) ("When a defendant's negligent act is deemed wrongful precisely because it has a strong propensity to cause the type of injury that ensued, that very causal tendency is evidence enough to establish a *prima facie* case of cause-in-fact. The burden then shifts to the *defendant* to come forward with evidence that its negligence was not such a but-for cause."); *Zuchowicz v. U.S.*, 140 F.3d 381, 390-91 (2d Cir. 1998) (citing Prosser and Keeton on the Law of Torts and Cardozo's principles of causational burden shifting in cases of *per se* violations); *Elliott v. Michael James, Inc.*, 559 F.2d 759, 764 (D.C. Cir. 1977) (proximate

causation established in wrongful death case by proving violation of safety regulations designed to protect against such harm). *See also, Morant v. Long Island R.R.*, 66 F.3d 518, 522-23 (2d Cir. 1995) (federal law includes the doctrine of *per se* liability).

In this case, plaintiffs have alleged that the defendant violated 18 U.S.C. § 2332d and its implementing regulations in 31 C.F.R. Part 596, that these laws were meant to protect against the threat of Iranian financed terrorism, and that plaintiffs were injured as a result. These allegations are sufficient to shift the burden of causation to UBS. *Cf. Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 113 n. 20 (D.D.C. 2006) (rejecting Sudan's arguments that its support to terrorist organizations was *de minimis* and noting cases where "causation may be presumed (subject to rebuttal proof by the defendant) for purposes of liability where the defendant violates a law that is designed to protect others from harm and such harm occurs.")

Lastly, although UBS argues that it cannot be liable because others helped fund the Iranian sponsored terrorist organizations that harmed the plaintiffs, Def. Mem. at 11-12, this argument only undermines its attempt to dismiss the complaint for lack of causational standing. As the Second Circuit has noted, when multiple defendants are at fault, it is their responsibility to disprove their causational connection to the tort. *Zuchowicz*, 140 F.3d at 389 n. 6 (citing *Summers v. Tice*, 33 Cal. 2d 80, 199 P.2d 1, 4 (Cal. 1948) (burden of causation shifted to joint tortfeasors)). Thus, if UBS reasonably believes others may also be jointly and severally liable to plaintiffs, it should implead them as third-party defendants pursuant to Fed. R. Civ. P. 14.

Furthermore, the Second Circuit has held that "tort defendants … are responsible for the natural consequences of their actions. Thus, an actor may be held liable for those consequences attributable to *reasonably foreseeable intervening forces*, including the acts of third parties." *Kerman v. City of New York*, 374 F.3d 93 (2d. Cir. 2004) (emphasis added)

(internal quotations marks, brackets and citations omitted). It was more than reasonably foreseeable that Iran and its terrorist proxies would continue to carry out terrorist attacks and that providing Iran with hundreds of millions of dollars in cash might assist them to do so.

### POINT III

### UBS'S CONDUCT WAS A CRIMINAL VIOLATION OF UNITED STATES LAW

#### A.    The Plain Meaning of 18 U.S.C. § 2332d Prohibits UBS's Conduct

UBS argues that its conduct "did not violate any U.S. criminal law," Def. Mem. at 8, including "either Section 2332d or 31 C.F.R. Part 596." Def. Mem. at 30. UBS, however, refuses to acknowledge the plain meaning of these rules, their extensive legislative history, and simply misconstrues Congressional testimony regarding UBS's conduct while trying to present this case as one premised on merely a breach of contract claim instead of a criminal violation of United States law.

On April 24, 1996, in the same year that the ECI program involving UBS was initiated, Congress passed the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214, to implement several key United States counterterrorism strategies to stop the financing of international terrorism and to expand the scope of civil liability claims that could be brought by victims of international terrorism. In particular, to help prevent the financing of international terrorism by rogue governments, Congress enacted 18 U.S.C. § 2332d (§ 321 of the AEDPA) to prohibit United States persons, including "any person in the United States," from engaging in financial transactions with the governments of state sponsors of terrorism because as Congress found in § 324 of the AEDPA, 22 U.S.C. § 2377 note, "international terrorism is

among the most serious transnational threats faced by the United States and its allies....Congress deplores decisions to ease, evade, or end international sanctions on state sponsors of terrorism."[7]

On August 22, 1996 the United States Treasury Department's Office of Foreign Assets Control ("OFAC") issued regulations to implement 18 U.S.C. § 2332d. These regulations, now codified in 31 C.F.R. Part 596 as the "Terrorism List Government Sanctions Regulations," prohibit any "United States person" from engaging in a financial transaction with a government that has been designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979. Because the Secretary of State designated Iran as a state sponsor of terrorism in 1984 pursuant to section 6(j) after finding "Iran is a country which has repeatedly provided support for acts of international terrorism," 49 Fed. Reg. 2836-02 (Jan. 23, 1984), the regulations in 31 C.F.R. Part 596, in conjunction with 18 U.S.C. § 2332d, criminally prohibit financial transactions with Iran and other state sponsors of terrorism.

UBS asserts these prohibitions do not apply to it because as a foreign corporation incorporated in Switzerland it is not a "United States person" pursuant to 18 U.S.C. § 2332d.[8]

---

[7] When Congress passed the AEDPA in 1996 to criminally prohibit financial transactions with state sponsors of terrorism, it also passed 18 U.S.C. § 2339B and amended the FSIA to permit civil actions against state sponsors of terrorism (AEDPA § 221). This is significant because, as noted *supra*, it shows Congress' commitment to stop the flow of money along the entire causal chain of terrorism and to supplement the civil liability provisions in 18 U.S.C. § 2333.

[8] Even if 18 U.S.C. § 2332d did not directly apply to UBS, this would still not prevent this Court from using § 2332d as a legislative guideline with regard to aiding and abetting Iranian supported terrorism. *Cf. Boim I*, 291 F.3d at 1015:

> We hasten to add that, although proof of a criminal violation under
> sections 2339A or 2339B might satisfy the definition of
> international terrorism under section 2333, such proof is not
> necessary to sustain a section 2333 claim. As we discuss in the

*(continued next page)*

Def. Mem. at 30. In short, UBS believes that it can conduct extensive business in the United States, maintain numerous offices here, and enjoy the benefits and protections of United States law,[9] yet it is free to engage in business with the enemies of the United States abroad and to suffer no adverse criminal or civil liability for doing so.

This claim is baseless because both § 2332d(b)(2)(D) and 31 C.F.R. § 596.313 define a "United States person" as including "*any person in the United States*" (emphasis added). A "person" is defined in 31 C.F.R. § 596.308 to include an "entity," which is further defined to include any corporation. As such, the plain meaning of both 18 U.S.C. § 2332d and its implementing regulations in 31 C.F.R. Part 596 prohibit financial transactions with state sponsors of terrorism by any corporation that is in the United States.

UBS by virtue of its numerous locations throughout the United States is without a doubt a "person in the United States." *Cf. Hoffman-La Roche, Inc. v. Invamed, Inc.*, 183 F.R.D. 157, 159-160 (D.N.J. 1998). ("[The phrase] 'located within the United States' should be taken to mean...a citizen, or a domestic corporation or association or governmental unit; if an alien, it should at least mean an alien residing in the United States, *or if a foreign nation corporation, one with an office in the United States*.") (Emphasis added). UBS is therefore subject to the criminal

---

context of aiding and abetting, we believe Congress intended for civil liability for financing terrorism to sweep more broadly than the conduct described in sections 2339A and 2339B.

[9] In fact, according to UBS's own corporate documents it employs more American citizens than any other nationality including employees from Switzerland. *See* UBS Handbook 2006/2007 at 23 "Composition of UBS's workforce by citizenship," *available at*

http://www.ubs.com/1/ShowMedia/investors/annual_reporting2006/handbook/0007?contentId=115535&name=hb0607_e_final.pdf

prohibitions against engaging in financial transactions with state sponsors of terrorism just as any other person who is in the United States, even though UBS may have been incorporated in Switzerland. Were this not the case, corporations with offices in the United States but incorporated abroad could completely bypass United States sanctions regimes through this loophole for both state sponsors of terrorism and terrorist organizations. The legislative history of United States terrorism sanctions and § 2332d indicates that Congress would never have intended this result, and it is clear that these laws apply to the activities of United States persons no matter where their activities are conducted in the world. Indeed, in June 1997 the House Committee on the Judiciary held hearings on the threat posed by state sponsors of terrorism and the financial support they provide to terrorist organizations and reiterated that 18 U.S.C. § 2332d was passed "to prohibit all financial support of U.S. persons with these countries *regardless of where these transactions took place*."[10] (Emphasis added).

The absurdity of UBS' argument is underscored by the fact the definition of a "United States person" in § 2332d and its implementing regulations is materially identical to the definition contained in the United States Global Terrorism Sanctions regulations, *see* 31 C.F.R. § 594.315, issued by the President Sept. 11, 2001, pursuant to Exec. Or. 13224, 66 Fed. Reg. 490708 (Sept. 23, 2001). These regulations also apply to "any person in the United States" and block financial transactions with Al Qaida, Osama bin Laden and terrorist groups such as Hamas and Hezbollah. Under UBS's construction, foreign corporations would be allowed to freely

---

[10] *Prohibition on Financial Transactions with Countries Supporting Terrorism Act of 1997 Before the Subcomm. on Crime of the H. Comm. On the Judiciary*, 105th Cong., 1st Sess., at 2 (Jun. 10, 1997) (opening statement of Chairman Bill Mccollum).

operate within the United States and engage in financial transactions with Al Qaida and Osama bin Laden abroad with no criminal ramifications.[11]

## B.       The Department of Justice Has Interpreted 18 U.S.C. § 2332d to Include Foreign Corporations in the U.S.

UBS's argument that a "United States person" does not include a foreign corporation in the United States is further contradicted by the Department of Justice, which indicted Bayoil S & T, a Bahamas corporation doing business in this country, after it was discovered Bayoil S & T had violated 18 U.S.C. § 2332d and engaged in financial transactions with the Hussein regime when Iraq was still classified as a state sponsor of terrorism. Although the charges against Bayoil S &T were later dismissed in *U.S. v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007), this decision interpreting § 2332d(b)(2) is, respectfully, fundamentally flawed.

Specifically, the decision in *Chalmers* erroneously held that the Supreme Court had "interpreted 'United States persons' as excluding foreign corporations." *Chalmers*, 474 F. Supp. 2d at 565 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000)).[12] In fact, *Crosby* only held that the definition of "United States persons" in United States human rights sanction laws against Burma's government preempted a Massachusetts law that was broader in scope because the state law imposed state government sanctions not only against

---

[11] In addition, the Terrorism Sanctions Regulations that were passed pursuant to President Clinton's Exec. Or. 12947 (Jan. 23, 1995) also define a "United States person" to include "any person in the United States." 31 C.F.R. § 595.315. Thus, according to UBS, these sanctions regulations would not apply to it, even though they block the property of, among others, Al Qaida, Hamas, and Hezbollah and subject violators to the criminal penalties specified in the International Emergency Economic Powers Act (50 U.S.C.§ 1701 *et seq*.) ("IEEPA").

[12] Even though the court in *Chalmers* relied on it, neither the government's brief nor the defendant's brief in that case addressed the Supreme Court's decision in *Crosby*.

Burma's government but against foreign corporations that did business in Burma even if they were not otherwise subject to United States jurisdiction. *Crosby*, 530 U.S. at 379. The Supreme Court in *Crosby* concluded that the state law was thus more restrictive than the federal law because it "imposes restrictions on foreign companies as well as domestic, whereas the federal Act limits its reach to United States persons." *Id.* at 379. Contrary to the conclusion in *Chalmers*, the Supreme Court's language in *Crosby* never actually addressed whether a foreign corporation that was in the United States was excluded from the definition of a United States person.

### C.    The Treasury Department Never Negated the Possibility of Criminal Enforcement Actions against UBS

UBS also attempts to overcome the plain meaning of § 2332d and its implementing regulations by selectively quoting congressional testimony from former OFAC Director R. Richard Newcombe during a hearing on UBS's violations. Specifically, UBS notes his statements that "we do not have jurisdiction over UBS Zurich—there's no enforcement action that we can take against that bank … we are not involved in the ECI program. It goes to banks over which we do not have jurisdiction." Def. Mem. at 8.[13]

What UBS fails to include with its carefully crafted quotation was that Mr. Newcombe was merely referring to enforcement actions and investigations that could be taken

---

[13] Citing *Oversight of the Extended Custodial Inventory Program: Hearing on the Recent Events Involving the Union Bank of Switzerland-Zurich which Violated its ECI Agreement with the Federal Reserve Bank of New York by Engaging in U.S. Dollar Banknote Transactions with Countries Subject to Sanctions by the U.S. Department of the Treasury's Office of Foreign Assets Control, which Administers and Enforces Economic Sanctions Against Targeted Foreign Countries Before the S. Committee on Banking, Housing and Urban Affairs*, 108th Cong. at 10-11 (2004) ("May 20, 2004 Senate Hearing") (statement of R. Richard Newcombe) (attached to Def. Mem. as Cantor Decl. Exh. 3).

against the bank branch "UBS Zurich," and he was certainly not ruling out the possibility of criminal enforcement measures against its corporate parent "UBS AG." Indeed, UBS's cunning use of ellipses after Mr. Newcombe's statement that "there's no enforcement action that we can take against that bank" simply omits his next words "*we do have other matters open that I cannot comment about to determine if there is U.S. jurisdiction and if U.S. laws have been violated.*" (Emphasis added). Mr. Newcombe's statement regarding jurisdiction over "UBS Zurich" occurred shortly after Chairman Richard Shelby asked what penalties and enforcement actions had occurred against the people actually involved in the conspiracy to funnel money to Iran.[14] In this respect, Mr. Newcombe's statements are accurate because these foreign employees are not "United States persons" and are not directly subject to the extraterritorial application of United States law and jurisdiction.

It is simply misleading, however, for UBS to construe the lack of enforcement powers over employees and documents at a bank branch in Zurich Switzerland as equivalent to a lack of enforcement powers over UBS AG, which is the same corporate body that has numerous offices in the United States.[15] UBS AG is therefore indisputably a person in the United States and is subject this country's jurisdiction as a single corporate entity whether or not the United States is capable of sanctioning the employees of any particular foreign branch.

---

[14] May 20, 2004 Senate Hearing at 9.

[15] *See* UBS, *Group structure and shareholders*: "None of the Business Groups of UBS or its Corporate Center are separate legal entities. They operate out of the parent bank, UBS AG, through its branches worldwide." *available at* http://www.ubs.com/1/e/investors/annual_reporting2006/handbook/0028.html .

**POINT IV**

**UBS IS CIVILLY LIABLE FOR AIDING AND ABETTING VIOLATIONS OF INTERNATIONAL LAW**

Plaintiffs' claims against UBS are also premised on violations of international law, which prohibits providing support for crimes against humanity and genocide. Customary international law (the law among nations) is a fundamental part of federal common law. *See The Paquete Habana*, 175 U.S. 677, 700 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination."); *Filartiga v. Pena-Irala*, 630 F.2d 876, 886 (2d Cir. 1980) ("The law of nations forms an integral part of the common law, and a review of the history surrounding the adoption of the Constitution demonstrates that it became a part of the common law of the United States upon the adoption of the Constitution."); *Restatement (Third) of the Foreign Relations Law of the United States* § 111 (1987). Because the Supreme Court has ruled that jurisdiction based on 28 U.S.C. § 1331 "will support claims founded upon federal common law as well as those of a statutory origin," *Illinois v. Milwaukee*, 406 U.S. 91, 100 (1972), plaintiffs also assert international law claims. *See also Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1201 at n. 5 (9th Cir. 2007) (holding that where a tort is actionable under international law "the suit arises under federal common law, and thus federal jurisdiction may … be premised upon § 1331") (citing cases).

In *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 274-85 (E.D.N.Y. 2007) the court concluded that international law prohibits genocide, crimes against humanity, and terrorism. It also prohibits aiding and abetting these crimes. *Id.*, at 285-87. As detailed in the Complaint (¶¶ 47-50), it is has been the explicit and notorious policy of the government of Iran to eradicate the State of Israel and expel or murder its Jewish residents. To further this policy,

Iran openly provides financial support to Islamic organizations that share its goals including Hamas and Hezbollah. Despite knowing about this policy and Iran's extensive financial support for its unlawful goals, UBS willfully provided Iran with vast sums of currency that were used to facilitate Iran's criminal activities. Accordingly, UBS is liable to plaintiffs for aiding and abetting Iranian violations of international law because "acts which in themselves may be benign, if done for a benign purpose, may be actionable if done with the knowledge that they are supporting unlawful acts." *Id.* at 291 (holding that defendant Arab Bank was liable for genocide, crimes against humanity, and terrorism if it knowingly provided financial services and support to terrorist organizations).

UBS argues that plaintiffs' customary international law claims are preempted by § 2333, but it openly concedes that these claims "inadequately" fit within the scope of § 2333. Def. Mem. at 24. The defendant's admission is absolutely correct, and the definition of "international terrorism" in § 2331 does not encompass the crime of genocide, which requires "intent to destroy, in whole or in part, a national, ethnical, racial or religious group," or crimes against humanity, which require "a widespread or systematic attack directed against any civilian population." *Almog*, 471 F. Supp. 2d at 274-75 quoting the Convention on the Prevention and Punishment of the Crime of Genocide and the Rome Statute of the International Criminal Court. UBS' preemption argument should therefore be rejected, since: "In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *U.S. v. Texas*, 507 U.S. 529, 534 (1993). Section § 2333 does not speak directly, or at all, to *jus cogens* violations such as genocide and crimes against humanity.

Moreover, it would be strange to conclude that Congress intended § 2333 to preempt the international customary law prohibiting terrorist bombings and terrorist financing

that was cited in *Almog*, 471 F. Supp. 2d at 276-79, since § 2333 was enacted in 1992 whereas the international treaties that crystallized the customary international law in this sphere were only signed in 1997 and 1999, as discussed in *Almog*. Furthermore, as noted *supra*, the legislative history of § 2333 explicitly stated that "[t]his bill opens the courthouse door to victims of international terrorism." S. Rep. No. 102-342, 102nd Cong., 2d Sess. at 45 (1992). As such, UBS' preemption argument is completely at odds with the intent of Congress to *expand* federal jurisdiction in favor of American victims of terrorism. Lastly, for the reasons stated above in respect to aiding and abetting violations of § 2333, plaintiffs have adequately alleged a claim for aiding and abetting violations of international law.

### POINT V

### PLAINTIFFS' ISRAELI LAW CLAIMS ARE ADEQUATELY PLED

In addition to their claims under 18 U.S.C. § 2333(a) and customary international law, the Complaint also asserts causes of action for negligence, breach of statutory duty and aiding and abetting under Israeli law, pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

UBS asserts that plaintiffs have failed to state a claim under Israeli law. However, as shown in the attached Declaration of Israeli tort law expert Dr. Boaz Shnoor, UBS' arguments (which rely on an outdated monograph and UBS' American counsel's own personal exegesis of Israeli law) are baseless, and the Israeli law causes of action are indeed all adequately pled.

### CONCLUSION

For the reasons set forth above, the defendant's motion should be denied in its entirety.

Dated:    New York, New York
          October 2, 2008

                          Respectfully submitted,

                          JAROSLAWICZ & JAROS, LLC
                          *Attorneys for the plaintiffs*

                          By: _____
                              Robert J. Tolchin

                          225 Broadway, 24th floor
                          New York, New York 10007
                          (212) 227-2780

                          TARNOR, PLLC
                          Nathaniel A. Tarnor
                          1200 G Street, NW, Suite 800
                          Washington, D.C. 20005
                          (202) 684-8172

                          NITSANA DARSHAN-LEITNER & CO.
                          *Israeli counsel for the plaintiffs*
                          10 Hata'as Street
                          Ramat Gan, 52512
                          Israel