UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RACHEL ROTHSTEIN, *et al.*,

                Plaintiffs,

       -against-

UBS AG,

             Defendant.

No. 08-cv-4414 (JSR)

Electronically Filed

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile: (212) 326-2061

Attorneys for Defendant UBS AG

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 1

I.      PLAINTIFFS HAVE FAILED TO ESTABLISH ARTICLE III
STANDING ........................................................................................................... 1

II.     PLAINTIFFS CANNOT STATE A SECTION 2333(a) AIDING-AND-
ABETING CLAIM ................................................................................................ 2

        A.     The FAC Does Not Contain Plausible Intent Allegations ......................... 3

        B.     The FAC Does Not Contain Plausible Knowledge Allegations ................ 4

        C.     The FAC Does Not Contain Plausible Substantial Assistance
Allegations ................................................................................................ 8

        D.     UBS Has Not Violated Section 2332d ...................................................... 9

III.    PLAINTIFFS' CUSTOMARY INTERNATIONAL LAW CLAIM
SHOULD BE DISMISSED .................................................................................. 11

        A.     The ATA Preempts Plaintiffs' Customary International Law Claim ...... 11

        B.     The FAC Fails to Plead an Aiding-and-Abetting Claim Under
Customary International Law ................................................................... 12

IV.    THE CWO CLAIMS SHOULD BE DISMISSED ON JURISDICTIONAL
AND SUBSTANTIVE GROUNDS .................................................................... 13

CONCLUSION .................................................................................................................... 15

## TABLE OF AUTHORITIES

**PAGE**

## CASES

*Allen v. Wright*, 468 U.S. 737, 752 (1984) ............................................................................ 1

*Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1964, 1974 (2007) ................................. 5, 14

*Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1010, 1015, 1023, 1024, 1025 (7th
    Cir. 2002) ..................................................................................................................... 3-4, 11

*Camp v. Dema*, 948 F.2d 455, 461-63 (8th Cir. 1991) .................................................... 7

*City of Milwaukee v. Illinois*, 451 U.S. 304, 314, 315, 317, 324 (1984) ................................. 11, 12

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000) ............................................. 10

*Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003)................................................................. 10

*Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001) ........................................ 2

*Halberstam v. Welch*, 705 F.2d 472, 477, 486, 488 (D.C. Cir. 1983) ........................................ 6, 7

*Hoffman-La Roche, Inc. v. Invamed*, 183 F.R.D. 157, 159-60 (D.N.J. 1998) .............................. 10

*In re Oswego Barge Corp.*, 664 F.2d 327, 335 (2d Cir. 1981).................................................... 11

*Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 277, 289 (2d Cir. 2007)...................... 7, 12

*Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)...................................................... 12

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 669
    (S.D.N.Y. 2006)................................................................................................................ 12-13

*Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 887-88 (3d Cir. 1975) ........................................... 7

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) ................................................. 1

*Stutts v. The De Dietrich Group,* 2006 WL 1867060, at *4, *6 (E.D.N.Y. June 30,
    2006) ................................................................................................................................ 4, 8

*United States v. Chalmers*, 474 F. Supp. 2d 555, 565-66 (S.D.N.Y. 2007) ............................ 9, 10

*United States v. Texas*, 507 U.S. 529, 534-35 (1993)................................................................ 11, 12

*Weiss v. National Westminster Bank PLC,* 453 F. Supp. 2d 609, 621-22 (E.D.N.Y.
    2006)................................................................................................................................ 4, 7

## OTHER AUTHORITIES

Exec. Order No. 13,047, 31 C.F.R. § 537.314 (1997) .................................................................. 10

PRELIMINARY STATEMENT[1]

Plaintiffs' opposition brief ignores numerous facts and legal arguments for which they have no answer. And the arguments they offer repeatedly misstate the FAC's allegations, misquote UBS's opening brief, and mischaracterize the case law. The reason for this is plain: Plaintiffs cannot rebut UBS's showing that Plaintiffs lack standing to sue UBS based on the U.S. banknote transactions, and that the FAC does not adequately plead a claim under the ATA, customary international law or Israeli civil law. Accordingly, the FAC should be dismissed.

ARGUMENT

## I.   PLAINTIFFS HAVE FAILED TO ESTABLISH ARTICLE III STANDING

UBS's opening brief demonstrated that Plaintiffs lack Article III standing to sue UBS because their injuries are not "fairly traceable" to the U.S. banknote transactions. (UBS Br. at 16-18.) Although Plaintiffs never mention Article III in their brief, they claim to have standing because UBS's actions were part of the "causal chain of terrorism" that resulted in their injuries. (Opp. at 16-20.) This argument fundamentally misapprehends the standing doctrine.

As UBS has shown, there is no standing where it is "purely speculative" that the injury can be fairly traced to "the challenged action of the defendant," as opposed to "the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *see also Allen v. Wright*, 468 U.S. 737, 752 (1984) (standing doctrine asks whether "the line of causation between [defendant's allegedly] illegal conduct and [plaintiff's] injury is too speculative"). But all Plaintiffs have is speculation. They expose this weakness in

---

[1]   This memorandum uses the terms defined in UBS's Memorandum of Law in Support of Defendant's Motion to Dismiss the First Amended Complaint, dated September 4, 2008, cited herein as "UBS Br." Plaintiffs' opposition brief is cited as "Opp." Unless otherwise noted, this memorandum omits internal quotation marks in citations and adds any emphasis reflected in quoted passages.

making the following argument: "it is impossible to state that as a matter of law UBS's illicit conduct did not *in some way* facilitate the Iranian sponsored attacks that harmed plaintiffs." (Opp. at 17.) That statement cries out for speculation. It is simply another way of saying that the UBS banknote transactions *might conceivably* have resulted in cash dollars going from Iran to terrorists who committed the attacks. The same can be said of *any* cash dollar transaction with Iranian counterparties at any point from 1996 to 2003.

In place of such speculation, Plaintiffs must "satisfy the burden of alleging facts from which it could be reasonably inferred that absent Defendants' unlawful acts, there is a substantial probability that Plaintiffs would not have been [attacked] by a third party." *Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001) (dismissing claims for lack of standing). Plaintiffs make no effort to distinguish *Greenberg*, and the FAC's allegations do not even approach the *Greenberg* standard. Indeed, Plaintiffs do not dispute that Iran and the terrorist groups Hamas and Hizbollah had the means to finance and carry out the attacks at issue without UBS's involvement. (*See* UBS Br. 11-14, 17.) The result is that the only "causal chain" Plaintiffs can allege is premised on speculation. Plaintiffs' arguments about the pleading standard for causation allegations, burden shifting for *per se* torts, and joint and several liability (Opp. at 17-20) are entirely inapposite to the standing issue. They have not made sufficient allegations to establish Article III standing

## II.     PLAINTIFFS CANNOT STATE A SECTION 2333(a) AIDING-AND-ABETTING CLAIM

Plaintiffs cannot state an ATA Section 2333(a) aiding-and-abetting claim because the FAC does not plausibly allege any of the claim's three elements—intent, knowledge and substantial assistance. (UBS Br. 18-21.) Plaintiffs' opposition brief concedes that the FAC does not plead intent at all. As to knowledge, the FAC fails to plead adequately that the UBS

2

banknote transactions were with "Iranian Government Organs," let alone that UBS knew the counterparties' identities or the plans Plaintiffs speculate those counterparties had to use the banknotes to fund terrorism. And the FAC's conclusory "substantial assistance" allegations do not rise above the speculative level because the record on this motion overwhelmingly demonstrates Iran's enormous cash resources, its use of banknotes for purposes other than terrorism, and the ample access that certain plaintiffs allege Hamas and Hizbollah have to terrorism funding from Islamic charities.

### A.     The FAC Does Not Contain Plausible Intent Allegations

Recognizing their inability to plead that UBS intended the U.S. banknote transactions to facilitate Iran's sponsorship of Hamas, Hizbollah and PIJ terrorist attacks, Plaintiffs argue that intent to facilitate terrorism is not an element of an ATA aiding-and-abetting claim unless there is a "First Amendment concern." (Opp. at 10-11, *citing Boim v. Holy Land Foundation for Relief and Development*, 511 F.3d 707, 728 (7th Cir. 2007) (*"Boim II"*).) Plaintiffs' novel argument misconstrues *Boim II* and the Seventh Circuit's earlier decision in *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000 (7th Cir. 2002) (*"Boim I"*).

In *Boim I*, the Seventh Circuit held that the Boims' aiding-and-abetting claims "[did] not offend the First Amendment because they seek to hold QLI and HLF liable not for their associations or speech but for their knowing and intentional financial support of illegal activities." *Boim I*, 291 F.3d at 1025. But nothing in that opinion or *Boim II* suggests that intent *only* becomes an element of an ATA aiding-and-abetting claim *if* First Amendment activity is involved. To the contrary, *Boim I* repeatedly reaffirms the intent requirement without referencing the First Amendment. *See id.* at 1015 ("Such acts would give rise to civil liability under section 2333 so long as knowledge and intent are also shown, as we shall discuss shortly in the context of aiding and abetting"), 1023 (the Boims' aiding-and-abetting claim "requires them

to prove that the defendants knew of Hamas' illegal activities, that they desired to help those activities succeed, and they engaged in some act of helping the illegal activities"), 1024 ("An aiding and abetting claim will require the Boims to prove that QLI and HLF knew about Hamas' illegal operations and provided aid to Hamas with the intent to facilitate those illegal activities.").

Moreover, Plaintiffs' argument ignores the ATA cases from this circuit that dismissed aiding-and-abetting claims against financial institutions for failure to allege, among other things, that the defendant intended to facilitate terrorism. *See Weiss v. National Westminster Bank PLC,* 453 F. Supp. 2d 609, 621-22 (E.D.N.Y. 2006) (plaintiffs must allege defendant provided "substantial assistance" to terrorist group "with knowledge and *with the intent* to have the venture go forward and succeed"); *Stutts v. The De Dietrich Group,* 2006 WL 1867060, at *6 (E.D.N.Y. June 30, 2006) (plaintiffs "allege no facts to suggest that the Bank Defendants intended to further Saddam Hussein's [chemical weapons] activities."). Neither of those cases involved any purported First Amendment activity, yet both courts required plausible intent allegations. Plaintiffs' admitted failure to plead intent requires dismissal of their Section 2333(a) aiding-and-abetting claim.

### B.     The FAC Does Not Contain Plausible Knowledge Allegations

UBS's opening brief demonstrated that the FAC failed to establish that UBS knowingly assisted Iran's terrorist activity. In fact, Plaintiffs fail to allege plausibly any of the three steps necessary to establish the knowledge element: (i) that UBS actually traded U.S. banknotes directly with the Iranian government; (ii) that even if the counterparties with which UBS traded were "Iranian Government Organs," UBS knew this at the time of the banknote transactions; and (iii) that even if UBS contemporaneously knew that it was transacting with "Iranian Government Organs," UBS also knew that the banknote transactions were assisting Iran in sponsoring terrorist attacks. (UBS Br. at 9-11, 19-20.)

4

The FAC's conclusory allegation that UBS actually traded U.S. banknotes directly with so-called "Iranian Government Organs" is based solely on supposed statements by unidentified non-descript confidential sources. Although Plaintiffs are correct that *Twombly* does not literally "require[] a plaintiff to identify in the complaint the *source* of his information" (Opp. at 13 (emphasis in original)), the complaint must allege actual facts sufficient to establish the allegation's plausibility. *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1974 (2007). An allegation based solely on undated, non-public statements by individuals identified only as "congressional sources," however, lacks sufficient factual support to be plausible. Plaintiffs argue that it is implausible "that UBS distributed hundreds of millions of dollars in cash to *private* persons in Iran." (Opp. at 13 (emphasis in original)) But this is a red herring because UBS did not "distribute" cash to anyone—it converted existing assets into U.S. banknotes. It is hardly implausible that over eight years, multiple companies and individuals in oil-rich Iran could have engaged in such transactions.

Plaintiffs grope for plausibility by citing "UBS's own concession" that in 2006 it stopped "doing business with the Iranian government, its officials and related entities." (Opp. at 13.) But this argument misleadingly relies on an out-of-context quote from UBS's opening brief. Plaintiffs improperly truncate the quote, deleting the reference to "Iranian banks, and all other persons or entities located in Iran," and they ignore the sentence's reference to "international banks and financial institutions—led by UBS." (UBS Br. at 13) This single sentence in a brief—intended to show that Iran had numerous potential sources for U.S. banknotes—is by no means a "concession" that UBS (as opposed to another "international bank") was doing business with the Iranian government.

But even if the FAC had plausibly alleged that the Iranian government or its banks were UBS's counterparties, it would still fail to plead the second step in the knowledge inquiry—that UBS knew the counterparties' identities. Plaintiffs do not dispute that the FAC establishes that Iranian banks, including the Central Bank of Iran, employed "deceptive practices specifically designed to evade the risk-management controls put in place by responsible financial institutions." (FAC ¶ 103; UBS Br. at 10-11, 19.) Plaintiffs make no attempt to reconcile the FAC's conclusory knowledge allegations with its description of Iran's deceptive practices.

Plaintiffs also fail to complete the final step in pleading knowledge—even if the FAC had plausibly alleged that UBS knew its counterparties were part of the Iranian government, it still would fail to allege plausibly that UBS knew Iran would use the U.S. banknotes to support terrorism. Plaintiffs argue that the FAC need only allege that UBS "was generally aware that Iran was unlawfully funding terrorism." (Opp. at 14.) This argument is based on a misreading of the very authority Plaintiffs cite and a misstatement of the facts in this case. Relying on *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), Plaintiffs lift the words "generally aware" from that opinion without considering the entire sentence in which they appear. *Halberstam* actually held that "the defendant must be generally aware of *his role as part of an overall illegal or tortious activity* at the time he provides the assistance." *Id.*, 705 F.2d at 477 (emphasis added). Thus, it is not enough, as Plaintiffs suggest, to allege that UBS was generally aware that Iran supported terrorism; Plaintiffs must plausibly allege that UBS knew that the banknote transactions were assisting Iran's illegal activities (*i.e.*, Iran's terror-financing activities).

The facts in *Halberstam* bear this out: Defendant Hamilton was held civilly liable for aiding and abetting a murder that her live-in boyfriend, Welch, committed during a burglary. The court held that even though Hamilton did not specifically know that Welch was committing

6

burglaries, she knew from his "evening forays," precious metal smelting and unexplained wealth accumulation that he was involved in some sort of property crime, and she was aware that her secretarial and recordkeeping activities (which included using her own name for all financial transactions) were assisting Welch's criminal activity. *Id.*, 705 F.2d at 486, 488.  Similarly, in *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 289 (2d Cir. 2007) (Hall, J. concurring), *aff'd mem. by an equally divided court sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 128 S. Ct. 2424 (2008), Judge Hall concluded that aiding-and-abetting liability required proof that the defendant knew that the "tools, instrumentalities, or services" it provided would be used to commit an unlawful act.  (Opp. at 12.)  And in the other two cases from which Plaintiffs lift quotes out of context (*id.* at 12-13), the courts dismissed aiding-and-abetting claims because plaintiffs had failed to plead knowledge of the wrongful act.  *Camp v. Dema*, 948 F.2d 455, 461-63 (8th Cir. 1991) (dismissing claims for aiding and abetting securities law violations); *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 887-88 (3d Cir. 1975) (same).

Plaintiffs alternatively argue that they have satisfied the knowledge element by pleading that UBS "transferr[ed] funds" or "provid[ed] funds" to a "known state sponsor of terrorism." (Opp. at 10, 15.)  But this argument mischaracterizes the FAC's allegations and the very nature of the banknote transactions.  UBS did not provide or transfer new funds to its counterparties; it simply converted funds the counterparties already possessed into U.S. banknotes.  That distinguishes this case from *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006), where the defendant bank was alleged to have transferred newly-donated funds to Hamas front organizations.

And that fact puts this case on all fours with *Stutts v. The De Dietrich Group*, 2006 WL 1867060 (E.D.N.Y. June 30, 2006), where the court dismissed aiding-and-abetting claims

7

because plaintiffs failed to allege that the defendant banks knew that the letters of credit they issued would facilitate Iraq's manufacture and use of chemical weapons. (UBS Br. at 20.) Plaintiffs attempt to distinguish *Stutts* because the transactions there predated Iraq's state sponsor of terrorism designation. (Opp. at 15.) This is a distinction without a difference. Given that, as alleged in *Stutts*, it was well known that Iraq had used chemical weapons against its Kurdish citizens (2006 WL 1867060, at *4), the state sponsor of terrorism designation would not have added anything meaningful to the banks' knowledge. Likewise, knowing that Iran sponsors terrorism is not the same as knowing that Iran will provide terrorists with U.S. banknotes. This is especially so given the FAC's failure to allege plausibly that UBS knew that Hamas, Hizbollah and PIJ needed U.S. banknotes to carry out terrorist attacks. (UBS Br. at 9.)

### C.    The FAC Does Not Contain Plausible Substantial Assistance Allegations

Plaintiffs offer only two cursory arguments in defending the FAC's inadequate substantial assistance allegations. Plaintiffs first simply cite, without discussion, the FAC's conclusory allegations that Hamas, Hizbollah and PIJ needed U.S. banknotes from Iran to carry out terrorist acts. (Opp. at 15.) But as UBS's opening brief methodically demonstrated, Plaintiffs do not plausibly allege

- o   that UBS was Iran's main source for U.S. banknotes given Iran's $156 million in average annual sales of goods to the United States, the numerous non-U.S. banks that did business with Iran prior to 2006, and Iran's multi-billion dollar annual oil exports (UBS Br. at 12-13, 21);

- o   that Iran actually used banknotes from the UBS transactions to support Hamas, Hizbollah and PIJ, rather than on, for example, its numerous infrastructure projects (UBS Br. at 14); and

- o   that Iran was Hamas's and Hizbollah's primary source for terrorism financing, especially in light of certain plaintiffs' allegations in other cases that Islamic charities fund most of those groups. (UBS Br. at 11-14, 21.)

Plaintiffs do not even address, much less refute, these arguments, which establish that the FAC's boilerplate substantial assistance allegations are speculative and implausible.

Plaintiffs also argue that the UBS banknote transactions constituted substantial assistance because the total value of those transactions from 1996-2003 was more than $40 million—a figure taken from the Iran and Libya Sanctions Act of 1996 ("ILSA"), Pub. L. 104-172. (Opp. at 15-16.) But the ILSA transactions cap does not establish any link between the banknote transactions (whatever their value) and Iran's support for terrorism generally, let alone the attacks that injured Plaintiffs. Moreover, there is a qualitative difference between the banknote transactions and the transactions subject to ILSA's $40 million cap. ILSA only sanctions transactions in excess of $40 million made with "actual knowledge" that the transaction "directly and significantly contributed to the enhancement of Iran's ability to develop petroleum resources of Iran." In other words, ILSA prohibits new investment aimed at growing Iran's primary revenue-generating industry. The banknote transactions, in contrast, involved no new UBS investment in Iran—they simply converted existing assets into U.S. banknotes. And the ILSA cap is an annual figure; a company could have invested $39 million annually from 1996-2003 ($312 million total) without incurring ILSA sanctions.

### D. UBS Has Not Violated Section 2332d

Plaintiffs expend considerable effort arguing that UBS violated ATA Section 2332d (Opp. at 20-26), even though such a violation would not establish any element of their aiding-and-abetting claim. This effort is unavailing because UBS is not a "United States person" under Section 2332d(b)(2). (UBS Br. at 8-9, 30.) Plaintiffs' arguments to the contrary defy law and logic. The only decision interpreting Section 2332d(b)(2), *United States v. Chalmers*, 474 F. Supp. 2d 555, 565-66 (S.D.N.Y. 2007), held that a foreign corporation (like UBS) does not fit the definition of a "United States person." Plaintiffs argue that *Chalmers* is "fundamentally

flawed" because it misreads *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). (Opp. at 24-25.) But *Chalmers'* reading of *Crosby* was sound—the Supreme Court concluded that a "United States person" definition essentially identical to Section 2332d(b)(2) (*see* Exec. Order No. 13,047, 31 C.F.R. § 537.314 (1997)) does not reach foreign companies. *Crosby*, 530 U.S. at 379. Nor was that the sole basis for the decision in *Chalmers*. The court also considered the statutory framework: "while other federal regulations and statutes prohibiting transactions with hostile countries have been crafted so as to make clear that they reach foreign entities, such is not the case [with Section 2332d]." *Chalmers*, 474 F. Supp. 2d at 565.[2] Plaintiffs' reliance on *Hoffman-La Roche, Inc. v. Invamed*, 183 F.R.D. 157 (D.N.J. 1998), is also misplaced because (i) that decision deals with non-identical language under Fed. R. Civ. P. 4(d)(2); and (ii) the cited portion is not the court's holding, but only a description of a litigant's argument (which the court found inapposite). *Id.*, 183 F.R.D. at 159-60.

Plaintiffs' argument is also poor statutory construction. Section 2332d(b)(2)'s "United States person" definition includes any "juridical person organized under the laws of the United States." This definition would be surplusage if, as Plaintiffs contend, any corporation "found in the United States" were a "United States person." And Plaintiffs' position makes no sense. If Section 2332d applied to UBS, why did the ECI Agreement require UBS to comply with all OFAC regulations? (FAC ¶ 64.) As OFAC's Richard Newcombe and the Fed's Thomas Baxter told Congress, it was because the OFAC regulations did not apply to UBS operations outside the United States. (UBS Br. at 8-9.) Consequently, UBS did not violate Section 2332d.

---

[2]   *Cf. Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003) (Foreign Sovereign Immunities Act only applies to entities directly owned by a foreign state, not indirect subsidiaries, because as various other statutes demonstrate, "[w]here Congress intends to refer to ownership in other than the formal sense, it knows how to do so.").

### III.    PLAINTIFFS' CUSTOMARY INTERNATIONAL LAW CLAIM SHOULD BE DISMISSED

#### A.    The ATA Preempts Plaintiffs' Customary International Law Claim

There is a longstanding "presumption in favor of preemption of federal common law whenever it can be said that Congress has legislated on the subject." *In re Oswego Barge Corp.*, 664 F.2d 327, 335 (2d Cir. 1981). In enacting Section 2333(a), Congress has legislated pervasively on the subject of U.S. nationals' tort claims for international terrorist acts. *See Boim I*, 291 F.3d at 1010 (Congress intended Section 2333(a) "to extend liability for acts of international terrorism to the full reaches of traditional tort law."). Because Congress has "occupied the field" for these types of claims, federal common law tort claims for injuries caused by international terrorism—such as claims for violations of customary international law—are preempted. *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1984). (UBS Br. at 22-24.)

Plaintiffs argue that preemption does not apply because the ATA does not "speak directly" to genocide or crimes against humanity, citing *United States v. Texas*, 507 U.S. 529 (1993). (Opp. at 28.) This argument is both factually and legally incorrect. Plaintiffs do not dispute that the FAC's First and Second Counts are substantively identical: both seek damages for injuries to U.S. nationals allegedly caused by international terrorism. (UBS Br. at 24.) Thus, the ATA clearly "speaks directly" to the Second Count's claims. It is not relevant for preemption purposes that Plaintiffs cannot state an ATA claim against UBS, or that the ATA does not cover every conceivable genocide claim—it is sufficient that the type of claims Plaintiffs assert are within the ATA's ambit. *See City of Milwaukee*, 451 U.S. at 314, 324 (rejecting respondent's claim that the regulatory regime's purported inadequacies permit it to rely on federal common law).

*United States v. Texas* is not to the contrary. Indeed, it relies on the same precedent UBS cites. At issue in that case was 31 U.S.C. § 3717(a)(1), which requires the federal government to collect prejudgment interest on debts owed by private persons. The question was whether that section's silence on debts owed by the States is an abrogation of the federal government's common law right to prejudgment interest on State debts. The Supreme Court, citing *City of Milwaukee*, held that because the statute did not specifically address the issue of State debts, the federal common law right concerning State debts was not abrogated. *Texas*, 507 U.S. at 534-35. Here, in contrast, no rights are being abrogated; the ATA does not abolish tort claims for genocide or other violations of customary international law. But where such claims are based on acts of international terrorism against U.S. nationals—an issue to which Congress in the ATA "speaks directly"—the separation of powers doctrine requires that those claims be brought under the ATA. *City of Milwaukee*, 451 U.S. at 315; *see also Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) (Death on the High Seas Act preempts some, but not all, aspects of federal maritime wrongful death law).

## B. The FAC Fails to Plead an Aiding-and-Abetting Claim Under Customary International Law

Plaintiffs devote only a single sentence in their brief to the substance of their customary international law claim, arguing that their pleading is adequate "for the reasons stated above in respect to aiding and abetting violations of § 2333." (Opp. at 29.) Accordingly, this claim fails for the same reasons as the ATA claim. But Plaintiffs also ignore that two of the three *Khulumani* panel members adopted Judge Katzman's (not Judge Hall's) aiding-and-abetting standard for customary international law claims; this standard requires proof that the defendant acted "with the purpose of facilitating the commission of the crime." *Khulumani*, 504 F.3d at 277 (Katzman, J., concurring); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*,

12

453 F. Supp. 2d 633, 669 (S.D.N.Y. 2006) (aiding and abetting a violation of international law requires proof that "defendant acted with the intent to assist that violation"). (UBS Br. at 24-25.) Because Plaintiffs have not even attempted to allege that UBS intended to support terrorism, Plaintiffs' customary international law claim fails for this independent reason.

## IV.   THE CWO CLAIMS SHOULD BE DISMISSED ON JURISDICTIONAL AND SUBSTANTIVE GROUNDS

UBS's opening brief demonstrated that the CWO claims should be dismissed because (a) there is no diversity jurisdiction over those claims; (b) in the "usual case," like this one, federal courts decline to exercise supplemental jurisdiction once the claims over which they have original jurisdiction are dismissed; (c) all the adult plaintiffs' 1997- and 2001-attack-based claims are time-barred; and (d) the CWO claims fail to state a claim under Israeli law. (UBS Br. at 25-31.) Plaintiffs concede that the Court has only supplemental jurisdiction over the CWO claims, but they do not even attempt to explain why the Court should exercise such discretionary jurisdiction once the ATA and customary international law claims are dismissed. (Opp. at 29.) For this reason alone, the CWO claims should be dismissed.

Plaintiffs likewise do not challenge UBS's statute of limitations argument. (*Id.*) Therefore, even if the Court were to exercise supplemental jurisdiction over the CWO claims, the adult plaintiffs' 1997- and 2001-attack-based claims should be dismissed.

As for the remaining CWO claims, Plaintiffs' brief incorporates by reference the arguments in an Israeli lawyer's declaration. (*Id.*) But Boaz Shnoor's declaration ("Shnoor Decl.") cannot save any of Plaintiffs' three Israeli causes of action.

Plaintiffs fail to state a claim for negligence under Israeli law (Third Count) because the FAC does not adequately allege that the attacks that injured them were a reasonably foreseeable consequence of the UBS banknote transactions. (UBS Br. at 28-29.) Although Dr. Shnoor's

13

declaration takes issue with the Israeli law treatise on which UBS relies, he ultimately recognizes the same standard: Plaintiffs' negligence claim depends on whether "a reasonable person could have foreseen that the harm suffered by the plaintiffs might result from UBS' conduct." (Shnoor Decl. ¶¶ 16, 23, 25, 36, 38.) But like Plaintiffs' counsel, Dr. Shnoor mischaracterizes the transactions at issue here as "the provision of cash dollars to Iran" (*e.g., id.* ¶¶ 25, 38)— suggesting that UBS transferred new funds to Iran, which they did not. UBS simply converted existing funds into U.S. banknotes. As demonstrated above (at pp. 4-8) and in UBS's opening brief (at 9-14, 20), the FAC pleads no facts establishing that a reasonable person in UBS's position could have foreseen that the U.S. banknote transactions would result in terrorist attacks in Israel. Accordingly, Plaintiffs fail to state an Israeli-law negligence claim.

Dr. Shnoor acknowledges that Plaintiffs' breach-of-statutory-duty claim (Fourth Count) cannot be based on a violation of Section 2332d or 31 C.F.R. Part 596—the only statutes that Plaintiffs mention in the FAC. (Shnoor Decl. ¶ 44.) But he claims that Plaintiffs have stated a claim based on a purported violation of Israel's "Trading with the Enemy Ordinance - 1939," even though the FAC never mentions that statute. According to Dr. Shnoor, the "Trading with the Enemy Ordinance" is implicit within the FAC's allegation in paragraph 170 that the "statutory obligations breached by defendant UBS include, *without limitation* ...." (*Id.* ¶¶ 45-46.) This turns the federal pleading standard on its head. A complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 127 S. Ct. at 1964 (citation omitted). The FAC's catch-all "without limitation" language plainly does not give UBS fair notice that the Fourth Count rests upon a violation of a 1939 law from the British Mandate of Palestine. Dr. Shnoor's argument is, at best, an improper attempt to amend the FAC; at worst, it is frivolous. Plaintiffs' breach-of-statutory-duty claim should be dismissed

14

Plaintiffs' Israeli-law aiding-and-abetting claim (Fifth Count) fails because the FAC does not allege that UBS knew that the U.S. banknote transactions would assist Hamas and Hizbollah. (UBS Br. at 30-31.)  Even if Dr. Shnoor were correct that assistance to Iran is sufficient to state a claim under CWO § 12 (Shnoor Decl. ¶¶ 60-61), Plaintiffs' pleading would still be inadequate because, as discussed previously, they cannot plausibly allege that UBS was aware that the U.S. banknote transactions would result in terrorist attacks in Israel.

## CONCLUSION

Plaintiffs' brief confirms that the FAC is a lawyer's theoretical construct in search of a factual basis—a cynical attempt to use the ATA's treble damages and attorneys' fees provisions to extract a settlement by associating a contract breach with terrorist acts that occurred during roughly the same period and beyond.  As demonstrated above, and in UBS's opening brief, Plaintiffs do not have standing to assert personal injury claims based on the U.S. banknote transactions.  Moreover, they do not adequately allege any, let alone all, of an aiding-and-abetting claim's elements under the ATA or customary international law.  And the customary international law claim is preempted by the ATA.  The Court should decline to exercise supplemental jurisdiction over the CWO claims, which are substantively deficient and largely time-barred in any event.

Accordingly, UBS respectfully requests that the Court dismiss the FAC with prejudice.

15

Dated: New York, New York
    October 10, 2008

O'MELVENY & MYERS LLP

By

Jonathan Rosenberg
Daniel L. Cantor

Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000
jrosenberg@omm.com
dcantor@omm.com

Attorneys for Defendant UBS AG

16