UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
RACHEL ROTHSTEIN, et al.,          :
                                    :
            Plaintiffs,             :     08 Civ. 4414 (JSR)
                                    :
        -v-                         :
                                    :     MEMORANDUM ORDER
UBS AG,                             :
                                    :
            Defendant.              :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

     In an Opinion and Order dated August 23, 2009, this Court granted defendant's motion to dismiss plaintiffs' claims that defendant UBS AG ("UBS") aided and abetted international terrorism and aided and abetted violations of customary international law. See Rothstein v. UBS AG, 647 F. Supp. 2d 292, 293 (S.D.N.Y. 2009). Plaintiffs filed a notice of appeal on September 29, 2009, and, while the appeal was pending, the Supreme Court issued a decision in Holder v. Humanitarian Law Project, 130 S. Ct. 2705 (2010). Finding that "[i]t may be that the holding in Humanitarian Law Project bears on the resolution of this case," the Second Circuit remanded the action on August 26, 2010 for reconsideration in light of the Supreme Court's decision. See Rothstein v. UBS AG, No. 09-4108-cv (2d Cir. August 26, 2010) ("Remand Order") at 3. Pursuant to the Remand Order, the Court directed the parties to file supplemental briefs addressing the issue, and subsequently heard oral argument on October 28, 2010. After careful consideration, the Court finds that Humanitarian Law Project does not change the outcome of the case.

The Court's original decision to dismiss the Complaint is therefore re-affirmed. In addition, plaintiffs' unsolicited motion on remand to again amend the Complaint is denied.

As explained in the Court's prior decision, plaintiffs are forty-five victims and/or families of victims injured or killed in six Hamas and Hezbollah attacks in Israel between 1997 and 2006. Rothstein, 647 F. Supp. 2d at 293. In their First Amended Complaint ("Complaint"), dated August 7, 2008, plaintiffs claim that although UBS had no direct involvement in these attacks, it indirectly assisted the Government of Iran in financially supporting Hamas and Hezbollah. Id. Consequently, plaintiffs contend that UBS is liable to plaintiffs for compensatory and punitive damages pursuant to 18 U.S.C. § 2333 of the Antiterrorism Act ("ATA") (Count One) and under customary international law (Count Two).[1] Id.

The Court dismissed plaintiffs' Complaint for two principal reasons. First, it held that plaintiffs lacked standing to pursue their claims, as the "extended chain of inferences" set forth in the Complaint was "far too attenuated" to satisfy federal standing requirements. Rothstein at 294. At a minimum, plaintiffs were required to allege facts demonstrating "a proximate causal relationship between UBS's transfer of funds to Iran and Hamas' and

---

[1] Plaintiffs had previously withdrawn their other claims, which were for negligence under Israeli law (Count Three), breach of statutory duty under Israeli law (Count Four), and aiding and abetting these violations under Israeli law (Count Five). Rothstein, 647 F. Supp. at 293 n.1.

2

Hezbollah's commission of the terrorist acts that caused plaintiffs' injuries," and this they failed to do. Id.

Second, the Court held that neither of the remaining claims stated a claim as a matter of law. Id. at 294-95. Count One was brought under the private right of action provision of the ATA, which provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States . . . ." 18 U.S.C. § 2333(a) (emphasis supplied). The Court explained that the "by reason of" language has typically been construed to be synonymous with proximate cause -- and proximate cause narrowly defined at that[2] -- and determined that "[i]f the allegations here are so speculative and attenuated as to deprive plaintiffs of standing, it follows a fortiori that they fail to adequately plead causation." Id. at 295.

Moreover, even assuming that a defendant in a private action brought under ATA can be held liable on an aiding and abetting theory -- a proposition questioned in Boim v. Holy Land Foundation for Relief and Development, 549 F.3d 685, 689 (7th Cir. 2008) ("Boim III")[3] -- the Court concluded that such a theory would require

---

[2] See, e.g., McBrearty v. Vanguard Group, Inc., 353 Fed. Appx. 640 (2d Cir. 2009).

[3] "[S]tatutory silence on the subject of secondary liability means that there is none; and section 2333(a) . . . does not mention aiders and abettors or other secondary actors . . . ."

3

"adequate allegations that the defendant not only knew that its funds would be used to sponsor terrorist acts by Hamas and Hezbollah, but also intended to do so." Id. (citing Boim v. Quaranic Literacy Institute and Holy Land Foundation for Relief and Development, 291 F.3d 1000, 1023 (7th Cir. 2002) ("Boim I"); Boim v. Holy Land Foundation for Relief and Development, 511 F.3d 707, 716 (7th Cir. 2007) ("Boim II")). Plaintiffs, however, made no such allegations in the Complaint.

Finally, the Court addressed the second cause of action, for aiding and abetting violations under customary international law, and determined that this claim was preempted by the first. Id. at 296.

With this background in mind, the Court now turns to the potential impact, if any, of Holder v. Humanitarian Law Project, 130 S. Ct. 2705 (2010), on the above conclusions. The plaintiffs in Humanitarian Law Project wished to provide support to two groups – the Kurdistan Workers' Party and the Liberation Tigers of Tamil Eelam – designated by the Secretary of State as foreign terrorist organizations ("FTO"s). Plaintiffs claimed that they sought to facilitate only the groups' lawful, nonviolent purposes. They were prevented from pursuing their purportedly humanitarian aims, however, by 18 U.S.C. § 2339(B)(a)(1), which provides the following:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall

---

Boim III, 549 F.3d at 689.

4

> be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

The term "material support or resources" is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(1).

Plaintiffs challenged Section 2339B's prohibition of the following four types of "material support": "training," "expert advice or assistance," "service," and "personnel." Humanitarian Law Project, 130 S. Ct. at 2716. They raised three constitutional claims, arguing that Section 2339B: (1) violates the Due Process Clause of the Fifth Amendment because the four statutory terms are impermissibly vague; (2) violates freedom of speech under the First Amendment; and (3) violates the First Amendment freedom of Association. Id.

In addressing these claims, the Supreme Court first clarified the mental state contemplated by the statute:

5

> Section 2339B(a)(1) prohibits "knowingly" providing material support. It then specifically describes the type of knowledge that is required: 'To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . ., that the organization has engaged or engages in terrorist activity . . ., or that the organization has engaged or engages in terrorism." Ibid. Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities.

Id. at 2717. The Court further explained that the sections immediately surrounding Section 2339B support this interpretation, as both refer to <u>intent</u> to further terrorist activity, rather than <u>knowledge</u>, thus highlighting that Congress meant something less than specific intent when it used the term "knowingly" in Section 2339B. Id. at 2717-18.

The Court then turned to the constitutional challenges, holding that "the statutory terms are clear in their application to plaintiffs' proposed conduct, which means that the plaintiffs' vagueness challenge must fail." Id. at 2720. The Court also rejected the claim that the statute violates plaintiffs' freedom of speech, holding that, "in prohibiting the particular forms of support that plaintiffs seek to provide to foreign terrorist groups, § 2339B does not violate the freedom of speech." Id. at 2730. In reaching this determination, the Court rejected the argument that the terrorist and peaceful activities of a terrorist organization could be segregated, pointing to Congress's finding that "foreign organizations that engage in terrorist activity are so tainted by

6

their criminal conduct that any contribution to such an organization facilitates that conduct." Id. at 2712, 2724 (quoting the Antiterrorism and Effective Death Penalty Act of 1996 § 301(a)(7), 110 Stat. 1247). Finally, the Court rejected plaintiffs' freedom of association claim, holding that "the statute does not penalize mere association with a foreign terrorist organization." Humanitarian Law Project, 130 S. Ct. at 2730.

In remanding the Rothstein case to this Court in light of the Supreme Court's decision in Humanitarian Law Project, the Second Circuit recognized that Humanitarian Law Project "was in a different posture and addressed a different statutory provision than this case." Remand Order at 2. However, the Second Circuit pointed to the following aspects of the Supreme Court decision as potentially bearing on the issues in Rothstein: (1) the Court's rejection of the argument that the terrorist and peaceful activities of a terrorist organization could be segregated; (2) the Court's rejection of the contention that the Government was required to offer proof, through specific facts and evidence, that the plaintiffs' proposed activities would support terrorist attacks; and (3) the Court's determination that only knowledge of an organization's connection to terrorism is necessary, and that no specific intent to further the organization's terrorist activities is required. Id. at 2-3.

As the Second Circuit suggested, there are several obvious and potentially dispositive differences between Humanitarian Law Project

7

and Rothstein.  To begin with, Humanitarian Law Project does not address Article III standing, a central component of the Court's Rothstein decision.  This is especially important as Article III "requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999).  Indeed, no statute could cure plaintiffs' standing deficiencies, as Congress cannot "abrogate the Art. III minima."  Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 100 (1979).  Thus, neither 18 U.S.C. § 2339(B)(a)(1) nor the Supreme Court's interpretation thereof alters in any way plaintiffs' obligation to satisfy the "fairly traceable" prong of the standing inquiry, which requires them to plausibly plead that a defendant's alleged actions "materially increase[d] the probability of injury."  Huddy v. F.C.C., 236 F.3d 720, 722 (D.C. Cir. 2001).

Similarly, Humanitarian Law Project does not address Section 2333(a)'s proximate causation requirement.  Section 2333 is a remedial civil statute that provides compensation to victims who demonstrate they were injured "by reason of" an act of international terrorism.  As such, establishing a proximate causal relationship between the defendant's conduct and the plaintiff's injuries is an indispensable element of a Section 2333(a) civil damages claim.  By contrast, Section 2339 is a purely criminal measure that has no causation element, see Humanitarian Law Project, 130 S. Ct. at 2728

8

(Section 2339B "is, on its face, a preventive measure"), and all that is needed to sustain a Section 2339B prosecution is proof that the defendant knowingly engaged in prohibited conduct. Accordingly, any potential connection between <u>Humanitarian Law Project</u>'s analysis of Section 2339B and this Court's analysis of Section 2333's proximate causation element would appear to be strained at best and more likely irrelevant.

Additionally, <u>Humanitarian Law Project</u> addressed different conduct than that at issue in <u>Rothstein</u>. In <u>Humanitarian Law Project</u>, the Supreme Court considered plaintiffs' proposed support of two "foreign terrorist organizations." This term is specifically defined in 8 U.S.C. § 1189, and, in accordance with that law, the names of all organizations receiving this designation are published in the federal register. The Complaint in this case, however, does not allege that UBS provided direct support to an FTO; rather, it alleges that UBS engaged in currency transactions with "Iran and . . . Iranian Government Organs." Compl. ¶ 137. Neither Iran nor the "Iranian Government Organs" are alleged to be FTOs, and Iran itself is definitively not an FTO but rather a "state sponsor of terrorism." <u>See</u> 50 U.S.C. App. § 2405(j). This is an important distinction, as the Supreme Court's finding that FTOs "are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct," <u>Humanitarian Law Project</u>, 130 S. Ct. at 2724, is specific to FTOs. Such a finding does not necessarily, or

9

even probably, apply to state sponsors of terrorism. Congressional policy determinations are likely to be quite different with respect to the two entities, as reflected by the fact that 50 U.S.C. App. § 2405(j)(1) permits certain transactions with state sponsors of terrorism as long as a valid license is obtained. It thus appears highly unlikely that the same stringent prohibitions on providing material support to FTOs apply with equal force to state sponsors of terrorism, with whom lawful contact is permitted.

Finally, whereas this Court's prior discussion of intent in Rothstein addressed this element in terms of the traditional knowledge and intent requirements of aiding-and-abetting liability, the Supreme Court's construction of the scienter requirements of Section 2339B was expressly limited to that statute. Indeed, in this regard, the Humanitarian Law Project Court explicitly contrasted Section 2339B with the "sections immediately surrounding" Section 2339B (i.e., Sections 2339A and 2339C), which, like Section 2333(a), expressly require intent. Humanitarian Law Project, 130 S. Ct. at 2717-18 ("Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities."). The Court's narrow focus on the specific text of Section 2339B, in explicit contrast to other sections of the ATA, demonstrates that the Supreme Court's discussion of intent does not apply any further than Section 2339B.

All that being said, however, the aforementioned distinctions were arguably apparent to the Second Circuit when it issued the Remand Order. The Court infers, therefore, that the Second Circuit hypothesized that <u>Humanitarian Law Project</u> might have broader implications than those apparent on the face of the decision. Accordingly, the Court considers below the broadest possible implications of the <u>Humanitarian Law Project</u> to determine whether they alter the Court's original analysis in <u>Rothstein</u>.

To help define the contours of those potential implications, the Court looks to the arguments offered by plaintiffs in their supplemental briefs. Plaintiffs first argue that <u>Humanitarian Law Project</u> "established that providing any material support to a designated terrorist entity furthers international terrorism as a matter of law." Pls.' Mem. at 3. The Supreme Court stated that "[m]oney is fungible," and noted that even money given to terrorist groups for purportedly legitimate purposes can be "redirected to funding the group's violent activities." <u>Humanitarian Law Project</u>, 130 S. Ct. at 2729. The Court also concluded that the Government was not required to provide "specific facts" or "specific evidence" that plaintiffs' proposed activities would support terrorist attacks; it explained that "[t]he Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before [the Court grants] weight to its empirical conclusions." <u>Id.</u>

11

at 2727-28. Applying this reasoning, plaintiffs contend that, after Humanitarian Law Project, "money that is provided to a terrorist entity can be presumed to have furthered the entity's terrorist-supporting activities," even without specific evidence. Pls.' Mem. at 3.

Plaintiffs argue that these broad principles can be applied to cure the defects the Court previously identified regarding standing and proximate causation. With regards to standing, plaintiffs contend the Supreme Court has definitively concluded that unlawful aid to terrorists "makes [terrorist] attacks more likely to occur." Pls.' Reply at 1-2 (quoting Humanitarian Law Project, 130 S. Ct. at 2728) (plaintiffs' supplied emphasis removed). Accordingly, they argue, it is now clear that the injuries plaintiffs suffered in the terrorist attacks are "fairly traceable" to UBS's financial transactions. Plaintiffs contend that the same reasoning supports the conclusion that they have sufficiently alleged proximate causation. Id. at 4. They analogize their case to cases involving toxic torts in which "the requirement of proving causation is relaxed because otherwise there would be a wrong and an injury but no remedy because the court would be unable to determine which wrongdoer inflicted the injury." Id. at 6 (quoting Boim III, 549 F.3d 685, 696-97.) Similarly, since the Supreme Court has concluded that providing funds to terrorists increases the risk that terrorist attacks will occur, plaintiffs argue there is a clear wrong that must be

redressed. Accordingly, they maintain that the causation requirements should be relaxed, because otherwise there would be a wrong without a remedy, as it is difficult, if not impossible, to determine which financial contributions caused the harm. Id. at 6-7. Plaintiffs also assert that "ATA's proximate cause requirement is governed by congressional intent," and that Congress's intent in enacting ATA was that "the imposition of liability along the causal chain of terrorism . . . would interrupt, or at least, imperil, the flow of money." Id. at 3-4 (quoting S. Rep. No. 102-342, 1992 WL 187372).

The Court has given careful thought to these arguments. However, the Court declines to stretch the dicta of Humanitarian Law Project this far. To do so would strain the traditional principles of Article III standing and proximate causation beyond their breaking point, creating a dangerous precedent that even the most remote and tenuous connections to organizations with some undefined relationship to undefined terrorist groups could subject potential defendants to ATA liability.[4] The Court does not believe that the Court in Humanitarian Law Project somehow intended to silently alter traditional Article III standing requirements or well-established definitions of the concept of proximate causation that serve as a limit on who may be held liable for what actions. Neither Article

---

[4] By contrast, the Supreme Court's unwillingness to require specific facts to sustain a Section 2339 prosecution was largely premised on its deference to the Government on issues of national security. Humanitarian Law Project, 130 S. Ct. at 2727.

III standing nor proximate causation was at issue in <u>Humanitarian Law Project</u>, for the simple reason that they are never at issue in a criminal case. By contrast, they are the <u>sine qua non</u> of every private civil action brought in a federal court. Accordingly, the Court concludes that applying the dicta of <u>Humanitarian Law Project</u> outside its criminal context would be like applying the rules of hockey to a game of lacrosse, on the theory that they both involve big sticks.

The Court has considered plaintiffs' other arguments and finds them without merit.[5] Accordingly, the Court's prior decision in <u>Rothstein v. UBS AG</u>, 647 F. Supp. 2d 292 (S.D.N.Y. 2009) is hereby re-affirmed.

The final issue pending before the Court is plaintiffs' motion to amend the Complaint. Such a motion is entirely inappropriate on this remand. Before plaintiffs can file an amended complaint after a case has been dismissed with prejudice, they "must first have the judgment vacated or set aside pursuant to Fed R. Civ. P. 59(e) or 60(b)." <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 191 (2d Cir. 2008); <u>Nat'l Petrochemical Co. v. The MT Stolt Sheaf</u>, 930 F.2d 240,

---

[5] In particular, plaintiffs devote a large amount of their supplemental briefing to analyzing <u>Boim v. Holy Land Foundation for Relief and Development</u>, 549 F.3d 685 (7th Cir. 2008) ("<u>Boim III</u>"). This is not proper on remand, as this case was before the Court when <u>Rothstein</u> was decided (indeed, it was specifically cited by the Court, see <u>Rothstein</u>, 647 F. Supp. 2d at 295 n.2), and was not mentioned in the Second Circuit's Remand Order. Nonetheless, the Court has considered plaintiffs' arguments, but concludes that nothing in <u>Boim III</u> changes the Court's analysis or decision.

245 (2d Cir. 1991) ("Unless there is a valid basis to vacate the previously entered judgment, it would be contradictory to entertain a motion to amend the complaint.")  The Court's Rothstein judgment, however, has not been vacated, altered, or amended; nor does the Remand Order cast doubt on its validity.  Moreover, the plaintiffs are barred from seeking relief under Rule 59(e) because they did not make a motion within twenty-eight days of the Judgment's entry.  Plaintiffs are similarly time-barred from seeking relief under Rules 60(b)(1), (2) or (3) because it has been more than a year since the Judgment was entered.  Fed. R. Civ. P. 60(c)(1).  Additionally, plaintiffs cannot in good faith claim that the Judgment is void; that it has been satisfied, released or discharged; that it was based on an earlier judgment that has been reversed or vacated; or that it is no longer equitable to apply it prospectively.  See Rules 60(b)(4) and (b)(5)).

Thus, plaintiffs must rely on Rule 60(b)(6)'s catch-all provision, which allows relief from a final judgment for "any other reason that justifies relief."  But Rule 60(b)(6) is "properly invoked only when there are extraordinary circumstances justifying relief or when the judgment may work an extreme and undue hardship." Mendes Junior Int'l Co. v. Banco Do Brasil S.A., 09-3478-cv, 2010 U.S. App. LEXIS 20362, at **3-4 (2d Cir. Oct. 1, 2010) (internal quotation marks and citations omitted).  There are no such circumstances in this case.

Accordingly, plaintiffs' motion to amend the Complaint is denied and the Court, on remand, re-affirms its original judgment dismissing the Complaint.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:   New York, New York
         December 30, 2010